UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CLARENCE R. COLLINS, JR., et al.<br><br>Plaintiffs,<br><br>v.<br><br>OLIN CORPORATION and the TOWN OF HAMDEN,<br><br>Defendants. | CIVIL ACTION NO.: 3-03-945 (CFD)<br><br><br><br><br><br><br><br>OCTOBER 27, 2003 |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
MOTIONS TO DISMISS FILED BY DEFENDANTS
TOWN OF HAMDEN AND OLIN CORPORATION**

*For the Plaintiffs:*

David B. Zabel, Esq. ct01382
dzabel@cohenandwolf.com
Monte E. Frank, Esq. ct13666
mfrank@cohenandwolf.com
Cohen and Wolf, PC
1115 Broad Street
Bridgeport, Connecticut 06604
Tele:  (203) 368-0211
Fax:   (203) 394-9901

Mark Roberts, Esq.
mroberts@mcrobertsandroberts.com
McRoberts & Roberts, LLP
101 Merrimac Street
Boston, Massachusetts 02114
Tele: (617) 722-8222
Fax:  (617) 720-2320

Neil T. Leifer, Esq.
nleifer@tenlaw.com
David C. Strouss, Esq.
dstrouss@tenlaw.com
Thornton & Naumes L.L.P
100 Summer Street, 30th Floor
Boston, Massachusetts 02110
Tele: (617) 720-1333

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .........................………………………………….. 1

FACTS………………………………………………………………………………. 1

LEGAL ARGUMENT………………………………………………………………. 3

    I.       STANDARD OF REVIEW ……………………………………………… 3

    II.      PLAINTIFFS SUFFICIENTLY ALLEGE A CAUSE OF
           ACTION IN NEGLIGENCE AGAINST OLIN AND HAMDEN………. 4

            A.     The Amended Complaint alleges specific facts, that Olin knew
                   or should have known that the land upon which it was disposing
                   of waste containing lead, arsenic and other obvious poisons
                   would be used to develop residential housing which establishes
                   a legal duty that gives rise to a cause of action in negligence ............ 4

                  1.     A manufacturer in Olin's position, knowing what Olin
                           knew or should have known, would have anticipated that
                           harm of the general nature suffered was likely to result ......... 6

                  2.     The fundamental public policy underlying Connecticut
                           environmental law dictates that Olin be held
                           responsible for the harms suffered by Plaintiffs .................... 8

                  3.     With respect to corporate liability, the *Vaillancourt*
                           case can be distinguished and Olin's reliance upon
                           it is misplaced ................................. ........................... .......... 9

            B.     The Amended Complaint alleges specific facts that Hamden knew
                     or should have known that-the land upon which it arranged for
                     the disposal of waste containing well-known poisons would be
                     used to develop residential housing is sufficient to establish
                     a legal duty that gives rise to a cause of action in negligence ............ 11

            C.     The Amended Complaint sufficiently alleges misconduct by
                     Olin and Hamden to state a claim for reckless conduct . .. ... ……... 13

            D.     Olin and Hamden have violated both Connecticut environmental
                     statutes as well as provisions of CERCLA and therefore Plaintiffs
                     have stated causes of action under negligence per se . ... ... . ... .. . ... 14

i

III.  OLIN'S AND HAMDEN'S ACTIONS CONSTITUTE BOTH
      NEGLIGENT AND INTENTIONAL INFLICTION OF
      EMOTIONAL DISTRESS…………………………………            19

      A.    Olin and Hamden mischaracterize the Amended Complaint and,
            so doing, did not move to dismiss plaintiffs' claims for
            negligent infliction of emotional distress .................……       19

      B.    Defendants' disposal of hazardous materials and chemicals for
            decades knowing houses were being build on the dumps
            constitutes extreme and outrageous conduct supporting Plaintiffs'
            claim of intentional infliction of emotional distress ……………     21

IV.   OLIN'S AND HAMDEN'S JOINT VENTURE TO USE INDUSTRIAL
      WASTES FOR FILL UNDER RESIDENTIAL DWELLINGS CREATED
      BOTH PUBLIC AND PRIVATE NUISANCES…………………..            23

      A.    Olin's and Hamden's joint actions have created private nuisances
            affecting each of the Plaintiffs………………………..            23

            1.    Private nuisance against Olin……………………            24

            2.    Private nuisance against Hamden…………………            25

      B.    Defendants' creation of toxic industrial waste dumps underlying
            a residential neighborhood constitute an actionable public
            nuisance………………………………………            26

      C.    Plaintiffs allege that Olin maintained control over the handling,
            disposal, and release of hazardous substances that caused the
            nuisance………………………………………            29

V.    CONNECTICUT COURTS HAVE HELD THAT THE DISPOSAL OF
      HAZARDOUS WASTE CONSTITUTES AN ABNORMALLY
      DANGEROUS ACTIVITY FOR PURPOSES OF
      STRICT LIABILITY………………………………            32

VI.   THE AMENDED COMPLAINT SUFFICIENTLY ALLEGES A
      CAUSE OF ACTION FOR REIMBURSEMENT UNDER
      CONN. GEN. STAT. § 22A-452……………………………            38

VII.  THE DOCTRINE OF PRIMARY JURISDICTION DOES NOT
      PROVIDE A BASIS TO DISMISS COUNTS V, VI AND XV………            39

      A.    The doctrine of primary jurisdiction does not apply…………            39

B.    Even if the court applies the doctrine of primary jurisdiction, the proper remedy is to hold plaintiffs' claims for injunctive relief in abeyance, not to dismiss them...........................    44

C.    Burford abstention does not apply...........................    44

VIII.    AS HAMDEN'S ACTS WERE PROPRIETARY, IT CANNOT SHIRK ITS RESPONSIBILITY TO PLAINTIFFS BY CLAIMING SOVEREIGN IMMUNITY....................................    46

A.    Governmental immunity does not extend to proprietary acts......    47

B.    Whether Hamden acted in a governmental or proprietary manner is a question of fact, and is inappropriate for disposition on a 12(b)(6) motion....................................    50

XI.    HAMDEN'S MOTION TO DISMISS COUNTS II, IV, VII, X AND XII ON GROUNDS OF STATUTE OF LIMITATIONS SHOULD BE DENIED BASED ON THE ALLEGATIONS CONTAINED WITHIN THE FOUR CORNERS OF THE AMENDED COMPLAINT...........    51

A.    A determination of whether the statute of limitations has run with respect to certain counts in this case is a pure questions of fact, and cannot be dismissed on a 12(b)(6) motion.............    51

B.    Connecticut courts apply §52-577c(b) to claims of property damage based upon contamination by hazardous substances.......    53

C.    The Amended Complaint sufficiently alleges acts within the statute of limitations period to withstand a motion to dismiss for failure to state a claim...............................    54

CONCLUSION............................................................    58

## PRELIMINARY STATEMENT

The Plaintiffs bring this complaint[1], for themselves and on behalf of a class of similarly situated property owners[2] in the Newhall section of Hamden, Connecticut (collectively referred to as "Plaintiffs") seeking damages against Olin Corporation ("Olin") and the Town of Hamden ("Hamden")(collectively, Olin and Hamden are referred to as "Defendants") for response costs, the diminution in the value of their properties, loss of use and enjoyment of their properties and emotional distress, resulting from Defendants' contamination of their properties. Plaintiffs also seek a mandatory injunction compelling Defendants to conduct, on an expedited basis, any and all response actions necessary to investigate and remediate the contamination on their properties. Olin and Hamden filed a "kitchen-sink" set of motions pursuant to Fed.R.Civ.P 12(b)(6) seeking to dismiss the majority of Plaintiffs' claims.  Because Defendants' motions overlap considerably, Plaintiffs address all the motions and arguments raised by Defendants in this Memorandum.[3]

## FACTS

Olin is the successor in interest to Winchester Repeating Arms Company ("Winchester")(*See* Amended Complaint at ¶7).  Winchester was founded in New Haven, Connecticut in 1866 and was in the business of small arms and ammunition manufacturing. (¶8). Winchester's business grew steadily and the New Haven plant expanded to cover over 80 acres. (¶10).  In approximately 1919, Winchester expanded its manufacturing and product distribution, putting the well-known Winchester brand on everything from tools and sporting goods to house wares, such as batteries, refrigerators and hardware items. (¶12).  In 1931, Olin purchased

---

[1] Plaintiffs served Olin and Hamden with a writ, summons and complaint on May 2, 2003, made returnable to the Superior Court for the Judicial District of New Haven.  Hamden, with Olin's consent, removed the case to the United States District Court on May 28, 2003.  On that same day, Plaintiffs filed their Amended Complaint (the "Amended Complaint").
[2] Plaintiffs filed their Motion for Class Certification on September 30, 2003.  That motion is pending.

Winchester and continued its operations[4] (¶¶17, 18, 19), which produced a substantial quantity of industrial waste containing hazardous substances including but not limited to lead, arsenic, semi-volatile organic compounds (SVOCs) and polyaromatic hydrocarbons (PAHs).  (¶38).  The waste contained substances that were well-known poisons at all relevant times.

As early as 1915, Hamden entered into a joint venture with Olin which lasted for decades whereby Hamden solicited owners of private properties in the Newhall Section of Hamden (the "Newhall Section")[5] to allow industrial waste from Olin to be dumped as "fill" onto their properties.  (¶21).  Olin and Hamden cooperated in the disposal of Olin's toxic industrial waste in the Newhall Section from 1915 until the 1950's. (¶¶ 23, 24).  Beginning in approximately 1920, and continuing for decades, portions of the privately owned property used by Olin and Hamden for disposal were developed into residential properties. (¶25).  Olin and Hamden were aware that after each dump in the Newhall Section was closed for disposal, residential structures were constructed **on** the former dumpsites. (¶¶ 26, 49, 54).  The development of the residential dwellings increased Hamden's population and tax base.

During 2000 and early 2001, the United States Environmental Protection Agency ("USEPA") conducted studies that discovered that wastes including hazardous substances from historical firearm, ammunition and battery manufacturing operations had been disposed of on publicly owned lands that border the residential areas in the Newhall Section. (¶27).  Thereafter, USEPA conducted some limited testing of a portion of the yards of private homes,[6] and sent test

---

[3] On August 28, 2003, the Court granted Plaintiffs' motion to file an opposition brief in excess of forty pages, but, in doing so, limited the response to sixty pages.

[4] Olin and its predecessors in interest are hereinafter collectively referred to as "Olin".

[5] The Newhall Section is generally defined in ¶22 of the Amended Complaint, and, more specifically, in the Consent Order which was submitted to the Court as part of the the parties' Rule 26(f) Report and the map from the Consent Order which was affixed to the Amended Complant as Exhibit A.

[6] In or about April 2001, USEPA conducted surficial soil sampling on 76 private properties in the Newhall Section and analyzed these samples for a variety of contaminants including lead, arsenic, SVOCs and PAHs.  (¶29).  All  of

results to the individual property owners on May 29, 2001 or shortly thereafter. (¶32). USEPA carried out "time-critical removal actions" at 13 of the properties, removing soil down to 18 inches or greater and replacing it with clean fill. (¶33). During this limited excavation program, waste materials related to Olin's firearms, ammunition and battery production were found throughout the Newhall Section. (¶34). In or about December 2002, consultants for Olin reported that analyses of fill in the Newhall Section consistently contained concentrations of the same types of hazardous substances, including but not limited to lead, arsenic, SVOCs and PAHs. (¶38).

## ARGUMENT

### I.    Standard of Review

Dismissal for failure to state a claim under Fed.R.Civ.P. 12(b)(6) is only proper when it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Conley v. Gibson*, 355 U.S. 41, 46 (1957). When the court reviews a claim with respect to a Rule 12(b)(6) motion to dismiss, the court must construe the complaint in the light most favorable to the non-moving party, accepting as true all factual allegations contained in the complaint. *Harsco Corp. v. Segui*, 91 F.3d 337, 341 (2d Cir. 1996).[7] Moreover, the court must draw all inferences in a light most favorable to the plaintiff. *Bello v. Barden Corp.*, 180 F. Supp. 2d 300, 305 (D. Conn. 2002), *citing Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). Dismissal is warranted only if, under any set of facts that the plaintiff can prove

---

the properties tested were found to be affected by similar types of hazardous substances. Over 25% of these samples contained concentrations which exceeded acceptable state standards for residential property soils. (¶30) Approximately 10% of the collected samples exceeded the "action level" developed by USEPA and the Connecticut Department of Environmental Protection ("CTDEP").

[7] The Federal Rules of Civil Procedure require only notice pleading, or "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[T]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim." *Conley*, 355 U.S. at 47. The

consistent with the allegations, it is clear that no relief can be granted. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). *See also Conley*, 355 U.S. at 45; *Frasier v. General Electric Co.*, 930 F.2d 1004, 1007 (2d Cir. 1991). "The issue on a motion to dismiss is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his or her claim." *U.S. v. Yale New Haven Hosp.*, 727 F. Supp. 784, 786 (D. Conn. 1990), *citing Scheuer*, 416 U.S. at 232. Finally, '[t]he modern trend is to read the pleadings broadly and realistically rather than technically." *DeMartin v. Yale-New Haven Hospital*, 4 Conn. App. 387, 390, *cert. denied*, 197 Conn. 813, 499 A.2d 62 (1985). *See also Comm. Union Ins. Co. v. Frank Perrotti and Sons, Inc.*, 20 Conn. App. 253, 257 (1989).

## II. PLAINTIFFS SUFFICIENTLY ALLEGE A CAUSE OF ACTION IN NEGLIGENCE AGAINST OLIN AND HAMDEN

### A. The Amended Complaint alleges specific facts, that Olin knew or should have known that the land upon which it was disposing of waste containing lead, arsenic and other obvious poisons would be used to develop residential housing which establishes a legal duty that gives rise to a cause of action in negligence.

A duty to use care may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered by Plaintiffs was likely to result from his act or failure. *See, e.g.*, *Coburn v. Lenox Homes, Inc.*, 173 Conn. 567, 575 (1977); *Neal v. Shiels, Inc.*, 166 Conn. 3, 12 (1974).

> The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised ...By that is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury which resulted was foreseeable, but the test is, would the ordinary [person] in the defendant's position, knowing what he knew or should have known, with

---

plaintiff is merely required to give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. *Id.* *See also Bennett v. Schmidt*, 153 F.3d 516 (7th Cir. 1998)

> any specialized knowledge, anticipate that harm of the general nature of
> that suffered was likely to result.

*Frankovitch v. Burton*, 185 Conn. 14, 20 (1981). To meet the test of foreseeability, the exact

nature of the harm suffered need not have been foreseeable, only the general nature of the harm.

*See, e.g.*, *Jaworski v. Kiernan*, 241 Conn. 399, 406 (1997). In addition, a further inquiry must be

made as to whether under the fundamental policy of the law, the defendant's responsibility

should extend to such results.

Although Olin recognizes that in ruling on this Rule 12(b)(6) motion to dismiss, the

Court will "accept as true all factual allegations in the complaint and must draw inferences in a

light most favorable to the plaintiff," *Bello v. Barden Corp.*, 180 F. Supp. 2d 300, 305 (D. Conn.

2002), Olin ignores both the allegations in the Amended Complaint and the Rule's presumption

when it argues that Plaintiffs cannot plead a duty created by Olin's conduct which underlies this

count in negligence. Olin appears to argue that because its alleged conduct occurred more than

fifty years ago, it cannot, as a matter of law, owe any duty to Plaintiffs. Whether Olin's conduct

occurred fifty years ago or yesterday is irrelevant in determining whether it owed a legal duty

because of its conduct. "'[T]he test for the existence of a legal duty of care entails (1) a

determination of whether an ordinary person in the defendant's position, knowing what the

defendant knew or should have known, would anticipate that harm of the general nature suffered

was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether

the defendant's responsibility for its negligent conduct should extend to the particular

consequences or particular plaintiff in the case." *Lodge v. Arett Sales Corp.*, 246 Conn. 563, 572

(1998).

5

1.    A manufacturer in Olin's position, knowing what Olin knew or should have known, would have anticipated that harm of the general nature suffered was likely to result.

In *Coburn v. Lenox Homes, Inc.*, 186 Conn. 370 (1982), the plaintiffs, remote purchasers of property, brought suit under a claim of negligence against the original installer of a septic system. In analyzing the duty requirement of negligence, and specifically foreseeability, the court noted that in negligent construction, the plaintiff must prove that the defendant knew or should have known of the circumstances that would foreseeably result in the harm suffered…[and 'w]here there is a duty of finding out and knowing, negligent ignorance has the same effect in law as actual knowledge.'" *Coburn*, 186 Conn. at 624, *citing Lippitt v. Ashley*, 89 Conn. 451, 464 (1915) (internal quotations omitted). In *Coburn*, the court noted the defendant's claimed to have had no notice of subsurface soil, water and ledge rock conditions that would foreseeably result in the particular failure of the system as it had occurred. The Connecticut Supreme Court found that the trial court had properly found that the defendant should have known of these conditions. *Id.* The court further held that "[r]eliance upon the town's testing of the soil and approval of the septic system is relevant, but does not preclude the inference of negligence which may be drawn from actual or constructive notice of these substandard conditions…[f]rom notice of these substandard conditions, a duty to exercise due care arose. *Id.* at 379 (internal citations omitted).

In *Cadlerock Properties v. Schilberg*, 2000 WL 268548 (Conn. Super. Ct. 2000), plaintiffs, the owners of certain property sued the lessee of the prior owner of the property and the prior owner itself for claims under General Statutes §22a-452 and under common law negligence. The defendant lessees moved to strike the negligence claim on the basis of lack of duty. The defendant argued that the doctrine of forseeability of who may be harmed by a

negligent act was critical to plaintiffs maintaining the cause of action.  The defendant argued that

since it could not know who will eventually own the property, it could not foresee harm coming

to that person.  The court rejected these arguments and denied the motion to strike the negligence

claim, stating that:

> The defendant overlooks the fact that the harm is to the land.  This court
> cannot accept a proposition that the duty to not pollute occurs only to the
> benefit of the then land owner, as it may well appear foreseeable that the fact
> of pollution and its cause may well not surface until after the original owner
> transfers property to a subsequent purchaser…Here, the specific *risk* of the
> pollution from a damages/liability standpoint is that the owner, present or
> future, is going to be responsible for clean up when the pollution is then
> discovered, and this is completely foreseeable.

*Id.* at *2 (emphasis in original).

Thus, the question is simply whether Plaintiffs have alleged in the Amended Complaint

that it was reasonably foreseeable to Olin that the type of harm Plaintiffs allege to have suffered

was likely to result from its conduct so that Olin should be made to answer for its conduct.

Plaintiffs have alleged sufficient facts for the Court to find that Olin owed Plaintiffs a duty of

care, and therefore, Olin's Motion to Dismiss must be denied.  In the Amended Complaint,

Plaintiffs allege that as early as 1915 and for decades thereafter, Olin began disposing industrial

waste and ash in the Newhall Section which originated at Olin's manufacturing operation in New

Haven and included well known poisons such as lead and arsenic.  ¶¶8, 23, 29 & 30.  The

dumping of these poisons in the Newhall Section coincided with opening and closing of a

sequential series of landfills.  ¶¶ 24 & 25.  Olin was aware that after each dump in the Newhall

Section was closed for disposal, residential structures were constructed on the former dump sites.

¶ 26.  This practice continued for decades.

The foregoing facts, accepted as true for purposes of a Rule 12(b)(6) motion, clearly permit the finding that Olin owed a legal duty of reasonable care to Plaintiffs in light of its actual and constructive knowledge.  A reasonable jury could certainly find that an ordinary manufacturer in Olin's position, knowing what it knew or should have known about the dumping of materials containing hazardous substances and poisons such as lead and arsenic on land that was being developed for residential housing, should reasonably have foreseen that harm of the general nature of that suffered by Plaintiffs was likely to result.

>    2.    The fundamental public policy underlying Connecticut environmental law dictates that Olin be held responsible for the harms suffered by Plaintiffs.

After analysis of the foreseeability of harm, a court must make further inquiry into whether, under the fundamental policy of the law, the defendant's responsibility should extend to such results.  *R.K. Const., Inc. v. Fusco Corp.*, 231 Conn. 381, 386 (1994).  In the present case, the relevant public policy for the Court's consideration is that established under Connecticut's environmental statutes, which is set out in *Conn. Gen. Stat.* § 22a-1: "The policy of the state of Connecticut is to conserve, improve and protect its natural resources and environment and to control air, land and water pollution in order to enhance the health, safety and welfare of the people of the state."[8]  The Connecticut Supreme Court has stated that "[t]he finding of the general assembly as articulated in [General Statutes] § 22a-114 forcefully attributes the contamination of the water, soil and air of the state, threatening the health and safety of Connecticut citizens, to hazardous wastes."  *Circuit-Wise, Inc. v. Comm. of Revenue Svcs.*, 215

---

[8] Connecticut environmental statute declares it's own policy as follows:

> It is hereby found and declared that there is a public trust in the air, water and other natural resources of the state of Connecticut and that each person is entitled to the protection, preservation and enhancement of the same. It is further found and declared that it is in the public interest to provide all persons with an adequate remedy to protect the air, water and other natural resources from unreasonable pollution, impairment or destruction.

Conn. 292, 303 (1990). Courts have held that there is a 'strong policy in Connecticut against environmental contamination as expressed forcefully in Title 22a of the General Statutes." *Wiehl v. Dictaphone Co.*, 1998 WL 70585, *1 (Conn. Super. Ct. 1998).[9]  *See also Keeney v. Town of Old Saybrook*, 237 Conn. 135 (1996) ("[w]ithout deciding what the law of municipal liability may be in other contexts, in light of the strong public policy manifested by the environmental protection statutes, ... a municipality may be liable for a public nuisance that it intentionally creates through its prolonged and deliberate failure to abate that nuisance.")

In the present case, there is a strong public policy in favor of holding that Olin owed a duty to Plaintiffs.  Olin benefited from its ability to dispose of hazardous and toxic wastes on Plaintiffs' properties.  The unavoidable risk of harm that is inherent in these activities requires that the activities be carried on at Olin's peril, rather than at the expense of the innocent property owners who suffer as a result of it.  The environmental statutes of Connecticut were enacted to address just this sort of disposal of hazardous materials.  Accordingly, under the standard articulated in *Lodge*, the motion to dismiss this count should be denied.

> 3.    With respect to corporate liability, the *Vaillancourt* case can be distinguished and Olin's reliance on it is misplaced.

Notwithstanding the facts alleged in the Amended Complaint giving rise to duty and evidencing a colorable claim in negligence, Olin asks the Court to find no duty as a matter of law.  Its sole authority for that suggestion is *Vaillancourt v. Town of Southington*, 2002 WL 1293053 (Conn. Super. Ct. 2002), which is factually distinguishable on the issue of corporate negligence because, unlike the Amended Complaint herein, the plaintiffs in *Vaillancourt* did not allege that the corporate defendant, Pratt & Whitney, had reason to foresee that Southington

would later open the area for development. Olin contends that *Vaillancourt* requires a dismissal of the negligence count in this case. However, because it is factually distinguishable with respect to the acts of the corporate polluter, nothing in *Vaillancourt* compels that result.

As the trial court noted in *Vaillancourt*, "a person is required only to take precautions against those dangers that are *reasonably* foreseeable" and that "[t]he question of duty is always based on the then-existing circumstances." *Id.* at *3. Applying that rule, the trial court found that the complaint did not set forth any facts that would permit an inference that the defendant should have foreseen that the former landfill would be developed. In contrast, Plaintiffs have alleged that "Olin was aware that after each dump in the Newhall Section was closed for disposal, residential structures were constructed on the former dump sites." ¶ 26. This practice continued for decades and accepting the allegations as true, it was reasonable for Olin to foresee that dumping industrial waste containing lead, arsenic and other hazardous substances in these landfills could result in the harm suffered by Plaintiffs.

Similarly, Olin's contention that it could not have anticipated the harm caused by dumping waste containing, among other things, lead and arsenic because at the time of the dumping terms such as "hazardous waste" or "hazardous materials" had not yet been coined misses the point. Olin cannot seriously dispute that materials such as lead and arsenic were known poisons and their dangers were well documented in the scientific literature at the time of the dumping. That laws and regulations were later enacted that named these substances as "hazardous waste" or "hazardous material", does not mean that the well documented literature that existed at the time of the dumping must be ignored when the Court determines whether Olin owed a duty under the then-existing circumstances.

---

[9] In *Wiehl*, the court was required to balance the policies behind the environmental statutes with the policies

**B.    The Amended Complaint alleges specific facts that Hamden knew or should have known that the land upon which it arranged for the disposal of waste containing well-known poisons would be used to develop residential housing is sufficient to establish a legal duty that gives rise to a cause of action in negligence.**

The Amended Complaint sufficiently alleges a cause of action for negligence by Hamden.  As is the case for Olin, Hamden contends that it does not owe any duty to Plaintiffs and therefore cannot be liable to them in negligence.  However, a review of the allegations of the Amended Complaint make clear that Hamden knew that the lands upon which Hamden arranged for Olin to dispose industrial waste containing hazardous substances would be used for residential housing and therefore had a duty to take reasonable measures to determine that the fill was suitable.

The standard for determining an existence of a duty by Hamden is the same as the authorities cited above regarding Olin.  *See*, *Lodge*, 246 Conn. at 252.  Therefore, the issue before the Court is whether it was reasonably foreseeable to Hamden at the time of the events in question that the type of harm Plaintiffs alleged to have suffered was likely to result from Hamden's conduct so that it should be made to answer for that conduct.  Contrary to  Hamden's contention, it will not be scrutinized on the basis of "21st Century standards", but rather on what it knew or reasonably should have known at the time that it entered into and profited from the joint venture with Olin to arrange for Olin to dispose of its toxic industrial waste in the Newhall Section.  On the basis of that standard and knowledge available at that time, Hamden had a duty to determine whether Olin's toxic waste was suitable fill for a landfill that it intended to use for residential properties.

---

underlying the common law rule of *caveat emptor*. *Caveat emptor* is not pertinent to the case at bar.

The Amended Complaint sufficiently alleges facts upon which this Court can find a duty owed by Hamden to Plaintiffs.  First, with the exercise of reasonable care, Hamden knew or should have known that fill from Olin's facility would contain toxins such as lead and arsenic, which were well known poisons at the dawn of the 20th Century.  ¶¶ 8, 9 & 11.  Second, Hamden knew that areas into which Olin's waste was disposed would be developed for residential housing.  ¶25.  These two facts, which must be accepted as true for the purposes of this motion, are sufficient to establish a duty by Hamden with regard to the activities related to the development of hundreds of houses in the Newhall Section.  Thus Plaintiffs satisfy the first criterion set forth in *Lodge*, i.e. 'the existence of a legal duty of care entails a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature suffered was likely to result."  *Id.* at 572.

Hamden seems to argue that even if this general duty can be inferred, there is nothing connecting it to Plaintiffs who did not own the properties in question at the time of the dumping. As Hamden acknowledges in its papers, '[t]he nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual."  *Pantley v. Shop-Rite Supermarkets, Inc.*, 2000 WL 960934, *2 (Conn. Super. Ct. 2000).  In this case, as Plaintiffs explain in response to Hamden's contention that these claims are time-barred,[10] the presence of these hazardous substances on the properties was a latent defect, that was not discovered until recently and has harmed present landowners.  ¶29.  As Plaintiffs have alleged in the Amended Complaint, the foreseeability of harm allegedly caused by

---

[10] *See* Section IX.

Hamden's conduct and the reasonable duties flowing from it did not end with the first owners of that property, but continued until it was discovered.  ¶54.

Hamden also argues that it owed no duty as a matter of law because of public policy considerations.  *Lodge's* consideration of duty includes "a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case."  *Lodge*, 246 Conn. at 572.  Hamden argues that "the only foreseeable result of the Town's alleged conduct as  *a benefit, not harm* to its citizens."  Memorandum of Law at 26 (emphasis added).  Whatever salutary goal of filling wetlands to create land to develop residential housing exists does not as a matter of law relieve the town from making the most basic inquiry as to whether the fill is suitable for that purpose or contains no known poisons.  Such an inquiry would not have prevented the claimed benefit, i.e. filling wetlands, but would have resulted in obtaining fill from sources that did not contain poisons such as arsenic and lead.[11]

### C.    The Amended Complaint sufficiently alleges misconduct by Olin and Hamden to state a claim for reckless conduct.

This case concerns a joint venture by Olin and Hamden wherein a large neighborhood was developed on massive amounts of toxic industrial waste containing lead, arsenic and other toxins.  As set forth in the Amended Complaint, Hamden arranged for and profited from Olin's export of these wastes from its New Haven manufacturing plant to the Newhall Section to facilitate the construction of hundreds of residential homes.  ¶¶ 20-26.  The landfills were operated sequentially so that Hamden had actual knowledge that the areas where Olin dumped its industrial waste would be developed for residential uses.  ¶26.  As a result of that venture,

---

[11] Hamden may have been forced to pay for clean fill, instead of receiving a pecuniary benefit from Olin of free fill, notwithstanding the risks associated with using massive amounts of Olin's industrial wastes as fill.

Plaintiffs today live in homes built on a series of landfills contaminated with materials known to be poisons at the time of the disposal.  ¶¶29-31.

A cause of action for reckless conduct 'requires a conscious choice of a course of action either with knowledge of the serious dangers to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man …." *Warner v. Kedah Corp.*, 1995 WL 573828, *4 (Conn. Super. Ct. 1995).  As a manufacturer, Olin is presumed to know the nature of its manufacturing processes, which in this case includes the creation of wastes containing poisons such as lead and arsenic.  *Restatement (Third) of Torts: Products Liability, §2C, comment m.  See also Vassallo v. Baxter Healthcare Corp.*, 428 Mass. 1 (1998).  Olin's conscious choice to enter into a venture with Hamden to dump such wastes in the Newhall Section, despite its knowledge that homes would be built on the former landfills, was reckless. The allegations against Hamden and Olin, accepted as true, can be viewed as 'highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." *Dubay v. Irish*, 207 Conn. 518, 533 (1988).  Such a finding is sufficient to recover for reckless conduct under Connecticut law.  *Id.*

> **D.    Olin and Hamden have violated both Connecticut environmental statutes as well as provisions of CERCLA and therefore Plaintiffs have stated causes of action under negligence per se.**

Under Connecticut law, '[t]he doctrine of negligence per se serves to superimpose a legislatively prescribed standard of care on the general standard of care." *Staudinger v. Barrett*, 208 Conn. 94, 101 (1998), *citing Wendland v. Ridgefield Const. Svcs., Inc.*, 184 Conn. 173, 178 (1981).  In order to establish negligence in a negligence per se case, the jury need only decide whether the defendant violated the relevant statue or regulation.  *Staudinger*, 208 Conn. at 101. *See also Wendland*, 184 Conn. at 178, *Citerella v. United Illuminating Co.*, 158 Conn. 600, 607

(1969); *Essam v. New York, N.H. & H.R. Co.*, 140 Conn. 319, 324 (1953). In order to utilize the principle of negligence per se, the plaintiff must satisfy a two-prong test: "(1) that the [plaintiff was] within the class of persons protected by the statute; and (2) that the injury suffered is of the type that the statute was intended to prevent." *Mirarchi v. Jennings*, 1997 WL 297734, *1 (Conn. Super. Ct. 1997), *citing Gore v. People's Savings Bank*, 235 Conn. 360, 368 (1995), *on remand*, 40 Conn. App. 219 (1996).

Plaintiffs have alleged a cognizable claim because: (1) General Statutes §§ 22a-15, 22a-16 and 22a-427 establish a standard of care: (2) Plaintiffs have alleged a breach of these statutes; (3) Plaintiffs are within the class of persons the statutes were enacted to protect; (4) the injuries and damages Plaintiffs sustained were of the type the statutes were intended to prevent; and (5) Plaintiffs were injured as a proximate result of Defendants' statutory violations. Many courts have sustained claims of negligence per se based upon violations of the Water Pollution Control Act (WPCA). In *Walker v. Barrett*, 1999 WL 1063189 (Conn.Super. Ct. 1999), a purchaser of a house brought suit against the sellers for concealing sewage problems with the property. The court denied the sellers' motion to strike the purchaser's negligence per se claim, ruling that a private cause of action pursuant to General Statutes § 22a-427 is sustainable when negligence per se is alleged. *Id.* at * 3. The court held that "[s]ome Superior Courts have rigorously applied a two-prong test finding a negligence per se action sustainable pursuant to the statute where inter alia allegations of state water pollution have been made." *Id.* The court further stated that, as inhabitants of the state, the purchasers were within the class of persons protected by the statute and they sustained the type of injury the statute was designed to prevent – the contamination of water of this state. *Id.*

15

In *Goodrich v. Jennings*, 1997 WL 297732 (Conn. Super. Ct. 1997), the court denied a motion to strike a negligence per se action based on General Statutes §§22a-427, 22a-430 and 22a-450 of the WPCA because the plaintiff was within the class of persons protected by these statutes and had sustained the type of injury these statutes were intended to prevent. In *Goodrich*, the court stated that "[t]he doctrine of negligence per se serves to superimpose a legislatively prescribed standard of care on the general standard of care." *Id.* at *2, *citing Staudinger*, 208 Conn. at 101. In denying the motion to strike, the court further stated that the plaintiffs were seeking to adopt those sections of the WPCA as the standard of care in their negligence claim and were not interpreting those statutes to provide a private cause of action under the WPCA. *Id.* at *2.

In the present case, Plaintiffs state a cause of action for negligence per se based on General Statutes §§ 22a-15, 22a-16 and 22a-427 of the WPCA. Plaintiffs are not attempting to recover under the WPCA, but are merely attempting to use the standard under the statute as the standard of care. *See, e.g.*, *Mirarchi*, 1997 WL 297734, at *1.

Plaintiffs clearly satisfy the two-pronged test for utilization of the doctrine of negligence per se: (1) the plaintiff must be within the class of persons protected by the statute - As inhabitants of the state of Connecticut, Plaintiffs are within the class of persons protected by the statute.[12] *See, e.g.*, *Mirarchi*, 1997 WL 297734, at *2.; and (2) the injury suffered is of the type that the statute was intended to prevent.[13] Plaintiffs allege that Hamden and Olin disposed of and/or released hazardous substances in the Newhall Section over the course of many years, that

---

[12] General Statutes § 22a-422 states the policy of the WPCA and this policy mentions 'the inhabitants of the state.'

[13] The injury incurred by Plaintiffs is the type which the WPCA was intended to prevent, namely 'the elimination of pollution is hereby declared as a matter of legislative determination.' *Conn. Gen. Stat.* § 22a-422. General Statues §22a-422 further states that 'the pollution of the waters of the state is inimical to the public health, safety and welfare of the inhabitants of the state, is a public nuisance ...and impairs domestic, agricultural, industrial, recreational and other legitimate beneficial uses of water.' *Conn. Gen. Stat.* § 22a-422

has resulted in the contamination of the soil and ground water flowing under the Newhall Section, and failed to warn residents of the Newhall Section of the hazards it had created. ¶¶75 & 79.  Plaintiffs further allege that Hamden's and Olin's actions and omissions constitute negligence per se, including the breach of the standard of care set forth in *Conn. Gen. Stat*. §§ 22a-15, 22a-16 and 22a-427, and, as a result, Plaintiffs have suffered damages, including damage to the value of their homes and properties, loss of the use and enjoyment of their properties and severe emotional distress. ¶¶ 76 & 80.  These allegations state a claim for of negligence per se against Olin and Hamden.  *See Goodrich*, 1997 WL 297732, at *2 (court denied motion to dismiss negligence per se claim in part because the plaintiff's alleged pollution had caused a loss of the use and enjoyment of his property, as well as causing the plaintiff concern about the medical effects of the pollution).

In addition to having violated relevant Connecticut environmental statutes, Olin and Hamden have violated provisions of the Comprehensive Environmental Response, Compensation, and Liability, 42 U.S.C.A. 9601, et. seq. ('CERCLA').  In enacting CERCLA, and in order to assist the USEPA with its implementation, Congress passed Section 103(c), which required the owner or operator of a facility to file a notification with the USEPA by June 9, 1981 if hazardous wastes were then or had in the past been stored, treated, or disposed of at the facility.  42 U.S.C. § 9603(c).  The notification requirement also covered the owner or operator of a facility at the time that such activities occurred, and the person who accepted hazardous wastes for transport and selected the facility.  Besides identifying the facility in question, the notification had to specify the amount and type of any hazardous waste to be found there and any known, suspected, or likely releases of such wastes from the facility.  *Id.*

USEPA has stated that this notification obligation is an ongoing one so that anyone who discovers hazardous waste at a site after the June 8, 1981 deadline must still notify USEPA of the site's existence.  USEPA has termed this continuing obligation as the Section 103(c) "lasting provision."  *See* February 1998 Introduction to the Superfund Response Process, RCRA, Superfund & EPCRA Hotline Training Module, at 9 (EPA540-R-98-029, OSWER 9205.5-14A, PB98-963 237, June 1998).  CERCLA Section 103(c) contains sanctions for knowing noncompliance with this notification requirement.

As was shown relative to the Connecticut environmental statutes, Plaintiffs in the present case clearly satisfy the two-pronged test for utilization of the doctrine of negligence per se with respect to CERCLA as well: (1) the plaintiff must be within the class of persons protected by the statute – CERCLA's legislative history makes clear that the statute's basic goal is to protect public health and the environment from the risks posed by hazardous waste sites.  *See, e.g.*, *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863 (9th Cir. 2001) ("CERCLA was enacted to protect and preserve public health and the environment by facilitating the expeditious and efficient cleanup of hazardous waste sites.").  Clearly Plaintiffs comprise Congress' intended beneficiaries of CERCLA, namely the public; and (2) the injury suffered is of the type that the statute was intended to prevent - "Congress enacted CERCLA to protect public health and the environment from inactive hazardous waste sites."  *Westfarm Associates Ltd. Partnership v. Washington Suburban Sanitary Com'n.*, 66 F.3d 669, 677 (4th Cir. 1995).  The injury incurred by Plaintiffs in this case is exactly the type which CERCLA intended to prevent and rectify.

Both Olin and Hamden were required under 42 U.S.C. §9603(c) to have notified USEPA of the existence of hazardous wastes in the Newhall Section in 1981. Hamden was, at the very least, the operator of the successive landfills and Olin, at the very least, transported and chose

this facility for disposal of its hazardous wastes. In these capacities, Olin and Hamden had, as of June 9, 1981, a statutory duty to report the existence of the hazardous waste sites to USEPA. This duty is continuing. Had Olin and Hamden complied with the applicable statutory provisions of CERCLA, Plaintiffs' property would have been investigated and remediated decades ago, as was contemplated by the enactment of CERCLA.

## III.    OLIN'S AND HAMDEN'S ACTIONS CONSTITUTE BOTH NEGLIGENT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### A.    Olin and Hamden Mischaracterize the Amended Complaint and, in so Doing, Did Not Move to Dismiss Plaintiffs'  Claims for Negligent Infliction of Emotional Distress

In their Amended Complaint, Plaintiffs seek damages from Olin and Hamden for "Infliction of Emotional Distress" based upon cited examples of Olin's and Hamden's negligence and extreme and outrageous behavior in the disposal of toxic industrial wastes in the Newhall Section. Olin and Hamden mischaracterize Plaintiffs' claim in an attempt to limit it to one of intentional infliction of emotional distress alone, ignoring Plaintiffs' repeated references to their negligent acts and omissions. Olin's self-serving and unwarranted conclusion that '[w] hile not specifically identified as such, Count XI can only be read to attempt to state a claim for intentional infliction of emotional distress," is clearly not supported by the structure or factual allegations of the Amended Complaint. Hamden merely 'assumes" that Plaintiffs 'intend to bring a claim for intentional infliction," ignoring as well Plaintiffs' repeated assertions of negligent conduct.[14]   As Defendants have made no arguments at all that seek dismissal of

---

[14] Where emotional distress has been claimed on the basis of Defendants' negligence, the Court may review the claim according to the standards of unintentional or negligent infliction of emotion distress. *See Voghel v. City of Waterbury*, 1999 WL 732984 (Conn. Super. Ct. 1999). It is undisputed that mental suffering or emotional distress may be an element of damages arising from negligent conduct. *See Orlo v. Connecticut Co.*, 128 Conn. 231, 239 (1941); *Bushnell v. Bushnell*, 103 Conn. 583, 594 (1925).

Plaintiffs' claims for negligent infliction of emotional distress, those claims must stand for this reason alone.

The Connecticut Supreme Court first articulated the test for an award of damages arising from the unintentional or negligent infliction of emotional distress as "[r]ecovery for unintentionally-caused emotional distress does not depend on proof of either an ensuing physical injury or a risk of harm from physical impact." *Montinieri v. Southern New England Telephone Co.*, 175 Conn. 337 (1978). Plaintiffs have the burden of pleading that 'the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness and bodily harm." *Id.*, *see also Morris v. Hartford Courant Co.*, 200 Conn. 676, 683 (1986). To prevail on an emotional distress claim plaintiffs must show 'that the fear or distress experienced by plaintiffs be reasonable in light of the conduct of the defendants." *Barrett v. Danbury Hosp.*, 232 Conn. 242, 261 (1995). *See also Carrol v. Allstate Ins. Co.*, 262 Conn. 463, 446 (2003). 'Under *Carrol v. Allstate Ins. Co.* and *Montinieri*, to support a negligent infliction of emotion distress claim a plaintiff need only allege that the defendant knew or should have known that his or her conduct involved an unreasonable risk of causing emotional distress and that such emotional distress occurred." *Augelli v. Matos,* 2003 WL 21958554, *2 (Conn. Super. Ct. 2003).

Plaintiffs need not show that Defendants hold any intent to cause such distress because '[t]he issue in a claim for negligent infliction of emotional distress is the Defendant's conduct, not his intent." *Jones v. Gem Chevrolet*, 166 F. Supp. 2d 647, 651 (D. Conn. 2001). *See also Whitaker,* 167 F. Supp. 2d 251, 255 (D. Conn. 2001). Furthermore, the determination of the reasonableness of Plaintiffs' negligent infliction of emotional distress claims are reserved for trial. *Augelli v. Matos*, 2003 WL 21958554, at *1. Where design or operational negligence has

been established in the transport, handling and disposal of waste materials (i.e. sewage and stormwater collection facilities), the court has affirmed a finding of negligent infliction of emotional distress where that distress was "reasonably foreseeable." *Voghel v. City of Waterbury*, 1999 WL 732984, *7 (Conn. Super. Ct. 1999). Defendants' joint conduct, facilitating the disposal of Olin's toxic industrial waste in the Newhall Section, knowing houses were going to be built on the dumps, constitutes at a minimum "inconsiderate" behavior comprising "unreasonable conduct" necessary to support a negligent infliction of emotional distress claim under *Barrett v. Danbury Hosp*, 232 Conn. at 261.

**B.    Defendants' Disposal of Hazardous Materials and Chemicals For Decades Knowing Houses Were Being Built on the Dumps Constitutes Extreme and Outrageous Conduct Supporting Plaintiffs' Claim of Intentional Infliction of Emotional Distress.**

To succeed on a claim of intentional infliction of emotional distress Plaintiffs' must establish "(1) that the actor intended to inflict emotional distress or that he knew or should have known that the emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiffs' distress; and (4) that the distress suffered by the plaintiff was severe." *Appleton v. Stonington Bd. Of Ed.*, 254 Conn. 205, 210 (2000), *citing Petyan v. Ellis*, 200 Conn. 243, 253 (1986). Plaintiffs have alleged facts in the Amended Complaint which provide support for each of these four elements, and therefore Defendants' Motion to Dismiss Plaintiffs' emotional distress claims must be denied.

Defendants' motions to dismiss Plaintiffs' emotional distress claim concentrates on their purported absence of a factual or legal basis upon which to support a claim of outrageous or extreme behavior. To state a claim for "intentional or reckless misconduct under Connecticut

law, a plaintiff must plead the defendant's conduct was ' highly unreasonable conduct, involving

an extreme departure from ordinary care, in a situation where a high degree of danger is

apparent.' " *Bello v. Barden Corp.*, 180 F. Supp. 2d  300, 312, *citing Dubay v. Irish*, 207 Conn.

518 (1988).  In *Bello* the court equates "intentional" and "reckless" behavior with regard to an

intentional infliction of emotional distress claim in a manner directly relevant to the current

instance.  *See also Kurzyna v. City of New Britain*, *supra*, 2002 WL 1008450 (Conn. Super. Ct.

2002) (municipality which deposited waste in a former pond, which was subsequently built upon

for residential purposes, exhibited 'reckless" conduct in regard for public health and safety in

failing to inspect the property and allowing construction to continue).

    The determination of whether the Defendants'  conduct is extreme and outrageous conduct

rests as a matter of first instance with the court; the general rule in Connecticut holds that 'there

is liability for conduct exceeding all bounds usually tolerated by a decent society, of a nature

which is especially calculated to cause, and does cause, mental distress of a very serious kind."

*Whitaker*, 167 F. Supp. 2d at 255 (internal citations omitted).  However, where 'reasonable

minds [may] differ this determination becomes a question for the jury." *Id.*, *citing Reed v.

Signode Corp.*, 652 F. Supp. 129, 137 (D. Conn. 1986). S*ee also* RESTATEMENT (SECOND) OF

TORTS § 46 cmt. h (1965).

    Defendants do not argue that Plaintiffs'  allegations of Olin' s and Hamden' s reckless

disposal would not or could not be considered extreme and outrageous by "reasonable" finders of

fact, thereby showing that the matter is suitable for consideration by the jury pursuant to *Reed*.

Rather, Defendants' claims that Plaintiffs 'fail to present any facts sufficient to support the

notion that Olin's conduct was extreme and outrageous" relies on the same conclusory

statements and unsupported allegations and fails to provide either legal or factual support for

their motions.  The Court need only look to the Amended Complaint to see the massive scope

and scale of toxic industrial waste disposal operations in the Newhall Section and the hazardous

materials which were thereby disposed.  *See Bello*, 180 F. Supp. 2d at 306.  In arguing that their

actions do not exceed all bounds usually tolerated by decent society, Defendants in fact demand

that the Court accept that indiscriminate large-scale dumping of hazardous materials in areas

where residential development is the known or intended use of the filled land constitutes an

activity usually or normally tolerated by informed society.  This position is illogical, and runs

contrary to long-standing public policy and generations of environmental and public health law.

Olin's argument that its conduct was encouraged by the State of Connecticut and

Hamden similarly fails.  Plaintiffs are not aware of, and Olin has not cited to, any case law in

which a defendant's alleged reliance on third-party permission for hazardous waste disposal

exempts that party from liability for claims of negligent or intentional emotional distress.

Whether or not Olin claims to have been "following orders", they retain legal liability and

responsibility in this disposal.

## IV.    OLIN'S AND HAMDEN'S JOINT VENTURE TO USE INDUSTRIAL WASTES FOR FILL UNDER RESIDENTIAL DWELLINGS CREATED BOTH PUBLIC AND PRIVATE NUISANCES

### A.    Olin's & Hamden's Joint Actions have Created Private Nuisances Affecting Each of the Plaintiffs.

"Private nuisance law …is concerned with conduct that interferes with an individual's

private right to the use and enjoyment of his or her land."  *Pestey v. Cushman*, 259 Conn. 345,

357 (2002).  In 2002 the Connecticut Supreme Court set forth the definitive standard for private

nuisance and adopted the "basic principles," of § 822 of the Restatement (Second) of Torts.

*Pestey*, 259 Conn. at 360. The Supreme Court refocused the private nuisance analysis to the

question of whether the defendant's conduct – whether intentional or negligent - causes an unreasonable interference with a plaintiffs' use of his or her property.  *Pestey*, 259 Conn. at 360. Accordingly, to support a cause of action for private nuisance, the plaintiff must prove that (1) there was an invasion of the plaintiff's use and enjoyment of his or her property; (2) the defendant's conduct is the proximate cause of the invasion; and (3) the invasion was either intentional or unreasonable, or unintentional and the defendant's conduct was negligent and reckless.  *Id.*, at 357, *citing* 4 RESTATEMENT (SECOND) OF TORTS § 822 (1965).  In defining the standard of reasonableness, it is the interference with the use and enjoyment, rather than the conduct of the defendant which is the determining factor.  *Id.* at 359.  In other words, even when the conduct of the defendant is otherwise reasonable, the extent and nature of the interference of plaintiff's use and enjoyment can be unreasonable to an extent sufficient to support a claim for private nuisance. A corollary result of this approach was that the Court found that the question of the *reasonableness* of the defendant's conduct, while a factor in the greater analysis of the unreasonableness of the *interference,* was not, itself, an independent element that must be proven. *Id.* at 360.

### 1.    Private Nuisance Against Olin

In applying the *Pestey* test to the Amended Complaint under the Rule 12(b)(6) standard, Plaintiffs have adequately pled private nuisance.  Plaintiffs pled that Olin contaminated their property with hazardous wastes and substances that have caused a diminution in value of their properties, caused severe emotional distress, and may cause additional physical and emotional harm.  Plaintiffs allege that as a result Olin has unreasonably interfered with Plaintiffs' use and enjoyment of their property.  Plaintiffs allege that Olin maintained control over and otherwise effected the handling, disposal, and release of the toxic hazardous industrial wastes and ash

created at its manufacturing facility. Further, Plaintiffs allege that the joint venture entered into by Olin and Hamden over a period of decades resulted in hundreds of residences being constructed on hazardous substances.

Plaintiffs' private nuisance count against Olin is supported by fact and law. In *Giunta v. Town of Westport*, 2002 WL 1293918 (Conn. Super. Ct. 2002), plaintiffs alleged that they had suffered odors from the municipal sewage plant, that defendants knew of the condition and effect on the plaintiffs, and that the plaintiffs had been deprived of their right to the use and enjoyment of their property. *Id.* at *1. The court denied the motion to strike the private nuisance claim, and, citing to *Pestey*, held that:

> The case refers to the use and enjoyment of one's property. All the plaintiffs reside [on the affected property], and they allege that the use and enjoyment of their home have been adversely affected by the defendant's conduct, thus affording them the right to pursue this action as plaintiffs . . . this court finds that the allegations are sufficient.

*Giunta*, 2002 WL 1293918, at *2.

### 2.    Private Nuisance Against Hamden

The Amended Complaint sufficiently alleges a cause of action for private nuisance against Hamden. The Amended Complaint alleges that as early as 1915 Hamden solicited owners of properties containing wetlands and low lying areas for the purpose of allowing industrial wastes containing hazardous substances to be disposed on these properties knowing that when filled, Hamden would grant building permits to allow their development for residential housing. The Amended Complaint also alleges that some time prior to 1917 Hamden and Olin entered into a joint venture that lasted for decades whereby dumps were established on properties in the Newhall Section and Olin dumped ash and other toxic industrial waste in these disposal facilities. The Amended Complaint further alleges that from the construction of the first of these

industrial dumps, they were immediately developed into residential properties.  Finally, the
Amended Complaint alleges that as a result of the industrial waste brought to the properties in
the Newhall Section, the soils contain elevated concentrations of arsenic, lead and PAHs which
pose significant risks to human health, welfare and the environment.

In order to prosecute a nuisance claim against a municipality plaintiffs must allege that
the nuisance was created by some positive act of the municipality. *Elliot v. Waterbury*, 245
Conn. 385, 421 (1998); *Keeney v. Town of Old Saybrook*, 237 Conn. 135, 165 (1996).  Contrary
to Hamden's assertions, Plaintiffs are not required to allege that Hamden intended to create a
danger or should have known of the potential toxic substances.[15]  *See Accashian v. City of
Danbury*, 2000 WL 157926, *3 (Conn. Super. Ct. 2000) ('[t]hough the use of the word
'intentional' to explain 'positive act' created the appearance of the adoption of a new standard,
the Court's actual ruling on the nuisance claim in *Elliot* turns on whether the claimed nuisance
resulted from an act of the town, not whether the town intended the intrusion.').  Plaintiffs allege
in detail that Hamden entered into a joint venture with Olin and for decades facilitated the
disposal of toxic industrial wastes in the Newhall Section and concurrently arranged for  and
allowed the development of residential dwellings on these massive piles of industrial waste.  As
a result, Hamden's motion to dismiss Count II (nuisance) must be denied.

### B.     Defendants' Creation of Toxic Industrial Waste Dumps Underlying a Residential Neighborhood Constitute an Actionable Public Nuisance.

The Connecticut Supreme Court has stated that a plaintiff must prove four elements to
succeed in a public nuisance cause of action: (1) the condition complained of had a natural
tendency to create danger and inflict injury upon persons or property; (2) the danger created was

a continuing one; (3) the use of the land was unreasonable and unlawful; [and] (4) the existence

of the nuisance was the proximate cause of the plaintiff's injuries and damages." *Pestey*, 259

Conn. at 355.  According to the Court, "[t]hese elements developed through a long line of cases

that can be described best as public nuisance cases." *Id.*, *citing* RESTATEMENT (SECOND) OF

TORTS § 821B (1965) to clarify that interference in the public nuisance context depends on

"[w]hether the conduct involves a significant interference with the public health, the public

safety, the public peace, the public comfort and the public convenience." *Id.* at 356.  In declining

to address whether the "four factor analysis adequately encompasses the proper inquiry in public

nuisance cases" the court indicated that some "adjustment" to this test might be necessary.  *Id.* at

n. 6.  The Court indicated that at least one of these adjustments must consider that "a public

nuisance can be created intentionally or negligently,"  *Id.* at 358, *citing Keeny*, 237 Conn. at 163.

The Amended Complaint sufficiently alleges a cause of action for public nuisance.  The

issue before the Court in this motion to strike is whether Plaintiffs sufficiently allege that

Defendants unreasonably interfered with a public right, specifically public health and safety.

*Pestey*, 259 Conn. at 357.  The facts as pled show Olin's and Hamden's joint venture to facilitate

the disposal of toxic industrial wastes in the Newhall Section unreasonably interferes with the

public health and safety of the residents of the Newhall Section.  The Amended Complaint

alleges that Olin dumped ash and other industrial waste containing hazardous substances in the

disposal areas created by Hamden in the Newhall Section, that tests of the soil in the Newhall

Section indicate the presence of elevated concentrations of arsenic, lead and PAHs, and that

elevated concentrations of these various hazardous constituents pose a significant risk to human

---

[15] Similarly, the defendants in both *Accashian* and *Vaillancourt* incorrectly argued that a valid nuisance claim
against a municipality required that the municipality knew of the hazard it was creating.  *See Valliancourt,* 2002 WL
1041381, at *4; *Accashian*, 2000 WL 157926, at *3.

health, welfare and the environment.  ¶¶24, 37, 38.  The presence of the hazardous substances in the Newhall Section presents harm and risk to any member of the public.  *See Brownlee v. Town of Newtown*, 1992 WL 17123 (Conn. Super. Ct. 1992) (motion to strike public nuisance count denied where factual issues existed as to whether harmful condition had a tendency to create danger as to members of the public); *State v. Lead Ind. Assn. Inc.*, 2001 WL 345830 (R.I.Super. 2001) (lead contamination on properties interferes with a right common to the general public where it unreasonably interferes with the health, safety, peace, comfort or convenience of the general community); *Pine v. Kalian*, 723 A.2d 804 (R.I. 1998) (persistence of the continuing hazard of lead paint presents harm to public).  Moreover, the threat of release of the hazardous contaminants from the properties in the Newhall Section unreasonably interferes with a public right. *See New York v. Shore Realty Corp.*, 759 F.2d 1032 (2d Cir. 1985).

In the "Love Canal" case, which is closely analogous to the instant case, the court found that chemical manufacturers could be liable for public nuisance where they dumped hazardous waste on property and then sat by idly and watched as residences and schools were built on the property. *U.S. v. Hooker Chems. & Plastics Corp.*, 722 F. Supp. 960 (W.D.N.Y. 1989). Similarly, other courts have held that conduct involving the improper disposal of hazardous waste constitutes a public nuisance.  *See, e.g.*, *State v. Charpenter*, 489 A.2d 594 (N.H. 1985); *Gray v. Westinghouse Elec. Corp.*, 624 N.E. 2d 49 (Ind.Ct.App. 1993).  As in the Love Canal case, the facts as pled allege that Olin and Hamden disposed of hazardous waste in the Newhall Section and sat by idly watching as residences were built on the very same land.  Acting even more egregiously than the manufacturer in Love Canal, Olin's and  Hamden' s disposal practices continued for decades with knowledge that residences were being built on the land where it disposed of hazardous waste.  Under public nuisance law, Defendants' conduct unreasonably

interfered with the pubic right to health and safety and thus constitutes a public nuisance and Plaintiffs have suffered individualized harm greater than the general public as alleged in the Amended Complaint.

### C. Plaintiffs Allege that Olin Maintained Control Over the Handling, Disposal, and Release of Hazardous Substances that Caused the Nuisance

Olin argues that Plaintiffs' nuisance claims must be dismissed because of a failure to plead control "over the property that is the source of the nuisance." Olin's Memorandum at 5. Olin's argument misconstrues the Amended Complaint and, therefore, misapplies applicable precedent. Plaintiffs allege that Olin and Hamden entered into a joint venture that spanned decades by which Olin had a site for disposal of its toxic industrial waste and Hamden expanded its tax base by creating a new residential neighborhood, both maintaining control over the handling, disposal, and release of the hazardous industrial wastes and ash created at Olin's manufacturing facility. Olin and Hamden orchestrated the dumping of these materials in the Newhall Section, where the Plaintiffs own homes.

In fact, Olin does not now argue that it did not control the New Haven, Connecticut facility or handling, disposal, and release of the industrial waste and ash created at that facility. Cases cited by Olin support this analysis. *E.g.*, *State v. Tippetts-Abbett-McCarthy-Stratton*, 204 Conn. 177 (1987) (dismissal of public nuisance claim warranted when bridge – property that was alleged to be source of nuisance – was found not to be control of defendants). "Control," under Connecticut law applies to the ***source*** of the nuisance, not the property that suffers the effects of the nuisance. *E.g.*, *Wiehl*, 1994 WL 16516, at *2 ("Rather, this case stands for the proposition that a plaintiff may bring a nuisance action against a tenant in possession of a neighboring parcel of land, provided that the tenant-defendant exercises *control over the source of the*

*nuisance*.")(citations omitted, emphasis added). [16]  In the instant case, Plaintiffs allege that Olin controlled the source of the nuisance because it controlled the handling, disposal, and release of its industrial wastes and ash in the Newhall Section.  As Plaintiffs allege, the properties in the Newhall Section *suffered* the nuisance; but Olin *controlled* the toxic industrial wastes that caused the nuisance.  *Tippetts*, 204 Conn. at 183.  Thus, while Olin is factually correct in stating that Plaintiffs have not used the words that Olin controlled the *land* that is now Plaintiffs' property, no such requirement exists under Connecticut law and Olin ignores its control as Hamden's partner as plead in detail in the Amended Complaint.  A result of Olin's illogical reading of Connecticut nuisance law would be that any entity that disposed of any toxic chemicals on the property of another could never be held liable for a nuisance, *as long as the disposal occurred on someone else's property*.  Such an absurd result cannot be countenanced by Connecticut jurisprudence, and is inconsistent with the facts alleged in the Amended Complaint.

This distinction is made clear by the Connecticut Supreme Court in *Pestey*, which focuses on the defendant's conduct as a cause of the nuisance: [17]

> On the basis of our reexamination of our case law and upon our review of private nuisance law as described by the leading authorities, we adopt the basic principles of § 822 of the Restatement (Second) of Torts and conclude that in order to recover damages in a common-law private nuisance cause of action, a plaintiff must show that the defendants' conduct was the proximate cause of an unreasonable interference with the plaintiff's use and enjoyment of his or her property.

*Pestey*, 259 Conn. at 360-361.

Olin cites *Vaillancourt, supra,* to further support its interpretation of "control" as a requirement in a nuisance case.  Unlike the private nuisance plaintiff in *Vaillancourt*, Plaintiffs

---

[16]  That Olin cited both *Tippetts* and *Wiehl* to support its interpretation of Connecticut nuisance law further suggests that its interpretation of "control" is incorrect.  As can be seen in both of these cases, the issue of control usually arises in the context of an actual ownership dispute between an owner and lessee of property, e.g. *Wiehl*, or a landlord and tenant of property, as cited in *Tippetts*.

in this case live on the same property on which Olin dumped toxic industrial waste and ash from

its plant.  More significantly, Plaintiffs in this case have alleged that Olin controlled the

industrial waste that caused the nuisance.[18]

Olin also asserts that an, "additional, independent reason," to dismiss Plaintiffs' nuisance

claims, is that Plaintiffs have failed to allege that Olin, "inflicted the alleged harm from a

neighboring property."  Olin's Memorandum at 7.  Olin misses the fact that it has contaminated

an entire neighborhood, that the contaminated ground water flows from one property to another,

and that the interference with use and enjoyment of one property due to the substantial

contamination of abutting contaminated properties were all caused by Olin's indiscriminate

disposal of its toxic industrial waste.[19]  As with the issue of control, Olin's argument is the result

of a stilted reading of the Amended Complaint and the applicable case law.  Therefore taking

Plaintiffs' allegations in the light most favorable to them, the Amended Complaint more than

adequately states claims for both public and private nuisance.

---

[17] The *Vaillancourt* decision does not, apparently, rely upon the private nuisance factors articulated in *Pestey*.

[18] As *Pestey* provides that intentional conduct may form the basis of a private nuisance, the result in this case should be no different because Olin intentionally transported the toxic industrial waste and ash in question to the Newhall Section.  *Pestey*, 259 Conn. at 361.

[19] To the extent that Olin's argument tacitly invokes questions of successor liability those issues are not presently before this court.

## V.    CONNECTICUT COURTS HAVE HELD THAT THE DISPOSAL OF HAZARDOUS WASTES CONSTITUTES AN ABNORMALLY DANGEROUS ACTIVITY FOR PURPOSES OF STRICT LIABILITY.

'Under [the doctrine of strict liability] a plaintiff is not required to show that his loss was caused by the defendant's negligence.  It is sufficient to show only that the defendant engaged in an ultrahazardous activity that caused the plaintiff's loss."  *Green v. Ensign-Bickford Co.*, 25 Conn. App. 479, 482 (1991), *cert. denied*, 220 Conn. 919 (1991).  "The issue of whether an activity is abnormally dangerous …is a question of law for the court to decide."  *Id.* at 485.  In order to sustain a cause of action for strict liability, Plaintiffs must show that certain factors are as a result of the activities of the defendant: (1) an instrumentality capable of producing harm; (2) circumstances and conditions in its use which, irrespective of a lawful purpose of due care, involve a risk of probable injury to such a degree that the activity fairly can be said to be intrinsically dangerous to the person or property of others; and (3) a causal relation between the activity and the injury for which damages are claimed. *See, e.g.*, *Caporale v. C.W. Blakeslee and Sons, Inc.*, 149 Conn. 79, 85 (1961).  In addition, Connecticut courts have adopted the factors set out in the Restatement of Torts in order to assist in the determination of whether activities should be classified as abnormally dangerous.  *See, e.g.*, *Green*, 25 Conn. App. at 485.  The factors for a court to consider in determining whether an activity is abnormally dangerous are: (a) the existence of a high degree of risk of some harm to the person, land or chattels of others; (b) the likelihood that the harm that results from it will be great; (c) an inability to eliminate the risk by the exercise of reasonable care; (d) the extent to which the activity is not a matter of common usage; (e) the inappropriateness of the activity to the place where it is carried on; and (f) the extent to which its value to the community is outweighed by its dangerous attributes. RESTATEMENT (SECOND) TORTS § 520 (1965).  All of these factors need not be present for an

activity to be considered abnormally dangerous.  Comment (f) to §520 provides that '[i]n determining whether the danger is abnormal, the factors listed in Clauses (a) to (f) of this Section are all to be considered, and are all of importance.  Any of them is not necessarily sufficient of itself in a particular case, and ordinarily several of them will be required for strict liability.  On the other hand it is not necessary that each of them be present, especially if others weigh heavily."  *Id.*

Defendants correctly note that the Connecticut Supreme Court and Appellate Court have applied the doctrine of strict liability only in certain areas, but '[while] it is true that the only cases where the Supreme Court or Appellate Court in our state have found ultrahazardous activity have involved blasting …use of pile driver …[and] conducting research with [a] highly volatile chemical …," the Defendants ignore the fact that numerous Superior Courts have held the disposal of hazardous waste to be ultrahazardous.  *P.R.I.C.E., Inc. v. Kenney, Comm'r of the Dept. of Envtl Protection*, 1998 WL 417591, at *9 (Conn. Super. Ct. 1998).

Defendants cite *Arawana Mills Co. v. United Technologies Corp.*, 795 F. Supp. 1238 (D. Conn 1992) as dispositive of whether strict liability will be imposed for the storage, use and disposal of contamination.  The holding in *Arawana Mills* is not as broad as Defendants contend.  In *Arawana Mills*, the defendant moved to dismiss the plaintiffs' strict liability claim by arguing that its metal finishing activities did not constitute an abnormally dangerous activity.  In response to the plaintiffs' argument that it was not the metal-finishing activities, but the 'storage, use and contamination of the premises" that constituted abnormally dangerous activity, the court noted that '[i]t does not appear that the Connecticut Supreme Court has addressed the issue of whether the *storage and use* of hazardous waste is a basis for strict liability"  *Id.* at 1251 (emphasis added), and further held that it did not believe that the Connecticut Supreme Court would extend

the concept of ultrahazardous and abnormally dangerous activity to 'the *storage and use* of hazardous wastes…'" *Id.* (emphasis added).

After the *Arawana Mills* decision, numerous Connecticut courts have been asked to consider whether the 'disposal' rather than the 'storage and use' of hazardous wastes constitute abnormally dangerous activities. While Connecticut courts have held that the 'storage and use' of hazardous materials is not an ultrahazardous activity and will not support a strict liability claim, *see, e.g.*, *Skelton v. Chemical Leaman Tank Lines*, 1996 WL 278343 (Conn. Super. Ct. 1996) (distinguishing storage and use from actual disposal of toxic material), '[t]he storage, use and *disposal* of hazardous waste …has been held to be an ultrahazardous activity." *Mather v. Birken Manufacturing Co.*, 1998 WL 920267, at *7 (Conn. Super. Ct. 1998) (emphasis in original), *citing Barnes v. General Electric Co.*, 1995 WL 447904 (Conn. Super. Ct. 1995) (storage, burial, and disposal of hazardous and toxic waste at a municipal landfill is capable of producing harms, including ground and surface water contamination, irrespective of whether due care is used).

The *French Putnam* court first noted the split of authority among judges of the Superior Court as to whether the *storage* of gasoline in underground tanks and pumps is an abnormally dangerous activity where gasoline has leaked and contaminated neighboring property, however the Court went on to hold that the 'judges of the Superior Court have found that the *disposal* of toxic and hazardous materials constitutes an abnormally dangerous activity." *French Putnam LLC v. County Envtl. Svcs.*, 2000 WL 1172341, at *14 (Conn. Super. 2000) (emphasis in original), *citing Mather*, 1998 WL 920267 (upholding plaintiff's strict liability for ultrahazardous activity claim because of allegations that the defendants directly disposed hazardous waste into the soil and environment); *Barnes*, 1995 WL 447904 (denying motion to strike because

allegations of burning, burial and disposal of toxic materials that contained latent defects and

dangers constituting a menace to human life sufficiently alleged that the defendants'   actions were

abnormally dangerous to support a strict liability for ultrahazardous activity claim).  *See also*

*Albahary v. City and Towns of Bristol, Conn.*, 963 F. Supp. 150, 154 (D. Conn. 1997) (disposal

of toxic materials at a landfill constitutes an abnormally dangerous activity sufficient to maintain

a cause of action for strict liability).

After concluding that the disposal of hazardous wastes is an abnormally dangerous

activity, the court in the *French Putnam* case, then considered whether or not the plaintiff had

successfully pled a claim for strict liability.  In *French Putnam*, the Court found that the plaintiff

had failed to state a claim for strict liability because the plaintiff did not directly allege or use the

word "disposal" in the complaint, "[r]  ather, the plaintiff alleges discharge of hazardous materials

but does not allege whether the discharge was a result of direct disposal, burial, leakage or some

other means."  *French Putnam*, 2000 WL 1172341, at *15.  The Court concluded that while the

disposal of hazardous waste constituted an abnormally dangerous activity, the plaintiff's

allegations were insufficient in that they did not sufficiently state that the defendants' "storage,

use and discharge of the hazardous materials was abnormally dangerous so as to warrant

imposition of strict liability."  *Id.*

Plaintiffs in the present action allege that Olin and Hamden directly disposed of

hazardous waste and toxic substances and compounds and metals onto the soil or environment in

the Newhall Section. ¶¶ 20-26.  Plaintiffs further allege that this disposal of hazardous wastes

poses a hazard to the health and well being of the public and Plaintiffs. ¶¶ 27-38.  In *Barnes v.*

*General Electric Co.*, 1995 WL 447904 (1995) the court held that the disposal, burial and storage

of hazardous waste by the defendants constituted an ultrahazardous activity.  *Id.* at *7.  The

*Barnes* case involved residential property owners on a site that was formerly part of or adjacent to a municipal landfill. The Town of Southington owned and operated the landfill prior to its closing in 1967. During the period of its operation, Pratt & Whitney disposed of hazardous materials at the landfill. After the landfill closed, the town subdivided the site and residential, recreational and commercial buildings were erected. In considering whether to strike the plaintiffs' claim for strict liability, the court found that: 1) storage, burial and disposal of hazardous and toxic waste at a municipal landfill is capable of producing harms, including ground and surface water contamination, irrespective of whether due care is used; 2) storage, burial and disposal of hazardous and toxic waste at a municipal landfill poses a risk of probable injury to such a degree that the activity fairly can be categorized as intrinsically dangerous to people or property; and 3) there existed a sufficient causal relation between the defendants' storage, burial and disposal of hazardous and toxic wastes and the plaintiffs' alleged injuries. *Id.* at *6.

In next considering the factors delineated in the Restatement, the *Barnes* Court weighed each factor, holding that: (a) defendants' storage, burial and disposal of hazardous and toxic wastes at a municipal landfill involved a high degree of risk of harm to property and persons and was, therefore abnormally dangerous; (b) the likelihood of resulting harm from the defendants' activities to property and persons, whether it is actually minimal or severe, is "great"; (c) the risk of "great" harm from defendants' abnormally dangerous activities cannot be eliminated by the exercise of reasonable care due to the nature of hazardous and toxic wastes and the severity of its harmful characteristics; (d) while in operation, it was common usage to dispose of commercial wastes at a landfill as it was not clearly known that disposing of these wastes was an abnormally dangerous activity; (e) because of this, the court was not certain that the defendants' activities

were 'inappropriate" under the restatement factor; and (f) despite the fact that the disposal of

hazardous and toxic wastes may be an activity of some use to society, 'the unavoidable risk of

harm that is inherent in it requires that it be carried on at [the disposers' own] peril, rather than at

the expense of the innocent who suffer as a result of it." *Id.* at *7. For these reasons, the court

found that the defendants' activity was abnormally dangerous and refused to strike the plaintiffs'

claim for strict liability. *Id.*

     With respect to the Restatement factor addressing whether a defendant's activities serve

some use to society in general, courts have held that '[w]e recognize that one engaged in the

disposing of toxic waste may be performing an activity that is of some use to society,

nonetheless, 'the unavoidable risk of harm that is inherent in it requires that it be carried on at its

peril, rather than at the expense of the innocent person who suffers harm as a result of it.'

Restatement (Second), comment h at 39." *P.R.I.C.E.*, 1998 WL 417591, at *9, *quoting State v.

Ventron*, 94 N.J. 473, 468 (1983).[20] The *P.R.I.C.E.* court ultimately held that defendants can be

held strictly liable for damage resulting from the disposal of hazardous waste and that the

---

[20] The *P.R.I.C.E.* court also noted that courts from other jurisdictions have held similarly, citing *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1544 (10th Cir. 1992) (under CO law and facts of case, disposal of hazardous waste constitutes abnormally dangerous activity and explaining that the Restatement factors 'require a particularized inquiry. Even blasting, the activity most commonly recognized as ultrahazardous …may not give rise to strict liability if conducted in an appropriate locale far away from human habitation or anything of value …To impose an inflexible strict liability rule on all blasting without consideration of the circumstances would be just as incorrect as defendant's assertion of the opposition rule regarding hazardous wastes); *Schwartzman, Inc. v. Atchison, Topeka & Santa Fe Railway Co.*, 842 F. Supp. 475, 478 (D.N.M. 1993) (holding that under the NM law, the storage and disposal of toxic chemical waste constitutes abnormally dangerous activity and explaining that the defendant's contention that only blasting is an abnormally dangerous activity in NM renders the six factors of the Restatement superfluous. The assessment of whether a given activity is abnormally dangerous under the Restatement is a particularized, case-specific inquiry); *Hanlin Group, Inc. v. International Minerals & Chemical Corp*, 759 F. Supp. 925, 934 (D. Me. 1990) (holding that under Maine law, a defendant may be held strictly liable for carrying on an ultrahazardous activity for damage resulting form the disposal of hazardous chemicals); *Lutz v. Chromatex, Inc.*, 718 F. Supp. 413, 430 (M.D.Pa. 1989) (holding that under Pennsylvania law, the storage and disposal of hazardous substances may constitute an abnormally dangerous activity); *Sterling v. Veliscol Chemical Corp.*, 647 F. Supp. 303, 315 (W.D. Tenn. 1986) (holding that under Tennessee law, the defendant was subject to strict liability for an ultrahazardous activity for storing and disposing of hazardous wastes).

disposal of hazardous waste may constitute an ultrahazardous activity as a matter of law. *P.R.I.C.E.*, 1998 WL 417591, at *9.

Plaintiffs' factual allegations in this case are directly analogous to those made by the plaintiffs in *Barnes* and concern the exact same activities as were considered in the *Barnes* case. Plaintiffs have appropriately pled the facts surrounding Olin's and Hamden's abnormally dangerous activities in disposing of its toxic industrial wastes in the property which is now owned by Plaintiffs. Plaintiffs have properly pled that 1) burial and disposal of hazardous and toxic waste at the Newhall Section is capable of producing harms, including ground and surface water contamination, irrespective of whether due care is used; 2) burial and disposal of hazardous and toxic waste at the Newhall Section poses a risk of probable injury to such a degree that the activity fairly can be categorized as intrinsically dangerous to people or property; and 3) there is a sufficient causal relation between the Defendants' burial and disposal of hazardous and toxic wastes and the Plaintiffs' alleged injuries.

## VI.       THE AMENDED COMPLAINT SUFFICIENTLY ALLEGES A CAUSE OF ACTION FOR REIMBURSEMENT UNDER CONN. GEN. STAT. § 22A-452

The Amended Complaint sufficiently alleges a cause of action for reimbursement under *Conn. Gen. Stat.* § 22a-452. The Amended Complaint alleges that Plaintiffs have suffered "damages" resulting from the contamination of their property. Clearly, "damages" includes investigation and remediation expenses, especially when drawing all inferences in favor of Plaintiffs, as required when considering a motion to dismiss.

Connecticut courts have held that environmental cleanup costs may be characterized as "damages." *Goldblum v. The Pittson Co.*, Superior Court, Judicial District of Stamford/Norwalk at Stamford, Docket No. CV92 0126252 S (Apr. 24, 1996, Stevens, J.), *citing Electroformers,*

*Inc. v. Emhart Corp.*, Superior Court, Judicial District of Danbury, Docket No. 297891 (Jan. 29,

1993, Fuller, J.)('[M]ajority view is that cost recovery actions are claims for damages.");

*Avondale Industries, Inc. v. Travelers Indemnity Co.*, 887 F.2d 1200, 1207 (2d Cir. 1989) (under

insurance policy, cleanup costs are damages).[21]  As a result, because Plaintiffs have alleged that

they incurred damages, they should be permitted to present evidence to support this claim for

relief.[22]

## VII.        THE DOCTRINE OF PRIMARY JURISDICTION DOES NOT PROVIDE A BASIS TO DISMISS COUNTS V, VI AND XV.

Olin's and  Hamden's claim that the doctrine of primary jurisdiction should apply are

limited to Counts V, VI and XV of the Amended Complaint, which seek injunctive relief.[23]

With respect to those claims, primary jurisdiction does not provide the basis for dismissal.

### A.      The Doctrine of Primary Jurisdiction Does Not Apply.

The doctrine of primary jurisdiction applies 'where a claim is originally cognizable in the

courts, but enforcement of the claim requires, or is materially aided by, the resolution of

threshold issues, usually of a factual nature, which are placed within the special competence of

the administrative body."  *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 58-59

(2d Cir. 1994).  *See U.S. v. Western Pac. R.R.*, 352 U.S. 59, 63-64 (1956); *Ricci v. Chicago*

*Mercantile Exch.*, 409 U.S. 289, 302 (1973).  Primary jurisdiction allows the court to defer the

---

[22] If this court, however, finds that Plaintiffs' have not sufficiently alleged a cause of action under *Conn. Gen. Stat.* § 22a-452, Plaintiffs would respectfully request leave to replead.

[23] Count XV of the Amended Complaint claims that Hamden created a public and private nuisance and requests damages as well as injunctive relief.  The Court should limit its consideration of the application of the doctrine of primary jurisdiction in relation to Count XV only to the extent that Count XV requests injunctive relief, as it has no applicability to claims for money damages. *Martin v. Shell Oil Co.,* 198 F.R.D. 580, 587 (D. Conn. 2000)(Primary jurisdiction 'does not have the purpose of vindicating individual property rights such as those asserted by plaintiffs in this case.").  The claims in *Martin* consisted of many of the same ones asserted in the case at bar. The CTDEP has no jurisdiction over, and the Consent Order does not encompass, Plaintiffs' claims for monetary damages.

matter to the appropriate administrative agency, so that specialized agency may make a determination of the matter that is within that agency's competence before the court passes judgment. *See Martin v. Shell Oil Company*, 198 F.R.D. 580, 585 (D. Conn. 2000), *citing Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 97 (2d Cir. 1996).

In a case similar to the case at bar, the District Court for the District of Connecticut refused to apply primary jurisdiction. *Martin v. Shell Oil Company*, 198 F.R.D. at 585. While Hamden and Olin go to great lengths to distinguish *Martin*, their argument is unavailing. In *Martin,* the plaintiffs brought a class action suit for the remediation of groundwater contamination on plaintiffs' property caused by defendants' Shell service station, and for money damages based on negligence, negligence per se, strict liability for ultrahazardous activity, gross negligence, private nuisance, trespass and fraud. The Amended Complaint in this case asserts many of these same claims. Similar to this case, in *Martin*, the CTDEP and Shell entered into a consent order which required Shell to retain a qualified consultant, submit a scope of study for an investigation, propose remedial measures, notify each intervenor and party of the of the remediation plan, and perform remedial measures in accordance with the plan. *Id.* at 583.

Indeed, in *Martin,* the CTDEP had issued additional orders providing a schedule for implementing various aspects of the Consent Order, which orders have not been issued in the case at bar. *Id.* at 584. In *Martin*, the consent order specified that none of its provisions and no action or inaction by the Commissioner 'shall be construed to constitute an assurance by the Commissioner that the actions taken [Shell] pursuant to this consent order will result in compliance or prevent or abate pollution;" and that the order 'shall neither create nor affect any rights of persons who or municipalities which are not parties to this consent order." *Id.* at 583.

---

Therefore, to the extent that the doctrine of primary jurisdiction is even applicable, it must be limited to the claim for

The Consent Order in this case contains **_identical_** provisions. *See* ¶¶ 17, 20.  In addition, in *Martin,* the Court stated: "nothing in the Consent Order indicates that the plaintiffs were intervenors or parties to that order." *Id*. at 583.  Similarly, the Consent Order in this case makes clear that none of the Plaintiffs were intervenors or parties to that Order.

Based on the doctrine of primary jurisdiction, the defendants in *Martin* moved to dismiss the plaintiffs' request for injunctive relief, arguing that the relief sought was already encompassed under a consent order and that the CTDEP had jurisdiction over the matter.  *Id.* Olin and Hamden have raised similar arguments in their motions to dismiss in this case.  In *Martin*, the court denied the motion, finding that the doctrine of primary jurisdiction does not apply.  *Id.* at 587.   For the same reasons set forth in *Martin*, this Court should do the same.

The Court in *Martin* discussed the four factors required for applying primary jurisdiction: (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's discretion; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made." *Id.* at 585.

With respect to the first and second factors, the Court was not persuaded that the CTDEP's specialized technical expertise was required because the claims raised (similar to those raised in this case) are of the "type commonly adjudicated by the courts," notwithstanding that they may require "some technical analysis." *Id.*  That reasoning is equally applicable to the case at bar.  While there will be some "technical analysis" it is similar to many issues concerning

---

injunctive relief only.

contamination that are frequently addressed by the District Court with respect to both common law claims, and claims raised under CERCLA, RCRA or other environmental laws.

With respect to the third factor, the Court in *Martin* found there is "very little risk" of inconsistent rulings, because the claims sound in "private tort actions at common law." *Id.* at 586. That is true of the majority of the claims raised in the Amended Complaint as well. For example, in *Martin*, the Court appropriately reasons: "whether or not the pollutants in the groundwater …exceeds 70 parts per billion is not dispositive of that plaintiff's claim of trespass, private nuisance or negligence." *Id.* That reasoning is equally applicable to the common law claims of negligence, private nuisance, and the like raised in this case.

The Court in *Martin* does draw a distinction between common law claims, and negligence per se, but still finds that the "danger of inconsistent rulings is minimal." *Id.* at 586, n. 7. The Court notes that "as a general proposition, the governing principle is that administrative adjudications have preclusive effect when the parties have had an adequate opportunity to litigate." *Id.*, *citing Carothers v. Capozziello,* 215 Conn. 82, 94 (1990). In both *Martin* and this case, the plaintiffs were not parties to the administrative process and there is no indication that they had any opportunity to adequately litigate the entrance of the Consent Order. Accordingly, while Count V does state a claim for negligence per se, the doctrine of primary jurisdiction does not apply to it either.

With respect to the fourth factor, whether a prior adjudication had been made, the Court in *Martin* emphasized: "There is no assertion by either party that the plaintiffs in this proceeding were ever parties to any action before the agency." *Id.* at 586. That is also true with respect to this case. Not one plaintiff was a party to the CTDEP administrative proceeding resulting in the

Consent Order.[24]  As a result, the Consent Order specifically carves out the plaintiffs: "This consent order neither creates nor affects any rights of persons that are not parties to this consent order." *See* ¶ 20 of the Consent Order.  In addition, in *Martin*, while Shell agreed in the Consent Order to monitor and remediate the plaintiffs' properties, the Court found that CTDEP had not "definitively ruled on the issues presented by this case, namely, whether Shell is in fact responsible for the particular contamination occurring on the plaintiffs' properties or all properties in the 'vicinity." *Id.*  Similarly the Consent Order in this case is carefully worded so that neither Olin (who agreed to monitor and remediate) nor Hamden admitted "responsibility" or "liability" for the contamination of the plaintiffs' properties.  *See* ¶¶ 26, 28, and 31.

Clearly, *Martin* is on point.  Olin's and  Hamden's attempts to distinguish it are transparent.  First, Olin claims that in *Martin*, the defendants (as did Hamden herein) moved to dismiss all counts, including those for monetary relief and injunctive relief.  Yet, the Court in Martin specifically states: "The defendants seek to dismiss the plaintiffs' claim for ***injunctive relief*** against them on the basis of the primary jurisdiction doctrine." *Martin*, 198 F.R.D. at 582 (emphasis supplied).   Both Olin and Hamden also try to distinguish the facts as they apply to the four factors, and rely primarily on decisions from the District Court for the District of New Mexico.  As discussed above the four factors do not apply based on the incredible similarity between *Martin* (a decision of this District Court interpreting Connecticut law, and a CTDEP Consent Order with some identical language and scope) and the case at bar.  Accordingly, the Court should hold similarly, and decline to apply the doctrine of primary jurisdiction.

---

[24] The extent of any plaintiff's involvement, as a member of the public, in the CTDEP administrative process is a question of fact.  However, it is beyond dispute that no plaintiff was involved in the negotiation of the Consent Order, and certainly, no plaintiff signed the Consent Order.

B.     **Even if the Court Applies the Doctrine of Primary Jurisdiction, the Proper Remedy is to Hold Plaintiffs' Claims for Injunctive Relief in Abeyance, Not to Dismiss Them.**

Application of the doctrine of primary jurisdiction does not mandate dismissal of the underlying claim as a consequence of finding that employment of the doctrine is warranted in a particular case.  Rather, the doctrine "requires the court to enable a 'referral' to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling."  *Reiter v. Cooper*, 507 U.S. 258, 268 (1993).  *See also Western Pacific*, 352 U.S. at 63-64; *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 291, 302 (1973); *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 65, 68 (1970).  *See also Marshall v. El Paso Natural Gas Co.*, 874 F.2d 1373, 1376 (10th Cir. 1989) (The doctrine [of primary jurisdiction] suspends the "judicial process …pending referral of the issues to the administrative body for its views.").

Even the case relied on heavily by Olin with respect to its argument that the doctrine of primary jurisdiction applies held that dismissal of the claims for injunctive relief is not appropriate.  *See Schwartzman, Inc. v. Atchison, Topeka & Santa Fe Railway Co.*, 857 F. Supp. 838, 844 (D. N.M. 1994). (The "preferred approach is that 'jurisdiction should be retained by a stay of proceedings, not relinquished by a dismissal,' even if without prejudice."  *Id.* at 844, *quoting Northern Cal. Dist. Council of Hod Carriers, AFL-CIO v. Opinski*, 673 F.2d 1074, 1076 (9th Cir. 1982).  To the extent that this Court finds the doctrine of primary jurisdiction applicable, it should similarly decline to dismiss Plaintiffs' request for an injunction and instead hold the claim in abeyance pending an order of the CTDEP for the investigation and remediation of Plaintiffs' properties.

C.     **Burford Abstention Does Not Apply.**

44

The application of the *Burford* abstention doctrine is inappropriate in this case, and, therefore, the Court should deny Hamden's motion to dismiss based upon it.  The *Burford* abstention doctrine, established by the United States Supreme Court in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), requires that federal courts abstain in certain types of cases where there are either "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar" or where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."  *New Orleans Pub. Serv. Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989).  *Burford* abstention, however, should be used sparingly.  *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996), *quoting Burford*, 319 U.S. at 334.  " *Burford* does not require abstention whenever there exists a complex state administrative process, or even in all cases where there is a potential for conflict with state regulatory law or policy from federal litigation, but only where there would be 'undue' federal interference."  *Bethpage Lutheran Service, Inc. v. Weicker*, 965 F.2d 1239, 1247 (2d Cir. 1992), *citing New Orleans Pub. Serv., Inc.*, 491 U.S. at 362.  Hamden argues that the Court should abstain from asserting its jurisdiction to consider Plaintiffs' request for injunctive relief, insinuating that Plaintiffs are attempting to circumvent the CTDEP's efforts to remediate the Newhall Section.  All of the cases relied upon by Hamden involve a challenge in federal court of a state agency's action.

Here, CTDEP is not a party.  In a case with a similar fact pattern where the New York State Department of Environmental Conservation had no involvement in the court proceedings, the United States District Court for the Eastern District of New York declined to apply the

*Burford* doctrine of abstention.  *See DMJ Assoc., L.L.C. v. Capasso*, 228 F. Supp. 2d 223, 230 (E.D.N.Y. 2002).  In that case, the defendants moved for a stay of plaintiffs' suit on *Burford* abstention grounds because the New York DEC was taking action to remediate the property, and therefore any action taken by the District Court would interfere with and disrupt the 'State's efforts to establish a coherent environmental waste policy."  *Id.* at 231.  The District Court attached particular significance to the DEC's position, noting that it had 'not asked this court to abstain on *Burford* or primary jurisdiction grounds…" The District Court declined to apply the *Burford* doctrine of abstention, concluding that '[w]hen the responsible state agency chooses not to ask the court to suspend its proceedings while the agency's work is underway, the court is hard pressed to say that this litigation will 'interfere unduly with specialized, ongoing state regulatory schemes', or 'be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial concern."  *DMJ Assoc.*, 228 F. Supp. 2d at 231, *quoting County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1294, 1308 (2d Cir. 1990).

In this case, Plaintiffs seek injunctive relief to require Hamden and Olin to take all actions necessary to investigate and remediate their property.  This claim is not the type of collateral attack upon an agency's actions contemplated by *Burford* and its progeny.  Moreover, the CTDEP is not a party, and has made no indication that any order by this Court would interfere with its efforts.  Finally, it was Defendants' choice to remove this case to the District Court, and it would be inequitable for Defendants' to defeat Plaintiffs' injunctive claims by this intentional procedural maneuver.

## VIII.    AS HAMDEN'S ACTS WERE PROPRIETARY, IT CANNOT SHIRK ITS RESPONSIBILITY TO PLAINTIFFS BY CLAIMING SOVEREIGN IMMUNITY.

Hamden seeks to dismiss Counts II (negligence), IV (gross negligence/reckless

conduct), VIII (negligence per se), X (strict liability) and XII (infliction of emotional

distress) of the Amended Complaint on the grounds of governmental immunity.

Hamden argues that its acts constituted discretionary activities, making it immune from liability.

In particular Hamden focuses in on singular acts, such as the issuance of a building permit or

certificate of occupancy, and ignores the larger picture; i.e., that Hamden entered into a joint

venture with Olin over a period of decades in which Hamden solicited industrial waste from Olin

for fill, so that Hamden's "unproductive" land could be converted into residential areas which

would allow it to collect building permit fees for hundreds of homes, and expand its tax base.

Moreover, by accepting industrial waste from New Haven, as opposed to garbage from

Hamden's residents, it is clear that this was not providing a service to Hamden citizens.  In its

Memorandum of Law, Hamden completely ignores the distinction between proprietary and

governmental functions based on the facts alleged.   The Amended Complaint contains sufficient

allegations to support Plaintiffs' claim that Hamden is liable for negligence and the other torts

alleged in Counts IV, VIII, X, and XII, respectively, because Hamden's actions fall within what

must be considered the exercise of a proprietary function.

### A.     Governmental Immunity Does Not Extend to Proprietary Acts.

The scope of governmental immunity is defined in part by *Conn. Gen. Stat*. §52-557n and

in part by common law principles.  *See Accashian*, 1999 WL 27223, at *2, *citing Elliott v.

Waterbury*, 245 Conn. 385, 407-08, 411 (1998).  Under Connecticut law, a municipality is

immune from liability only for its governmental acts involving the exercise of judgment or

discretion.  *Id.* at 411.  Governmental immunity does not extend to a municipality's ministerial or

proprietary acts.  *See Vaillancourt*, 2002 WL 1041381, at *2.  Connecticut statutes provide an

exception to common law governmental immunity.  *Conn. Gen. Stat.* § 52-557n abrogates

common law governmental immunity, expressly recognizing liability for negligence in the performance of 'proprietary' functions from which a political subdivision 'derives a special corporate profit or pecuniary benefit.' *See Williams v. New Haven*, 243 Conn. 763, 767 (1998); *Tryon v. Town of North Branford*, 58 Conn. App. 702, 721 (2000). The statute also recognizes liability in several other circumstances, including: 1) the negligent acts or omissions of the municipality, its agents or employees, and 2) acts which constitute the creation or participation in the creation of a nuisance. *See Conn. Gen. Stat.* §52-557n (2003); *see also Tryon*, 58 Conn. App. at 721.

Proprietary acts are "act[s] done in the management of [a city's] property or rights for its own corporate benefit or profit and that of its inhabitants." *Accashian*, 1999 WL 27223, at *2. The "distinction between governmental and proprietary acts is not drawn on the basis of whether the activity serves the public." *Accashian*, 1999 WL 27223, at *2. Instead, the issue is whether the municipality's allegedly tortious actions were for the sake of corporate gain rather than for the administration of government. *See Elliott*, 245 Conn. at 413.

Connecticut courts have declined to grant a motion to strike where a municipality simply claims governmental immunity for its operation of a landfill. In *Accashian*, 1999 WL 27223, at *3-4, the court declined to strike negligence counts against the City of Danbury arising from its operation of a landfill because the factual allegations supported a finding that the landfill operation was a proprietary rather than a governmental function. Similarly, in *Vaillancourt*, 2002 WL 1041381, at *3-4, the court refused to strike a count alleging negligent disposal of hazardous and toxic waste on grounds that allegations that the Town of Southington accepted commercial and industrial waste could give rise to an inference that the town operated the landfill on a proprietary basis. *See also Koontz v. City of Winston-Salem*, 280 N.C. 513, 1972

N.C. LEXIS 1276 (1972) (the Supreme Court of North Carolina declined to grant governmental immunity to the city of Winston-Salem, finding that the city's operation of a landfill was proprietary in nature. The Court recognized the "modern tendency to restrict rather than to extend the application of governmental immunity." *Id.* at 529.); *Coleman v. Kootsillas*, 456 Mich. 615, 616, 619, 624 (1998).

Based on these cases, it is clear that the allegations in the Amended Complaint support the conclusion that Hamden acted in a proprietary manner in its operation of the landfills in the Newhall Section. Hamden's reliance on *Wood v. Wilton*, 156 Conn. 304 (1968) is misplaced. In that case, the Connecticut Supreme Court stated that a "refuse disposal operation is generally held to be a governmental function." *Id.* at 310. The landfill operated by the Town of Wilton at issue in that case stands in sharp contrast to the industrial waste landfill operated by Hamden for a *non-resident* corporation, Olin. The Wilton landfill was a sanitary landfill. *Id.* at 305. The Town of Wilton appointed a committee to locate and decide on the operation of the landfill site, which included the town health officer and two engineers. *Id.* at 306. These facts are very different than the facts alleged in the Amended Complaint.

The Amended Complaint sufficiently alleges that the operation of the landfills were a proprietary function of Hamden. The landfills were not operated as a municipal dump, but, instead, Hamden accepted massive amounts of Olin's industrial waste. ¶ 22-24. Once the dumps were filled, the areas were developed as residential properties. ¶ 25. Hamden profited from the industrial waste landfills, as the areas became, and remain today, a source of tax revenue for the Town. The revenue realized by the landfills is significant, as the area is comprised of hundreds of residential properties. ¶ 43. The filling, leveling, and developing was not a single incident, but continued over the course of decades. ¶ 54. This residential development involving the filling

49

and development of the landfills constituted a proprietary act from which Hamden received, and continues to receive, significant revenue. Therefore, Hamden may be held liable for its operation of the landfills. Accordingly, this Court should deny Hamden's motion to dismiss Counts II, IV, VIII, X and XII of the Amended Complaint.

### B. Whether Hamden Acted in a Governmental or Proprietary manner is a Question of Fact, and is Inappropriate for Disposition on a 12(b)(6) Motion.

Connecticut courts have repeatedly refused to dismiss cases based on governmental immunity in connection with the operation of a landfill because of the factual inquiry that is required to determine whether the municipality acted in a governmental or proprietary function. Several Connecticut courts have indicated that the status of a landfill operation as a governmental or proprietary function depends on the manner in which the landfill is operated, rather than a blanket characterization of a landfill as a government function. This determination turns on several questions of fact. *See, e.g.*, *Savelli v. Town of Windsor*, 1999 WL 1063405, *2 (Conn. Super. Ct. 1999) ("Whether the operation of [a] landfill transfer station is an exercise of a governmental or proprietary function involves several questions of fact"). *See also Accashian*, 1999 WL 27223, at *3-4 (Court declined to strike negligence counts against City of Danbury arising from its operation of a landfill because factual allegations supported finding that landfill operation was proprietary rather than governmental function.).

Other state and federal courts have acted similarly. In *Albertson v. City of Akron*, 1981 Ohio App. LEXIS 13657 (1981), residents located adjacent to a landfill operated by the city of Akron filed a complaint claiming that the city's operation of the landfill amounted to a nuisance and asked for damages due to the adverse effect on their health, well being and property values. *Id.* at *2. The trial court granted the city of Akron's motion to dismiss, which argued that the

operation of the landfill was a governmental function and therefore, that the city should be immune from liability. *Id.* The Ohio Court of Appeals reversed the trial court's decision noting that '[b]ased upon the material before the court, we find that there was a genuine issue as to whether the operation of the Hardy Road Landfill was a proprietary or governmental function." *Id.* at *8. *See also Gache v. Town of Harrison*, 813 F. Supp. 1037, 1051-52 (S.D.N.Y. 1993). Plaintiffs allege that Hamden's facilitation of the disposal of Olin's waste was a proprietary function, resolution of this issue is a question of fact to be resolved by a jury and, therefore, Hamden's Motion to Dismiss must be denied.

IX.   **HAMDEN'S MOTION TO DISMISS COUNTS II, IV, VIII, X AND XII ON GROUNDS OF STATUTE OF LIMITATIONS SHOULD BE DENIED BASED ON THE ALLEGATIONS CONTAINED WITHIN THE FOUR CORNERS OF THE AMENDED COMPLAINT.**

Hamden moved pursuant to Fed.R.Civ.P 12(b)(6) to dismiss Counts II (negligence), IV (gross negligence/reckless conduct), VIII (negligence per se), X (strict liability) and XII (infliction of emotional distress) based on statute of limitations. The plaintiffs seek redress as a result of the contamination of their properties with hazardous chemical substances, including, without limitation, lead, arsenic, SVOCs and PAHs. Accordingly, the applicable statute of limitations is *Conn. Gen. Stat*. §52-577c(b), which applies to claims of property damage based upon contamination by hazardous substances. Based on the allegations in the Amended Complaint, there is no question that the applicable statute of limitations did not run, and that Hamden's motion should be denied.

A.   **A Determination of Whether the Statute of Limitations has Run with Respect to Certain Counts in this Case is a Pure Question of Fact, and Cannot be Dismissed on a 12(b)(6) Motion.**

When a motion to dismiss is based upon expiration of the statute of limitations, dismissal is "appropriate only if a complaint clearly shows that the claim is out of time." *Swan v. EMI Music Publishing Inc.*, 2000 U.S. Dist. LEXIS 15085, *4-5 (S.D.N.Y. 2000), *citing Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999). Some doubt as to whether the statute of limitations has expired is "all that is necessary to withstand a motion to dismiss under rule 12(b)(6)." *Ortiz v. Cornetta*, 867 F.2d 146, 149 (2d Cir. 1989) (Second Circuit reversed District Court's dismissal under Rule 12(b)(6) on the basis of the expiration of the applicable statute of limitations where doubt existed as to when a complaint was received.), *citing Compagnie Des Bauxites De Guinee v. L'Union*, 723 F.2d 357, 363-64 (3d Cir. 1983) (disputed issues of fact concerning statute of limitations precluded dismissal under rule 12(b)(6)); *Egelston v. State University College*, 535 F.2d 752, 754 (2d Cir. 1976) (Rule 12(b)(6) dismissal improper unless it "appears beyond doubt" that plaintiff's claim is barred by statute of limitations). Moreover, "when …a genuine issue of material fact remains, especially as to the time the action accrued, a motion for summary judgment [or pursuant to 12(b)(6)] on the basis of statute of limitations should be denied." *Sungard Recovery Services L.P. v. Unisource Worldwide, Inc.*, 2002 U.S. Dist. LEXIS 23489, *9 (E.D.N.Y. 2002), *citing* 6 James Wm. Moore et al., Moore's Federal Practice P 56.200 app., at 56.203 (3d ed. 2002).

It is against this rigorous standard that Hamden's motion to dismiss must be viewed. Hamden's motion does not even come close. On its face, Hamden's motion raises questions of fact. For example, Hamden states on page 39 of its Memorandum of Law: "It is clear that the Plaintiffs *were aware of or should have known* about the alleged contamination long before this action was filed."(emphasis added). There is no clearer question of fact than what a particular plaintiff knew or should have known at a particular time, the determination of which is essential

to decide whether the applicable statute of limitations set forth in *Conn. Gen. Stat.* §52-577c(b)

has run. *See Goldblum v. Pittson Co, supra*, at *4 ("The defendants last argue that the plaintiffs

knew, or in reasonable exercise if care should have known of the contamination more than two

years before commencing the suit…This question also raises a genuine issue of material fact

about whether the suit was filed within the §52-577c statute of limitations.").

>    **B.    Connecticut Courts Apply §52-577c(b) to Claims of Property Damage Based upon Contamination by Hazardous Substances.**

*Conn. Gen. Stat*. §52-577c(b) provides that "no action to recover damages for personal

injury or property damage caused by exposure to a hazardous chemical substance or mixture or

hazardous pollutant released into the environment shall be brought but within two years *from the*

*date when the injury or damage complained of is discovered or in the exercise of reasonable*

*care should have been discovered.*" *Conn. Gen. Stat*. §52-577c(b) (2003) (emphasis added).

Connecticut courts have held that "[Connecticut] General Statutes §52-577c is the applicable

statute of limitations for personal injury or property damage caused by exposure to a hazardous

pollutant or hazardous chemical substance or mixture whether the claim is based on negligence,

or some other theory." *French Putnam v. County Enviro. Servs.*, 2002 WL 31236213, *1,

(Conn. Super. Ct. 2002) (citations omitted). *See also Blackburn v. Miller-Stephenson Chem.*

*Co., Inc.*, 1998 WL 661445, *2 (Conn. Super. Ct. 1998) ("[Connecticut] General Statutes 52-

557c[(b)] is the applicable statute of limitations for personal injury or property damages caused

by exposure to a hazardous pollutant, 'whether based on negligence or some other theory.'")

(citations omitted).  The Amended Complaint seeks damages as a result of exposure to hazardous

substances released into the environment. As such, the applicable statute of limitations period for

the causes of action asserted in the Amended Complaint that this Court should apply is that found in §52-577c(b).[25]

Hamden's motion barely addresses §52-577c(b).  Instead it relies exclusively on *Bello v. Barden Corp.,* 180 F. Supp. 2d 300 (D. Conn. 2002).  However, *Bello* is clearly distinguishable. With respect to the application of §52-577c(b), the Court in *Bello* dismissed the case because the complaint alleged that the release occurred on January 8, 1998, and that the USEPA cleaned up the property between January 8, 1998 and June 30, 1998.  It is self-evident that the plaintiff in *Bello*  knew or should have known of the clean-up of his own property.  Nonetheless, the plaintiff in *Bello* filed the action on August 14, 2001, more than three years later.  On those allegations, the case would be barred under any of the tort-related statutes of limitations including §52-577c(b).  However, there are no similar allegations in the case at bar, nor does Hamden point to any, that would demonstrate that the Plaintiffs discovered or in the exercise of reasonable care should have discovered the contamination of their properties more than two years prior to filing this action.

    **C.**    **The Amended Complaint Sufficiently Alleges Acts within the Statute of Limitations Period to Withstand a Motion to Dismiss for Failure to State a Claim.**

In applying §52-577c(b), the question is whether the Amended Complaint sufficiently alleges that Plaintiffs discovered or should have discovered the contamination of their properties less than two years prior to commencing this action.  It does.  The Amended Complaint alleges: (1) that in or about April 2001, USEPA conducted surficial soil sampling on only 76 private properties in the Newhall Section (¶29);  (2) that results of these tests were sent to various

---

[25] "The legislative history of §52-577c indicates that the purpose of this statute 'was to extend the statute limitations for suits to recover damages caused by toxic waste pollution." *Goldblum v. The Pittson Co.,* 1996 Ct. Sup. 3679 April 24, 1996).

individual property owners by letter dated May 29, 2001 (¶32); (3) that over 25% of the samples

contained lead concentrations exceeding acceptable state standards (¶30); (4) that approximately

10% of the samples exceeded action levels developed by the USEPA and CTDEP (¶31); (5) that

USEPA carried out a time-critical removal action at 13 properties known to exceed the action

level (¶33); (6) that materials excavated included waste materials (¶34); (7) that CTDEP sampled

soils which showed widespread contamination (¶35); and (8) that in or about December 2002,

Olin reported that analysis of the fill in the Newhall Section indicated the presence of elevated

concentrations of metals in residential site soil (principally arsenic and lead), and PAHs (¶38).

Plaintiffs served the initial state court complaint on Hamden and Olin on May 2, 2003, less than

two years from the date the first test results were sent to any of the Plaintiffs.

When a plaintiff "discovered or in the exercise of reasonable care should have

discovered" property contamination so as to begin the running of the statute of limitations under

Conn. Gen. Stat. § 52-577c is an extremely fact specific determination. *See Goldblum, supra*, at

*4. The District Court for the District of Connecticut held that under *Conn. Gen. Stat.* § 52-577c

an "injury or damage is 'discovered' when '[t]he harm to be alleged . . . become[s] actionable;

that is, the plaintiff must have discovered all the essential elements of the cause of action it seeks

to assert." *Armotek Ind., Inc. v. Freedman*, 790 F. Supp. 383, 392-93 (D. Conn. 1992), *quoting*

*West Haven School District v. Owens-Corning Fiberglas Corp.*, 721 F. Supp. 1547, 1556 (D.

Conn. 1998). Other District Courts have agreed, finding that the date of contamination is not

relevant under statutes of limitations similar to *Conn. Gen. Stat.* § 52-577c. Instead, the time that

the plaintiffs became aware of the contamination is relevant for statute of limitations purposes.

*See Lessord v. General Electric Co.*, United States District Court, Western District of New York,

Docket No. 01-CV-6103L (Aug. 29, 2002, Larimer, J.). *See also Town of Sturbridge v. Mobil*

*Corp.*, 195 F. Supp. 2d 330, 333-34 (D. Mass. 2002)  (Cause of action for negligence associated with hazardous waste leakage did not accrue until discovery of contamination.)

Moreover, courts have logically held that the receipt of test results triggers the statute of limitations under the "reasonably should have known" standard.  In  *Taygeta Corp. v. Varian Assoc., Inc.*, 436 Mass. 217 (2002), the Massachusetts Supreme Court in interpreting a similar statute of limitations found that the statute of limitations for property damage resulting from hazardous waste contamination began to run when the plaintiff received test results of groundwater contamination.[26]  *Id.* at 228.  In reaching this conclusion, the Massachusetts Supreme Court noted that "[g]enerally speaking, it is not until this [testing] process provides definitive information that hazardous material has migrated from its original site and contaminated other properties, and the owners of such other properties receive actual knowledge of their own contamination, that they will have discovered their damages and the cause thereof. At that point, the statute of limitations begins to run."  *Id.* at 227.  *See also Town of Sturbridge*, 195 F. Supp. 2d at 333-34 (Applying *Taygeta*).

Hamden makes no assertion that any of the Plaintiffs either discovered or reasonably should have discovered the contamination of their property at any time before approximately 76 of the hundreds of homes in the Newhall Section received results of the surficial USEPA testing. Hamden merely argues that the statute of limitations began to run at the moment the contamination occurred, which position ignores the clear language of §52-577(c)(b).

As stated above, dismissal of a claim under Rule 12(b)(6) on the basis of the expiration of the statute of limitations is appropriate only where a complaint "clearly shows that the claim is out of time."  *Swan*, 2000 U.S. Dist. LEXIS at *5, *citing Harris v. City of New York*, 186 F.3d

243, 250 (2d Cir. 1999). The Amended Complaint states a cause of action falling within the statute of limitations prescribed § 52-577c(b). At worst, the Amended Complaint presents a factual dispute as to when the plaintiffs' discovered or reasonably should have discovered the contamination. However, even if doubt remains as to whether the statute of limitations has been satisfied, the motion must be denied.

---

[26] See Massachusetts General Laws c. 21E which provides for a three year statute of limitations from the date that a plaintiff "discovers or reasonably should have discovered" the contamination.

**CONCLUSION**

For the reasons set forth above, all of the Defendants' Motions to Dismiss must be denied and the case should proceed to trial in accordance with the established Case Management Schedule.

THE PLAINTIFFS,

By_____
David B. Zabel, Esq. ct01382
dzabel@cohenandwolf.com
Monte E. Frank, Esq. ct13666
mfrank@cohenandwolf.com
Cohen and Wolf, PC
1115 Broad Street
Bridgeport, Connecticut 06604
Tele:  (203) 368-0211
Fax:   (203) 394-9901

Mark Roberts, Esq.
mroberts@mcrobertsandroberts.com
McRoberts & Roberts, LLP
101 Merrimac Street
Boston, Massachusetts 02114
Tele: (617) 722-8222
Fax:  (617) 720-2320

Neil T. Leifer, Esq.
nleifer@tenlaw.com
David C. Strouss, Esq.
dstrouss@tenlaw.com
Thornton & Naumes L.L.P
100 Summer Street, 30th Floor
Boston, Massachusetts 02110
Tele: (617) 720-1333
Fax:  (617) 720-2445

## CERTIFICATION OF SERVICE

I hereby certify that on this 27th day of October, 2003, a copy of the foregoing was served via First Class Mail, postage prepaid, upon the following:

**Olin Corporation:**

Attorney Mark S. Baldwin
Attorney Sandra K. Davis
Brown Rudnick Berlack Israels LLP
185 Asylum Street, 38th Floor
Hartford, CT  06103-3402

Attorney Michael Wetmore
Attorney Joel B. Samson
Husch & Eppenberger, LLC
190 Carondelet Plaza, Suite 600
St. Louis, MO  63105-3441

**Town of Hamden:**

Attorney Ann Catino
Attorney Joseph G. Fortner, Jr.
Attorney Laurie R. Steinberg
Halloran & Sage LLP
225 Asylum Street
Hartford, CT  06103-4303

_____
David B. Zabel