*CASE NO. 03-945- PLAINTIFFS' APPENDIX OF UNREPORTED CASES, EXHIBIT 13*
**Goodrich v. Jennings**
1997 WL 297732 , Conn.Super., May 22, 1997
Not Reported in A.2d
Conn.Super.,1997.
May 22, 1997.

MEMORANDUM OF DECISION RE: MOTION TO STRIKE # 116

MINTZ.

I
FACTS

*1 The plaintiffs, Gail Goodrich and Toni Goodrich, filed an eleven count complaint on January 10, 1996, seeking damages allegedly caused by an underground gasoline storage tank that had leaked. One of the defendants, Strain Oil Company (Strain), moved to strike count ten of the plaintiffs' complaint.

II
DISCUSSION
A
Motion To Strike

"Whenever any party wishes to contest (1) the legal sufficiency of the allegations of any complaint ... or of any one or more counts thereof, to state a claim upon which relief can be granted ... that party may do so by filing a motion to strike the contested pleading or part thereof." Practice Book § 152. "The purpose of a motion to strike is to contest ... the legal sufficiency of the allegations of any complaint ... to state a claim upon which relief can be granted. In ruling on a motion to strike, the court is limited to the facts alleged in the complaint. The court must construe the facts in the complaint most favorably to the plaintiff." (Internal quotation marks omitted.) *Waters v. Autuori,* 236 Conn. 820, 825, 676 A.2d 357 (1996). "In ruling on a motion to strike, the court is limited to considering the grounds specified in the motion." *Meredith v. Police Commissioner,* 182 Conn. 138, 140, 438 A.2d 27 (1980).

B
Count Ten: Negligence Per Se

Count ten of the plaintiffs' complaint states a cause of action for negligence per se based upon General Statutes §§ 22a-427, 22a-430, and 22a-450 of the Water Pollution Control Act (WPCA). Strain moves to strike count ten of the plaintiffs' complaint on the ground that "the statutes cited by the plaintiffs do not support a negligence cause of action because the statutes create public rights enforceable only by the State, and the plaintiffs have no right to bring an action to recover solely private damages under those statutes." Motion To Strike, # 116. The plaintiffs contend that they are not attempting to recover under the WPCA, they are merely attempting to use the standard under the statute as the standard of care in their negligence cause of action, as per the doctrine of negligence per se.

"Negligence per se operates to engraft a particular legislative standard onto the general standard of care imposed by traditional tort law principles, i.e., that standard of care to which an ordinarily prudent person would conform his conduct. To establish negligence, the jury in a negligence per se case need not decide whether the defendant acted as an ordinarily prudent person would have acted under the circumstances. They merely decide whether the relevant statute or regulation has

been violated. If it has, the defendant was negligent as a matter of law." (Internal quotation marks omitted.) *Gore v. People's Savings Bank*, 235 Conn. 360, 368-69, 665 A.2d 1341 (1995), on remand, 40 Conn.App. 219, 670 A.2d 332 (1996). In order to utilize the principle of negligence per se the plaintiffs must satisfy a two-prong test: "(1) that the plaintiffs were within the class of persons protected by the statute; and (2) that the injury suffered is of the type that the statute was intended to prevent." *Id.,* 368-69.

*2 General Statutes § 22a-422 states the policy of the WPCA. This policy mentions "the inhabitants of the state." General Statutes § 22a-422. As inhabitants of the state of Connecticut, the plaintiffs are within the class of persons protected by this statute.

The injury incurred by the plaintiffs is of the type which the WPCA was intended to prevent. General Statutes § 22a-422 states that "the elimination of pollution is hereby declared as a matter of legislative determination." Furthermore, "the pollution of the waters of the state is inimical to the public health, safety and welfare of the inhabitants of the state, is a public nuisance ... and impairs domestic, agricultural, industrial, recreational and other legitimate beneficial uses of water." General Statutes § 22a-422. The plaintiffs have alleged, inter alia, that the pollution has caused damages constituting a loss of the use and enjoyment of their property, as well as causing the plaintiffs to become concerned about the medical effects of the pollution. Complaint, Count 10, ¶¶ 23, 24.

"If a plaintiff alleges that a statute, ordinance or regulation has been violated, thereby relying on negligence per se, and also alleges that there is a causal connection between such negligence and the injuries sustained, a cause of action has been stated." *Commercial Union Ins. Co. v. Frank Perrotti & Sons, Inc.,* 20 Conn.App. 253, 258, 566 A.2d 431 (1989). The plaintiffs have alleged that Strain violated General Statutes §§ 22a-427, 22a-430, and 22a-450. Complaint, Count 10, ¶¶ 68-70. The plaintiffs have also alleged that these violations were the proximate cause of the damages to their property. Therefore, the plaintiffs have sufficiently stated a claim of negligence as a matter of law.

Strain also argues that allowing the plaintiffs to recover under a negligence per se theory based upon §§ 22a-427, 22a-430, and 22a-450 violates the laws of statutory construction because it renders § 22a-452 mere surplusage. This is because § 22a-452(a) allows the party that cleans up the contamination to recover for "reimbursement from any person, firm or corporation for the reasonable costs expended for ... containment, removal, or mitigation" of the contamination. The plaintiffs claim that this assertion by Strain misinterprets how the negligence per se doctrine is applied.

Strain is correct that, according to the law of statutory interpretation, "[a] statute must be interpreted to give effect to all its provisions ... No word within a statute is to be rendered mere surplusage ..." (Citations omitted.) *Westport Taxi Service, Inc. v. Westport Transit District,* 235 Conn. 1, 40, 664 A.2d 719 (1995). The plaintiffs, however, are also correct in that the application of this doctrine is inapplicable to their claim of negligence per se. "The doctrine of negligence per se serves to superimpose a legislatively prescribed standard of care on the general standard of care." *Staudinger v. Barrett,* 208 Conn. 94, 101, 544 A.2d 164 (1988). The plaintiffs are not interpreting §§ 22a-427, 22a-430, and 22a-450 as providing a private cause of action under the WPCA. Instead, the plaintiffs are merely seeking to adopt those sections of the WPCA as the standard of care in their negligence claim. The plaintiffs would only be foreclosed from asserting a negligence per se claim based upon the WPCA if the remedy therein was designated a plaintiff's exclusive remedy. See *Sanzone v. Board of Police Commissioners,* 219 Conn. 179, 192, 592 A.2d 912 (1991) ("an action under the highway defect statute, § 13a-149, is a plaintiff's

exclusive remedy against a municipality or other political subdivision ' for damages resulting from injury to any person or property by means of a defective road or bridge' "); see also *Winslow v. Lewis-Shepard, Inc.,* 212 Conn. 462, 562 A.2d 517 (1989) (the Products Liability Act, General Statutes § 52-572n, is a plaintiff's exclusive remedy for claims within its scope). Therefore, the rules of statutory interpretation cited by Strain are not implicated in the current motion. Strain's motion to strike count ten of the plaintiffs' complaint is denied.
Conn.Super.,1997.
Goodrich v. Jennings
1997 WL 297732 (Conn.Super.)
END OF DOCUMENT

***CASE NO. 03-945- PLAINTIFFS' APPENDIX OF UNREPORTED CASES, EXHIBIT 14***
**Kurzyna v. City of New Britain**
2002 WL 1008450, 32 Conn. L. Rptr. 118 , Conn.Super., Apr 11, 2002
Not Reported in A.2d
Conn.Super.,2002.
April 11, 2002.

PETER EMMETT WIESE, Judge.

I
FACTS

*1 The plaintiff, Julie Kurzyna, filed a nine-count complaint against the defendants, the city of New Britain (city) and Norman F. Wnuk, individually and in his official capacity, on September 18, 2000. The plaintiff alleges the following facts in support of her complaint. The plaintiff, together with her late husband, purchased property known as 150 Reservoir Road, New Britain, Connecticut in 1983. On May 22, 1985, the Kurzynas obtained a building permit from the city and began building a residential structure on the property. The city revoked the permit on June 17, 1985, reissued the permit in 1986, and then revoked the permit a second time. As of the present date, the residential structure remains unfinished, uninhabited and contains many defects. Specifically, the foundation has developed cracks approximately three inches wide and part of the structure is splitting away.

The plaintiff alleges that she first became aware that the condition of her property was caused by the city when she learned of a letter dated September 14, 1998, which was written by the department of environmental protection (DEP) explaining the history of the property, including the presence of industrial sludge. On or about April 1, 1999, the DEP completed a Phase I Site Assessment Report for the property confirming that the city disposed of potentially four million gallons of industrial sludge onto the plaintiff's property. The report also provided the plaintiff with the following additional facts. In 1951, the city purchased a four million gallon industrial lagoon known as Lock Shop Pond from the American Hardware Corporation. From approximately 1951 until 1958 or 1959, the city disposed of industrial sludge and/or other contaminants from Lock Shop Pond to the property at issue. In the early 1950s, the city turned Lock Shop Pond into a parking lot and sold it to the department of transportation in 1976. The property at issue was covered over in either 1958 or 1959 and was known as 146 Reservoir Road until approximately March 1976.

The plaintiff filed the current action on September 18, 2000, alleging that the defects in her

structure are caused by instability in the ground due to the presence of industrial sludge and other contaminants underground. The plaintiff alleges that she is precluded from building on the property or making use of the property and that its value has been greatly reduced. The plaintiff further alleges that the city has assessed the property at values exceeding its actual market value and that she has paid excessive taxes to the defendant based on overvalued assessments. On July 25, 2001, the plaintiff filed a revised nine-count complaint in response to the defendants' November 3, 2000, request to revise. [FN1] In the complaint, the plaintiff alleges negligence pursuant to General Statutes § 52-557n (count one), nuisance pursuant to § 52-557n (count two), trespass (count three), strict liability (count four), injunctive relief (count five), declaratory and equitable relief pursuant to General Statutes § 22a-16 (count six), negligent infliction of emotional distress (count seven), a violation of 42 U.S.C. § 1983 and other federal laws (count eight) and a violation of article first, §§ 7 and 8, of the constitution of Connecticut (count nine) against the defendants. The plaintiff also attached the State of Connecticut Phase I Environmental Site Assessment dated April 1, 1999, as an exhibit to her revised complaint, and frequently references this exhibit in her complaint.

FN1. The revised complaint is the operative complaint with respect to this motion.

*2 The defendants now move to strike paragraphs 23, 25(b)-(e), (i) and (j) and a portion of paragraph 26 of count one and counts two through nine of the plaintiff's revised complaint on numerous grounds. The defendants filed a memorandum in support of their position and the plaintiff filed a timely memorandum in opposition. The defendants further filed a reply memorandum and the plaintiff subsequently filed a supplemental memorandum.

II

DISCUSSION

"The purpose of a motion to strike is to contest ... the legal sufficiency of the allegations of any [complaint] ... to state a claim on which relief can be granted." (Internal quotation marks omitted.) *Peter-Michael, Inc. v. Sea Shell Associates,* 244 Conn. 269, 270, 709 A.2d 558 (1998). "In ruling on a motion to strike, the court is limited to the facts alleged in the complaint." (Internal quotation marks omitted.) *Waters v. Autuori,* 236 Conn. 820, 825, 676 A.2d 357 (1996). "If facts provable under the allegations would support a defense or a cause of action, the motion to strike must be denied." *RK Constructors, Inc. v. Fusco Corp.,* 231 Conn. 381, 384, 650 A.2d 153 (1994). "The court must construe the facts in the complaint most favorably to the plaintiff." (Internal quotation marks omitted.) *Waters v.. Autuori, supra,* 236 Conn. at 825.

A

Count One: Negligence

The defendants move to strike paragraphs 23, 25(b)-(e), (i) and (j) and a portion of paragraph 26 of count one of the plaintiff's revised complaint. "Although there is a split of authority, most trial courts follow the rule that a single paragraph of a pleading is subject to a motion to strike only when it attempts to set forth all of the essential allegations of a cause of action or defense ..." (Internal quotation marks omitted.) *Pinho v. Daly,* Superior Court, judicial district of New Britain, Docket No. 500895 (May 3, 2001, Shapiro, J.); *Cain v. Destefano,* Superior Court, judicial district of New Haven, Docket No. 420347 (December 17, 1999, Zoarski, J.). Here, since the defendants, in essence, argue that the paragraphs sought to be stricken set forth allegations of

separate causes of action, the court will address the merits of the defendants' motion to strike these individual paragraphs.

1

Excessive Taxes

The defendants move to strike paragraphs 23 and 25(j) and a portion of paragraph 26 of count one of the plaintiff's revised complaint on the ground that the exclusive remedy for the plaintiff's claim for excessive taxes is set forth under General Statutes § 12-119. The defendants further argue that the one-year statute of limitations set forth in the statute has expired.

In response, the plaintiff argues that she can recover for the overpayment of taxes in her negligence count. Specifically, the plaintiff argues that § 12- 119 is not the exclusive remedy and that, regardless, an action of assumpsit remains and was not eradicated by § 12-119. With regard to the one-year statute of limitations, the plaintiff contends that she did not become aware of the city's involvement until September 14, 1998, and that she could not have obtained the information necessary within one year of the last property assessment in order to bring a timely claim.

*3 Section 12-119 states in relevant part that "[w]hen it is claimed that a tax has been laid on property not taxable in the town or city in whose tax list such property was set, or that a tax laid on property was computed on an assessment which ... was manifestly excessive ... the owner thereof ... may, *in addition to the other remedies provided by law,* make application for relief to the superior court for the judicial district in which such town or city is situated." (Emphasis added.)

In *Norwich v. Lebanon,* 200 Conn. 697, 513 A.2d 77 (1986), the Supreme Court noted that it has previously declared "that the enactment of § 12-119 merely added one more to the recognized remedies of an appeal to the board of tax review and of assumpsit for money illegally received and retained." (Internal quotation marks omitted.) *Id., at 710.* The plain language of § 12-119 suggests that it is not the exclusive remedy for claims of manifestly excessive taxes. The language provides that the owner may apply for relief pursuant to § 12-119, in addition to other remedies provided for by law. See General Statutes § 12-119.

This court finds that § 12-119 is not necessarily the exclusive remedy for a claim of excessive taxes. This does not, however, end the court's inquiry. The court must next determine whether the plaintiff's claim is barred by the one-year statute of limitations set forth in the statute Section 12-119 provides in pertinent part that "[s]uch application may be made within one year from the date as of which the property was last evaluated for purposes of taxation."

In *Norwich v. Lebanon, supra,* 200 Conn. at 697, the Court found it apparent that the legislative purpose behind §§ 12-118 and 12-119 "would be thwarted if an action for refund of taxes paid upon a disputed assessment could be brought *far beyond the time limits* for contesting an assessment established by these statutes." (Emphasis added.) *Id., at 710.* "The contention of the plaintiff ... that it can circumvent the time limitations of §§ 12-118 and 12-119 by resorting to the ancient writ of indebitatus assumpsit is incompatible with the conception that such an action is governed by equitable principles." *Id., at 711.* "Although § 12-119 may have been enacted ' in addition to the other remedies provided by law' and thus did not wholly remove indebitatus assumpsit as a vehicle for obtaining a tax refund ... the statute did not exempt such an action from application of the equitable principles that have historically controlled its use." (Citation omitted; internal quotation marks omitted.) *Id., at 712.*

Here, the plaintiff alleges that the city assessed the property at values exceeding its actual market value and that the Kurzynas and/or Kurzyna have paid excessive taxes to the city based upon

these overvalued assessments. (Revised Complaint, Count One, ¶¶ 23 and 25(j).) The plaintiff argues that her claim should be equitably tolled because she had no knowledge of the city's involvement until September 14, 1998, and because she could not have obtained the information necessary within one year of the last property assessment.

*4 Although the plaintiff discovered the city's involvement from a letter dated September 14, 1998, she did not commence this action until September 18, 2000. The plaintiff, therefore, brought this action more than a year after discovering the city's involvement. Further, the plaintiff fails to allege the date of the last property assessment. Although the plaintiff argues that she was unable to obtain the information necessary within one year of the last property assessment, she has failed to allege such facts in her complaint. Based on the plaintiff's failure to allege these facts, the court cannot determine how far beyond the time limits the plaintiff is attempting to make her claim for excessive taxes. The court is unwilling to extend the statute of limitations in this case.

Since the plaintiff failed to file this claim for excessive taxes within the one-year statute of limitations, her claim is untimely. Accordingly, the court grants the defendants' motion to strike paragraphs 23 and 25(j) and the portion of paragraph 26 pertaining to excessive taxes in count one of the plaintiff's revised complaint [FN2]

> FN2. The portion of paragraph 26 that is stricken is the phrase "unreasonable payment of taxes."

## 2
## Governmental Immunity

The defendants argue that the court should strike paragraphs 25(b) through (e) and (i) in count one of the plaintiff's revised complaint because the claims are barred by governmental immunity pursuant to General Statutes §§ 52- 557n(b)(7) and (8). The plaintiff, in response, argues that her claims are not barred and, further, argues that her claims fall within the statutory exceptions set forth in subsections (7) and (8).

"It is well settled that municipalities and their employees are immune from liability for the negligent performance of discretionary acts." *Ford v. West Haven,* Superior Court, judicial district of Ansonia Milford at Milford, Docket No. 051003 (July 14, 1998, Ripley, J.). The immunity is limited, however, and subject to the exceptions set forth in §§ 52-557n(b)(7) and (8). Section 52-557n(b) states in relevant part that "a political subdivision of the state or any employee, officer or agent acting within the scope of his employment or official duties shall not be liable for damages to person or property resulting from ... (7) the issuance, denial, suspension or revocation of, or failure or refusal to issue, deny, suspend or revoke any permit, license, certificate, approval, order or similar authorization, when such authority is a discretionary function by law, unless such issuance, denial, suspension or revocation or such failure or refusal constitutes a reckless disregard for health or safety; (8) failure to make an inspection or making an inadequate or negligent inspection of any property, other than property owned or leased by or leased to such political subdivision, to determine whether the property complies with or violates any law or contains a hazard to health or safety, *unless* the political subdivision had notice of such a violation of law or such a hazard or *unless* such failure to inspect or such inadequate or negligent inspection constitutes a reckless disregard for health or safety under all the relevant circumstances ..." (Emphasis added.)

\*5 In her complaint, the plaintiff alleges that although the city had notice of the dangerous and defective condition, it failed to monitor and inspect the property to determine the extent of the contamination in reckless disregard of health and safety concerns. (Revised Complaint, Count One, ¶ 25(d).) The plaintiff asserts that the city, on two separate occasions, and in reckless disregard for health and safety considerations, issued building permits to the Kurzynas to build on the property when it knew or should have known of the dangerous or defective condition of the property. (Revised Complaint, Count One, ¶ 25(h).) The plaintiff further alleges that on two separate occasions, the city revoked the permits and, to date, she is precluded from building on the property due to the instability of the ground. (Revised Complaint, Count One, ¶¶ 15, 16, 20 and 21.)

"Under §§ 52-557n(b)(7) or (8) the court considers the conduct of the municipality' s employees, officers or agents in determining whether a municipality' s conduct constituted a reckless disregard for health or safety." *Greystone Condominium Assn., Inc. v. Boulder Run, LLC,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 370368 (May 7, 2001, Brennan, J.) (29 Conn. L. Rptr. 471). "Simply using the word ' reckless' ... is not enough. A specific allegation setting out the conduct that is claimed to be reckless or wanton must be made." (Internal quotation marks omitted.) *Id.*

In construing the complaint in the light most favorable to the plaintiff, this court finds that the plaintiff has alleged sufficiently conduct by the city that constitutes a reckless disregard for the health and safety of others. The plaintiff has alleged that the city was aware that it had disposed of industrial sludge on the plaintiff' s property. The plaintiff avers that, despite its knowledge, the city failed to inspect the property for contamination in reckless disregard for the health and safety of herself, her family and neighboring properties and, further, has alleged that the city on two different occasions issued building permits and then subsequently revoked them.

The plaintiff has alleged sufficiently conduct falling within the exceptions to §§ 52-557n(b)(7) and (8). Accordingly, the defendants' motion to strike paragraphs 25(b) through (e) and ( ) in count one of the plaintiff' s revised complaint is denied.

B

Count Two: Nuisance

The defendants next move to strike count two of the plaintiff' s complaint on the ground that the plaintiff has failed to allege sufficiently a cause of action for nuisance. Specifically, the defendants argue that the plaintiff has failed to allege that the city is an owner of neighboring property or that the city' s use is causing a nuisance.

The plaintiff concedes that Connecticut case law does not recognize a cause of action for nuisance when the nuisance is committed on one' s own property or when the nuisance is not committed from a neighboring property. The plaintiff asks the court to instead follow California case law and, therefore, allow a cause of action against a preceding owner of property.

\*6 The plaintiff raises her nuisance claim pursuant to General Statutes § 52-557n(a)(1). Section 52-557n(a)(1) states in relevant part that "a political subdivision of the state shall be liable for damages to person or property caused by ... (C) acts of the political subdivision which constitute the creation or participation in the creation of a nuisance ..."

In *Pestey v. Cushman,* 259 Conn. 345 (2002), the Court clarified the law on private nuisance and adopted the basic principles of § 822 of the Restatement (Second) of Torts. "A private nuisance is a nontrespassory invasion of another' s interest in the private use and enjoyment of land." (Internal quotation marks omitted.) *Id., at 352.* "The law of private nuisance springs from the general principle that ' i[t] is the duty of every person to make a reasonable use of his own

property so as to occasion no unnecessary damage or annoyance *to his neighbor.*' " (Emphasis added.) *Id.* "The essence of a private nuisance is an interference with the use and enjoyment of land." (Internal quotation marks omitted.) *Id.* "According to the Restatement (Second) of Torts, a plaintiff must prove that: (1) there was an invasion of the plaintiff's use and enjoyment of his or her property; (2) the defendant's conduct was the proximate cause of the invasion; and (3) the invasion was either intentional and unreasonable, or unintentional and the defendant's conduct was negligent or reckless." *Id.,* at 358.

The plaintiff alleges that the contamination of the property has a natural tendency to create danger and inflict injury upon person or property because it causes instability of the soil, as well as soil, water and air pollution. (Revised Complaint, Count Two, ¶ 28(a).) The plaintiff further alleges that the contamination is a continuing danger, that the use of the property continues to be unreasonable and unlawful and that the contamination proximately caused the plaintiff's losses and rendered the property useless and unsaleable. (Revised Complaint, Count Two, ¶ 28(b)-(d).) Lastly, the plaintiff alleges that "[b]y disposing the contents of Lock Shop Pond to the property and failing to monitor, control and/or remedy the resulting contamination, New Britain created the contamination of the Property." (Revised Complaint, Count Two, ¶ 28(e).)

In *B & D Products, Inc. v. Vitek Research Corp.,* Superior Court, judicial district of Ansonia-Milford at Milford, Docket No. 060362 (August 17, 1998, Corradino, J.) [(23 Conn. L. Rptr. 90),](#) the plaintiff made similar allegations of nuisance arising out of the defendant's actions of depositing hazardous waste over a seven-year period. *Id.* The defendant had been a lessee of the prior owner of the property and the plaintiff was the current owner of the property at issue. *Id.* The plaintiff alleged that the deposits were continuing to affect the plaintiff's property and that the defendant had unreasonably polluted the plaintiff's land. *Id.* In reviewing the plaintiff's private nuisance claim, the court held that "no action in private nuisance will lie against the former lessee of the land that was subsequently purchased by the plaintiff because ... the alleged wrong does not arise out of the use of property which inflicts harm on neighboring property--the same land that was leased was later purchased." *Id.,* at 93. The court reviewed several general authorities that discussed private nuisance, and "the court could not find a private nuisance case where the alleged harm to property forming the basis of the nuisance claim did not arise out of the tortious ' use' [broadly defined] of neighboring property." *Id.*

*7 Moreover, that court quickly dismissed the California case law which the plaintiff in this case asks the court to follow. The court noted that "California allows a nuisance action against, for example, a prior lessee of the same land but, in that state, nuisance is a creature of statute and their courts explicitly state that under their statute it is not necessary that a nuisance have its origin in neighboring property." (Internal quotation marks omitted.) *Id.,* at 95 n. 4; see *[Mangini](#)* *[v. Aerojet-General Corp., 230 Cal.App.3d 1125, 281 Cal.Rptr. 827 (1991).](#)*

This court finds *B & D Molded Products, Inc. v. Vitek Research Corp., supra,* 23 Conn. L. Rptr. at 90, to be persuasive and, therefore, follows its holding. The court finds no reason to depart from established Connecticut case law on nuisance. While the plaintiff has set forth the bare allegations of nuisance in her complaint, [\[FN3\]](#) the plaintiff simply cannot sustain this cause of action under Connecticut law without alleging that the city inflicted such harm from a neighboring property.

[FN3.](#) The court notes that the plaintiff pleaded the bare allegations of private nuisance as set forth in *[Walsh v. Stonington Water Pollution Control Authority,](#)* [250 Conn. 443, 449](#) [n. 4, 736 A.2d 811 (1999).](#) Despite the Supreme Court's recent clarification of the law,

the plaintiff has failed to allege, under either test, that the city inflicted harm from a
neighboring property.


Accordingly, the court grants the defendants' motion to strike count two of the plaintiff's revised
complaint.

## C
## Continuing Trespass

The defendants also move to strike count three of the plaintiff's revised complaint on the ground
that the plaintiff has failed to allege that the act of the placement of the hazardous waste was
unauthorized and the product of a trespass when it occurred. The plaintiff relies on the
Restatement Second of Torts in support of her argument and, further, argues that the continuing
trespass is the dumping of industrial sludge on the property by the city.

"A trespass may be committed by the continued presence on the land of a structure, chattel, or
other thing which the actor has tortiously placed there, whether or not the actor has the ability to
remove it." 2 Restatement (Second), Torts § 161 (1965). In *B & D Molded Products, Inc. v. Vitek
Research Corp., supra,* 23 Conn. L. Rptr. at 90, however, the court observed that the Connecticut
courts have rejected this continuing trespass argument in situations where the hazardous waste
was placed on property by the defendant, but the placement was not done tortiously. *Id.,* at 94.
Here, the plaintiff alleges that the city's placement of the industrial sludge or other contaminants
on her property was tortious at the time that it occurred. (Revised Complaint, Count One, ¶
25(a)-(j) and Count Three, ¶ 27(b).) The plaintiff further alleges that from approximately 1951 to
1958-59, the city repeatedly disposed or repeatedly approved, directed, allowed or permitted the
disposal of industrial sludge or other contaminants onto the property at issue. (Revised
Complaint, Count One, ¶ 7.) The plaintiff does not, however, allege whether the city ever owned
the property or what her factual basis is for asserting that the city's actions were tortious.[FN4]
In the State of Connecticut Phase I Environmental Site Assessment, the property was described
as an abandoned stone quarry at the time the alleged conduct occurred. (Revised Complaint,
Exhibit One.) Further, the plaintiff had no property interest in this land when the alleged tortious
acts occurred, as she and her late husband purchased the property approximately thirty years
after the alleged tortious conduct occurred.


FN4. In the plaintiff's supplemental memorandum, she states that '[i]t is presently
unknown as to whether or not the defendant ever owned plaintiff's property at 150
Reservoir Road ... The correct reference to defendant's ownership to [the] property in this
case is the Lock Shop Pond property." (Plaintiff's Supplemental Memorandum, p. 1.) The
plaintiff filed this memorandum to correct previous references to the city of New Britain
as the prior owner of her property.


*8 While the plaintiff alleges that the city's activity of placing industrial sludge on the property
was tortious, she provides no facts supporting this assertion. Accordingly, the court grants the
defendants' motion to strike count three of the plaintiff's revised complaint.

## D
## Strict Liability

The defendants next move to strike count four of the plaintiff's revised complaint on the ground that the facts alleged are insufficient to state a claim for strict liability. Specifically, the defendants argue that the plaintiff has alleged that the waste is non-hazardous and that it does not pose a threat to human safety. The plaintiff argues that she has alleged sufficiently that the city's activity is ultrahazardous and that the property is polluted.

"The factors for a court to consider in determining whether an activity is abnormally dangerous are listed in § 520 of the Restatement as: (a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes." (Internal quotation marks omitted.) *Green v. Ensign-Bickford Co.,* 25 Conn.App. 479, 486, 592 A.2d 1383, cert. denied, 220 Conn. 919, 597 A.2d 343 (1991). "In determining whether the danger is abnormal, the factors listed ... are all to be considered, and are all of importance. Any one of them is not necessarily sufficient of itself in a particular case, and ordinarily several of them will be required for strict liability. On the other hand it is not necessary that each of them be present, especially if others weigh heavily." (Internal quotation marks omitted.) *Id.*

In *French Putnam LLC v. County Environmental Services, Inc.,* Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. 166445 (July 21, 2000, D' Andrea, J.) (27 Conn. L. Rptr. 684), the court observed that "[t]he judges of the Superior Court have found that the *disposal* of toxic and hazardous materials constitutes an abnormally dangerous activity." (Emphasis in original.) *Id.,* at 694 (holding that the plaintiff failed to allege sufficient facts regarding the disposal of hazardous materials, but noting that the plaintiff did not directly allege or use the word "disposal"); see also *Mather v. Birken Manufacturing Co.,* Superior Court, judicial district of Hartford, Docket No. 564862 (December 8, 1998, Hennessey, J.) (23 Conn. L. Rptr. 443) (denying the defendant's motion to strike because the plaintiffs did not merely allege that the defendant stored or used hazardous materials; the plaintiffs further alleged that the defendant disposed of hazardous and toxic chemicals and wastes); *P .R.I.C.E., Inc. v. Keeney,* Superior Court, judicial district of Hartford, Docket No. 054269 (July 10, 1998, Hale, J.) (22 Conn. L. Rptr. 373) (concluding that while the disposal of hazardous waste may constitute an ultrahazardous activity, the facts alleged were insufficient to state a claim for strict liability). The cases tend to distinguish between the disposal and storage of hazardous materials, and generally hold that the mere storage and use of hazardous material is not an ultrahazardous activity and, therefore, does not support a strict liability claim. See *French Putnam LLC v. County Environmental Services, Inc., supra,* 27 Conn. L. Rptr. at 684; *Skelton v. Chemical Leaman Tank Lines,* Superior Court, judicial district of New Haven, Docket No. 359236 (May 13, 1996, Corradino, J.) (17 Conn. L. Rptr. 56).

*9 In this case, the plaintiff is clearly alleging that the city's *disposal* of industrial sludge and/or other contaminants onto the property constitutes an ultrahazardous activity. (Revised Complaint, Count Four, ¶ 27.) The plaintiff avers that the city *disposed* of approximately four million gallons of industrial waste onto the property. (Revised Complaint, Count One, ¶ 8.) In further support of her allegations, the plaintiff attached an exhibit and references the exhibit in count one of her complaint. (Revised Complaint, Exhibit One.) The plaintiff argues that this report identifies semi-volatile organic compounds in the industrial sludge on the property and finds that specific semi-volatile compounds exceed the GA pollutant mobility. (Plaintiff's Memorandum, p. 17.)

The plaintiff alleges that a dangerous and defective condition has existed on the property for an unreasonable length of time and that the city has failed to warn owners of the possibility of contamination. (Revised Complaint, Count One, ¶ 25(e)-(g).) The plaintiff further asserts that the harm that results will be great in that, due to the contamination, she is precluded from building on the property and the property is not saleable or its value has been greatly reduced. (Revised Complaint, Count One, ¶¶ 21 and 22.) Lastly, the plaintiff alleges that the city failed to take any action in remedying the dangerous and defective condition. (Revised Complaint, Count One, ¶ 25(b)-(c).)

This court relies on the cases holding that the disposal of hazardous materials constitutes an abnormally dangerous activity. The plaintiff has alleged sufficiently that the city disposed of hazardous materials, i.e., industrial sludge and other contaminants, to the property that she now owns. This court finds that the plaintiff has alleged sufficiently facts to state a claim for strict liability for an ultrahazardous activity.

Accordingly, the defendants' motion to strike count four of the plaintiff's revised complaint is denied.

E

Injunctive Relief

The defendants further move to strike count five of the plaintiff's revised complaint on the ground that the plaintiff has failed to allege sufficiently a claim for injunctive relief. Specifically, the defendants argue that the city's actions ceased over forty years ago and, therefore, the plaintiff has alleged no action that can be enjoined. The plaintiff responds by arguing that injunctive relief is available to undo a continuing wrong.

"[A] party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law." (Internal quotation marks omitted.) *Lawrence Brunoli, Inc. v. Branford,* 247 Conn. 407, 416, 722 A.2d 271 (1999). The plaintiff incorporates paragraphs one through 26 from count one and paragraphs twenty-seven through thirty from count two into her claim for injunctive relief. The plaintiff alleges that the acts of the city are a nuisance that have caused and will cause her irreparable injury. (Revised Complaint, Count Five, ¶ 30.) The plaintiff also alleges that the city's acts are continuous, recurrent and permanent and that the nuisance will continue unless the property is restored and the industrial sludge and waste are removed. (Revised Complaint, Count Five, ¶ 30.) Lastly, the plaintiff alleges that she has no adequate remedy at law. (Revised Complaint, Count Five, ¶ 31.)

*10 In essence, the plaintiff's claim for injunctive relief is based solely on her private nuisance claim. The court has previously determined that the plaintiff has not pleaded a legally sufficient cause of action for private nuisance in part II B of this opinion. The plaintiff cannot, therefore, satisfy the irreparable harm prong in seeking injunctive relief. Accordingly, the court grants the defendants' motion to strike count five of the plaintiff's revised complaint.

F

Declaratory and Equitable Relief Pursuant to General Statutes § 22a-16

The defendants next move to strike count six of the plaintiff's revised complaint on the ground that the plaintiff has failed to allege sufficiently a claim for declaratory and equitable relief. The defendants argue that the plaintiff has failed to allege sufficiently proof that any natural resource has been unreasonably polluted, impaired or destroyed. In response, the plaintiff argues that she has alleged that the industrial sludge and waste have come into contact with both the ground and below-ground water and that water is a natural resource.

General Statutes § 22a-16 provides in pertinent part that "*any person* ... may maintain an action

in the superior court ... for declaratory and equitable relief against the state, any political subdivision thereof, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity, acting alone, or in combination with others, for the protection of the public trust in the *air, water and other natural resources* of the state from unreasonable pollution, impairment or destruction ..." (Emphasis added.) "Statutes such as the EPA are remedial in nature and should be liberally construed to accomplish their purpose." *Manchester Environmental Coalition v. Stockton,* 184 Conn. 51, 57, 441 A.2d 68 (1981). There is no requirement under the statute that the defendant act negligently or otherwise culpably. See *Blackburn v. Miller-Stephenson Chemical Co.,* Superior Court, judicial district of Danbury, Docket No. 314089 (September 11, 1998, Leheny, J.).

Here, the plaintiff has alleged that the city's conduct has or is reasonably likely to pollute, impair, or destroy the public trust in the air, water or other natural resources of the state. (Revised Complaint, Count Six, ¶ 34.) The plaintiff alleges that the sludge, industrial waste and other pollutants include semi-volatile organic compounds at concentrations exceeding the GA pollutant mobility criteria of Connecticut State Regulations §§ 22a-133k-1 through 22a-133k-3. (Revised Complaint, Count Six, ¶ 34(h).) The plaintiff asserts that these contaminants have been exposed to the air and, further alleges that the contaminants have made contact with ground and below-ground water on her property and that they continue to be transported via water flow to locations outside of her property. (Revised Complaint, Count Six, ¶¶ 34(g) and (i).) Both air and water are expressly listed as natural resources in § 22a-16. Therefore, based on these allegations, the plaintiff has alleged sufficiently that the city's conduct has or is reasonably likely to pollute, impair, or destroy the public trust in the air, water or other natural resources of the state.

*11 In construing the complaint in the light most favorably to the plaintiff, this court finds that the plaintiff has alleged sufficiently a claim for declaratory relief under General Statutes § 22a-16. Accordingly, the defendants' motion to strike count six of the plaintiff's revised complaint is denied.

G

Negligent Infliction of Emotional Distress

The defendants next move to strike count seven of the plaintiff's revised complaint on the ground that the plaintiff has failed to allege sufficiently a cause of action for negligent infliction of emotional distress. The defendants argue that any disposal that occurred years before the plaintiff took title cannot constitute extreme and outrageous conduct and, further argue that the plaintiff's claim is based solely on damage to property. The plaintiff argues that the city's conduct was sufficiently unreasonable such as to meet the standard for her claim and further contends that her claim is based on more than mere damage to her property.

"[I]n order to state ... a claim [for negligent infliction of emotional distress], the plaintiff has the burden of pleading that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm." (Internal quotation marks omitted.) *Parsons v. United Technologies Corp.,* 243 Conn. 66, 88, 700 A.2d 655 (1997). "[R]ecovery for unintentionally-caused emotional distress does not depend on proof of either an ensuing physical injury or a risk of harm from physical impact. Nevertheless ... the protection the law accords to ' the interest in one's peace of mind' ... must be limited so as not to open up a wide vista of litigation in the field of bad manners, where relatively minor annoyances had better be dealt with by instruments of social control other than the law." (Citation omitted; internal quotation marks omitted.) *Montinieri v.*

*Southern New England Telephone Co.,* 175 Conn. 337, 345, 398 A.2d 1180 (1978). "
' Unreasonable conduct' has been interpreted as conduct performed in an inconsiderate, humiliating or embarrassing manner." (Internal quotation marks omitted.) *Early v. Derby Neck Library,* Superior Court, judicial district of Ansonia- Milford at Derby, Docket No. 072405 (September 27, 2001, Nadeau, J.) (30 Conn. L. Rptr. 450, 453).

In support of her claim, the plaintiff alleges that the city knew or should have known that its conduct involved an unreasonable risk of causing emotional distress to the plaintiff and that the city' s conduct was a direct and proximate cause of her emotional distress. (Revised Complaint, Count Seven, ¶¶ 31 and 32.) The plaintiff alleges that she has suffered severe emotional distress and, further, alleges that she was forced to abandon her property and fears that the industrial sludge has harmed her property and herself individually, as well as her immediate family. (Revised Complaint, Count Seven, ¶¶ 33 and 34.) The plaintiff also incorporates paragraphs one through twenty- five of count one and paragraphs twenty-six through twenty-nine of count two into her emotional distress claim.

*12 A review of a number of decisions by judges of the Connecticut Superior Court reveals that the law does not recognize a claim for negligent infliction of emotional distress based solely on damage to property. See e.g., *Early v. Derby Neck Library, supra,* 30 Conn. L. Rptr. at 450; *Hixon v. Eilers,* Superior Court, judicial district of Hartford, Docket No. 592937 (February 14, 2001, Fineberg, J.) (29 Conn. L. Rptr. 254); *Deleo v. Reed,* Superior Court, judicial district of Stamford Norwalk at Stamford, Docket No. 172435 (January 3, 2000, Hickey, J.) (26 Conn. L. Rptr. 213). The plaintiff cannot, therefore, recover for negligent infliction of emotional distress based on her fear that the industrial sludge has harmed her property.

In addition to her property damage claim, the plaintiff alleges that she has suffered emotional distress and fears that the industrial sludge has harmed herself and her family. (Revised Complaint, Count Seven, ¶ 34.) The plaintiff has failed, however, to allege any facts supporting this claim. The plaintiff alleges that she and her husband obtained building permits from the defendant which were revoked on two separate occasions, and that the residential structure remains unfinished and is uninhabited. (Revised Complaint, Count One, ¶¶ 14 through 17.) The plaintiff further alleges that due to the contamination, she is precluded from building on the property or making use of the property, and that the property is not saleable and its value has been greatly reduced. (Revised Complaint, Count One, ¶¶ 21 and 22.)

Despite the fact that the plaintiff alleges that the city issued the permits in reckless disregard for health and safety reasons, the plaintiff has failed to allege sufficiently a fear of harm to herself to support her claim. Based on her allegations, the plaintiff' s claim of emotional distress is directly related to the damage to her property and the financial losses she has incurred as a result. Since the property remains unfinished and uninhabited, the court cannot find that the plaintiff has alleged a negligent infliction of emotional distress claim based on anything other than property damage. The plaintiff cannot simply allege that she fears the industrial sludge will harm either herself or her family without facts to support this conclusion.

A negligent infliction of emotional distress claim based on property damage is not a legally cognizable claim in Connecticut. Since the plaintiff is, in essence, arguing emotional distress based on damage to her property, her claim cannot withstand a motion to strike. Accordingly, the defendants' motion to strike count seven of the plaintiff' s revised complaint is granted.

## H
### Violation of 42 U.S.C. § 1983 and Other Constitutional Claims

The defendants argue that the court should strike count eight of the plaintiff's revised complaint because there is no authority recognizing a violation of 42 U.S.C. § 1983 based on a Building Officials Code Association (BOCA) violation. The defendants further argue that none of the plaintiff's claims rise to the level of an unreasonable search and seizure. The plaintiff, in response, argues that she has legally viable federal claims because the BOCA charges were baseless and lacking in probable cause. The plaintiff further contends that the defendants knew or should have known that the charges lacked in probable cause because it was the city that created the dangerous and unsafe conditions on her property.

*13 "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law ... These two elements denote two separate areas of inquiry: the plaintiff must prove a constitutional or statutory violation and that violation must have been committed by the defendant acting under color of law." (Citations omitted; internal quotation marks omitted.) *Wilson v. Hryniewicz,* 38 Conn.App. 715, 719-20, 663 A .2d 1073, cert. denied, 235 Conn. 918, 665 A.2d 610 (1995).

The plaintiff alleges that she is a citizen of the United States and that Wnuk was the acting chief building inspector and acting zoning enforcement officer for the city at all relevant times. (Revised Complaint, Count Eight, ¶¶ 32 through 34.) "This action arises under the United States Constitution and, in particular, under the provisions of the Fourth, Fifth and Fourteenth Amendments of the Constitution of the United States and arises under Federal law and invokes Title 28 of the United States Code, Sections 1331 and 1343(3) and Title 42 of the United States Code, Sections 1983 and 1988." (Revised Complaint. Count Eight, ¶ 35.)

In support of this claim, the plaintiff alleges that on or about March or April 1998, Wnuk caused her to be cited with violating BOCA State Building Code § 117.4 and forced her to appear in housing court and face fines, imprisonment and charges. (Revised Complaint, Count Eight, ¶ 37.) The plaintiff alleges that Wnuk, acting under color of law, unlawfully cited her without a warrant and without probable cause and that his actions were intentional, reckless and grossly negligent. (Revised Complaint, Count Eight, ¶ 38.) The plaintiff alleges that the defendants' actions violated her federally protected rights and caused her to suffer injuries and losses, namely, her right to freedom, her right to be free from unreasonable and unlawful seizure, and her right to procedural and substantive due process as guaranteed by the fourth, fifth and fourteenth amendments. (Revised Complaint, Count Eight, ¶¶ 39 and 41.) The plaintiff seeks monetary damages to address these violations and, further alleges that she suffered emotional distress as a result of the defendants' actions. (Revised Complaint, Count Eight, ¶¶ 40 and 41.)

The plaintiff has sufficiently pleaded that Wnuk was acting under color of law when he cited her with violating BOCA State Building Code § 117.4. In furtherance of her § 1983 claim, the plaintiff alleges violations of numerous constitutional provisions. The allegations in the plaintiff's revised complaint, however, primarily address her fourth amendment claim.

The United States Supreme Court has stated that " § 1983 allow[s] a plaintiff to seek money damages from government officials who have violated [her] Fourth Amendment rights." *Wilson v. Layne,* 526 U .S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). The courts have held that administrative searches to enforce a municipal health and housing code require a warrant to satisfy the fourth amendment unless consent is obtained. See *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *Dillon v. Dept. of Public Health,* Superior Court, judicial district of Hartford, Docket No. 570364 (September 30, 1998, McWeeny, J.) (23 Conn. L. Rptr. 73); *Campbell v. Lasica,* Superior Court, judicial district of Danbury, Docket No.

935380 (October 12, 1993, Flynn, J.) (10 Conn. L. Rptr. 249).

*14 Here, the plaintiff alleges that Wnuk unlawfully cited her with violations of BOCA State Building Code § 117.4 without a warrant and without probable cause. (Revised Complaint, Count Eight, ¶¶ 37 and 38.) The plaintiff also alleges that Wnuk's actions violated her federally protected rights and caused her to suffer injuries and losses, namely, her right to freedom, her right to be free from unreasonable and unlawful seizure, and her right to procedural and substantive due process as guaranteed by the fourth, fifth and fourteenth amendments. (Revised Complaint, Count Eight, ¶¶ 39 and 41.)

The plaintiff fails to allege, however, that there was an unlawful search and seizure of either her person or her property. While the plaintiff alleges that Wnuk was acting under color of law at the time of his actions, she does not allege specific facts describing Wnuk's actions or how these actions were intentional, reckless or grossly negligent. The plaintiff does not allege that Wnuk made an unlawful inspection of her property, without a warrant and without probable cause, leading to her citation for violating BOCA State Building Code § 117.4. The plaintiff only alleges that Wnuk caused her to appear in housing court and face fines, imprisonment and charges, without alleging whether she was actually detained on a pretrial status or ultimately fined or imprisoned for this alleged building code violation.

In construing the complaint in the light most favorably to the plaintiff, the court finds that the plaintiff has failed to allege sufficiently facts supporting her claims under 42 U.S.C. § 1983. Accordingly, the defendants' motion to strike count eight of the plaintiff's revised complaint is granted.

I

Connecticut Constitutional Claims

Lastly, the defendants move to strike count nine of the plaintiff's revised complaint on the grounds that BOCA citations do not violate the Connecticut constitution and that there is no private cause of action set forth under article first, § 8, of the constitution of Connecticut. The plaintiff argues that she has alleged sufficiently a cause of action under the Connecticut constitution.

The plaintiff brings this claim under article first, §§ 7 and 8, of the constitution of Connecticut. [FN5] The defendants correctly argue that the courts have rejected a private cause of action under article first, § 8, of the Connecticut constitution. See *ATC Partnership v. Windham,* 251 Conn. 597, 612-17, 741 A.2d 305 (1999), cert. denied, 530 U.S. 1214, 120 S.Ct. 2217, 147 L.Ed.2d 249 (2000); *Peters v. Greenwich,* Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. 147192 (January 2, 2001, D'Andrea, J.) (28 Conn. L. Rptr. 671). This court follows these cases and similarly concludes that there is no private cause of action under article first, § 8, of the constitution of Connecticut.

FN5. Article first, § 7, of the constitution of Connecticut provides that "[t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures, and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

Article first, § 8, of the constitution of Connecticut provides in relevant part that "[n]o person shall ... be deprived of life, liberty or property without due process of law ..."

The Supreme Court has, however, recognized a private cause of action for money damages for violations of article first, § 7, of the constitution of Connecticut based on allegedly unreasonable searches and seizures. See *Binette v. Sabo,* 244 Conn. 23, 710 A .2d 688 (1998). In part II H of this opinion, the court determined that the plaintiff failed to allege sufficiently a claim under federal law to be free from unreasonable searches and seizures due to Wnuk's failure to obtain a warrant, prior to bringing charges against her for violating BOCA. The plaintiff essentially relies upon the same factual allegations to support this claim. For the same reasons set forth in part II H of this opinion, the court finds that the plaintiff has alleged insufficiently a cause of action for money damages under article first, § 7, of the constitution of Connecticut.

*15 Accordingly, the defendants' motion to strike count nine of the plaintiff's revised complaint is granted.

III

CONCLUSION

For the foregoing reasons, the court grants the defendants' motion to strike paragraphs 23 and 25(j) and a portion of paragraph 26 of count one and denies the defendants' motion with respect to the remaining paragraphs in count one of the plaintiff's revised complaint. The court further grants the defendants' motion to strike counts two, three, five, seven, eight and nine and denies the defendants' motion to strike counts four and six of the plaintiff's revised complaint.

So ordered.

Conn.Super.,2002.

Kurzyna v. City of New Britain

2002 WL 1008450 (Conn.Super.), 32 Conn. L. Rptr. 118

END OF DOCUMENT

*CASE NO. 03-945- PLAINTIFFS' APPENDIX OF UNREPORTED CASES, EXHIBIT 15*

---

**LESSORD v. GENERAL ELECTRIC CO., (W.D.N.Y. 2002)**
**JOHN LESSORD, et al., Plaintiffs, v. GENERAL ELECTRIC CO., et al.,**
**Defendants**
**No. 01-CV-6103L**
**United States District Court, W.D. New York**
**August 29, 2002**

Alan J. Knauf, Esq., Knauf & Shaw LLP, Rochester, NY, for JOHN LESSORD, MARY JANE LESSORD, JILLAYNE LESSORD, and SHAWN LESSORD, Plaintiffs

S. Paul Battaglia, Esq., Bond, Schoeneck & King, Syracuse, NY, and

Thomas E. Reidy, Esq., Daniel P. Purcell, Esq., Ward, Norris, Heller & Reidy, Rochester, NY, for GENERAL ELECTRIC CO. AND BLACK & DECKER, Defendants

Beryl Nusbaum, Esq., Woods Oviatt Gilman LLP, Rochester, NY, for
KLEEN BRITE LABORATORIES, INC. and JMT PROPERTIES, INC, Defendants

Richard E. Alexander, Esq., Harter, Secrest and Emery, LLP, Rochester,
NY, and

Mark S. Lillie, Esq., John C. Bunge, Esq., John T. Hickey, Jr., Esq.,
Kirland & Ellis, Chicago, IL, and

David W. Reger, Esq., Btesler, Amery & Ross, Florham Park, NJ, for 3M
COMPANY, and DYNACOLOR CORPORATION

Joseph Picciotti, III, HARRIS BEACH & WILCOX, Rochester, NY, for
AGRILINK FOODS, INC

<u>DECISION AND ORDER</u>

DAVID G. LARIMER, Chief Judge United States District Court

Plaintiffs, John Lessord, Mary Jane Lessord, Shawn Lessord and Jillayne
Lessord, commenced this action on February 28, 2001, pursuant to the
Comprehensive Environmental Response, Compensation and Liability Act
("CERCLA"), <u>42 U.S.C. § 9601</u> *et seq.* Plaintiffs seek various relief
in connection with the contamination of property owned by plaintiffs
("the Lessord property") on Lyman Street in the Village of Brockport, in
the Town of Sweden, New York. The contaminants include polychlorinated
biphenyls ("PCBs"), solvents, petroleum constituents, and other
substances. The contamination was allegedly caused by releases of
contaminants from certain industrial sites in Brockport. Plaintiffs have
sued seven corporations, all of which allegedly have some connection with
or responsibility for the contamination of the Lessord property.
Plaintiffs have asserted a claim under CERCLA, as well as several claims
under New York law.

Two of the defendants, General Electric Company ("GE") and Black &
Decker (U.S.) Inc. ("B&D") have moved to dismiss plaintiffs'   state law
claims under Rule <u>12</u>(b)(6) of the Federal Rules of Civil Procedure, or in
the alternative for summary judgment under Rule 56, on the ground that
those claims are time-barred. For the reasons that follow, defendants'
motions are denied.

## FACTUAL BACKGROUND

The contamination on the Lessord property is alleged to have emanated
from two sites. The first of these, the Dynacolor Site, is a 3.5-acre

parcel currently owned and operated by defendant Agrilink Foods, Inc. ("Agrilink"). Defendant Dynacolor Corporation ("Dynacolor") owned the site from 1956 to 1961, when Dynacolor sold the site to defendant Minnesota Mining and Manufacturing Company ("3M"). 3M owned the site until 1985, when it donated the site to the Town of Sweden, which transferred the site to Agrilink a year later.

Plaintiffs allege that Dynacolor and 3M ("the 3M defendants") performed photoprocessing operations at the Dynacolor Site until 1978, during which they discharged wastewater containing cyanide and other contaminants. The wastewater exited the site through a northward-flowing drainage ditch ("the ditch") that runs under the Erie Canal to a stream running through the Lessord property ("the stream"), polluting the stream. Although 3M has performed some remedial work at the Dynacolor Site, plaintiffs allege that the 3M defendants and Agrilink have failed to adequately remediate the contamination.

The other alleged source of the contaminants on the Lessord property is the GE Site, which consists of about 28.6 acres in the Village of Brockport. The GE Site was owned by GE from about 1949 to 1984, when it sold the site to B&D. B&D owned and operated the site until 1988, when it sold the site to the County of Monroe Industrial Development Agency ("COMIDA"). COMIDA leased the site to defendant Kleen Brite Laboratories, Inc. ("Kleen Brite"). In 1993, COMIDA sold the site to defendant JMT Properties, Inc. ("JMT"), the current owner, which continues to lease the site to Kleen Brite to this day.

Both GE and B&D manufactured electrical appliances and other items at the site. During those operations, GE and B&D allegedly disposed of trichloroethylene ("TCE"), PCBs, and other contaminants at the site. As a result, groundwater at or near the GE Site was contaminated, and the contaminants spread northward to the Lessord property, roughly a quarter mile away. Although GE and B&D have undertaken some efforts at remediation, plaintiffs allege that defendants have not remedied contamination at the site.

Plaintiffs allege that the contamination from the two sites is continuing, and that as a result of their exposure to the contaminants, plaintiffs' health has been threatened, their property has severely declined in value, and they have incurred response costs due to the contamination.

The complaint asserts seven causes of action. The first alleges that all defendants are strictly liable under CERCLA § 107(a), 42 U.S.C. § 9607(a), for investigation, cleanup, remediation and removal of the contamination of the Lessord property, and that defendants

should be ordered to pay all plaintiffs' past and future response costs and to take any necessary steps to remediate the contamination. The second cause of action alleges strict liability for emission of hazardous substances under the New York Environmental Conservation Law ("ECL"), Article 37. The third through seventh causes of action assert claims under common law for, respectively, negligence, trespass, strict liability for abnormally hazardous activity, public nuisance, and private nuisance.[fn1] The eighth cause of action alleges that the 3M defendants are strictly liable to plaintiffs under New York Navigation Law § 181(5), which provides a right of action for any person who sustains damages as the result of an oil spill caused by another person.

As stated, defendants have moved in the alternative either to dismiss plaintiffs' common law claims,*i.e.*, claims three through seven, or for summary judgment on those claims on the ground that they are time-barred. Because both defendants, as well as plaintiffs, have submitted materials outside the pleadings, I will treat the motions as motions for summary judgment.[fn2] Because I find that genuine issues of fact exist as to when the limitations period began to run on those claims, however, defendants' motions must be denied.

## DISCUSSION

### I. Burden of Proof

Under the well-established standards governing summary judgment motions, summary judgment will be granted if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994). As the parties moving for summary judgment, defendants bear the burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movants establish that there is no genuine issue of material fact, then the burden shifts to the nonmovants to come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Weg v. Macchiarola*, 995 F.2d 15, 18 (2d Cir. 1993).

The Court must also, however, consider the burden of proof with respect to defendants' statute of limitations defense. That defense is asserted, at this point, only against plaintiffs' New York common law claims, which are brought pursuant to the Court's supplemental jurisdiction under 28 U.S.C. § 1367.

"New York statutes of limitations apply to plaintiffs' supplemental

state law tort claims." *Wiwa v. Royal Dutch Petroleum Co.*, 2002 WL 319887, *20 (S.D.N.Y. Feb. 28, 2002). *See also Overall v. Estate of Klotz*, 52 F.3d 398, 402-05 (2d Cir. 1995) (applying New York statute of limitations and tolling doctrines to state law claims in diversity case); *Bouton v. BMW of North America*, 29 F.3d 103, 110 (3d Cir. 1994) (recognizing that rule requiring application of state law limitations periods to state claims brought pursuant to diversity jurisdiction also applies to supplemental state law claims). This rule also requires federal courts to apply state rules that are an "integral part of the statute of limitations," including tolling rules. *Walker v. Armco Steel Corp.*, 446 U.S. 740, 751 & n. 12 (1980) (internal quotations omitted).

   Under New York law, "[b]ecause the statute of limitations is an affirmative defense, the defendant[s] bear[] the burden of establishing by prima facie proof that the limitations period has expired since the plaintiff[s'] claims accrued." *Overall*, 52 F.3d at 403 (citing *Hoosac Valley Farmers Exchange, Inc. v. AG Assets, Inc.*, 168 A.D.2d 822 (3d Dep't 1990)); *accord Larkins v. Glaxo Wellcome, Inc.*, 1999 WL 360204, *1 (E.D.N.Y. May 20, 1999); *Dorsey v. Apple Computers, Inc.*, 936 F. Supp. 89, 90 (E.D.N.Y. 1996). Once the defendants meet that burden, the burden then shifts to the plaintiffs to establish that the limitations period should be tolled, or that some exception to the limitations rule should apply. *Id.* (citing *Waters of Saratoga Springs, Inc. v. State*, 116 A.D.2d 875 (3d Dep't), *aff'd*, 68 N.Y.2d 777 (1986)); *see also Pompa v. Burroughs Wellcome Co.*, 259 A.D.2d 18 (3d Dep't 1999) (plaintiffs having conceded that action was not commenced within general three-year limitations period of CPLR § 214, burden was on them to aver evidentiary facts showing that exception embodied in § 214-c(4) applied); *L & L Plumbing & Heating v. DePalo*, 253 A.D.2d 517 (2d Dep't 1998) (where defendant met her initial burden of establishing by prima facie proof the affirmative defense that the statute of limitations had elapsed, burden shifted to plaintiff to rebut this presumption by establishing applicability of the relation-back doctrine).

   Defendants, then, have the initial burden of showing that the limitations period has expired as to plaintiffs' claims. Once they have done so, plaintiffs, in order to defeat the motions for summary judgment, must demonstrate that there are genuine issues of material fact as to that issue, whether because the limitations period should be tolled, or for some other reason. *See Cox v. Kingsport Med. Group*, 88 N.Y.2d 904, 906 (1996) (defendants moving for summary judgment satisfied burden of making prima facie showing of entitlement to judgment as a matter of law by demonstrating that they were served with complaint after expiration of the 2 1/2-year limitations period for medical malpractice claims; consequently, plaintiffs bore burden of demonstrating the existence of triable issues of fact concerning whether doctrine of

continuous treatment tolled statute of limitations for those claims);
*Evans v. Ginsberg*, 292 A.D.2d 566, 739 N.Y.S.2d 429 (2d Dep' t 2002) (once
defendant satisfied his burden as proponent of motion for summary
judgment by demonstrating that action was commenced more than 2 years
after the occurrence of the alleged malpractice upon which the
plaintiff' s complaint was based, burden shifted to the plaintiff to
demonstrate a triable issue of fact with respect to tolling of statute of
limitations based upon continuous-treatment doctrine).

## II. Which Statute Governs in this Case

Defendants contend that the statute of limitations that applies to
plaintiffs'  common law claims is that set forth in N.Y. CPLR §
214-c(2). That section provides for tolling of the three-year period
generally applicable to actions to recover damages for personal injury or
injury to property under § 214. Specifically, § 214-c(2) states:

> Notwithstanding the provisions of section 214, the
> three year period within which an action to recover
> damages for personal injury or injury to property
> caused by the latent effects of exposure to any
> substance or combination of substances, in any form,
> upon or within the body or upon or within property
> must be commenced shall be computed from the date of
> discovery of the injury by the plaintiff or from the
> date when through the exercise of reasonable diligence
> such injury should have been discovered by the
> plaintiff, whichever is earlier.

Plaintiffs do not take a clear position on which statute of limitations
applies. Rather, they contend that any one of three statutes applies, but
that their action is timely under each.

First, plaintiffs contend that if the Court applies § 214-c(2), the
action is timely because the evidence shows that, regardless of when
plaintiffs'  property first became contaminated, they did not have
knowledge of such contamination until late 1999, less than two years
before they filed the complaint in this action in February 2001.
Plaintiffs assert that prior to 1999, although they were aware generally
that there was contamination in the area, they reasonably believed, based
on the facts then available to them, that there was no significant
contamination of their own property.

Plaintiffs next argue that their claims are timely under CPLR §
214-c(4), which provides for an extension of the limitations period where
the plaintiff was aware of his injury, but unaware of its cause due to a

lack of sufficient technical, scientific or medical knowledge and
information. Specifically, that section provides that

> [n]otwithstanding the provisions of subdivisions two
> and three of this section, where the discovery of the
> cause of the injury is alleged to have occurred less
> than five years after discovery of the injury or when
> with reasonable diligence such injury should have been
> discovered, whichever is earlier, an action may be
> commenced or a claim filed within one year of such
> discovery of the cause of the injury; provided,
> however, if any such action is commenced or claim
> filed after the period in which it would otherwise
> have been authorized pursuant to subdivision two or
> three of this section the plaintiff or claimant shall
> be required to allege and prove that technical,
> scientific or medical knowledge and information
> sufficient to ascertain the cause of his injury had
> not been discovered, identified or determined prior to
> the expiration of the period within which the action
> or claim would have been authorized and that he has
> otherwise satisfied the requirements of subdivisions
> two and three of this section.

This section, then, extends the limitations period for one year following
discovery of the cause of an injury, provided that such discovery is made
within five years after the injury itself is discovered, upon a showing
by the plaintiffs that there was insufficient scientific, technical or
medical knowledge to allow the cause of their injury to have been
discovered within the otherwise applicable limitations period.

   Plaintiffs contend that their action is timely under this section
because they did not know that the cause of the contamination of the
stream on their property by PCBs (which were first discovered in the
stream in 1999) was stormwater runoff from the GE Site until
investigations were conducted by the New York State Department of
Environmental Conservation ("DEC") and a private engineering firm in
2000. Plaintiffs also argue that the one-year period under § 214-c(4)
did not begin to run until they identified the correct defendants, *i.e.*
the defendants who caused the contamination, which also did not occur
until late 2000.

   In addition, plaintiffs contend that their action is timely under CERCA
§ 309, 42 U.S.C. § 9658[fn3], which provides that if a claim is
brought under state law for property damages caused by hazardous
chemicals, the state statute of limitations cannot begin to run until the

"federally required commencement date" ("FRCD"), which is the date on which the plaintiff first knew or reasonably should have known that the damages were caused by hazardous chemicals. This statute "neither creates a separate federal cause of action based on toxic torts within its terms nor a uniform statute of limitations for such torts; rather, it provides a uniform accrual date from which the applicable state period of limitation governing the relevant claim is measured." *In re Pfohl Bros. Landfill Litigation*, 68 F. Supp.2d 236, 248 (W.D.N.Y. 1999), *vacated and remanded on other grounds sub nom. Freier v. Westinghouse Elec. Corp.*, ___ F.3d ___, 2002 WL 1870450 (2d Cir. Aug. 15, 2002).

Plaintiffs assert that the effect of § 9658 is to delay the commencement of the limitations period beyond either § 214-c(2) or § 214-c(4), since the former tolls the statute until the discovery of the injury, but not its cause, and the latter applies only where "technical, scientific or medical knowledge and information sufficient to ascertain the cause of his injury had not been discovered, identified or determined" previously. According to plaintiffs, under § 9658, the limitations period did not begin to run until the Fall of 2000, when they first discovered that PCBs were entering the stream from the GE Site.

The Second Circuit has very recently examined the interplay between CPLR § 214-c and CERCA § 309. In *Freier v. Westinghouse Elec. Corp.*, ___ F.3d ___, 2002 WL 1870450 (2d Cir. Aug. 15, 2002), the court said that it is "indisputably clear that Congress intended, in the cases to which § 9658 applies, that the FRCD preempt state law accrual rules if, under those rules, accrual would occur earlier than the date on which the cause of the personal injury was, or reasonably should have been, known to be the hazardous substance." 2002 WL 1870450 at *17. Noting that "[t]he FRCD preempts a more restrictive state law only with respect to the date on which a claim accrues, not with respect to the length of the limitations period," the court added that "New York law still controls with respect to the length of the limitations period." *Id.* at 31. The court concluded that "[s]ection 214-c, as modified by the FRCD, gives the plaintiff one year from the date of discovery of the cause of the injury to commence a lawsuit (or three years from the date of discovery of the injury, if longer) and that provision satisfies the requirements of the FRCD." *Id.* [fn4]

In the case at bar, then, plaintiffs had either three years from the date of discovery of their injury, or one year from the date on which they discovered or reasonably should have discovered the cause of their injury, whichever period ended later. Plaintiffs allege that they became aware of the contamination of their property at issue in late 1999, and that they first learned that the GE Site was the source of that contamination in late 2000. If those allegations are true, then under

*Freier*, plaintiffs would have had until some time in 2002 to bring an action.[fn5]

   In addition, if the facts show that plaintiffs discovered or should have discovered the cause of their injury more than two years after they discovered the injury itself, then under § 214-c(4), as modified by § 9658, they would have had one year from the date of discovery of the cause of the injury to file suit.[fn6]

## III. Application of §§ 214-c and 9658 to this case

   After reviewing the record, I conclude that issues of fact exist concerning when plaintiffs discovered, or reasonably should have discovered, both the injury at issue in their claims against the moving defendants, and the cause of that injury. Accordingly, defendants' motions for summary judgment must be denied.

   The evidence indicates that the DEC became aware that the GE Site contained hazardous wastes during the 1980s. *See, e.g.*, DEC 1995 "Fact Sheet" (B&D's Ex. A-4) at 2 (noting that test results in 1983 "showed possible groundwater contamination" at the GE Site). There is also evidence that at various times in the 1990s, the DEC issued notices (generally in the form of "Fact Sheets") to the public concerning the contamination on and around the GE Site. There is also evidence that there were reports in the local news media about the DEC investigation.

   Plaintiffs do not contest these general allegations that information about chemical contamination in the area was disseminated to the public during the mid 1990s. They deny, however, that they were aware of any significant contamination of the stream emanating from the GE Site until 2000, and I see no evidence in the record that demonstrates conclusively that plaintiffs were aware of the contamination before then.[fn7] While the evidence may persuade a jury that plaintiffs knew or should have known of the contamination at some earlier date, the Court cannot make such a determination on a motion for summary judgment.

   In addition, there is evidence that some of the information available to plaintiffs prior to 1999 indicated that there was no contamination of the stream, or at least none that plaintiffs needed to be concerned about. Some of that information also indicated that whatever contaminants were present in the stream had probably originated at the Dynacolor Site, not the GE Site.

   For example, in a letter dated February 21, 1996, Steven J. Shost, an Environmental Health Specialist with the New York State Department of Health ("DOH"), informed plaintiff John Lessord of the results of a test

of water and sediment samples taken from the stream on January 25, 1996, as part of an ongoing investigation of the GE Site. He stated, "Although some chemicals were found in the water sample that I collected from the stream on your property, the levels are too low to cause illness in individuals playing or wading in the stream. In fact, the observed levels of these contaminants are all below the State's drinking water standards." Lessord Aff. Ex. B.

Similarly, in a letter to John Lessord dated August 26, 1997, Shost related additional results of tests for metals and cyanide in the stream, since those substances were among the contaminants that had been identified in soil and groundwater at the GE and Dynacolor Sites. Shost stated that cyanide was detected at concentrations "too low to pose a health concern . . . ." Affidavit of S. Paul Battaglia, Esq. (Docket #13), Ex. L. He added, however, that "the presence of cyanide in these samples may indicate that the creek receives contaminated water from the *3M/Dynacolor* site, where cyanide is a contaminant of concern." *Id.* (emphasis added). He reported similar results for metals, and said, "Again, I have requested that *3M* perform the necessary work." *Id.* (emphasis added).

It was not until September 1999 that Shost reported to John Lessord that a sediment sample taken from the stream on July 19, 1999 contained "[concentrations of PCBs and total polycyclic aromatic hydrocarbons" that were "above levels at which [the DOH] typically requires clean up for residential use." Lessord Aff. Ex. C. Shost stated that further testing was needed to determine the extent of the contamination, and in the meantime he advised plaintiff to "avoid direct contact with black-stained sediment in the stream." *Id.*

That September 1999 letter, however, did not identify any suspected source of the contamination. In a letter to the DEC dated October 20, 2000, Ray Wuolo, an engineer with Barr Engineering Company, which had performed chemical analyses of sediment samples from the vicinity of the Dynacolor Site, concluded that "PCBs are entering the storm sewer system from at least two different branches upstream . . . ." Lessord Aff. Ex. E. His report also stated that the catch basins from which the PCBs were entering the sewer system "receive[d] flow from the former Black & Decker property," *i.e.*, the GE Site. *Id.*

A March 1, 2001 DEC Fact Sheet also states that "DEC *initially* sampled the tributary [*i.e.*, the stream] in July of 1999." Even at that date, the DEC stated that based on "*preliminary* on-site sampling data, DEC required additional sampling to evaluate the former GE/Black & Decker site as a *potential* source of PCBs." Lessord Aff. Ex. F. The Fact Sheet stated that additional on-site sampling had been performed on February 26,

2001, and that the results were expected within the next four weeks.

Thus, there is some evidentiary support for plaintiffs' allegations
that they were unaware of the PCB contamination in the stream until
1999, and that it was not until 2000 at the earliest that there was solid
evidence that the GE Site was a possible source of that contamination.
When all the evidence is presented at trial, a jury may conclude that
plaintiffs knew or should have known about the contamination at some
earlier date, but given the conflicting evidence on that point, it is not
for the Court to decide that issue as a matter of law.

Likewise, there is some evidence that plaintiffs knew about widespread
chemical contamination in the vicinity of their property; as stated, they
themselves admit as much. For instance, defendants point to a map that
was distributed at a June 6, 1996 public meeting at which members of the
DOH, DEC, and Monroe County Department of Health were present.[fn8]
Allegedly the map shows the presence of TCE in ground water in
plaintiffs' neighborhood, including the Lessord property. Affidavit of
Paul Wm. Hare (Docket #14), Ex. 19.

Plaintiff John Lessord states in his affidavit that he does not recall
receiving a copy of this map. Lessord Aff. ¶ 32. Even assuming that
plaintiff did receive a copy, however, I am not prepared to rule as a
matter of law that this constituted notice sufficient to commence the
running of the limitations period. The map (which is marked "DRAFT")
shows roughly concentric curved lines (similar to those found on a
topographic map to show elevation), indicating the level of TCEs along
those lines, with the highest concentrations in the center. The outermost
line, showing a level of five parts per billion (the lowest concentration
shown on the map), runs through a part of plaintiffs' property. That
portion of the line running through plaintiffs' property is dashed, which
indicates that the level of TCEs along that line is "inferred." *Id.*

Again, this may prove to be highly persuasive evidence — to a
factfinder. The court's "task at the summary judgment motion stage of the
litigation," however, "is carefully limited to discerning whether there
are any genuine issues of material fact to be tried, not to deciding
them." *Gallo v. Prudential Residential Services, Ltd. Partnership*,
22 F.3d 1219, 1224 (2d Cir. 1994). I am not prepared to rule as a matter
of law that this map, which indicates that it was a "draft," showing an
"inferred" level of TCEs of five parts per billion (the lowest level
indicated on the map) through a portion of plaintiffs' property, was
enough to trigger the running of the statute of limitations on
plaintiffs' claims against GE and B&D.

In addition, that map appears to have been based on testing that was

done in early 1996. In a letter dated March 18, 1996, however, Paul Hare, a Remedial Project Manager for GE, told John and Mary Jane Lessord that the preliminary analytical results of a water sample collected from their basement showed that "[n]o site-related compounds were detected," and that there was therefore "no need . . . to conduct indoor air sampling in your home." Hare Aff. Ex. 8. Thus, the map's indication that there may have been some contamination on the Lessord property was to some extent undercut by contemporaneous test results taken from plaintiffs' home.

It must also be remembered that the GE Site is not the only source of chemical contamination in the area, and that there are various contaminants at issue here. As stated, the mere fact that plaintiffs might have known that there was some contamination of their property does not mean that they could or should have sued everyone who *might* be liable. At this point, it is not even clear that the TCEs indicated on the map originated at the GE Site, so it cannot be said as a matter of law that plaintiffs' alleged receipt of this map triggered the limitations period for their claims against GE and B&D.

While I recognize that "[i]t is not necessary . . . for a plaintiff to know the identity of each defendant's specific contaminants that damaged the property before the statute of limitations begins to run," *Seneca Meadows, Inc. v. ECI Liquidating, Inc.*, 983 F. Supp. 360, 364 (W.D.N.Y. 1997), at the same time, Rule 11 of the Federal Rules of Civil Procedure mandates that an attorney is not to present a pleading or other paper to the court unless he reasonably believes that the factual allegations contained in the pleading or paper have evidentiary support, or at least that they are likely to have evidentiary support after further investigation or discovery.[fn9]

Plaintiffs in toxic tort cases, then, should not be encouraged to take a shotgun approach and sue everyone who *might* be liable, before they have an evidentiary basis for asserting a claim. GE argues that the discovery of PCBs in the stream in 1999 does not provide a basis for a recent accrual date because PCBs are just one constituent of a combination of contaminants on the Lessord property, and plaintiffs have allegedly been aware of that general contamination for many years. Were the Court to accept that argument, however, it would implicitly encourage just such a shotgun approach. Assuming *arguendo* that plaintiffs were long aware that there was some sort of contamination on their property, they still needed some evidentiary basis for asserting liability before they sued GE and B&D. In fact, had plaintiffs commenced this action in 1996, as defendants now argue they should have, defendants very likely would have moved to dismiss for failure to state a claim.

As stated, these issues will ultimately be for a jury to decide. At this point, though, I cannot rule as a matter of law that plaintiffs sat on their rights while the limitations period was running. *See Glod v. Morrill Press Div. of Engraph*, 168 A.D.2d 954, 956 (4th Dep't 1990) ("Where it does not conclusively appear that a plaintiff had knowledge of facts from which the injury could reasonably be inferred, . . . the question should be left to the trier of fact"); *see also Pompa v. Burroughs Wellcome Co.*, 259 A.D.2d 18, 25 (3d Dep't 1999) ("While the burden remains upon plaintiffs at trial to make the showing required by CPLR 214-c(4), material questions of fact were raised pertaining to the applicability of this extension"); *Grossjahann v. Geo. B. Wilkins & Sons, Inc.*, 244 A.D.2d 808, 809-10 (3d Dep't 1997) (plaintiff's averments that defendant had assured him that underground storage tanks were empty, and that plaintiff never detected any oil or gasoline on his property, though "self-serving," were nonetheless probative, and raised a legitimate question of fact concerning whether plaintiff commenced action within three years from the date when plaintiff discovered or reasonably should have discovered his injury).

I also believe that it is for a jury, not the Court on a motion for summary judgment, to weigh the strength of defendants' contention that plaintiffs were on notice of contamination of the stream as far back as the 1970s. In support of this assertion, defendants point to evidence that John Lessord has stated that he saw various, unnatural colors running in the stream at that time.[fn10] Defendants have not even shown that those colors were caused by chemicals emanating from the GE Site, much less that these incidents should have put plaintiffs on notice of such contamination and its source.[fn11] In short, defendants' evidence, viewed as a whole, does lend some weight to their arguments that plaintiffs knew or should have known of their injury and its cause more than three years before they commenced this action, but the weight of that evidence, and whether it is enough to find plaintiffs' claims time-barred, are for a properly-instructed jury to determine.

With respect to the question of whether plaintiffs should have done more, sooner, to ascertain the cause of their injury, I also note that in *Freier*, the Second Circuit stated that it did not believe that either Congress or the New York Legislature, in making the triggering of the limitations period dependent on when a plaintiff "reasonably should have known" of the cause of his injury, or on whether scientific or medical knowledge existed that was sufficient to permit that cause to be ascertained, "meant to refer to scientific knowledge that would not have been available to a plaintiff without the expenditure of huge sums of money to commission independent studies," or "to information that was obtainable only through the private commissioning of expensive studies." 2002 WL 1870450, at *27. Certainly, then, it would be inappropriate as a

matter of law to find plaintiffs' claims time-barred merely because they did not undertake to go beyond what the DEC had done and have their own tests performed to try to ascertain sooner the nature, extent and source of the suspected contamination.

In addition, I note plaintiffs' contention that there is no evidence that they even *had* a cause of action until 1999 at the earliest, because there is no evidence of any contamination of their property emanating from the GE site prior to that time. All prior contamination, plaintiffs assert, was of neighboring property, except for some "*de minimis*" contamination of the stream by volatile organic compounds ("VOCs") in 1999. Plaintiffs, however, argue that such minimal levels of contaminants will not give rise to a tort cause of action.

In response, defendants argue that any invasion of one's land can support a trespass or nuisance claim, and that occurrence triggers the running of the limitations period. To support a nuisance claim, however, there must be a "substantial" interference with one's use and enjoyment of property. *Scribner v. Summers*, 84 F.2d 554, 559 (2d Cir. 1996). And even assuming that a minimal invasion can support a trespass claim, *see Kronos v. AVX Corp.*, 81 N.Y.2d 90, 95 (1993) (nominal damages are available to protect a landowner's right to be free of trespass, "because a continuing trespass may ripen into a prescriptive right and deprive a property owner of title to his or her land"), I believe that a jury should decide at what point plaintiffs became aware of levels of contamination sufficient to put them on notice that a trespass to their property had occurred. Moreover, given the uncertainty that appears to have existed concerning the source of contamination in the stream, fact issues remain with respect to when plaintiffs reasonably should have discovered the entity that caused their injury.

Finally, the Court must address plaintiffs' contention that there are issues of fact relating to the application of New York's "two-injury rule." Under this rule, which evolved in the context of exposure-related medical problems but which has since been applied to toxic torts generally, where the statute of limitations has run on one injury, a later injury that is "separate and distinct" from the first is still actionable under New York law. *Braune v. Abbott Labs.*, 895 F. Supp. 530, 555-56 (E.D.N.Y. 1995) (citing *Fusaro v. Porter-Hayden Co.*, 145 Misc.2d 911, 915 (N.Y.Cty. 1989), *aff'd*, 170 A.D.2d 239 (1st Dep't 1991); *see also Griffin v. Garratt-Callahan Co.*, 74 F.3d 36, 40 (2d Cir. 1996) (applying two-injury rule but finding that the plaintiffs two injuries were related and therefore time-barred); *Sweeney v. General Printing Inc.*, 210 A.D.2d 865, 865-66 (3d Dep't 1994) (same), *leave to appeal denied*, 85 N.Y.2d 808 (1995); *Bimbo v. Chromalloy American Corp.*, 226 A.D.2d 812 (3d Dep't 1996) (since defendants had not shown that

pollution of plaintiffs' soil and shallow groundwater was an "outgrowth, maturation or complication" of contamination of plaintiffs' well water, lower court correctly decided that dismissal was premature). Plaintiffs assert that a jury should decide whether the pre-1999 incidents and manifestations of contamination were separate and distinct from the contamination giving rise to this lawsuit, so as to warrant application of this rule.

  Defendants argue that this rule is inapplicable to this case, since GE ceased operations at the GE Site in 1984, and B&D ceased operations there in 1988. Thus, defendants argue, any contamination found in 1999 or later was either not caused by them, or was an "outgrowth, maturation or complication" of their pre-1988 contamination.

  This argument is not without some persuasive force. However, since defendants have argued that plaintiffs were aware of some contamination as far back as the 1970s, I am not prepared to decide at this point whether plaintiffs may avail themselves of the two-injury rule. Given the other issues of fact surrounding the commencement of the statute of limitations in this case, I believe that it would be wiser to await trial to determine whether the evidence warrants submission of this issue to a jury. *See Golod v. La Roche*, 964 F. Supp. 841, 852 (S.D.N.Y. 1997) (factual issue concerning whether plaintiff's injuries were simply complications of ongoing ocular problems which had begun years earlier presented factual issue barring summary judgment in defendant's favor).

## CONCLUSION

  The motions for summary judgment filed by defendants General Electric Company (Docket #10) and Black & Decker (U.S.) Inc. (Docket #18) are denied.

  IT IS SO ORDERED.

[fn1] The fourth and fifth causes of action are asserted only against the 3M defendants, GE, and B&D.

[fn2] Plaintiffs oppose defendants' motions in part on the ground that they need additional discovery, pursuant to Fed.R.Civ.P. 56(f). Since I conclude that defendants are not entitled to summary judgment even on the evidence that they have submitted, I find it unnecessary to rule on plaintiffs' Rule 56(f) request.

[fn3] **§ 9658. Actions under state law for damages from exposure to hazardous substances**

**(a) State statutes of limitations for hazardous substance cases** (1) Exception to State statutes. In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute.

  The term "federally required commencement date" is defined as "the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages referred to in subsection (a)(1) were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." 42 U.S.C. § 9658(b)(4)(A).

[fn4] The court in *Freier* also held that the FRCD does not violate the Commerce Clause or the Tenth Amendment to the United States Constitution, thus erasing whatever doubt about § 9658' s constitutionality that the court had earlier raised in *ABB Indus. Systems, Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 360 n. 5 (2d Cir. 1997) (stating that § 9658 "appears to purport to change state law, and is therefore of questionable constitutionality," but finding it unnecessary to decide the issue).

[fn5] As pointed out by Judge Leval in his concurring opinion in *Freier*, § 214-c(2)' s accrual date, the date on which the plaintiff discovers the injury, "is illegal under the FRCD because it commences at a date earlier than the `the date the plaintiff knew (or reasonably should have known)' the cause of injury." 2002 WL 1870450 at *32 (quoting 42 U.S.C. § 9658(b)(4)(A)). Under *Freier*, however, § 214-c(2)' s accrual date would nonetheless apply if the three-year period running from that date ended later than the one-year period commencing on the date of actual or imputed discovery of the cause of the injury under § 214-c(4), as modified by § 9658.

[fn6] As explained in *Freier*, pursuant to § 9658, § 214-c(4)' s requirement that the discovery of the cause occur within five years after the discovery of the injury is preempted by the FRCD. 2002 WL 1870450 at *31. In addition, "[t]o the extent . . . that the scientific-knowledge provision of CPLR § 214-c(4) imposes an accrual date earlier than the date on which the plaintiff knew or reasonably should have known the cause of the injury, it is . . . preempted by the FRCD" as well. 2002 WL 1870450 at *27. *See also id.* at *33 ("The scientific knowledge proviso, like the condition requiring the discovery of cause to be within five

years of the discovery of injury, cannot function lawfully; it is
therefore preempted by the FRCD and must be disregarded") (Leval, J.,
concurring).

[fn7] As explained below, plaintiffs concede that they were aware at some
point prior to 1999 of the presence of some minimal levels of contaminants
in the stream, but I do not believe that this supports a finding that, as
a matter of law, the limitations period began to run when plaintiffs
first became aware of such low levels of contaminants.

[fn8] A sign-in sheet from the meeting bears what appears to be John
Lessord's signature. Affidavit of Paul Wm. Hare (Docket #14), Ex.
22.

[fn9] In *Seneca Meadows*, the plaintiff, which owned and operated a
landfill ("the Tantalo Site"), sued a number of entities that had
generated hazardous wastes that they had disposed of at the landfill.
This Court, in holding that the plaintiffs state law claims were
untimely, rejected the plaintiffs argument that the statute of
limitations did not begin to run until the plaintiff knew exactly which
contaminants had been discharged by which defendants. In *Seneca Meadows*,
though, the plaintiff had "essentially concede[d] that in 1985 — a
decade before the . . . action was commenced — it knew of both the
injury (the presence of hazardous substances in the groundwater at the
Tantalo Site) and its cause (the wastes at the Tantalo Site)." 983 F.
Supp. at 363. *Seneca Meadows*, then, involved a single site that had been
contaminated by wastes dumped directly at the site by known parties, all
of which plaintiff had been aware of for ten years. In the instant case,
however, there is evidence that there was an investigative process that
took place over a number of years, and that over the course of that
process, plaintiffs learned both that their property was contaminated, and
the source of that contamination. At what point during that process they
first knew, or should have known, enough to commence the limitations
period with respect to their claims against GE and B&D, will be for a jury
to determine.

[fn10] Although this evidence comes from a newspaper article, and is
therefore of questionable admissibility, John Lessord has stated in his
affidavit that he did see such colors running in the stream. Lessord
Aff. ¶ 43.

[fn11] Furthermore, B&D had not even begun its operations at the GE Site
at the time that John Lessord saw those colors, so the colors could not
have put plaintiffs on notice of any contamination caused by B&D.

*CASE NO. 03-945- PLAINTIFFS' APPENDIX OF UNREPORTED CASES, EXHIBIT 16*
**Mather v. Birken Mfg. Co.**
1998 WL 920267, 23 Conn. L. Rptr. 443 , Conn.Super., Dec 08, 1998
Not Reported in A.2d
Conn.Super.,1998.
Dec. 8, 1998.

MEMORANDUM OF DECISION ON MOTION TO STRIKE # 114

HENNESSEY.
*1 The defendant has moved to strike counts two, three and five raising the following issues:
1. Whether the plaintiffs have pleaded sufficient facts satisfying the element of "intent" to withstand a motion to strike a count sounding in trespass.
2. Whether the court should, by way of a motion to strike, determine whether the plaintiffs have sufficiently alleged facts showing the defendants engaged in "ultrahazardous activity" so as to support a common law strict liability claim.
3. Whether any of the plaintiffs set forth sufficient allegations demonstrating that they are within the class of persons allowed to bring a claim under the Connecticut Unfair Trade Practices Act (CUTPA).
On October 1, 1997, the plaintiffs, Linwood S. Mather, Jr., Mather Realty Corporation and Mather Corporation filed a six-count revised complaint, alleging in count two, trespass, in count three, strict liability for an ultrahazardous activity, and in count five, a violation of the Connecticut Unfair Trade Practices Act (CUTPA). The claims arise out of the alleged contamination of the plaintiffs'   property by activities of the defendant Birken Manufacturing Company, on its own property.
According to the allegations in the revised complaint, the plaintiffs each own or possess land on West Dudley Town Road in Bloomfield, Connecticut. The defendant owns or operates a manufacturing facility at the intersection of West Dudley Town Road and Old Windsor Road in Bloomfield, Connecticut. Since 1952, the defendant operated metal finishing, electroplating, and related manufacturing processes "which rely extensively on the generation, storage, use, treatment and disposal of hazardous and toxic chemicals and wastes." Revised Complaint, 5. On or about August 12, 1980, the defendant submitted to the United States Environmental Protection Agency (EPA) a preliminary notification pursuant to federal statutes identifying itself as a generator of, and treatment and storage facility for hazardous wastes, thereby qualifying itself as a storage and treatment facility for hazardous wastes. According to the plaintiffs, the defendant, on its property, "discharged hazardous waste from the defendant's tanks, soils, groundwater or storage areas or from some other source on the [defendant's land] into the groundwater of the State." Revised Complaint, 7.
On March 31, 1987, the EPA determined that the presence and release of hazardous wastes on the defendant's property constituted a substantial health hazard. From test results dated December 15, 1994, the hazardous wastes contaminated the soil and groundwater of the plaintiffs'  properties. The defendant received notice of its noncompliance with the previous orders issued by the EPA and the Connecticut Department of Environmental Protection (DEP).

Counts two, three and five repeat the foregoing allegations. In addition, count two alleges that the defendant committed a trespass on the plaintiffs' properties. Count three alleges that the defendant is strictly liable for engaging in an ultrahazardous activity. Count five alleges that the defendant violated CUTPA.

*2 For each of the counts asserted, the plaintiffs allege that they have suffered and continue to suffer money damages, disruption of business activity, consultant and testing fees, legal expenses and exposure to future adverse regulatory actions and/or toxic waste liability.

On February 26, 1998, the defendant filed a motion to strike counts two, three and five of the plaintiffs' revised complaint. With respect to count two, the defendant argues that the plaintiffs fail to allege sufficient facts which satisfy the requisite "intent" element of a cause of action for trespass. With respect to count three, the defendant argues that strict liability is not applicable here because the defendant is not involved in an abnormally or intrinsically dangerous activity. With respect to count five, the defendant argues that the plaintiffs fail to sufficiently allege that they fall within the class of persons CUTPA was designed to protect.

"The purpose of a motion to strike is to contest ... the legal sufficiency of the allegations of any complaints ... to state a claim upon which relief can be granted ..." (Citation omitted; internal quotation marks omitted.) *Peter- Michael, Inc. v. Sea Shell Associates,* 244 Conn. 269, 270, 709 A.2d 558 (1998). "A motion to strike admits all facts well pleaded." *Parsons v. United Technologies Corp.,* 243 Conn. 66, 68, 700 A.2d 655 (1997). "[The motion to strike] does not admit legal conclusions or the truth or accuracy of opinions stated in the pleadings." *Mingachos v. CBS, Inc.,* 196 Conn. 91, 108, 491 A.2d 368 (1985). "A motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged." *Novametrix Medical Systems, Inc. v. BOC Group Inc.,* 224 Conn. 210, 215, 618 A.2d 25 (1992). "The role of the trial court [is] to examine the [complaint], construed in favor of the plaintiffs, to determine whether the [pleading party has] stated a legally sufficient cause of action." (Internal quotation marks omitted.) *Dodd v. Middlesex Mutual Assurance Co.,* 242 Conn. 375, 378, 698 A.2d 859 (1997). "[I]f facts provable in the complaint would support a cause of action, the motion to strike must be denied." *Pamela B. v. Ment,* 244 Conn. 296, 308, 709 A.2d 1089 (1998). "[A] trial court must take the facts to be those alleged in the complaint ... and cannot be aided by the assumption of any facts not therein alleged." (Internal quotation marks omitted.) *Liljedahl Bros., Inc. v. Grigsby,* 215 Conn. 345, 348, 576 A.2d 149 (1990). "A ' speaking,' motion to strike (one imparting facts outside the pleadings) will not be granted ..." (Citations omitted.) *Doe v. Marselle,* 38 Conn.App. 360, 364, 660 A.2d 871 (1995), rev' d on other grounds 236 Conn. 845, 675 A.2d 835 (1996). "Where the legal grounds for [a motion to strike] are dependent upon underlying facts not alleged in the plaintiff' s pleadings, the defendant must await the evidence which may be adduced at trial, and the motion should be denied." *Liljedahl Bros., Inc. v. Grigsby, supra,* 215 Conn. 348.

*3 "It is axiomatic that, in passing on a motion to strike based on a claim of failure to state a cause of action, we must take the facts alleged favorably to the pleader and view those facts in a broad fashion, not strictly limited to the allegations, but also including the facts necessarily implied by and fairly probable under them." (Internal quotation marks omitted.) *Zeller v. Mark,* 14 Conn.App. 651, 654, 542 A.2d 752 (1988).

The defendant moves to strike the second count of the plaintiffs' complaint on the ground that the plaintiffs have failed to state a cause of action for trespass because they have not sufficiently alleged the defendant' s "intent." The plaintiffs argue that their allegations, when read in the light most favorable to them, and including facts necessarily implied and fairly probable thereunder,

show the defendant knew of the contamination of its own property, and knew with substantial certainty that it would migrate to the plaintiffs' properties.

Specifically, the plaintiffs argue that their allegations show that the defendant received numerous notices from the EPA and the DEP regarding violations of EPA/DEP orders. Further, the plaintiffs argue that the defendant submitted reports to the EPA documenting the presence and probable migration of hazardous wastes. Taking the foregoing facts as true, the plaintiffs argue that the defendant knew of the groundwater contamination on its own property, and knew with substantial certainty that such contaminated groundwater had migrated to the plaintiffs' properties.

"The essentials of an action for trespass are: (1) ownership or possessory interest in land by the plaintiff, (2) invasion, intrusion or entry by the defendant affecting the plaintiff's exclusive possessory interest; (3) done intentionally; and (4) causing direct injury. *Avery v. Spicer,* 90 Conn. 576, 579, 98 A. 135 (1916); 75 Am.Jur.2d, Trespass §§ 3, 8, 14, 25, 35." *Abington Ltd. Partnership v. Talcott Mountain Science Ctr. for Student Involvement, Inc.,* 43 Conn.Supp. 424, 427, 657 A.2d 732 (1994). "[A] trespass need not be inflicted directly on another's realty, but may be committed by discharging foreign polluting matter at a point beyond the boundary of such realty ..." (Citation omitted; internal quotation marks omitted.) *Ahnert v. Getty,* Superior Court, judicial district of New London at New London, Docket No. 537008 (April 4, 1997) (Handy, J.). "In order that there may be a trespass ... [i]t is enough that an act is done with knowledge that it will to a substantial certainty result in the entry of the foreign matter [on the property] ..." (Citation omitted; internal quotation marks omitted.) *Id.*

In *Ahnert v. Getty, supra,* Superior Court, Docket No. 537008, the plaintiffs brought an action in trespass alleging that "the defendant intentionally invaded the plaintiffs' property by his placement of excessive dust thereon." *Id.* The plaintiffs also alleged that the defendant "knew or should have known that significant amounts of dust were settling outside of the defendant's premises, including on the plaintiffs' property. *Id.* Based on those allegations, the court found sufficient facts to satisfy the "intent" element in an action for trespass, and denied the defendant's motion to strike.

*4 Unlike the plaintiffs' allegations in *Ahnert,* the plaintiffs' allegations in the present case, including those facts necessarily implied and fairly provable thereunder, fall short of satisfying the "intent" element in a trespass claim. Even when reading the complaint broadly, there are no facts alleged which rise to the level of showing that the defendant knew, or was substantially certain, of the impact its alleged activity had, or would have, on the plaintiffs' property. Although the plaintiffs have alleged facts which show that the defendant knew of contaminants on its own land; see Revised Complaint, Count Two, 7 and 9; the defendant is correct in asserting that the plaintiffs have not sufficiently alleged that the defendant knew with substantial certainty that contaminants would migrate, or had migrated, to the plaintiffs' properties.

For the reasons stated, the allegations are not legally sufficient to support an action for trespass. Accordingly, the motion to strike the second count of the revised complaint is granted.

The defendant next argues that Count three of the revised complaint should be stricken on the ground that the alleged activity of the defendant, as a matter of law, is not abnormally dangerous or ultrahazardous. [FN1 ] The plaintiffs first respond by arguing that the question of what constitutes "abnormally dangerous" activity, though a question of law for the court, cannot be appropriately decided by way of a motion to strike. Instead, the plaintiffs argue, the court should hold a full evidentiary hearing on the nature of the defendant's activity before making this determination. Even if the court chooses to decide this issue without holding such a hearing, the

plaintiffs argue that the defendant's generation, use, storage, treatment and disposal of hazardous wastes in the alleged circumstances and conditions is an ultrahazardous activity.

> FN1. Since the terms "abnormally dangerous" and "ultrahazardous" are used interchangeably without distinction in case law, this memorandum will also use both terms. See. e.g., *Goodrich v. Jennings,* Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. 150074 (May 22, 1997) (Mintz, J.) (19 CONN. L. RPTR. 542) (stating the two are "synonymous terms in the law").

"Under [the doctrine of strict liability] a plaintiff is not required to show that his loss was caused by the defendant's negligence. It is sufficient to show only that the defendant engaged in an ultrahazardous activity that caused the defendant's loss.'*Green v. Ensign-Bickford Co.*, 25 Conn.App. 479, 482, 595 A.2d 1383 (1991), cert. denied, 220 Conn. 919, 597 A.2d 343 (1991). "The issue of whether an activity is abnormally dangerous ... is a question of law for the court to decide." *Id.*, 485, 595 A.2d 1383.

Connecticut courts have utilized two similar tests for determining whether an activity deserves strict liability treatment. The Appellate Court, in *Green,* stated that the factors for a court to consider when deciding whether an activity is abnormally dangerous are listed in § 520 of the Restatement (Second) of Torts, as follows:

"(a) existence of a high degree of risk of some harm to the person, land or chattels of others;
*5 (b) likelihood that the harm that results from it will be great;
(c) inability to eliminate the risk by the exercise of reasonable care;
(d) extent to which the activity is not a matter of common usage;
(e) inappropriateness of the activity to the place where it is carried on: and
(f) extent to which its value to the community is outweighed by its dangerous attributes.
3 Restatement (Second), Torts § 520." *Green v. Ensign-Bickford Co., supra,* 25 Conn.App. 486.

The Connecticut Supreme Court has similarly held that certain factors must be present in order to invoke strict liability for ultrahazardous activity: "[A]n instrumentality capable of producing harm; circumstances and conditions in its use which, irrespective of a lawful purpose or due care, involve a risk of probable injury to such a degree that the activity fairly can be said to be intrinsically dangerous to the person or property of others; and a causal relation between the activity and the injury for which damages are claimed." *Caporale v. C.W. Blakeslee & Sons, Inc.,* 149 Conn. 79, 85, 175 A.2d 561 (1961).

Although the plaintiffs acknowledge the *Green* court's holding that a determination of what constitutes "abnormally dangerous" activity is a question of law, the plaintiffs contend that the court should not make this determination by way of a motion to strike, and should instead, hold an evidentiary hearing. This court has been confronted with such an issue before, and has not held an evidentiary hearing. See *Barnes v. General Electric Co*., Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 0529354 (July 25, 1995) (Hennessey, J.) (14 CONN. L. RPTR. 455); *Burns v. Lehigh,* Superior Court, judicial district of Hartford-New Britain at Hartford. Docket No. 342600 (July 12, 1988) (Hennessey, J.) (3 C.S.C.R. 722). Moreover, the overwhelming majority of Superior Courts do not hold evidentiary hearings on such matters. See, e.g. *Goodrich v. Jennings,* Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. 150074 (May 22, 1997) (Mintz, J.) (19 CONN. L. RPTR. 542); *Mirarchi v. Jennings,* Superior Court, judicial district of Stamford-Norwalk at Stamford,

Docket No. 152917 (May 22, 1997) (Mintz, J.); *Connecticut Water Co. v. Thomaston,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 535590 (March 4, 1996) (Corradino, J.) (16 CONN. L. RPTR. 213); *Blackburn v. Miller-Stephenson Chemical Co*., Superior Court, judicial district of Danbury, Docket No. 314089 (January 12, 1995) (Stodolink, J.) (13 CONN. L. RPTR. 364); *Southern New England Telephone Co. v. Clifford,* Superior Court, judicial district of Litchfield, Docket No. 057131 (December 10, 1991) (Pickett, J.); *Michael v. Kenyon Oil Co*., Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 344098 (March 22, 1989) (O' Connor, J.) (4 C.S.C.R. 337). But see *Woodford v. Heritage Village,* Superior Court, judicial district of Waterbury, Docket No. 114794 (December 21, 1994) (Sullivan, J.) (requiring evidence beyond facts in complaint in order to weigh factors for determining whether activity ultrahazardous); *Polymetrics, Inc. v. Jones Chemical, Inc*. Superior Court, judicial district of Hartford-New Britain at Hartford. Docket No. 500452 (March 2, 1992) (Burns, J.) (denying motion to strike because ultrahazardous activity is mixed question of law and fact, and court requires submission of evidence). Indeed, the use of an evidentiary hearing would require the court to consider extraneous facts not within the four corners of the pleading, and thus frustrate the function and purpose of a motion to strike. [FN2]

FN2. In negligence cases, the question of whether a duty of care

exists is also a question of law for the court to decide. See *Waters v. Autuori,* 236 Conn. 820, 826, 676 A.2d 357 (1996). Similar to the question of whether an activity is ultrahazardous, the court is required to address (and weigh) specific factors in order to determine whether there is a legal duty. See *Clohessy v. Bachelor,* 237 Conn. 31, 45, 675 A.2d 852 (1996). Contrary to the plaintiffs' argument, however, this process is routinely conducted at the motion to strike stage. See, e.g., *Rosenberg v. Hebrew Home and Hospital, Inc*., Superior Court., judicial district of Fairfield at Bridgeport, Docket No. 333135 (January 23, 1997) (Melville, J.) (addressing only allegations in complaint to determine if plaintiff sufficiently alleged facts demonstrating a duty of care was owed).

*6 The only two superior court cases that refused to decide the issue of ultrahazardous activity at the motion to strike stage; *see Woodford v. Heritage Village, supra,* Superior Court, Docket No. 114794; *Polymetrics, Inc. v. Jones Chemical, Inc. supra,* Superior Court, Docket No. 500452; based their respective decisions on different reasoning.
*In Polymetrics,* the plaintiff alleged that the defendant' s transferring and loading of hydrochloric acid is an inherently dangerous activity. The court listed the Restatement § 520 factors as stated by the Appellate Court in *Green v. Ensign-Bickford Co., supra,* and concluded that the determination of whether the questioned activity is ultrahazardous involves mixed questions of law and fact. In denying the defendant' s motion to strike, the court stated that "[e]vidence must be presented to the court in order for the court to form a reasonable basis of opinion as to whether or not said allegation is true." *Polymetrics, Inc. v. Jones Chemical, Inc., supra,* Superior Court, Docket No. 500452. It is apparent that the court viewed the plaintiff' s allegation in *Polymetrics* as nothing more than a legal conclusion which lacked sufficient underlying factual allegations.
The *Woodford* court was confronted with the issue of whether the application of pesticides is an

ultrahazardous activity. In *Woodford,* the court acknowledged that the issue is a question of law, and listed the Restatement § 520 factors which must be considered. Relying solely on the *Polymetrics* decision, the court concluded that the issue of ultrahazardous activity "cannot be resolved by way of a motion to strike because the court must consider evidence in order to weigh the factors outlined in Restatement (Second), § 520." *Woodford v. Heritage Village, supra,* Superior Court, Docket No. 114794. It is apparent, however, that the *Woodford* court was troubled by the fact that the defendant in that case made factual assertions not found within the complaint: "The defendant's memorandum in support of the motion to strike the second count contains factual assertions regarding the Restatement (Second) § 520 factors, which assertions are not contained in the complaint. Therefore, in order to make the determination of whether the questioned activity is ultrahazardous, the court must look beyond the facts alleged in the complaint, which is improper on a motion to strike." *Woodford v. Heritage Village, supra,* Superior Court. Docket No. 114794.

In the present case, unlike the plaintiff in *Polymetrics,* the plaintiffs' allegations do not amount to mere conclusions of law without underlying factual allegations. See Revised Complaint, 7 and 8. The present case, unlike the defendant in *Woodford,* the defendant's arguments do not rely on factual assertions not found within the complaint. Compare *Connecticut Water Co. v. Thomaston, supra,* 16 CONN. L. RPTR. 542 ("[I]t might be said that the necessary predicate facts for making the determination of law can't properly be developed by means of a motion to strike. I think it's more productive to approach the problem from the point of view of determining whether the factual allegations of the complaint set forth a legally sufficient basis for a claim of ultrahazardous activity. If they don't, the claim is stricken, the plaintiff can plead over and if it does so the matter can be properly set up for the factual questions that have to be resolved in a motion for summary judgment").

\*7 Accordingly, the court can rightly determine at the motion to strike stage whether the plaintiffs sufficiently allege facts demonstrating that the defendant engaged in an ultrahazardous activity.

The defendant first argues that its alleged activity of producing and finishing metal aircraft parts is not an abnormally dangerous activity. The defendant is correct in asserting that the alleged activity of producing and finishing metal aircraft parts does not deserve strict liability treatment. See, e.g. *Nielsen v. Sioux Tools, Inc., 870 F.Supp. 435, 442 (D.Conn.1994)* (declining to extend strict liability to activity of operating a tool repair shop); *Arawana Mills Co. v. United Technologies Corp., 795 F.Supp. 1238, 1251 (D.Conn.1992)* (declining to characterize activity of metal finishing and servicing jet engines as ultrahazardous).

The plaintiff responds by arguing that it is not the activity of producing or finishing metal parts which deserves strict liability treatment, but rather, the defendant's alleged acts of discharging and disposing of hazardous wastes. According to the defendant, however, the storage and use of hazardous wastes is not an ultrahazardous activity in Connecticut. Furthermore, the defendant contends that the plaintiffs' own allegations acknowledge that the alleged harm suffered by the plaintiffs was not the result of the intrinsic nature of the defendant's activity, but rather from the alleged lack of proper care in conducting that activity.

The Connecticut Supreme and Appellate Courts have only imposed strict liability with respect to such activities as blasting and pile driving. See *Whitman Hotel Corp. v. Elliott & Watrous Engineering Co., 137 Conn. 562, 565, 79 A.2d 591 (1951)* (blasting); *Caporale v. C.W. Blakeslee & Sons, Inc., supra, 149 Conn. 85-86* (pile driving); *Green v. Ensign-Bickford Co., supra, 25 Conn.App. 482-83* (experimental explosions). Although certainly not bound to follow

the Federal District Court for the District of Connecticut or other Superior Courts, this court looks to those courts for guidance, and uses their decisions as persuasive authority. See *Barnes v. General Electric* Co., *supra,* 14 CONN. L. RPTR. 458.

The mere storage and use of hazardous material is not an ultrahazardous activity, and has not been held to support a strict liability claim. See *Skelton v. Chemical Leaman Tank Lines,* Superior Court, judicial district of New Haven at New Haven, Docket No. 359236 (May 13, 1996) (Corradino, J.) (17 C ONN. L. RPTR. 56) (distinguishing storage and use from actual disposal of toxic material). The Federal District Court for the District of Connecticut has also uniformly held that "the storage and use of hazardous materials, which result in a subsequent release" does not constitute ultrahazardous activity for which strict liability may be imposed. See *Nielsen v. Sioux Tools, Inc., supra.* 870 F.Sup. 442; *Arawana Mills Co. v. United Technologies Corp., supra,* 795 F.Sup. 1252. The storage, use and *disposal* of hazardous waste, however, has been held to be an ultrahazardous activity. See *Barnes v. General Electric Co., supra,* 14 CONN. L. RPTR. 458 ("The storage, burial, and *disposal* of hazardous and toxic waste at a municipal landfill is capable of producing harms, including ground and surface water contamination, irrespective of whether due care is used" (emphasis added)).

*8 In *Barnes,* the plaintiffs were residential property owners on a site that was formerly part of, or adjacent to, a municipal landfill. The defendant town of Southington owned and operated the landfill prior to its closing in 1967. During the periods of operation, the defendant Pratt & Whitney used the landfill for its disposal of hazardous materials. After closing the landfill, the town subdivided the landfill and its surrounding area into parcels supporting residential, recreational and commercial buildings. The plaintiffs alleged, inter alia, that the defendants' handling, burning, burying, and disposing of hazardous materials at the site constituted ultrahazardous activity sufficient to state a claim for strict liability. See *id*., 456.

Weighing the Restatement § 520 factors. the court in *Barnes* concluded that the defendants' alleged activity "pose[d] a risk of probable injury to such a degree that the activity fairly can be categorized as intrinsically dangerous to people or property." *Id*., 458. The court also found that "the likelihood of resulting harm from the defendants' activities to property and persons, whether it is actually minimal or severe, is great." *Id*. In addition, the court found that such risks of harm were not capable of being mitigated by the defendants' exercise of reasonable care. *Id*. For those reasons, the *Barnes* court found the defendants' activity to be abnormally dangerous, and did not strike the claim for strict liability. *Id*., 459.

In the present case, unlike the plaintiffs in *Nielsen, Arawana Mills Co.* and *Skelton,* the plaintiffs do not merely allege that the defendant stored or used hazardous materials. The courts in those cases focused on the *storage* and *use* of hazardous materials which were subsequently released. Rather, the plaintiffs in the present case also allege that the defendant' s manufacturing processes "rely extensively on the generation, storage, use, treatment, and *disposal* of hazardous and toxic chemicals and wastes." (Emphasis added.) Revised Complaint, 5. In addition, the plaintiffs allege that the defendant *"discharged* hazardous waste ... into the groundwater of the State." (Emphasis added.) Revised Complaint, 7.

The plaintiffs in the present case have made similar allegations as those made in *Barnes.* Similar to the plaintiffs' allegations in *Barnes,* the defendants are accused of directly *disposing* hazardous waste into the soil or the environment. Although the disposal in *Barnes* occurred at a municipal landfill, this distinction is not dispositive of the present case. In both instances, the plaintiffs allege that the defendants' conduct adversely affected the plaintiffs' land. Moreover, the activity of the defendant in the present case is apparently more unusual and severe than the defendants'

acts in *Barnes.*

*9 In *Barnes,* the court noted that "it was common usage to dispose of commercial wastes at a landfill ... [and] may be an activity of some use to society." *Barnes v. General Electric Co., supra,* 14 CONN. L. RPTR. 459. In the present case, however, there is apparently no "common usage" or a "benefit to society" as the plaintiffs allege that the EPA characterized the defendant's activities as unsafe and hazardous in that community. Revised Complaint, 9. Thus, upon comparison of the alleged activities of the defendant in the present case and the defendants in *Barnes,* it is apparent that the present case involves even greater risks, decree and likelihood of harm. It follows. therefore, that the risks, degree and likelihood of harm, as found in *Barnes,* should apply a fortiori to the defendants' alleged activity in the present case.

The court, upon consideration of the requirements set forth in *Caporale v. C.W. Blakeslee & Sons, Inc., supra,* 149 Conn. 85, § 520 of the Restatement (Second) of Torts, as well as the holding in *Barnes v. General Electric Co., supra,* 14 CONN. L. RPTR. 459, finds that the plaintiffs' factual allegations set forth a legally sufficient basis for a claim of ultrahazardous activity on the part of the defendant.

The defendant next argues that the plaintiffs, through their own words, acknowledge the fact that their injury occurred through the alleged lack of proper care under the circumstances, and not from the intrinsic nature of an ultrahazardous activity. Specifically, the defendant claims that the plaintiffs' allegation that the defendant "*permitted* the escape of ultrahazardous substances"; (emphasis added) Revised Complaint, Third Count, 17; is dispositive of the ultrahazardous activity claim. That is, the defendant argues that if the court takes that allegation as true, then the activity cannot be deemed ultrahazardous--because the word "permitted" infers "negligent" or "careless" conduct, which undermines the strict liability claim.

The plaintiffs' use of the word "permitted" is not dispositive of their claim for strict liability. "[T]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically." (Internal quotation marks omitted.) *Normand Josef Enterprises, Inc. v. Connecticut National Bank,* 230 Conn. 486, 496, 646 A.2d 1289 (1994). "We reject a formalistic, highly technical view of pleading requirements. Under modern rules of pleading, slight linguistic ambiguity should not be fatal to a cause of action." (Internal quotation marks omitted.) *Fuessenich v. DiNardo,* 195 Conn. 144, 150-51, 487 A.2d 514 (1985).

In *Michael v. Kenyon Oil Co., supra,* 4 C.S.C.R. 337, the defendants moved to strike the plaintiffs' strict liability for an abnormally dangerous activity claim. The plaintiffs alleged that pollutants discharged from the defendants' storage tanks contaminated the plaintiffs' water supply. The plaintiffs also alleged that "the defendants have knowingly engaged in an abnormally dangerous activity, and have permitted the escape of ultrahazardous substances, and are strictly liable to the plaintiffs for any damages resulting therefrom." (Emphasis added.) *Id.,* 339. Under those allegations, notwithstanding the plaintiffs' use of the word "permitted," the court in *Michael v. Kenyon Oil Co.* held that the plaintiffs sufficiently set forth a cause of action in strict liability for an abnormally dangerous activity.

*10 The plaintiffs in the present case have used almost identical language in their allegations as the plaintiffs in *Michael v. Kenyon Oil Co.* The court will not engage in a hypertechnical reading of the plaintiffs' allegations. Accordingly, the plaintiffs' strict liability claim will not be stricken on this ground.

For the reasons stated, the motion to strike the third count of the revised complaint is denied.

The defendant moves to strike count five of the revised complaint, which alleges a violation of CUTPA. The count repeats the general factual allegations common to all counts. The count also

incorporates the allegations that the defendant committed a nuisance and trespass, conducted an abnormally dangerous activity and was negligent. These acts, the plaintiffs allege, constitute violations of CUTPA.

The defendant argues that the plaintiffs have failed to state a legally sufficient claim under CUTPA because they have not alleged that they are consumers, competitors, or "other business persons" within the meaning of CUTPA. The plaintiffs respond by arguing that CUTPA must be liberally applied to afford its remedial purpose. Furthermore, the plaintiffs argue that "they are consumers, albeit unwilling consumers, of the defendant's toxic waste products." Plaintiffs' Memorandum In Opposition to Motion to Strike, p. 30. The plaintiffs also argue that they have a "sufficient business relationship" with the defendant because the plaintiffs' business has been forced to absorb the extra costs associated with the defendant's alleged contamination of their land. Finally, the plaintiffs argue that the defendant's alleged violations of environmental regulations constitute breaches of public policy. This, the plaintiffs argue, is enough to constitute a CUTPA violation.

"It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the 'cigarette rule' by the federal trade commission for determining when a practice is unfair: (1)[W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other business persons] ... All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Internal quotation marks omitted.) *Willow Springs Condominium Assn., Inc. v. Seventh BRT Development Co.,* 245 Conn. 1, 43, 612 A.2d. 742 (1998).

"Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action." General Statutes § 42- 110g(a). Pursuant to General Statutes § 42-110b(a), "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

*11 "CUTPA is not limited to conduct involving consumer injury ...[;] a competitor or other business person can maintain a CUTPA cause of action without showing consumer injury." (Internal quotation marks omitted.) *Larsen Chelsey Realty Co. v. Larsen,* 232 Conn. 480, 496, 656 A.2d 1009 (1995). "[CUTPA], modeled as it is on the federal act, gives protection to wronged competitors and consumers but not to the world at large or any individual who might be injured by the activities of a business entity no matter what relationship the individual had with that business, even no relationship at all." *Skelton v. Chemical Leaman Tank Lines, supra,* 17 CONN. L. RPTR. 60. To ensure fair competition, CUTPA gives protection to business persons "who have that type of a commercial relationship to the alleged wrongdoer which is such that the latter's unfair and deceptive acts might deleteriously affect fair competition in a particular marketplace." *Connecticut Water Co. v. Thomaston,* Superior Court, judicial district of Hartford-New Britain at Hartford. Docket No. 535590 (April 24, 1997) (Corradino, J.). Moreover, "[t]he act wasn't meant to protect any individual or business who happened to be harmed no matter what the context or relationship between the wrongdoer and the claimant." *Id.*

The plaintiffs have made the following pertinent allegations concerning their relationship to the

defendants, and the unfair or deceptive trade practices by the defendant. The respective properties of the defendant and the plaintiffs are in close proximity to each other. The defendant's contamination of their properties caused a diminution in the value of the plaintiffs' leasehold and real property interests. Because of the defendant's conduct, they have suffered and continue to suffer, inter alia, a disruption of business activity.

These allegations, including those facts necessarily implied and fairly provable thereunder, do not either (1) allege a consumer, competitor, or business person relationship with the defendant; see *Larsen Chelsey Realty Co. v. Larsen, supra,* Conn. 496; or (2) allege an "unfair method of competition [or] unfair or deceptive acts or practices in the conduct of any trade or commerce." See General Statutes § 42-110b(a). The plaintiffs' remaining argument concerning a consumer relationship via consumption of the defendant's toxic wastes is without merit. The plaintiffs' public policy argument need not be addressed because of their lack of factual allegations demonstrating a consumer, competitor or business person relationship to the defendant.

For the reasons stated, the motion to strike the fifth count of the revised complaint is granted.

## CONCLUSION

The plaintiffs' claim for trespass is legally insufficient because it fails to allege the defendant's intent or knowledge to a substantial certainty. The plaintiffs have properly alleged an ultrahazardous activity on the part of the defendant, and therefore, their strict liability claim is legally sufficient. The plaintiffs' CUTPA claim does not sufficiently allege either a consumer, competitor, or other business person relationship, and therefore, is legally insufficient.

*12 For the foregoing reasons, the court denies the defendant's motion to strike as to count three, and grant the defendant's motion as to counts two and five.

Conn.Super.,1998.

Mather v. Birken Mfg. Co.

1998 WL 920267 (Conn.Super.), 23 Conn. L. Rptr. 443

END OF DOCUMENT

### *CASE NO. 03-945- PLAINTIFFS' APPENDIX OF UNREPORTED CASES, EXHIBIT 17*
**Mirarchi v. Jennings**

1997 WL 297734 , Conn.Super., May 22, 1997

Not Reported in A.2d

Conn.Super.,1997.

May 22, 1997.

MEMORANDUM OF DECISION RE: MOTION TO STRIKE # 102

MINTZ, J.

I

FACTS

*1 The plaintiff, Ralph Mirarchi, filed an eleven count complaint on June 21, 1996, seeking damages allegedly caused by an underground gasoline storage tank that had leaked. One of the defendants, Strain Oil Company (Strain), moved to strike count ten of the plaintiff's complaint.

II

DISCUSSION

A

Motion To Strike

"Whenever any party wishes to contest (1) the legal sufficiency of the allegations of any complaint ... or of any one or more counts thereof, to state a claim upon which relief can be granted ... that party may do so by filing a motion to strike the contested pleading or part thereof." Practice Book § 152. "The purpose of a motion to strike is to contest ... the legal sufficiency of the allegations of any complaint ... to state a claim upon which relief can be granted. In ruling on a motion to strike, the court is limited to the facts alleged in the complaint. The court must construe the facts in the complaint most favorably to the plaintiff." (Internal quotation marks omitted.) *Waters v. Autuori,* 236 Conn. 820, 825, 676 A.2d 357 (1996). "In ruling on a motion to strike, the court is limited to considering the grounds specified in the motion." *Meredith v. Police Commissioner,* 182 Conn. 138, 140, 438 A.2d 27 (1980).

                                                          B

Count Ten: Negligence Per Se

Count ten of the plaintiff's complaint states a cause of action for negligence per se based upon General Statutes §§ 22a-427, 22a-430, and 22a-450 of the Water Pollution Control Act (WPCA). Strain moves to strike count ten of the plaintiff's complaint on the ground that "the statutes cited by the plaintiff do not support a negligence cause of action because the statutes create public rights enforceable only by the State, and the plaintiff has no right to bring an action to recover solely private damages under those statutes." Motion To Strike, # 102. The plaintiff contends that he is not attempting to recover under the WPCA, he is merely attempting to use the standard under the statute as the standard of care in his negligence cause of action, as per the doctrine of negligence per se.

"Negligence per se operates to engraft a particular legislative standard onto the general standard of care imposed by traditional tort law principles, i.e., that standard of care to which an ordinarily prudent person would conform his conduct. To establish negligence, the jury in a negligence per se case need not decide whether the defendant acted as an ordinarily prudent person would have acted under the circumstances. They merely decide whether the relevant statute or regulation has been violated. If it has, the defendant was negligent as a matter of law." (Internal quotation marks omitted.) *Gore v. People's Savings Bank,* 235 Conn. 360, 368-69, 665 A.2d 1341 (1995), on remand, 40 Conn.App. 219, 670 A.2d 332 (1996). In order to utilize the principle of negligence per se the plaintiff must satisfy a two-prong test: "(1) that the [plaintiff was] within the class of persons protected by the statute; and (2) that the injury suffered is of the type that the statute was intended to prevent." *Id.,* 368-69.

*2 General Statutes § 22a-422 states the policy of the WPCA. This policy mentions "the inhabitants of the state." General Statutes § 22a- 422. As an inhabitant of the state of Connecticut, the plaintiff is within the class of persons protected by this statute.

The injury incurred by the plaintiff is of the type which the WPCA was intended to prevent. General Statutes § 22a-422 states that "the elimination of pollution is hereby declared as a matter of legislative determination." Furthermore, "the pollution of the waters of the state is inimical to the public health, safety and welfare of the inhabitants of the state, is a public nuisance ... and impairs domestic, agricultural, industrial, recreational and other legitimate beneficial uses of water." General Statutes § 22a-422. The plaintiff has alleged, inter alia, that the pollution has caused damages constituting a loss of the use and enjoyment of his property, as well as causing the plaintiff to become concerned about the medical effects of the pollution. Complaint, Count 10, ¶¶ 29, 30.

"If a plaintiff alleges that a statute, ordinance or regulation has been violated, thereby relying on

negligence per se, and also alleges that there is a causal connection between such negligence and the injuries sustained, a cause of action has been stated." *Commercial Union Ins. Co. v. Frank Perrotti & Sons, Inc.,* 20 Conn.App. 253, 258, 566 A.2d 431 (1989). The plaintiff has alleged that Strain violated General Statutes §§ 22a-427, 22a-430, and 22a-450. Complaint, Count 10, ¶¶ 32-34. The plaintiff has also alleged that these violations were the proximate cause of the damages to his property. Therefore, the plaintiff has sufficiently stated a claim of negligence as a matter of law.

Strain also argues that allowing the plaintiff to recover under a negligence per se theory based upon §§ 22a-427, 22a-430, and 22a-450 violates the laws of statutory construction because it renders § 22a-452 mere surplusage. This is because § 22a-452(a) allows the party that cleans up the contamination to recover for "reimbursement from any person, firm or corporation for the reasonable costs expended for ... containment, removal, or mitigation" of the contamination. The plaintiff claims that this assertion by Strain misinterprets how the negligence per se doctrine is applied.

Strain is correct that, according to the law of statutory interpretation, "[a] statute must be interpreted to give effect to all its provisions ... No word within a statute is to be rendered mere surplusage ..." (Citations omitted.) *Westport Taxi Service, Inc. v. Westport Transit District,* 235 Conn. 1, 40, 664 A.2d 719 (1995). The plaintiff, however, is also correct in that the application of this doctrine is inapplicable to his claim of negligence per se. "The doctrine of negligence per se serves to superimpose a legislatively prescribed standard of care on the general standard of care." *Staudinger v. Barrett,* 208 Conn. 94, 101, 544 A.2d 164 (1988). The plaintiff is not interpreting §§ 22a-427, 22a-430, and 22a-450 as providing a private cause of action under the WPCA. Instead, the plaintiff is merely seeking to adopt those sections of the WPCA as the standard of care in his negligence claim. The plaintiff would only be foreclosed from asserting a negligence per se claim based upon the WPCA if the remedy therein was designated a plaintiff's exclusive remedy. See *Sanzone v. Board of Police Commissioners,* 219 Conn. 179, 192, 592 A.2d 912 (1991) ("an action under the highway defect statute, § 13a-149, is a plaintiff's exclusive remedy against a municipality or other political subdivision ' for damages resulting from injury to any person or property by means of a defective road or bridge' "); see also *Winslow v. Lewis-Shepard, Inc.,* 212 Conn. 462, 562 A.2d 517 (1989) (the Products Liability Act, General Statutes § 52-572n, is a plaintiff's exclusive remedy for claims within its scope). Therefore, the rules of statutory interpretation cited by Strain are not implicated in the current motion. Strain's motion to strike count ten of the plaintiff's complaint is denied.

Conn.Super.,1997.

Mirarchi v. Jennings

1997 WL 297734 (Conn.Super.)

END OF DOCUMENT

*CASE NO. 03-945- PLAINTIFFS' APPENDIX OF UNREPORTED CASES, EXHIBIT 18*
**P.R.I.C.E., Inc. v. Keeney**
1998 WL 417591, 22 Conn. L. Rptr. 373 , Conn. Super., Jul 10, 1998
Not Reported in A.2d
Conn.Super.,1998.
July 10, 1998.

MEMORANDUM OF DECISION ON MOTION TO STRIKE (# 168)

HALE.

*1 The plaintiffs in this case include individual landowners who reside or resided in the vicinity of landfills located in the town of Canterbury, and People's Rights In A Clean Environment, Inc. (P.R.I.C.E, Inc.), a Connecticut nonprofit corporation, whose members are residents and/or taxpayers of the town of Canterbury and Windham County who are dedicated to preserving the public trust in the air, water and other natural resources in and around Canterbury.

By way of a complaint dated September 23, 1994, the plaintiffs commenced an action against the defendant, Timothy R.E. Keeney, commissioner of environmental protection. [FN1] By way of a fourth revised complaint dated June 12, 1996, the plaintiffs cited into the action the defendants Yaworski, Inc., James Yaworski, Sr., and Rose Yaworski, the owners and operators of the landfills that are the subject of this action, and James Yaworski, Jr., and Denis Yaworski, officers and shareholders who allegedly have been actively engaged in all phases of the operation of the landfills. On January 14, 1997, the plaintiffs filed a sixth revised complaint, citing into the action the following defendants: Yaworski Trucking, Inc.; Packer Limited, LLC; Quinebaug Valley Regional Resources, LLC; Haul of Fame, Inc.; Canterbury Environmental Management, LLC; Packer Mining, LLC; and Aspinook, LLC. The plaintiffs allege fraudulent conveyance claims against these defendants. The plaintiffs' seventh revised complaint, dated February 24, 1998, is the subject of this motion to strike.

FN1. On October 25, 1996, the complaint was withdrawn as to the defendant Timothy R.E. Keeney.

In their seventh revised complaint, the plaintiffs allege that the defendants unlawfully accepted hazardous chemicals for disposal that have contaminated the surrounding environment and their properties. The twenty-count complaint includes claims for private nuisance (counts 2, 3 and 20), public nuisance (counts 15, 16 and 17), trespass (counts 4 and 5), strict liability for an ultrahazardous activity (counts 6 through 14) and fraudulent conveyances (counts 18 and 19). The defendants move to strike counts two through twenty of the seventh revised complaint. The defendants filed a memorandum of law in support of their motion to strike. The plaintiffs timely filed a memorandum of law in opposition, to which the defendants filed a supplemental memorandum in reply.

"The purpose of a motion to strike is to contest ... the legal sufficiency of the allegations of any complaint ... to state a claim upon which relief can be granted. In ruling on a motion to strike, the court is limited to the facts alleged in the complaint ... The court must construe the facts in the complaint most favorably to the plaintiff." (Citations omitted; internal quotation marks omitted.) *Novametrix Medical Systems, Inc. v. BOC Group, Inc.,* 224 Conn. 210, 214-15, 618 A.2d 25 (1992). "[F]or the purpose of a motion to strike, the moving party admits all facts well pleaded ..." (Citations omitted.) *RK Constructors, Inc. v. Fusco Corp.,* 231 Conn. 381, 383 n. 2, 650 A.2d 153 (1994). "If the facts provable in the complaint would support a cause of action, the motion to strike must be denied." *Waters v. Autuori,* 236 Conn. 820, 826, 676 A.2d 357 (1996).

1. PRIVATE NUISANCE

*2 "A nuisance, whether public or private, describes an inherently dangerous condition that has a

natural tendency to inflict injury upon persons or property." (Internal quotation marks omitted.) *Quinnett v. Newman,* 213 Conn. 343, 348, 568 A.2d 786 (1990). In order to establish a claim for a private nuisance, the plaintiffs must prove the existence of the following four elements: "(1) the condition complained of had a natural tendency to create danger and inflict injury upon person or property; (2) the danger created was a continuing one; (3) the use of the land was unreasonable or unlawful; [and] (4) the existence of the nuisance was the proximate cause of the [plaintiffs'] injuries and damages." (Internal quotation marks omitted.) *Tomasso Brothers, Inc. v. October Twenty-Four, Inc.,* 221 Conn. 194, 197, 602 A.2d 1011 (1992).

The defendants argue in support of their motion to strike counts two, three and twenty that the plaintiffs fail to allege that any existing condition had a natural tendency to create danger and inflict injury upon persons or property. They argue that because the plaintiffs allege that *actions* of the defendants had a natural tendency to cause harm and not *conditions,* the plaintiffs' allegations are insufficient to state a claim for nuisance. The plaintiffs argue that they have alleged the essential elements of a nuisance claim.

The defendants' argument is unavailing. In *Quinnett v. Newman, supra,* 213 Conn. 349, the court explained that "[t]he term nuisance refers to the condition that exists and not to the act or failure to act that creates it. If the creator of the condition intends that act that brings about the condition found to be a nuisance, the nuisance thereby created is said to be absolute and its creator is strictly liable ... If the condition claimed to be a nuisance arises out of the creator's unintentional but negligent act, i.e., a failure to exercise due care, the resulting condition is characterized as a negligent nuisance." Thus, while a nuisance is a condition that has a tendency to inflict injury on persons or property, it is a condition that is brought about by actions that are either intentional or negligent. The allegations in counts two, three and twenty that the actions of the defendants created the nuisance, therefore, are appropriate. See *Connecticut Light & Power Co. v. Streckfus,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 545198 (November 16, 1995, Hennessey, J.) (holding that allegations that the defendants' actions caused injury to the plaintiff's property were sufficient to allege a private nuisance claim).

In counts two, three and twenty, the plaintiffs incorporate the allegations of count one wherein they allege that they have an ownership interest in the affected property. They also allege that the defendants failed to dispose of hazardous substances and solid waste in a reasonable manner, that they knowingly treated, stored and disposed of hazardous waste without proper permits or licenses and that the actions of the defendants in operating the landfill were unlawful. Counts two, three and twenty allege further that the actions of the defendants in allowing the unlawful uses of their properties had a natural tendency to and did cause harm to others, and that the dangers created are continuing ones. The plaintiffs also allege that hazardous substances, dust, noises, odors, unsafe traffic and other conditions are a continuing threat to the plaintiffs and have caused them to suffer continuing injury that affects the use and enjoyment of their property, diminishes their property values and impairs their health.

*3 The court finds that the plaintiffs have alleged sufficient facts to support their nuisance claims. Accordingly, the court denies the motion to strike counts two, three and twenty. See *Ahnert v. Getty,* Superior Court, judicial district of New London at New London, Docket No. 537008 (April 4, 1997, Handy, J.).

II. PUBLIC NUISANCE

When a public nuisance is claimed, the plaintiffs must establish not only the four elements discussed above, but also that the condition or conduct complained of interfered with a right common to the general public. *State v. Tippetts-Abbett-McCarthy-Stratton,* 204 Conn. 177, 183,

527 A.2d 688 (1987). A nuisance is public "where it affects the rights enjoyed by citizens as part of the public, that is, the rights to which every citizen is entitled." (Internal quotation marks omitted.) *Anzellotti v. National Amusements,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 546129 (February 20, 1996, Hennessey, J.).

In *Higgins v. Connecticut Light & Power Co.,* 129 Conn. 606, 611, 30 A.2d 88 (1943), the court held that "if the annoyance is one that is common to the public generally then it is a public nuisance ... The test is not the number of persons annoyed, but the possibility of annoyance to the public by the invasion of its rights. A public nuisance is one that injures the citizens generally who may be so circumstanced as to come within its influence." (Citations omitted; internal quotation marks omitted.) "It is not, however, necessary that the entire community be affected by a public nuisance, so long as the nuisance will interfere with those who come in contact with it in the exercise of a public right or it otherwise affects the interests of the community at large." 4 Restatement (Second), Torts § 821B comment (g) (1977). "In any case in which a private nuisance affects a large number of persons in their use and enjoyment of land it will normally be accompanied by some interference with the rights of the public as well. Thus the spread of smoke, dust or fumes over a considerable area filled with private residences may interfere also with the use of the public streets or affect the public health of so many persons as to involve the interests of the public at large." *Id.*

The defendants move to strike counts fifteen, sixteen and seventeen, which allege public nuisance, because the plaintiffs fail to allege either that a condition caused the injury [FN2] or that the rights infringed were those of the general public. The defendants argue that the plaintiffs fail to allege that the injuries were sustained in the exercise of a public right.

> FN2. The defendants make the same argument with respect to the public nuisance claims that was made regarding the private nuisance claims in counts two, three and twenty, namely, that the allegations that the actions of the defendants caused harm and not of a condition causing harm were insufficient to support a nuisance claim. Because the court has found this argument to be without merit, it will not be discussed further in this section.

The plaintiffs argue in opposition that they have alleged an interference with a public right, namely, the enjoyment of the public trust in the Quinebaug River and in clean breathable air, and that the public harm alleged is the unlawful impairment of their rights in the public trust. The plaintiffs rely on General Statutes § a-15 to support their argument. Section 22a-15 provides that: *4 "It is hereby found and declared that there is a public trust in the air, water and other natural resources of the state of Connecticut and that each person is entitled to the protection, preservation and enhancement of the same. It is further found and declared that it is in the public interest to provide all persons with an adequate remedy to protect the air, water and other natural resources from unreasonable pollution, impairment or destruction."

In counts fifteen, sixteen and seventeen, the plaintiffs incorporate the allegations of count one wherein they allege that the actions of the defendants in failing to maintain and repair a gas recovery system to control odors and airborne emissions, in failing to maintain proper cover over the solid waste at the landfill, in permitting the vertical and horizontal expansion of solid waste piles in excess of permitted heights and lateral boundaries and in accepting for disposal hazardous and toxic substances for which the facility was not designed, resulted in the

contamination of surface waters of the state near and including the Quinebaug River, and the contamination of the air and groundwater.

These counts further allege that the condition complained of had a natural tendency to inflict injury upon person or property, that the danger created was a continuing one, that the use of the land was unreasonable and unlawful and that the existence of the nuisance was the proximate cause of the plaintiffs' injuries. The plaintiffs further allege that "the above described conditions have caused the members of PRICE and the public generally to suffer continuing injury that injures the public trust in the environment by unreasonably polluting the air, water and other natural resources and unreasonably interfering with the public right to enjoy the environment in the Packer Road, Canterbury vicinity."

Based on the foregoing, the court finds that the allegations of counts fifteen, sixteen and seventeen are sufficient to allege public nuisance claims. Accordingly, the court denies the motion to strike these counts.

III. TRESPASS

In order to state a claim for trespass, a plaintiff must show:

"(1) ownership of a possessory interest in land by the plaintiff;

(2) invasion, intrusion or entry by the defendant affecting the plaintiff's exclusive possessory interest;

(3) done intentionally; and

(4) causing direct injury.

*Avery v. Spicer,* 90 Conn. 576, 579, 98 A. 135 (1916)." *Abington Limited Partnership v. Talcott Mountain Science Center,* 43 Conn.Supp. 424, 427, 657 A.2d 732 (1994). "The action of trespass to land is used most commonly to describe the intentional and wrongful invasion of another's real property." *Blackburn v. Miller-Stephenson Chemical Co.,* Superior Court, judicial district of Danbury, Docket No. 314089 (January 12, 1995, Stodolink, J.) (13 CONN. L. RPTR. 364). "[A] trespass may be committed on, beneath, or above the surface of the earth [and] the phrase ' surface of the earth' includes soil, water, trees, and other growths ... Additionally, a trespass need not be inflicted directly on another's realty, but may be committed by discharging foreign polluting matter at a point beyond the boundary of such realty." (Citations omitted; internal quotation marks omitted.) *Id.* Furthermore, "because it is the right of the owner in possession to exclusive possession that is protected by an action for trespass, it is generally held that the intrusion of the property be physical and accomplished by a tangible matter." (Internal quotation marks omitted.) *Abington Limited Partnership v. Talcott Mountain Science Center, supra,* 427.

*5 The defendants move to strike counts four and five, which allege trespass, on the grounds that the plaintiffs fail to allege that the defendants' invasion was intentional or that it interfered with the plaintiffs' exclusive possessory interests. Specifically, they argue that the plaintiffs have failed to allege that the defendants intentionally caused some substance to enter upon the plaintiffs' land. The plaintiffs counter that the complaint alleges intentional acts resulting in a physical invasion of the plaintiffs' property by dust, litter and hazardous substances and, therefore, the motion to strike counts four and five should be denied.

Counts four and five incorporate the allegations of count one wherein the plaintiffs allege that they own land near the properties on which the harmful activities occurred and that the defendants knowingly and intentionally accepted for disposal hazardous substances without proper permits or licenses. Counts four and five further allege that the actions of the defendants "in allowing the unlawful uses of their properties resulted in litter, dust ... and hazardous substances [entering] and [remaining] on the real estate." The plaintiffs also allege that the above

conditions caused the plaintiffs to suffer continuing injury that affects and diminishes their property values, interferes with their use and enjoyment of their property, and impairs their health.

The court finds that the plaintiffs have sufficiently alleged a claim for trespass. When viewed in the light most favorable to the plaintiffs, counts four and five sufficiently allege an ownership interest in property by the plaintiffs, entry on the property by the defendants which affected the plaintiffs' possessory rights, intent to do the act that caused the entry on the property and a direct injury.

The court finds the defendants' argument that the plaintiffs fail to allege the requisite intent for an actionable trespass claim unpersuasive. In *Ahnert v. Getty, supra,* Superior Court, Docket No. 537008, the defendants made a similar argument. The court, however, held that "the Restatement [Second] makes clear that action taken with the substantial certainty that the activity will result in entry of foreign matter on the property of another is actionable trespass." *Id.* In the present case, the plaintiffs allege that the defendants knowingly and intentionally accepted hazardous substances for disposal in a facility not designed for such use, failed to maintain proper cover over the solid waste at the landfill, expanded the solid waste piles in excess of permitted heights and lateral boundaries and failed to dispose of the hazardous substances and solid waste in a reasonable manner. As a result of the defendants' alleged unlawful use of their property, the plaintiffs allege that litter, dust and hazardous substances entered and remained on their property. These allegations satisfy the intent element of an action in trespass.

*6 Accordingly, the court denies the defendants' motion to strike counts four and five. See *Connecticut Light & Power Co. v. Streckfus, supra,* Superior Court, Docket No. 545198 (denying motion to strike trespass claim where actions of the defendant in operating snow plow equipment caused oil to leak onto the plaintiff's property)

IV. STRICT LIABILITY

The defendants move to strike counts six through fourteen on the ground that the facts alleged are insufficient to state a claim for strict liability for an ultrahazardous activity. The plaintiffs argue that the disposal of hazardous wastes constitutes an ultrahazardous activity and, therefore, the motion to strike should be denied. Both parties agree that the issue presented is one of law that may be decided by the court on a motion to strike.

"The doctrine of strict liability for abnormally dangerous activity provides that ' [o]ne who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.' *Restatement (Second), Torts* § 519(1). This principle has been recognized by Connecticut Courts." *Levenstein v. Yale University,* 40 Conn.Supp. 123, 125- 26, 482 A.2d 724 (1984). See *Whitman Hotel Corporation v. Elliott & Watrous Engineering Co.,* 137 Conn. 562, 572-73, 79 A.2d 591 (1951) [FN3] (holding the defendant strictly liable for damages caused by blasting with dynamite); *Caporale v. C.W. Blakeslee & Sons, Inc.,* 149 Conn. 79, 86, 175 A.2d 561 (1961) (imposing strict liability for damage caused by pile-driver operation). The issue of whether an activity is abnormally dangerous is a question of law for a court to decide. *Green v. Ensign-Bickford Co.,* 25 Conn.App. 479, 485, 595 A.2d 1383 (1991).


FN3. In *Whitman,* the defendant argued that public policy should prevent the application of strict liability to that case because the blasting was being done for the public welfare. "No case has come to our attention which, in a jurisdiction adhering to the rule of absolute liability, holds that the application of the rule should be affected by the fact that

the blasting was done in aid of a public work ... The advantages to society of a public work are not so great as to require that private citizens suffer damage without compensation." *Whitman Hotel Corporation*


*v. Elliott & Watrous Engineering Co., supra,* 137 Conn. 572.


"The courts in Connecticut and other jurisdictions which recognize the doctrine of strict liability for dangerous activities, impose it only in narrow circumstances. Typically, it has been found applicable when an activity, not regularly engaged in by the general public, is conducted in or near a heavily populated area, such that it necessarily subjects vast numbers of persons to potentially serious injury in the event of a mishap. Such activities include storing quantities of water or explosives in an unsuitable or dangerous place, maintaining inflammable liquids in quantity in the midst of a city, blasting in the midst of a city, pile driving with abnormal risk to surroundings, releasing poisonous gas or dust, and drilling oil wells or operating refineries in a thickly settled area." *Levenstein v. Yale, supra,* 40 Conn.Sup. 126.

"To impose liability without fault, certain factors must be present: [1] an instrumentality capable of producing harm; [2] circumstances and conditions in its use which, irrespective of a lawful purpose or due care, involve a risk of probable injury to such a degree that the activity fairly can be said to be intrinsically dangerous to the person or property of others; and [3] a causal relation between the activity and the injury for which damages are claimed." *Caporale v. C.W. Blakeslee & Sons, Inc., supra,* 149 Conn. 85.

*7 Under the doctrine of strict liability for one engaged in an ultrahazardous activity, "a plaintiff is not required to show that his loss was caused by the defendant's negligence. It is sufficient to show only that the defendant engaged in an ultrahazardous activity that caused the [plaintiffs] loss. The doctrine has traditionally been applied in cases involving blasting and explosives ... Connecticut's sole extension beyond blasting cases is to damage from a concussion resulting from pile driving." *Green v. Ensign- Bickford Co., supra,* 25 Conn.App. 483. In *Green,* the court applied the test set forth in the Restatement and concluded that the defendant's experiments with highly explosive materials created an unavoidable risk of damage and, therefore, the defendant was strictly liable for any damage caused by the explosion. *Id.,* 487, 595 A.2d 1383. Sections 519 and 520 of the Restatement (Second), Torts, address the doctrine of strict liability for ultrahazardous activities. Section 520 sets forth the following factors to be considered in determining whether an activity is abnormally dangerous: "(a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes." 3 Restatement (Second), Torts § 520 (1976). "For an activity to be abnormally dangerous, not only must it create a danger of physical harm to others, but the danger must be an abnormal one. In general, abnormal dangers arise from activities that are in themselves unusual, or from unusual risks created by more usual activities under particular circumstances. In determining whether the danger is abnormal, the factors listed in Clauses (a) to (f) of this Section are all to be considered, and are all of importance. Any one of them is not necessarily sufficient of itself in a particular case, and ordinarily several of them will be required

for strict liability. On the other hand, it is not necessary that each of them be present, especially if others weigh heavily. Because of the interplay of these various factors, it is not possible to reduce abnormally dangerous activities to any definition. The essential question is whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm that results from it, even though it is carried on with all reasonable care." 3 Restatement (Second), *supra* § 520, comment (f).

In a case brought by four of the plaintiffs in the present case against several of the defendants in the present case, the court, Potter, J., granted the defendants' motion to strike count four of the plaintiffs' complaint on the ground that the acceptance of hazardous waste for disposal did not constitute an ultrahazardous activity. *Deitz v. Yaworski, Inc.,* Superior Court, judicial district of Windham at Windham, Docket No. 046351 (March 14, 1994, Potter, J.). The court explained that the doctrine has been applied to only a narrow class of activities involving blasting and explosives. "Connecticut's sole extension beyond blasting and explosives situations is a damage claim from a concussion resulting from pile driving ... In the absence of authority to the contrary, the court finds that as a matter of law the defendants' activities are not ultrahazardous." *Id.* The court also found that the plaintiffs nevertheless failed to allege that the activities were conducted in a heavily populated area or in an otherwise unreasonable or dangerous location. *Id.* [FN4]

FN4. Other courts have similarly refused to extend application of the doctrine to situations not involving blasting, explosives or damage from pile driving. See *Goodrich v. Jennings,* Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. 150074 (May 22, 1997, Mintz, J.) (19 CONN. L. RPTR. 542) (holding that the storage of gasoline in an underground tank is not an ultrahazardous activity); *Bashura v. Strategy Plus, Inc.,* Superior Court, judicial district of Ansonia-Milford at Milford, Docket No. 050871 (October 17, 1995, Comerford, J.) (granting motion to strike because paint ball game was not an ultrahazardous activity); *Alberino v. Town of Wilton,* Superior Court, judicial district of

Stamford-Norwalk at Stamford, Docket No. 138022 (August 17, 1995, Lewis, J.) (15 CONN. L. RPTR. 21) (hanging a chain was not an abnormally dangerous activity akin to blasting or pile driving); *Blackburn v. Miller-Stephenson Chemical Company, supra,* 13 CONN. L. RPTR. 364 (holding that the packaging and distribution of chemicals as alleged in the complaint failed to comport with the factors set forth in the Restatement and did not meet the threshold of ultrahazardous activity as a matter of law); *Gutierrez v. Jefferson Street Medical Building,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 529230 (September 27, 1994, Hennessey, J.) 12 CONN. L. RPTR. 472) (granting motion to strike because leasing apartment with lead-based paint reflects an unavoidable danger); *Sanchez v. General Urban Corp.,* Superior Court, judicial district of New Haven at New Haven, Docket No. 378774 (February 6, 1997, Lager, J.) (19 CONN. L. RPTR. 97) (same); *Smith v. Lenoci,* Superior Court, judicial district of Hartford-New Britain at New Britain, Docket No. 455130 (January 25, 1994, Pittman, J.) 11 CONN. L. RPTR. 51) (holding that tree cutting is a fairly common activity among residential property owners and did not constitute an ultrahazardous activity as a matter of law); *Rivera v. Connecticut Light & Power,* Superior Court,

judicial district of New Haven at New Haven, Docket No. 341570 (July 1, 1993, Stanley, J.) (9 CONN. L. RPTR. 415) (declining to impose strict liability for an

ultrahazardous activity on an electric utility company for the transmission or supply of electricity); *Curtiss v. Northeast Utilities,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 511572 (December 5, 1994, Norko, J.) (13 CONN. L. RPTR. 137) (same); *Esposito v. City of Shelton,* Superior Court, judicial district of Ansonia- Milford at Milford, Docket No. 025263 (February 4, 1993, McGrath, J.) (8 CONN. L. RPTR. 325) (holding that the maintenance of a soccer goal post was not an inherently dangerous activity); *Pye & Hogan Machine Co. v. Hi-Tech Industries,* Superior Court, judicial district of Middlesex, Docket No. 57907 (June 23, 1992, Austin, J.) (holding that because the inherently dangerous activity alleged was not the operation of the lathe per se, but the operation of the lathe in the proximity of certain highly flammable substances, risk could be eliminated through operation of ordinary care and, therefore, an ultrahazardous activity had not been alleged.)

*8 In *Burns v. Lehigh, Inc.,* Superior Court, judicial district of Hartford- New Britain at Hartford, Docket No. 342600 (July 12, 1988, Hennessey, J.) (14 CLT 722), the court granted the defendant's motion to strike count one of the complaint because "the alleged leakage of gasoline into the subsurface soil is insufficient to state a cause of action for strict liability." The court explained, however, that "[t]he plaintiff fails to allege whether the defendant's activities were conducted in a heavily populated area or whether the gasoline was stored in an unsuitable or dangerous place." *Id.*

The defendants also rely on decisions of federal courts, construing Connecticut law, holding that the storage of hazardous waste and toxic solvents is not an abnormally dangerous activity. For example, in *Arawana Mills Co. v. United Technologies Corp.,* 795 F.Supp. 1238, 1251 (D.Conn.1992), the court held that: "It does not appear that the Connecticut Supreme Court has addressed the issue of whether the storage and use of hazardous waste is a basis for strict liability. In the absence of any direct decision by the state's highest court, a federal court, must determine what it believes the state's highest court would find if the same issue were before it ... I am persuaded that if given the opportunity to expand the narrowly-construed concept of 'ultrahazardous' or ' abnormally dangerous' activity to the storage and use of hazardous wastes, the Connecticut Supreme Court would decline to do so. Such activities are subject to extensive federal and state regulation ... and I do not believe that the Connecticut Supreme Court would interpose an expanding common law into such matters by imposing strict liability in every case in which a plaintiff can prove that a defendant stored and used hazardous waste. Accordingly, I conclude that the storage and use of hazardous waste is not per se an 'ultrahazardous' or ' abnormally dangerous' activity for the purpose of imposing strict liability. I conclude further that plaintiff has failed to state a claim for strict liability in this case inasmuch as it has failed to allege any facts showing that the ' circumstances and conditions' of the activity conducted by defendant on the Property ' involve a risk of probable injury to such a degree that the activity fairly can be said to be intrinsically dangerous.' ..." (Citations omitted.) See also *Nielsen v. Sioux Tools, Inc.,* 870 F.Supp. 435, 442 (D.Conn.1994) (declining to extend strict liability to activities of the defendant in storing and using hazardous materials).

The cases relied upon by the defendants, however, are not dispositive as to the issue of whether the defendants may be held strictly liable for their activities. While the courts in those cases declined to impose strict liability for the various activities, including the disposal of hazardous waste, the courts did not necessarily foreclose the possibility that such an activity may be considered ultrahazardous. Instead, the courts in *Burns, Arawana,* and *Deitz* ultimately held that the plaintiffs failed to allege facts sufficient to state a claim for strict liability. "It is true that the only cases where the Supreme Court or Appellate Court in our state have found ultrahazardous activity have involved blasting ... use of pile driver ... [and] conducting research with [a] highly volatile chemical ... But such an observation does not provide a rational basis for ipso facto holding the doctrine shouldn't be applied to other types of activity claimed to be hazardous; thus Superior Courts have held the following activity to be ultrahazardous [: the] disposal of hazardous waste." (Citations omitted.) *Connecticut Water Co. v. Thomaston,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 535590 (March 4, 1996, Corradino, J.) (16 CONN. L. RPTR. 213).

*9 Thus, in *Barnes v. General Electric Co.,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 529354 (July 25, 1995, Hennessey, J.) (14 CONN. L. RPTR. 455), the court held that the disposal, burial and storage of hazardous waste by the defendants constituted an ultrahazardous activity. Specifically, the court held that "[t]his court's application of both the requirements set forth in *Caporale* as well as those in section 520 of the Restatement (Second) of Torts, leads it to the conclusion that the plaintiff has sufficiently alleged facts to withstand the defendants' motion to strike ... The storage, burial and disposal of hazardous and toxic waste at a municipal landfill is capable of producing harms, including ground and surface water contamination, irrespective of whether due care is used. Additionally, the storage, burial and disposal of hazardous and toxic waste at a municipal landfill poses a risk of probable injury to such a degree that the activity fairly can be categorized as intrinsically dangerous to people or property. Furthermore, the court finds a sufficient causal relation between the defendant's storage, burial and disposal of hazardous and toxic wastes and the plaintiffs' alleged injuries.*Id.* [FN5]

> FN5. See also *Southern New England Telephone Co. v. Clifford,* Superior Court, judicial district of Litchfield, Docket No. 057131 (December 10, 1991, Pickett, J.) (5 CONN. L. RPTR. 331) (denying motion to strike because the plaintiff's allegations that the defendant knowingly engaged in an abnormally dangerous activity, namely, the use of underground gasoline storage tanks and pumps which leaked gasoline onto the plaintiff's land, were sufficient to establish a claim for strict liability); *Michael v. Kenyon Oil Company, Inc.,* Superior Court, judicial district of Hartford- New Britain at Hartford, Docket No. 344098 (March 22, 1989, O'Connor, J.) 4 C.S.C.R. 337) (same).

The plaintiffs in the present case also rely on the case of *State v. Ventron,* 94 N.J. 473, 468 A.2d 150, 160 (N.J.1983), wherein the New Jersey Supreme Court held that the disposal of hazardous waste constituted an ultrahazardous activity. The court in that case applied the factors set forth in the Restatement (Second), *supra* § 520, and concluded that "mercury and other toxic wastes are 'abnormally dangerous,' and the disposal of them, past or present, is an abnormally dangerous activity. We recognize that one engaged in the disposing of toxic waste may be performing an activity that is of some use to society. Nonetheless, 'the unavoidable risk of harm that is inherent

in it requires that it be carried on at his peril, rather than at the expense of the innocent person who suffers harm as a result of it.'   Restatement (Second) *supra,* comment h at 39." *Id.* [FN6]

> FN6. Courts from other jurisdictions have held similarly. See *Daigle v. Shell Oil Co.,* 972 F.2d 1527, 1544 (10th Cir.1992) (holding that under Colorado law and facts of the case, the disposal of hazardous waste constituted an abnormally dangerous activity and explaining that the Restatement factors "require a particularized inquiry. Even blasting, the activity most commonly recognized as ultrahazardous ... may not give rise to strict liability if conducted in an appropriate locale far away from human habitation or anything of value ... To impose an inflexible strict liability rule on all blasting without consideration of the circumstances would be just as incorrect as [the defendant's] assertion of the opposite rule regarding hazardous wastes"); *Schwartzman, Inc. v. Atchison, Topeka & Santa Fe Railway Co.,* 842 F.Supp. 475, 478 (D.N.M.1993) (holding that under the New Mexico Law, the storage and disposal of toxic chemical waste constitutes an abnormally dangerous activity and explaining that the "[d]efendant's contention that only blasting is an abnormally dangerous activity in New Mexico renders the six factors of the Restatement superfluous. The assessment of whether a given activity is abnormally

> dangerous under the Restatement is a particularized, case-specific inquiry for the Court"); *In re Tutu Wells Contamination Litigation,* 846 F.Supp. 1243, 1270 (D.Virgin Islands 1993) (holding that allegations that defendants maintained underground storage tanks of petroleum and petroleum waste in residential area, near water wells supplying public with fresh water for human consumption stated cause of action for strict liability); *Hanlin Group, Inc. v. International Minerals & Chemical Corp.,* 759 F.Supp. 925, 934 (D.Me.1990) (holding that under Maine law, a defendant may be held strictly liable for carrying on an ultrahazardous activity for damage resulting from the disposal of hazardous chemicals); *Lutz v. Chromatex, Inc.,* 718 F.Supp. 413, 430 (M.D.Pa.1989) (holding that under Pennsylvania law, the storage and disposal of hazardous substances may constitute an abnormally dangerous activity); *Crawford v. National Lead Co.,* 784 F.Supp. 439, 443 (S.D.Ohio 1989) (holding that the production of uranium was an abnormally dangerous activity under Ohio law); *Piccolini v. Simon's Wrecking,* 686 F.Supp. 1063, 1069 (M.D.Pa.1988) (holding that allegations against an operator of a landfill that disposal of toxic wastes at illegal, unpermitted landfill was an abnormally dangerous activity were sufficient to state a claim for strict liability under Pennsylvania law); *Sterling v. Velsicol Chemical Corp.,* 647 F.Supp. 303, 315 (W.D.Tenn.1986) (holding that under Tennessee law, the defendant was

> subject to strict liability for an ultrahazardous activity for storing and disposing of hazardous waste).

The court is persuaded by the cases holding that a defendant may be held strictly liable for damage resulting from the disposal of hazardous waste and concludes that the disposal of

hazardous waste may constitute an ultrahazardous activity as a matter of law.
However, even though the court concludes that the disposal of hazardous waste may constitute an ultrahazardous activity, it must, nevertheless, grant the motion to strike counts six through fourteen on the ground that the facts alleged are insufficient to state a claim for strict liability for an ultrahazardous activity.

Counts six through fourteen incorporate the allegations of count one, wherein the plaintiffs allege that the defendants knowingly accepted for disposal, hazardous substances including organic compounds, semi-volatile organic and extractable compounds and toxic inorganic compounds. The plaintiffs further allege that the defendants accepted these hazardous substances without proper permits, licenses or other valid authority. As a result of these activities, the plaintiffs allege that environmental and health hazards have been created, including the contamination of ground, air and surface waters, as well as the production and dissemination of noxious odors and airborne particulates, dust and hazardous substances.

*10 Counts six through fourteen allege that "accepting hazardous substances for disposal in a facility not designed for such use constitutes an ultrahazardous activity that necessarily and obviously exposed the person and property of [the plaintiffs] to injury and did in fact cause such injury to the person and property values of these plaintiffs." (Count 6, 14.)

While counts six through fourteen allege the existence of an instrumentality capable of producing a high degree of risk of some harm and a causal relation between the activity and the injury for which the damages are claimed, these counts fail to allege the inability to eliminate the risk of harm caused by the activity through the exercise of reasonable care or that the activity was conducted in a heavily populated area or otherwise inappropriate location. The case law is not clear as to whether a plaintiff must allege every factor set forth in the Restatement; however, a plaintiff must allege some factual predicate to support the imposition of strict liability and may not just rely on conclusory allegations that the defendants' activities are "ultrahazardous." "What the plaintiff asserts is little more than a legal conclusion; i.e., that such activity does constitute an ultrahazardous activity. The plaintiff has failed to plead sufficient facts to be weighed against the determinative factors above described. Without supporting facts in the context of the controlling factors, a cause of action for strict liability based on an ultrahazardous activity is legally insufficient. *Prudential Property & Gas v. Connecticut Light,* Superior Court, judicial district of New Haven at Meriden, Docket No. 255016 (June 27, 1997, Gaffney, J.) (19 CONN. L. RPTR. 659). Accordingly, the motion to strike counts six through fourteen is granted.

V. FRAUDULENT CONVEYANCES

In 1991, Connecticut adopted the Uniform Fraudulent Transfer Act, General Statutes § 52-552a et seq. Section 52-552e provides that:

"(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation:

(1) With actual intent to hinder, delay or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."

Section 52-552e further provides that:

"(b) In determining actual intent under subdivision (1) of subsection (a) of this section,

consideration may be given, among other factors, to whether:

*11 (1) The transfer or obligation was to an insider,

(2) the debtor retained possession or control of the property transferred after the transfer,

(3) the transfer or obligation was disclosed or concealed,

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit,

(5) the transfer was of substantially all the debtor's assets,

(6) the debtor absconded,

(7) the debtor removed or concealed assets,

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred,

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred,

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred, and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."

The defendants argue in support of their motion to strike counts eighteen and nineteen that the plaintiffs fail to allege sufficient facts to support a fraudulent conveyance claim. Specifically, they argue that the plaintiffs fail to allege the existence of a matured debt owed, that the conveyances rendered the defendants insolvent with respect to an actual debt, that the conveyances rendered the defendants unable to meet any existing obligations and that it is insufficient to allege that the defendants' intent was to avoid satisfying any unadjudicated claims in this case.

The court finds that the defendants' arguments are without merit. A "claim" means "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." General Statutes § 52- 552b(3). A creditor is a person who has a claim. General Statutes § 52-552b(4). Accordingly, the present law suit qualifies as a "claim" under the statute.

Counts eighteen and nineteen allege that subsequent to the commencement of this action, the defendants transferred property owned by them to a number of corporations and limited liability companies controlled and owned, at least in part, by the defendants, in that they share corporate officers who are immediate family members. The plaintiffs allege that these transfers were made with the intent to hinder, delay and defraud the plaintiffs as to the claims made in this action. They further allege that the transferee corporations had reason to believe that the defendants would be made insolvent by the transfers because administrative and private party environmental enforcement actions were pending or threatened at the time of the transfers. The plaintiffs also allege that the transfers were made without receiving reasonably equivalent value in exchange for the transfer.

The court finds that the allegations of counts eighteen and nineteen are sufficient to state fraudulent conveyance claims. The plaintiffs allege the existence of a claim prior to the transfer, namely, the present law suit, and that the defendants made the transfer with the actual intent to hinder, delay and defraud the plaintiffs. This claim is supported by allegations that the defendants transferred assets to corporations owned and controlled by the defendants, that before the transfer was made the debtor was sued or threatened with suit, and that the transfers rendered the defendants insolvent. Accordingly, the court denies the motion to strike counts eighteen and nineteen.

CONCLUSION

*12 For the foregoing reasons, the court grants the defendants'  motion to strike counts six through fourteen of the plaintiffs'  seventh revised complaint and denies the motion to strike counts two, three, four, five, fifteen, sixteen, seventeen, eighteen, nineteen and twenty.

Conn.Super.,1998.

P.R.I.C.E., Inc. v. Keeney

1998 WL 417591 (Conn.Super.), 22 Conn. L. Rptr. 373

END OF DOCUMENT