*CASE NO. 03-945- PLAINTIFFS' APPENDIX OF UNREPORTED CASES, EXHIBIT 19*
**Pantley v. Shop-Rite Supermarkets, Inc.**
2000 WL 960934 , Conn.Super., Jun 20, 2000
Not Reported in A.2d
Conn.Super.,2000.
June 20, 2000.

MEMORANDUM OF DECISION RE: DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

DOHERTY
*1 This is an action for monetary damages brought by the plaintiff, Julia M. Pantley against
Shop-Rite Supermarkets, Inc. (Shop-Rite) for personal injuries which she allegedly sustained
after being struck by an automatic door which was owned by Shop-Rite and which had been
manufactured and installed by the defendant The Stanley Works (Stanley).
The defendant Stanley has filed a motion for summary judgment as to counts three and four of
the plaintiff's Second Revised Complaint dated November 24, 1998.
In the first and second counts of the second revised complaint, the plaintiff alleges that she was
injured due to the negligence of Shop-Rite and Door Control when electronic doors, which are
located on Shop-Rite's premises, closed on the plaintiff as she was exiting the supermarket.
In the third count, the plaintiff alleges that The Stanley Works, the manufacturer of the electronic
doors, is legally responsible to the plaintiff for her losses caused by the electronic doors due to
product liability, pursuant to General Statutes § 52-572m, because The Stanley Works failed to
properly and safely repair and maintain the electronic doors, knew or should have discovered
that a defect in the electronic doors was present and dangerous, failed to maintain or provide a
safe area for patrons, failed to make a reasonable and timely inspection of the electronic doors,
and failed to take any steps to repair the dangerous condition of the electronic doors.
In the fourth count, the plaintiff alleges that she was injured due to The Stanley Works'
negligence in that The Stanley Works allowed a defect in the electronic doors to exist so that
they would close on the plaintiff, knew or should have known about the defect, manufactured
doors that were insufficient for the uses and purposes intended, and failed to post warning signs
to indicate that the area around the electronic doors was dangerous.
On February 4, 2000, The Stanley Works moved for summary judgment on counts three and four
of the plaintiff's second revised complaint. Pursuant to Practice Book § 11-10, The Stanley
Works filed a memorandum of law in support of its motion for summary judgment. The plaintiff
did not file an objection to this motion for summary judgment.
"Practice Book § 384 [now § 17-49] provides that summary judgment shall be rendered
forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine
issue as to any material fact and that the moving party is entitled to judgment as a matter of law
... In deciding a motion for summary judgment, the trial court must view the evidence in the light
most favorable to the nonmoving party ... The party seeking summary judgment has the burden
of showing the absence of any genuine issue [of] material facts which, under applicable
principles of substantive law, entitle him to a judgment as a matter of law ... and the party
opposing such a issue of motion must provide an evidentiary foundation to demonstrate the
existence of a genuine material fact. Practice Book § 381 [now § 17-46]...." (Citations omitted;
internal quotation marks omitted.) *Witt v. St. Vincent's Medical Center, 252 Conn. 363, 368, 746*

A.2d 753 (2000). "While a party opposing a motion for summary judgment is well advised to file appropriate documentary proof in support of his objection, the failure to do so does not bar him from attacking the sufficiency of the movant's affidavit and other proof *Evans Products Co. v. Clinton Building Supply, Inc.,* 174 Conn. 512, 514-18, 391 A.2d 157 (1978). Moreover, the opposing party has no obligation to establish by counter-affidavit the truth of any allegations the movant has not challenged in its motion for summary judgment. *Plouffe v. New York, N.H. & H.R, Co.,* 160 Conn. 482, 491, 280 A.2d 359 (1971)." *McGillicuddy v. Giga Plus, Inc.,* Superior Court, judicial district Hartford-New Britain at Hartford, Docket No. 384266 (January 29, 1992) (Wagner, J.) (6 CONN.L.RPTR. 613, 7 CSCR 323).

*AS TO THE THIRD COUNT*

*2 The Stanley Works argues that the plaintiff cannot establish that the defect existed in the electronic doors at the time of sale because the plaintiff did not respond to The Stanley Works' request for admissions, dated November 16, 1999. General Statutes § 52-572m(b) defines a product liability claim as including "all claims or actions brought for personal injury ... caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of any product." "To maintain a product liability action under 52- 572m et seq., the plaintiff must establish and prove, inter alia, that ... the defendant was engaged in the business of selling the product ... [and] the defect existed at the time of the sale ..." (Citations omitted.) *Zichichi v. Middlesex Memorial Hospital,* 204 Conn. 399, 403, 528 A.2d 805 (1987).

"If a request for admission is ignored it is deemed admitted. Conn. Practice Book Sec. 13-23 ... The Connecticut Supreme and Appellate Courts have consistently affirmed the granting of summary judgment based on admissions of a party who did not respond to requests for admissions." (Citations omitted.) *Tavares v. Mcnamee,* No. CV 97 0141683 (Jan. 15, 1999), citing *Oernstein v. Old Buckingham Corporation,* 205 Conn. 572, 575-77, 534 A.2d 1172 (1987), *Allied Grocers Cooperative, Inc. v. Caplan,* 30 Conn.App. 274, 279-80, 620 A.2d 165 (1993).

The Stanley Works' request for admissions included the following requests: "1. You are not aware of any evidence that the subject doors were defective at the time of sale; 2. You have not disclosed an expert who will testify that the subject doors were defective at the time of sale; 3). You are not prepared to offer any evidence at trial that the subject doors were defective at the time of sale." (The Stanley Works Motion for Summary Judgment, Exhibit E). Because The Stanley Works' request for admissions are deemed admitted, the plaintiff cannot show that a defect in the electronic doors existed at the time of sale. Consequently, the plaintiff does not have an action in product liability under Connecticut Statutes § 52-572m. For the foregoing reasons, The Stanley Works' motion for summary judgment as to the third count of the second revised complaint is hereby granted.

*AS TO THE FOURTH COUNT*

The Stanley Works further argues that it did not owe a duty to the plaintiff at the time of the accident, and therefore, The Stanley Works cannot be held liable in negligence in the fourth count of the plaintiff's complaint. "There can be no actionable negligence ... unless there exists a cognizable duty of care." *Waters v. Autuori,* 236 Conn. 820, 826, 676 A.2d 357 (1996). "Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence cause of action. The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual ... Although it has been said that no universal test for [duty] ever has been formulated ... our threshold inquiry has

always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised ... By that is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury which resulted was foreseeable, but the test is, would the ordinary [person] in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result? ... *Lombard v. Edward J. Peters, Jr., P.C.,* 252 Conn. 623, 632-34 (2000).

*3 The plaintiff alleges that the "doors through which the plaintiff passed failed to remain open, and instead closed on the plaintiff, and hence, were in a defective condition," and that the "defendant caused and allowed said defect to exist in the electronic doors through which the plaintiff passed." (Second Revised Complaint, p. 10.) The fourth count of the second revised complaint sufficiently alleges that The Stanley Works could owe a duty of care to the plaintiff. It is further submitted that even though the plaintiff admits through her failure to respond to The Stanley Works' request for admissions that "The Stanley Works had no duty to maintain or otherwise service the subject doors," (The Stanley Works Motion for Summary Judgment, Exhibit E), the plaintiff has sufficiently alleged that The Stanley Works owed a duty of care. This admission only refers to the period after The Stanley Works ceased to service the electronic doors because The Stanley Works admits that it installed the electronic doors in May 1992 and serviced them per warranty through December 1992. (The Stanley Works Memorandum of Law in Support of Summary Judgment, p. 10.)

The Stanley Works lastly argues that its conduct was not the proximate cause of the plaintiff's injuries, and therefore, it cannot be held liable in negligence in the fourth count of the second revised complaint. "[I]f such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand? ..." (Citations omitted, internal quotation marks omitted.) *Santopietro v. City of New Haven,* 239 Conn. 207, 226, 682 A.2d 106 (1996). "Proximate cause is a question of fact to be decided by the trier of fact, but it becomes a question of law when the mind of a fair and reasonable person could reach only one conclusion ... Lines must be drawn determining how far down the causal continuum individuals will be held liable for the consequences of their actions ... This line is labeled proximate cause ..." (Citations omitted; internal quotation marks omitted.) *Medcalf v. Washington Heights Condominium Assn.,* 57 Conn.App. 12, 17, 747 A.2d 532 (2000). "Issues of negligence are ordinarily not susceptible of summary adjudication but should be resolved by trial in the ordinary manner." (Internal quotations omitted.) *Fogarty v. Rashaw,* 193 Conn. 442, 446, 476 A.2d 582 (1984); *Amendola v. Germia,* 21 Conn.App. 35, 37, 571 A.2d 131, cert. denied, 215 Conn. 803, 574 A.2d 217 (1990). "[S]ummary judgment procedure is especially ill-adapted to negligence cases, where, as here, the ultimate issue in contention involves a mixed question of fact and law, and requires the trier of fact to determine whether the standard of care was met in a specific situation ..." (Citations omitted; internal quotation marks omitted.) *Michaud v.. Gurney,* 168 Conn. 431, 434, 362 A.2d 857 (1975).

The Stanley Works does not show that there is no possibility for a reasonable disagreement regarding the cause of the plaintiff's injuries and resulting damages, The Stanley Works fails to show that no genuine issue exists as to any material fact, and that it is, therefore, entitled to judgment as a matter of law. Practice Book § 17-49 "provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." *Witt v. St. Vincent's Medical Center,* 252 Conn. 363, 368, 746 A.2d 753 (2000). For the foregoing reasons The Stanley Works'  motion for summary judgment is hereby denied as to count four of the second revised complaint.
Conn.Super.,2000.
Pantley v. Shop-Rite Supermarkets, Inc.
2000 WL 960934 (Conn.Super.)
END OF DOCUMENT


***CASE NO. 03-945- PLAINTIFFS' APPENDIX OF UNREPORTED CASES, EXHIBIT 20***
**Savelli v. Town of Windsor**
1999 WL 1063405, 25 Conn. L. Rptr. 600 , Conn.Super., Nov 03, 1999
Not Reported in A.2d
Conn.Super.,1999.
Nov. 3, 1999.


Memorandum of Decision On Motion for Summary Judgment


BOOTH.

FACTUAL BACKGROUND

*1 This matter was initiated by complaint dated July 15, 1997 and a six count amended complaint dated March 18, 1998. The plaintiff seeks recovery for personal injuries, death and loss of consortium arising out of an incident occurring at the Town of Windsor Sanitary Landfill Transfer Station located at 500 Huckleberry Road, Windsor, Connecticut.
The plaintiff' s decedent sustained serious injuries on July 22, 1995 which ultimately led to his death in August of 1995. These injuries occurred when decedent was on the premises during operational hours and was struck by an automobile on the premises. The plaintiff alleges that the injuries were caused by the defendants through their negligence and careless design, construction, maintenance and supervision of the site. In addition to the Town, the plaintiff names as defendants two town employees generally concerned with the operation of the landfill. The defendants have moved for summary judgment as to the entire complaint claiming that as a matter of law a landfill transfer station represents governmental duties protected by governmental immunity.

STANDARD

Summary judgment should be rendered if the pleadings, affidavits and other proof submitted show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Orkney v. Hanover, Inc. Comp. ,* 248 Conn. 195, 727 A.2d 700 (1999) Connecticut Practice Book Sec. 17-49. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the non-moving party. *Orkney, supra* at p. 201, 727 A.2d 700.

DISCUSSION

Connecticut case law on municipal immunity deals extensively with the distinction between "proprietary functions" and "governmental acts." Our cases also analyze immunity in terms of "discretionary acts" and "ministerial acts." At times, the concepts appear to be used interchangeably.
In the instant case, the municipal defendants assert that even if the conduct is proprietary,

municipal immunity bars the claims if the acts complained of are discretionary in nature. This argument is inconsistent with Section 52- 557n(a)(B) which provides: "[e]xcept as otherwise provided by law, a political subdivision of the state shall be liable for damages to persons or property caused by ... (B) negligence in the performance of functions from which the political subdivision derives a special corporate profit or pecuniary benefit." The defendants have cited no statute which provides immunity from liability for negligence in the performance of proprietary functions. See *Accashian v. Danbury,* 23 Conn.L.Rptr. 648, 1999 WL 27223 (Conn.Sup.) (Hodgson, J.). Defendants have filed the affidavit of Dr. Charles Petrillo, Jr., the Director of Public Health for the Town and one of the named defendants. In that affidavit, Dr. Petrillo states in part:

*2 6. That the Town of Windsor Landfill/Transfer Station is operated for the public benefit and the promotion of public health ...

10. That the manner of design, construction and maintenance of the landfill/transfer station were and are discretionary acts.

The distinction between governmental and proprietary acts is not drawn on the basis of whether the activity serves the public. *Accashian, supra.* Operation or maintenance of public facilities has been ruled governmental rather than proprietary on numerous occasions. Storm sewers, *Spitzer v. Waterbury,* 113 Conn. 84, 154 A. 157 (1931): public parks, *Stradmore Development Corp. v. Commissioners,* 164 Conn. 548, 324 A.2d 919 (1973); swimming facilities, *Carter v. City of Norwalk,* 108 Conn. 697, 145 A. 158 (1929); fire departments, *O'Donnell v. Groton,* 108 Conn. 622, 144 A. 468 (1929); police services, *Gordon v. Bridgeport Housing Authority,* 208 Conn. 161, 544 A.2d 1185; and maintenance of fire hydrants, *Williams v. City of New Haven,* 243 Conn. 763, 707 A.2d 1251 (1998). Provisions for utilities for profit such as the operation of water works have been ruled proprietary. *Abbott v. Bristol,* 167 Conn. 143, 355 A.2d 68 (1974); *Richmond v. Norwalk,* 96 Conn. 582, 115 A. 11.

Whether the operation and maintenance of the landfill transfer station is an exercise of a governmental or proprietary function involves several questions of fact. Among those questions are whether fees are charged, whether the town covers all or part of the costs or whether the landfill generates a profit, whether the landfill is operated for the comfort and convenience of the citizens thereby providing a corporate benefit or conversely whether it is the fulfillment of a governmental function related to the health, safety and welfare of the public at large. See *McDermott v. Calvary Baptist Church,* 1999 WL 73981 (Conn.Sup.) (Flynn, J.).

The court holds, even assuming for the sake of argument that the duties alleged to be breached are discretionary, that the court does not reach the question of discretion unless and until the landfill transfer station is found not to be proprietary.

In the present case, the affidavit submitted is largely conclusionary and is not conclusive as to the nature of the landfill. If evidence at trial shows that maintaining and operating the landfill transfer station is a proprietary function of the municipality, then the defendant would have the same duties as would a private possessor of property and would have the duty to inspect the property and warn invitees of possible danger. It is the defendant's obligation in a motion for summary judgment to show that there is no dispute of material fact. The court holds that there is presently a dispute of material fact as to whether the landfill transfer station as operated is a proprietary or municipal function.

Conn.Super.,1999.

Savelli v. Town of Windsor

1999 WL 1063405 (Conn.Super.), 25 Conn. L. Rptr. 600

END OF DOCUMENT

*CASE NO. 03-945- PLAINTIFFS' APPENDIX OF UNREPORTED CASES, EXHIBIT 21*
**Skelton v. Chemical Leaman Tank Lines, Inc.**
1996 WL 278343, 17 Conn. L. Rptr. 56 , Conn.Super., May 13, 1996
Not Reported in A.2d
Conn.Super.,1996.
May 13, 1996.

MEMORANDUM OF DECISION ON CHEMICAL LEAMAN'S MOTION TO STRIKE

CORRADINO.
*1 The defendant Chemical Leaman has brought a motion to strike against the plaintiffs' claims for (1) loss of filial consortium and the plaintiff parents claim for medical expenses for treatment of their minor child, (2) counts III, X, and XII (negligent infliction of emotional distress), (3) Count IV (strict liability), (4) count V (nuisance), (5) Count VI (CUPTA claim), (6) Counts IX, X, XI, XII (failure to state cause of action because they are brought against corporate officials or agents in their individual capacity).

This suit arises out of an explosion that occurred at the defendant's facility. The allegation is made that as a result of the explosion certain toxic materials and contaminants were spread onto an adjacent property known as Rose Orchards. The day after the explosion the plaintiff mother had occasion to visit the orchard and allegedly come in contact with these contaminants. At the time she was pregnant. The claim is made that as a result of the plaintiff mother's exposure to these toxic materials her child suffered severe injury and was born with a variety of medical problems. The suit alleges various theories of relief and the motion to strike is aimed at several of them. The allegations of the third revised complaint will be discussed further as they become relevant.

The rule on a motion to strike is that the complaint must be given that reading which is most favorable to the plaintiff, *Amodio v. Cunningham,* 182 Conn. 80 (1982), but such a motion cannot be resisted by conclusory assertions. A plaintiff must plead facts.

I.

The defendant Chemical Leaman construes certain paragraphs of the First Count of the plaintiff's complaint as alleging parental claims of interference with their relationship with their child as a result of injuries purportedly suffered by the child due to the defendant's negligence. The defendant argues that Connecticut Appellate Courts have held that loss of consortium claims do not include filial consortium claims between a parent and child or between a child and his siblings. My understanding is that the siblings are not plaintiffs in this litigation and as far as claims of loss of filial consortium are concerned no Appellate Court has held such claim may be made. *Hobson v. St. Mary's Hospital,* 176 Conn. 485 (1979), held that an action for loss of spousal consortium may be made there was no claim for loss of filial consortium in the case. The court in *Maloney v. Lesniak,* 17 Conn.App. 130, 141 (1988), in dicta said "the right to consortium is said to arise out of the civil contract of marriage and as such does not extend to the parent-child relationship." However, in footnote 7 on page 141 the court made clear it was not deciding the issue and the issue had not been decided by the Appellate Courts. There are Superior Court cases taking opposing views on this question. I will deny the motion to strike this

claim by resting on a decision I wrote in *Joseph Scalise, et al. v. Bristol Hospital, et al.,* 14 C ONN. L. R PTR. 534 (1995), where I discussed the matter.

2.

*2 I agree with the defendant that the claims for medical expenses are at least ambiguous in that they certainly can be read to ask for medical expenses on behalf of the child and for recovery of medical expenses made by the parents for the child. Pursuant to § 52-204 both the child and the parents cannot make a claim to recover such medical expenses. I believe the plaintiff recognizes this but maintains that the jury instructions would preclude the possibility of any double recovery. The defendant, however, has a right to move to strike these pleadings based on their ambiguity on this issue. The plaintiffs merely have to plead over as they have a right to do. The defendant seeks to strike the third, tenth, and twelfth counts. It claims that although the plaintiffs have labeled these counts as sounding in negligent infliction of emotional distress "they have, in reality, alleged a claim for bystander emotional distress," (page 7 of defendant' s brief). The characterization made by the defendant is that in a negligent infliction of emotional distress claim an injury is directly caused to the plaintiff whereas in a bystander recovery claim the allegation is that a defendant' s negligence has injured a third party. The distinction becomes somewhat confused when the injury is to the child during the birthing process and the mother makes the claim, cf *Joseph Scalise, et al. v. Bristol Hospital, et al.,* at p. 537.

I am not sure that cases recognizing an action for negligent infliction of emotional distress in these birthing process injury cases would extend the reach of that doctrine to provide a recovery for the mother for observed injuries to the child apparent after the birthing process. I will regard this then as an action for recovery for bystander emotional distress. Several cases have recognized that doctrine. I did so in *Corchesne v. Dickou Bus Co.,* 11 C ONN. L. RPTR. 463 (1994). Since there is a virtue in consistency and I at least tried to analyze the competing considerations in *Corchesne,* I still conclude there should be a cause of action for bystander emotional distress in our state.

I have serious doubt whether an action for what in effect appears to be an action for bystander emotional distress should be allowed on the facts of this case. The California courts have created this doctrine and I believe have intelligently limited it, see *Thing v. La Chusa,* 771 P.2d 814, 829-30 (1989, Cal.). I am not sure the allegations here meet the requirements of *Thing v. La Chusa, supra.* However, neither side really argued this question or addressed it in their briefs so I am reluctant to grant the motion without giving counsel the chance for further argument. If the defendant wishes to press this motion on these three counts it should so inform the plaintiff and both sides can contact my clerk to set a date for further argument.

4.

In the Fourth Count the plaintiff makes a claim for strict liability in tort for engaging in abnormally dangerous activities by virtue of the storage and use of hazardous materials on its property.

*3 A claim such as this raises very technical issues as to whether it should be tested by a motion to strike or by way of summary judgment, *Connecticut Water Co. v. Town of Thomaston, et al.,* 16 CONN. L. RPTR. 213, 215- 18 (1996).

In this regard the facts alleged in a complaint are to be construed in a manner that is most favorable to the plaintiff when the complaint is attacked by a motion to strike, *Amodio v. Cunningham,* 182 Conn. 80 (1980). On the other hand claims must be supported by factual allegations otherwise a motion to strike is appropriate. *Pepper v. The American Way Homes, Inc.,* 6 Conn. L. Trib. # 26, p. 17 (1980).

Adopting the reasoning of *Connecticut Water Co. v. Town of Thomaston, supra,* I have to regard the strict liability claim asserted here as merely conclusory. For the reasons stated in that opinion I do not believe the mere storage of hazardous or toxic material as such permits a strict liability claim unless perhaps there is some factual allegation that due to the corrosive properties of the substance or its gaseous nature it cannot be stored without leaking or escaping into the environment.

If the claim is that the use and/or disposal of the material is the basis of the claim I do not believe a strict liability claim can be based on what in fact is a leak or escape of hazardous material due to negligent activity. *Arlington Forest Associates v. Exxon Corporation,* 774 F.Supp. 387, 392 (E.D.Va, 1991).

In paragraph 15 of the Fourth Count it is stated the materials the defendant handled are intrinsically dangerous to people and property "in the event of an accident, spill, or release like that which occurred on September 8, 1991." Paragraph 16 states as a result of the defendant's choice to engage and do business in an intrinsically and abnormally dangerous activity on the date mentioned there was a release of toxic material which caused the plaintiff's damage.

All of this is conclusory and doesn't supply the essential factual allegations to make out a strict liability claim. In other words the mere fact that a business or person stores toxic substances or even uses or disposes of such material does not establish a strict liability claim even if on occasion such material is spilled or released. The nature of the material must be such that its storage, use, or disposal in the ordinary course despite any safety standards that are adopted will and does result in such release or spillage. Even given these pleadings their most favorable reading I cannot conclude that sufficient factual allegations are set forth to support this theory. In fact the "like that which occurred on September 8, 1991" language makes the claim of strict liability somewhat legally suspect since the first three counts are based on variations of a negligence claim concerning the release of toxic material which occurred on the date in question. I will grant the motion to strike as to the Fourth Count.

5.

*4 The defendant has also filed a motion directed toward the Fifth Count and alleges in the 13th paragraph a "private nuisance." The plaintiff now argues that in any event they have set forth sufficient factual allegations to support a "public nuisance" theory of liability. Factual allegations of the first count are incorporated into this count and those allegations state that an explosion occurred at the defendant's facility releasing pollutants into the air which "came to rest in part the entire property and orchard farm ... owned by David S. Rose and maintained and operated as Rose Orchards," par. 22 of First Count and 16 of Fifth Count. The plaintiff later entered the Orchard and alleges she was subjected to contamination which caused her injury. Paragraph 26 of the First Count and thus paragraph 20 of the Fifth Count says that soon after her involuntary exposure to the contaminants the plaintiff mother "left the Rose Orchards Farm property and the surrounding area, to return home." That is the only place in the Fifth Count where the words "surrounding area" are used. As noted in paragraph 16 of the Fifth Count (22 of First Count) the plaintiffs claim the pollutants fell "in part" on the Rose Orchard. Where the other "parts" may have come to rest is not alleged-they could have come to rest on non-Rose Orchard and non-defendant property, they could have come to rest on the defendant's own property*Dahlstrom v. Roosevelt Mills, Inc.,* 27 Conn.Supp. 355, 357 (1967) referred to by both parties states: Nuisances are public where they violate public rights, and produce a common injury, and where they constitute an obstruction to public rights that is the rights by citizens as part of the public. (Citations omitted.)

In *Higgins v. Connecticut Light & Power Co.,* 129 Conn. 600, 611 (1943) the court said:

... if the annoyance is one that is common to the public generally then it is a public nuisance ... The test is not the number of persons annoyed, but the possibility of annoyance to the public by the invasion of its rights. A public nuisance is one that injures the citizens generally who may be so circumstanced as to come within its influence. (Citations omitted.)

The Restatement (2d) Torts at § 821 comment (g) gives some factual examples that make the notion of a "public nuisance" somewhat clearer. Speaking of that interference with a public right that creates a public nuisance the Restatement says at page 92-93 citing factual examples. Thus the pollution of a stream that merely deprives fifty or a hundred lower riparian owners of the use of the water for purposes connected with their land does not for that reason alone become a public nuisance. If, however, the pollution prevents the use of a public bathing beach or kills the fish in a navigable stream and so deprives all members of the community of the right to fish, it becomes a public nuisance ... It is not, however, necessary that the entire community be affected by a public nuisance, so long as the nuisance will interfere with those who come in contact with it in the exercise of a public right or it otherwise affects the interests of the community at large. The obstruction of a public highway is a public nuisance, although no one is travelling upon the highway or wishes to travel on it at the time ... In any case in which a private nuisance affects a large number of persons in their use and enjoyment of land it will normally be accompanied by some interference with the rights of the public as well. Thus the spread of smoke, dust or fumes over a considerable area filled with private residences may interfere also with the use of the public streets or affect the health of so many persons as to involve the interests of the public at large.

*5 Based on the factual allegations of this Fifth Count all I can deduce with certainty that "in part" contaminants fell on to the Rose Orchard property. Also the plaintiff mother came to be on that particular property where she came into contact with contaminants. This seems to be the exact situation faced by the court in *Dahlstrom v. Roosevelt Mills, Inc., supra* where the court sustained a demurrer on a complaint of public nuisance. The plaintiff there said he entered a store and was injured claiming the condition of a soft drink vending machine on the premises constituted a public nuisance.

In granting the demurrer the court said at 27 Conn.Sup. at p. 357: As a patron, the plaintiff was an invitee while in the defendant' s establishment. While members of the general public were unquestionably welcome to enter the store, and even solicited to do so, nevertheless they were not entitled to do so by virtue of any public right enjoyed by citizens as part of the public. The public was invited to enter, but there was no public right to do so, and the defendant' s establishment was not a public place where the public had a right to be. The plaintiff was not in the exercise of any public right while on the defendant' s premises, and he cannot base his right to recover upon the existence of a public nuisance.

It might be that if in fact contaminants are spread over a large area including public streets giving access to private residences or businesses a public nuisance claim can be made by an individual under circumstances where that person suffers injury while going to those premises as the Restatement perhaps suggests but no such allegations are made here.

The motion to strike the Fifth Count is, however, granted for the reasons stated.

Finally for possible future reference, although I will grant the motion to strike, I will not grant it on the additional ground that is suggested in the defendant' s brief. At page 11 it states or implies a public nuisance claim cannot be made because the plaintiffs "claim to have received personal and monetary ' injuries' resulting from the actions of defendant Chemtreat amon." Under the

Restatement (§ 821 C) to recover in an individual action for a public nuisance one must have suffered a harm of a kind or type different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference. As the Restatement indicates in comments (d) and (h) where a public nuisance causes personal injury to the plaintiff or pecuniary loss that is certainly a harm normally different in kind from that suffered by the general public.

6.

In the Sixth Count the plaintiff alleges a violation of the Connecticut Unfair Trade Practices Act, § 42-110b et seq. The following factual allegations are made in this count: the defendant Chemical Leaman at times relevant to this complaint was engaged in trade or commerce in our state, the defendant failed to maintain properly placarded tankers when storing loads at its Branford facility and failed to maintain and control substances stored at its facility so as not to damage neighboring persons or property and their invitees. The latter two factual allegations support the plaintiffs'  claim of a deceptive or unfair trade practice under the act. These factual allegations are used to also support a claim that the actions of the defendant in this regard were "immoral, unethical, oppressive or unscrupulous" and thus violative of our Unfair Trade Practices Act. These acts are then alleged to have caused injury to the plaintiff mother and as a result to her unborn child because it is further alleged the plaintiff mother entered on property adjacent to the defendant's facility the day after there was an explosion at the facility. This explosion resulted in the plaintiff being exposed to contaminants when she entered the neighboring property. As a result of her exposure to contact with and ingestion of the contaminants the plaintiff mother suffered from harmful physical and medical reactions and the claim is made that the condition and the health of her unborn child was also affected all of which led to severe injury and damages.

*6 The just recited facts, if proven, would entitle the plaintiffs to recovery under one or more theories of liability. The question is whether they provide the basis for a CUTPA claim. The defendant says they do not and has filed a motion to strike this claim.

Section 42-110b states that the legislative intent of CUTPA was that no person should engage in unfair methods of competition and unfair and deceptive acts or practices in the conduct of any trade or commerce. Subsection (b) indicates that in interpreting our act the legislature intended that our courts be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act, 15 USC 45(a)(1).

The Federal Trade Commission Act when originally enacted in 1914 was designed to supplement and bolster the Sherman and Clayton Act. It forbade only "unfair methods of competition in commerce." In 1938 the Act was amended to outlaw also "unfair acts or deceptive acts or practices in commerce." This amendment as noted in *Trade Commission v. APW Paper Co.,* 328 U.S. 193, 199, ftn. 4, was designed to make the consumer who may be injured by an unfair trade practice of equal concern with a merchant or business person engaged in competition with an alleged wrongdoer.

The plaintiff mother in this case of course is not a "competitor" of the defendant so that she or the other plaintiffs in this case can only proceed under CUTPA if she or they can be categorized as "consumers." *Larsen Chelsy Realty Co. v. Larsen,* 232 Conn. 480, 495-96 (1995) limited the reach of dicta in *Jackson v. RG Whipple, Inc.,* 225 Conn. 705, 725-26 (1993) insofar as it implied that the act was limited to consumer relationships. As the *Larsen* case noted a competitor or other business person can maintain a CUTPA claim without showing a consumer injury. *Id. p. 496.* Keeping that limitation in mind, however, the *Jackson* dicta is still instructive in trying to

arrive at a definition of what a "consumer" is in light of the purposes of the federal act and our act. The court in *Jackson* at 225 Conn. pages 725-27.

... it strains credulity to conclude that CUTPA is so formless as to provide redress to any person, for any actionable harm caused by any person in the conduct of any ' trade' or ' commerce' ... a claimant under CUTPA must possess at least some type of consumer relationship with the party who allegedly caused harm to him or her.

In other words the defendant company stored and managed these toxic materials as part of its business, the business qua business is involved in trade or commerce. But the injuries allegedly suffered by the plaintiffs did not result from the activities of the defendant as a result of its "conduct" in trade or commerce with the plaintiff as consumers. In other words our act, modeled as it is on the federal act gives protection to wronged competitors and consumers but not to the world at large or any individual who might be injured by the activities of a business entity no matter what relationship the individual had with that business, even no relationship at all. The federal law and ours were aimed at regulating and sanitizing *commerce* and practices in commercial markets.

*7 Admittedly the "unfair methods of competition referred to in Section 5(a)(1) of the federal act have been described as "flexible," and are not confined to those that were illegal at common law or condemned in the Sherman Act but still they are "to be defined with particularity by the myriad of cases from the field of *business," FTC v. Motion Picture Advertising Service Co.,* 344 U.S. 392, 394 (1953) (emphasis added). The plaintiff mother here alleged to have been contaminated when she entered a piece of property adjacent to the defendant' s facility a day after an explosion at that facility. She had no consumer relationship let alone a business relationship with the defendant at the time of her injury, she did not suffer injury as a result of a business or consumer relationship with the defendant and her injuries or that of any other plaintiff did not arise out of any such relationship. Therefore no action on this state of alleged facts may be brought under CUTPA against the defendant cf *Watson et al. v. Northeast Utilities,* 11 CONN. L. RPTR. 200 (1994) injuries allegedly caused by electromagnetic radiation from an electrical substation are not injuries received in plaintiff' s capacity as a consumer and these are not covered by CUTPA, also see *Edelwich v. 33 Summer Associates,* 9 CSCR 620 (1994).

I will grant the motion to strike only on the above stated ground, however I will not address the claim raised by the defendant that CUTPA does not apply to personal injuries. Count Six is stricken.

7.

The defendants St. Jean and Latham are employees of the defendant corporation and have been sued by the plaintiffs for negligence and negligent infliction of emotional distress, Counts Nine, Ten, Eleven and Twelve.

These individual defendants have now moved to strike the counts against them based on *Scribner v. O'Brien,* 169 Conn. 389 (1975). They also cite *Amortek Indus., Inc. v. Freedman,* 790 F.Supp. 383 (D.Conn.1992) and *Lailhenque v. Mobil Oil Corp.,* 775 JF.Supp. 908 (E.D.La, 1991).

In *Scribner* at 169 Conn. page 404 the court said: It is also true that an officer of a corporation does not incur personal liability for its torts merely because of his (sic) official position. Where, however, an agent or officer commits or participates in the commission of a tort whether or not he acts on behalf of his principal or corporation, he (sic) is liable to third persons injured thereby. Cf *First National Bank & Trust Co. v. Manning,* 116 Conn. 335, 340 (1933), *Sample v. Morgenstern,* 97 Conn. 402, 404 (1922), *Bennett v. Ives,* 30 Conn. 329, 334 (1862). *Fletcher Cyclopedia Corporations,* Vol. 3A § 1135, § 1137 also takes the view that personal participation

in the tort by a corporate officer is essential if he or she is to be held liable. The defendants have also cited *Amortek Industries, Inc. v. Freedman,* 790 F.Supp. 383, 394 (D.Conn.1992) which adopts the view that individual liability of corporate officer does not depend on his or her status as such "but depends on the specific activities of a party, including the level of involvement in day to day business operations and participation in decisions regarding disposal of hazardous waste."

*8 From this general reference to the law which is, as the defendants note, widely accepted, the defendants make a further argument which is not so "black letter." The defendants at page 17 of their brief say "plaintiffs' assertions of alleged omission/failures by the ChemicalLeaman employees fails to validate the Common Law claims-corporate employees cannot be held liable for mere omissions or ' nonfeasance.' " In other words the defendants argue the plaintiffs have failed to plead that the individual defendants actively participated in the tortious activity. They allege nothing more than a failure to act, *Lailhengue v. Mobil Oil Corp.,* 775 F.Supp. 908, 910 (E.D.La, 1991) (this case cites Louisiana Law).

The distinctions between malfeasance, nonfeasance and misfeasance, which is apparently a concept between mal and nonfeasance but heading towards malfeasance are more easily put on paper than explained. I agree with the opinion of an Ohio case, *Schaefer v. D & J Produce Inc.,* 403 N.E.2d 1015, 1019-20 (1978). There the court said: Early Ohio cases drew a distinction between an agent' s acts of misfeasance or positive wrongs, and an agent' s nonfeasance or omissions of duty. The agent was held personally liable to third parties for his positive wrongs and misfeasances but, in general, the agent was not held liable to third persons for his nonfeasance and omissions of duty therein. See 2 Ohio Jurisprudence 2d 208, Agency, Section 144 and cases cited therein. Later Ohio decisions, particularly *Richards v. Stratton,* (1925), 112 Ohio St. 476, 147 N.E. 645, and *Employers' Fire Ins. Co. v. U.P. Service, Inc.,* (1950), 89 Ohio App. 447, 99 N.E.E.2d 794, indicate a departure from reliance on distinctions between misfeasance and nonfeasance as the measure of an agent' s liability. These cases are in line with the modern trend of authority summarized in 2 Ohio Jurisprudence 2d 208, Agency, Section 144, as follows: The modern tendency of the courts is to repudiate, in cases where the agent has actually undertaken the work, any distinction as to the liability of agent to third persons in tort, based on the fact that the cause of the injury may be an omission to perform some act-a nonfeasance-rather than a positive misfeasance, and to hold the agent liable equally for his nonfeasance or negligent omissions of duty (in the sense of omitting to do some part of the work he has actually undertaken to do) as for his positive misfeasances ... As observed in *Employers' Fire Ins. Co., supra,* at 452, 99 N.E.2d at 797, the difficulty with using the terms "misfeasance" and "nonfeasance" as a criterion of the agent' s liability "is that the terms themselves require definition to determine when nonfeasance ceases and misfeasance or malfeasance begins." This method of determining an agent' s liability has been severely criticized.

Also see Restatement of Torts 2d § 324a page 142, Restatement of Agency 2d § 354, p. 142. The defendants raise a specter-"If mere omissions could be the basis for corporate employee liability, there would be no logical limitation on the number of corporate employees who might be sued" (p. 16 of brief). Of course there would be a limitation on what corporate officers could be sued-it would depend on their responsibility for and participation in the acts or failures to act comprising the corporate activity and causing injury. In other words the limitation would be based on the concept of duty not scholastic disputes about whether in a particular case we had malfeasance, misfeasance, or nonfeasance. After all ... it seems that the true basis of liability should be the violation by the officer or servant of some duty owed to the third person by reasons

whereof injury results to such third person. Certainly the managing officer of a corporation would not be liable to a third person for any injury resulting from a neglect of duty unless that duty was one he (sic) owed to such third person, *Darling & Co. v. Fry,* 24 S.W.2d 722, 724 (Mo.1930).

*9 In fact if *Scribner v. O'Brien, Inc., supra* is closely examined and the basis for the suit is looked at it could be categorized as a case of nonfeasance. There a claim was made against individual corporate employees for failure to put in a drainage system 169 Conn. at p. 396 and the trial court concluded that the resulting water problem was caused by defendant's excavation of the property and failure to provide for drainage-that sounds like nonfeasance, or at least misfeasance. In any event the *Scribner* court made the question of individual liability turn on the question of the actual participation of the corporate officers in the construction project. *Id.* pp. 403-04.

As to both defendants the plaintiffs allege that they had responsibility over certain equipment, substances, and personnel who worked with these substances and equipment and their failure to take certain steps regarding the supervisory role resulted in the discharge of contaminants which caused injury to the plaintiffs.

That is enough to get by a motion to strike as to the counts against these individual defendants-whether they could be sued in their individual capacities was the only ground raised against counts Nine and Eleven and I will not grant the motion to strike on this particular ground as to Counts Nine, Ten, Eleven and Twelve.

The motion to strike is granted as to the following matters: Motion to strike as it relates to certain medical expenses; Count Four (strict liability), Count Five (nuisance), Count Six (CUTPA claim).

Conn.Super.,1996.

Skelton v. Chemical Leaman Tank Lines, Inc.

1996 WL 278343 (Conn.Super.), 17 Conn. L. Rptr. 56

END OF DOCUMENT

**CASE NO. 03-945- PLAINTIFFS' APPENDIX OF UNREPORTED CASES, EXHIBIT 22**
**State v. Lead Ind. Assn., Inc.**

2001 WL 345830 , R.I.Super., Apr 02, 2001

Not Reported in A.2d

R.I.Super.,2001.

April 2, 2001.

DECISION

SILVERSTEIN, J.

*1 Before the Court, pursuant to Rule 12(b)(6) of the Superior Court Rules of Civil Procedure, are defendants' motions to dismiss and the plaintiff's objection thereto.

Facts/Travel

On October 12, 1999, the Attorney General of the State of Rhode Island (the Attorney General or the State) filed a complaint against several lead pigment manufacturers and their trade association, specifically nine named defendants [FN1] and John Doe Corporations collectively identified herein as the lead [FN2] industry. In its complaint, the State alleges an extensive

history of defendants' conduct consisting of misrepresentations and concealment of evidence regarding the hazards of lead. The State claims that it has been damaged because it has incurred, and continues to incur, substantial costs related to discovering and abating lead, detecting lead poisoning, and providing (i) medical and/or other care for lead-poisoned residents of this state, (ii) education programs for children suffering injuries as a result of lead exposure and (iii) education programs for state residents. [FN3] In seeking compensatory and punitive damages, injunctive and other equitable relief, the State pled ten causes of action: (i) public nuisance, (ii) violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, G.L.1956 § 6-13.1-1 *et seq.* (UTPA), (iii) strict liability, (iv) negligence, (v) negligent misrepresentations and omissions, (vi) fraudulent misrepresentations and omissions, (vii) civil conspiracy, (viii) unjust enrichment, (ix) indemnity and (x) equitable relief to protect children.

> FN1. The named defendants include Lead Industries Association, Inc., American Cyanamid Company, Atlantic Richfield Company, E.I. DuPont De Nemours and Company, The O'Brien Company, the Glidden Company, NL Industries, Inc., SCM Chemicals, and The Sherwin-Williams Company, some being successors-in-interest to other entities.

> FN2. The State avers that "American Cyanamid, Atlantic Richfield, DuPont, O'Brien, Glidden, NL Industries, SCM Chemicals and Sherwin-Williams and their agents, servants, aiders and/or abettors and co-conspirators ( [ ] Manufacturing Defendants) manufactured, processed, marketed, promoted, supplied, distributed and/or sold all or substantially all lead products contained in paint and coatings ( [ ] Lead) during the relevant time period." A. Compl., ¶ 13.

> FN3. "As a direct and proximate result of these and other wrongful actions by the defendants, the State has suffered substantial damages, including but not limited to, the costs of discovering and abating Lead, the expenditure of State funds to detect lead poisoning and provide medical and/or other care of lead poisoned residents of the State, the costs of education programs for children suffering injuries as a result of Lead

> exposure and the costs of education programs for residents of the State due to the dangers present as a result of Lead in the State. These costs continue to mount as residents of the State continue to be exposed to Defendants' Lead." Am.Compl., ¶ 42.

Certain defendants filed their motion to dismiss on January 31, 2000. On the same date, defendant The Sherwin-Williams Company (Sherwin-Williams) filed a motion to dismiss the complaint on constitutional grounds. On May 31, 2000, defendant Lead Industries Association (LIA) filed a motion to dismiss wherein it joined Sherwin-Williams' argument to dismiss based on constitutional grounds. In early June, the State filed briefs in opposition to the defendants' motions filed on January 31, 2000, to which Sherwin-Williams, the LIA and certain defendants

filed reply briefs on August 15, 2000. On July 21, 2000, the State filed its first amended complaint wherein it merely added ConAgra as a defendant. [FN4] Defendant ConAgra filed its motion to dismiss on September 15, 2000. On October 12, 2000, the Court heard extensive oral argument on the motions to dismiss and the State's objection thereto. Subsequent to the availability of a transcript of the hearing, the parties simultaneously filed post-hearing briefs on or about December 14, 2000.

FN4. The named defendants are collectively referred to hereinafter as

the defendants.

Relying on various theories and over the State's objection, the defendants move this Court pursuant to Rule 12(b)(6) of the Superior Court Rules of Civil Procedure to dismiss for failure to state any cause of action cognizable under Rhode Island law.

Motion to Dismiss

It is well-settled that the sole function of a motion to dismiss is to test the sufficiency of the complaint. *Rhode Island Affiliate, American Civil Liberties Union, Inc. v. Bernasconi,* 557 A.2d 1232, 1232 (R.I.1989). "When ruling on a Rule 12(b)(6) motion, the trial justice must look no further than the complaint, assume that all allegations in the complaint are true, and resolve any doubts in a plaintiff's favor." *Estate of Sherman v. Almeida,* 747 A.2d 470, 473 (R.I.2000) (quoting *Rhode Island Affiliate, American Civil Liberties Union, Inc.,* 557 A.2d at 1232). "When it appears clear beyond a reasonable doubt that plaintiff would not be entitled to relief under any set of facts, a motion made pursuant to Rule 12(b)(6) should be granted." *Solomon v. Progressive Casualty Insurance Co.,* 685 A.2d 1073, 1074 (R.I.1996) (order) (citing *Ellis v. Rhode Island Public Transit Authority,* 586 A.2d 1055, 1057 (R.I.1991)).

Attorney General's Capacity to Bring this Suit

*2 At the outset, the defendants challenge the Attorney General's authority in bringing this suit on behalf of the State. The Attorney General counters that his authority derives from the following three distinct capacities: (1) proprietary, as the State's corporate attorney; (2) statutory, as provided for in the Rhode Island General Laws; and (3) sovereign, as founded in the common law and established in the Rhode Island Constitution. The State contends that this suit differs in kind from other suits commenced by private individual plaintiffs. Regarding the Attorney General's authority to bring this action, the defendants primarily challenge the extent of his sovereign capacity to pursue certain claims on behalf of the Rhode Island citizenry.

In this state it is well-settled that "[s]uits for the public should be placed in public and responsible hands." *McCarthy v. McAloon,* 79 R.I. 55, 62, 83 A.2d 75, 78 (1951) (quoting *O'Brien v. Board of Aldermen,* 18 R.I. 113, 116, 25 A. 914, 915 (1892)). The public officer vested with that authority is the Attorney General of the state. *Id.; see also Stearns v. Newport Hospital,* 27 R.I. 309, 316, 62 A. 132, 135 (1905) (Recognizing that the Attorney General is the proper person to represent the public in any judicial inquiry regarding the conduct of the trustee in administering a public trust, our Supreme Court quoted *Burbank v. Burbank,* 152 Mass. 254, 25 N.E. 427 (1890), " ' This duty of maintaining the rights of the public is vested in the Commonwealth, and it is exercised here, as in England, by the attorney-general." ' ) Although exclusive, the Attorney General's authority to redress a purely public wrong excepts "those

instances where one of the public who is injured has a distinct personal legal interest different from that of the public at large." *McCarthy,* 79 R.I. at 62, 83 A.2d at 78.

The significant powers of the office of Attorney General derive from common and statutory law. " '  The office of Attorney General is an ancient one. It came into being as a necessary adjunct in the administration of the common law of England and was transported to America in the early days of the establishment of government in the colonies as part of their English derived common law." ' *Suitor v. Nugent,* 98 R.I. 56, 58, 199 A.2d 722 (R.I.1964) (quoting *Commonwealth ex re. Minerd v. Margiotti,* 325 Pa. 17, 21, 188 A. 524 (1936)). Our Supreme Court recognized, as the Pennsylvania court had noted, that with the office of Attorney General "came the common-law powers and duties thereof to the extent that they were not abridged by constitutional provision." *Id.* Our constitution "did not purport to create such an office but recognized it as existing and provided for continuance of the powers and duties exercised by its occupant prior to the adoption of the constitution." *Id.* Specifically, Article IX, section 12 of our constitution provides, "The duties and powers of the ... attorney-general ... shall be the same under this constitution as are now established, or as from time to time may be prescribed by law." Accordingly, the common law powers of the Attorney General are not abridged by the Rhode Island Constitution. Further, the Legislature may not "infringe [ ] upon the fundamental powers of the Attorney General." *In Re House of Representatives,* 575 A.2d 176, 180 (R.I.1990) (construing *Murphy v. Yates,* 276 Md. 475, 492, 494, 348 A.2d 837, 846-47 (1975)) ("the General Assembly may not abrogate the common law powers of the Attorney General ... having been stated as those '  prescribed by law' .... If an Office is created by the Constitution ... the position can neither be abolished by statute nor reduced to impotence by the transfer of duties characteristic of the office to another office created by the legislature").

*3 Additionally, the powers of the Attorney General derive from certain statutory authority, including G.L.1956 §§ 42-9-2, 42-9-5, and 6-13.1- 5 (*infra* ). Specifically, in relevant part, G.L.1956 § 42-9-2 provides that, "The attorney general ... shall exercise the powers and duties prescribed in and shall enforce the provisions of this chapter and of §§ 12-1-4--12-1-12 [Title 12 Criminal Procedure], and in all other provisions of the general laws and public laws insofar as they relate to the powers and duties of the attorney general." Further, G.L.1956 § 42-9-5 provides, "The attorney general shall commence and prosecute to final judgment and execution those other legal or equitable processes, and shall perform those other duties which are or may be required of him or her by law." Accordingly, the Attorney General'  s authority in bringing this action is comprised of that which existed at common law, as well as that allowed by statute.

The Doctrine of Parens Patriae

A state'  s authority to vindicate certain interests of the state and its citizens is often referred to as a parens patriae action. "Parens patriae means literally '  parent of the country." *Estados Unidos Mexicanos v. DeCoster,* 229 F.3d 332, 335 (1st Cir. Me 2000) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 600, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982)). The doctrine "creates an exception to normal rules of standing applied to private citizens in recognition of the special role that a State plays in pursuing its quasi-sovereign interests in '  the well-being of its populace." ' *Id.* (citing *Snapp,* 458 U.S. at 602); *see also Georgia v. Tennessee Copper Co.,* 206 U.S. 230, 237, 27 S.Ct. 618, 51 L.Ed. 1038 (1907) (a state "has an interest independent of and behind all titles of its citizens, in all the earth and air within its domain"). A state'  s "quasi-sovereign interest is thus distinct from, for example, its sovereign interest in protecting and maintaining its boundaries and its proprietary interest in owning land or conducting a business venture." *Id.* at n. 3 (citing *Snapp,* 458 U.S. at 601-02). It is a "judicially created exception that

has been narrowly construed." *Id.* In *DeCoster,* the First Circuit Court of Appeals recognized that the "most complete explanation of the parens patriae doctrine in its modern incarnation, as applied to the States of this country," appears in the United States Supreme Court's opinion in *Snapp:*

"In order to maintain [a parens patriae] action, the State must articulate an interest apart from the interests of particular private parties, i.e., the State must be more than a nominal party. The State must express a quasi- sovereign interest. Although the articulation of such interests is a matter for case-by-case development--neither an exhaustive formal definition nor a definitive list of qualifying interests can be presented in the abstract-- certain characteristics of such interests are so far evident. These characteristics fall into two general categories. First, a State has a quasi-sovereign interest in the health and well-being--both physical and economic--of its residents in general. Second, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system." *Id.* at 336 (quoting *Snapp,* 458 U.S. at 607).

*4 Finally, a quasi-sovereign interest "must be sufficiently concrete to create an actual controversy between the State and the defendant." *Snapp,* 458 U.S. at 602. Sufficient quasi-sovereign interests include a state's interests in its citizens' health, safety, and welfare as well as in a healthful environment. *Id.* at 603-07.

Rhode Island recognizes the parens patriae doctrine. [FN5] Further, if the Attorney General could not bring such actions, it appears that wrongs to the public interest would not be able to be vindicated by the State.

FN5. General Laws 1956 §§ 6-36-12 (Rhode Island Antitrust Act); 40-8 .2-6 (Medical Assistance Fraud); 42-9.1-1 (Office of Health Care Advocate); and 46-12.3-5 (Environmental Injury Compensation Act).

Separation of Powers

The defendants characterize the instant action as an attempt by the State to have the judiciary exercise legislative function by setting the State's fiscal and regulatory policy in violation of separation of powers principles. Without citing controlling caselaw, they contend that, absent legislative authorization, the State cannot by this action recover costs for lead inspections and abatement, public health education, medical care and special education of lead-affected children. Specifically, the defendants contend that besides not imposing any obligation or responsibility on lead pigment manufacturers, the Lead Poisoning Prevention Act, G.L.1956 § 23-24.6-1 *et seq.,* enacted in 1991 (LPPA), as a comprehensive enactment, does not provide any right of action which allows the state to recover its costs. The defendants contend that the Rhode Island Constitution "entrusts the powers for setting fiscal and regulatory policy to the legislature, not the judiciary acting at the behest of the Attorney General." [FN6] Accordingly, the defendants contend, this Court should dismiss the entire action.

FN6. Sherwin-Williams Mem. at 3.

The Attorney General, relying on a liberal interpretation clause within the statute, counters that the LPPA does not contain any language suggesting that the General Assembly intended the

statute to provide the exclusive mechanism to remedy Rhode Island's environmental health problem caused by lead. Specifically, section 25 of the LPPA, entitled "Interpretation and severability," provides in relevant part that "[t]he provisions of this chapter shall be liberally construed and shall be held to be in addition to, and not in substitution for or a limitation of, the provisions of any other law." *G.L. § 23-24.6-25*. It is well-settled that it is "the province and duty of the judicial department to say what the law is." *City of Pawtucket v. Sundlun,* 662 A.2d 40, 59 (R.I.1995) (citing *Marbury v. Madison,* 5 U.S. 137, 177 2 L.Ed 60, 73 (1803)). Accordingly, "when the language of a legislative enactment is clear and unambiguous, th[e][c]ourt will interpret the statute literally and accord the words of the statute their plain and ordinary meanings." *Seddon v. Bonner,* 755 A.2d 823, 826 (R.I.2000) (citing *Accent Store Design, Inc. v. Marathon House, Inc.,* 674 A.2d 1223, 1226 (R.I.1996)). Furthermore, in examining an unambiguous statute, "there is no room for statutory construction"; it must be applied as written. *Id.* (citing *In re Denisewich,* 643 A.2d 1194, 1197 (R.I.1994)). The General Assembly's inclusion of the liberal-interpretation clause supports the state's argument. Further, subsection 6 of the legislative findings codified in § 23-24.6-2 of the LPPA provides:

*5 "The enactment and enforcement of this chapter is essential to the public interest. It is intended that the provisions of this chapter be liberally construed to effectuate its purposes." Moreover, the express purpose of the LPPA is "to protect the public health and the public interest by establishing a comprehensive program to reduce exposure to environmental lead and thereby prevent childhood lead poisoning, the most severe environmental health problem in Rhode Island." G.L.1956 § 23-24.6.3. Accordingly, the absence of express authorization in the statute does not constitute a separation of powers bar which absolutely precludes the Attorney General from bringing this type of action. However, to the extent that the State seeks to defray lead-related special education costs, its claims fail entirely. *City of Pawtucket,* 662 A.2d at 57-59 ("the task of designing a system of financing public education has been delegated to the General Assembly under Article 12 [of the Rhode Island Constitution]"; the court may not meddle with "the plenary constitutional power of the General Assembly in education" nor assume "a responsibility explicitly committed to the Legislature").

### Free Public Services

While acknowledging that Rhode Island decisions have not addressed the free public services doctrine specifically, the defendants contend that the Court should apply the rule and hold that the costs of public services related to lead are not recoverable as a matter of law. The free public services doctrine generally provides that "public expenditures made in the performance of governmental functions are not recoverable." *Koch v. Consolidated Edison Company of New York, Inc.,* 62 N.Y.2d 548, 468 N.E.2d 1, 8, 479 N.Y.S.2d 163 (1984), *cert. denied,* 469 U.S. 1210, 105 S.Ct. 1177, 84 L.Ed.2d 326 (1985). "[C]ertain exceptions to the general rule have been created by statutory enactment to give a municipality a claim for expenditures for firefighters or other police power services." *Id.* The defendants argue that the free public services rule especially applies to this matter because it is consistent with separation of powers principles. The defendants essentially contend that this Court may not create a remedy.

Rule 12(b)(6) which controls this matter does not permit this Court to dismiss a case unless it fails to state a claim upon which relief can be granted. Super. Ct. R. of Civ. P. 12(b)(6). In reviewing a 12(b)(6) motion, as in all matters before it, this Court is constrained to follow existing Rhode Island law. *See, e.g., Robinson v. Delfino,* 710 A.2d 154, 161 (R.I.1998) (Here our Supreme Court, though ultimately overturning the Superior Court, recognized that the trial

justice "had correctly followed and applied the controlling Rhode Island case law existing at the time of the trial"). Indeed, "the creation of new causes of action should be left to the Legislature." *Ferreira v. Strack,* 652 A.2d 965, 968 (R.I.1995) (citations omitted). However, this Court's recognition of the Attorney General's existing authority to protect the public interest is not, in this Court's opinion, creating a cause of action or judicial remedy.[FN7] Accordingly, the defendants' motions to dismiss must be examined in the context of the well-established powers of the Attorney General to redress public wrongs. To adopt the free public services rule and dismiss this action thereby, particularly in the absence of controlling caselaw requiring such a rule, would ignore existing authority of the Attorney General, as for example, with respect to his right to bring a public nuisance action.

> FN7. *See, e.g.,* G.L.1956 § 23-19.1-18.1(g) of the Hazardous Waste Management Act of 1978, enacted by P.L.1982, ch. 337, § 2 which provides: "The provisions of this section [Determination of restoration costs--Judgment--Other relief not precluded] shall not preclude the state or attorney general or department of environmental management from seeking any other relief authorized by other statute or common law."

### Count I--Public Nuisance

*6 In Count I of its complaint, the State asserts that "the defendants created an environmental hazard that continues and will continue to unreasonably interfere with the health, safety, peace, comfort or convenience of the residents of the State, thereby constituting a public nuisance." [FN8] It is undisputed that the Attorney General may prosecute a public nuisance at common law and under General Laws 1956 § 10-1-1 *et seq.,* entitled "Abatement of Nuisances." Section 10-1-1 provides:

> FN8. Am. Compl., ¶¶ 44, 46.

"Whenever a nuisance is alleged to exist, the attorney general or any citizen of the state may bring an action in the name of the state, upon the relation of the attorney general or of an individual citizen, to abate the nuisance and to perpetually enjoin the person or persons maintaining the nuisance and any or all persons owning any legal or equitable interest in the place from further maintaining or permitting the nuisance either directly or indirectly. The complaint shall be duly sworn to by the complaining party, unless brought by the attorney general, and shall set forth the names of the parties, the object of the action, a description of the place complained of, and a statement of the facts constituting the alleged nuisance."

Here, the Attorney General, as guardian of the public, asserts that the defendants, as manufacturers, promoters and suppliers, are responsible for the presence of lead, a substance alleged to be a health hazard to members of the public, in public and private buildings throughout the State. [FN9] Further, the State also contends that the defendants' misconduct, by causing a public health crisis, has caused the State to incur substantial damages. In its expansive request for relief, the State, in part, seeks an order for the abatement of lead.

FN9. The Attorney General distinguishes this claim as a "public nuisance, massive harm to the community" as opposed to an action brought in a governmental entity's "proprietary capacity for buildings that it owned." Tr. at 133.

In support of its claim, the State relies in part upon the legislative findings codified in the LPPA. General Laws 1956 § 23-24 .6-2 expresses the significant legislative findings regarding the dangers to the public resulting from exposure to lead:

"The general assembly finds, upon the report of the environmental lead task force, and the reports, hearings, and records of its own committees and of federal agencies including the environmental protection agency and centers for disease control, that:

(1) Environmental exposures to even low levels of lead increase a child's risks of developing permanent learning disabilities, reduced concentration and attentiveness and behavior problems, problems which may persist and adversely affect the child's chances for success in school and life.

(2) *Childhood lead poisoning is caused by environmental exposure to lead. The most significant sources of environmental lead are lead based paint in older housing and house dust and soil contaminated by such paint.*

(3) Childhood lead poisoning is completely preventable.

(4) Rhode Island does not currently have a comprehensive strategy in place for preventing childhood lead poisoning. As a result, tens of thousands of Rhode Island's children are poisoned by lead at levels believed to be harmful, with most of these poisoned children going undiagnosed and untreated.

*7 (5) *Childhood lead poisoning is dangerous to the public health, safety, and general welfare of the people and necessitates excessive and disproportionate expenditure of public funds for health care and special education, causing a drain upon public revenue.*

(6) The enactment and enforcement of this chapter is essential to the public interest. It is intended that the provisions of this chapter be liberally construed to effectuate its purposes.

(7) *The magnitude of the childhood lead poisoning in Rhode Island's older homes and urban areas is a result of approved use of lead based materials over such an extended period in public buildings and systems as well as private housing* that a comprehensive approach is necessary to alleviate the cause, identify and treat the children, rehabilitate the affected housing where young children reside, and dispose of the hazardous material. Rhode Island presently does not have the public nor the private resources to handle the total problem, thereby requiring prioritizing on a need basis. (Emphasis added.)

Moreover, as previously stated, the purpose of the LPPA "is to protect the public health and public interest by establishing a comprehensive program to reduce exposure to environmental lead and thereby prevent childhood lead poisoning, the most severe environmental health problem in Rhode Island." G.L.1956 § 23-24.6-3.

Our Supreme Court has recognized the Attorney General's prosecution of a public nuisance action seeking abatement of lead paint from a premises where "significant amounts of lead ha[d] been found to constitute a hazard to the public and to children, in particular." *Pine v. Kalian,* 723 A.2d 804, 805 (R.I.1998) (order) (affirming trial court order granting preliminary injunction). The matter involved an application for a preliminary injunction by the Attorney General and the Director of the Department of Health who asserted "an overriding public interest in the protection of public health." *Pine v. Kalian,* C.A. 96-2673, February 2, 2000, Israel, J. The trial

justice, having found certain facts based on the evidence before him, had stated his belief that at a hearing on the merits, the Court "would rule as a matter of law based on the evidence ... [that] the premises are a public nuisance." *Id.* Accordingly, the trial court, after including a reference to its general equitable power as well as jurisdiction pursuant to G.L.1956 § 10-1-1 *et seq.* to abate a public nuisance upon application of the Attorney General, granted the application for a preliminary injunction and ordered, in part, that the defendants abate all lead hazards from the premises. [FN10] In its affirmance order, the Supreme Court acknowledged the trial justice' s finding that the "persistence of the continuing hazard of lead paint presents immediate and irreparable harm to the public so long as that hazard remains unabated." *Pine,* 723 A.2d at 805.

FN10. The trial court also referenced its statutory authority to grant injunctive relief upon application of the director of the Department of Health. G.L.1956 §§ 23-1-23 and 23-24.6-23.

Rhode Island case law defines a public nuisance as "an unreasonable interference with a right common to the general public: it is behavior that unreasonably interferes with the health, safety, peace, comfort or convenience of the general community." *Citizens for Preservation of Waterman Lake v. Davis,* 420 A.2d 53, 59 (R.I.1980) (citing *Copart Industries, Inc. v. Consolidated Edison Company of New York,* 41 N.Y.2d 564, 568, 362 N.E.2d 968, 971, 394 N.Y.S.2d 169, 172 (1977)); *Radigan v. W.J. Halloran Co.,* 97 R.I. 122, 128, 196 A.2d 160, 163 (1963); *see also Hydro-Manufacturing, Inc. v. Kayser-Roth Corp.,* 640 A.2d 950, 957 (R.I.1994); 4 Restatement (Second) *Torts* §§ 821B(1), (2)(a) at 87 (1979). The burden of proving a nuisance is upon the party alleging it who must "demonstrate the existence of the nuisance, and that injury has been caused by the nuisance complained of." *Citizens for Preservation of Waterman Lake,* 420 A.2d at 59 (citations omitted). However, "the law does not attempt to impose liability in every case in which one person' s conduct has some detrimental effect on another." *Id.* "Liability is imposed only in those cases in which the harm or risk to one is greater than he ought to be required to bear under the circumstances." *Id.* (citing 4 Restatement (Second) *Torts* § 822, cmt. g at 112 (1979)). Nevertheless, "[o]ne is subject to liability for a nuisance caused by an activity, not only when he carries on the activity but also when he participates to a substantial extent in carrying it on." 4 Restatement (Second) *Torts* § 834 at 149 (1979).

*8 According to the defendants herein, the State has not asserted a public nuisance claim because a public right has not been infringed and because the defendants' lead did not cause the alleged harm while within their control as product manufacturers or promoters. Further, the defendants contend that the allegations fail to satisfy the language of § 10-1-1 regarding enjoining the person(s) "maintaining the nuisance and any and all persons owning any legal or equitable interest in the place from further maintaining or permitting the nuisance."

The State alleges that the defendants are responsible for the presence of lead, a product recognized by our courts and the Legislature as constituting a potentially severe health hazard to members of the public, in public and private properties throughout the State. It further contends that the defendants' misconduct, including a conspiracy calculated to mislead the public and the government regarding the danger to the public resulting from exposure to lead, has unreasonably interfered with the public health, including the public' s right to be free from the hazards of unabated lead.

The issue before this Court is whether the State has sufficiently averred that the defendants have

unreasonably interfered with a right common to the general public: more specifically, whether their conduct has unreasonably interfered with the health, safety, peace, comfort or convenience of the general community. *Citizens for Preservation of Waterman Lake,* 420 A.2d at 59. Further, reasonableness is a question of fact. *See Gimmicks, Inc. v. Dettore,* 612 A.2d 655, 659 (R.I.1992) (citing *DeNucci v. Pezza,* 114 R.I. 123, 129, 329 A.2d 807, 810 (1974)) ("noise must be unreasonable to rise to the level of a [private] nuisance, and reasonableness is a question of fact"). Moreover, in *Pucci v. Algiere* where a party contended that the remedy for abatement of common law nuisances is controlled by § 10-1-1, the Supreme Court determined that the Superior Court could consider the matter before it "as constituting a nuisance at common law" despite noncompliance with § 10- 1-1 [FN11] because "the remedy set forth therein is neither exclusive nor mandatory." 106 R.I. 411, 419-20, 261 A.2d 1, 6-7 (1970). Accordingly, in light of the legislative findings in the LPPA and our caselaw, including *Kalian,* assuming the facts as alleged in the complaint are true, and drawing all reasonable inferences in favor of the State, the Attorney General has adequately asserted an action for public nuisance. Accordingly, the defendants'   motion to dismiss the public nuisance count is denied.

FN11. Although § 10-1-1 does not define nuisances, "statutes defining nuisances generally do not change the common-law definition of the term" or "supersede the common law as to other acts which constitute a public nuisance at common law." 58 Am Jur 2d *Nuisances* § 61 (1989). Moreover, "statutory remedies for the abatement of nuisances do not, as a rule, supersede existing common law remedies." *Id.*

## Count II--Violation of R.I. Unfair Trade Practice and Consumer Protection Act

[G.L. § 6-13.1-1 et seq.]
In his second count, pursuant to G.L.1956 § 6-13.1-5, the Attorney General alleges the defendants violated the UTPA thereby proximately causing the State to suffer substantial damages. Specifically, the State alleges that the defendants have violated the Act,
*9 "among other things, by
a. Making false and/or misleading statements that had, and have, the capacity, tendency or effect of deceiving or misleading Rhode Island consumers;
b. Failing to state material facts regarding the dangers of exposure to Lead, the omission of which deceived or tended to deceive."
A. Compl., ¶¶ 48-51.
In pertinent part, the UTPA makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." G.L.1956 § 6-13.1-2. When the UTPA became law on June 1, 1968, the relevant provision, § 6-13.1- 5, read:
"Whenever the attorney general has reason to believe that any person *is using or is about to use* any method, act, or practice declared by § 6-13.1-2 of this act to be unlawful, and that proceedings would be in the public interest, [the attorney general] may bring an action in the name of the state against such person to restrain by temporary or permanent injunction the use of the method, act, or practice .... The [ ] courts are authorized to issue temporary or permanent injunctions to restrain and prevent violations of this act...."
P.L.1968, ch. 12, §§ 1, 2. (Emphasis added.) Subsequently, in 1970, the Legislature added the

term "has used" to the original provision:

"Whenever the attorney general has reason to believe that any person is using, *has used,* or is about to use any method, act or practice declared by section 6-13.1-2 of this act to be unlawful, and that proceedings would be in the public interest, [the attorney general] may bring an action in the name of the state against such person to restrain by temporary or permanent injunction the use of the method, act, or practice...."

P.L.1970, ch. 249, § 2. (Emphasis added.) The subject 1970 amendment expressly states that it shall take effect upon its passage. P.L.1970, ch. 249, § 5.

The defendants argue that this claim fails because the statute may not be applied retroactively and because the State does not have standing under § 6-13.1-5 to bring a claim for damages or affirmative injunctive relief. Further, the defendants contend that the State is not seeking to enjoin defendants from recently or presently engaging in unfair or deceptive trade practices. In opposition, the Attorney General, while asserting that the State's UTPA claim is not based on a retroactive application of the statute, contends that the addition of the term "has used" in 1970 manifests an intent by the General Assembly to allow pre-1970 misconduct to form a basis of recovery for post-1970 damages and relief. The Attorney General argues that the statute is remedial and should be construed broadly, and also that the amendment relates back to the original statute thereby encompassing any harm that occurred after the 1968 enactment.

It is well-settled that statutes and their amendments are presumed to apply prospectively. *Hydro-Manufacturing, Inc.,* 640 A.2d at 954 (citing *Lawrence v. Anheuser-Busch, Inc.,* 523 A.2d 864, 869 (R.I.1987)); *Dunbar v. Tammelleo,* 673 A.2d 1063, 1065 (R.I.1996) ("statute will generally be construed to operate prospectively from and after effective date of statute"); *Avanzo v. Rhode Island Department of Human Services,* 625 A.2d 208, 211 (R . I.1993) (only when a statute "contains clear and explicit language requiring retroactive application [will] that statute [ ] be interpreted to operate retroactively"). "Only when ' it appears by clear, strong language or by necessary implication that the Legislature intended' a statute to have retroactive application will the courts apply it retroactively." *Hydro- Manufacturing, Inc.,* 640 A.2d at 954-55 (citing *VanMarter v. Royal Indemnity Co.,* 556 A.2d 41, 44 (R.I.1989)). When a statute lacks "the requisite specificity or necessary implication regarding retroactivity, the distinction between a substantive statute and a remedial or procedural statute comes into play." *Lawrence,* 523 A.2d at 869. However, the "clear enunciation of a legislative choice overrides any constructional preference for prospective or retrospective application that otherwise might obtain." *Id.* (quoting *Raymond v. Jenard,* 120 R.I. 634, 637, 390 A.2d 358, 359 (1978)).

*10 Arguably, the use of the words "has used" in the amendment could be construed as a retroactive intention; however, the Legislature specifically articulated its intention that the subject amendment "shall take effect upon passage." P.L.1970, ch. 249, § 5. The language "shall take effect upon passage" indicates a prospective intent. *Hydro-Manufacturing, Inc.,* 640 A.2d at 955; *see also Jennings v. U.S. Bobbin & Shuttle Co.,* 44 R.I. 388, 117 A. 647 (R.I.1922) ("statutes are presumably intended to operate prospectively, and words should not have a retrospective operation unless they are so clear, strong and imperative that no other meaning can be annexed to them or the Legislature's intention cannot be otherwise satisfied"). Further, as maintained by the defendants, other meaning can be applied to the term "has used." For example, that the amendment prevents a defendant from avoiding prosecution by terminating misconduct. Accordingly, this Court must construe § 6-13 .1-5, as amended, as operating prospectively. Consequently, the Attorney General's contentions that pre-amendment conduct which causes post-amendment damages is within the purview of § 6-13.1-5 and not a retroactive application of

the statute must fail.

Beneath the assertions of ongoing harms resulting from the alleged unfair or deceptive acts or practices of the defendants, the latest-dated misconduct complained of occurred in 1962. A. Compl., ¶ 39(b). Further, the Attorney General concedes that "Defendants finally discontinued manufacturing and promoting Lead in 1978 when the federal government required them to do so." P. Mem. in Opp. at 50; *see also* Am. Compl., ¶ 20 ("the use of Lead was banned for residential use in the United States in 1978"). Nevertheless, a careful reading of the complaint reveals allegations that may be construed as past, as well as continuing, unlawful and deceptive practices by the defendants. Because the amendment to § 6-13.1-5 requires prospective application, the Attorney General can rely on the term "has used" to prosecute an action for misconduct that occurred after, not before, the 1970 amendment. Further, in light of the legislative findings contained in the LPPA, it is reasonable to believe that this action is in the public interest. Accordingly, the Attorney General has pled sufficient factual allegations to withstand the defendant's motion to dismiss. Further, whether since the time when the operative language is applicable, such unlawful and deceptive practices have occurred is a question of fact. Accordingly, it is inappropriate to dismiss the UTPA claim.

Based on the foregoing and the State's expansive request for injunctive relief, this Court need not reach the defendants' challenge regarding the Attorney General's standing pursuant § 6-13.1-5 to bring an action for prospective injunctive relief and/or the State's alleged damages.

Counts III, IV, V and VI--Strict Liability, Negligence, Negligent

Misrepresentations and Omissions, and Fraudulent Misrepresentations and Omissions

*11 In Count III of its complaint, the State asserts a strict liability claim against manufacturing defendants. The State alleges negligence, negligent misrepresentations and omissions, and fraudulent misrepresentations and omissions, Counts IV--VI respectively, against all defendants. In response, the defendants contend that the tort claims are barred because of the statute of repose found in G.L.1956 § 9-1-29 and because they are too remote or derivative.

Statute of Repose

It is undisputed that § 9-1-29 is a statute of repose. *See Allbee v. Crane Co.,* 644 A.2d 308 (R.I.1994) (order). Section 9-1-29, entitled "Construction of improvements to real property--Immunity from liability," provides:

"No action (including arbitration proceedings) in tort to recover damages shall be brought against any architect or professional engineer who designed, planned, or supervised to any extent the construction of improvements to real property, or against any contractor or subcontractor who constructed the improvements to real property, or material suppliers who furnished materials for the construction of the improvements, on account of any deficiency in the design, planning, supervision, or observation of construction or construction of any such improvements or in the materials furnished for the improvements:

(1) For injury to property, real or personal, arising out of any such deficiency;

(2) For injury to the person or for wrongful death arising out of any such deficiency; or

(3) For contribution or indemnity for damages sustained on account of any injury mentioned in subdivisions (1) and (2) hereof more than ten (10) years after substantial completion of such an improvement; provided, however, that this shall not be construed to extend the time in which actions may otherwise be brought under §§ 9-1-13 and 9-1-14."

The purpose of the statute of repose in § 9-1-29 is well-settled. In enacting § 9-1-29, the General

Assembly required that individuals seeking recovery in tort against constructors of improvements to real property bring an action within ten years of the substantial completion of the improvement. *Qualitex, Inc. v. Coventry Realty Corp.,* 557 A.2d 850, 852 (1989). The Legislature enacted this statute of repose in reaction to the extinction of the doctrine of privity. *Walsh v. Gowing,* 494 A.2d 543, 546 (R.I.1985). With the abrogation of this doctrine, architects, engineers, and others ceased to enjoy immunity from liability to third parties. *Id.* (citing *Temple Sinai- Suburban Reform Temple v. Richmond,* 112 R.I. 234, 308 A.2d 508 (1973)). Therefore, the General Assembly attempted to shield "architects, professional engineers, contractors, subcontractors, and materialmen" and to provide them with a reasonable limitation on their expandly expanded potential liability. *Qualitex, Inc.,* 557 A.2d at 852 (1989) (citing *Walsh v. Gowing,* 494 A.2d at 546).

In *Qualitex,* the court considered whether a fire-sprinkler system is an improvement to real property for the purposes of § 9-1-29 and whether the statute protected the manufacturer of the system from liability. 557 A.2d at 852-53. After finding that the fire-sprinkler system is "within the ' improvement to real property'  language within the statute," the court then, construing the broadly written language of the statute, determined that "[m]anufacturers, just like architects, engineers, contractors, and subcontractors, need protection from individuals whose negligence in maintaining an improvement to real property may cause liability." *Id.* at 853 (citing *J.H. Westerman Co. v. Fireman' s Fund Insurance Co.,*499 A.2d 116, 121 (D.C.App.1985)). Further, in *Qualitex,* the court, found that the defendant who allegedly "designed, manufactured, inspected and installed" the fire-sprinkler system, as manufacturer, installer and supplier, was a materialman [FN12] for purposes of § 9-1-29. *Id.* Accordingly, the *Qualitex* Court held that the defendant, as materialman or manufacturer, was entitled to the protection of § 9-1-29.

      FN12. The Court defined materialman as one who

*12 In the matter before this Court, the defendants, over the State' s objection, argue that paint, like the fire-sprinkler system, is within the "improvement to real property" language of § 9-1-29 and further, that as manufacturers, they are immune from liability. However, the matter herein involves a significant distinction. The relevant causes of action are not brought against the manufacturing defendants as manufacturers of paint. Rather, they are brought against the manufacturing defendants in relation to the manufacture of lead, specifically "all lead products contained in paint and coatings." A. Compl., ¶ 13. In light of the *Qualitex* analysis, this Court finds that the statute is not calculated to include lead, an ingredient in paint, as within the "improvement to real property" language and thereby afford protection to the manufacturers of such ingredients. [FN13] Accordingly, as to the manufacturing defendants, the defense of the statute of repose is not applicable. In light of this Court' s finding regarding lead, it follows that the LIA, as an alleged promoter of the lead, may not rely on § 9-1-29 as a defense to the relevant causes of action.

      FN13. An "improvement" is "a valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to

more than mere repairs or replacement, costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes." *Black's Law Dictionary* 757 (West 6th ed.1990).

## Nullum Tempus

Having determined that § 9-1-29 is not applicable to the counts herein, this Court need not decide whether the State, as the Attorney General argues, may invoke the common law doctrine of nullum tempus to avoid its time limitation. However, to the extent that the State, pursuant to the subject counts, seeks to protect a public right, the doctrine of nullum tempus allows the Attorney General to avoid any relevant statute of limitation. Under the doctrine of nullum tempus, "the sovereign is exempt from the consequences of its laches, and from the operation of statutes of limitations," unless the statute specifically provides otherwise. *Guaranty Trust Co. v. United States,* 304 U.S. 126, 132-33, 58 S.Ct. 785, 82 L.Ed. 1224 (1938). The policy behind the doctrine has been the preservation of the public rights, revenues, and property from injury or loss, by the negligence of public officers. *Id.* at 132. The doctrine is well-established in Rhode Island. *See Almy v. Church,* 18 R.I. 182, 187-88, 26 A. 58, 60 (1893) (the ancient maxim "Nullum tempus occurrit regi" is in force in this state); *see also Searle v. Laraway,* 27 R.I. 557, 65 A. 269 (1906); *State of Rhode Island v. Pawtuxet Turnpike Co.,* 8 R.I. 521, 524 (1867) ("Indeed, no length of usurpation shall affect the Crown, *nullum tempus occurrit regi;* the Attorney General being a public officer, may be presumed to be capable of a salutary and reasonable discretion, as well as the court, and when acting in behalf of the State [quo warranto], he deems it his duty to prosecute for a forfeiture, it is not for the court, in the absence of any statutory limitation, to say he is too late.").

However, the subject counts are common law tort claims for strict liability, negligence, negligent misrepresentations and omissions, and fraudulent misrepresentations and omissions. To the extent that these torts are alleged to affect consumers, the general public or residents of the State, they could have been filed by any private litigant against the defendants. Accordingly the State is not making a claim in its governmental capacity to preserve a public right. Further, under Rhode Island law, it is well-settled that "the common law forbids the assignment of one's cause of action to recover for personal injuries." *Hospital Service Corp. of Rhode Island v. Pennsylvania Ins. Co.,* 101 R.I. 708, 712, 227 A.2d 105, 109 (1967). Accordingly, the Attorney General may not invoke the nullum tempus doctrine for such a purpose and may not prosecute tort claims for individual citizens

*13 To the extent that the State's allegations claim harm resulting from lead in public buildings, the State retains the nullum tempus exemption from the operation of a statute of limitations, unless by its terms the statute expressly includes the State. The pertinent statute of limitations, G.L.1956 § 9-1-13, does not expressly exempt the State. [FN14] Accordingly, this portion of State's tort claims survives the motions to dismiss.

FN14. General Laws § 9-1-13, entitled "Limitation of actions generally--Product liability" provides:

"(a) Except as otherwise specially provided, all civil actions shall be commenced within ten (10) years next after the cause of action shall accrue, and not after.

(b) [Ruled unconstitutional] Notwithstanding the provisions of subsection (a) of this section, an action for the recovery of damages for personal injury, death, or damage to real or personal property, including any action based upon implied warranties arising out of an alleged design, inspection, listing or manufacturing defect, or any other alleged defect of whatsoever kind or nature in a product, or arising out of any alleged failure to warn regarding a product, or arising out of any alleged failure to properly instruct in the use of a product, shall be commenced within ten (10) years after the date the product was first purchased for use or consumption."

Remoteness

Even if the subject counts did not suffer from the infirmities already mentioned, these claims would still be barred because, as the defendants contend, to the extent that they are entirely derived from alleged damages to others, they are too remote to be recoverable by the State. The doctrine of remoteness bars recovery in tort for indirect harm suffered as a result of injuries directly sustained by another person. In the context of a securities fraud action, the United States Supreme Court recognized that the concept of proximate causation generally requires "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). Therefore, "a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [is] generally said to stand at too remote a distance to recover." *Holmes,* 503 U.S. at 268- 69 (citing 1 J. Sutherland, *Law of Damages* 55-56 (1882)). In support of the directness of relationship requirement, the *Holmes* Court articulated a three factor rationale:

"First, the less direct an injury is, the more difficult it becomes to ascertain the amount of the plaintiff's damages attributable to the [defendant's wrongdoing], as distinct from other, independent factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the [wrongdoing], to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Id.* at 269-70 (citations omitted).

The State contends that this Court should permit its claim to recover the costs of providing lead-related services to the public because the defendants' alleged wrongdoing has caused direct injuries to the State itself, that the claims are not derivative. It alleges:

"As a direct and proximate result of these and other wrongful actions by the Defendants, the State has suffered substantial damages, including, but not limited to, the costs of discovering and abating Lead, the expenditure of State funds to detect lead poisoning and provide medical and/or other care of lead poisoned residents of the State, the costs of education programs for children suffering injuries as a result of Lead exposure and the costs of education programs for residents of the State due to the dangers present as a result of Lead in the State. These costs continue to mount as residents of the State continue to be exposed to Defendants' Lead." AmCompl., ¶ 42.

*14 However, the State would not have suffered its alleged injuries unless, for example, some consumer(s) chose to purchase lead-products and subsequently expose residents of Rhode Island

to lead. These expenditures construed as injuries by the State are inescapably contingent on direct or speculative harm to such persons and accordingly are too derivative, remote, or contingent to support a cognizable tort claim.

Count VII--Civil Conspiracy

In this count, the State, after incorporating the foregoing allegations, avers in relevant part that the defendants conspired to "conceal the known hazards of lead, to mislead the public and the government as to those hazards, and to market and promote the use of the product despite such knowledge of the hazards." A. Compl., ¶ 85. The defendants contend that this count fails because a civil conspiracy claim requires an actionable underlying wrong and none exists.

The tort of civil conspiracy exists in Rhode Island. *ERI Max Entertainment, Inc. v. Streisand, 690 A.2d 1351, 1354 (R.I.1997),* and is established by evidence from "which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise." *Stubbs v. Taft,* 88 R.I. 462, 468, 149 A.2d 706, 708-09 (1959) (citation omitted); *see also Sullivan v. Faria,* 112 R.I. 132, 138, 308 A.2d 473, 477 (1973) (a civil conspiracy claim fails without evidence "to show the requisite unlawful purpose or unlawful means"); *Guilbeault v. R.J. Reynolds Tobacco Co.,* 84 F.Supp.2d 263, 268 (D.R.I.2000) (Under Rhode Island law, "a civil conspiracy claim requires the specific intent to do something illegal or tortious").

The State alleges that the defendants wrongfully agreed to mislead the public regarding the hazards of lead and to market and promote it without proper warnings, all the while knowing the dangers that lead presented, especially to children. Because a valid claim for civil conspiracy requires a collaborative intent to do something unlawful and because this Court has not dismissed the State's entire complaint, the conspiracy count survives this stage of the proceedings.

Count VIII--Unjust Enrichment

The complaint alleges that the defendants have been and continue to be unjustly enriched because the State's paying of lead-related costs resulting from the harms caused by the defendant's conduct has conferred a benefit on the defendants by allowing them to derive substantial economic benefit. The defendants counter that the alleged "conferred benefit" is not legally cognizable.

The doctrine of unjust enrichment "permits the recovery in certain instances where a person has received from another a benefit, the retention of which, would be unjust under some legal principle, a situation which equity has established or recognized." *Merchants Mutual Insurance Co. v. Newport Hospital,* 108 R.I. 86, 93, 272 A.2d 329, 332 (1971). "[T]he unjust enrichment doctrine has for its basis that in a given situation it is contrary to equity and good conscience for one to retain a benefit that has come to him [or her] at the expense of another and that it is not necessary in order to create the obligation to make restitution or to compensate that the party unjustly enriched be guilty of a tortious or fraudulent act." *Id.* In Rhode Island, "actions brought upon theories of unjust enrichment and quasi-contract are essentially the same." *Bouchard v. Price,* 694 A.2d 670, 673 (R.I.1997) (quoting *R & B Electric Co. v. Amco Construction Co.,* 471 A.2d 1351, 1355 (R.I.1984). It is well-settled that

*15 "in order to recover under quasi-contract for unjust enrichment, a plaintiff is required to prove three elements: (1) a benefit must be conferred upon the defendant by the plaintiff, (2) there must be appreciation by the defendant of such benefit, and (3) there must be an acceptance of such benefit in such circumstances that it would be inequitable for a defendant to retain the benefit without paying the value thereof." *Id.* (citations omitted).

Under the doctrine of unjust enrichment, the concept of benefit is construed broadly: "a person confers a benefit upon another if he [or she] ... satisfies a debt or a duty of the other, or in any way adds to the other's security or advantage. He [or she] confers a benefit not only where he [or she] adds to the property of another, but also where he [or she] saves the other from expense or loss. The word ' benefit,' therefore, denotes any form of advantage." *Restatement of Restitution* § 1, cmt. b at 12 (1937).

Here, the Attorney General alleges that the State's payment of Lead-related costs has allowed and continues to allow the defendants to derive economic gain from their promotion and sale of lead while, at the State's expense, avoiding responsibility for the damages it has caused. Further the State alleges that the defendants have appreciated this benefit and that retention of the benefit is inequitable. In order for the defendants to succeed on their motion to dismiss, they are required to show that the State would not be entitled to relief under any of its alleged facts. It is impossible for the Court to determine at this stage that the State's lead-related expenditures have not added to the defendants', including the LIA's, advantage or saved them from loss. Accordingly, the State's pleading is sufficient with respect to its claim for unjust enrichment.

Count IX--Indemnity

The State's claim for equitable indemnification is based on the alleged intentional, negligent and/or other wrongful conduct of the defendants. The Attorney General contends that according to equitable principles, the defendants should be legally responsible for the State's lead-related expenditures because they, he alleges, result from the hazards created by the defendants' lead. The concept of indemnity is "based upon the theory that a party who has been exposed to liability solely as a result of the wrongdoing of another should be able to recover from the wrongdoer." *McCrory v. Spigel,* 740 A.2d 1274, 1276- 77 (R.I.1999) (citing *Muldowney v. Weatherking Products, Inc.,* 509 A.2d 441 (R.I.1986)). In explaining the concept, our Supreme Court has stated:

"Everyone is deemed responsible for the consequences of his or her own acts. The responsibility extends not only to the person directly injured but also to the one indirectly harmed by being held liable by operation of law.... If another person has been compelled to pay damages that should have been paid by the wrongdoer, the latter becomes liable to the former." *Muldowney,* 509 A.2d at 443-44 (citations omitted).

*16 A prospective indemnitee must prove three requisite elements:

"First, the party seeking indemnity must be liable to a third party. Second, the prospective indemnitor must also be liable to the third party. Third, as between the prospective indemnitee and indemnitor, the obligation ought to be discharged by the indemnitor." *Id.* at 443.

"Indemnity can only be obtained when the liability of the claimant is solely constructive or derivative and only when the prospective indemnitor's wrongful acts have caused such liability to be imposed." *Id.* at 444. "One situation satisfying th[e] third element is when a potential indemnitor is at fault and the prospective indemnitee is blameless." *Wilson v. Krasnoff,* 560 A .2d 335, 341 (R.I.1989) (citing *Muldowney,* 509 A.2d at 444).

In essence, the State avers that its owes a nondelegable, legally imposed duty to the residents of the State to make lead-related expenditures which were and are necessary because the defendants intentionally, negligently or otherwise wrongfully failed to provide a reasonably safe product that would not harm the public, especially the children, who have been exposed to it. As between the State and the defendants, the Attorney General alleges, the defendants ought to bear the burden of the lead-related expenditures resulting from the damages due to lead. These averments suffice to allege legal obligations owed by the State, albeit under statutory mandate, and the

defendants to third parties. Accordingly, the State has articulated the requisite elements for an indemnity claim.

Count X--Equitable Relief to Protect Children

It the final count, the State, after incorporating the foregoing averments in its pleading, asserts that granting equitable relief requiring the defendants "to aid in the education of the general public as to hazards posed by their products and to aid in the abatement of Lead hazards throughout the State is the only way to end the long-standing cycle of exposure, injury and permanent damage suffered by children in this State." A. Compl., ¶ 108. The defendants counter that the law of Rhode Island does not permit this count to stand as an independent cause of action.

An injunction is a "court order prohibiting someone from doing some specified act or commanding someone to undo some wrong or injury." *See Black's Law Dictionary* 784 (West 6th ed.1990). Whereas injunctions are

"equitable remedies whose grant or denial in each case is governed by principles of equity, the rights or subjects that properly lie within the power of a court of equity to control or protect by injunction are the same as those over which equity jurisdiction extends generally. A court of equity does not create rights, but rather determines whether legal rights exist and, if so, whether it is proper and just to enforce those rights. In short, a court may exert its equitable powers to grant appropriate relief only when a judicially cognizable right exists, and no adequate legal remedy is available."

*17 42 Am Jur 2d Injunctions § 46 (2000). In order for an injunction to issue, the moving party must demonstrate that rights in question will be irreparably injured or endangered if the injunction is not issued. *School Committee of Pawtucket v. Pawtucket Teachers' Alliance, Local No. 930,* 117 R.I. 203, 206, 365 A.2d 499, 501 (R.I.1976).

The State argues that a request for an injunction which is premised solely on allegations of imminent, irreparable harm without an underlying claim or allegation of statutory duty amounts to an independent cause of action under Rhode Island law. However, as the defendants counter, in each of the cases relied upon by the State, the plaintiff asserted an infringement of a particular right and requested injunctive relief as a remedy therefor.

In its amended complaint, the State, after averring several causes of action, requests in pertinent part rather extensive injunctive relief. Upon proving its burden with respect to "judicially cognizable rights," the State may indeed obtain equitable relief. *See, e.g., The Fund for Community Progress v. United Way of Southeastern New England,* 695 A.2d 517, 521 (R.I.1997) ("The moving party seeking a preliminary injunction must demonstrate that it stands to suffer some irreparable harm that is presently threatened or imminent and for which no adequate legal remedy exists to restore that plaintiff to its rightful position."); *City of Woonsocket v. Forte Brothers, Inc.,* 642 A.2d 1158, 1159 (R.I.1994) (Despite different procedural requirements, the "same criteria must be established to issue either a preliminary injunction or a temporary restraining order."). However, the formulation of this count as a claim for injunctive relief to protect children is, in this Court's reading, duplicative of the relief requested by the State in the "Relief Requested" section of its amended complaint. Moreover, absent controlling caselaw establishing that a request for injunctive relief constitutes an independent cause of action, injunctive relief is a remedy and, can not, in itself, be recognized as a substantive claim. Accordingly, the request for injunctive relief as articulated herein cannot stand as a separate cause of action and this claim for injunctive relief to protect children fails.

Court's Order

Counsel for the plaintiff is directed to present to the Court an appropriate order consistent with the foregoing to be settled after notice and an opportunity for all parties to be heard.

R.I.Super.,2001.

State v. Lead Ind. Assn., Inc.

2001 WL 345830 (R.I.Super.)

END OF DOCUMENT

*CASE NO. 03-945- PLAINTIFFS' APPENDIX OF UNREPORTED CASES, EXHIBIT 23*

**2002 U.S. Dist. LEXIS 23489, ***

**SUNGARD RECOVERY SERVICES L.P., Plaintiff, v. UNISOURCE WORLDWIDE, INC., Defendant.**

**CIVIL ACTION No. 02-CV-3845**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**2002 U.S. Dist. LEXIS 23489**

December 2, 2002, Decided

December 3, 2002, Filed; December 4, 2002, Entered

**COUNSEL:** For SUNGARD RECOVERY SERVICES L.P., Plaintiff: BRIAN S. PASZAMANT, BLANK ROME COMISKY & McCAULEY, REBECCA D. WARD, BLANK ROME COMISKY & MCCAULEY LLP, PHILADELPHIA, PA.

For UNISOURCE WORLDWIDE, INC., Defendant: CRAIG DOUGLAS MILLS, BUCHANAN INGERSOLL, PC, ELIOT G. LONG, BUCHANAN, INGERSOLL, PHILADELPHIA, PA.

**JUDGES:** JAMES McGIRR KELLY, J.

**OPINIONBY:** JAMES McGirr KELLY

**OPINION: MEMORANDUM AND ORDER**

**J. M. KELLY, J.**

**DECEMBER 2, 2002**

Presently before the Court is a Motion to Dismiss filed by Plaintiff SunGard Recovery Services, L.P. ("SunGard"), the response filed by Defendant Unisource Worldwide, Inc. ("Unisource"), and SunGard's reply thereto. SunGard petitions this Court to dismiss Counterclaim Counts I and II (collectively "Counterclaims") included in Unisource's Answer to SunGard's Complaint filed August 14, 2002. As set forth in the Counterclaims, Unisource argues that statements made by SunGard agents were fraudulent and negligently concealed and misrepresented the parties' [*2]

relationship and contractual obligations. In the instant Motion to Dismiss, SunGard contends that the Counterclaims are time-barred by the two-year statute of limitations for claims of fraud, negligent concealment and misrepresentation pursuant to 42 Pa. Cons. Stat. § 5524(7). For the forgoing reasons, SunGard's Motion is **DENIED.**

## I. BACKGROUND

On September 1, 1995, the parties entered into a Recovery Services Agreement ("Agreement") in which SunGard contracted to provide, among other things, emergency data recovery services for an AS 400 mainframe computer ("mainframe") located at Unisource's facility in St. Louis, Missouri. Around September 1999, Unisource determined that it no longer needed the services SunGard provided since it had recently moved the mainframe to a different location. However, Unisource continued to receive invoices from SunGard for services relating to the mainframe. Unable to locate the Agreement and unsure of how it could cancel SunGard's services pursuant to the contractual provisions therein, Unisource contacted SunGard and requested a copy of the Agreement. SunGard assured Unisource that it would provide a copy of the Agreement, but insisted that [*3] SunGard representatives would deliver the Agreement to it instead of mailing a copy. Unisource agreed and, in early October 1999, Unisource management met with SunGard agents. However, at the meeting, SunGard agents failed to produce a copy of the Agreement, professed ignorance of the Agreement's terms and attempted to sell Unisource additional services. Unisource management in attendance stressed that SunGard's services were no longer needed and stated that Unisource was uninterested in any additional services. Upon their departure, SunGard agents promised to deliver a copy of the Agreement to Unisource in the near future. However, two weeks after the meeting, Unisource still had not received the Agreement, prompting another call to SunGard and another request for a copy of the Agreement.

In December 1999, Unisource management spoke with SunGard agent Joe Walsh, who informed Unisource that the entire Agreement had automatically renewed for another term. On March 8, 2000, Unisource sent SunGard a written notice of termination that stated it disputed the Agreement's automatic renewal provision and asserted it had properly cancelled the Agreement pursuant to its terms. On June 19, 2002, SunGard [*4] filed suit against Unisource, alleging that Unisource breached the Agreement and was responsible for contractual damages, or in the alternative, relief under an unjust enrichment theory. On August 14, 2002, Unisource filed its Answer, which included several affirmative defenses and counterclaims. This opinion addresses the vitality of Unisource's Counterclaims alleging fraud, negligent concealment and misrepresentation.

## II. STANDARD OF REVIEW

*HN1* clscc1clscc1 Federal Rule of Civil Procedure 12 provides that a party may move to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). *HN2* clscc2 clscc2 When reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the non-movant's well-plead averments of fact as true and view all inferences in the light most favorable to the non-moving party. Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985); Society Hill Civic Asso. v. Harris, 632 F.2d 1045, 1054 (3d Cir. 1980); Abbdulaziz v. City of Philadelphia, Civ. A. No. 00-5672, 2001 U.S. Dist. LEXIS 16972, at *4

(E.D. Pa. Oct. 18, 2001). *HN3* clscc3clscc3A motion to dismiss is appropriate only when [*5] the movant establishes that he is entitled to judgment as a matter of law and there exists "no set of facts in support of his claims which would entitle him to relief." Ford v. Schering-Plough Corp., 145 F.3d 601, 604 (3d Cir. 1998); Schrob v. Catterson, 948 F.2d 1402, 1405 (3d Cir. 1991). In reviewing a motion to dismiss, the court must only consider the facts alleged in the pleadings and attachments thereto. Jordan v. Fox, Rothschild, O' Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994); Douris v. Schweiker, 229 F. Supp. 2d 391, [WL] at *6 (E.D. Pa. Oct. 23, 2002).

## III. DISCUSSION

In the instant Motion, SunGard petitions this Court to dismiss Unisource' s Counterclaims because, pursuant to the applicable statute of limitations, Unisource' s allegations of fraud, negligent concealment and misrepresentation are untimely. From the averments contained in Unisource' s Answer, SunGard contends that Unisource knew or should have known of the alleged fraud, negligent concealment and misrepresentation perpetrated by SunGard on March 8, 2000, and that Unisource did not choose to take legal action [*6] until it filed the Counterclaims on August 14, 2002, more than two years after the alleged fraud was discovered. In response, Unisource argues that since there are factual issues surrounding when it knew of, or should have reasonably discovered the alleged fraud, concealment and misrepresentation, a motion to dismiss is improper, premature and involves a determination best left to the jury.

As a preliminary matter, we note that *HN4* clscc4clscc4since this claim is based on the diversity of the parties, we are bound to apply state law to assess whether Unisource' s counterclaims are time-barred. Patterson v. American Bosch Corp., 914 F.2d 384, 387 (1990); Falbo v. State Farm Insurance Co., Civ. A. No. 96-5540, 1997 U.S. Dist. LEXIS 2687, at *30 n.8 (E.D. Pa. Mar. 13, 1997). *HN5* clscc5clscc5Under Pennsylvania law, claims "sounding in trespass, including deceit or fraud" are governed by a two-year statute of limitations. n1 42 Pa. Cons. Stat. § 5524(7). The parties do not dispute that Pennsylvania' s two-year statute of limitations apply. Rather, they protest each other' s characterization of when Unisource' s Counterclaims accrued to trigger the two-year statute of limitations. *HN6* clscc6clscc6Under [*7] Pennsylvania law, claims of fraud and negligence-related accusations accrue "when the injury is suffered, and the statute begins to run when the plaintiff knows, or reasonably should know, that he or she has been injured and that the injury was caused by the conduct of another," Abbdulaziz, 2001 U.S. Dist. LEXIS 16972, at *14. The injury triggering the statute of limitations is "the occurrence of the final significant event necessary to make the claim suable." Mack Trucks, Inc. v. Bendix-Westinghouse Automotive Air Brake Co., 372 F.2d 18, 20 (3d Cir. 1966). Pennsylvania' s accrual scheme seeks to protect an individual from another' s acts of fraud or concealment that would cause him "to relax his vigilance or to deviate from his right of injury." Bohus v. Beloff, 950 F.2d 919, 925 (3d Cir. 1991); In re Joshua Hill, Inc., 199 B.R. 298, 309 (Bankr. E.D. Pa. 1996).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Section 5524 states, relevant part:

*HN7* clscc7clscc7The following actions and proceedings must be commenced within two years:

(7) Any other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud, except an action or

proceeding subject to another limitation specified in this subchapter.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - [*8]

Although SunGard urges this Court to conclude that Unisource's Answer clearly illustrates that its Counterclaims are time-barred, this determination is usually left to a jury. Bohus, 950 F.2d at 925. With that in mind, we believe that there are significant factual disputes underlying SunGard's contention thatUnisource suffered a cognizable legal injury outside of the two-year statute of limitations. SunGard stresses that the alleged injury triggering the statute of limitations occurred when Unisource first learned of the purported falsity of SunGard's statements on or before March 8, 2000. In contrast, Unisource suggests that since it did not state when it sustained an injury as a result of SunGard's alleged fraudulent and negligent acts, this Court must draw the inference that Unisource could have incurred the injury triggering the statute of limitations when SunGard sought to enforce the renewed contract. To that end, Unisource proposes its injury did not accrue until SunGard filed suit to enforce the Agreement on August 14, 2002.

Although a jury may eventually deem SunGard's interpretation more plausible, this Court, viewing all allegations contained in Unisource's [*9] Answer and Counterclaims as true and in a light most favorable to Unisource, cannot conclude that "it appears beyond a reasonable doubt that ... [the non-movant] can prove no set of facts in support of his claim which would entitled him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). Since there remain issues of fact involving the time of accrual of Unisource's injury, such determinations must be left to a jury and cannot be decided by this Court. See 6 James Wm. Moore et al., Moore's Federal Practice P 56.200[67] app., at 56-203 (3d ed. 2002)*HN8* clscc8 clscc8"when ... a genuine issue of material fact remains, especially as to the time the action accrued, a motion for summary judgment [or pursuant to 12(b)(6)] on the basis of the statute of limitations should be denied"). Therefore, for the forgoing reasons, SunGard's Motion to Dismiss is **DENIED.**

**ORDER**

**AND NOW,** this 2nd day of December 2002, in consideration of the Motion to Dismiss filed by Plaintiff, SunGard Recovery Services, L.P. ("Plaintiff"), (Doc. No. 8), the Response of Defendant Unisource Worldwide, Inc., (Doc. No. 11) and Plaintiff's Reply thereto (Doc. No. 12), [*10] it is **ORDERED** that the Motion to Dismiss is **DENIED.**

BY THE COURT:

JAMES McGIRR KELLY, J.

***CASE NO. 03-945- PLAINTIFFS' APPENDIX OF UNREPORTED CASES, EXHIBIT 24***
**2000 U.S. Dist. LEXIS 15085, \*; 58 U.S.P.Q.2D (BNA) 1089;**
**Copy. L. Rep. (CCH) P28,176**
**DONALD SWAN, Plaintiff, - against - EMI MUSIC PUBLISHING INC., as successor-in-interest to ESTEEM MUSIC CORP., LLEE MUSIC CORP., as successor-in-interest to SIDMORE MUSIC, INC., SBK CATALOG PARTNERSHIP, and MPL COMMUNICATIONS, INC., Defendants.**
**99 Civ. 9693 (SHS)**
**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**
**2000 U.S. Dist. LEXIS 15085; 58 U.S.P.Q.2D (BNA) 1089; Copy. L. Rep. (CCH) P28,176**

**October 13, 2000, Decided**
**October 16, 2000, Filed**

**COUNSEL:** For DONALD SWAN, plaintiff: Robert S. Meloni, Rubin, Bailin, Ortoli, Mayer, Baker & Fry L.L.P., New York, NY.

**JUDGES:** SIDNEY H. STEIN, U.S. District Judge.

**OPINIONBY:** SIDNEY H. STEIN

**OPINION:** OPINION AND ORDER

SIDNEY H. STEIN, U.S. District Judge.

Defendants have filed this motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that this action is barred by the applicable statute of limitations. For the reasons set forth below, that motion is granted in part and denied in part.

## I. BACKGROUND

The facts set forth below are taken from the allegations in the complaint.

Plaintiff Donald Swan is the nephew of Pauline and Al Stillman. Compl. at P 11. Al Stillman was a professional lyricist and songwriter who wrote the English lyrics to the song Never on Sunday (the "Song") in 1960. Id. PP 12, 21-23. After Al Stillman died in 1979 and his wife,

Pauline, died in 1990, Swan inherited their interests in the musical compositions written by Al Stillman. Id. PP 14-16.

According to the complaint, defendants possess two documents purportedly [*2] dated August 1, 1960, that contain the forged signatures of Al Stillman: (1) an Agreement that purports to grant to Esteem Music Corp. and Sidmore Music, Inc. all of the "writer's interest in and to the Song, including the worldwide copyrights therein," but does not contain a grant to Esteem and Sidmore of the renewal copyrights in the Song (the "1960 Agreement"), id. PP 38-40; and (2) a one-page typewritten document that purports to confirm that the English lyrics were written as a "work for hire" and grant Esteem all renewal and extension rights (the "Work for Hire Document"), id. P 41-42.

On September 15, 1960, the United States Copyright Office issued a registration (the "1960 Registration") for the English lyric version of the Song referencing Manos Hadjidakis and "Billy Towne" -- a pseudonym for Al Stillman -- as co-authors. Id. P 26. The copyright claimants listed on the 1960 Registration were Esteem Music Corp. and Sidmore Music, Inc. Id. P 29. The 1960 Registration does not contain any reference that English lyrics were written by Billy Towne as a "work made for hire," despite the purported existence of the Work for Hire Document. Id. PP 44, 53.

Approximately [*3] two months later, on November 28, 1960, an amended copyright registration application for the Song was filed with the United States Copyright Office on behalf of Esteem and Sidmore (the "Amended Registration"). Id. P 45. The Amended Registration purported to correct the 1960 Registration by claiming that Manos Hadjidakis was not the "author of music" but was instead "an employee for hire" for Esteem and Sidmore. Id. P 46. The Amended Registration does not, however, contain any alteration or attempt to make any correction of the designation of "Billy Towne" as sole author of the English lyrics. Id. PP 47, 54.

Approximately 27 years later, on January 4, 1988, SBK Catalog Partnership, as successor-in-interest to Esteem, prepared and filed with the United States Copyright Office renewal copyright applications for the Song, and within the week, renewal registrations were issued. Id. P 48. The renewal applications, for the first time, identified the author of the English lyrics as "Esteem Music Corp. as employer for hire of Billy Towne." Id. P 50. Allegedly, neither Esteem, Sidmore, or SBK or any of their successors, predecessors or representatives had ever notified [*4] Al or Pauline Stillman that those entities claimed to be "employers for hire" of Al Stillman, nor that they had filed with the Copyright Office renewal applications changing the status of Billy Towne from "author" to "employee for hire." Id. P 52.

In September 1999 -- 29 years after the 1960 Registration and 11 years after the renewal registrations issued -- Swan filed this action seeking a declaration that he is the owner of an undivided 50% interest in the copyrights to the Song and is entitled to an accounting of defendants' exploitation of the Song. Id. PP 58, 61. He also seeks a declaration that Al Stillman was the author of the English lyrics of the Song, that the English lyrics were not a work made for hire, and that the purported assignment of rights to defendants was void on the grounds of forgery. Id. PP 69, 71.

Swan also asserts claims pursuant to state law, including breach of fiduciary duty, unjust enrichment, and fraud, and he seeks the imposition of a constructive trust as well as an accounting. Id. PP 76, 79-82, 84-86, 90, and 93-98.

## II. DISCUSSION

*HN1* clscc1clscc1 When deciding a motion to dismiss a complaint pursuant to Rule 12(b)(6) of the Federal Rules [*5] of Civil Procedure, the court must accept all of the well-pleaded facts as true and draw all reasonable inferences from those allegations in favor of the plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974). A complaint will survive defendants' motion to dismiss unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." See Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). In the statute of limitations context, this means that "dismissal is appropriate only if a complaint clearly shows that the claim is out of time." Harris v. City of New York, 186 F.3d 243, 250 (2d Cir. 1999). The Copyright Act, 17 U.S.C. § 101 et seq., provides that *HN2* clscc2clscc2 "no civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b); see Merchant v. Levy, 92 F.3d 51, 56 (2d Cir. 1996).

### A. Plaintiff's Claims for Royalties Accruing Before the Copyright Renewal Term.

Although [*6] the time period for which plaintiff seeks to recover royalties is not clear from the complaint, plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss states that this action seeks exclusively to establish his entitlement to a co-ownership interest in the renewal term of the Song's copyright, which began in 1988. Plaintiff's Mem. at 2-3. Accordingly, any claim for royalties accruing before the 1988 renewal term of the Song's copyright are deemed abandoned and are dismissed with prejudice. See New York State Ass'n of Career Schs., Inc. v. State Educ. Dep't, 142 F.R.D. 403, 406 (S.D.N.Y.1992).

### B. Plaintiff's Renewal Term Copyright Act Claims

When the renewal copyright registrations were filed in 1988, the copyright laws provided that:

*HN3* clscc3clscc3

In the case of [a non-posthumous] copyrighted work . . . the widow . . . , if the author be not living, . . . shall be entitled to a renewal and extension of the copyright in such work for a further term of forty-seven years when application for such renewal and extension shall have been made to the Copyright Office and duly registered therein within one year

prior to the expiration of the original [*7] term of copyright.

17 U.S.C. § 304(a) (1988). n1 *HN4* clscc4clscc4 In the case of co-authorship, if one co-author renews the original copyright solely in his own name, that renewal is held upon a constructive

trust for the other authors, see Shapiro, Bernstein & Co. v. Jerry Vogel Music. Co., 223 F.2d 252, 253 (2d Cir. 1955) (per curiam); Edward B. Marks Music. Corp. v. Jerry Vogel Music. Co., 140 F.2d 266, 267 (2d Cir. 1944), or the other authors' heirs, see Schmid Bros., Inc. v. W. Goebel Porzellanfabrik A.G., 589 F. Supp. 497, 501 (S.D.N.Y. 1984). Defendants concede that Pauline Stillman "would have been statutorily entitled to whatever interest, if any, [Al Stillman] had in the Song." Pl.'s Reply Mem. at 7. Thus, plaintiff's claim turns on whether Al Stillman possessed any rights in the Song at the time of his death.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 This section was amended by the Copyright Amendments Act of 1992, Pub. L. No. 102-307, § 102, 106 Stat. 264, 264-66. The Amendment was effective on June 26, 1992. Id. § 213, 106 Stat. at 272.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [*8]

At the time he died in 1978, Stillman was listed as a co-author of the Song on the Amended Registration. Such a designation constitutes prima facie evidence that he was, in fact, a co-author of the Song. See 17 U.S.C. § 410(c). Thus, plaintiff has pled facts sufficient to establish that, upon Al Stillman's death, his widow was "entitled to a renewal and extension of the copyright in such work for a further term of forty-seven years when application for such renewal and extension shall have been made to the Copyright Office and duly registered therein within one year prior to the expiration of the original term of copyright." 17 U.S.C. § 304(a) (1988).

Defendants contend that Al Stillman gave all his rights in the Song to Esteem and Sidmore by virtue of the 1960 Agreement. However, the 1960 Agreement does not contain an assignment of the copyright renewal term. Even if it did, Swan correctly points out that such an assignment would not have vested because Stillman did not survive into the renewal term. See Stewart v. Abend, 495 U.S. 207, 219-20, 109 L. Ed. 2d 184, 110 S. Ct. 1750 (1990). Thus, regardless of the validity [*9] vel non of the 1960 Agreement, it could not and did not vitiate Swan's rights in the renewal copyright registration. Similarly, the fact that Stillman allegedly accepted "lesser royalties" pursuant to the 1960 Agreement during the initial copyright term -- even if true -- is not inconsistent with an assertion of rights by Stillman's heirs in the renewal copyright registration.

Nevertheless, defendants argue that Swan's claim is time-barred because Stillman's widow and nephew were placed on notice by the redesignation of Stillman as an "employee for hire" on the 1988 renewal registration, over ten years before plaintiff filed his claim. Defendants also contend that by certain statements in the complaint, plaintiff has conceded that "neither plaintiff's uncle, aunt or plaintiff himself have ever been treated as a co-author." Def's Reply Mem. at 13 (citing Compl. PP 58, 61, 63, 67, 76, 86, and 97).

As an initial matter, defendants' contention that Stillman was "never" treated as a co-author of the Song is incorrect. Stillman was listed as a co-author, and not as an "employee for hire," on

not only the 1960 Registration, but also the Amended Registration, both filed by the defendants [*10] -- or their predecessors in interest -- after the 1960 Agreement and Work for Hire Document were purportedly signed by "Billy Towne." In addition, the paragraphs cited by defendants as "conceding" that Stillman was never treated as a co-author contain no such concession. Moreover, defendants' invitation to this Court to draw an inference of "concession" from the complaint flies in the face of the requirement that all reasonable inferences from those allegations be drawn in favor of plaintiff. See Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974).

Defendants' argument that Swan's claim accrued no later than the date the 1988 renewal registration was filed must also be rejected at this stage of the litigation. HN5 clscc5 clscc5 Copyright claims accrue when the plaintiff "knows or should have known of the injury on which the claim is premised," Merchant, 92 F.3d at 56, or when a reasonably diligent person would have been on inquiry as to the existence of a right. See Netzer v. Continuity Graphic Associates, Inc., 963 F. Supp. 1308, 1315 (S.D.N.Y. 1997). In a dispute over co-ownership, the statute of limitations begins to [*11] run when the defendant plainly and expressly repudiates the plaintiff's claim. See Lennon v. Seaman, 63 F. Supp. 2d 428, 443-44 (S.D.N.Y. 1999).

Stillman was listed as the co-author on two registrations prepared by the defendants -- or their predecessors in interest -- for more than a quarter of a century. Throughout that time period, defendants paid royalties to Stillman and his heirs. Indeed, defendants did so even after they obtained the renewal copyrights redesignating Stillman as an "employee for hire." The complaint alleges that neither Stillman nor his widow was ever notified that Stillman was considered an "employee for hire" of the defendants or their predecessors, and the complaint is silent as to when, if ever, their nephew was so notified.

Nevertheless, defendants claim that Stillman and his heirs knew that the amount of royalties they were being paid was below what they would have been entitled to as a co-author, and that therefore they should have expected an increase in royalty payments in 1988. When the payments did not increase, argue defendants, Pauline Stillman and her nephew were on inquiry notice of their claim, and the exercise of due diligence [*12] would have led to the discovery that the renewal registrations had redesignated Stillman as an "employee for hire." The complaint, however, is devoid of any allegations concerning either the actual or relative amount of royalties due or paid, and, therefore, dismissal of the claim for royalties on this basis is not warranted.

In addition, defendants have not cited, and the Court has not found, any case finding that the mere filing of a renewal registration is sufficient to place an author on notice that his rights are being violated. Instead, defendants have cited cases involving persons who had actual notice that their work was being exploited without compensation, thus triggering a duty to inquire into the copyright status of the work in question. See Willsea v. Theis, No. 98 Civ. 6773, 1999 WL 595629, at *5 (S.D.N.Y. Aug. 6, 1999); Margo v. Weiss, 1997 U.S. Dist. LEXIS 20867, No. 96 CIV. 3842, 1998 WL 2558 (S.D.N.Y. Jan. 5, 1998); see also Merchant v. Levy, 92 F.3d 51, 56-57 (2d. Cir. 1996). In this case, in contrast, the parties agree that Stillman and his heirs were being compensated while the work was being exploited. Thus, unless plaintiff knew or should [*13] have known that the level of compensation was inconsistent with his rights, he was not on inquiry notice as to his claims.

In sum, the date plaintiff's claims accrued is, at this stage of the litigation, a disputed issue of fact. Thus, resolution of defendants' statute of limitations defense is inappropriate on a motion to dismiss. See, e.g., Koch v. Dwyer, 1999 U.S. Dist. LEXIS 11101, *21, No. 98 Civ. 5519, 1999 WL 528181, at *10 (S.D.N.Y. July 22, 1999); ABF Capital Management v. Askin Capital Management, L.P., 957 F. Supp. 1308, 1325 (S.D.N.Y. 1997).

## C. Plaintiff's Renewal Term State Law Claims

Resolution of defendants' statute of limitations defenses to plaintiff's state law claims also is inappropriate on a motion to dismiss for the reasons discussed in the copyright context. Defendants also contend, however, that Swan's claim for unjust enrichment is preempted by the Copyright Act, and should therefore be dismissed, and that Swan's claim for breach of fiduciary duty should be dismissed for failure to allege a fiduciary relationship.

### 1. Unjust Enrichment

*HN6* clscc6clscc6"The Copyright Act preempts a state cause of action if the subject matter of the state law right falls within [*14] the subject matter of federal copyright law and the state law rights are equivalent to the rights federal copyright law protects." Netzer, 963 F. Supp. at 1321; see also Boyle v. Stephens Inc., 1998 U.S. Dist. LEXIS 15215, No. 97 CIV. 1351, 1998 WL 690816, at *4 (S.D.N.Y. Sept. 29, 1998). In determining whether a state law creates rights that are equivalent to those provided by federal copyright law, a Court must determine whether the state cause of action requires an "extra element" in addition to or instead of the acts of "reproduction, performance, distribution or display" required by the Copyright Act. Computer Assoc. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 716 (2d Cir. 1992).

Here, the unjust enrichment claim arises from the same circumstances and seeks vindication of the same rights as plaintiff's claims pursuant to copyright law. That claim is therefore dismissed.

### 2. Breach of Fiduciary Duty

*HN7* clscc7clscc7No fiduciary relationship exists between a music publisher and a composer as a matter of law, unless "special circumstances" are found to exist giving rise to such a relationship. Carter v. Goodman Group Music Publishers, 848 F. Supp. 438, 445 (S.D.N.Y. 1994). [*15] As currently pled, plaintiff's claim for breach of fiduciary duties is devoid of any "special circumstances" establishing the existence of a fiduciary duty.

Swan seeks leave to replead this claim on the basis that the former owner of defendant LLEE Music Corp., Lee V. Eastman, was also the personal attorney for Stillman and that this relationship constitutes one of the "special circumstances" giving rise to a fiduciary relationship. Plaintiff will be given leave to replead this claim.

## III. CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is: (1) granted with prejudice as to

plaintiff's claim for royalties for any time period covered by the 1960 Registration or the Amended Registration; (2) granted with prejudice as to plaintiff's sixth claim (for unjust enrichment); (3) granted without prejudice to plaintiff serving an amended complaint within 20 days as to plaintiff's fifth claim (for breach of fiduciary duty); and (4) in all other respects denied.

Dated: New York, New York

October 13, 2000

SO ORDERED:

Sidney H. Stein, U.S.D.J.