*CASE NO. 03-945- PLAINTIFFS' APPENDIX OF UNREPORTED CASES, EXHIBIT 25*
**Vaillancourt v. Town of Southington**
2002 WL 1293053, 32 Conn. L. Rptr. 191 , Conn.Super., May 07, 2002
Not Reported in A.2d
Conn.Super.,2002.
May 7, 2002.

AURIGEMMA, J.

*1 Defendant United Technologies Corporation, Pratt & Whitney Division ("Pratt & Whitney") has moved to strike the First, Third, Fourth, Fifth, Sixth, Seventh and Eighth Counts of the plaintiffs' Revised Complaint dated August 31, 2001. This case involves municipal waste disposal activities that took place several decades ago. The plaintiffs, Richard and Norma Vaillancourt, live on Rejean Road in the Town of Southington. Mr. Vaillancourt purchased the home in 1988. The home is located near the site of a former municipal landfill, a facility which operated for more than forty years until it was closed in 1967.

Summary of Allegations

The plaintiffs have sued the Town of Southington ("Southington" or "the Town"), on claims concerning Southington's operation of the landfill up to 1967. The plaintiffs also have sued Southington based on claims that, after closing and covering the landfill in 1967, the Town permitted residential and commercial development to occur in areas on and around the former landfill. During its decades of operation, the landfill was the municipally designated facility for disposal of all wastes in Southington. The Town accepted and disposed of a variety of residential, commercial and industrial wastes at the landfill. Pratt & Whitney, along with many other parties, used this landfill for disposal of its wastes, including industrial wastes. The plaintiffs have sued Pratt & Whitney based on claims that Pratt & Whitney used the landfill. The plaintiffs have not sued any of the other former users of the Southington landfill.

The Revised Complaint asserts common-law theories of negligence (First, Second and Eighth Counts), nuisance (Fourth Count), trespass (Fifth Count), and strict liability (Sixth Count) to advance plaintiffs' claims for damages based on alleged contamination and/or toxic exposure. The plaintiffs also claim damages for fraud (Seventh Count), alleging that they relied upon false assurances by the Town (and possibly Pratt & Whitney) as to the environmental condition of the former landfill.

Discussion of the Law and Ruling

The function of a motion to strike is to test the legal sufficiency of a pleading. Practice Book § 10-39; *Ferryman v. Groton,* 212 Conn. 138, 142, 561 A.2d 432 (1989); *Mingachos v. CBS, Inc.,* 196 Conn. 91, 108, 491 A.2d 368 (1985). In deciding a motion to strike the trial court must consider as true the factual allegations, but not the legal conclusions set forth in the complaint. *Liljedahl Bros., Inc. v. Grigsby,* 215 Conn. 345, 348, 576 A.2d 149 (1990); *Blancato v. Feldspar Corp.,* 203 Conn. 34, 36, 522 A.2d 1235 (1987).

The court should view the facts in a broad fashion, not strictly limited to the allegations, but also including the facts necessarily implied by and fairly provable under them. *Dennison v. Klotz,* 12 Conn.App. 570, 577, 532 A.2d 1311 (1987). In ruling on a motion to strike, the court must take as admitted all well-pled facts, and those necessarily implied thereby, and construe them in the

manner most favorable to the pleader. *Norwich v. Silverberg,* 200 Conn. 367, 370, 511 A.2d 336 (1986).

First Count--Negligent Disposal of Toxic and Hazardous Wastes

*2 For purposes of this decision, the following are the relevant allegations by the plaintiffs under their First Count. Plaintiffs allege that Southington "owned and operated" the Old Southington Landfill for about 47 years, from approximately 1920 until the landfill was closed by Southington in 1967. First Count ¶¶ 6, 12. During that period, the Town accepted liquid, solid, and other wastes at the municipal landfill, from a variety of residential, commercial, and industrial sources. *Id.* at ¶ 8. Among the users of the landfill was Pratt & Whitney. *Id.* at ¶ 10. Some of the wastes disposed of in the landfill up to 1967, including wastes from Pratt & Whitney, allegedly were "hazardous" and/or "toxic." [FN1] *Id.* at ¶¶ 9-10.

> FN1. The Complaint contains various assertions that, up until 1967, "hazardous" or "toxic materials" were disposed of at the landfill. But plaintiffs do not allege that the defendants violated any laws or regulations with respect to "hazardous" materials. During the time the Southington landfill was in operation, the terms "hazardous waste" and "hazardous materials" had no particular meaning. Laws defining "hazardous waste" and regulating its disposal were not enacted until much later. See Connecticut General Statutes § 22a-448(3) (1979 Public Acts No. 79-605) (definition of "hazardous waste," referring to definition under 1976 federal law) and Conn. Gen.Stat. § 22a-115 (1980 Public Acts No. 80- 472) (same); *see also* Connecticut General Statutes § 22a-1331 (1989 Public Acts No. 89-365) (authorizing grants to municipalities "for the clean up of landfills where wastes were disposed of and later determined to be hazardous waste").

Plaintiffs further allege that, after Southington closed the landfill, Southington permitted and allowed residential, commercial and industrial development to occur in the formerly undeveloped areas on and around the landfill site, including the construction of residences on Rejean Road, located to the north of the site, where the plaintiffs now live. First Count ¶ 13-14. Southington allowed this development to occur without requiring the properties to be tested. *Id.* at ¶ 15. In 1988, plaintiff Richard Vaillancourt purchased a house at 94 Rejean Road, "across [the road] from" the former landfill site. *Id.* at ¶¶ 3, 7. Ten years later, in 1998, plaintiff Norma Vaillancourt moved to the 94 Rejean Road residence. *Id.* at ¶ 3. Richard Vaillancourt also owned and operated a welding business which was situated on the former landfill site for over fifteen years. *Id.* at ¶¶ 53-54 (pp. 15-16).

Plaintiffs allege that the defendants were negligent in disposing of "toxic and hazardous substances," in failing to maintain the landfill, in allowing substances to spread, in failing to warn the plaintiffs, and in permitting or encouraging the plaintiffs to live and work on and around the former landfill site. *Id.* at ¶ 59 (pp. 17-18). Plaintiffs claim that their property has been contaminated by unidentified "chemical runoff from the hazardous and toxic wastes" at the landfill. *Id.* at ¶ 48 (pp. 14-15). They also claim that they have been personally exposed to unidentified "hazardous chemicals." *Id.* at ¶ 56 (p. 18).

The existence of a duty of care, which is a question of law for the court, is essential to any claim of negligence. *Lodge v. Arett Sales Corp.,* 246 Conn. 563, 571, 717 A.2d 215 (1998). The nature of the duty and the identity of the persons to whom a duty is owed are determined by the specific circumstances surrounding the conduct of the individual. *Jaworski v. Kierman,* 241 Conn. 399,

405, 696 A.2d 332 (1997). Only if a duty is found by the court to exist may the trier of fact consider the question of whether that duty was violated. *Petriello v. Kalman,* 215 Conn. 377, 382-83, 576 A.2d 474 (1990). To determine the existence of a duty, the court considers: (1) whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that the harm of the general nature of that suffered by the plaintiff was likely to result; and (2) whether, on the basis of public policy, the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case. *Zamstein v. Marvasti,* 240 Conn. 549, 558, 692 A.2d 781 (1997).

*3 The first step in the court's duty analysis is to determine the foreseeability of the plaintiff's injury. *Jaworski,* 241 Conn. at 406. In hindsight, virtually all harms are technically "foreseeable." *RK Constructors, Inc. v. Fusco Corp.,* 231 Conn. 381, 386, 650 A.2d 153 (1994). What is relevant in determining foreseeability is the "attenuation between [the defendant's] conduct, on the one hand, and the consequence to and the identity of the plaintiff on the other hand." *RK Constructors,* 231 Conn. at 387-88.

While it may seem that there should be a remedy for every wrong, this is an ideal limited perforce by the realities of this world. Every injury has ramifying consequences, like the ripplings of the waters, without end. The problem for the law is to limit the legal consequences of wrongs to a controllable degree.

*Waters v. Autuori,* 236 Conn. 820, 827-28, 676 A.2d 357 (1996). Thus, a person is required only to take precautions against those dangers that are "*reasonably* foreseeable." *Lodge,* 246 Conn. at 577 (emphasis in original). The question of duty is always determined based on the then-existing circumstances. *Roy v. Friedman Equip. Co.,* 147 Conn. 121, 124, 157 A.2d 599 (1960).

In *Lodge,* a fire alarm was falsely reported due to negligence on the part of the defendants. When fire engines responded to the alarm, a fire truck's brakes failed en route, resulting in an accident. The fire engine's brakes had not been properly maintained. *Lodge,* 246 Conn. at 567-69. The plaintiffs sued the defendants in negligence. The Supreme Court declined to recognize a duty of care between the defendants and the plaintiffs, because the circumstances of the injuries were too far removed from the defendant's conduct. *Id.* at 577. The court observed that the negligent transmission of a fire alarm did entail some foreseeable risk; *id.* at 573-74; and that the risk of brake failure by a fire engine was literally or technically "foreseeable." *Id.* at 576. However, as a matter of law, the court held that that particular risk was not "reasonably foreseeable," and that the brake failure therefore was considered an "unforeseeable consequence." *Id.* at 577. Lodge further considered the question of duty from a policy perspective, concluding that imposing a duty on the defendants running to the remote plaintiffs would not serve a proper purpose. *Id.* at 577-86.

Here, the link between Pratt & Whitney and the plaintiffs is too attenuated for the plaintiffs' alleged injuries to have been a reasonably foreseeable consequence of Pratt & Whitney's activity when Pratt & Whitney used the landfill. Pratt & Whitney's waste disposal activity took place decades before Richard Vaillancourt purchased his house on Rejean Road. Southington owned and operated the landfill for the purpose of receiving and disposing of wastes from businesses such as Pratt & Whitney. Southington had responsibility to oversee the closure of its landfill in 1967, and plaintiffs do not allege any role by Pratt & Whitney in that process. See First Count ¶ 12. Similarly, plaintiffs allege that it was Southington that decided to open the former landfill site and its nearby areas to development. *Id.* at ¶ 13-14. Plaintiffs do not allege that Pratt & Whitney had anything to do with those actions by the Town.

*4 The Complaint sets forth no facts to support a conclusion that, when Pratt & Whitney used the

landfill, it had any reason to anticipate the Town would not operate or maintain this public facility in a safe and proper manner. *See* *Cahill v. Board of Educ., 198 Conn. 229, 242, 502 A.2d 410 (1985)* (public officers are presumed to have performed their duties properly). Nor did Pratt & Whitney have any reason to anticipate any negligence on the part of the Town in closing the landfill in 1967. There is no factual allegation supporting a conclusion that Pratt & Whitney had either the opportunity or the legal authority to control the actions and decisions of Southington. A refuse disposal operation is a governmental function. *Wood v. Wilton, 156 Conn. 304, 310, 240 A.2d 904 (1968)*. Similarly, zoning and development are matters controlled by municipalities. At the time Pratt & Whitney used the landfill, Pratt & Whitney could not reasonably foresee that Southington later would open the area on and around the former landfill site for development. When those decisions later were made by Southington, Pratt & Whitney had no role or involvement.

The case of *Accashian v. Danbury,* 23 Conn. L. Rptr. No. 19, p. 656, 1999 Conn.Super. LEXIS 59 (Conn.Super.Ct. Jan. 8, 1999) (Hodgson, J.), is directly on point. In *Accashian,* corporate parties which had disposed of wastes at the Danbury municipal landfill were sued in negligence based on claims that the landfill had contaminated neighboring property. The court struck the claims of negligence against the users of the landfill, concluding that such claims failed both the foreseeability test and the public policy test:

The first [test], foreseeability, would be satisfied only if an entity paying a fee to deposit waste at a public refuse facility should be expected to investigate the manner in which the municipality operates the facility and foresee that the materials it is accepting will not be stored or processed in an appropriate manner ...

It does not seem reasonable, as a matter of law, to impose on a user of a regulated facility the task of foreseeing that the municipality will fail in its duties to comply with applicable standards and to take applicable precautions regarding the waste it accepts and of further foreseeing that managing authorities or regulatory authorities will fail to detect or prevent noncompliance.

...

The plaintiffs' claim also fails the public policy test. It is not the public policy of this state to impose on entities disposing of wastes a duty to oversee and regulate the operation of the facilities where the wastes are accepted. Rather, the statutes impose those duties on various environmental protection officials and boards.

*Accashian,* 1999 Conn.Super. LEXIS 59, *5, *7.

The Complaint does not contain any facts to support an inference that Pratt & Whitney had any reason to foresee that Southington would not operate, maintain, or close the landfill properly. Pratt & Whitney had no reason to foresee the alleged post-closure actions by Southington to permit or encourage the development of areas on and around the former landfill. Furthermore, the alleged actions or omissions by Southington were not within the scope of any risk reasonably created by any alleged negligence of Pratt & Whitney. As a matter of public policy, this court cannot impose upon Pratt & Whitney the duty to have anticipated such events decades ago, when Pratt & Whitney (like many others) simply used the landfill. Accordingly, because Pratt & Whitney cannot be said to have owed a duty of care to these remote future plaintiffs during the time when Pratt & Whitney used the landfill, the First Count claim of "negligent disposal" against Pratt & Whitney is ordered stricken.

*5 To the extent the First Count also may be construed to include claims that Pratt & Whitney had any common-law duty to the plaintiffs arising or continuing sometime *after* the landfill closed in 1967, the plaintiffs also fail to state a claim. Paragraphs 16-18 of the First Count (pp. 5-

6) assert, in conclusory fashion, that Pratt & Whitney "knew," or was "aware," or "should have been aware," of the manner in which Southington closed the landfill, and of the post-closure development and uses subsequently permitted by Southington in the area of the former landfill. A bare assertion that the defendant "knew or should have known" something is simply a claim of negligence, not a sufficient allegation of fact. *Ruocco v. United Adver. Corp.,* 98 Conn. 241, 244, 119 A. 48 (1922); *Jerez v. City of Danbury,* 2000 Conn.Super. LEXIS 2238 (Conn.Super.Ct. Aug. 25, 2000) (Moraghan, J.). Although plaintiffs allege broadly that "the defendants" were negligent in that "they permitted and actively encouraged people ... to live and work on and around the Site" (First Count ¶ 59(e) (p.18)), there is absolutely no factual allegation supporting any conclusion that Pratt & Whitney was involved in such matters. Conclusory assertions in a pleading, not supported by sufficient allegations of fact, are not sufficient to withstand a motion to strike. *Mingachos v. CBS, Inc.,* 196 Conn. 91, 108, 491 A.2d 368 (1985); *Fortini v. New England Log Homes, Inc.,* 4 Conn.App. 132, 134-35, 492 A.2d 545, *cert. dism'd,* 197 Conn. 801, 495 A.2d 281 (1985); *P.R.I.C.E. Inc. v. Keeney,* 22 Conn. L. Rptr. 373, 1998 Conn.Super. LEXIS 2018, *30-31 (Conn.Super.Ct. July 9, 1998) (Hale, J.) (claim of strict liability stricken where sufficient supporting facts not pleaded).

The gravamen of plaintiffs' post 1967 claims against Pratt & Whitney is that Pratt & Whitney became aware of problems with the landfill sometime after 1979, but failed to warn the plaintiffs. See First Count ¶¶ 47, 59(d) (pp. 14, 17). These allegations do not state a claim against Pratt & Whitney in negligence, because Pratt & Whitney had no common-law duty to the plaintiffs. Courts generally will not impose a continuing duty in negligence unless there is evidence of a special relationship between the parties. *See e.g., Blanchette v. Barrett,* 229 Conn. 256, 275, 640 A.2d 74 (1994) (doctor-patient relationship); *Starkweather v. Patel,* 34 Conn.App. 395, 400-02, 641 A.2d 809 (1994) (same). Even where a defendant initially may have been negligent in the performance of some act, the defendant generally has no continuing duty to warn. *See Bartha v. Waterbury House Wrecking Co.,* 190 Conn. 8, 13, 459 A.2d 115 (1983) (no continuing duty of contractor to safeguard large hole left on construction site); *Sanborn v. Greenwald,* 39 Conn.App. 289, 297, 664 A.2d 803 (1995) (no continuing duty to warn of negligently prepared stipulation); *Nardi v. AA Elec. Sec. Eng'g, Inc.,* 32 Conn.App. 205, 213, 628 A.2d 991 (1993) (no continuing duty to warn of negligently installed phone jack).

*6 To the extent that the First Count might be interpreted as a claim by the plaintiffs that Pratt & Whitney failed to warn them about Southington's alleged negligence, either before or after 1967, the plaintiffs also fail to state a claim. A defendant generally does not have a duty to warn others of the dangers posed by third parties. See *Fraser v. U.S.,* 236 Conn. 625, 627, 674 A.2d 811 (1996) (no duty of medical center to control outpatient to prevent harm to third parties); *Kaminski v. Fairfield,* 216 Conn. 29, 37, 578 A.2d 1048 (1990) (parents have no duty to warn police officer of child's violent propensity).

Due to Pratt & Whitney's lack of a common-law duty running to the plaintiffs either before or after 1967, the First Count of the Complaint is ordered stricken as to Pratt & Whitney.

## Fourth Count--Nuisance

In the Fourth Count, the plaintiffs attempt to pursue a private nuisance claim against both Southington and Pratt & Whitney. The plaintiffs allege that Southington "owned and operated" the landfill, First Count ¶ 6; and that Southington "stored and disposed of" wastes from various residential, commercial and industrial sources. *Id.* at ¶ 8. Pratt & Whitney, along with others, simply "used" the landfill for disposal of its wastes. *Id.* at ¶ 10. The plaintiffs allege that both

defendants "created" the nuisance "by permitting harmful materials to spread onto and into Plaintiffs'  property in an unreasonable manner." Fourth Count ¶ 64 (p. 29). The plaintiffs allege generally that the harms that they claim to have suffered "were caused by the nuisance created, permitted, continued and/or maintained by the Defendants ..." *Id.* at ¶ 65 (p. 30).

In a nuisance case, control over the land claimed to be a nuisance is an essential requisite to liability. *State v. Tippetts-Abbett-McCarthy- Stratton,* 204 Conn. 177, 185, 527 A.2d 688 (1987) (trial court did not err in refusing to submit nuisance claim to jury, where no evidence to suggest defendant had control over land, even if pleadings considered in light most favorable to plaintiff); *Lomangino v. LaChance Farms, Inc.,* 17 Conn.App. 436, 438-39, 553 A.2d 197 (1989). Where a defendant exercises no control over the land at issue, the court may strike a nuisance count. See *Wiehl v. Dictaphone Corp.,* 10 Conn. L. Rptr. 591, 1994 Conn.Super. LEXIS 44, *3 (Conn.Super.Ct. Jan. 12, 1994)* (Maiocco, J.) (granting motion to strike nuisance count against former lessee for disposal of hazardous wastes, where no control over land shown). Here, the plaintiffs do not allege that Pratt & Whitney actually exercised control over the landfill. Although the Fourth Count purports to claim broadly that both defendants "created" or "maintained" a nuisance, that allegation is insufficient. It is clear from the complaint that Southington operated and controlled this landfill as a public refuse disposal facility and a municipal service. See *Wood v. Wilton,* 156 Conn. 304, 310, 240 A.2d 904 (1968). In the *Tippetts* case, *supra,* the defendants had contracted with the State of Connecticut to maintain the Mianus River Bridge, portions of which collapsed in 1983. 204 Conn. at 178-79. The State alleged that, by failing to properly construct and maintain the bridge, the defendants had created a nuisance. *Id* . The Supreme Court held that while the defendants were delegated a degree of control over the bridge for purposes of construction and maintenance, the "ultimate" control over the bridge was always with the State, and thus the defendants were not liable in nuisance. *Id.* at 186. Here, since control over the Southington landfill always rested with its owner and operator, the Town of Southington, Pratt & Whitney cannot be liable in nuisance as a matter of law. The Fourth Count is ordered stricken as to Pratt & Whitney.

Fifth Count--Trespass

*7 In the Fifth Count, the plaintiffs claim trespass, alleging that unidentified toxic and hazardous substances "escaped" from the landfill and migrated to the plaintiffs'  property. Fifth Count ¶ 62 (p. 31). The essential elements of a trespass are: (1) the plaintiffs ownership or possessory interest in the land; (2) an invasion by the defendant which affects the plaintiff's ownership or possessory interest; (3) that such invasion was "done intentionally"; and (4) damages. See *Abington Ltd. P' ship v. Talcott Mountain Science Ctr. for Student Involvement Inc.,* 43 Conn.Sup. 424, 427, 11 Conn. L. Rptr. 349 (Super.Ct.1994). Here, plaintiffs fail to plead the intentionality element. "The intention required to make the actor liable for trespass is an intention to enter upon the particular piece of land in question." *Ike' s Auto Body, Inc. v. Martin,* 1995 Conn.Super. LEXIS 3628 *13 (Conn.Super.Ct. Dec. 22, 1995) (Pickett, J.); see also *Kramer v. Ordway,* Conn.Super. LEXIS 3082, *3 (Conn.Super.Ct. Nov. 30, 1994) (Lewis, J.) ("[I]n order to be liable for trespass, one must intentionally cause some substance or thing to enter upon another' s land")*Caltabiano v. Jimmo,* 1995 Conn.Super. LEXIS 1334, *19 (Conn.Super.Ct. May 5, 1995) (Higgins, J.) (intent to do that which causes the invasion is a required element of trespass).

An intrusion on the land of another as a result of negligence is not a trespass. *Walsh v. Stonington Water Pollution Control Auth.,* 1996 Conn.Super. LEXIS 1461 (Conn.Super.Ct. June

5, 1996) (Hurley, J.) (granting summary judgment). Even where EPA and DEP are alleged to have issued notices of environmental violations to the defendant, a claim based on trespass may be stricken for failure to show the requisite intent. *Mather v. Birken Mfg. Co.,* 23 Conn. L. Rptr. 443, 1998 Conn.Super. LEXIS 3669 (Conn.Super.Ct. Dec. 8, 1998) (Hennessey, J.). In *Accashian v. Danbury,* 23 Conn. L. Rptr. 656, 1999 Conn.Super. LEXIS 59 (Conn.Super.Ct. Jan. 8, 1999) (Hodgson, J.), the City of Danbury and several corporations which had used the city landfill to dispose of wastes were sued for trespass because chemicals allegedly leached from the landfill onto the plaintiffs' neighboring properties. The court granted the corporate defendants' motion to strike the trespass claim, holding that a user of a municipal landfill cannot be liable in trespass.

Since the corporate defendants are not alleged to have operated the landfill or decided how their materials were to be handled or processed, they cannot be said to have had any basis for certainty, substantial or otherwise, as to the likelihood that any substance from their materials would invade neighboring properties by air or water or soil.

*Accashian,* 1999 Conn.Super. LEXIS 59, at *9-*10.

Here, plaintiffs broadly allege that the defendants "caused and allowed" substances to escape from the landfill. Fifth Count ¶ 62 (p. 31). The plaintiffs also allege that the escaping substances included "vapors" (Fifth Count ¶ 62 (p. 31)), but a claim relating to "vapors" does not lie in trespass. A trespass claim must allege the invasion of plaintiff's property by tangible matter. See *Abington Ltd. Partnership,* 43 Conn.Sup. at 428, 11 Conn. L. Rptr. 349 ("Generally, all intangible intrusions, such as noise, odor, or light [alone], are dealt with as nuisance cases, not trespass"); *Kramer v. Ordway, supra,* 1994 Conn.Super. LEXIS at 3082, *3 ("[I]t is generally held that intrusion of the property be physical and accomplished by a tangible matter"); *Pestey v. Cushman,* 13 Conn. L. Rptr. 217, 1994 Conn.Super. LEXIS 3275, *9 (Conn.Super.Ct. Dec. 15, 1994) (Hurley, J.) (rejecting a trespass claim based on farm odor, court held that, "[a]bsent some direct or indirect physical invasion or deposit of some substance onto the Pesteys' land, there is no recognizable action in trespass").

*8 The plaintiffs also allege, without factual elaboration, that the defendants "knew or in the exercise of reasonable care should have known" that substances "released from the Site would enter the land of others, including the plaintiffs." *Id.* at ¶ 63. The plaintiffs cannot satisfy the element of intent based only upon these conclusory allegations. *Mingachos v. CBS, Inc.,* 196 Conn. 91, 108 (1985); *Fortini v. New England Log Homes, Inc.,* 4 Conn.App. 132, 134-35, *cert. dism'd* 197 Conn. 801 (1985). A bare assertion that a defendant "knew or should have known" something is a claim of negligence only, not a factual allegation of actual knowledge. *Ruocco v. United Advertising Corporation,* 98 Conn. 241, 244 (1922); *Jerez v. City of Danbury,* 2000 Conn.Super. LEXIS 2238 (Conn.Super.Ct. Aug. 25, 2000) (Moraghan, J.).

The plaintiffs have not pleaded any facts which would support a conclusion that Pratt & Whitney intended, prior to 1967, that wastes which Pratt & Whitney disposed of at the landfill would migrate to the property of these remote future plaintiffs decades later. Indeed, by plaintiffs' own allegations, it was not until "[b]etween 1979 and 1983" that the defendants first "learned" that substances from the former landfill allegedly were affecting other properties. First Count ¶ 48 (p. 14). Because plaintiffs have not pled the required element of intent as to Pratt & Whitney, the Fifth Count is ordered stricken as to Pratt & Whitney.

Sixth Count--Strict Liability

In the Sixth Count, the plaintiffs claim that the "handling, burning, burying and disposing" of unspecified "toxic and hazardous substances" at the landfill prior to 1967 was "an ultra-

hazardous activity" for which the defendants should be strictly liable. Sixth Count ¶¶ 62, 65 (pp. 34, 35).

To prevail in a claim of strict liability under Connecticut law, a plaintiff must prove, among other things, that the defendant engaged in activity that was so dangerous it was unsafe even with the exercise of due care. Specifically:

To impose liability without fault, certain factors must be present: an instrumentality capable of producing harm; circumstances and conditions in its use which, *irrespective of a lawful purpose or due care,* involve a risk of *probable* injury to such a degree that the activity fairly can be said to be intrinsically dangerous to the person or property of others; and a causal relation between the activity and the injury for which damages are claimed.

*Caporale v. C.W. Blakeslee & Sons, Inc.,* 149 Conn. 79, 85, 175 A.2d 561 (1961) (emphasis added).

Connecticut courts have applied the factors listed in the Restatement (Second) of Torts to determine whether an activity is abnormally dangerous so as to give rise to strict liability. Those factors are the:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes.

*9 *Green v. Ensign-Bickford Co.,* 25 Conn.App. 479, 486, 595 A.2d 1383 (1991) (emphasis added) (quoting Restatement (Second) of Torts § 520).

The Connecticut Appellate and Supreme Courts have recognized abnormally dangerous activity giving rise to strict liability only with respect to blasting, pile driving and research with explosives. See, e.g., *Whitman Hotel Corp. v. Elliott & Watrous Eng'g Co.*137 Conn. 562, 565, 79 A.2d 591 (1951) (blasting); *Caporale,* 149 Conn. at 85-86 (pile driving); *Green,* 25 Conn.App. at 482-83 (research with explosives).

In *Accashian v. City of Danbury,* No. XO1CV-97-0147228-S, 23 Conn. L. Rptr. 648, 1999 Conn.Super. LEXIS 36 (Conn.Super.Ct. Jan. 6, 1999) (Hodgson, J.), the court held that operation of a landfill is not ultrahazardous because "[s]tate and regulatory schemes suggest that these [disposed] materials do not pose a hazard if handled properly." *Id.* at *20-21 (citing Conn. Gen.Stat. §§ 22a-114 through 134q). Judge Hodgson articulated that conclusion three times in consideration of the *Accashian* litigation. See 23 Conn. L. Rptr. 656, 1999 Conn.Super LEXIS 59, at *7-8 (Conn.Super. Jan. 8, 1999); 26 Conn. L. Rptr. 287, 2000 Conn.Super. LEXIS 168, at *4 (Conn.Super.Ct. Jan. 27, 2000); and 23 Conn. L. Rptr. 648, 1999 Conn.Super. LEXIS 36, *supra,* injury," *id.* at *17.

Other courts have reached the same conclusion with respect to storage of hazardous materials. See, e.g., *Goodrich v. Jennings,* No. 150074, 19 Conn. L. Rptr. 542, 1997 Conn.Super. LEXIS 1399, at *78 (Conn.Super.Ct. May 22, 1997) (Mintz, J.) (storage of gasoline in an underground tank is not an ultrahazardous activity); *Nielsen v. Sioux Tools, Inc.,* 870 F.Sup. 435, 442 (D.Conn.1994) (refusing to impose strict liability for leaking underground tank); *Arawana Mills Co. v. United Techs. Corp.,* 795 F.Sup. 1238, 1251 (D.Conn.1992) ("I am persuaded that if given the opportunity to expand the narrowly-construed concept of 'ultrahazardous' or 'abnormally dangerous' activity to storage and use of hazardous wastes, the Connecticut Supreme Court would decline to do so"); *Bernbach v. Timex Corp.,* 989 F.Sup. 403, 407 (D.Conn.1996) (declining to extend strict liability to the handling of hazardous wastes).

The plaintiffs allege that the disposal of toxic and hazardous materials was an ultra-hazardous activity, subjecting persons coming into contact with said substances and materials to a severe risk of personal injury, regardless of the degree of caution they might have exercised. (Sixth Count, ¶ 62.) In other words, they plead that the OSL should be found to be ultrahazardous because it involved materials that would cause severe harm to those who come into contact with the materials, regardless of the care exercised *by such people* prior to coming into contact with the harmful materials. That is not the test for determining whether an activity is ultrahazardous in Connecticut. Rather, the plaintiffs must plead and prove that a landfill cannot be operated safely regardless of the exercise of due care *by the landfill operator.* This proposition has been rejected in Connecticut. See *Accashian, supra.* There is simply no basis for an argument that landfills will probably cause harm even where operated in accordance with appropriate operating procedures and regulations.

*10 Strict liability applies only to activities that entail an obvious risk of probable harm, under the theory that a defendant who chooses to engage in such obviously dangerous activity must be prepared to pay compensation for any resultant harm. The doctrine is inapplicable to a circumstance in which an activity was not known to be dangerous at the time it was undertaken but is only alleged to have been dangerous years after the fact.

The Connecticut Supreme Court explained the doctrine as follows:

In all of these situations *danger may be foreseen by reasonable men,* as possible if not probable, but the risks to others are not by the ordinarily prudent man, regarded as unreasonable. It is precisely these conditions which give rise to the doctrine of strict liability.

*Whitman Hotel Corp. v. Elliott & Watrous Eng' g Co.*, 137 Conn. 562, 567, 79 A.2d 591 (1951) (emphasis added). In such a situation,

[a] person who uses an intrinsically dangerous means to accomplish a lawful end, in such a way as will necessarily or obviously expose the person of another to the danger of probable injury, is liable if such injury results, even though he uses all proper care.

*Id.* at 565.

In all circumstances in which strict liability has been applied by Connecticut' s appellate level courts, the danger was obvious to the defendant at the time of the disputed action. In *Caporale,* the defendant drove heavy steel piles with a pile driver for four months within seventy-five feet of the plaintiff' s concrete-block buildings, and "actually anticipated [the potential damage] when it inspected premises nearby before it began work." 149 Conn. at 85-86. In *Whitman Hotel,* the defendant "discharged many hundreds of blasts of ... dynamite ... in close proximity to a number of compactly located business buildings." 137 Conn. at 564. In *Green,* the defendant' s employees were experimenting with explosives. 25 Conn.App. at 481.

In order to state a claim against Pratt & Whitney for strict liability the plaintiffs must plead facts supporting a conclusion that the particular *circumstances and conditions* of Pratt & Whitney' s use of the Southington municipal landfill prior to 1967 were such that Pratt & Whitney was engaging in *conduct* which "necessarily or obviously" created a high risk of unavoidable harm. *Whitman,* 137 Conn. at 565.

Here, the plaintiffs have not alleged any facts concerning the particular "circumstances or conditions" of Pratt & Whitney' s use of the Southington landfill in the decades prior to 1967. There are no factual allegations supporting a conclusion that Pratt & Whitney knew, prior to 1967, that its conduct in disposing of wastes in Southington would have posed a "high degree of risk of harm." Restatement (Second) of Torts § 520(a). The plaintiffs themselves state that it was not until "[b]etween 1979 and 1983" that the defendants "learned" of contamination allegedly

affecting properties away from the former landfill site. First Count ¶ 48 (p. 14). From the allegations of the complaint, therefore, it is not possible to conclude that any industrial user of the Southington landfill prior to 1967 would have been engaging in an activity that "*necessarily or obviously* expose[d] the person of another to the danger of *probable* injury." Whitman Hotel, 137 Conn. at 565 (emphasis added). For the foregoing reasons the Motion to Strike the Sixth Count is granted.

### Seventh Count--Fraud

*11 The Seventh Count of the Revised Complaint purports to state a claim for common-law fraud. Most, if not all, of the allegations are directed against Southington; the plaintiffs refer to various times between the 1970s and 1993 when the Town allegedly made statements or allegedly failed to disclose information. Plaintiffs claim generally that the Town "implied by its actions and affirmatively advised invitees and the public, including the Plaintiffs, that no danger condition existed on or around the Site" of the former landfill. Seventh Count ¶ 68 (p. 37). Plaintiffs claim that Southington "did not disclose the dangers of the Site to the public, nor did it disclose the health risks and dangers to those residents of the Town who were living ... adjacent to the Site." *Id.* at ¶ 72 (pp. 38-39). Plaintiffs also allege that "the Town, in January, February and March 1993, indicated that the adjacent areas, including those of the Plaintiffs were not affected by the contamination in the landfill and that there is no risk to the residences herein [sic]." *Id.* at ¶ 77 (p. 40). Plaintiffs further allege that the Town Manager "disagreed with the amount of contamination on the Site" and that "on July 1, 1993 the ... Town Manager, indicated that there was no health hazard." *Id.* at ¶¶ 73, 75 (p. 39). Only two paragraphs in the Seventh Count mention Pratt & Whitney. Paragraph 75 (p. 39) alleges, in pertinent part: "The Defendants Pratt & Whitney and the Town of Southington stated on July 8, 1993 that the State of Connecticut, Department of Public Health Service Report overstated the risk attributable to landfill gases ..." This is followed by paragraph 76 (pp. 39-40), which reads in full as follows: Again, on July 8, 1993, the Town of Southington, speaking for the Town and for Pratt & Whitney, indicated that the Department of Health Service Report characterization of the former landfill as a public health hazard was misleading and that the report overstated the risk to the residents.

A cause of action for common-law fraud requires the plaintiff to establish four distinct elements. They are: "(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." Weisman v. Kaspar, 233 Conn. 531, 540, 661 A.2d 550 (1995) (citations omitted).

When interpreted in a manner most favorable to the plaintiff, the Seventh Count is sufficient to state a cause of action against Pratt & Whitney for Fraud. Therefore, the Motion to Strike the Seventh Count is denied.

### Eighth Count--Negligent Infliction of Emotional Distress

In the Eighth Count, the plaintiffs again attempt to allege a claim of negligence in connection with post 1967 events. The Eighth Count purports to state a claim for negligent infliction of emotional distress. Plaintiffs allege that the "Defendants have known since 1979 that the contamination at the Site constituted a severe health hazard ... but that the defendants "took no steps to promptly relocate the Plaintiffs from the Site, and in fact ... consistently advised the Plaintiffs and others the health risk (sic), and permitted the Plaintiffs and others to use and/or occupy the Site ..." Eighth Count ¶ 87 (pp. 43-44).

*12 To recover on a claim for negligent infliction of emotional distress, a plaintiff must show

that "the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." *Montinieri v. Southern New England Tel. Co.,* 175 Conn. 337, 345, 398 A.2d 1180 (1978); *Barrett v. Danbury Hospital,* 232 Conn. 242, 260, 654 A.2d 748 (1995). When the emotional distress is claimed to be based on fear of future illness, a plaintiff's fear must be objectively reasonable when compared against the defendant's conduct. See *Barrett,* 232 Conn. at 261. The plaintiff must present sufficient facts to demonstrate the objective reasonableness of the fear. *Id.* at 262 (affirming defense summary judgment where plaintiff failed to show that alleged fear was reasonable). In the present case, although plaintiffs claim that Pratt & Whitney's "conduct" was unreasonable (Eighth Count ¶ 88 (p. 44)) and caused the plaintiffs to suffer distress, the gravamen of the claim is not Pratt & Whitney's affirmative "conduct" but rather the absence of action by Pratt & Whitney with regard to the plaintiffs.

There is no authority for the claim that some twenty years after Pratt & Whitney last used the OSL for the disposal of substances that it did not then know were hazardous, Pratt & Whitney had a common-law duty to "relocate" the plaintiffs, to prevent them from living or working in the area, or otherwise to intervene in their situation. Negligence cannot be predicated upon failure to perform an act which the actor was under no duty to perform. *Behlman v. Universal Travel Agency, Inc.,* 4 Conn.App. 688, 691, 496 A.2d 962 (1985). Therefore, the Motion to Strike the Eighth Count as to Pratt & Whitney is granted.

Conn.Super.,2002.
Vaillancourt v. Town of Southington
2002 WL 1293053 (Conn.Super.), 32 Conn. L. Rptr. 191
END OF DOCUMENT

**CASE NO. 03-945- PLAINTIFFS' APPENDIX OF UNREPORTED CASES, EXHIBIT 26**
**Vaillancourt v. Town of Southington**
2002 WL 1041381, 32 Conn. L. Rptr. 185 , Conn.Super., Apr 26, 2002
Not Reported in A.2d
Conn.Super.,2002.
April 26, 2002.

AURIGEMMA, J.
*1 The defendant Town of Southington ("Southington") has moved to strike all counts of the plaintiffs' Amended Complaint, dated August 31, 2001, which alleges liability arising from acts and omissions involving the Old Southington Landfill ("OSL"), and has also moved to strike plaintiffs' second, third, fifth, sixth, seventh, eighth, and ninth prayers for relief.

*Summary of Allegations*

The plaintiffs have sued the Town of Southington ("Southington" or "the Town"), on claims concerning Southington's operation of the landfill up to 1967. The plaintiffs also have sued Southington based on claims that, after closing and covering the landfill in 1967, the Town permitted residential and commercial development to occur in areas on and around the former landfill. During its decades of operation, the landfill was the municipally designated facility for disposal of all wastes in Southington. The Town accepted and disposed of a variety of

residential, commercial and industrial wastes at the landfill. Pratt & Whitney, along with many other parties, used this landfill for disposal of its wastes, including industrial wastes. The plaintiffs have sued Pratt & Whitney based on claims that Pratt & Whitney used the landfill. The plaintiffs have not sued any of the other former users of the Southington landfill.

The Revised Complaint asserts common law theories of negligence (First, Second and Eighth Counts), nuisance (Fourth Count), trespass (Fifth Count), and strict liability (Sixth Count) to advance plaintiffs' claims for damages based on alleged contamination and/or toxic exposure. Plaintiffs separately assert a claim for "Diminution in Property Value" (Third Count), in which they apparently seek damages based solely upon the proximity of their home to the former landfill site. Plaintiffs also claim damages for fraud (Seventh Count), alleging that they relied upon false assurances by the Town (and possibly Pratt & Whitney) as to the environmental condition of the former landfill.

### Discussion of the Law and Ruling

The function of a motion to strike is to test the legal sufficiency of a pleading. Practice Book § 10-39; *Ferryman v. Groton,* 212 Conn. 138, 142, 561 A.2d 432 (1989); *Mingachos v. CBS, Inc.,* 196 Conn. 91, 108, 491 A.2d 368 (1985). In deciding a motion to strike the trial court must consider as true the factual allegations, but not the legal conclusions set forth in the complaint. *Liljedahl Bros., Inc. v. Grigsby,* 215 Conn. 345, 348, 576 A.2d 149 (1990); *Blancato v. Feldspar Corp.,* 203 Conn. 34, 36, 522 A.2d 1235 (1987).

The court should view the facts in a broad fashion, not strictly limited to the allegations, but also including the facts necessarily implied by and fairly provable under them. *Dennison v. Klotz,* 12 Conn.App. 570, 577, 532 A.2d 1311 (1987). In ruling on a motion to strike, the court must take as admitted all well-pled facts, and those necessarily implied thereby, and construe them in the manner most favorable to the pleader. *Norwich v. Silverberg,* 200 Conn. 367, 370, 511 A.2d 336 (1986).

### Negligence Claims

*2 Southington seeks to strike the three counts sounding in negligence--the First, Second and Eighth Counts--based on the doctrine of governmental immunity.

The doctrine of governmental immunity protects municipalities from liability for alleged negligence in the performance of discretionary, governmental acts, as opposed to acts that are merely ministerial. *Evon v. Andrews,* 211 Conn. 501, 504, 559 A.2d 1131 (1989); *Gauvin v. City of New Haven,* 187 Conn. 180, 184, 445 A.2d 1 (1982). Discretionary acts are those that require "the exercise of judgment by a municipal employee." *Evon,* 211 Conn. at 507. Governmental acts are those "performed wholly for the direct benefit of the public and are supervisory and discretionary in nature." *Gauvin,* 187 Conn. at 184. Conversely, ministerial acts are those "performed in a prescribed manner without the exercise of judgment or discretion as to the propriety of the action ." *Id.*

Municipalities are not, however, immune from liability for acts that concern a proprietary, as opposed to a governmental, activity. *Elliott v. Waterbury,* 245 Conn. 385, 414, 715 A.2d 27 (1998). Section 52-557n(a)(1)(b) of the Connecticut General Statutes provides that "[e]xcept as otherwise provided by law, a political subdivision of that state shall be liable for damages to person or property caused by: ... negligence in the performance of functions from which the political subdivision derives a special corporate profit or pecuniary benefit."

The plaintiffs argue that the conduct about which they complain in the negligence counts was proprietary in nature. Operation or maintenance of the following public amenities has been ruled governmental rather than proprietary: storm sewers, *Spitzer v. Waterbury,* 113 Conn. 84, 154 A.

157 (1931); public parks, *Stradmore Development Corp. v. Commissioners,* 164 Conn. 548, 324 A.2d 919 (1973), and *Wysocki v. City of Derby,* 140 Conn. 173, 376 A.2d 1111 (1953); swimming facilities, *Carta v. City of Norwalk,* 108 Conn. 697, 145 A. 158 (1929); fire departments, *O' Donnell v. Groton,*108 Conn. 622, 144 A. 468 (1929); police services, *Gordon v. Bridgeport Housing Authority,* 208 Conn. 161, 544 A.2d 1185 (1988); and maintenance of fire hydrants, *Williams v.. City of New Haven,* 243 Conn. 763, 707 A.2d 1251 (1998).

Provision of utilities for profit, such as the operation of a water works, has been ruled proprietary. *Abbott v. Bristol,* 167 Conn. 143, 355 A.2d 68 (1974); *Richmond v. City of Norwalk,* 96 Conn. 582, 115 A. 11 (1921); *Hourigan v. Norwich,* 77 Conn. 358, 59 A. 486 (1904).

The Connecticut Supreme Court has ruled that refuse disposal operations, unlike water utilities, are governmental functions: "[a] refuse disposal operation is generally held to be a governmental function." *Wood v. Wilton,* 156 Conn. 304, 310, 240 A.2d 904 (1968). Several trial courts have applied the doctrine of governmental immunity to landfills. In *Doyle v. Webster,* No. CV- 98-0076407-S, 1999 Conn.Super. LEXIS 2629, at *3-4, 23 Conn. L. Rptr. 332 (Conn.Super.Ct. Sept. 29, 1999) (DiPentima, J), the court, on the ground of governmental immunity, struck a third-party claim against the Town of Litchfield arising from pollution emanating from the town landfill. In *Jewett City Sav. Bank v. Town of Canterbury,* No. CV-97-0056725-S, 1998 Conn.Super. LEXIS 2948, at *3-4 (Conn.Super.Ct. Oct. 16, 1998) (Sferrazza, J.), the court refused to strike a special defense asserting governmental immunity with respect to the operation of a landfill.

*3 In *Accashian v. City of Danbury,* No. X01 CV 970147228S, 1999 Ct. Sup. 772, 23 Conn. L. Rptr. 648 (Jan. 6, 1999) (Hodgson, J.), the plaintiffs alleged that in addition to operating a municipal landfill for the benefit of town residents, the city conducted a proprietary enterprise in that it accepted waste from entities that were not town residents in return for a per-load fee and that between January 1995 and December 1996 the city's income from such fees was approximately twelve million dollars. Based on that allegation the court could not rule out the possibility that Danbury's operation of the landfill was proprietary and, therefore, denied the city's motion to strike the negligence counts.

The plaintiffs here argue that Southington, like Danbury in *Accashian,* "operated a municipal landfill for the benefit of Town residents, but also conducted a proprietary enterprise in that the use of the landfill was open to area citizens without regard to whether they lived in Southington or whether they had industrial, commercial, or residential municipal wastes and acted as a catalyst for out of town companies to locate in Southington who paid a large percentage of the taxbase of the Town (e.g. Pratt & Whitney Aircraft)." See Plaintiffs' Memorandum in Opposition to Defendant Town of Southington's Motion to Strike p. 3. However, the foregoing language appears nowhere in the plaintiffs' lengthy complaint. Paragraph 8 of the complaint alleges that the Town of Southington accepted waste over the course of seventeen years from residential, commercial and industrial sources. Taking the complaint in a manner most favorable to the plaintiffs, as the court must when considering a motion to strike, the allegation that the town accepted commercial and industrial waste could give rise to the inference that it operated the landfill on a proprietary basis. Therefore, the court denies the Motion to Strike Count One which alleges negligent disposal of toxic and hazardous waste.

The Second Count, titled Negligent Closure and Sale of the Site, alleges that Southington negligently allowed the post-closure commercial and residential development of OSL and surrounding area by issuance of building permits, zoning approval and the like. (Second Count, ¶ 62.) The Eighth Count, titled Negligent Infliction of Emotional Distress, alleges that Southington

negligently caused the Plaintiffs to suffer stress-related injuries by virtue of Southington's use of OSL. (Eighth Count, ¶¶ 77, 80.) Those counts fail to complain about conduct which is even arguably proprietary. Rather they allege negligence in the conduct of Southington's land regulation function.

Municipalities are granted governmental immunity for their regulatory actions, including efforts to regulate land use and health. *See, e.g., Evon,* 211 Conn. at 506 (1986) (municipality immune from liability for alleged failure to enforce statues, regulations and codes regarding maintenance of rental dwellings).

*4 In 1986, the Connecticut Legislature reformed Connecticut's tort laws by, in part, the adoption of Section 52-557n of the Connecticut General Statutes. See *Sanzone v. Board of Police Commissioners,* 219 Conn. 179, 185, 592 A.2d 912 (1991). The statute adds further support to the above interpretation of the doctrine of governmental immunity. Specifically, Section 52-557n(a) provides in part that:

a political subdivision of the state shall not be liable for damages to person or property caused by ... negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law.

In addition, Section 52-557n(c) provides that municipalities in Connecticut cannot be liable for: the issuance, denial, suspension or revocation of or failure or refusal to issue, deny, suspend or revoke any permit, license, certificate, approval, order or similar authorization, when such authority is a discretionary function by law, *unless such issuance, denial, suspension or revocation or such failure or refusal constitutes a reckless disregard for health or safety.* Conn. Gen.Stat. § 52-557n(c)(7). Emphasis added.

The Second Count paragraph 59(g) alleges that Southington "granted permits, licenses and approvals to members of the public to construct dwelling and other facilities on and in the vicinity of the Site, including the residences of the Plaintiffs, while knowing of the danger presented by said substances and materials ..." Taken in a manner most favorable to the plaintiffs, the foregoing paragraph alleges Southington's reckless disregard for health or safety, within the exception to governmental immunity set forth above in § 52-557n(c). Therefore, the Motion to Strike must be denied with respect to the Second Count.

Similarly, the Eighth Count alleges that "notwithstanding the fact that the Defendants have known since 1979 that the contamination at the Site constituted a severe health hazard to the public, took no steps to promptly relocate the Plaintiffs from the Site and ... permitted the Plaintiffs and others to use and/or occupy the Site and abutting properties as a place of work, residence and recreation." ¶ 87. Based on the foregoing the reckless disregard of health and safety exception could apply to defeat the governmental immunity and therefore, the Motion to Strike the Eighth Count is denied.

### *Nuisance Claim*

Southington argues that the plaintiffs' Fourth Count, alleging nuisance, should be stricken because it fails to allege that Southington intentionally created the conditions that constituted the nuisance, as required to prevail on such a claim against a municipality in Connecticut. This argument is based on the claim that *Keeney v. Town of Old Saybrook,* 237 Conn. 135, 676 A.2d 795 (1996), imposed an additional element of intentional conduct in a nuisance action against a municipality. That interpretation of *Keeney* is incorrect. In *Keeney* the Court dealt with the longstanding rule that " ' [l]iability can be imposed on the municipality only in the event that, if the condition constitute[s] a nuisance, it was created by some positive act of the municipality.' *Brennan v. West Haven,* 151 Conn. 689, 692, 202 A .2d 134 (1964)." *Keeney, supra,* 237 Conn.

at 164. The Court expanded that rule, holding that "steadfast refusal to change a situation known to cause an intrusion on the property of others satisfied the requirement of a showing of a ' positive act,' since the prolonged continuation of the status quo with knowledge of the results evidenced a choice by the town to let the condition exist." *Accashian v. City of Danbury,* No. X01CV970147228S, 2000 Ct. Sup. 1114, 1118, 26 Conn. L. Rptr. 287 (Jan.27, 2000) (Hodgson, J.).

*5 In the Fourth Count of the Complaint the plaintiffs allege that the nuisance was created by the "negligent disposing of toxic and hazardous substances and materials on the Site ..." Complaint ¶ 59. Thus they allege a positive act sufficient, if proven, to constitute the creation of a nuisance. Therefore, the Motion to Strike the Fourth Count is denied.

*Trespass Claim*

To state a claim for trespass, the plaintiff must show: 1) plaintiff's ownership or possessory interest in the land; 2) an invasion by defendant that affects plaintiff's exclusive possessory interest; 3) defendant's invasion was done intentionally; and 4) such invasion causes direct injury. *Abington Ltd. Partnership v. Talcott Mountain Science Ctr. for Student Involvement, Inc.,* 43 Conn.Sup. 424, 427, 657 A.2d 732, 11 Conn. L. Rptr. 349 (1994) (emphasis added). "The intention required to make the actor liable for trespass is an intention to enter upon the particular piece of land in question, irrespective of whether the actor knows or should know that he is not entitled to enter." *Ike's Auto Body, Inc. v. Martin* No. CV-95-0068506, 1995 Conn.Super. LEXIS 3628, at *3 (Conn.Super.Ct. Dec. 22, 1995) (Pickett, J.); see also *State v. Avila,* 223 Conn. 595, 606, 613 A.2d 731, 737 n. 11, 613 A.2d 731 (Conn.1992) ( "[T]o act intentionally it must be one's conscious objective to bring about a result or conduct") *Kramer v. Ordway,* No. CV-91-0118711, 1994 Conn.Super. LEXIS 3082, at *3 (Conn.Super.Ct. Nov. 30, 1994) (Lewis, J.) ("[I]n order to be liable for trespass, one must intentionally cause some substance or thing to enter upon another's land") *Caltabiano v. Jimmo,* No. CV-93-0068929-S, 1995 Conn.Super. LEXIS 1334, at * 19 (Conn.Super.Ct. May 5, 1995) (Higgins, J.) (intent to do that which causes the invasion is required element of trespass).

The Restatement of Torts (Second) sets forth the elements of a cause of action for trespass to stand in Section 158:

One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally

(a) enters land in the possession of the other, or causes a thing or a third person to do so, or

(b) remains on the land, or

(c) fails to remove from the land a thing which he is under a duty to remove.

In *Accashian v. City of Danbury,* No. X01CV970147228S, 1999 Ct.Sup.772, 23 Conn. L. Rptr. 698 (Jan. 6, 1999) (Hodgson, J.), the court stated:

The Comments to § 158(a) of the Restatement indicate that intent to invade another's land may be established by showing conduct of a kind substantially certain to result in an invasion: "It is enough that an act is done with knowledge that it will to a substantial certainty result in the entry of the foreign matter. Thus one who so piles sand close to his boundary that by force of gravity alone it slides down onto his neighbor's land or who so builds an embankment that during ordinary rainfalls the dirt from it is washed upon adjacent lands, becomes a trespasser on the other's land."

*6 1999 Ct. Sup. at 783.

In *Accashian* the court denied the defendant's Motion to Strike a claim of trespass on the grounds that the plaintiff had alleged facts supporting the element of intent by alleging that the landfill

was "unlined and that it was contiguous to wetlands." In this case the plaintiffs allege that the Old Southington Landfill was closed in 1967, and that they suffered injuries decades later from the escape into the surrounding environment of hazardous substances stored at the landfill. The plaintiffs point to the allegation that "no impervious covering was used to close the OSL, nor was any remedial work performed by the Town of Southington, or by other defendants before OSL was closed." Therefore, the issue is: does an allegation of the failure to put an impervious covering on a landfill which was closed in 1967 allege that Southington engaged in conduct of a kind substantially certain to result in an invasion of the plaintiffs' properties in the 1980s and 1990s? The answer to this question depends on Southington's knowledge of the nature of the materials in the OSL at the time it closed the landfill without an impervious cover. By the plaintiffs' own admission, Southington did not learn until 1979--12 years after OSL closed--that OSL "was contaminated by hazardous wastes" (Complaint, First Count, ¶¶ 12, 46); Southington did not learn until after 1979 that chemical runoff from OSL could be contaminating some adjoining properties (Complaint, First Count, ¶ 48). Based on the foregoing, the complaint fails to allege that Southington knew about the hazardous nature of the materials at the time it closed OSL. The failure to secure the landfill with an impervious cover is not enough to constitute an allegation that Southington acted in a manner that it knew to be substantially certain to cause injury to the plaintiffs' properties. Therefore, the Motion to Strike the Fifth Count is granted.

### Strict Liability Claim

The plaintiffs' Sixth Count alleges strict liability. To prevail in a claim of strict liability under Connecticut law, a plaintiff must prove, among other things, that the defendant engaged in activity that was so dangerous that it was unsafe even with the exercise of due care. Specifically:

To impose liability without fault, certain factors must be present: an instrumentality capable of producing harm; circumstances and conditions in its use which, *irrespective of a lawful purpose or due care,* involve a risk of probable injury to such a degree that the activity fairly can be said to be intrinsically dangerous to the person or property of others; and a causal relation between the activity and the injury for which damages are claimed.

*Caporale v. C.W Blakeslee & Sons, Inc.,* 149 Conn. 79, 85, 175 A.2d 561 (1961) (emphasis added). Connecticut courts have applied the factors listed in the Restatement (Second) of Torts to determine whether an activity is abnormally dangerous so as to give rise to strict liability. Those factors are the:

*7 (a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) *inability to eliminate the risk by the exercise of reasonable care;* (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes.

*Green v. Ensign-Bickford Co.,* 25 Conn.App. 479, 486, 595 A.2d 1383 (1991) (emphasis added) (quoting Restatement (Second) of Torts § 520).

The Connecticut Appellate and Supreme Courts have recognized abnormally dangerous activity giving rise to strict liability only with respect to blasting, pile driving and research with explosives. *See, e.g., Whitman Hotel Corp. v. Elliott & Watrous Eng'g Co.,* 137 Conn. 562, 565, 79 A.2d 591 (1951) (blasting); *Caporale,* 149 Conn. at 85-86 (pile driving); *Green,* 25 Conn.App. at 482-83 (research with explosives).

In *Accashian v. City of Danbury,* No. X01CV-97-0147228-S, 1999 Conn.Super. LEXIS 36, 23 Conn. L. Rptr. 648 (Conn.Super.Ct. Jan. 6, 1999) (Hodgson, J.), the court held that operation of a

landfill is not ultrahazardous because "[s]tate and regulatory schemes suggest that these [disposed] materials do not pose a hazard if handled properly." *Id.* at *20-21 (citing Conn. Gen.Stat. §§ 22a-114 through 134q). Judge Hodgson articulated that conclusion three times in consideration of the *Accashian* litigation. *See* 1999 Conn. Super LEXIS 59, at *7-8 (Conn.Super.Jan.8, 1999); 2000 Conn.Super. LEXIS 168, at * 4 (Conn.Super.Ct. Jan. 27, 2000); and 1999 Conn.Super. LEXIS 36, *supra,* injury," *id.* at *17.

Other courts have reached the same conclusion with respect to storage of hazardous materials. See, e.g., *Goodrich v. Jennings,* No. 150074, 1997 Conn.Super. LEXIS 1399, at *7-8, 19 Conn. L. Rptr. 542 (Conn.Super.Ct. May 22, 1997) (Mintz, J.) (storage of gasoline in an underground tank is not an ultrahazardous activity); *Nielsen v. Sioux Tools, Inc.,* 870 F.Sup. 435, 442 (D.Conn.1994) (refusing to impose strict liability for leaking underground tank); *Arawana Mills Co. v. United Techs. Corp.,* 795 F.Sup. 1238, 1251 (D.Conn.1992) ("I am persuaded that if given the opportunity to expand the narrowly-construed concept of 'ultrahazardous' or ' abnormally dangerous' activity to storage and use of hazardous wastes, the Connecticut Supreme Court would decline to do so"); *Bernbach v. Timex Corp.,* 989 F.Sup. 403, 407 (D.Conn.1996) (declining to extend strict liability to the handling of hazardous wastes).

The plaintiffs allege that the disposal of toxic and hazardous materials was an ultra-hazardous activity, subjecting persons coming into contact with said substances and materials to a severe risk of personal injury, regardless of the degree of caution they might have exercised. *8 (Sixth Count, ¶ 62.) In other words, they plead that the OSL should be found to be ultrahazardous because it involved materials that would cause severe harm to those who come into contact with the materials, regardless of the care exercised by such people prior to coming into contact with the harmful materials. That is not the test for determining whether an activity is ultrahazardous in Connecticut. Rather, Plaintiffs must plead and prove that a landfill cannot be operated safely regardless of the exercise of due care by the landfill operator. This proposition has been rejected in Connecticut. See *Accashian, supra,* 1999 Conn.Super. LEXIS 36, at *20-21 ("State and federal regulatory schemes suggest that these materials do not pose a hazard if handled properly." (citing Conn. Gen.Stat. §§ 22a-114 through 134q)). There is simply no basis for an argument, in 2002, that landfills will probably cause harm even where operated in accordance with appropriate operating procedures and regulations.

Strict liability applies only to activities that entail an obvious risk of probable harm, under the theory that a defendant who chooses to engage in such obviously dangerous activity must be prepared to pay compensation for any resultant harm. The doctrine is inapplicable to a circumstance in which an activity was not known to be dangerous at the time it was undertaken but is only alleged to have been dangerous years after the fact.

The Connecticut Supreme Court explained the doctrine as follows:

In all of these situations *danger may be foreseen by reasonable men,* as possible if not probable, but the risks to others are not by the ordinarily prudent man, regarded as unreasonable. It is precisely these conditions which give rise to the doctrine of strict liability.

*Whitman Hotel Corp. v. Elliott & Watrous Eng' g Co.,*137 Conn. 562, 567, 79 A.2d 591 (1951) (emphasis added). In such a situation,

[a] person who uses an intrinsically dangerous means to accomplish a lawful end, in such a way as will necessarily or obviously expose the person of another to the danger of probable injury, is liable if such injury results, even though he uses all proper care.

*Id.* at 565.

Indeed, in all circumstances in which strict liability has been applied by Connecticut' s appellate

level courts, the danger was obvious to the defendant at the time of the disputed action. In *Caporale,* the defendant drove heavy steel piles with a pile driver for four months within seventy-five feet of the plaintiff's concrete-block buildings, and "actually anticipated [the potential damage] when it inspected premises nearby before it began work." 149 Conn. at 85-86. In *Whitman Hotel,* the defendant "discharged many hundreds of blasts of ... dynamite ... in close proximity to a number of compactly located business buildings." 137 Conn. at 564. In *Green,* the defendant's employees were experimenting with explosives 25 Conn.App. at 481.

*9 The case at bar presents an entirely different situation. Plaintiffs allege that Southington disposed of material at the OSL, or permitted the same, from 1920 to 1967. Plaintiffs plead no facts to support any allegation that Southington knew during the operation of the OSL that such disposal posed a risk. Plaintiffs concede that the area around OSL was undeveloped when materials were dumped there. (Complaint, First Count,¶¶ 13-14.) By the plaintiffs' own admission, Southington did not learn until 1979--12 years after OSL closed--that OSL "was contaminated by hazardous wastes" (Complaint, First Count, ¶¶ 12, 46); Southington did not learn until after 1979 that chemical runoff from OSL could be contaminating some adjoining properties (Complaint, First Count, ¶ 48). Plaintiffs claim that because landfill operations have *subsequently* been found to be potentially dangerous, strict liability should attach to actions taken as much as 80 years ago, at a time when such alleged danger was unknown. There is no Connecticut appellate authority for the proposition that strict liability can attach on the basis of actions that were not known to be dangerous at the time they were undertaken.

Landfills can be operated safely if due care is exercised, and strict liability cannot be appropriately applied to conduct not known to be dangerous at the time it is undertaken. Therefore, the Sixth Count, alleging strict liability, is ordered stricken.

### Fraud Claim

Connecticut General Statutes § 52-557n provides:

(a)(1) Except as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by: (A) The negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties; (B) negligence in the performance of functions from which the political subdivision derives a special corporate profit or pecuniary benefit; and (C) acts of the political subdivision which constitute the creation or participation in the creation of a nuisance; provided, no cause of action shall be maintained for damages resulting from injury to any person or property by means of a defective road or bridge except pursuant to section 13a-149. (2) Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by: (A) Acts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or wilful misconduct; or (B) negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law.

Contrary to the plaintiffs' argument, the statute provides for municipal liability for the negligent acts of its employees in the performance of proprietary functions. However, it explicitly prohibits municipal liability for the fraudulent or wilful acts of its employees, without reference to whether those acts are incidental to the provision of proprietary or discretionary services. Based on the foregoing the Motion to Strike the Seventh Count is granted.

### Prayers for Relief

*10 In their prayer for relief the plaintiffs seek punitive and exemplary damages, attorneys fees, and expert witness fees. Punitive and exemplary damages are not recoverable in Connecticut in

the absence of proven "wanton or willful malicious misconduct." *Fidelity & Deposit Co. of Md. v. Bradley,* No. CV-94-0544726, 1997 Conn.Super. LEXIS 3473, at *14-15 (Conn.Super.Ct. Dec. 22, 1997) (Mulcahy, J.) (citing *Markey v. Santangelo,* 195 Conn. 76, 77, 485 A.2d 1305 (1985)). A plaintiff seeking to recover such damages must prove that injury was "inflicted intentionally without just cause." *Fidelity, supra.* Attorneys fees are typically not recoverable absent statutory or contractual authorization, although attorneys fees may be awarded as a component of punitive damages where a defendant engaged in "reckless indifference to the rights of others or an intentional and wanton violation of those rights." *Id.*

Here, the plaintiffs allege negligence (Counts One, Two and Eight), diminution in value (Count Three), nuisance (Count Four), trespass (Count Five) and strict liability (Count Six) against Southington. None of these counts alleges the type of wilful injury that might support recovery of punitive damages or attorneys fees. Only the fraud claim (Count Seven) is legally capable of supporting an award of punitive or exemplary damages or attorneys fees. However, that Count has been ordered stricken. Therefore, the plaintiffs'  claims for relief dependent on the fraud claim are ordered stricken. To the extent that the plaintiffs seek to recover expert witness fees as an element of punitive damages, the plaintiffs'  claim for such relief is also ordered stricken.

In the fifth, sixth, seventh, eighth and ninth claims in plaintiffs'  prayer for relief, the plaintiffs seek equitable remedies: that the Court order Defendants to "immediately relocate the Plaintiffs" to alternative housing (¶ 5); that the Court order Plaintiffs'  property condemned by eminent domain (¶ 6); that the Court order Defendants to pay for "medical surveillance" (¶ 7); that the Court order Defendants to offer Plaintiffs a "reasonable purchase price" for their home (¶ 8); and that Southington return to Plaintiffs certain taxes they have paid (¶ 9).

An injunction is an "extraordinary remedy" that is not available unless a plaintiff alleges and proves "irreparable harm and lack of an adequate remedy at law." *City of Hartford v. American Arbitration Ass' n,* 174 Conn. 472, 476, 391 A.2d 137 (1978). The nature of the plaintiffs'  claims are such that the court cannot presently rule out the need for extraordinary remedies. Therefore, the court declines to strike the fifth, sixth, seventh, eighth and ninth claims in plaintiffs'  prayer for relief.

Conn.Super.,2002.

Vaillancourt v. Town of Southington

2002 WL 1041381 (Conn.Super.), 32 Conn. L. Rptr. 185

END OF DOCUMENT

*CASE NO. 03-945- PLAINTIFFS' APPENDIX OF UNREPORTED CASES, EXHIBIT 27*
**Voghel v. City of Waterbury**
1999 WL 732984 , Conn.Super., Sep 09, 1999
Not Reported in A.2d
Conn.Super.,1999.
Sept. 9, 1999.

MEMORANDUM OF DECISION

VERTEFEUILLE.

*1 The plaintiffs bring this action alleging that the negligence of the defendants in the

maintenance of the City of Waterbury sanitary sewer system caused a sewer backup that substantially damaged the plaintiffs' home. The plaintiffs Laurent and Irene Voghel were the owners of a single family home at 214 Clough Road, Waterbury in August of 1994, when the sewage backup occurred. The defendants are the City of Waterbury and Robert Carroll, the superintendent of the Waterbury street department, Ronald Jennings, supervisor of the Waterbury sewage department, and Ernest Phillips, supervisor of the Waterbury engineering department. The defendants deny that they were negligent. They also filed two special defenses contending that they are immune from liability under the common law doctrine of governmental immunity and under General Statutes § 52-557n(2)(B).

On August 21, 1994, after it had rained heavily for much of the day, the plaintiffs arrived at their home after having dinner out to find that the first floor and basement of their home were inundated with a substantial amount of sewage, which included human excrement, mud, water, twigs, sticks and debris. The sewage entered the home through the first floor bathroom sink, toilet and shower head under great pressure. The home was filled with a horrible smell from the sewage. The plaintiffs' home and its contents were significantly damaged.

The parties disagree as to the cause of the sewage backup. Clough Road is served by a sanitary sewer line, but is not served by a stormwater drainage sewer. The plaintiffs contend that two stormwater catch basins in Clough Road near their home improperly emptied stormwater into the sanitary sewer line in Clough Road, causing an overload of the sanitary sewer pipe and a partial blockage of the sanitary sewer line, which in turn caused the sewage to back up into the plaintiffs' home. The plaintiffs' engineering expert was Kenneth Black, a consulting civil engineer with experience in water resource engineering and sewer hydraulics. Black has B.S., M.S. and Ph.D degrees in civil engineering and taught engineering at the college level for over ten years.

Black testified that it is a poor engineering practice to have storm drains connect to sanitary sewer lines. Such connections do exist in many cities, but the better practice, he said, is to reconnect stormwater drains to a stormwater sewer or to abandon the old drains and build a new storm drainage system. Article V of the Waterbury sewer ordinance prohibits the connection of stormwater drainage to any sanitary sewer. One of the significant problems with the connection of stormwater drains to a sanitary sewer line is the possibility of overwhelming the normally small, 8 to 10 inch sewer pipe with a large amount of stormwater and the sticks and leaves that enter catch basins and cause blockages in small pipes. Stormwater drainage pipes, Black testified, are usually at least 15 to 18 inches wide to accommodate these blockages and large amounts of stormwater.

*2 On September 16, 1994, approximately one month after the sewage backup at the plaintiffs' home, Black examined the stormwater catch basins on Clough Road that were closest to the plaintiffs' house. By using a technique called smoke testing, he determined that the two catch basins closest to the plaintiffs' home, referred to as "A" and "B," were connected to the sanitary sewer line and that they were clean, operable and unobstructed.

He then examined the many photographs that the plaintiffs had taken of the sewage in their home. He saw considerable fecal material as well as sticks, leaves and debris, which demonstrated in his opinion that there was a sewer backup involving stormwater from the catch basins. Black testified that it was his opinion that the sewage backup in the plaintiffs' home was caused by the entry of a large volume of stormwater into the small sewer pipe in Clough Road, aggravated by the sticks and leaves, which caused a partial blockage of the sanitary sewer that was hydraulically released through the sewer connection to the plaintiffs' home. He further stated

that the connection of catch basins "A" and "B" to the sewer line was a substantial factor in causing the sewage backup.

Black acknowledged that there was some evidence that catch basin B was blocked when examined by others on June 3, 1994 and stated that if it remained blocked on August 21, 1994, the stormwater that entered catch basin A alone would have been sufficient to overwhelm the sewer line. Catch basin A was the one located closest to the plaintiffs' home. With reference to two catch basins further uphill on Clough Road, known as "C" and "D," which were connected to a storm sewer line in an intersecting street, he testified that the water from an intense storm could flow past C and D because of the steep grade in the road as it extends downhill past C and D. He concluded his testimony by stating that the sewage backup would not have occurred if catch basin A were not connected to the sanitary sewer line.

The defendants also presented expert engineering testimony. Their expert was Bruce Kirkland, a consulting engineer with a B.S. and M.S. in engineering. Kirkland was employed by Camp, Dresser & McKee, consulting engineers who were hired by the City beginning in July 1992 to perform various tests and analyses concerning the City's sanitary sewer system. In June 1994, before the sewage backup at issue, Camp, Dresser & McKee smoke tested the catch basins on Clough Road and determined that catch basin A was emptying into the sanitary sewer line, that catch basin B was clogged with sand and dirt and that catch basins C and D were properly connected to a storm sewer line in an intersecting street. This information was conveyed to the City in a written report dated July 29, 1994. On August 31, 1994, ten days after the sewage backup at the plaintiffs' home, Kirkland and other Camp, Dresser & McKee representatives examined the Clough Road catch basins once again at the City's request. They found that catch basin A was still emptying into the sanitary sewer line and that catch basin B was now physically plugged with brick and concrete. They also determined that there were no curbs anywhere on Clough Road and that the east side of Clough Road is higher than the west side, where the plaintiffs' home is located. They further found that there was a ditch along the east side of the road that collects water coming down the road and that sump pumps from homes along the east side of the road were still discharging water into the ditch on August 31. Kirkland testified that in his opinion the stormwater entering catch basin A was small in volume because of: (1) the lack of curbing along Clough Road, which leads to water going across lawns; (2) the existence of the ditch; and (3) the fact that catch basin C, also located on the east side, was collecting a large amount of the stormwater going down Clough Road. He further concluded that the amount of stormwater entering the system from catch basin A was smaller than the capacity of the sewer line and catch basin A therefore was not the cause of the sewer backup at the plaintiffs' home. He also acknowledged that Camp, Dresser & McKee had recommended the removal of catch basins A and B because they are inefficient and do not serve any function relating to stormwater drainage.

*3 On cross examination, Kirkland admitted that it is improper to connect stormwater catch basins to a sanitary sewer line and that such connections violate the City's sewer ordinance. He further admitted that he did not know what caused the sewer backup into the plaintiffs' home because he was not asked to determine the cause. His opinion was limited to the role of catch basin A in the sewer backup. Kirkland admitted that Clough Road is "crowned," meaning that the center of the road is highest and the road slopes down toward both sides, and that catch basin A is at the edge of the east side of the road. He also admitted that the lawns on the east side slope toward catch basin A. Although initially evasive, he did concede that if sticks and twigs were found in the plaintiffs' home as part of the sewage backup, they most probably entered the sewer

line from a catch basin.

The court found Black's testimony far more persuasive than Kirkland's. Black's analysis was comprehensive and plausible. Kirkland's analysis, limited as it was to the role of catch basin A in the sewage backup and lacking an opinion as to the cause of the sewage backup, was considerably less persuasive. Furthermore, photographs submitted into evidence showed that water traveling down the east side of Clough Road would be funnelled toward catch basin A, not dissipated in the area around it as Kirkland concluded. The court credits Black's testimony and finds that the sewage backup was caused by a large volume of stormwater as well as sticks and leaves entering the sewer line from catch basin A, and perhaps catch basin B as well, which overwhelmed the sewer line and caused a blockage of it that led to the sewage backup into the plaintiffs' home.

The court further finds that it is a poor engineering practice for catch basins to be connected to a sanitary sewer line, that such connections are in violation of Waterbury's sewer ordinance and that the City was aware in May 1993, if not earlier, that catch basins A and B on Clough Road were connected to the sanitary sewer line. The defendant Ernest Phillips, the city engineer, testified that after catch basins C and D were installed in May 1994, he intended to plug up catch basins A and B, which he called "Mickey Mouse catch basins." The defendants were negligent in failing to disconnect catch basins A and B from the sanitary sewer line, and that failure was a substantial factor in causing the sewage backup at the plaintiffs' home. (The parties have consistently treated all of the defendants together for liability purposes; neither side has separately analyzed the liability of the individual defendants.)

The defendants contend in their first special defense that they are immune from liability under the common law doctrine of governmental immunity. (The defendants failed to brief their claim of immunity under General Statutes § 52-557n(2)(B) and their second special defense based on that statute is therefore deemed abandoned. *Collins v. Goldberg,* 28 Conn.App. 733, 738, 611 A.2d 938 (1992).) A municipality and its employees have a qualified immunity when performing discretionary governmental duties. *Evon v. Andrews,* 211 Conn. 501, 505, 559 A.2d 1131 (1989). They are not immune, however, in the performance of ministerial acts, which are duties to be performed in a prescribed manner without the exercise of judgment or discretion. *Id*.

*4 In a case where the City of Waterbury was the defendant, our Supreme Court ruled, "[T]he work of constructing drains and sewers, as well as that of keeping them in repair, is ministerial, and the municipality is responsible for negligence in its performance." *Spitzer v. Waterbury,* 113 Conn. 84, 88, 154 A. 157 (1931). Waterbury was not found liable in the *Spitzer* case because the plaintiffs' claim was that the drains and sewers were not adequate for an extraordinary storm or flood, as opposed to ordinary weather conditions. There is no dispute in this case that the rain storm that occurred on August 21, 1994 was within the range of ordinary weather conditions. The defendants therefore are liable for those damages that were proximately caused by their negligence. The court finds for the plaintiffs on the defendants' first special defense.

With respect to damages, the court notes that the Voghels claim damages for all of the consequences suffered as a result of the sewage backup. Their claim includes a subrogation claim for the benefit of their insurance carrier, Atlantic Mutual, which was represented by separate counsel at trial. Counsel for both the Voghels and Atlantic Mutual stipulated at trial that the court need not enter judgment for separate amounts as between the Voghels and their carrier. Counsel for those parties represented that they would agree to an allocation of the damages awarded as between the Voghels and their insurer. The defendants' repeated objections to damages claimed by the plaintiffs on the ground that the plaintiffs were compensated by the

insurer are therefore without merit; counsel for the defendants fails to recognize that Atlantic Mutual is making a subrogation claim.

The first item of damages claimed by the sellers is $37,281 for the loss in the fair market value of their home as a result of the sewage backup. There is no dispute that the fair market value of the home on August 21, 1994, prior to the sewage damage, was $140,000. After the backup and repairs to the house, the plaintiffs placed their home on the market. They informed each prospective purchaser about the sewage backup. The home was sold by the plaintiffs in March 1996 for $110,000, from which the plaintiffs received net proceeds of $102,719. They seek judgment for the difference between the fair market value of the home prior to the backup and the net proceeds they received, which is $37,281.

The defendants contend that there is no evidence that the loss in value of the home was the result of the sewage backup; they claim it could have been attributable to "market forces" between August 1994 and March 1996. Given that the plaintiffs told each prospective purchaser about the sewage damage, the court infers that this disclosure had a negative impact on the value of the home and the decrease in value was attributable to the sewage damage caused by defendants' negligence. The defendants also argue that the plaintiffs should be awarded only $30,000, the difference between the original fair market value, $140,000, and the later sales price, $110,000, without a deduction for expenses of sale. The court agrees and awards the plaintiffs $30,000 for the loss in value of their home.

*5 With respect to the contents of the home, the plaintiffs stated in their brief that they seek damages of $51,128.82, the actual cash value of the contents that were lost plus 6% sales tax and 5% for debris removal. Kenneth Ursaki, a public adjuster retained by the plaintiffs, testified that he estimated the actual cash value of the contents at $48,500; however, Atlantic Mutual paid the plaintiffs only $38,491. The court credited Ursaki's testimony. The court awards the plaintiffs damages for the actual value of the lost contents plus sales tax and debris removal in the amount of $51,128.82.

The plaintiffs also claim as damages the expenses of their unoccupied Clough Road home from August 21, 1994, the date of the backup, to March 1, 1996, when the property was sold. Included in the claim are such items as utility bills, real estate taxes, liability insurance and lawn maintenance. The defendants contest the propriety of an award of such damages. The plaintiffs have cited two cases in support of this claim, *Scovill v. Ronalter,* 162 Conn. 67, 76, 291 A.2d 222 (1971) and *Housing Authority v. Lustig,* 139 Conn. 73, 76, 90 A.2d 169 (1952). Neither of these cases supports the plaintiffs' claim. The court declines to award damages relating to the unoccupied Clough Road home because the plaintiffs are also seeking an award of damages for their living expenses at the condominium they rented from October 1994 until April 30, 1996, when they moved into a new home. If the sewage backup had not occurred, the plaintiffs would have incurred the expenses they seek for their Clough Road home while they lived there. The occurrence of the sewer backup does not give rise to a valid claim to be compensated for both their living expenses at the condominium and the ongoing expenses for Clough Road. Such a result would constitute a double recovery, leaving the plaintiffs wholly free of any obligation to pay for any of their living expenses during the period between the sewage backup and the sale of the Clough Road home.

The plaintiffs also seek damages of $19,462.67 for their living expenses at a rented condominium, including rent, utilities and moving expenses from October 1994 until April 30, 1996. (Until October 1994, the plaintiffs lived at their daughter's home.) The defendants contest compensation for the condominium expenses for any period after May 31, 1995. However, there

was no evidence that the Clough Road home could have been inhabited once again as of that date. A report obtained by the plaintiffs in August 1995 recommended that further work be done to insure that all contamination was removed, so the court finds that the house was not fit for occupation in August. Given that the plaintiffs did not settle with their insurance carrier, Atlantic Mutual, until October 1995, it was only then that they had the financial ability to investigate the purchase of a new home. It is not unreasonable that it took six months to consummate the sale of a new home. The court awards damages of $19,462.67.

*6 The plaintiffs also contend that they paid certain cleaning and other expenses for which they seek compensation. These bills include bills for cleaning the plaintiffs' clothing, cleaning their home and testing the home for contamination. The court finds these expenses were reasonably incurred and awards the full amount claimed, $12,330.76.

The plaintiffs' next claim is for the 10% fee that they paid to the adjuster they retained to negotiate on their behalf with Atlantic Mutual, the plaintiffs' insurer. The fee paid was $9,543.95. The plaintiffs have cited no precedent for awarding an adjuster's fee as an item of damages with respect to a negligence claim. The defendants oppose an award of the fee as damages, contending that an adjuster's fee is analogous to an attorneys fee, which generally is not recoverable as damages unless a statutory or contractual provision provides for such an award. _Raph v. Vogeler,_ 45 Conn.App. 56, 65, 695 A.2d 1066 (1997).

An adjuster's fee is substantially analogous to an attorneys fee on the facts of this case. The plaintiffs were free to negotiate their claim directly with their insurance carrier, but they elected to hire and pay an appraiser to act on their behalf. Likewise, the plaintiffs could have brought this action pro se, but instead decided to hire and pay counsel to represent them. Given the absence of any authority supporting an award of the adjuster's fee as damages, the court declines to make such an award.

The final item of damages claimed by the plaintiffs is damages for the emotional distress that the plaintiffs experienced in seeing their home of twenty years, and much of its contents, substantially damaged by sewage. The test for an award of damages for unintentional infliction of emotional distress is well established. Such damages can be awarded if the defendants should have realized that their conduct involved an unreasonable risk of causing emotional distress and that such distress might result in illness or bodily harm. _Barrett v. Danbury Hospital,_ 232 Conn. 242, 260, 654 A.2d 748 (1995). This test was first established in Connecticut in _Montinieri v. Southern New England Telephone Co.,_ 175 Conn. 337, 398 A.2d 1180 (1978). In _Barrett,_ our Supreme Court interpreted the first part of the _Montinieri_ test as requiring "that the fear or distress experienced by the plaintiffs be reasonable in light of the conduct of the defendants. If such a fear were reasonable in light of the defendants' conduct, the defendants should have realized that their conduct created an unreasonable risk of causing distress, and they therefore would be held liable." _Barrett v. Danbury Hospital, supra,_ 232 Conn. 261.

The facts concerning the plaintiffs' damages for emotional distress are as follows. The plaintiffs lived in their home on Clough Road for approximately twenty years and raised all ten of their children there. Mr. Voghel, who was semi-retired, was a builder and kept a home office in the house. Mrs. Voghel was a homemaker who enjoyed taking care of their home and babysitting their grandchildren. When they arrived home on August 21, 1994 they found the first floor of the house saturated in water and sewage about one and one-half inches deep. The sewage and water left water marks as high as three inches deep, but the water was draining down into the basement when they arrived. A disgusting odor permeated the interior of the home. Sewage was splattered five to six feet high in the shower. Excrement and toilet paper adhered to walls, carpets and

floors. Many irreplaceable items were destroyed--photographs of the Voghels' children when young, photographs of the Voghels' parents, artwork that the children had done, and similar items. Mrs. Voghel was so distressed that she could not re-enter their home for four months. After the house had been thoroughly cleaned, she still could not tolerate the residual odor in the home and the memory of its condition after the sewage backup. The plaintiffs therefore decided to sell the house and purchase a different one. Mrs. Voghel still gets headaches and weeps when she remembers the Clough Road house and the sewage backup.

*7 The court finds that the severe distress experienced by the plaintiffs was reasonable in light of the defendants' negligence. The defendant city engineer testified that he had seen dozens of sewer backups during his career and that although the basement of a home usually suffers the most damage, in the Voghels' case, the first floor living quarters suffered terrible damage. It was reasonably foreseeable that a sewer backup into a home and the ensuing contamination of the home and its contents would cause great emotional distress to the owners. The second factor in the *Montinieri* test is whether the defendants should have known that the distress caused by their negligence might result in illness or bodily harm. *Montinieri v. Southern New England Telephone Co., supra,* 175 Conn. 345. Proof of an ensuing bodily injury, however, is not required. *Id.* The court finds that the defendants should have known that the severe distress experienced by the plaintiffs might result in illness or bodily harm. It is, of course, difficult to measure emotional distress and to award fair and reasonable damages for it. The plaintiffs seek damages of $150,000 for each of them for emotional distress. Having listened carefully to the testimony of both plaintiffs and having examined the numerous photographs that show the extent of the sewage backup into the plaintiffs' home, the court awards the plaintiff Irene Voghel damages of $25,000 for negligent infliction of emotional distress and the plaintiff Laurent Voghel damages of $20,000 for negligent infliction of emotional distress.

Judgment is entered for the plaintiffs against the defendants for compensatory damages of $157,922.25. The file reveals that on September 25, 1998, the plaintiffs filed an offer of judgment for $105,000, which was not accepted by the defendants. Therefore, the plaintiffs are also awarded interest at the rate of twelve per cent per year on the amount of the judgment from September 25, 1998 until the date of the entry of judgment.

Conn.Super.,1999.

Voghel v. City of Waterbury

1999 WL 732984 (Conn.Super.)

END OF DOCUMENT

**CASE NO. 03-945- PLAINTIFFS' APPENDIX OF UNREPORTED CASES, EXHIBIT 28**
**Walker v. Barrett**

1999 WL 1063189, 25 Conn. L. Rptr. 665 , Conn.Super., Nov 08, 1999

Not Reported in A.2d

Conn.Super.,1999.

Nov. 8, 1999.

MEMORANDUM OF DECISION RE: MOTION TO STRIKE

D' ANDREA.

*1 The plaintiffs, Anne and George Walker, ("Plaintiffs"), are owners of real property, ("Property"), located at 30 Peach Hill Road in Darien, Connecticut. The property was formerly owned and sold to the plaintiffs by the defendants, Barbara and David Barrett, ("defendants"). The gravamen of the plaintiffs' complaint is that the defendants, prior to conveying the property to the plaintiffs, concealed sewage system problems with the property by running a pipe from an allegedly failing septic system to a storm drain, thereby emitting waste into the storm drain. Moreover, the plaintiffs contend that the defendants allegedly checked off the "no" box in a disclosure statement which specifically asked if there were any sewage system problems with the property. The plaintiffs allege that they relied on the aforementioned representation in executing the contract for purchase of the property. The plaintiffs are now allegedly faced with replacing the septic system as per a Health Department order.

In their amended complaint the plaintiffs allege causes of action for fraudulent misrepresentation (count one), negligent misrepresentation (count two), unjust enrichment (count three), breach of the Connecticut Unfair Trade Practices Act, ("CUTPA") (count four), negligence per se (count five), private nuisance (count six), and a violation of General Statutes § 22a-452 (count seven). The defendants now move to strike counts four through seven of the plaintiffs' amended complaint.

"The motion to strike ... replaced the demurrer in our practice. Its function, like that which the demurrer served, is to test the legal sufficiency of a pleading." (Internal quotation marks omitted.) *RK Constructors, Inc. v. Fusco Corp.,* 231 Conn. 381, 384, 650 A.2d 153 (1994). "The purpose of a motion to strike is to contest ... the legal sufficiency of the allegations of any complaint ... to state a claim upon which relief can be granted." (Internal quotation marks omitted.) *Peter-Michael, Inc. v. Sea Shell Associates,* 244 Conn. 269, 270, 709 A.2d 558 (1998). "[F]or the purpose of a motion to strike, the moving party admits all facts well pleaded." *RK Constructors, Inc. v. Fusco Corp., supra,* 231 Conn. 383 n. 2; see also *Ferryman v. Groton,* 212 Conn. 138, 142, 561 A.2d 432 (1989). Moreover, "[t]he court must construe the facts in the complaint most favorably to the plaintiff." (Internal quotation marks omitted.) *Faulkner v. United Technologies Corp.,* 240 Conn. 576, 580, 693 A.2d 293 (1997).

### Count Four

The defendants argue that count four of the plaintiffs' amended complaint sounding in CUTPA should be stricken because CUTPA does not apply to the one time sale of property as between two parties not engaged in the business of selling real estate. The plaintiffs argue in opposition that, as correctly noted by the defendants, there is a split of authority as to the issue of CUTPA's applicability to the one time sale of houses by people not engaged in the business of selling real estate. Moreover, both parties acknowledge that the Connecticut Appellate Court has yet to rule on this issue.

*2 This court aligns itself with those Superior Court decisions which have held that a single act will not constitute a CUTPA violation if the actor is an individual not engaged in a trade or business, such as situations involving the one time sale or rental of a house by an individual not engaged in the business of selling or renting houses. See *Boyce v. Canby,* Superior Court, judicial district of Stamford/Norwalk at Stamford, Docket No. 153623 (February 27, 1998) (*Lewis, J.*); *McCarthy v. Fingelly,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 268839 (May 28, 1991) (*Katz, J.*) (4 C ONN. L. RPTR. 177, 6 CSCR 623); *Skinner v. Till,* Superior Court, judicial district of New London at New London, Docket No. 514857

(April 16, 1991) (3 CONN. L. RPTR. 481, 6 CSCR 511); but see *Jamison v. Artinian,* Superior Court, judicial district of New London at New London, Docket No. 507709 (March 28, 1989) (*Hendel, J.*) (4 CSCR 387) (finding that CUTPA should be construed liberally to include causes of action for the one-time sale of houses by persons not engaged in the trade or business of selling houses).

In *Boyce v. Canby, supra,* Superior Court, Docket No. 153623, the court found that "an isolated private sale of real estate by one not in the business of doing so, is not encompassed within the trade or commerce language of the CUTPA statute § 42-110b." (Internal quotation marks omitted.) Moreover, "[i]n order to allege a CUTPA violation properly, the plaintiff must allege, inter alia, that the acts complained of were performed in a ' trade or business.'  See General Statutes § 42-110b; *Web Press Services Corporation v. New London Motors, Inc.,* 203 Conn. 342, 354, 525 A.2d 57 (1987)." *Quimby v. Kimberly Clark Corporation,* 28 Conn.App. 660, 669, 613 A.2d 838 (1992). Here, the plaintiffs have made no allegations that the defendants were engaged in the trade or business of selling real estate. Further, no facts have been alleged which show that the defendants habitually bought and sold houses for profit as one would do in a business. Consequently, the plaintiffs have not pled a sustainable CUTPA cause of action. The defendants'   motion to strike count four is, therefore, granted.

Count Five

The defendants correctly argue that count five of the plaintiffs'   amended complaint sounding in a violation of General Statutes § 22a-427 should be stricken because a private right of action is impermissible pursuant to the statute. [FN1] The plaintiffs argue in opposition that an allegation of negligence per se is a recognized exception to the rule not allowing a private right of action pursuant to General Statutes § 22a-427. Consequently, the issue presented is not whether a private right of action is sustainable pursuant to § 22a-427, but rather, whether a private right of action is sustainable when negligence per se is alleged.

> FN1. General Statutes § 22a-427 of the Water Pollution Control Act, ("WPCA"), provides that "[n]o person or municipality shall cause pollution of any of the waters of the state or maintain a discharge of any treated or untreated wastes in violation of any provision of this chapter." See also *Wiehl v. Dictaphone Corporation,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 306492 (January 13, 1994)

> (*Maiocco, J.*) (10 CONN. L. RPTR. 591) (finding that § 22a-427 does not create a private right of action).

*3 There is a split of authority as to cases sustaining negligence per se actions pursuant to General Statutes § 22a-427. Some Superior Courts have rigorously applied a two-prong test finding a negligence per se action sustainable pursuant to the statute where *inter alia* allegations of state water pollution have been made. See *Goodrich v. Jennings,* Superior Court, judicial district of Stamford/Norwalk at Stamford, Docket No. 150074 (May 22, 1997) (*Mintz, J.*) (19 CONN. L. RPTR. 544). "In order to utilize the principle of negligence per se the plaintiffs must satisfy a two-prong test: (1) that the plaintiffs were within the class of persons protected by the statute; and (2) that the injury suffered is of the type that the statute was intended to prevent." (Internal quotation marks omitted.) *Id*. See also *Connecticut Light & Power Co. v. Knight,*

Superior Court, judicial district of Windham at Putnam, Docket No. 033646 (June 16, 1988) (*Noren, J.*) (3 CSCR 600) (finding a cause of action for negligence per se sustainable under § 22a-427 where the persons are within the class of persons the statute intended to protect and where the injury suffered is that which the statute intended to prevent); but see *The Connecticut Water Co. v. Thomaston,* Superior Court, judicial district of Hartford at Hartford, Docket No. 535590 (March 4, 1996) (Corradino, J.) (16 CONN. L. RPTR. 213) (finding that a violation of § 22a-427 does not constitute negligence per se).

In this case the plaintiffs have alleged sufficient facts to satisfy the two- prong test necessary to bringing a negligence per se action. First, as inhabitants of the state the plaintiffs are within the class of persons protected by the statute. See *Goodrich v. Jennings, supra,* Superior Court, Docket No. 150074, 19 CONN. L. RPTR. 544. Second, the statute is aimed at protecting the citizens of this state from the alleged injury, namely the contamination of state water through septic tank overflow into the storm drain. Consequently, the plaintiffs have properly pled a sustainable negligence per se cause of action pursuant to § 22a-427. The defendants' motion to strike count five is, therefore, denied.

### Count Six

The defendants argue that count six of the plaintiffs' amended complaint sounding in nuisance should be stricken because causes of action sounding in private nuisance only apply as to neighboring property. The plaintiffs argue in opposition that causes of action sounding in private nuisance are not limited to situations involving neighboring property and, in fact, can be maintained by a successor in interest against the predecessor in interest.

Connecticut state law is clear that causes of actions sounding in nuisance are limited to recovery for damages caused by an activity on neighboring land. See *Wiehl v. Dictaphone Corporation,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 306492 (January 13, 1994) (*Maiocco, J.*) (10 CONN. L. RPTR. 591); *B & D Molded Products v. Vitek Research,* Superior Court, judicial district of Ansonia/Milford at Milford, Docket No. 060362 (August 17, 1998) (*Corradino, J.*) (23 CONN. L. RPTR. 90). The plaintiff, however, cites to two federal cases which reasoned that a private nuisance action is sustainable against a predecessor in interest where, defects in the property are not discoverable through reasonable inspection and the predecessor in interest is chargeable with knowledge of the defect. See *Cornerstone Realty, Inc. v. Dresser Rand Co.,* 993 F.Supp. 107, 113 (D.Conn.1998); *Nielsen v. Sioux Tools, Inc.,* 870 F.Supp. 435, 443 n. 12 (D.Conn.1994). This court is, however, reluctant to apply the federal courts' reasoning to the present set of facts because the court, in both cited federal cases, ultimately found that the specific facts in their cases did not warrant an exception to the general rule requiring that a nuisance action be brought against an occupier of neighboring land. Absent further guidance by the federal courts in Connecticut, this court confines its ruling on the issue to established Connecticut state law which holds that actions in nuisance can only be brought against persons occupying neighboring land. See *Wiehl v. Dictaphone Corporation, supra,* Superior Court, Docket No. 306492, 10 CONN. L. RPTR. 591; *B & D Molded Products v. Vitek Research, supra,* Superior Court, Docket No. 060362, 23 CONN. L. RPTR. 90. The defendants' motion to strike count six is, therefore, granted.

### Count Seven

*4 The defendants argue that count seven of the plaintiffs' amended complaint sounding in violation of the Water Pollution Control Act, ("WPCA"), General Statutes § 22a-452, should be stricken because § 22a-452 does not provide reimbursement for the cleanup of domestic sewage. The plaintiffs argue in opposition that domestic sewage is hazardous waste pursuant to the

statute, therefore, entitling them to recovery.

General Statutes § 22a-452(a) provides in relevant part that "[a]ny person, firm, corporation or municipality which contains or removes or otherwise mitigates the effects of oil or petroleum or chemical liquids or solid, liquid or gaseous products or hazardous wastes resulting from any discharge, spillage, uncontrolled loss, seepage or filtration of such substance or material or waste shall be entitled to reimbursement from any person, firm, or corporation ... if such oil or petroleum or chemical liquids or solid, liquid or gaseous products or hazardous wastes pollution or contamination or other emergency resulted from the negligence or other actions of such person, firm or corporation."

"In construing a statutory provision, [the court] first look[s] to its language, and if that language is plain and unambiguous, [the court] need look no further for interpretive guidance because we assume that the words themselves express the intention of the legislature." (Internal quotation marks omitted.) *Samperi v. Inland Wetlands Agency,* 226 Conn. 579, 590, 628 A.2d 1286 (1993). Here, it is clear that General Statutes § 22a-452 has nothing to do with domestic sewage. A survey of the cases discussing § 22a-452 has revealed that no court has applied the statute to cases involving domestic sewage. The terms discussed in the statute are *sui generis* with dangerous chemicals that require highly specialized disposal and not regular domestic sewage. Moreover, this court is unwilling to extend the meaning of § 22a-452 to include domestic sewage because no mention of domestic sewage is made in the legislative history to the statute. The defendants'   motion to strike count seven is, therefore, granted.

In summary, the defendants'   motion to strike is granted as to counts four, six and seven, but denied as to count five.

So Ordered.

Conn.Super.,1999.

Walker v. Barrett

1999 WL 1063189 (Conn.Super.), 25 Conn. L. Rptr. 665

END OF DOCUMENT

*CASE NO. 03-945- PLAINTIFFS' APPENDIX OF UNREPORTED CASES, EXHIBIT 29*
**Warner v. Kedah Corp.**
1995 WL 573828, Conn.Super., Sep 20, 1995
Not Reported in A.2d
Conn.Super.,1995.
Sept. 20, 1995.

*MEMORANDUM OF DECISION ON DEFENDANTS'   MOTIONS TO STRIKE*

STANLEY, Judge.
*1 On December 2, 1994, the plaintiffs, Alan and Marjorie Warner ("plaintiffs") filed a seven count amended complaint against the defendants, Kedah Corporation ("Kedah"), Cryodyne Technologies, Inc., n/k/a Winthrop Technologies, Inc. ("Winthrop"), and IPC Contel Corporation ("Contel"). Therein, the plaintiffs allege that the defendants'   actions caused the plaintiffs'   well water to become contaminated, resulting in personal injuries to the plaintiffs, as well as damage to their property.

Counts one through three allege claims of nuisance, trespass, and negligence, respectively, against Kedah and Winthrop, while count four alleges a claim of negligence against Contel. Count five alleges a claim of reckless misconduct against Kedah and Winthrop, while count six alleges a claim of reckless misconduct against Contel. Count seven allegedly sets forth a claim for reimbursement for containment or removal costs, pursuant to General Statutes § 22a-452, against all three of the defendants.

The plaintiff's prayer for relief seeks *inter alia:* punitive damages on counts five and six, and reasonable attorney's fees on count seven.

On December 16, 1994, Contel filed a motion to strike count seven of the plaintiffs' amended complaint, and a memorandum of law in support thereof. In response, the plaintiffs filed a memorandum of law in opposition on January 23, 1995.

On March 29, 1995, Kedah and Winthrop filed a motion to strike counts one, five, and seven of the plaintiff's amended complaint, as well as the plaintiff's second and third prayers for relief, and ¶ 14 of the first, second, third, and fifth counts of the plaintiff's amended complaint. Additionally, Kedah and Winthrop, on this same date, filed a memorandum of law in support thereof. On May 25, 1995, the plaintiffs filed a memorandum of law in opposition thereto.

On May 11, 1995, Contel filed an amended motion to strike, seeking to strike ¶ 17 of count four, ¶ 14 of count six, count six in its entirety, and the second and third prayers for relief, as well as count seven. Additionally, Contel filed a memorandum of law, incorporating therein the arguments set forth in Kedah and Winthrop's memorandum of law in support of their motion to strike. In response, on May 15, 1995, the plaintiffs filed a memorandum of law in opposition. Finally, on June 22, 1995, Kedah and Winthrop filed a supplemental memorandum of law in support of their motion to strike.

### DISCUSSION

Pursuant to Practice Book § 152, a motion to strike may be brought to test the legal sufficiency of a complaint or any of its counts. See *Pratt v. Old Saybrook,* 225 Conn. 177, 185, 621 A.2d 1322 (1993). In ruling on a motion to strike, the court must construe the facts in the complaint most favorably to the plaintiff. *Novametrix Medical Systems, Inc. v. BOC Group, Inc.,* 224 Conn. 210, 215, 618 A.2d 25 (1992). This includes the facts necessarily implied and fairly provable under the allegations but does not include, however, the legal conclusions or opinions stated in the complaint. *Westport Bank & Trust Co. v. Corcoran, Mallin & Aresco,* 221 Conn. 490, 495, 605 A.2d 862 (1992). "If any facts provable under the express and implied allegations in the plaintiff's complaint support a cause of action ... the complaint is not vulnerable to a motion to strike." (Citations omitted.) *Bouchard v. People's Bank,* 219 Conn. 465, 471, 594 A.2d 1 (1991).

*2 Generally, a motion to strike must be directed to the legal sufficiency of an entire complaint, count or counterclaim. One or more paragraphs of a complaint or count, however, may be attacked if a separate cause of action is attempted to be stated therein. *Donovan v. Davis,* 85 Conn. 394, 397, 82 A. 1025 (1912). See also *Bourquin v. Melsungen,* 2 Conn.L.Rptr. 372, 373 (September 4, 1990, Miano, J.); *Ahsan v. Olsen,* 3 CSCR 55, 55 (November 9, 1987, Wagner, J.); *Depray v. St. Francis Hospital,* 2 CSCR 691, 691 (June 9, 1987, Dorsey, J.).

### Count One

Kedah and Winthrop argue that count one of the plaintiffs' amended complaint should be stricken, on the ground that said count lacks essential factual allegations which must be plead and proven in order to set forth a legally sufficient claim of nuisance. In response, the plaintiffs argue that, construing the count in the light most favorable to them, they have set forth a legally sufficient claim of nuisance, because they have alleged that the plume of contamination

emanating from the defendants' property is hazardous to the plaintiffs' health, and that this hazardous condition is unreasonable and unlawful.

A nuisance describes an inherently dangerous condition that has a natural tendency to inflict injury upon persons or property. *Quinnett v. Newman,* 213 Conn. 343, 348, 568 A.2d 786 (1990). "The term nuisance refers to the condition that exists and not to the act or failure to act that creates it." Id. In order to prevail on a claim of nuisance, the plaintiff must establish that: (1) the condition complained of had a natural tendency to create danger and inflict injury upon person or property; (2) the danger created was a continuing one; (3) the use of the land was unreasonable or unlawful; [and] (4) the existence of the nuisance was the proximate cause of the [plaintiff' s] injuries and damages.

*Tomasso Bros., Inc. v. October Twenty-Four, Inc.,* 221 Conn. 194, 197, 602 A.2d 1011 (1992); *Heritage Village Master Assn., Inc. v. Heritage Village Water Co.,* 30 Conn.App. 693, 708, 622 A.2d 578 (1993).

In the present case, count one of the plaintiffs' amended complaint alleges, in pertinent part, as follows:

7. On or about July 25, 1991, the Plaintiffs were notified by the State of Connecticut Department of Environmental Protection ("DEP") that their well- water was contaminated by "hazardous substances" identified as numerous chlorinated hydrocarbon compounds....

10. Upon information and belief, the DEP has determined that some or all of the "hazardous substances" found in the Plaintiffs' well-water have been found in a septic system on the Defendants' property including in and around the septic tank and leaching fields and the surrounding soil and in an inactive dug well located within the building of Cryodyne' s facility.

11. Upon information and belief the DEP subsequently determined that a plume of groundwater contamination including some or all of the hazardous substances found in the Plaintiffs' well-water, is emanating from the Defendants' property and spreading to and entering upon the Plaintiffs' property thereby contaminating the Plaintiffs' well-water.

*3 12. The contamination of the Plaintiffs' well-water by the plume of groundwater contamination constitutes a continuing nuisance in that it interferes with the Plaintiffs' enjoyment and use of their property in an unreasonable and/or unlawful manner.

It is true, as the plaintiffs point out, that our Supreme Court has recognized that one may be held liable for polluting underground water, regardless of whether the person causing the same had been negligent in the use of his property. *Swift & Co. v. Peoples Coal & Oil Co.,* 121 Conn. 579, 588-89, 186 A.2d 629 (1936): "A nuisance may grow out of negligence ... but it may exist where *the use a person is making of his property* is not in any respect negligent but nevertheless *results in damage to his neighbor.*" (Emphasis added; citations omitted.) Id.

However, it is equally true, as the defendants point out, that, although the plaintiffs have averred the existence of certain contaminants in the septic system and dug well on the defendants' property and in their well-water, and have further alleged that "a plume of groundwater contamination ... [is] emanating from the defendants' property ...", the plaintiffs have failed to relate one allegation to the other. That is, the plaintiffs have failed to establish that a nexus exists between the contaminants on the defendants' property, and the plume emanating therefrom, because they have not alleged that the plume emanating from the defendants' property is a result of releases in the defendants' septic system or the dug well, or from some other source. Accordingly, the court agrees with the defendants that the plaintiffs have failed to allege a legally sufficient claim of nuisance, and the defendants' motion to strike count one of the plaintiffs' amended complaint is hereby granted.

*Counts Five & Six*

Kedah and Winthrop argue that count five, and Contel argues that count six, should be stricken, on the ground that said counts, which purportedly set forth claims of reckless misconduct, fail to allege facts sufficient to demonstrate that the defendants acted in a wanton, reckless and willful manner. In this regard, the defendants contend that ¶ 12 of count five is virtually identical to ¶ 12(c) of count three, the plaintiffs' negligence count, together with the conclusory statement that such negligence amounts to "wanton, reckless and willful misconduct." The minor differences between the two paragraphs, the defendants argue, are not enough to transform what is essentially a negligence claim into a claim of reckless misconduct. Further, the defendants argue that, in the event that these counts are stricken, the plaintiffs' second prayer for relief, seeking punitive damages based upon counts five and six, should also be stricken.

In response, the plaintiffs argue that counts five and six of their amended complaint should not be stricken because said counts allege that, despite knowing that there was a likelihood of injury to the plaintiffs, the defendants made a conscious choice to allow the contamination to continue. As such, the plaintiffs argue, they have set forth a legally sufficient claim of reckless misconduct.

*4 In Connecticut, reckless and wanton misconduct and negligence are separate and distinct causes of action, each of which has its own unique set of essential elements. *Foxworth v. Juliano,* Superior Court, judicial district of Hartford-New Britain, at Hartford, D.N. 524237 (November 4, 1993, Sheldon, J.), citing *Bordonaro v. Senk,* 109 Conn. 428, 431-32, 147 A. 136 (1929). See also *Warner v. Leslie-Elliott Constructors, Inc.,* 194 Conn. 129, 138, 479 A.2d 231 (1984) (causes of action for negligence and "willful or malicious conduct" are separate and distinct causes of action).

Negligence involves the failure of the actor to exercise the degree of care which a reasonably prudent person would have exercised under similar circumstances. Typically the result of thoughtlessness, inadvertence or an error in judgment, negligence does not require proof that the actor was aware of the likely consequences of his acts, but only that a reasonable person in his position would have been aware of them and attempted to avoid them.

*Foxworth v. Juliano,* supra. Recklessness, by contrast:

is a state of consciousness with reference to the consequences of one's acts. It requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man, and the actor must recognize that his conduct involves a risk substantially greater ... than that which is necessary to make his conduct negligent.

(Citations omitted; internal quotation marks omitted.) *Sheiman v. Lafayette Bank & Trust Co.,* 4 Conn.App. 39, 45, 492 A.2d 219 (1985). " 'Wilful,' ' wanton,' or ' reckless' conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent"; ... thus, "such aggravated negligence must be more than any mere mistake resulting from inexperience, excitement, or confusion, and more than mere thoughtlessness or inadvertence, or simply inattention...." (Citations omitted.) *Dubay v. Irish,* 207 Conn. 518, 533, 542 A.2d 711 (1988). Reckless and wanton misconduct is, therefore, more than negligence and more than gross negligence. Id,. 532.

In light of the above, "[a] plaintiff cannot transform a negligence count into a count for wilful and wanton misconduct merely by appending a string of adjectives to allegations that clearly sound in negligence." (Citations omitted.) *Brown v. Branford,* 12 Conn.App. 106, 110, 529 A.2d 743 (1987). Thus, a complaint purporting to state a cause of action for reckless and wanton misconduct "should employ language explicit enough to clearly inform the court and opposing

counsel that reckless misconduct is relied on." *Brock v. Waldron,* 127 Conn. 79, 81, 14 A.2d 713 (1940).

In the present case, counts five and six of the plaintiffs'  amended complaint allege, in pertinent part, only that the contamination of the plaintiffs'  well- water was caused by the wanton, reckless and willful misconduct of the defendants in that they:

*5 substantially aggravated and exacerbated negligent conduct by failing or refusing to investigate and remediate spills and/or discharges of hazardous substances at 67 Winthrop Road in reckless disregard of the just rights and/or safety of the Plaintiffs and other neighbors who the Defendants knew or in the exercise of reasonable care ought to have known were likely to actively consume, and handle well-water contaminated by said hazardous substances.

Amended Complaint, ¶ 12 of Counts Five and Six. This paragraph is virtually identical to ¶ 12(c) of count three, which alleges that the defendants were negligent:

[i]n that it/they failed to remedy and remediate the contamination emanating from 67 Winthrop Road [the defendants'  business] when it/they knew or should have known that said substances are or are likely to be hazardous to persons living on neighboring properties including the Plaintiffs'  [sic].

Amended Complaint, ¶ 12(c) of Count Three.

Moreover, nowhere in their recklessness counts do the plaintiffs specifically set forth factual allegations to support their claim that the defendants knew, or had sufficient facts before them to know, that their actions involved "a serious danger to others," and that, despite knowledge of this substantial risk, nonetheless proceeded to make a conscious choice to disregard said risk. See, e.g., *Oink, Inc. v. Ann Street Limited Partnership,* 12 Conn.L.Rptr. 547, 548-50 (October 19, 1994, Corradino, J.) (granting defendant'  s motion to strike where the plaintiffs'  complaint failed to allege particular facts or a course of conduct to support their allegation that the defendant acted recklessly or with an actual intention to violate the law, because "[t]he fact that there may have been discharge of waste and that statutes may have been violated does not make the purported wrongdoer a reckless or intentional actor relative to the dangers presented by his or her activities"); *Palmisano v. Caldor, Inc.,* Superior Court, judicial district of Hartford-New Britain, at Hartford, D.N. 443365 (November 5, 1993, Berger, J.) (granting defendant'  s motion to strike where the only allegations in the plaintiff'  s recklessness count, that were not contained in his negligence count, were that the defendant had knowledge of the potential for injury to others and that the alleged negligent acts of the defendant were also willful).

Accordingly, the defendants'  motions to strike counts five and six of the plaintiffs'  amended complaint must be, and are, hereby granted. Additionally, in light of the fact that the plaintiffs concede that the reckless misconduct claim is the only one upon which they may recover punitive damages from the defendants; Amended Complaint, Prayer for Relief, ¶ 2; and in light of the fact that it is axiomatic that the pleadings must allege recklessness for there to be a basis for the recovery of punitive damages; *Markey v. Santangelo,* 195 Conn. 76, 77, 485 A.2d 1305 (1985); the defendants'  motions to strike the plaintiffs'  second prayer for relief, seeking punitive damages, are granted as well. *Varlese v. Beers,* 3 Conn.L.Rptr. 474, 474 (April 4, 1991, Sullivan, J.) (granting motion to strike prayer for relief for double or treble damages because the plaintiff failed to allege specific facts to support a claim of reckless disregard).

### Count Seven

*6 Kedah, Winthrop, and Contel argue that count seven, which seeks reimbursement pursuant to General Statutes § 22a-452, should be stricken, on the ground that said count fails to allege that the plaintiffs expended money to contain, remove or otherwise mitigate the effects of the alleged

contamination, and, fails to allege that the defendants engaged in culpable conduct. Further, the defendants argue that, in the event that said count is stricken, the plaintiffs' third prayer for relief, seeking reasonable attorney's fees based upon count seven, should also be stricken.

In response, the plaintiffs argue that, reading count seven as a whole, it is reasonable to infer that the plaintiffs have incurred costs of mitigation because they still live at the subject property and obviously need potable water to live. As far as culpable conduct is concerned, the plaintiffs argue, they have alleged culpability by virtue of the defendants' failure to clean up the contamination.

General Statutes § 22a-452(a) provides, in pertinent part, that:

Any person, firm, corporation or municipality which contains or removes or otherwise mitigates the effects of oil or petroleum or chemical liquids or solid, liquid or gaseous products or hazardous wastes resulting from any discharge, spillage, uncontrolled loss, seepage or filtration of such substance or material or waste shall be entitled to reimbursement from any person, firm or corporation for the reasonable costs expended for such containment, removal, or mitigation, if such oil or petroleum or chemical liquids or solid, liquid or gaseous products or hazardous wastes pollution or contamination or other emergency resulted from the negligence or other actions of such person, firm or corporation.

Thus, by its very terms, General Statutes § 22a-452(a) allows reimbursement of remediation costs only if a plaintiff has contained, removed or otherwise mitigated contamination. See also *Bristol Shopping Plaza v. Vigilante Cleaners,* Superior Court, judicial district of Hartford-New Britain, at Hartford, Docket No. 338958 (December 1, 1989, Ripley, J.) (General Statutes § 22a-452 "was intended to apply to cost of contamination and to removal of pollutants and not to actions for damages which may or may not be expended for cleanup purposes"); *Connecticut Light & Power Co. v. Knight,* Superior Court, judicial district of Windham at Putnam, Docket No. 33646 (July 23, 1993, Potter, J.) (as a "precondition" to recovery under General Statutes § 22a-452, the language of the statutes "specifically requires that the party seeking reimbursement undertake some action to ' [contain], [remove] or otherwise [mitigate] the effects' of any contamination in order to recover the reasonable costs expended in cleanup efforts").

Moreover, it has also been recognized that a legally sufficient claim under General Statutes § 22a-452(a) must contain an allegation that the contamination was caused by the defendants' culpable conduct:

*7 Section 22a-452(a) provides for reimbursement for contaminant removal costs only where the pollution or contamination *resulted from the negligence or other actions of such person, firm or corporation....* This section permits the injured property owner to abate the contamination and to seek reimbursement from the *generator* of the contamination.

(Emphasis added.) *Connecticut Resources Recovery Authority v. Refuse Gardens, Inc.,* 43 Conn.Sup. 83, 87-88, 642 A.2d 762 (1993), aff'd 229 Conn. 455, 642 A.2d 697 (1994). Thus, "culpability and not merely causation" ... "is an element of § 22a-452(a)." Id., 90.

In the present case, count seven of the plaintiffs' amended complaint alleges, in pertinent part, only that:

14. The Defendants, as owners, occupiers or previous owners or occupiers of 67 Winthrop Road and by virtue of their failure to clean up the contamination, are jointly and severally liable to the Plaintiffs, pursuant to Connecticut General Statutes § 22a-452 for all costs to contain, remove or otherwise mitigate the effects of the contamination of their well-water.

Nowhere in count seven do the plaintiffs allege that they have taken action to remediate the alleged contamination, that they have expended funds for such remediation, and that the

contamination resulted from the defendants' culpable conduct. Accordingly, the defendants' motions to strike count seven of the plaintiffs' amended complaint must be, and are, hereby granted.

Further, in light of the fact that count seven has been stricken, the defendants' motions to strike that portion of the plaintiffs' third prayer for relief, seeking reasonable attorney's fees based on count seven, are also granted.

   *Paragraph 14 of Counts One, Two, Three, Five, & Six Paragraph 17 of Count Four:*
Kedah and Winthrop argue that ¶ 14 of counts one, two, three, and five, claiming emotional distress, should be stricken because, since the infliction of emotional distress is a separate tort, it must be stated in a separate count, accompanied by the allegation of sufficient facts to support each of the tort's essential elements. For these same reasons Contel argues that ¶ 14 of count six, and ¶ 17 of count four, must also be stricken.

In response, the plaintiffs argue that emotional distress is a proper element of the damages they have suffered as a result of each cause of action alleged. It follows, the plaintiffs argue, that they may properly plead damages for emotional distress in each of the counts of their complaint.

In the present case, § 14 of counts one, two, three, five, and six, and ¶ 14 of count four, of the plaintiffs' amended complaint allege, in pertinent part, that:

[a]s a further result of the Defendants' [actions] ..., the Plaintiffs have suffered fear and anxiety for the health, safety and well-being of themselves and their two minor children and they are at risk in the future to suffer serious health problems as a result of their exposure to the well-water contamination. [FN1]

   FN1. There are minor variations in this paragraph from count to count, reflecting the differing legal theories asserted. In count one, the allegation is of Kedah's and Winthrop's "maintenance of the continuing nuisance as aforesaid"; in count two, the "trespass upon the Plaintiffs' land" by Kedah and Winthrop; in count three, Kedah's and Winthrop's "negligence"; in count four, Contel's negligence; in count five Kedah's and Winthrop's recklessness; and, in count six, Contel's "recklessness."

*8 As noted earlier, however, a party may not properly move to strike a paragraph of a complaint, unless said paragraph states a separate cause of action. *Donovan v. Davis, supra, 85 Conn. 397; Bourguin v. Melsungen,* supra, 2 Conn.L.Rptr. 373; *Ahsan v. Olsen,* supra, 3 CSCR 55; *Depray v. St. Francis Hospital,* supra, 2 CSCR 691.

Here, as in *Texixeira v. Scranton Motors, Inc.,* Superior Court, judicial district of Tolland at Rockville, Docket No. 40558 (September 13, 1990, Spada, J.), the subject "paragraph does not state a separate cause of action, but seeks damages...."

Accordingly, the defendants' motions to strike ¶ 14 of counts one, two, three, five and six, and ¶ 17 of count four, of the plaintiffs' amended complaint, are hereby denied.

Conn.Super.,1995.

Warner v. Kedah Corp.

1995 WL 573828 (Conn.Super.)

END OF DOCUMENT

*CASE NO. 03-945- PLAINTIFFS' APPENDIX OF UNREPORTED CASES, EXHIBIT 30*
**Wiehl v. Dictaphone Co.**
1998 WL 70585, 21 Conn. L. Rptr. 402 , Conn.Super., Feb 11, 1998
Not Reported in A.2d
Conn.Super.,1998.
Feb. 11, 1998.

MEMORANDUM OF DECISION

MOTTOLESE, Judge.

*1 The setting for this motion to strike is that the plaintiff is a purchaser of commercial property who alleges that a lessee of a former owner of the premises negligently contaminated his property by discharging hazard materials into the earth and water. The lessee-defendant asserts that the count in negligence fails to state a claim upon which relief can be granted because the defendant owed no duty to the plaintiff to exercise care in the use of contaminants on the premises.

It is fundamental that there can be no tort grounded in negligence unless the defendant owed a duty to the plaintiff. *Jaworski v. Kiernan,* 241 Conn. 399, 405, 696 A.2d 332 (1997). Whether such a duty exists in Connecticut is a question of first impression.

The basis for the plaintiff's assignment of a duty to the defendant rests upon the doctrine of foreseeability of harm.

The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised ... By that is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury which resulted was foreseeable, but the test is, would the ordinary [person] in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result. (Citation omitted; internal quotation marks omitted.) *Frankovitch v. Burton,* 185 Conn. 14, 20- 21, 440 A.2d 254 (1981); *Noebel v. Housing Authority,* 146 Conn. 197, 200- 01, 148 A.2d 766 (1959); *Orlo v. Connecticut Co.,* 128 Conn. 231, 237, 21 A.2d 402 (1941); *R.K. Construction, Inc. v. Fusco Corp.,* 231 Conn. 381, 385, 650 A.2d 153 (1994). *R.K. Construction, Inc. v. Fusco Corp.,* 231 Conn. 381, 650 A.2d 153 (1994).

On the other hand, the court cautioned that "many harms are quite literally foreseeable yet for pragmatic reasons, no recovery is allowed." *Id. at 386.* So, mere foreseeability is not enough. "A further inquiry must be made as to whether under the fundamental policy of the law, the defendant's responsibility should extend to such results.*Ibid.*

In this case there exist two competing fundamental policies of the law. The first, as the plaintiff points out, is the strong policy in Connecticut against environmental contamination as expressed forcefully in Title 22a of the General Statutes. The second policy is embodied in the common law rule of *caveat emptor* which has survived for centuries almost unchanged in its application to a vendee of real property. As our Supreme Court noted in *Connecticut Resources Recovery Authority v. Refuse Gardens, Inc.,* 229 Conn. 455, 458, n. 5, 642 A.2d 697 (1994) the doctrine has given way to liability for negligence in special cases such as those involving the defective construction of buildings or other appurtenances by builder-vendors of real property. *Coburn v. Lenox Homes, Inc.* 186 Conn. 370, 375, 441 A.2d 620 (1982).

*2 While the plaintiff and the defendant in this case are not in a vendor- vendee relationship, the rationale upon which the doctrine of caveat emptor is based applies here. Under the allegations

of the first count there is nothing to indicate that the plaintiff became the owner of the property under any circumstances other than those that existed at arms length.

It is a universal rule that under ordinary circumstances once an owner of real property sells it, he ceases to be liable for injuries occurring on the property unless he transfers the land with known or knowable concealed defects. *Mei v. Tsokalas,* 25 Conn.Supp. 114, 197 A.2d 527 (1961). So too, of course, is a landowner liable to an invitee for failure to keep his property in a reasonably safe condition, *Long v. Savin Rock Amusement. Co.* 141 Conn. 150, 104 A.2d 221 (1954) and even in certain cases, to a licensee. *Pomponio v. New York, New Haven and Hartford RR Co.,* 66 Conn. 528, 34 A. 491 (1895). Finally, a landowner owes a duty of care not to use his land in a manner which poses an unreasonable risk of harm to those outside the premises. *Spagnola v. Lanza* 110 Conn. 178, 147 A. 594 (1929).

The fundamental policy of the law extends protection to the above classes of persons because they have no opportunity to protect themselves from the harm inflicted on them whereas a real property vendee may take appropriate measures to discover the harm and protect himself from it by exercising reasonable diligence in inspecting the premises and in negotiating with the vendor protective terms and conditions of the purchase. *Philadelphia Electric Co. v. Hercules, Inc.,* 762 F.2d 303 (3rd Cir.1985); *Wellesley Hills Realty Trust v. Mobil Oil Corp.,* 747 F.Supp. 93 (D.Mass.1990).

This court therefore holds that a present owner of real property has no common law cause of action for negligent contamination of commercial property against the lessee of a former owner of that property. For this reason the motion to strike is granted.

Conn.Super.,1998.

Wiehl v. Dictaphone Co.

1998 WL 70585 (Conn.Super.), 21 Conn. L. Rptr. 402

END OF DOCUMENT

*CASE NO. 03-945- PLAINTIFFS' APPENDIX OF UNREPORTED CASES, EXHIBIT 31*
**Wiehl v. Dictaphone Corp.**

1994 WL 16516, 10 Conn. L. Rptr. 591 , Conn.Super., Jan 12, 1994

Not Reported in A.2d

Conn.Super.,1994.

Jan. 12, 1994.

MEMORANDUM OF DECISION RE: MOTION TO STRIKE NO. 108

MAIOCCO, Judge.

*1 On July 29, 1993, the plaintiff, William Wiehl, an owner of a parcel of land located in Milford ("the subject property"), filed a three count complaint against defendants Dictaphone Corporation ("Dictaphone"), A.B. Dick Company ("A.B. Dick") and ALCO Standard Corporation ("ALCO"). The plaintiff alleges that the subject property is contaminated with hazardous waste products which were deposited onto the property by the defendants during the course of their respective tenancies.

In his revised complaint, filed on September 29, 1993, the plaintiff alleges that in 1962, A.B.

Dick leased the subject property from a former owner, and subsequently sublet the property to Dictaphone. The plaintiff alleges that the sublease instrument was assigned to him by the former owner on May 27, 1983, and that he purchased the subject property on June 3, 1983. On October 1, 1991, Dictaphone sublet the subject property to the current tenant, defendant ALCO.

In the first count of the revised complaint, the plaintiff asserts a nuisance cause of action against the defendants, based on allegations that the defendants deposited hazardous waste materials onto the subject property during the course of their respective tenancies. In the second count, the plaintiff asserts a cause of action against the defendants based on their alleged violations of General Statutes § 22a-427. In the third count, the plaintiff alleges that Dictaphone and ALCO breached the terms of the parties' sublease agreement dated October 1, 1984. In the prayer for relief, the plaintiff seeks injunctive relief as well as money damages from all of the defendants. On October 15, 1993, A.B. Dick filed a motion to strike (# 108) the first count, the second count, and the first paragraph of the prayer for relief of the plaintiff's revised complaint, along with a supporting memorandum of law. The plaintiff filed a memorandum of law in opposition (# 110) on October 22, 1993. A.B. Dick filed a reply memorandum (# 116) on November 15, 1993.

The motion to strike tests the legal sufficiency of a complaint, or any one or more counts thereof, to state a claim upon which relief can be granted. *Ferryman v. Groton,* 212 Conn. 138, 142, 561 A.2d 432 (1989). A motion to strike also may be used to test the legal sufficiency of a prayer for relief. Practice Book § 152(2). In analyzing a motion to strike, the court is limited to the facts alleged in the pleading; *Rowe v. Godou,* 209 Conn. 273, 278, 550 A.2d 1073 (1988); which must be construed in the light most favorable to the pleader. *Gordon v. Bridgeport Housing Authority,* 208 Conn. 161, 170, 540 A.2d 1185 (1988). If the court finds that the facts alleged in the pleading support a cause of action, the motion to strike must be denied. *Ferryman v. Groton, supra, 142.*

In support of its motion to strike the first count of the plaintiff's revised complaint, A.B. Dick argues that this count fails to state a claim upon which relief can be granted because the plaintiff has no standing under common law to bring a nuisance action against a tenant of a former owner of the plaintiff's property. A.B. Dick contends that a nuisance claim may only be asserted against a defendant who is a neighboring, contemporaneous property owner. A.B. Dick further contends that the plaintiff has failed to allege two essential elements of a nuisance claim, namely: (1) that the plaintiff does not allege that A.B. Dick's use of the subject property was unreasonable or unlawful; and (2) that the danger allegedly created by A.B. Dick is continuous in nature. In response, the plaintiff argues that a private nuisance claim may properly be brought against a defendant who is not a neighboring land owner, and that he has alleged all of the elements necessary to state a legally sufficient private nuisance cause of action.

*2 In *Nicholson v. Connecticut Half-Way House,* 153 Conn. 507, 218 A.2d 383 (1966), the court held that "[i]t is the duty of every person to make a reasonable use of his own property so as to occasion no unnecessary damage or annoyance *to his neighbor.*" (Emphasis added.) Id., 510. See also *Nailor v. C.W. Blakeslee & Sons, Inc.,* 117 Conn. 241, 245, 167 A. 548 (1933); *Hoadley v. Seward & Son Co.* 71 Conn. 640, 646, 42 A. 997 (1899). "Historically, the ' assize of nuisance' was designed to cover invasions of the plaintiff's land due to conduct wholly on the land of the defendant." Prosser & Keeton, Torts, 5th Ed., Ch. 15, § 86, p. 617. See also *Philadelphia Electric Co. v. Hercules, Inc.,* 762 F.2d 303, 313-14 (3d Cir.1985), cert. denied, 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985); *Wilson Auto Enterprises v. Mobil Oil Corporation,* 778 F.Supp. 101, 106 (D.R.I.1991); *Hamlin Group, Inc. v. International Minerals & Chem. Corp.,* 759 F.Supp. 925, 935 (D.Me.1990); *Wellesley Hills Realty Trust v. Mobil Oil Corp.,* 747 F.Supp.

93, 98-99 (D.Mass.1990); *Amland Properties Corp. v. Alcoa,* 711 F.Supp. 784, 801 (D.N.J.1989) (all holding that a private nuisance claim is actionable only when a defendant property owner creates or maintains a condition on his property which causes a substantial and unreasonable interference with the use and enjoyment of the property of another).

In opposition to A.B. Dick's motion to strike, the plaintiff argues that a private nuisance cause of action may properly be brought against a defendant who is not a neighboring land owner (i.e., a private nuisance cause of action may be asserted by a plaintiff property owner against a tenant of a former owner of the plaintiff's property). The plaintiff cites *State v. Tippetts- Abbett-McCarthy-Stratton,* 204 Conn. 177, 527 A.2d 688 (1987), in support of his argument. In *State v. Tippetts-Abbett-McCarthy-Stratton,* supra, the court stated that:

Our case law has established no bright line test to determine when a defendant's connection to a particular parcel of property suffices to make it an unreasonable or unlawful "user" of the property. While the defendant in a nuisance action frequently is the owner of the property alleged to be the source of nuisance ... property ownership is not a prerequisite to nuisance liability.... (Citations omitted.) Id., 183-84. Despite its broad language, this case does not dispense with the requirement that the nuisance which is the subject of the plaintiff's suit must be located on, or must emanate from, a neighboring parcel of land. Rather, this case stands for the proposition that a plaintiff may bring a nuisance action against a tenant in possession of a neighboring parcel of land, provided that the defendant-tenant "exercises control over the property that is the source of [the] nuisance." Id., 184. The plaintiff also cites *Mangini v. Aerojet-General Corp.,* 281 Cal.Rptr. 827 (Cal.App.3d Dist.1991) in support of his position. *Mangini* is inapposite to the present case because California nuisance law is a "creature of statute," and the California nuisance statutes have been construed "to allow an owner of property to sue for damages caused by a nuisance created *on* the [plaintiff] owner's property." (Emphasis in original.) Id., 832.

*3 Consequently, since the plaintiff is not asserting his private nuisance claim against a defendant who is or was in control of a neighboring parcel of land, the plaintiff's first count is legally insufficient. Accordingly, A.B. Dick's motion to strike the first count of the plaintiff's revised complaint is granted.

In support of its motion to strike the second count of the plaintiff's revised complaint, A.B. Dick argues that the plaintiff cannot assert a claim pursuant to General Statutes § 22a-427 because this statute does not create a private cause of action. A.B. Dick also contends that the plaintiff fails to allege that the waters of the state have been contaminated. In response, the plaintiff argues that the statute does create a private cause of action.

General Statutes § 22a-427 provides that "[n]o person or municipality shall cause pollution of any of the waters of the state or maintain a discharge of any treated or untreated wastes in violation of any provisions of this chapter." As used in this statute, the words "this chapter" refers to the Water Pollution Control Act ("WPCA"), General Statutes §§ 22a-416 through 22a-484. In *Michael v. Kenyon Oil Company, Inc.,* 4 CSCR 337 (March 22, 1989, O'Connor, J.), the court addressed the question of whether §§ 22a-427 and 22a-451 create a private right of action. After examining the legislative history, the court concluded that "there is nothing ... which exhibits any legislative intent to benefit anyone other than the commissioner of environmental protection in the assessment of the penalties provided for [by the WPCA]." Id., 338. Accord., *Andrews v. Caron,* 7 CSCR 501, 502 (May 4, 1992, McWeeny, J.). See also *Bristol Shopping Plaza, Inc. v. Vigilante Cleaners,* D.N. 344098, judicial district of Hartford-New Britain at Hartford, January 12, 1989, (Aronson, J.) (court granted a motion to strike an action brought by a private corporation based on a violation of § 22a-451 of the WPCA on the ground that the

WPCA does not provide for a private cause of action).

It is clear that the plain language of § 22a-427 does not create a private right of action. "The commissioner shall have the following powers and duties: ... [t]o exercise general supervision of the administration and enforcement of this chapter [the WPCA, Ch. 446K]...." General Statutes § 22a-424(a). "The DEP commissioner has statutory authority to enforce the environmental protection laws...." *Diamond v. Marcinek,* 226 Conn. 737, 748, --- A.2d ---- (1993). Thus, the second count of the plaintiff's revised complaint is legally insufficient, and A.B. Dick's motion to strike is accordingly granted.

A.B. Dick also seeks to strike the first paragraph of the plaintiff's prayer for relief which seeks injunctive relief. Generally, "[i]f the elements of a nuisance claim are clearly demonstrated, and if irreparable harm cannot otherwise be prevented, the court may enjoin the use objected to." *Nicholson v. Connecticut Half-Way House,* supra, 510; *Brainard v. West Hartford,* 140 Conn. 631, 636, 103 A.2d 135 (1954). Although the plaintiff has not pled a legally sufficient private nuisance cause of action, injunctive relief may be available to the plaintiff as against Dictaphone and ALCO, based on allegations that Dictaphone and ALCO are in breach of the parties' sublease agreement (as stated in the third count of the plaintiff's revised complaint). Accordingly, A.B. Dick's motion to strike the first paragraph of the plaintiff's prayer for relief is denied.

Conn.Super.,1994.

Wiehl v. Dictaphone Corp.

1994 WL 16516 (Conn.Super.), 10 Conn. L. Rptr. 591

END OF DOCUMENT