**Attachment A**
**Unsupported or Contradicted "Factual" Contentions in**
**Plaintiff's Opposition Memorandum**

| Claim | Location | Defect |
|---|---|---|
| Combining Olin and Hamden's arguments. | Throughout brief | Not supported: both defendants filed separate and distinct motions. |
| That "waste contained substances that were well-known poisons at all relevant times." | p. 2 | Not alleged in complaint; no authority offered for that contention; false statement. |
| Hamden and Olin entered a "joint venture". | Throughout brief | Not alleged in complaint; no factual basis cited for claim that this distinct legal form existed. |
| Hamden solicited private property owners in Newhall Section to allow industrial waste from Olin to be dumped as "fill." | p. 2 | Not alleged in paragraph cited (¶ 21), which makes no reference to private property or, more importantly, an effort to solicit to dump Olin's waste. Further, does not claim that the waste was to be dumped as "fill," but instead that Hamden solicited to allow refuse to be dumped. |
| Olin & Hamden "cooperated" in disposal of Olin's toxic industrial waste in the Newhall Section from 1915 until the 1950s (citing ¶¶ 23, 24). | p. 2 | Not alleged in complaint (including paragraphs cited); no support; and illogical. The 1915 date is cited, but there is no assertion that it continued until the 1950s. All that paragraphs 23 and 24 talk about is Winchester disposing of waste beginning in 1915 in Hamden until "closure" of the facilities. |
| "Beginning in approximately 1920, and continuing for decades," (citing ¶ 25). | p. 2 | Period not cited in complaint – which just says "beginning in approximately 1915" but makes no comment about "continuing for decades." |
| "privately owned property used for disposal 'by Olin and Hamden' was developed into residential properties" (citing ¶ 25). | p. 2 | Not supported in complaint, which merely states that privately owned property used by Hamden "for disposal" was developed. |
| Development of the residential dwellings increased Hamden's population and tax base. | p. 2 | Not alleged in complaint; no extrinsic authority cited. |
| USEPA conducted "limited testing of a portion of the yards in private homes." (citing ¶ 32). | p. 2 | Complaint alleges (¶ 29) that surficial soil testing was conducted on 76 private properties (not limited testing). |
| Waste materials related to Olin's . . . production were uncovered "throughout the Newhall Section." | p. 3 | Not alleged – complaint does not state the waste materials found "throughout" ¶ 34. |
| Plaintiffs allege that from 1915 and continuing for decades thereafter, Olin disposed industrial waste and ash which included "well known poisons such as lead and arsenic" (citing ¶¶ 8, 23, 29, 30). | p. 7 | None of those paragraphs allege that lead and arsenic were "well known poisons." Indeed, they don't even cite arsenic, and thus there is no support for that contention. Moreover, plaintiffs cite no extrinsic authority to support those claims. Lastly, those claims are false, as the toxicity of lead and arsenic are dose-specific. |
| A manufacturer knowing what Olin knew or should have known about the dumping of materials containing hazardous substances and poisons such as lead and arsenic on land that was being developed for residential housing. | p. 8 | No citation to anything in complaint. No citation that such "knowledge" existed in 1915. |
| Olin benefited from ability to dispose of hazardous and toxic wastes on Plaintiff's properties. | p. 9 | No citation to anything in the complaint; moreover, they were NOT plaintiffs' properties at the time. |
| Olin cannot seriously dispute that materials such as lead and arsenic were known poisons and their dangers were well documented in the scientific literature at the time of the dumping. | p. 10 | Actually, such a claim can be disputed. There is no citation to anything in the complaint on point, and the plaintiffs do not so allege in the complaint. Plaintiffs offer no citation for the "well documented" literature about lead and arsenic. And, in fact, statutory review of the environmental laws reflect that these substances were not regulated until the latter half of the 20th century. |
| "Well documented literature" existed at the time of the dumping. | p. 10 | No citation to anything in the complaint, and no such allegation in the complaint. Further, no citation to any authority offered to support counsel's argument. |
| Amended Complaint alleges "specific facts" that Hamden knew or should have known that the land | p. 11, Heading | There are no specific facts cited there, or in the complaint, supporting that Hamden "arranged" waste disposal, that the |

| | | |
|---|---|---|
| upon which it arranged for disposal of waste containing well-known poisons would be used to develop residential housing. | | material in the waste was a "well-known poison," and that Hamden should have known of that. |
| "the lands upon which Hamden arranged for Olin to dispose industrial waste containing hazardous substances". | p. 11 | No citation to complaint; nothing in the complaint supports that Hamden "arranged for Olin to dispose," nor that Hamden knew it contained hazardous substances. |
| Hamden "profited" from the disposal. | p. 11 | No citation to the complaint; nothing in the complaint reflects that Hamden "profited." |
| Hamden "profited" from a "joint venture" with Olin. | p. 11 | No citation to the complaint; nothing in complaint reflects a joint venture. |
| Hamden arranged for Olin to "dispose of its toxic industrial waste." | p. 11 | No citation to complaint; nothing in complaint reflects an "arrangement" to dispose of "toxic industrial waste;" at most, it was the disposal of waste which it is now believed includes some amount of toxic materials. |
| Hamden had a duty to determine whether Olin's toxic waste was suitable fill for a landfill that it intended to use for residential properties. | p. 11 | No citation to any authority for this legal conclusion. No citation to any facts or allegations that Olin provided "toxic waste" as fill that Hamden intended to use for residential properties, as opposed to the fact that Olin's "fill" (whatever it contained) was used to eliminate wetlands. |
| Fill contained toxins such as lead and arsenic, "which were well-known poisons at the dawn of the 20th century" (citing ¶¶ 8, 9, 11). | p. 12 | None of those paragraphs support that claim. Moreover, there is nothing in the complaint or any reference to extrinsic authority to support that lead and arsenic were "well-known poisons at the dawn of the 20th century." |
| Hamden knew that areas into which Olin's waste was disposed would be developed for residential housing (citing ¶ 25). | p. 12 | Not supported – all that paragraph alleges is that portions of privately held property used for disposal were developed into residential properties. It is not alleged that it was areas where Olin's waste was dumped. |
| Whatever salutary goal of filling wetlands . . . does not as a matter of law relieve Hamden from making the most basic inquiry. | p. 13 | No citation to legal authority; also no citation as to whether inquiry would have resulted in conclusion fill was inappropriate. |
| Hamden arranged for and profited from Olin's export of these wastes. | p. 13 | No citation to complaint; nothing in complaint reflects Hamden arranging from Olin's export, or that Hamden "profited" from such "export." |
| Hamden acted to facilitate the construction of hundreds of residential homes (citing ¶¶ 20-26). | p. 13 | Not reflected in complaint: instead, in contrast, the complaint says that filling wetlands was encouraged by the *State of Connecticut* (¶ 20), that Hamden solicited owners to allow refuse (not *Olin's* materials) in wetlands (¶ 21), and that after 1915, portions of property were developed for residential properties (¶ 25). It does not reflect, as plaintiffs claim, that Olin's fill was arranged for by Hamden so that residential homes could be built. |
| Landfills contaminated with materials known to be poisons at the time of the disposal (citing ¶¶ 29-31). | p. 14 | Absolutely no connection to the allegations in those paragraphs, which refer to events in 2001. No support anywhere in complaint for this assertion, nor reference to any extrinsic authority to support that. |
| Olin's conscious choice to enter into a venture with Hamden to dump such wastes. | p. 14 | No support in complaint for claim of a "venture." |
| In addition to having violated relevant Connecticut statutes to support negligence per se, Hamden violated the notice provisions of CERCLA, 42 U.S.C. § 9603(c). | p. 17 | No CERCLA violation to support Plaintiffs' negligence per se is set forth in the complaint. |
| Plaintiffs' Emotional Distress Claims include negligence claims. | p. 19 | In reality, those counts (Counts XI and XII) plead outrageous conduct, and knowledge of recklessness, but no allegations of negligence are included. |
| "Defendants' joint conduct, . . . knowing houses were going to be built on the dumps . . ." | p. 21 | No support cited; no allegations of or extrinsic authority to support "joint" conduct; no allegations that Hamden (or Olin) disposed of the waste knowing houses would be built on the dumps. |
| "indiscriminate large-scale dumping of hazardous | p. 23 | No citations to anything in complaint; moreover, the |

| | | |
|---|---|---|
| materials in areas where residential development is the known or intended use of the filled land." | | complaint does not include any allegation of "indiscriminate" or "large-scale" dumping of hazardous materials. |
| Such dumping does not "constitute an activity usually or normally tolerated by informed society." | p. 23 | No citation to complaint; no citation to extrinsic authority; if anything, this statement is 21st century counsel's personal opinion seeking to have it govern early 20th century behavior. |
| "Olin's and Hamden's Joint Venture to use industrial wastes for fill;" "Olin's and Hamden's Joint Actions." | p. 23, Headings | No allegations in complaint of "joint venture;" no citation to extrinsic authority of same. |
| "Hamden solicited owners of properties . . . for the purpose of allowing industrial wastes containing hazardous substances to be disposed on these properties." | p. 25 | No citations to complaint; no allegations of solicitation for dumping industrial wastes containing hazardous substances. |
| "knowing that when filled, Hamden would grant building permits to allow their development for residential housing." | p. 25 | No citations to complaint; complaint has no such allegations. |
| "some time prior to 1917 Hamden and Olin entered into a joint venture that lasted for decades." | p. 25 | No citations to complaint; no such allegations in complaint. |
| "a joint venture . . . whereby dumps were established on properties . . . and Olin dumped ash and other toxic industrial waste." | p. 25 | No citations to complaint; no such allegations in complaint. In fact, complaint states, in contrast, that filling wetlands was State policy, and that Hamden solicited owners to allow refuse (not Olin's waste) to be filled, after which the owners developed the properties. |
| Olin dumped "other toxic industrial waste." | p. 25 | No citations to complaint; closest that is contained is ¶ 24, which states that Olin dumped "ash and other industrial waste." |
| "Plaintiffs allege in detail that Hamden entered into a joint venture with Olin and for decades facilitated the disposal of toxic industrial wastes . . . and concurrently arranged for and allowed the development of residential dwellings on these massive piles of industrial waste." | p. 26 | No citations to complaint. *Nothing* in complaint alleges a joint venture, decades of facilitation, concurrent arrangement, or "massive piles" of industrial waste. |
| "Olin's and Hamden's joint venture to facilitate the disposal of toxic industrial wastes." | p. 27 | No citations to complaint; nothing in complaint reflects a "joint venture" or any facilitation for dispose of toxic wastes. |
| "Olin's and Hamden's disposal practices continued for decades with knowledge that residences were being built on the land where it disposed of hazardous waste." | p. 28 | No citations to complaint; nothing in complaint supports knowing disposal practices; or knowledge that residences were being built on land with hazardous waste. |
| "Plaintiffs allege that Olin and Hamden entered into a joint venture that spanned decades by which Olin had a site for disposal of its toxic industrial waste and Hamden expanded its tax base by creating new residential neighborhood, both maintaining control over the handling, disposal and release of the hazardous industrial wastes and ash created by Olin's manufacturing facility." | p. 29 | No citations to complaint; *nothing* in complaint supports the assertion of a decades-long joint venture; that Hamden used this to expand its tax base; or that either maintained control over the "handling, disposal and release of hazardous" materials. |
| "Olin and Hamden orchestrated the dumping of these materials in the Newhall Section, where the Plaintiffs own homes." | p. 29 | No citations to complaint; nothing in the complaint claims "orchestration" or, for that matter, that Hamden played a role in deciding that hazardous materials would be dumped in any particular locale. |
| "Hamden's partner". | p. 30 | No citation to any portion of complaint; moreover, nothing to support any such claim. |
| "the contaminated ground water flows from one property to another." | p. 31 | No citation to any portion of complaint; not alleged in complaint. |
| "interference with use and enjoyment of one property due to the substantial contamination of abutting contaminated properties." | p. 31 | No citation to any portion of complaint. Moreover, this appears to be a new theory, by which the so-called class now includes not just property owners/residents for properties with contamination, but apparently also those |

| | | with clean properties abutting contaminated properties. No such claim made in complaint. |
|---|---|---|
| "Plaintiffs in the present action allege that Olin and Hamden directly disposed of hazardous waste and toxic substances . . . onto the soil or environment in the Newhall Section" (citing ¶¶ 20-26). | p. 35 | There is no allegation in those paragraphs of direct (or indirect) disposal of wastes (hazardous or not) by Hamden. |
| Hamden's Acts were Proprietary. | p. 46, Heading | No citations to complaint; not alleged in complaint. |
| "Hamden entered into a joint venture with Olin over a period of decades in which Hamden solicited industrial waste from Olin for fill, so that Hamden's 'unproductive' land could be converted into residential areas which would allow it to collect building permit fees for hundreds of homes, and expand its tax base." | p. 47 | Absolutely not a single citation to the complaint; moreover, none of this is supported by any claims in the complaint or any extrinsic authority. |
| "by accepting industrial waste from New Haven, as opposed to garbage from Hamden's residents, it is clear that this was not providing a service to Hamden citizens." | p. 47 | No citation to complaint; no citation to law. Moreover, contrary to allegations in complaint, where plaintiffs claim that "Olin conducted business in New Haven, Connecticut *and Hamden, Connecticut."* (¶ 5) |
| "the industrial waste landfill operated by Hamden for *non-resident corporation,* Olin" (emphasis in original). | p. 49 | No citation to complaint. Moreover, plaintiffs allege that Olin was, in fact, a Hamden resident (¶ 5), and there is nothing in complaint to reflect that the "landfills" were operated by Hamden for Olin. Instead, at most, the complaint alleges that dumps were located in Hamden pursuant to Connecticut State policy, and that Winchester used them (*see* ¶¶ 20-26). |
| "The landfills were not operated as a municipal dump, but, instead, Hamden accepted massive amounts of Olin's industrial waste" (citing ¶¶ 22-24). | p. 49 | Not supported by the paragraphs cited, either as to how the dumps were operated or as to the acceptance of "massive amounts" of Olin's waste. |
| "Hamden profited from the industrial waste landfills, as the areas became, and remain today, a source of tax revenue for Hamden." | p. 49 | No citation to complaint; nothing in the complaint to support this assertion. |
| "The revenue realized by the landfills is significant, as the area is comprised of hundreds of residential properties" (citing ¶ 43). | p. 49 | All this alleges is that there are more than 300 properties in the proposed class area; there is nothing in that paragraph to support any claim about revenues or even whether the properties are residential. |
| "This residential development . . . constituted a proprietary act from which Hamden received, and continues to receive, significant revenue." | pp. 49-50 | No citation to complaint; no factual authority cited regarding revenue; no legal authority cited for claim that purported receipt of property tax revenue is a "proprietary act." |
| "Plaintiffs allege that Hamden's facilitation of the disposal of Olin's waste was a proprietary function." | p. 51 | No citation to complaint. This is for a good reason: the complaint does not so allege, and further there is nothing to support contention that Hamden "facilitated" Olin's disposals. |

484548_1.DOC