**H**
Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

Susan Lapka SCHMITZ, Plaintiff,
v.
CAMPBELL-MITHUN, INC., Defendant.

No. 88C 2314.

July 7, 1989.

*Memorandum Opinion and Order*

ZAGEL, District Judge.

*Findings of Fact*
A. *Plaintiff's Commencement of the Lawsuit*

*1 1. Defendant Campbell-Mithun is an advertising agency, and has an office in Chicago, Illinois.

2. Plaintiff Susan Lapka Schmitz was employed by Campbell-Mithun from approximately June 1984 until October 1987, when Campbell-Mithun terminated her.

3. In November, 1987, plaintiff retained Kathleen I. Zitzka of the law firm Niew & Zitzka as her attorney. At an initial meeting with Zitzka, plaintiff told Zitzka that she believed she had been fired in violation of a written Campbell-Mithun policy which required employees to be placed on probation before discharge. Zitzka instructed plaintiff to bring what documents she had from Campbell-Mithun which supported her claims.

4. In November, after this meeting, plaintiff called Linda Projansky, Campbell-Mithun's then-manager of human resources, and requested a copy of Campbell-Mithun's "Office Fax" manual which contained, among other things, the company's personnel policies and procedures. Projansky told plaintiff that the manual was voluminous and asked whether plaintiff was interested in any particular policy. Plaintiff replied that she wanted the termination policy, which Projansky promptly sent to plaintiff. Projansky also told plaintiff she was welcome to come in and peruse the entire procedures manual in the Campbell-Mithun waiting area. Neither plaintiff nor Zitzka ever came in to see the manual. Zitzka did write to Projansky requesting documents. Projansky referred the letter to defendant's attorney, Reid Carron. Zitzka and Carron spoke and Carron refused to send a copy of the employee manual to Zitzka.

5. The written information sent to plaintiff had nothing to support the claim that Campbell-Mithun's written termination policy required that an employee be placed on probation before termination.

6. In December 1987, plaintiff and Zitzka met again. At this meeting, plaintiff produced whatever Campbell-Mithun documents she had received from Projansky. There was nothing in the documents about probation prior to termination. Plaintiff also identified Campbell-Mithun employees Barbara Toia, Jan Jalovet, Donald Lesser, Daniel Helsdingen and others as persons who would have knowledge of the supposed written probation policy.

7. At this meeting, plaintiff also identified Campbell-Mithun secretaries Judy Chapin, Donna Kurtti, and Linda (last name unknown) as persons whom Campbell- Mithun had placed on probation. Plaintiff also identified several non- clerical employees as persons plaintiff thought had been placed on probation. Plaintiff had little information about the circumstances under which the non-clericals were supposedly placed on probation and did not identify for Zitzka any instance when plaintiff herself was told by Campbell-Mithun management that she would be placed on probation prior to discharge though she asserted that one person in personnel did tell her there was a probation policy from which she inferred the policy was in the manual.

8. Zitzka testified that at this second meeting with plaintiff, she initiated a telephone conversation about Campbell-Mithun's policies with Jalovet and listened in on the speaker phone to a conversation between plaintiff and Helsdingen in which Helsdingen stated that Campbell-Mithun had a policy which required an employee to be placed on probation prior to discharge. Assuming these conversations occurred (only Zitzka recalled them), Jalovet never stated she saw a written probation policy, she (Jalovet) said she was advised there was one; Helsdingen said that there was such a policy,

he did not indicate it was in writing.

*2 9. Zitzka also testified that she had a telephone conversation with Toia regarding Campbell-Mithun's policies prior to the filing of the complaint, but it is unclear that Toia stated there was a written policy.

10. Following her second meeting with plaintiff, Zitzka told plaintiff that she had a basis for a lawsuit. Specifically, Zitzka stated that even if Campbell-Mithun did not have a written probationary policy, it had an oral policy which it violated in discharging plaintiff. Zitzka made this recommendation without speaking to a single witness whose names plaintiff provided her and even though she was in possession of no document indicating that Campbell-Mithun has a probation policy and was in possession of Campbell- Mithun's written termination policy, which does not provide for probation before termination. Plaintiff herself also never spoke to any potential witnesses concerning Campbell-Mithun's policies prior to the filing of the lawsuit.

11. Zitzka drafted a complaint on Schmitz's behalf. While Zitzka was on vacation, Schmitz, on or about January 2, 1988, signed (in violation of Illinois Rule 2-611 since Zitzka should have signed) and filed the complaint in the Circuit Court of Cook County. The complaint alleged that Campbell-Mithun violated its written policy in discharging plaintiff. Nowhere did the complaint allege that Campbell-Mithun violated any oral policy.

12. On March 18, 1988, Campbell-Mithun removed this action to the Federal District Court for the Northern District of Illinois.

B. *Plaintiff's Prosecution of the Lawsuit*

13. On April 8, 1988, plaintiff answered Campbell-Mithun's First Set of Interrogatories. In response to Interrogatory No. 1, which requested plaintiff to identify the persons who had knowledge of facts supporting the allegations in the complaint, plaintiff did not list Helsdingen, Lesser, Toia, or Jalovet. In response to Interrogatory No. 11, which requested plaintiff to identify any statements regarding plaintiff's complaint "obtained ... in any form, from any person(s)", plaintiff represented that she had received no statements.

14. On May 17, 1988, Zitzka attended plaintiff's deposition. At her deposition, plaintiff admitted that (a) she had never seen a written policy requiring that an employee be placed on probation before termination and (b) she had never been told by any member of Campbell-Mithun management that she would be placed on probation before termination.

15. Rather than withdrawing the lawsuit after the deposition, Zitzka on behalf of plaintiff sent a written settlement proposal dated June 7, 1988 to Campbell- Mithun's attorney demanding $25,000 and a letter of apology to each Campbell- Mithun employee employed on October 30, 1987. Not surprisingly, Campbell- Mithun rejected the demand.

16. On June 30, 1988, plaintiff served on Campbell-Mithun's attorneys her First Request for Production of Documents. In Request No. 3, she requested Campbell-Mithun's policies and personnel manual. On August 1, 1988, Campbell-Mithun produced the requested documents. None of the documents produced contained a policy requiring that an employee be placed on probation before discharge. Although Zitzka later inquired of Campbell-Mithun's counsel as to the possible existence of other personnel documents, plaintiff never moved to compel Campbell-Mithun to produce additional documents.

*3 17. On August 26, 1988, Zitzka and Campbell-Mithun's counsel attended a status conference at which the court entered an Order requiring all motions for summary judgment to be filed on or before September 16, 1988 and all responses thereto to be filed on or before October 14, 1988. Campbell-Mithun's counsel specifically represented at this conference that Campbell-Mithun intended to file a summary judgment motion in this case. Once again, Zitzka did not, at this time, seek to withdraw the lawsuit.

18. There is no evidence that plaintiff sought to take the depositions of any Campbell-Mithun management employees who might have had knowledge of Campbell- Mithun's personnel policies.

19. On September 16, 1988, Campbell-Mithun filed its Motion for Summary Judgment.

20. On October 14, 1988, plaintiff filed a Motion

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

to Extend Time in which she requested until November 1, 1988 to file her answer. As the grounds for her motion, plaintiff asserted to this court that she needed the affidavit of Daniel Helsdingen, a former Campbell-Mithun management employee, to defeat Campbell-Mithun's summary judgment motion, but could not obtain the affidavit until November 1. However, at the Rule 11 hearing, Helsdingen testified without contradiction that neither plaintiff nor Zitzka ever contacted him to secure the affidavit, and that he knew of no policy requiring probation prior to termination (and thus could not testify to its existence).

21. Shortly after October 14, 1988, plaintiff spoke to former Campbell-Mithun employee Donald Lesser and asked him if he would support her in her lawsuit. Lesser responded that he would not. Zitzka never spoke to Lesser or requested an affidavit from him.

C. *Plaintiff's Attempt to Withdraw the Lawsuit*

22. After plaintiff's conversation with Lesser but before November 1, 1988, plaintiff and Zitzka met to discuss the case. Plaintiff specifically testified several times that Zitzka told her that, in light of the fact that there was no support for her case, she could dismiss the action without prejudice and that plaintiff could reactivate the lawsuit within a year. Plaintiff authorized Zitzka to dismiss the lawsuit.

23. On November 1, 1988, Zitzka wrote Campbell-Mithun's counsel, indicating that she intended to seek voluntary dismissal of the case pursuant to Rule 41 of the Federal Rules of Civil Procedure.

24. On November 21, 1988, Campbell-Mithun filed its Motion for Sanctions under Rule 11.

25. On December 14, 1988, plaintiff filed her Response to Defendant's Motion for Sanctions. In her response, plaintiff asserted that she was required to withdraw her lawsuit only after two Campbell-Mithun supervisory employees refused to execute affidavits in support of her response to Campbell-Mithun's summary judgment motion because of their "perceived fear in losing their jobs."

26. At the Rule 11 hearing, plaintiff revealed that the two supervisory employees to which plaintiff referred were Lesser and Helsdingen. As noted above, Zitzka had never contacted Helsdingen to secure an affidavit; plaintiff only belatedly spoke to Lesser.

*4 27. Moreover, neither Lesser nor Helsdingen was working for Campbell-Mithun at the time Campbell-Mithun filed its summary judgment motion. Lesser was fired by Campbell-Mithun on February 29, 1988; Helsdingen on September 29, 1986.

28. Plaintiff never produced with her Response to Defendant's Motion for Sanctions the documents Zitzka prepared in connection with plaintiff's response to Campbell-Mithun's summary judgment motion. Indeed those documents were apparently destroyed by a secretary no longer employed by Niew & Zitzka.

29. As of March 27, 1989, Campbell-Mithun had incurred $26,596.94 in legal fees and costs for defending this action, ($14,379.15 of which was incurred after August, 1988). Campbell-Mithun's legal fees and costs after March 27 are as yet undetermined. Plaintiff has made no showing that Campbell-Mithun's fees and costs are unreasonable.

30. Any conclusion of law erroneously included as a finding of fact shall be treated as a conclusion of law; and any finding of fact erroneously included as a conclusion of law shall be treated as a finding of fact.

*Conclusions of Law*

1. Section 2-611 of the Illinois Code of Civil Procedure (Ill.Rev.Stat. ch. 110, sec. 2-611 (1987)) applies to plaintiff's complaint. *Schmitz v. Campbell-Mithun, Inc.,* 124 F.R.D. 189 (N.D.Ill.1989). Rule 11 (Fed.R.Civ.P. 11) applies to all papers filed by plaintiff after the case was removed here. *Id.*

2. In construing Section 2-611, courts may examine federal case law interpreting Rule 11, on which Section 2-611 is modeled. *Frisch Contracting Service Co. v. Personnel Protection, Inc.,* 158 Ill.App.3d 218, 224, 511 N.E.2d 831 (2d Dist.1987).

3. The purposes of Rule 11, and by implication Section 2-611, are to (a) deter counsel and parties from making assertions of fact or law without

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

support, *Marathon Finance Co. v. Pioneer Bank & Trust Co.,* 168 Ill.App.3d 148, 153, 522 N.E.2d 248 (1st Dist.1988), and (b) compensate parties victimized by actions or pleadings which violate Rule 11 standards, *Brown v. Federation of State Medical Boards,* 830 F.2d 1429, 1437 (7th Cir.1987).

4. The requirements of Rule 11 and Section 2-611 are as follows:

(a) The attorney or party filing the complaint must make a "reasonable inquiry" into fact and law;

(b) The pleading must be filed in good faith;

(c) The legal theory must be objectively "warranted by existing law or a good faith argument" for the modification of existing law; and

(d) The attorney must believe that the complaint is "well grounded in fact."

*Szabo Food Service, Inc. v. Canteen Corp.,* 823 F.2d 1073, 1080 (7th Cir.1987), *cert. dism'd,* 108 S.Ct. 1101 (1988). Failure to satisfy any one of the four requirements is a violation of Rule 11 or Section 2-611.

5. The test under Rule 11 and Section 2-611 is objective--sanctions must be imposed where the claim is frivolous or without foundation, even though the claim is not advanced in subjective bad faith. *Thornton v. Wahl,* 787 F.2d 1151, 1154 (7th Cir.1986).

A. *The Complaint*

*5 6. Section 2-611 requires that the attorney or party filing the complaint make a "reasonable inquiry" into fact and law. *Szabo,* 823 F.2d at 1080. In determining whether the attorney or party has met this standard, courts should consider (a) the time available for investigation; (b) the extent to which the attorney had to rely on the client for facts; (c) the complexity of the case; and (d) counsel's ability to complete a pre-filing investigation. *Brown,* 830 F.2d at 1435. A review of these factors as they apply to this case leads to the conclusion that Zitzka failed to make the "reasonable inquiry" required by Section 2-611.

7. Here, there was ample time for a pre-filing investigation. Plaintiff first approached Zitzka only a few weeks after her October 30, 1987 discharge. No lawsuit had to be filed under plaintiff's breach of written contract theory until approximately October 1997, as actions for violations of a written contract in Illinois are governed by a ten-year statute of limitations, Ill.Rev.Stat. ch. 110, sec. 13-206 (1987). And plaintiff had until 1992 (under a five-year limitations period, Ill.Rev.Stat. ch. 110, sec. 13-205 (1987)) to probe and prepare her claim for breach of an oral employment contract.

8. Zitzka was not forced to rely exclusively (or even primarily) on plaintiff's recitation of the facts in making her inquiry. First, plaintiff provided Zitzka with the names of a number of witnesses who could have told Zitzka whether Campbell-Mithun had a written probationary policy. But Zitzka never contacted any of these people before filing the complaint. This was a no-no, for if she had it may have nipped this lawsuit in the bud. See *In re Ginther,* 791 F.2d 1151, 1155 (5th Cir.1986). Second, Zitzka possessed (or at least could have reviewed) Campbell-Mithun's written termination policy, which does not require probation before discharge. Third, plaintiff or Zitzka could have reviewed the entire Campbell-Mithun Office Fax manual prior to the filing of the complaint to determine if there were other policies which could be construed as requiring probation--Projansky explicitly extended the invitation to plaintiff in November 1987. Neither bothered to accept the offer.

9. Plaintiff's claim was simple, not complex. Schmitz could prevail if she could prove that (a) Campbell-Mithun had a policy that required employees to be placed on probation before discharge; (b) the policy was disseminated to plaintiff; and (c) plaintiff continued to work after learning of the policy. *Duldulao v. Saint Mary of Nazareth Hosp. Center,* 115 Ill.2d 482, 489, 505 N.E.2d 314 (1987). By interviewing the witnesses whose names were provided her, considering the Campbell-Mithun termination policy in her possession, and reviewing the Office Fax as offered by Projansky, Zitzka easily could have determined whether plaintiff's case met either the *Duldulao* test or the requirements for an enforceable oral contract (and should have concluded that it did not).

*6 10. Nothing in the record demonstrates that Zitzka was unable, due to illness or some other

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

unusual circumstances beyond her control, to complete a reasonable pre-filing investigation.

11. Based upon these factors, the court finds that Zitzka failed to make a reasonable inquiry before filing the complaint as required by Section 2-611.

B. *Plaintiff's Continued Prosecution of the Case*

12. Even if the complaint were well-grounded in fact and the result of a reasonable inquiry, plaintiff and Zitzka nevertheless violated Rule 11 by continuing to file pleadings in this court long after it was apparent through discovery that the lawsuit was meritless.

13. Although Rule 11 does not require ongoing revisions of pleadings to conform with subsequently discovered information, it does entail "an implicit obligation to update" papers subsequently filed. *Pantry Queen Foods, Inc. v. Lifschultz Fast Freight, Inc.,* 809 F.2d 451, 454 (7th Cir.1987).

14. Here, it was apparent as of May 17, 1988, the date of plaintiff's deposition, that plaintiff's claim for breach of written employment contract was baseless. At that time plaintiff and Zitzka had reviewed Campbell-Mithun's written termination policy, which contained no probation requirement. In addition, plaintiff specifically admitted in her deposition that she had never discussed Campbell-Mithun's alleged probation policy as it might apply to her with any member of management. The facts demonstrate that as of May 17 no policy requiring probation before discharge was ever published to plaintiff. It should have been apparent, at least to Zitzka, that plaintiff's claim failed under *Duldulao, supra.*

15. Following this date, plaintiff nevertheless continued to prosecute the lawsuit, filing a Request for Production of Documents on June 30, 1988 and a Motion to Extend Time, in which she represented that she intended to answer Campbell-Mithun's summary judgment motion.

C. *Plaintiff's Misrepresentations of Fact*

16. Rule 11 requires an attorney who signs a pleading to certify that to the best of the attorney's belief, the pleading is "well grounded in fact", and imposes sanctions for pleadings which are not.

17. Zitzka and plaintiff misrepresented facts they knew or should have known to be untrue in both discovery pleadings and pleadings before this court in violation of Rule 11.

18. First, in response to Campbell-Mithun's Interrogatory No. 1, Zitzka and plaintiff failed to identify a number of significant witnesses they believed had knowledge of facts supporting the complaint. Specifically they did not identify Helsdingen, Toia, Lesser, Jalovet, Kurtti, and Chapin.

19. Second, plaintiff misrepresented to the court in her Motion for Extension of Time her need to secure Helsdingen's affidavit. Neither she nor Zitzka contacted Helsdingen at that point or thereafter.

D. *Sanctions*

20. If Section 2-611 or Rule 11 is violated, the imposition of sanctions is mandatory. *Frantz v. U.S. Powerlifting Federation,* 836 F.2d 1063, 1065 (7th Cir.1987).

*7 21. Attorney's fees are appropriate sanctions under Rule 11 and Section 2-611.

22. Because this action was frivolous from its inception, Campbell-Mithun is entitled to the reasonable costs and fees it incurred in defense, including reasonable costs and fees incurred in connection with its Motion for Sanctions. As plaintiff failed to challenge the reasonableness of Campbell-Mithun's fees, the court accordingly awards Campbell-Mithun $26,596.54 in costs and fees. Plaintiff and Zitzka shall be jointly and severally liable.

1989 WL 81804, 1989 WL 81804 (N.D.Ill.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

C

Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.

Loren J. ANDREO, et al.
v.
FRIEDLANDER, GAINES, COHEN, ROSENTHAL & ROSENBERG, et al.

Civ. No. H-85-551(MJB).

April 28, 1986.

Howard Rosenfield, Plainville, Connecticut, for plaintiff.

Dennis M. Laccavole & Arnold Bai, Bridgeport, Conn., Deborah S. Freeman, Joseph F. Seklley, Jr., Joel J. Rottner & Carl F. Yeich, Skelley, Clifford, Vinkels, William & Rottner, P.C., Hartford, Conn., Sharon Tisher, John B. Nolan, Robert A. Brooks, Day, Berry & Howard, Hartford, Conn., John A. Redmon & Robert B. Murray, David Markel Dwyer & Edwards, New York City, Warren Kaps, Hackensack, N.J., for defendants.

RULING ON MOTIONS TO DISMISS OF DEFENDANTS PEAT, MARWICK & MITCHELL AND ZARROW, ZARROW & KLEIN

BLUMENFELD, Senior District Judge.

*1 This action arises out of a series of private placements of limited partnership interests in satellite communications facilities. The plaintiffs are a number of investors who bought interests in one or more of three limited partnerships. The defendants are a law firm, two public accounting firms, a lawyer/promoter, two named corporations, and a group of unknown defendants designated "John Does 1-25" and "XYZ Corporations 1-25." The plaintiffs, claiming that the defendants were part of a scheme to defraud them through the sale of the partnership interests, have brought suit under the federal securities laws, 15 U.S.C. §§ 77*l*, 77q, and 78j; the federal racketeering statute (RICO), 18 U.S.C. §§ 1961 *et seq.*; and state and common law theories.

The two defendant accounting firms, Peat, Marwick & Mitchell ("PMM") and Zarrow, Zarrow & Klein ("ZZK") have moved to dismiss the complaint on a variety of grounds, including failure to plead fraud with particularity as required by Rule 9(b), failure to state a claim under the securities laws or under RICO, and failure to comply with the statute of limitations. Taken together, their motions attack the sufficiency of all of the plaintiffs' federal claims, and they have moved that the pendent state claims be dismissed along with the federal claims. For the reasons stated below, the complaint will be dismissed as against defendants PMM and ZZK, with leave to the plaintiff to amend.

*Facts*

On a motion to dismiss, the plaintiffs' allegations must be taken to be true and all reasonable inferences must be drawn in the plaintiffs' favor. Therefore, the facts recited below are taken from the complaint. That 53-page document contains many details concerning the formation and sale of the limited partnership interests at issue. Despite its voluminous and diffuse nature, however, the complaint fails to articulate the role that these particular defendants played in the alleged fraudulent scheme or to recite facts that might support liability on their part.

The investments at issue in this case are interests in three limited partnerships, Star Link Associates (Star Link), Sky Link Associates (Sky Link), and Galactic Link Associates (Galactic). These partnerships were formed to build and operate earth station facilities for satellite communications. (¶¶ 31-32.)

The moving force behind the partnerships was a man named Bejamin Rabin and a network of corporations that he controlled. The plaintiffs refer to this network throughout the complaint as "Rabin and affiliates." Rabin organized the three partnerships at issue. (¶ 29.) The general partner of each of the partnerships was a corporation called Satellite Communications Network, Inc. ("SCNI"). (¶¶ 30, 32.) SCNI's sole shareholder was another corporation, Prime Network, Inc. ("Prime"). Twenty percent of the stock of Prime was owned by Digital Video Network, Inc. ("Digital"), a corporation which is a named defendant in this action. The other 80 percent of Prime's stock was owned by Continental Consultants Corporation

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

("CCC"), a corporation whose sole shareholder was Benjamin Rabin. (¶ 24.) Other than Digital, the only named defendant in Rabin's network of corporations is SCN Management, Inc., a wholly-owned subsidiary of SCNI that entered into management contracts with Sky Link and Galactic. (¶ 21.) One final corporation whose name appears among the allegations is Alpha Technologies Construction Corporation ("Alpha"), which was "controlled by Benjamin Rabin and his relatives." (¶ 36.) Alpha was to finance the construction of the earth stations by taking back a promissory note from each of the partnerships, to be executed on behalf of the partnerships by the general partner, SCNI. (¶ 48(Q).)

*2 Rabin was president of SCNI. He was also an officer of CCC, Prime, SCN Management, and Alpha. (¶ 29.) It is this network of "Rabin and affiliates" that was the major player in the ensuing saga.

The sales of interests in the limited partnerships were held out to be private placements and were not registered with the Securities Exchange Commission. (¶ 48(P).) They were offered through private offering memoranda to a number of investors throughout the nation. (¶ 34.) Although many features of the partnerships were similar, a separate offering memorandum was issued for each partnership. The private offering memorandum for Star Link was issued on or about November 21, 1979; the Sky Link memorandum on or about April 21, 1980; and the Galactic memorandum on or about December 17, 1980. (¶¶ 33, 38, 40.)

The partnership investments all had essentially the same structure. Star Link consisted of 35 limited partnership units. Each unit required an investment of $55,000 together with an "assumption agreement" signed by the purchaser for an amount not to exceed $81,000 plus 6% interest per annum. The assumption agreements permitted Rabin, as president of SCNI, to convert non- recourse financing to recourse financing debt, with the result that each investor would assume a portion of the partnership's outstanding liabilities to Alpha. The purpose of this device was to create tax losses for the investors. (¶¶ 33-37.)

Sky Link and Galactic were similar to Star Link. Sky Link consisted of 35 limited partnership units, each requiring an investment of $65,000 and an assumption agreement for not more than $108,000 plus 9% interest. (¶ 39.) Each of the 35 Galactic units required an investment of $50,000 and an assumption agreement for not more than $90,000 plus 9% interest. (¶ 40.)

Rabin and SCNI retained Friedlander, Gaines, Cohen, Rosenthal and Rosenberg, a law firm (which is a defendant in this action), to prepare the private placement memoranda and tax opinions for distribution to potential investors. Plaintiffs claim that the offering memoranda and tax opinions misrepresented and omitted numerous material facts.

Many of the undisclosed facts relate to Rabin's prior history of securities violations and his involvement as a defendant in a variety of pending legal actions. (¶ 48(M).) Other misrepresentations and omissions relate to the partnerships themselves. Plaintiffs allege that conflicts of interest were not revealed, including the amount of profit that Alpha would derive from the partnerships (¶ 48(0)) and the fact that SCNI had sold partnership assets for its own profit (¶ 48(N)). They also allege that the offering documents misrepresented the frequency with which investors would receive financial statements (¶ 48(L)), the necessity to register the securities with the SEC (¶ 48(P)), and the tax benefits that the partnerships would produce (¶¶ 49-52).

The plaintiffs received the offering memoranda and the tax opinions prepared by Friedlander, Gaines. They purchased the interests with the expectation of making profits from the operation of the earth stations and receiving tax benefits.

*3 The tax opinions and the offering memoranda indicated that the deductibility of certain expenses connected with the establishment of the partnerships was open to question (¶¶ 49-50), and that such deductions might be disallowed by the Internal Revenue Service as "pre-opening expenses." Nonetheless, defendant Zarrow, Zarrow & Klein, in preparing tax returns for the partnerships and limited partners included those deductions and characterized them as "advertising expenses." (¶ 51.)

The IRS commenced an audit of the three partnerships in 1982. Rabin and the defendants represented to the plaintiffs and their representatives that the audit was routine and that

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

the deductions that they had taken were in little danger of being successfully challenged. Apparently, however, those deductions were disallowed. (¶ 58.)

In early August 1984, the limited partners including the plaintiffs learned that a trustee in bankruptcy had been appointed to supervise the affairs of the partnerships, petitions having been filed in bankruptcy court for SCNI, Prime, Alpha, CCC and Rabin. (¶ 59.)

*Discussion*

The most prominent feature of this complaint, as the foregoing recitation of the facts illustrates, is that it contains many allegations of wrongdoing by a group of individuals and corporations and then names as defendants a different group of individuals and defendants as to whom very few specific allegations are made. While plaintiffs may have substantial grounds for claims of securities fraud against Rabin and his affiliates for their actions in organizing and selling these partnership interests, they have demonstrated no basis for bringing such claims against the named defendants. The complaint is extremely vague as to the role that the defendants played in the allegedly fraudulent scheme. Most of the factual allegations refer simply to "the defendants." It is left to the court and the defendants to infer what connection there may be between the defendants and any injury that the plaintiffs may have suffered. This task is complicated by the length and unfocused nature of the complaint which makes it difficult to tell precisely what the plaintiffs have and have not alleged. [FN1] It seems clear, however, that the defendants' motions are well taken.

The motions to dismiss filed by PMM and ZZK attack every count of the complaint on a variety of grounds. The plaintiffs' federal claims will be considered seriatim.

A. *Section 10(b) and Rule 10b-5*

Count One alleges a violation of Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. The plaintiffs allege that, in connection with the sale of the partnership interests, "the defendants" knowingly made numerous misrepresentations and omissions upon which the plaintiffs relied in purchasing the interests. (¶¶ 61-66.)

The moving defendants have attacked this claim for failure to plead fraud with specificity, failure to state a claim, and failure to comply with the statute of limitations.

*4 The failure to plead fraud with particularity and the failure to state a claim are necessarily intertwined. Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity." This requirement applies to allegations of fraud in a 10b-5 action. *Decker v. Massey- Ferguson, Ltd.,* 681 F.2d 111, 115 (2d Cir.1982); *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557-59 (2d Cir.1979, cert. denied, 446 U.S. 946 (1980); *Denny v. Barber,* 576 F.2d 465, 468-69 (2d Cir.1978). Thus, a failure to plead fraud with the requisite specificity in a 10b-5 action can result in failure to state a claim justifying dismissal under Rule 12(b)(6).

While it is often appropriate to view a plaintiff's complaint tolerantly at the most preliminary stages and to relegate defendants to discovery as a means of ascertaining the particulars of the plaintiff's claim, *see Schreiber v. Blankfort,* 76 F.R.D. 474, 480 (D.Conn.1977) (denying motion for more definite statement); a plaintiff must have some basis for believing that defendants engaged in securities fraud before bringing such an action against them. *Segal v. Gordon,* 467 F.2d 602, 607-08 (2d Cir.1972); *Ross* at 558; *Denny* at 470. Where, as here, plaintiffs do not make even a minimal effort to sort out the relationship between their claims and the individual defendants and "the complaint is replete with vague accusations against 'the defendants' without reference to the specific parties or the specific acts, it is insufficient under 10b-5." *Natowitz v. Mehlman,* 542 F.Supp. 674, 676 (S.D.N.Y.1982).

In order to state a claim under Rule 10b-5, a plaintiff must allege that the defendant, in connection with the purchase or sale of a security, and with scienter, made misrepresentations or omissions of material fact upon which the plaintiff justifiably relied to its detriment. *Savino v. E.F. Hutton & Co., Inc.,* 507 F.Supp. 1225, 1231 (S.D.N.Y.1981); *Lloyd v. Industrial Bio-Test Laboratories, Inc.,* 454 F.Supp. 807, 810

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

(S.D.N.Y.1978).

At the outset, it is important to note that this case involves three separate private placements made pursuant to three separate offering memoranda. Each plaintiff's right to recover depends upon the facts concerning the particular partnership in which that plaintiff invested. A plaintiff who bought a unit of Star Link cannot recover for a misrepresentation in the Galactic offering memorandum. Likewise, the defendants' liability hinges in part on which offerings they participated in. A defendant's participation in preparing the Galactic offering memorandum would not render that defendant liable for misrepresentations in the Star Link offering memorandum. Plaintiffs' failure to distinguish among the three partnerships in their allegations and claims is a major defect that pervades the complaint. *See, e.g., Zerman v. Ball,* 735 F.2d 15 (2d Cir.1984); *Denny v. Barber,* 576 F.2d 465 (2d Cir.1978). This defect also hinders an accurate assessment of the validity of the claims as pleaded.

*5 1. *Zarrow, Zarrow & Klein*

Turning first to the section 10(b) claim against ZZK, the plaintiffs' failure to make specific allegations concerning the named defendants is especially evident. ZZK's name appears very rarely in the complaint.

Paragraph 51 alleges that:

Despite the characterization of Defendant Friedlander Gaines, Defendant Zarrow, Zarrow & Klein completed the tax returns for the partnership and limited partners included the deductions including but not limited to those characterized as "pre-opening expenses" for the partnerships despite their knowledge of the foregoing facts and improperly characterized them as "advertising expenses".

This allegation, although not crystal clear, appears to refer to actions taken by ZZK *after* the plaintiffs purchased their interests, since it is hard to imagine why ZZK would have prepared tax returns for the plaintiffs involving the partnership interests prior to their purchase. The defendant's post- purchase preparation of tax returns for investors in the limited partnerships could not give rise to a claim of fraud in connection with the purchase or sale of a security. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723 (1975); *Pross v. Katz,* slip op. at 7186-89 (2d Cir. Feb. 28, 1986); *Ross v. A.H. Robins,* 607 F.2d at 558; *Denny v. Barber,* 576 F.2d at 468-69.

The next reference to ZZK is in Paragraph 57, which alleges that:

Plaintiffs, in the exercise of reasonable diligence, could not have known of the facts constituting Defendants [*sic* ] misconduct, or the full extent or gravity thereof, until late 1984 at the earliest. In view of the Defendants' misrepresentations with respect to the worth and value of the limited partnership interests; the legitimacy of using the valuation of the earth stations as formulated by Defendant Zarrow, Zarrow & Klein; the tax returns as compiled by Defendant Zarrow, Zarrow & Klein, and the fact that Defendants failed to correct the inaccuracy of such representations; Plaintiffs had no reason to believe that further investigation or inquiry was necessary.

This paragraph and the one that follows it apparently go to the fraudulent concealment that plaintiffs claim should serve to toll the statute of limitations. Again, these are post-purchase actions which cannot support a claim for securities fraud under Rule 10b-5. Nowhere in the complaint do the plaintiffs set forth any action by ZZK prior to the sale of the partnership interests.

Many of the plaintiffs' allegations center upon the defendants' failure to disclose various facts to them. Mere nondisclosure is not actionable under Rule 10b-5, however, absent some duty on the part of the defendant towards the plaintiff. *Chiarella v. United States,* 445 U.S. 222, 235 (1980). The mere possession of information, without more, does not give rise to a duty to disclose. *Id.* The plaintiffs in this case have not alleged any facts from which a pre-purchase duty on the part of ZZK to disclose to these plaintiffs facts concerning the investments, let alone facts concerning Rabin's past, can be inferred. [FN2]

*6 In order to establish that such a duty existed, plaintiffs would have to plead some facts that would suggest a relationship between the defendant and the plaintiffs prior to the purchase at issue. Thus far, they have not done so.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

As it stands, the complaint does not allege any claim under section 10(b) or Rule 10b-5 against ZZK because it is not possible to detect from its contents that this defendant did anything prior to the sale of the investments upon which the plaintiffs could have relied in deciding to purchase. Absent some indication in the pleadings that ZZK played an active role in the offering or sale of these partnership units, or that it had some pre-existing duty to disclose facts to the plaintiffs, it cannot be held liable for fraud in connection with the purchase or sale of securities. *Pross,* slip op. at 7186- 89; *In re Investors Funding Corp.,* 523 F.Supp. 563 (S.D.N.Y.1980). [FN3] The plaintiffs' 10b-5 claim against ZZK must therefore be dismissed.

2. *Peat, Marwick & Mitchell*

For the most part, plaintiffs' claims against PMM suffer from the same defects as their claims against ZZK. There is no way to ascertain from the complaint whether or not the plaintiffs are claiming that PMM was involved at all in the offer and sale of the Star Link and Galactic partnership interests. [FN4] Therefore, the claims of those plaintiffs who purchased units in those two partnerships will be dismissed against PMM for the same reason that they were dismissed against ZZK.

Plaintiffs have alleged pre-purchase activity on the part of PMM in connection with the Sky Link offering a trifle more specifically. Paragraph 38 of the complaint states that:

On or about April 21, 1980 and thereafter Benjamin Rabin acting by himself and through his affiliates in concert with other Defendants including but not limited to PM & M issued the Sky Link Associates private offering memorandum.

Here, plaintiffs have at least taken the first step of tying PMM to this offering by the bald statement that PMM "issued" the offering memorandum. Unfortunately, they have not stated in even conclusory terms what role PMM played in that issuance. While plaintiffs need not specify in great detail at this early stage the role that PMM played, they must allege some facts supporting their claim for securities fraud. The plaintiffs must have had a reason for deciding to bring this action against PMM, but they have not stated it in their complaint. [FN5] Therefore, the claims of plaintiffs who invested in Sky Link will be dismissed against PMM as well.

3. *Aiding and Abetting*

The plaintiffs also seek to assert a claim against PMM and ZZK for aiding and abetting a securities violation. Although they make this argument more clearly in their memorandum of law than in their complaint, the complaint makes mention of aiding and abetting. Their aiding and abetting claims, however, are insufficient for much the same reasons as their claims of a direct violation by these defendants.

*7 In order to establish a claim against a defendant for aiding and abetting a 10b-5 violation, a plaintiff must allege: 1) that someone other than the defendant committed a primary violation of 10b-5; 2) that the aider and abettor knew of the primary violation; and 3) that the aider and abettor knowingly rendered substantial assistance to the primary violator. *IIT, An International Investment Trust v. Cornfeld,* 619 F.2d 909 (2d Cir.1980); *Edwards & Hanley v. Wells Fargo Securities Clearance Corp.,* 602 F.2d 478 (2d Cir.1979), *cert. denied,* 444 U.S. 1045 (1980); *Rolf v. Blyth, Eastman, Dillon & Co., Inc.,* 570 F.2d 38 (2d Cir.), *cert. denied,* 439 U.S. 1039 (1978).

Plaintiffs claim that they have alleged a primary violation by Rabin and affiliates, and that PMM and ZZK aided and abetted that violation. One cannot aid and abet a fraudulent securities transaction after it has been completed, however. In order to constitute substantial assistance in the accomplishment of the primary violation, defendants would have had to act or omit to act in breach of a duty to the plaintiffs prior to the sale of the securities. *See Mendelsohn v. Capital Underwriters, Inc.,* 490 F.Supp. 1069 (D.Cal.1979); *Morgan v. Prudential Funds, Inc.,* 446 F.Supp. 628 (S.D.N.Y.1978). As has already been pointed out, plaintiffs have not alleged in their complaint any pre-sale involvement by these defendants. They have therefore not stated a claim for aiding and abetting a violation of 10b-5.

4. *Statute of Limitations*

Both defendants have also asserted that any claims under section 10(b) and Rule 10b-5 are time-barred. Although these claims have been dismissed for lack of specificity and failure to state a claim, a

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

discussion of this contention is merited because of the likelihood that it will recur if the plaintiffs amend their complaint.

The 1934 Act does not expressly provide for a private right of action under section 10(b); such a right of action was implied by the courts. Not surprisingly, then, the Act does not furnish a statute of limitations for 10(b) actions. Lacking a Congressional directive, courts look to the most closely analogous statute of limitations of the forum state. *See Auto Workers v. Hoosier Cardinal Corp.,* 383 U.S. 696, 703-04 (1966); *Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402, 406 (2d Cir.1975).

In Connecticut, the federal courts have held consistently that 10b-5 claims are governed by the statute of limitations in the state blue sky laws, section 36-498(e) of the Connecticut General Statutes. *Clute v. Davenport Co.,* 584 F.Supp. 1562, 1577 (D.Conn.1984); *Dandorph v. Fahnstock & Co.,* 462 F.Supp. 961, 963 n. 4 (D.Conn.1979); *Hitchock v. DeBruyne,* 377 F.Supp. 1403, 1407 (D.Conn.1974). This state statute bars suits brought "more than two years after the contract of sale."

Courts very rarely dismiss 10b-5 claims on statute of limitations grounds. *See, e.g., Taylor v. Bear Stearns & Co.,* 572 F.Supp. 667, 672 (N.D.Ga.1983) (denying motion to dismiss 10b-5 claim under statute of limitations as premature); *Fuls v. Shastina Properties, Inc.,* 448 F.Supp. 983, 986-87 (N.D.Cal.1978); *Kramer v. Loewi & Co., Inc.,* 357 F.Supp. 83, 88 (E.D.Wis.1973). It may be appropriate to do so, however, where the running of the statute appears on the face of the complaint. *Hendrickson v. Westland Mineral Corp.,* 463 F.Supp. 826 (S.D.Fla.1978). Defendants argue that, although plaintiffs have not alleged the dates on which they entered into their contracts of sale, they were clearly not within the two-year period, since the last of the offering circulars was issued on December 17, 1980, four and a half years before the plaintiffs filed suit.

*8 It is not necessary to decide whether the defendants' argument would justify the conclusion that the complaint shows that the statute has run, however, because plaintiffs invoke the doctrine of equitable tolling and claim that the statute of limitations did not begin to run until they knew of the fraud that had been perpetrated.

Although the federal courts look to state law for the statute of limitations in a 10b-5 action, federal law governs the question of when the statutory period begins to run. As a result, courts in this district have incorporated federal standards of equitable tolling into the Connecticut statute of limitations for purposes of 10b-5 actions. *See Clute v. Davenport* at 1578; *Long v. Abbott Mortgage Corp.,* 459 F.Supp 108, 113 (D.Conn.1978). Under the equitable tolling doctrine, the limitations period does not begin to run until the plaintiff discovers or in the exercise of due diligence should have discovered the fraud. *Clute* at 1578; *Long* at 1099.

Here, the plaintiffs have alleged that they did not and could not have known of the facts constituting the defendants' misconduct, nor of the truth regarding the alleged misrepresentations and nondisclosures, until late August of 1984. (¶¶ 56-59.) In support of this contention they have cited acts of concealment by the defendants, including sending misleading status reports to the plaintiffs, and misrepresenting the gravity of certain IRS audits. Plaintiffs' assertions that defendants engaged in a common course of conduct to conceal the fraud may or may not be valid. At this early stage, however, they suffice to bring the equitable tolling doctrine into play. It is not clear from the face of the complaint that this action is time-barred; therefore, the statute of limitations alone would not be grounds for dismissing this claim. *See Chute* at 1579.

B. *RICO*

Count Two alleges a violation of the federal racketeering statute, 18 U.S.C. § 1962(c) and (d). The relevant sections of the RICO statute provide:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of ... this section.

The plaintiffs assert that Rabin and affiliates, and

the named defendants, including PMM and ZZK, comprised an "enterprise," and that the defendants conducted the affairs of the enterprise through a pattern of racketeering activity. (¶¶ 68-69.)

1. *Section 1962(c)*

To establish a RICO violation, plaintiffs must allege 1) conduct 2) of an enterprise 3) through a pattern 4) of racketeering activity. *Sedima, SPRL v. Imrex Co.*, 105 S.Ct. 3275 (1985). Defendants assert that plaintiffs have not alleged the necessary pattern of racketeering activity.

*9 As defined in the statute, a pattern of racketeering activity "requires at least two acts of racketeering activity" within a particular time period. 18 U.S.C. § 1961(5). In its most recent consideration of the scope of RICO, the Supreme Court commented upon this definition, noting that the statute says that:

a pattern "*requires* at least two acts of racketeering activity" ... not that it "means" two such acts. The implication is that while two such acts are necessary, they may not be sufficient. Indeed, in common parlance, two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern.

*Sedima*, 105 S.Ct. at 3285 n. 14. Thus, plaintiffs must allege at the very least two acts of racketeering activity by the defendants.

The statute defines racketeering activity as any of a number of specific predicate offenses. 18 U.S.C. § 1961(1). The predicate offenses that are relevant in this case are mail fraud indictable under 18 U.S.C. § 1341, wire fraud indictable under 18 U.S.C. § 1343, and offenses involving fraud in the sale of securities.

As with the 10(b) claims, plaintiffs' RICO allegations fail because they have made no attempt to specify which defendants committed what predicate acts. The Rule 9(b) requirement that fraud be pleaded with particularity applies to fraud being alleged as the basis for a RICO claim. *Lopez v. Dean Witter Reynolds, Inc.*, 591 F.Supp. 581, 585 (N.D.Cal.1984); *Rich-Taubman Associates v. Stamford Restaurant Operating Co.*, 587 F.Supp. 875 (S.D.N.Y.1984); *Clute v. Davenport* at 1570.

Plaintiffs have alleged that "Each of the defendants transmitted or caused to be transmitted private offering memoranda and other information, including, money by wire, in interstate commerce in the course of executing the fraudulent scheme." (¶ 69(b).) This conclusory statement does not serve to allege at least two acts of mail or wire fraud by PMM or ZZK, especially in light of the absence of any more specific allegations that these particular defendants engaged in such acts.

Since plaintiffs have failed to state a claim for securities fraud, the alleged securities frauds cannot serve as predicate offenses for RICO purposes. It may be that plaintiffs can amend their complaint to allege two instances of securities fraud by these defendants which would then support a RICO claim. *See Mauriber v. Shearson/American Express, Inc.*, 546 F.Supp. 391, 397 (S.D.N.Y.1984) ("Until such time as plaintiff adequately pleads [securities] fraud it will not be known whether a RICO violation is properly alleged"). It should be noted, however, that fraudulent conduct by an accountant involving only one of the offerings might not suffice to allege a "pattern." *See Professional Assets Management, Inc. v. Penn Square Bank, Inc.*, 616 F.Supp. 1418 (W.D.Okla.1985) (noting that one engagement to perform one audit does not constitute a pattern of activity). [FN6]

*10 Plaintiffs' claim against PMM and ZZK under subsection (c) for conducting the affairs of an enterprise through a pattern of racketeering activity is dismissed for failure to allege a pattern of racketeering activity.

2. *Section 1962(d)*

Plaintiffs also allege in Count Two that the defendants conspired to violate section 1962(d). It is possible to allege a conspiracy offense under RICO separate from the underlying substantive racketeering offense. See *United States v. Tille*, 729 F.2d 615, 619 (9th Cir.), *cert. denied*, 105 S.Ct. 156, 164 (1984).

Participation in a RICO conspiracy, however, requires more than a mere agreement to commit predicate acts. *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 792 n. 8 (3d Cir.1984), *cert. denied*, 105 S.Ct. 1179 (1985). To be held liable as a member of a

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

conspiracy, a defendant must "by his words or actions have objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes." *Laterza v. American Broadcasting Co., Inc.,* 581 F.Supp. 408, 413 (S.D.N.Y.1984) (quoting *United States v. Elliott,* 571 F.2d 880, 903 (5th Cir.), *cert. denied,* 439 U.S. 953 (1978)). It is insufficient merely to allege that a defendant "played an unspecified role in an undetailed conspiracy." *Laterza* at 413.

As it stands, the complaint does not plead any facts from which to draw an inference that PMM or ZZK conspired to participate in the affairs of an enterprise through a pattern of racketeering activity. [FN7] Again, it is possible that plaintiffs can amend the complaint to adequately plead a conspiracy, but they have not succeeded on the first try. [FN8]

C. *Section 12(1)*

Count Three alleges a violation of sections 5(a) and 5(c) of the Securities Act of 1933, giving rise to liability under section 12(1) of that Act. Section 12(1), 15 U.S.C. § 77*l* (1) provides a right of action to a purchaser of a security against persons who offer or sell the security in violation of section 5. Section 5, 15 U.S.C. § 77e, makes it unlawful to offer, buy, sell or deliver a security unless a registration statement is in effect as to the security. Plaintiffs assert that the limited partnership interests were securities as to which no registration statements were filed with the SEC, and that the defendants offered, sold, and delivered them by use of means of interstate commerce.

The 1933 Act contains an express statute of limitations for actions brought under section 12(1). Section 13 of the 1933 Act provides that:

No action shall be maintained to enforce any liability created under ... section 77*l* (2) [section 12(2)] of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 77*l* (1) [section 12(1)] of this title, unless brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under section ... 77*l* (1) of this title more than three years after the security was bona fide offered to the public, or under section 77*l* (2) of this title more than three years after the sale.

*11 15 U.S.C. § 77m.

Plaintiffs alleging a violation of section 12 must plead facts demonstrating compliance with the statute of limitations. *Wigand v. Flo-Tex, Inc.,* 609 F.2d 1028, 1033 n. 5 (2d Cir.1979); *Eriksson v. Galvin,* 484 F.Supp. 1108, 1118 (S.D.N.Y.1980); *Hagert v. Glickman, Lurie, Eiger & Co.,* 520 F.Supp. 1028, 1032 (D.Minn.1981). Plaintiffs have alleged in the complaint that the offering memoranda were issued on or about November 21, 1979; April 21, 1980; and December 17, 1980. There is no indication from the complaint that any violations of section 12(1) by the defendants occurred a significant length of time after the memoranda were issued. The allegation that defendants were offering to sell, selling, and delivering the interests "since 1979 and thereafter" does not suffice to avoid the bar of the statute of limitations. The plaintiffs should know when they purchased their interests and whether or not it was within the statutory period.

The three year statute of limitations in section 13 is an absolute bar and is not subject to equitable tolling. Plaintiffs argue that the three year portion of the statute should be equitably tolled, citing *In re Homestake Production Company Securities Litigation,* 76 F.R.D. 337 (N.D.Okla.1975). This court has recently considered and rejected that argument in the case of *Clute v. Davenport,* 584 F.Supp. 1562, 1576-77 (D.Conn.1984). *See also Admiralty Fund v. Hugh Johnson & Co.,* 677 F.2d 1301, 1308 (9th Cir.1982); *Summer v. Land & Leisure, Inc.,* 664 F.2d 965 (5th Cir.1981), *cert. denied,* 458 U.S. 1106 (1982); *Turner v. First Wisconsin Mortgage & Realty Trust,* 442 F.Supp. 283, 389-92 (W.D.N.Y.1977); *Cowsar v. Regional Recreations, Inc.,* 65 F.R.D. 394 (M.D.La.1974).

Each plaintiff, in order to maintain this action under section 12(1), must allege that the partnership interest that it bought was offered to the public within three years of the date suit was filed. Since there is no reason to believe that any of these interests were offered to the public by the defendants later than June 28, 1982, plaintiffs' claims under section 12(1) are dismissed against all

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

the defendants. [FN9]

D. *Section 17(a)*

Count Eight alleges a violation of section 17(a) of the 1933 Act, 15 U.S.C. § 77q(a), which makes it unlawful:

for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly--

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Defendants argue that there is no private right of action under section 17(a).

*12 The existence of a private right of action under section 17(a) is a very controversial issue. This is particularly true within the Second Circuit. The Court of Appeals has held that a private right of action exists. *Kirshner v. United States,* 603 F.2d 234, 241 (2d Cir.1978), *cert. denied,* 442 U.S. 909 (1979). To date, the Supreme Court has declined to decide this issue, while recognizing it as unsettled. *International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 557 n. 9 (1979); *Herman & MacLean v. Huddleston,* 459 U.S. 375, 378 n. 2 (1983). Supreme Court decisions have called into question some of the premises underlying the *Kirshner* decision, however. The *Kirshner* court assumed that the elements of an action under section 17 were identical to the elements of an action under section 10(b). This assumption is no longer valid, since the Supreme Court held in *Aaron v. SEC,* 446 U.S. 680, 697 (1980), that actions under sections 17(a)(2) and (3) do not require proof of scienter on the part of defendants but may be maintained for negligence as well. Under section 10(b), on the other hand, scienter on the part of the defendant is a necessary element. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185 (1976).

Two recent opinions of the Second Circuit Court of Appeals have hinted that *Kirshner* may not be the last word on the existence of a right of action under section 17(a) in this Circuit. *See Yoder v. Orthomolecular Nutrition Institute,* 751 F.2d 555, 559 n. 3 (2d Cir.1985); *Zerman v. Ball,* 735 F.2d 15, 20 (2d Cir.1984). *But see Pross v. Katz,* slip op. at 7183-84 (2d Cir. Feb. 28, 1986) (apparently assuming, without discussion, existence of right of action under 17(a)). Meanwhile, the district courts have been reaching a variety of conclusions on this issue. *See, e.g., Ackerman v. Clinical Data, Inc.,* Fed.Sec.L.Rep. ¶ 92,207 (S.D.N.Y. July 8, 1985) (no private right of action); *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 545 F.Supp. 1314, 1354 n. 20 (S.D.N.Y.1982) (private right of action).

At this point, however, it is not necessary to grapple with this question. Even if a private right of action does exist, plaintiffs' claims under this section fail for the same reason as their claims under section 10(b). The only difference that has been identified between actions under 17(a) (if they exist) and actions under 10(b) is the question of scienter. Plaintiffs' securities claims suffer from defects that go beyond a failure adequately to allege scienter. They have not alleged any acts by PMM or ZZK which would support an inference that those defendants did anything untoward related to the offer or sale of a security. *Pross v. Katz.* Therefore, plaintiffs' claims under section 17(a) are dismissed against PMM and ZZK.

E. *Pendent State Law Claims*

Defendants' final contention is that the remaining counts of the complaint should be dismissed since they arise under state law. Having dismissed all of the plaintiffs' state claims against defendants PMM and ZZK, it is appropriate to dismiss these pendent state law claims as well. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966); *McLearn v. Cowen & Co.,* 660 F.2d 845, 848 (2d Cir.1981); *Natowitz v. Mehlman,* 542 F.Supp. at 677. If plaintiffs amend their complaint to adequately allege federal claims against these defendants, it may be appropriate to reinstate the state law claims.

*Conclusion*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

*13 Count One of the complaint is dismissed as it relates to defendants PMM and ZZK for failure to plead fraud with particularity and failure to state a claim under section 10(b) of the 1934 Act.

Count Two of the complaint is dismissed as it relates to defendants PMM and ZZK for failure to plead fraud with particularity and failure to state a claim under RICO.

Count Three of the complaint is dismissed in its entirety as being barred by the statute of limitations.

Count Eight of the complaint is dismissed as it relates to defendants PMM and ZZK for failure to state a claim under section 17(a) of the 1933 Act.

The remaining counts of the complaint are dismissed against PMM and ZZK because they state only pendent state claims and are not appropriate in view of the disposition of the federal claims.

Plaintiffs have 30 days from the date of this ruling to amend their complaint. In so doing, plaintiffs should attempt to allege some connection between these particular defendants and each of the three securities offerings and to give a clearer picture of the circumstances on which they base this suit against these defendants.

SO ORDERED.

FN1. In response to the defendants' assertions that they have failed to plead fraud with particularity, the plaintiffs respond that Rule 9(b) must be read in conjunction with Rule 8(a) which requires "a short and plain statement of the claim." This complaint, consisting of 53 pages and 134 paragraphs, satisfies neither standard.

FN2. In their memorandum of law in opposition to the motions to dismiss, the plaintiffs go into greater detail concerning the role of both accounting firms in the partnership scheme. This expanded explanation hints at the possibility that plaintiffs could adequately allege pre-sale participation by ZZK. For instance, plaintiffs state that ZZK prepared the financial projections and statements contained within the offering documents. See Memorandum in Opposition of Defendant Zarrow, Zarrow & Klein, P.A.'s Motion to Dismiss at 14. No such allegations are included in the complaint however. Even if these further facts would suffice to state a claim (even in the memorandum it remains unclear what plaintiffs are asserting that ZZK did and at what point), any such allegations must be included in the complaint to be effective. See Pross v. Katz, slip op. at 7182 (distinguishing between claim in plaintiff's brief and "forthright allegation[s]" in complaint).

FN3. The mere fact that a defendant acted as an accountant in connection with a securities offering (an allegation not made in this complaint) may not be enough to state a claim against it for failure to disclose. The Second Circuit Court of Appeals has held in dismissing a complaint for failure to state a claim under Rule 10b-5 that an accountant has "no independent duty to see to the correction of portions of the prospectus other than the financial statement it prepared." IIT, An International Investment Trust v. Cornfeld, 619 F.2d 909, 927 (2d Cir.1980). Thus, in the absence of any allegations from which an inference could be drawn that ZZK was acting in some way other than as a typical accountant, or that it had "a conscious and specific motivation for not acting" or "an independent duty to report," the plaintiffs may encounter difficulty in stating a claim against ZZK as to omissions and misrepresentations in the offering memoranda that were not part of the financial statements. IIT at 927. The same consideration is applicable to plaintiffs' claims against PMM.

FN4. Paragraph 37 states that:
It was represented by Mr. Rabin and some of the Defendants including Peat Marwick Mitchell & Co. ... that these assumption agreements and the debt conversion from nonrecourse to recourse would be utilized solely for the purpose of creating tax losses

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

for their clients including some of the Plaintiffs.

This paragraph appears following the description of the Star Link offering, but it is not clear whether it refers to the Star Link assumption agreements. Even if it does, there is no allegation that PMM took part in the Star Link offering, nor any explanation at all as to the when or how PMM made such representations.

FN5. As with ZZK, the plaintiffs have attempted to flesh out their allegations against PMM in their memorandum of law in opposition to the motions to dismiss. Plaintiffs cannot amend their complaint by means of a memorandum of law opposing a motion to dismiss. In addition, the plaintiffs' attempts to elaborate upon the complaint in their memorandum do not clarify their claims. They specify that paragraphs 36, 37, 38, 40, 42, 43, 45, 46, 48(J), 48(N), 48(O), 48(Q), 53(b), 54, 57, and 58 of the complaint concern PMM's actions. Of those paragraphs, only three (¶ ¶ 37, 38 and 57) mention PMM by name. Several of the others do not even purport to encompass PMM, but rather state specifically that they refer to activities of specific individuals or entities.

Those paragraphs cannot be interpreted to include PMM. Paragraph 36 simply alleges the nature of the assumption agreements; paragraphs 42 and 45 allege the manner in which the units were sold through selling agents; paragraph 53(b) alleges activities by defendant Friedlander Gaines. Although the remainder of the referenced paragraphs of the complaint refer to "the defendants," many of them contain allegations which simply are not relevant to PMM. For instance, paragraph 48 lists a variety of material facts that the defendants failed to disclose to the plaintiffs. 48(J) refers to an omission in the Star Link offering memorandum, but there is no allegation that PMM had anything to do with that memorandum. 48(O) refers to certain representations contained in the three offering memoranda, concluding "these representations were misleading and were represented solely to secure tax deductions and credits to the limited partner." This allegation simply makes no sense.

FN6. In *Sedima,* the Supreme Court refused to require RICO plaintiffs to show the existence of a "racketeering injury" separate from the harm caused by the underlying predicate offenses. While rejecting what had become the most significant limitation on the scope of RICO, however, the Court indicated a more viable source of limitation--the "pattern" requirement. *Sedima,* 105 S.Ct. at 3285 n. 14. Quoting from the legislative history of RICO, the Supreme Court noted that:

"The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern."

*Id.* (quoting from S.Rep. No. 91-617, p. 158 (1969)) (emphasis supplied by Supreme Court). Other federal courts have begun to focus increasingly on defining the contours of the "pattern" requirement and have been requiring something more than simply the commission of two predicate offenses as part of one fraudulent undertaking. *See, e.g., Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.,* 615 F.Supp. 828 (N.D.Ill.1985); *Allington v. Carpenter,* 619 F.Supp. 474 (C.D.Cal.1985) (to constitute a "pattern" of racketeering activity, racketeering acts must be connected in that they have common perpetrators, methods of commission, or victims, and yet be sufficiently unconnected in time or substance to warrant consideration as separate criminal episodes); *Soper v. Simmons International, Ltd,* 84 Civ. 0070 (S.D.N.Y. Feb. 27, 1986) (Sand, J.).

FN7. In their memorandum, plaintiffs refer vaguely to a "special relationship" which PMM entered into with Rabin and

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

affiliates. In support thereof they append an unsigned, undated letter concerning an indemnification agreement. This allegation, if contained in a pleading and stated somewhat more coherently, might help to support a claim that PMM affirmatively participated in a conspiracy with Rabin and/or his corporations. As part of a memorandum of law, however, it is of no effect. *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984), *cert. denied*, 105 S.Ct. 1758 (1985); *Bowman v. Grolsche Bierbrouwerij B.V.*, 474 F.Supp. 725, 728 (D.Conn.1979).

FN8. Defendants also assert that the RICO claim is barred by the statute of limitations.
Congress has not specified a statute of limitations for RICO actions. Defendants apparently invoke the same two-year statute of limitations that applies to the 10b-5 claim, Connecticut's section 36-498(e). *See also Clute* at 1577. As with the 10b-5 claim, if plaintiffs could assert a RICO claim, it would not be barred at this stage by the statute of limitations because of the possibility that the period should be equitably tolled.

FN9. In their memorandum, plaintiffs attempt to assert a claim under section 12(2). For purposes of avoiding the statute of limitations, the plaintiffs are in no better position under section 12(2) than under section 12(1), since there is no indication that any of them purchased their interests after June 28, 1982.

1986 WL 15663, 1986 WL 15663 (D.Conn.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works