**EXHIBIT F**

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CLARENCE R. COLLINS, JR., et al.,    :    CIVIL ACTION NO. 3:03 CV-945(CFD)

                               :

V.                                :

                               :

OLIN CORPORATION, et al.,         :

                               :    February 9, 2004

## OLIN CORPORATION'S RESPONSES
## TO PLAINTIFFS' REQUESTS FOR ADMISSIONS

Defendant, Olin Corporation ("Olin"), in accordance with Fed. R. Civ. P. 36, files its

Responses to Plaintiffs' Requests for Admissions Directed to Olin as follows:

### PRELIMINARY STATEMENT

Plaintiffs' Request For Admissions are directed jointly to the Town of Hamden and to

Olin.  Olin is providing responses to Plaintiffs' Request for Admissions based on Olin's

independent knowledge, information and belief.   Olin has no obligation to answer Requests for

Admission that it deems are directed to the Town of Hamden.  Olin further states that the

following responses have been made after reasonable inquiry into Olin's records.  To the extent

Olin lacks knowledge or information to respond to a request, Olin states that it has made a

reasonable inquiry and that the information known or readily obtainable by Olin is insufficient to

enable Olin to admit or deny such request.

### GENERAL OBJECTIONS

1.      Pursuant to the July 14, 2003 Scheduling Order (approved by the Court on

October 14, 2003 and modified by consent of the parties in January 2004), discovery at this stage

is limited to issues of class certification, governmental immunity and successor liability.

Plaintiffs' written discovery requests directed to Olin seek information to support Plaintiffs'

allegations that "Olin is the successor in interest to Winchester Repeating Arms Company." *See*,

*92*

Plaintiffs' Amended Complaint, ¶ 7. Plaintiffs' allegations in support of this conclusion appear

to focus on the "substantial continuity" test for successor liability. *See, e.g.*, Plaintiffs' Amended

Complaint, ¶¶ 17 through 19 (listing the alleged reasons Western Cartridge Company continued

the operations of Winchester "at a level sufficient to constitute a *substantial continuity* of

business for liability purposes") (emphasis added).

   To the extent Plaintiffs rely on the "substantial continuity" test for successor liability

under their CERCLA count, that reliance has been rendered moot by the Second Circuit's recent

opinion in *State of New York v. National Services Industries, Inc.*, No. 02-9227, 2003 U.S. App.,

LEXIS 25411 (2d Cir. Dec. 17, 2003). In *New York v. National Services Industries, Inc.*, the

court held that the Supreme Court's decision in *United States v. Bestfoods*, 524 U.S. 51 (1998),

required the Second Circuit to overturn a 1996 Second Circuit decision adopting the "substantial

continuity" theory of successor liability. Instead, the Court held that a court must look to the

state common law rules of successor liability.

   Accordingly, and consistent with the *New York v. National Services Industries, Inc.*

decision, Plaintiffs may only attempt to prove successor liability based on the Connecticut

common law successor liability rules. Under the general rule in Connecticut, a corporation

which purchases all the assets of another company does not become liable for the debts and

liabilities of its predecessor unless: 1) the purchase agreement expressly or impliedly so

provides; 2) there was a merger or consolidation of the two firms; 3) the purchaser is a 'mere

continuation' of the seller; or 4) the transaction is entered into fraudulently for the purpose of

escaping liability. *See, e.g., Ricciardello v. J.W. Grant & Co.*, 717 F.Supp. 56, 57-58 (D.Conn.

1989). With respect to "mere continuation," this exception focuses on a continuity of ownership

between corporations involved in an asset purchase. *See, e.g., Pesce v. Overhead Door Corp.*,

1996 U.S. Dist. LEXIS 22244, at *11-12 (D.Conn. July 25, 1996) ("The focus of the [mere continuation] exception is not whether there is a continuation of the business, but rather the test is whether there is a continuation of the corporate identity of the seller. The key element in determining whether the corporate entity continues to exist is a determination of whether there is a common identity of the officers, directors, and stockholders in both the selling and purchasing corporations.")

Winchester Repeating Arms Company of Delaware ("Winchester – Delaware") was put into receivership on a creditors' bill filed in United States District Court in Connecticut in 1931. Through a Court supervised auction, Winchester – Delaware's assets were sold to the highest bidders, two men named P.C. Beardslee and Ben-Fleming Sessel. These men subsequently transferred the assets that they acquired at the auction to Winchester Repeating Arms Company of Maryland ("Winchester – Maryland). There was no commonality of stockholders between Winchester – Delaware and Winchester – Maryland. Absent that commonality, there can be no "mere continuation" exception to the no successor liability rule in Connecticut.

In these proceedings, the only relevant transaction with respect to successor liability is what happened in and around 1931 when Winchester-Delaware's assets were sold as reflected in the Final Decree Confirming Sale and Directing Execution and Delivery of Deeds ("Final Decree Confirming Sale," a copy of which is being produced to Plaintiffs). The assets were purchased by two individuals, P.C. Beardslee and Ben-Fleming Sessel. Within a week of their December 15, 1931 purchase of the assets, Beardslee and Sessel "assigned , transferred and set over" all of their ownership of the acquired assets to Winchester Repeating Arms Company of Maryland, a wholly owned subsidiary of Western Cartridge Company (hereinafter "Winchester-Maryland"). If Winchester-Maryland is not the successor of Winchester-Delaware, Plaintiffs' successor

liability allegations are at an end.  As a result, any requests by Plaintiffs which seek information

for transactions or time periods other than those related to the asset purchase in or around 1931

are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in

these proceedings.

Finally, any reliance Plaintiffs place on the product line exception to the no-successor

liability rule is misplaced.  First, neither the Connecticut Supreme Court, nor any appellate court

in Connecticut recognizes the product line exception to the no-successor liability rule.  *See, e.g.,*

*Pesce*, 1998 U.S. Dist. LEXIS 20615 at *5 (declining to adopt the product line exception and

stating that "no Connecticut appellate court had recognized the product line exception" and

ruling that "it is this court's best judgment that the Connecticut Supreme Court would not extend

the law to recognize this exception.").  Second, no Connecticut Superior Court has applied the

product line exception outside the context of a product liability claim – that is, a claim for

personal injuries resulting from the continued manufacture of the type of product alleged to have

caused injury.  This is not a product liability case.  It would be burdensome and oppressive to

respond to the extensive discovery requests propounded by the Plaintiffs when there is no body

of Connecticut case law that imposes successor liability on a product line exception basis on the

facts of this case.

      2.      Olin objects to Plaintiffs definition of Olin as meaning "the Olin Corporation and

its predecessors."  The term "predecessors" is vague and ambiguous and calls for a legal

conclusion.  Olin is answering Plaintiffs Requests for Admission on behalf of the named

defendant Olin Corporation.

      3.      Olin objects to Plaintiffs' definition of the "Non-Public Properties" as vague and

ambiguous.

4.    Olin objects to Plaintiffs' characterization of portions of the Site as "wetlands" on the grounds that the term is vague and ambiguous.

## REQUESTS TO ADMIT

1.    Attached hereto as Exhibit A is a genuine copy of the Consent Order.

**RESPONSE:** Admitted.

2.    On July 10, 2001 the Commissioner issued Order No. SRD-128 to the Respondents, requiring the respondents to investigate and remediate sources of pollution at the Site.

**RESPONSE:** Admitted.

3.    Olin and Hamden appealed from the issuance of the Order and a contested case proceeding commenced.

**RESPONSE:** Admitted, although other parties appealed, as well.

4.    On February 13, 2003, Hamden signed the Consent Order.

**RESPONSE:** Olin lacks knowledge or information to either admit or deny this Request other than to say that February 13, 2003 is the date indicated under the Hamden signature line.

5.    On February 7, 2003, Olin signed the Consent Order.

**RESPONSE:** Admitted.

6.    On April 16, 2003, the Consent Order was accepted as a final decision in Order No. SRD-128.

**RESPONSE:** Admitted.

7.    In the early 1900s, Hamden solicited owners of properties containing wetlands and low lying areas to allow refuse to be dumped on their property.

**RESPONSE:** RFA 7 relates to the co-defendant's history and is best responded to by the co-defendant. Therefore, Olin objects to providing a response as to do so would be unduly burdensome on Olin.

8.    In the first half of the last century substantial portions of the Site contained wetlands and low lying areas.

**RESPONSE:** Objection: This request is vague and ambiguous as to "substantial" and uncertain as to time, especially as this landscape changed over fifty years. Subject to this objection, Olin admits that certain areas of the Site contained swamps in the first half of the 20th Century.

9.    From as early as 1915, Hamden solicited owners of properties containing wetlands and low lying areas to allow refuse to be dumped on them. In some instances Hamden would operate public dumps on these properties and when filled, the properties would be developed.

**RESPONSE:** RFA 9 relates to the co-defendant's history and is best responded to by the co-defendant. Therefore, Olin objects to providing a response as to do so would be unduly burdensome on Olin.

10.    Some time prior to 1917, Hamden established dumps between Goodrich Street and Morse Street.

**RESPONSE:** RFA 10 relates to the co-defendant's history and is best responded to by the co-defendant. Therefore, Olin objects to providing a response as to do so would be unduly burdensome on Olin.

11. The dumps between Goodrich Street and Morse Street were closed some time after World War I.

**RESPONSE:** RFA 11 relates to the co-defendant's history and is best responded to by the co-defendant. Therefore, Olin objects to providing a response as to do so would be unduly burdensome on Olin.

12. Thereafter substantial areas where the dumps were located were developed for residential use.

**RESPONSE:** Objection: This request is vague and ambiguous as to the term "substantial" and is uncertain as to time. Further, RFA 12 relates to the co-defendant's history and is best responded to by the co-defendant. Therefore, Olin objects to providing a response as to do so would be unduly burdensome on Olin.

13. During the mid-1920s to late-1930s Hamden established other public dumps in the area where Rochford Field and Mill Rock Park are currently located. These dumps were referred to as the Newhall Street Dump and the Mill Rock Dump.

**RESPONSE:** RFA 13 relates to the co-defendant's history and is best responded to by the co-defendant. Therefore, Olin objects to providing a response as to do so would be unduly burdensome on Olin.

14. Prior to 1934, the New Haven Water Company entered into an agreement with Winchester Repeating Arms Company, which gave Winchester use of what is currently known as the Hamden Middle School Property for dumping purposes.

**RESPONSE:** Olin objects to this RFA as the phrase "Winchester Repeating Arms Company" is undefined. There were different companies, incorporated in different states, that used the name "Winchester Repeating Arms Company" at different points in time. Olin does not know to which company this RFA refers.

15.     The Winchester Repeating Arms Company, a Connecticut corporation, was founded in 1866 in New Haven, Connecticut.

**RESPONSE:** Objection: Irrelevant, see General Objection No. 1. Subject to and without waiving this objection, although Olin does not have records verifying the truth or falsity of this request, upon information and belief, and to the extent relevant to these proceedings, Olin states that Winchester Repeating Arms Company of Connecticut was originally chartered in Connecticut, under a different name, in 1865 and changed its name to Winchester Repeating Arms Company of Connecticut in 1866.

16.     On or about February 7, 1929, Winchester Repeating Arms Company was renamed Winchester Manufacturing Company and was ordered by the United States District court to reorganize with the Winchester Company. All assets were transferred to a newly formed corporation known as Winchester Repeating Arms Company of Delaware.

**RESPONSE:** Objection: Irrelevant, see General Objection No. 1. Subject to and without waiving this objection, although Olin does not have records verifying the truth or falsity of this request, upon information and belief, and to the extent relevant to these proceedings, Olin admits this request.

17.     On January 22, 1931, the Winchester Repeating Arms Company of Delaware was put into receivership on a creditor's bill filed in the United States District Court in Connecticut.

**RESPONSE:** Objection: Irrelevant, see General Objection No. 1. Subject to and without waiving this objection, although Olin does not have records verifying the truth or falsity of this request, upon information and belief, and to the extent relevant to these proceedings, Olin admits this request.

18.     In December of 1931, the assets of Winchester Repeating Arms Company of Delaware were sold out of receivership and were subsequently purchased by John M. Olin's Western Cartridge Company.

**RESPONSE:** The request as stated is denied based on Olin's information and belief that the events of December 1931 occurred as follows: On December 15, 1931, Winchester Repeating Arms Company of Delaware's assets were sold as reflected in the Final Decree Confirming Sale and Directing Execution and Delivery of Deeds ("Final Decree Confirming Sale", a copy of which is being produced to Plaintiffs). The assets were purchased by two individuals, P.C. Beardslee and Ben-Fleming Sessel. Within a week after their purchase of the assets, Beardslee and Sessel "assigned, transferred and set over" all of their ownership of the acquired assets to Winchester Repeating Arms Company of Maryland, a wholly-owned subsidiary of Western Cartridge Company (hereinafter "Winchester-Maryland").

19.     Western Cartridge Company is a predecessor of Olin Corporation.

**RESPONSE:** Admitted.

20.     Since approximately 1933, Olin Corporation and its predecessors continued the practice of the Winchester Repeating Arms Company of dumping ash and other waste at the Hamden Middle School Property as fill with the permission of the New Haven Water Company.

**RESPONSE:** Objection: This request is vague as to time, the phrase "Olin Corporation and its predecessors" is vague and ambiguous and objected to, as stated in General Objection No. 2, and the phrase "Winchester Repeating Arms Company" is not defined. There were different companies, incorporated in different states, that used the name "Winchester Repeating Arms Company" at different points in time. Olin does not know to which company this RFA refers.

21.     Olin also used public dumps established by the Town of Hamden on Public and Non-Public Properties to discard ash and other manufacturing wastes that it generated at its New Haven plant on Winchester Avenue.

**RESPONSE:** Olin objects to this Request on the grounds that the terms "Public" and "Non-Public Properties" are vague and ambiguous. Subject to and without waiving this objection, Olin admits that after Winchester-Maryland acquired the assets more fully described in the Final Decree Confirming Sale, Winchester-Maryland deposited ash and other materials from Winchester-Maryland's New Haven Plant in designated disposal areas in the Newhall Section of the Town of Hamden.

**RESPONSE:** Olin objects to this Request on the grounds that the phrase "including, but not limited to" is vague, ambiguous and overbroad. Subject to and without waiving this objection, Olin admits that certain materials were disposed of at various locations within the Site, and at those locations, in various proportions. Olin denies the remaining portions of this Request.

27.      Soils at the Site are polluted with metals, volatile organic compounds, semi volatile organic compounds, polychlorinated biphenyls (PCBs) and total petroleum hydrocarbons.

**RESPONSE:** Objection: This request is overbroad, vague and ambiguous as to "polluted" and "Site" and uncertain as to location.

28.      Prior to filling, the areas of the Newhall Section that contained wetlands and low lying areas could not be developed with residential dwellings.

**RESPONSE:** RFA 22 relates to the co-defendant's history and is best responded to by the co-defendant. Therefore, Olin objects to providing a response as to do so would be unduly burdensome on Olin.

29.      After filling, the areas of the Newhall Section that previously contained wetlands and low lying areas were developed with residential dwellings.

**RESPONSE:** Olin objects to this Request as the "areas of the Newhall Section" to which this Request refers are undefined.

30.      Hamden issued building permits for the construction of residential dwellings that were constructed in the Newhall Section.

**RESPONSE:** RFA 30 relates to the co-defendant's history and is best responded to by the co-defendant. Therefore, Olin objects to providing a response as to do so would be unduly burdensome on Olin.

22.    On March 29, 1950, the New Haven Water Company transferred the Hamden Middle School Property to the Town of Hamden.

**RESPONSE:** RFA 22 relates to the co-defendant's history and is best responded to by the co-defendant. Therefore, Olin objects to providing a response as to do so would be unduly burdensome on Olin.

23.    On March 30, 1950, the town of Hamden transferred the Hamden Middle School Property to the State of Connecticut for use as a regional technical training school.

**RESPONSE:** RFA 23 relates to the co-defendant's history and is best responded to by the co-defendant. Therefore, Olin objects to providing a response as to do so would be unduly burdensome on Olin.

24.    From March 30, 1950 to February 24, 1954 the State of Connecticut owned the Hamden Middle School Property and thereafter it was conveyed back to the Town of Hamden.

**RESPONSE:** RFA 24 relates to the co-defendant's history and is best responded to by the co-defendant. Therefore, Olin objects to providing a response as to do so would be unduly burdensome on Olin.

25.    Olin continued its practice of dumping at the Hamden Middle School Property until approximately 1957.

**RESPONSE:** Olin objects to this Request as vague and ambiguous as to the phrase "its practice of dumping" and is uncertain as to time.

26.    Industrial waste including, but not limited to, batteries, empty ammunition shells, ash, slag and coal waste, as well as other industrial and household waste are buried throughout the Site in varying proportions and at various locations.

31.    Hamden issued certificates of occupancy for the residential dwellings that were

constructed in the Newhall Section.

**RESPONSE:** RFA 31 relates to the co-defendant's history and is best responded to by
the co-defendant. Therefore, Olin objects to providing a response as to do so would be unduly
burdensome on Olin.

32.    Hamden collected fees in connection with the issuance of building permits for the

construction of residential dwellings that were constructed in Newhall Section.

**RESPONSE:** RFA 32 relates to the co-defendant's history and is best responded to by
the co-defendant. Therefore, Olin objects to providing a response as to do so would be unduly
burdensome on Olin.

33.    Hamden levied real property taxes for real property located in the Newhall

Section.

**RESPONSE:** RFA 33 relates to the co-defendant's history and is best responded to by
the co-defendant. Therefore, Olin objects to providing a response as to do so would be unduly
burdensome on Olin.

34.    Hamden collected real property taxes in connection with real property located in

the Newhall Section.

**RESPONSE:** RFA 34 relates to the co-defendant's history and is best responded to by
the co-defendant. Therefore, Olin objects to providing a response as to do so would be unduly
burdensome on Olin.

35.    The development of the residential dwellings in the Newhall Section increased

Hamden's population and tax base.

1691105.01                                    12

**RESPONSE:** RFA 35 relates to the co-defendant's history and is best responded to by the co-defendant. Therefore, Olin objects to providing a response as to do so would be unduly burdensome on Olin.

36.    The development of the residential dwellings in the Newhall Section increased Hamden's tax revenues.

**RESPONSE:** RFA 36 relates to the co-defendant's history and is best responded to by the co-defendant. Therefore, Olin objects to providing a response as to do so would be unduly burdensome on Olin.

37.    Hamden allowed Olin to dispose of its industrial waste at the Site.

**RESPONSE:** Objection: the term "industrial waste" is vague and ambiguous. Subject to and without waiving this objection, Olin admits that it deposited certain materials from its New Haven facility at certain portions of the Site.

38.    Olin and Hamden cooperated in the disposal of Olin's industrial waste in the Newhall Section from 1915 until the 1950s.

**RESPONSE:** Objection: the terms "industrial waste" and "cooperated" are vague and ambiguous. In addition, Olin has no knowledge of any disposal at the Newhall Section of the Town of Hamden prior to the acquisition of assets referred to in response to Request for Admission No. 18.

39.    Olin operated a factory or manufacturing facility in New Haven, Connecticut.

**RESPONSE:** Admitted.

40.    Since at least 1915 to the present, Olin has not operated a factory or manufacturing facility in Hamden.

**RESPONSE:** Admitted.

41.   Since at least 1915 to the present, Olin has not paid real property taxes in Hamden.

**RESPONSE:** Denied.

42.   Olin Corporation ("Olin") is a Virginia corporation that was incorporated in 1892.

**RESPONSE:** Admitted, although Olin Corporation was not originally incorporated in Virginia.

43.   Western Cartridge Company was incorporated under Illinois law in 1898.

**RESPONSE:** Denied, it was incorporated in New Jersey in 1898.

44.   Winchester Repeating Arms Company of Maryland was incorporated under the laws of Maryland as a wholly-owned subsidiary of Western Cartridge Company until 1938 when it became a division of Western Cartridge Company.

**RESPONSE:** Admitted.

45.   Winchester Repeating Arms Company of Delaware was incorporated in 1929.

**RESPONSE:** Objection: Irrelevant, see General Objection No. 1. Subject to and without waiving this objection, although Olin does not have records verifying the truth or falsity of this request, upon information and belief, and to the extent relevant to these proceedings, Olin admits this request.

46.   Winchester Repeating Arms Company of Connecticut was incorporated in 1866 and maintained its principal place of business in New Haven, Connecticut.

**RESPONSE:** Objection: Irrelevant, see General Objection No. 1. Subject to and without waiving this objection, although Olin does not have records verifying the truth or falsity of this request, upon information and belief, and to the extent relevant to these proceedings, Olin states that Winchester Repeating Arms Company of Connecticut was originally chartered in

Connecticut, under a different name, in 1865 and changed its name to Winchester Repeating Arms Company of Connecticut in 1866.

47.    In 1944 there was a corporate merger between Western Cartridge Company and Olin. As a result of the merger the new entity was called Olin Industries, Inc.

**RESPONSE:** Objection: the term "corporate merger" is vague and ambiguous. Subject to and without waiving this objection, Olin states that on December 31, 1944, Western Cartridge merged with Olin Corporation. After this merger the corporate name was changed to Olin Industries, Inc.

48.    Winchester Repeating Arms Company of Maryland became a division of Western Cartridge Company in 1938.

**RESPONSE:** Admitted.

49.    Western Cartridge Company acquired all of the assets of Winchester Repeating Arms Company of Delaware in 1931.

**RESPONSE:** The request as stated is denied based on Olin's information and belief that the events of December 1931 occurred as follows: On December 15, 1931, Winchester Repeating Arms Company of Delaware's assets were sold as reflected in the Final Decree Confirming Sale and Directing Execution and Delivery of Deeds. The assets were purchased by two individuals, P.C. Beardslee and Ben-Fleming Sessel. Within a week after their purchase of the assets, Beardslee and Sessel "assigned, transferred and set over" all of their ownership of the acquired assets to Winchester-Maryland, a wholly-owned subsidiary of Western Cartridge Company.

50.    Western Cartridge Company transferred all of the assets of Winchester Repeating Arms Company of Delaware to Winchester Repeating Arms Company of Maryland in 1931.

**RESPONSE:** Denied. See response to RFA #49.

51.     Winchester Repeating Arms Company of Connecticut reorganized and transferred all of its assets to Winchester Repeating Arms Company of Delaware in 1931.

**RESPONSE**: Denied.

52.     After 1944, Western Cartridge Company did not carry on any business activity.

**RESPONSE**: Objection: Irrelevant, see General Objection No. 1.

53.     After 1938, Winchester Repeating Arms Company of Maryland did not carry on any business activity.

**RESPONSE**: Objection: Irrelevant, see General Objection No. 1.

54.     After 1931, Winchester Repeating Arms Company of Delaware did not carry on any business activity.

**RESPONSE**: Denied.

55.     After 1931, Winchester Repeating Arms Company of Connecticut did not carry on any business activity.

**RESPONSE**: Objection: Irrelevant, see General Objection No. 1.

56.     When Winchester Repeating Arms Company of Delaware acquired the assets of Winchester Repeating Arms Company of Connecticut in 1929, it also continued the product line of Winchester Repeating Arms Company of Connecticut.

**RESPONSE**: Objection: Irrelevant, see General Objection No. 1.

57.    When Winchester Repeating Arms Company of Maryland acquired the assets of Winchester Repeating Arms Company of Delaware in 1931, it also continued the product line of Winchester Repeating Arms Company of Delaware.

**RESPONSE:** Objection:  Irrelevant, see General Objection No. 1.

58.    When Winchester Repeating Arms Company of Maryland dissolved and became a division of Western Cartridge Company in 1938, Western Cartridge Company continued the product line of Winchester Repeating Arms Company of Maryland.

**RESPONSE:** Objection:  Irrelevant, see General Objection No. 1.

59.    When Western Cartridge Company purchased the "Winchester" trademark from Winchester Repeating Arms Company of Delaware, it also began to manufacture and sell products under the "Winchester" trademark name.

**RESPONSE:** Objection:  Irrelevant, see General Objection No. 1.

60.    Following the merger of Western Cartridge Company and Olin in 1944, Olin continued the product line of Western Cartridge Company.

**RESPONSE:** Objection:  Irrelevant, see General Objection No. 1.

61.    Winchester Repeating Arms Company of Delaware acquired all of the assets of Winchester Repeating Arms Company of Connecticut in 1929.

**RESPONSE:** Objection:  Irrelevant, see General Objection No. 1.  Subject to and without waiving this objection, although Olin does not have records verifying the truth or falsity

of this request, upon information and belief, and to the extent relevant to these proceedings, Olin admits this request.

62.    Winchester Repeating Arms Company of Maryland acquired all of the assets of

Winchester Repeating Arms Company of Delaware in 1931.

**RESPONSE:** The request as stated is denied based on Olin's information and belief that the events of December 1931 occurred as follows:  On December 15, 1931, Winchester Repeating Arms Company of Delaware's assets were sold as reflected in the Final Decree Confirming Sale and Directing Execution and Delivery of Deeds.  The assets were purchased by two individuals, P.C. Beardslee and Ben-Fleming Sessel.  Within a week after their purchase of the assets, Beardslee and Sessel "assigned, transferred and set over" all of their ownership of the acquired assets to Winchester-Maryland, a wholly-owned subsidiary of Western Cartridge Company.

63.    Western Cartridge Company acquired the assets of Winchester Repeating Arms

Company of Maryland in 1938.

**RESPONSE:** Winchester-Maryland was a wholly owned subsidiary of Western Cartridge.  In 1938, Winchester-Maryland became a division of Western Cartridge.

64.    As a result of the merger between Western Cartridge Company and Olin in 1944,

the new entity, Olin Industries, Inc., acquired the assets of Western Cartridge Company.

**RESPONSE:** Admitted.

65.    When Winchester Repeating Arms Company of Delaware acquired the assets of

Winchester Repeating Arms Company of Connecticut in 1929, it also assumed the liabilities of

Winchester Repeating Arms Company of Connecticut.

**RESPONSE:** Olin lacks independent knowledge or information sufficient to either admit or deny this request.

66.     When Winchester Repeating Arms Company of Maryland acquired the assets of Winchester Repeating Arms Company of Delaware in 1931, it also assumed the liabilities of Winchester Repeating Arms Company of Delaware.

**RESPONSE:** Denied.

67.     When Winchester Repeating Arms Company of Maryland dissolved and became a division of Western Cartridge Company in 1938, Western Cartridge Company assumed the liabilities of Winchester Repeating Arms Company of Maryland.

**RESPONSE:** Admitted.

68.     When Olin and Western Cartridge Company merged in 1944, Olin assumed the liabilities of Western Cartridge Company.

**RESPONSE:** Admitted.

69.     When Winchester Repeating Arms Company of Delaware acquired the assets of Winchester Repeating Arms Company of Connecticut in 1929, it also retained employees of Winchester Repeating Arms Company of Connecticut.

**RESPONSE:** Olin lacks independent knowledge or information sufficient to either admit or deny this request.

70.     When Winchester Repeating Arms Company of Maryland acquired the assets of Winchester Repeating Arms Company of Delaware in 1931, it also retained employees of Winchester Repeating Arms Company of Delaware.

**RESPONSE:** Objection: Irrelevant, see General Objection No. 1. See also response to RFA 18.

71.     When Olin and Western Cartridge Company merged in 1944, Olin retained employees of Western Cartridge Company.

**RESPONSE:** Objection: Irrelevant, see General Objection No. 1.

72.     When Winchester Repeating Arms Company of Delaware acquired the assets of Winchester Repeating Arms Company of Connecticut in 1929, it also utilized the manufacturing processes of Winchester Repeating Arms Company of Connecticut.

**RESPONSE:** Olin lacks independent knowledge or information sufficient to either admit or deny this request.

73.     When Winchester Repeating Arms Company of Maryland acquired the assets of Winchester Repeating Arms Company of Delaware in 1931, it also utilized the manufacturing processes of Winchester Repeating Arms Company of Delaware.

**RESPONSE:** Objection: Irrelevant, see General Objection No. 1. See also response to RFA 18.

74.     When Winchester Repeating Arms Company of Maryland dissolved and became a division of Western Cartridge Company in 1938, Western Cartridge Company utilized the manufacturing processes of Winchester Repeating Arms Company of Maryland.

**RESPONSE:** Objection: Irrelevant, see General Objection No. 1.

75.    When Olin and Western Cartridge Company merged in 1944, Olin utilized the manufacturing processes of Western Cartridge Company.

**RESPONSE:** Objection: Irrelevant, see General Objection No. 1.

76.    Winchester Repeating Arms Company of Connecticut disposed of industrial waste in the Newhall Section of Hamden.

**RESPONSE:** Objection: the term "industrial waste" is vague and ambiguous. Subject to and without waiving this objection, Olin lacks independent knowledge or information sufficient to either admit or deny this request.

77.    When Winchester Repeating Arms Company of Delaware acquired the assets of Winchester Repeating Arms Company of Connecticut in 1929, it also disposed of industrial waste in the Newhall Section of Hamden.

**RESPONSE:** Objection: the term "industrial waste" is vague and ambiguous. Subject to and without waiving this objection, Olin lacks independent knowledge or information sufficient to either admit or deny this request.

78.    When Winchester Repeating Arms Company of Maryland acquired the assets of Winchester Repeating Arms Company of Delaware in 1931, it also disposed of industrial waste in the Newhall Section of Hamden.

**RESPONSE:** Objection: the term "industrial waste" is vague and ambiguous. See also response to RFA 18. Subject to and without waiving the objection, Olin admits that Winchester-Maryland disposed of certain materials from its New Haven manufacturing facility in certain locations in the Newhall Section of the Town of Hamden after December of 1931.

79.    When Winchester Repeating Arms Company of Maryland dissolved and became a division of Western Cartridge Company in 1938, Western Cartridge Company disposed of industrial waste in the Newhall Section of Hamden.

**RESPONSE:** Objection: the term "industrial waste" is vague and ambiguous. Subject to and without waiving the objection, Olin admits that Western Cartridge Company disposed of certain materials from its New Haven manufacturing facility in certain locations in the Newhall Section of the Town of Hamden.

80.    When Olin and Western Cartridge Company merged in 1944, Olin disposed of industrial waste in the Newhall Section of Hamden.

**RESPONSE:** Objection: the term "industrial waste" is vague and ambiguous. Subject to and without waiving the objection, Olin admits that Olin disposed of certain materials from its New Haven manufacturing facility in certain locations in the Newhall Section of the Town of Hamden.

81.    When Winchester Repeating Arms Company of Delaware acquired the assets of Winchester Repeating Arms Company of Connecticut in 1929, it also utilized the customer base of Winchester Repeating Arms Company of Connecticut.

**RESPONSE:** Olin lacks independent knowledge or information sufficient to either admit or deny this request.

82.    When Winchester Repeating Arms Company of Maryland acquired the assets of Winchester Repeating Arms Company of Delaware in 1931, it also utilized the customer base of Winchester Repeating Arms Company of Delaware.

**RESPONSE:** Objection:  Irrelevant, see General Objection No. 1.

83.    When Winchester Repeating Arms Company of Maryland dissolved and became a division of Western Cartridge Company in 1938, Western Cartridge Company utilized the customer base of Winchester Repeating Arms Company of Maryland.

**RESPONSE**: Objection: Irrelevant, see General Objection No. 1.

84.    When Olin and Western Cartridge Company merged in 1944, Olin utilized the customer base of Western Cartridge Company.

**RESPONSE**: Objection: Irrelevant, see General Objection No. 1.

85.    When Winchester Repeating Arms Company of Delaware acquired the assets of Winchester Repeating Arms Company of Connecticut in 1929, it also retained management from Winchester Repeating Arms Company of Connecticut.

**RESPONSE**: Olin objects to the term "management" as vague and ambiguous. Subject to and without waiving this objection, Olin lacks independent knowledge or information sufficient to either admit or deny this request.

86.    When Winchester Repeating Arms Company of Maryland acquired the assets of Winchester Repeating Arms Company of Delaware in 1931, it also retained management from Winchester Repeating Arms Company of Delaware.

**RESPONSE**: Olin objects to the term "management" as vague and ambiguous. Olin further objects that the request is irrelevant, see General Objection No. 1.

87.    When Winchester Repeating Arms Company of Maryland dissolved and became a division of Western Cartridge Company in 1938, Western Cartridge Company retained management from Winchester Repeating Arms Company of Maryland.

**RESPONSE:** Olin objects to the term "management" as vague and ambiguous. Olin further objects that the request is irrelevant, see General Objection No. 1.

88.    When Olin and Western Cartridge Company merged in 1944, Olin retained management from Western Cartridge Company.

**RESPONSE:** Olin objects to the term "management" as vague and ambiguous. Olin further objects that the request is irrelevant, see General Objection No. 1.

HUSCH & EPPENBERGER, LLC

By: _____
    Michael H. Wetmore (ct24899)
    Joel B. Samson (ct24898)
    190 Carondelet Plaza, Suite 600
    St. Louis, Missouri 63105
    Telephone: 314-480-1500
    Fax: 314-480-1505
    michael.wetmore@husch.com
    joel.samson@husch.com

and

BROWN RUDNICK BERLACK ISRAELS LLP
    Sandra K. Davis
    185 Asylum St.
    CityPlace I, 38th Floor
    Hartford, CT  06103
    Telephone: 860-509-6500
    Fax: 860-509-6501
    sdavis@brbilaw.com

*Attorneys for Defendant Olin Corporation*

## <u>CERTIFICATE OF SERVICE</u>

       The undersigned hereby certifies that a true and accurate copy of the foregoing Motion to Compel Discovery, Affidavit, and Memorandum of Law in Support of Plaintiffs' Motion to Compel, with Attachments, was forwarded on the 9th day of March 2004, by first class mail, postage prepaid to:

Monte E. Frank, Esq.
158 Deer Hill Avenue
Danbury, CT 06810
Telephone: (203) 792-2771
Facsimile: (203) 791-8149

David B. Zabel, Esq.
Cohen and Wolf, PC
1115 Broad Street
Bridgeport, CT 06604
Telephone: (203)368-0211
Facsimile: (203)394-9901

Mark Roberts, Esq.
McRoberts & Roberts, LLP
101 Merriman Street
Boston, MA 02114
Telephone: (617) 722-8222
Facsimile: (617) 720-2320

*Attorneys for Plaintiffs*

Michael H. Wetmore, Esq.
Joel B. Sampson, Esq.
Husch & Eppenberger, LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
Telephone: (314) 480-1500
Facsimile: (314) 480-1505

Mark S. Baldwin, Esq.
Sandra K. Davis, Esq.
Brown Rudnick Berlack Israels, LLP
185 Asylum Street
Hartford, CT 06103-3402
Telephone: (860) 509-6500
Facsimile: (860) 509-6501

*Attorneys for Olin Corporation*

Joseph G. Fortner, Jr., Esq.
Halloran & Sage, LLP
225 Asylum Street
Hartford, CT 06103-4303
Telephone: (860) 522-6103
Facsimile:  (860) 548-0006

*Attorney for Town of Hamden*

Neil T. Leifer, Esq. ct25262