**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **CLARENCE R. COLLINS, JR., JENNIFER AND PATRICK DONTFRAID, DONNA LEE JOHNSON, LEONARDO MELENDEZ, SONIA POWELL, DOROTHY WILLIAMS, VALERIE LASSITER, MATTHEW AND PHYLLIS ABRAHAM, HENRY L. BLUE, JANIE CLEMONS, GWENDOLYN L. COPPAGE, LOUIS CRAIG, RUTH B. EATON, WILLIAM AND MAXINE JONES, JOSEPHINE NEAL, COLLIN ROUSE, CLIFFORD SENIOR AND ADRIENNE ROUSE-SENIOR, RAYMOND SIMS, SR. AND ELLECIA R. SIMS, MARC PERRY, WILLIAM C. AND VENUS D. WALKER, MORRIS AND MARY DRAUGHN, CAROLYN SMITH, ELIZABETH HAYES, ABDUL HAMID, MURLINE WELLESLEY, EUGALYN WILSON, CHARLENE O. WEBB, ELIAS ROCHESTER AND MARUS WALTERS, for themselves and on behalf of a class similarly situated property owners,** | : | **3:03-cv-945 (CFD)** |
| ***Plaintiffs,*** | : | |
| **v.** | : | |
| **OLIN CORPORATION and the TOWN OF HAMDEN,** | : | |
| ***Defendants.*** | : | **NOVEMBER 30, 2004** |

**MEMORANDUM IN SUPPORT OF OLIN CORPORATION'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

COMES NOW Defendant Olin Corporation ("Olin") and for its Memorandum in Support of Defendant Olin's Motion for Partial Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, states as follows:

**ORAL ARGUMENT REQUESTED**

## INTRODUCTION

As part of their claim against Olin, Plaintiffs seek to impose liability on Olin for waste disposal in the Town of Hamden resulting from pre-December 1931 waste disposal activities of an entity known as Winchester Repeating Arms Company, a Delaware corporation ("Winchester-Delaware"). Winchester-Delaware operated a manufacturing facility in New Haven. Plaintiffs allege that Olin is the successor in interest to Winchester-Delaware. Plaintiffs seek to establish Olin's liability as a successor on the basis of either the "mere continuation" exception or the "product line" exception to the general rule of no successor liability. Olin cannot be liable for the waste disposal activities of Winchester-Delaware, all of which occurred prior to December 22, 1931, for two independent reasons.

First, Olin's connection with the facility in New Haven began on December 22, 1931 when Winchester Repeating Arms Company, a Maryland corporation ("Winchester-Maryland") purchased certain of Winchester-Delaware's assets out of a receivership then pending in the United States District Court for Connecticut, in an arms-length, court-sponsored and court-approved transaction. Winchester-Maryland was a wholly owned subsidiary of Western Cartridge Company. Western Cartridge Company ("Western Cartridge") is a predecessor of Olin. In its two decrees authorizing and then approving the asset sale, the United States District Court for the District of Connecticut expressly barred all claims against those assets, including those claims which Plaintiffs now seek to assert against Olin.

Second, in Connecticut, as elsewhere in the country, an entity that acquires assets – as opposed to stock – of a corporate entity is not subject to the liabilities of the corporate entity.

While there are exceptions to this general rule of law, Connecticut and federal courts have narrowly defined the scope of the "mere continuation" exception and "product line" exception to the general rule of no successor liability. Neither of these exceptions advanced by Plaintiffs, nor any other exceptions to the no successor liability rule, apply here. Hence partial summary judgment is appropriate, holding that Olin has no liability for the acts of Winchester-Delaware alleged in the Plaintiffs' Amended Complaint, all of which occurred prior to December 22, 1931.

## STATEMENT OF FACTS

### A. Winchester-Maryland, A Wholly Owned Subsidiary of Western Cartridge, Purchased Winchester-Delaware's Assets Out of Receivership In An Arms-Length, Court Sponsored And Approved Transaction, Free And Clear Of All Liabilities Of Winchester-Delaware Associated With Those Assets.

Winchester-Delaware was put into receivership on a creditors' bill filed in United States District Court in Connecticut in 1931. Through a Court supervised auction, Winchester-Delaware's assets were sold to the highest bidders, two men named P.C. Beardslee and Ben-Flemming Sessel. On December 22, 1931, these men transferred the assets that they acquired at the auction to Winchester-Maryland as part of an arms-length, court-sponsored and court-approved transaction in connection with the receivership then pending in the United States District Court for Connecticut. As part of the receivership proceeding, the Court entered an injunction which perpetually enjoined all persons from bringing any claims against Winchester-Maryland or its successors, based upon any liabilities associated with the Winchester-Delaware assets. The series of transactions which led to Winchester-Delaware's receivership and Olin's

eventual acquisition of Winchester-Delaware's assets through a 1944 merger with Western Cartridge is summarized below.

**1. Winchester Was Reorganized In Receivership.**

In February of 1929, Winchester Repeating Arms Company, a Connecticut corporation (hereafter "Winchester-Connecticut") was reorganized with its companion company, The Winchester Company, by transferring all of its assets to a newly formed corporation, Winchester Repeating Arms Company of Delaware ("Winchester-Delaware"). *See Final Decree of Foreclosure and Sale*, November 10, 1931, in the receivership proceeding, styled *Chase National Bank of New York v. Winchester Repeating Arms Company, et al.*, In Equity, Consolidated Cause No. 2131 (U.S.D.C. Conn.) (attached to Olin's Local Rule 56(a)(1) Statement of Facts as Exhibit A thereto) (hereinafter "Final Decree"), at page 3, ¶4; page 4, ¶8; pages 19-20, ¶¶ 7-8.[1]

When financial conditions worsened, a creditors' bill was filed against Winchester-Delaware in the United States District Court for the District of Connecticut. *See* Final Decree, Exhibit A, at pp. 7-8, ¶¶ 2-4. The Court appointed receivers for Winchester-Delaware. With the Court's approval, Winchester-Delaware's creditors established a Reorganization Committee to propose a plan for the sale of Winchester-Delaware's assets and to solicit bidders for the sale. *See* Final Decree, Exhibit A, at pp. 70-71, ¶¶ 1-3.

[1] In the Final Decree and the subsequent Decree Confirming, Winchester-Connecticut is referred to as "the Connecticut Company," and Winchester-Delaware is referred to as "the Delaware Company."

On November 3, 1931, the Winchester Reorganization Committee submitted a plan to the Court, which the Court approved in its Final Decree of November 10, 1931. *See* Final Decree, Exhibit A, pp. 70-71, ¶¶ 1-3. In approving the Plan, the Court found that the continued receivership of Winchester-Delaware would not produce sufficient revenue to pay its debts, and further found that:

> the assets of the Delaware company [Winchester-Delaware] are not and will not be of sufficient value to meet its matured liabilities or its liabilities as they mature or accrue and its property . . . [the assets of Winchester-Delaware] should be administered and sold and the net proceeds thereof distributed in the manner herein stated.

Final Decree, Exhibit A, at p. 72, ¶¶ 1-2.

The Court decreed that all of the property of Winchester-Delaware (but not its stock) be sold free of any liens and claims, and that the proceeds of the sale be applied to the payment of Winchester-Delaware's debts. *See* Final Decree, Exhibit A, at pp. 74-76, 102-103. As part of its Final Decree, the Court entered the following injunction, which expressly provided that the assets to be acquired at the Court sponsored and approved sale – including the Winchester facility in New Haven – would be taken free of any claims or liabilities:

> All creditors and stockholders of, and ***claimants against, the Delaware Company [Winchester-Delaware] and/or the Connecticut Company [Winchester-Connecticut]***, including . . . all persons claiming by, through or under the Delaware Company and/or the Connecticut Company, their respective creditors and stockholders, ***are hereby severally and respectively perpetually enjoined from prosecuting against the Receivers or the Purchaser*** of any of the property directed to be sold by this decree, or against any nominee or assignee or grantee of such Purchaser, or against any party to the above entitled Consolidated Cause or Constituent Causes or any thereof, or against any person or persons, corporation or corporations, claiming by, under or through them, or any of them, or against any of the property sold pursuant to this decree, ***any suit or proceeding***

> ***arising out of, or based on, any obligation or liability of the Delaware Company and/or the Connecticut Company, or otherwise to impose liability upon the Purchaser***, or upon any nominee or assignee or grantee of the Purchaser, or upon any party to any of the above-entitled Causes, or upon any person or persons, corporation or corporations, claiming by, under or through them, or any of them, or upon any property sold pursuant to this decree, ***in respect of any claim against the Delaware Company and/or the Connecticut Company*** . . .

Final Decree, Exhibit A, at p. 97 (emphasis added).

Further, the Final Decree expressly "barred and foreclosed" "all claims and demands" by all creditors of Winchester-Delaware which were not filed as of the date of the Final Decree, except for "any claims which may accrue after the entry of this decree, and/or, which may thereafter be proved *nunc pro tunc* by permission of this Court." *See* Final Decree, Exhibit A, p. 96.

**2. Olin's Predecessor Purchased The Winchester-Delaware Assets From The Receivership.**

On December 15, 1931, Winchester-Delaware's assets were sold as contemplated by the Final Decree. *See Decree Confirming Sale and Directing Execution and Delivery of Deeds*, December 22, 1931, *Chase National Bank of New York, Trustee v. Winchester Repeating Arms Company, et al.*, Equity Consolidated Cause No. 2131 (U.S.D.C. Conn.) (attached to Olin's Local Rule 56(a)(1) Statement of Facts as <u>Exhibit B</u> thereto) (hereinafter "Decree Confirming"), at pp. 3-5, ¶¶ 2-5.

On December 15, 1931, all of Winchester-Delaware's assets (including the Winchester facility in New Haven) were sold at a public sale, pursuant to the Final Decree. *See* Decree Confirming, Exhibit B, at pp. 4-5, ¶ 5. The purchasers of Winchester-Delaware's property at the

public sale were two individuals, P. C. Beardslee and Ben-Fleming Sessel, whose bid of $4,000,000 was the highest bid for the property at the public sale. *See* Decree Confirming, Exhibit B, at pp. 4-5, ¶ 5. Beardslee and Sessel's successful bid as joint tenants was made pursuant to the Final Decree and the Reorganization Committee's plan. *See* Decree Confirming, Exhibit B, at pp. 3-5, ¶¶ 2-7.

Within a week after their purchase of Winchester-Delaware's assets, Beardslee and Sessel "assigned, transferred and set over" all of their ownership of the acquired assets to Winchester-Maryland, a wholly-owned subsidiary of Western Cartridge. *See* Decree Confirming, Exhibit B, at p. 5, ¶ 8; Olin Corporation's Responses to Plaintiffs' Requests for Admissions (attached to Olin's Local Rule 56(a)(1) Statement of Facts as Exhibit C thereto) (hereinafter "Olin's RFA Responses"), ¶ 18.

**3. The District Court Confirmed The Sale of Winchester Delaware's Assets, And Entered A Second Injunction, Which Enjoins All Persons From Imposing Any Liability Upon Winchester-Maryland Or Its Successors For Any Claims Against Winchester-Delaware.**

A week after the sale of the Winchester-Delaware assets, the Court entered its Decree Confirming of December 22, 1931. In its Decree Confirming, the Court found that the Reorganization Committee's plan was fair and equitable, confirmed the sale of Winchester-Delaware's assets to Winchester-Maryland pursuant to the plan, and ordered, among other things, delivery of the necessary transfer documents to Winchester-Maryland. *See* Decree Confirming, Exhibit B, at pp. 6-23.

The Court entered a further injunction in its Decree Confirming, mirroring what it had

done in its Final Decree, barring any claims against the purchasers at the asset sale or their successors and assigns, arising in any respect from the acquired assets. The language of this injunction is, in pertinent part, identical to the language of the earlier injunction, except that it names the actual purchasers and their successors and assigns:

> FIFTEENTH: All creditors and stockholders of, and ***claimants against, the Delaware Company [Winchester-Delaware] and/or the Connecticut Company [Winchester-Connecticut]***, including . . . all persons claiming by, through or under the Delaware Company and/or the Connecticut Company, their respective creditors and stockholders, ***are hereby severally and respectively perpetually enjoined from prosecuting against the Receivers or against said P. C. Beardslee and Ben-Fleming Sessel . . . or against the Maryland Company [Winchester-Maryland], its successors or assigns***. . . any suit or proceeding arising out of or based on any obligation or liability of the Delaware Company, and/or the Connecticut Company, ***or otherwise to impose liability upon the said P.C. Beardslee and Ben-Fleming Sessel . . . or upon [Winchester-Maryland], its successor or assigns . . . in respect of any claim against the Delaware Company and/or the Connecticut Company.***

Decree Confirming, Exhibit B, at pp. 23-24 (emphasis added).

The Decree Confirming does ***not*** contain any language similar to that in the Final Decree which would allow any creditors to file claims which accrue after the entry of the decree. *See* Decree Confirming, Exhibit B. Accordingly, all claims by all creditors were barred and enjoined as of the date of the Decree Confirming. *See* Decree Confirming, Exhibit B, at p. 23.

Beardslee and Sessel, and through them Winchester-Maryland and Western Cartridge, acquired only assets at the Court sponsored sale. Neither Winchester-Maryland nor Western Cartridge purchased or acquired any of the stock of Winchester-Delaware. *See* Olin's RFA Responses, Exhibit C, ¶ 49; Deposition of Johnnie Jackson, taken on March 24, 2004 (relevant portions of which are attached to Olin's Local Rule 56(a)(1) Statement of Facts as Exhibit D

thereto) (hereinafter "Jackson Deposition I"), pp. 48-49.

Although Western Cartridge, or its wholly owned subsidiary Winchester-Maryland, continued to operate the Winchester New Haven facility that it acquired at the December 1931 asset sale, the types of products manufactured by Winchester-Maryland varied from those made by Winchester-Delaware prior to December 1931. *See* Jackson Deposition I, Exhibit D, pp. 70-75; Deposition of Johnnie Jackson, taken on November 9, 2004 (relevant portions of which are attached to Olin's Local Rule 56(a)(1) Statement of Facts as Exhibit E thereto) (hereinafter "Jackson Deposition II"), pp. 83-84. In addition, while Winchester-Maryland continued to manufacture firearms under the Winchester brand name, and employed some former employees of Winchester-Delaware, Winchester-Maryland brought in new management and new officers and directors. *See*, Jackson Deposition I, Exhibit D, pp. 97-98; Jackson Deposition II, Exhibit E, pp. 19-23.

No officers or directors of Winchester-Delaware became officers or directors of Western Cartridge. *See* Olin Corporation's Supplemental Answers to Plaintiffs' First Set of Interrogatories (attached to Olin's Local Rule 56(a)(1) Statement of Facts as Exhibit F thereto) (hereinafter "Olin's Supplemental Interrogatory Responses"), ¶ 12. Moreover, no director of Winchester-Delaware became a director of Winchester-Maryland. *See*, Secretary of State Documents for Winchester-Delaware and Winchester-Maryland (attached to Olin's Local Rule

56(a)(1) Statement of Facts as Exhibit G thereto) (hereinafter "Secretary of State Documents").[2]

No shareholder of Winchester-Delaware became a shareholder of Winchester-Maryland or Western Cartridge as a result of the asset purchase. *See*, Olin Corporation's Answers to Plaintiffs' First Set of Interrogatories (attached to Olin's Local Rule 56(a)(1) Statement of Facts as Exhibit H thereto) (hereinafter "Olin's Interrogatory Responses"), ¶¶ 23 and 25.

Western Cartridge's, or its wholly owned subsidiary Winchester-Maryland's, operations at the New Haven facility continued until December 31, 1944, when Western Cartridge merged with Olin Corporation. Jackson Deposition I, Exhibit D, pp. 33-34, 70. After the 1944 merger the corporate name was changed to Olin Industries, Inc. *See* Jackson Deposition I, Exhibit D, pp. 33-34, 36; Olin's RFA Responses, Exhibit C, ¶ 47. Olin Industries, Inc. is the predecessor of Defendant Olin Corporation.

After the sale of its assets, the original Winchester-Delaware continued its corporate existence until January 1935, when the Governor of Delaware voided its charter. *See* Letter dated August 27, 1984, from Delaware Department of State (attached to Olin's Local Rule 56(a)(1) Statement of Facts as Exhibit I thereto).

---

[2] The Secretary of State Documents indicate that Edwin Pugsley was a director of Winchester-Delaware as of December 1929 and a Vice President of Winchester-Delaware as of December 23, 1930. *See*, Secretary of State Documents, Exhibit G. Despite having been a director of Winchester-Delaware, Mr. Pugsley never served as a director of Winchester-Maryland. *See*, Secretary of State Documents, Exhibit G. Mr. Pugsley served as one of Winchester-Maryland's Vice Presidents and was the only officer of Winchester-Delaware who served as an officer of Winchester-Maryland. *See*, Secretary of State Documents, Exhibit G. No other individuals previously with Winchester-Delaware served as either directors or officers of Winchester-Maryland. *See*, Secretary of State Documents, Exhibit G.

**B. Much Of The Damage At The Hamden Site Occurred Before Winchester-Maryland's 1931 Purchase Of Winchester Delaware's Assets.**

Winchester Delaware's activities in Hamden, including Winchester-Delaware's waste disposal activities, began well before Winchester-Maryland acquired the assets of Winchester-Delaware in December, 1931. In their Amended Complaint, Plaintiffs allege that "Winchester began disposing of its industrial waste and ash at the Newhall Section in approximately 1915." *See* Amended Complaint, ¶ 23. The Final Decree and Decree Confirming enjoin all claimants from asserting any claims against Winchester-Maryland and its successors (including Western Cartridge and Olin) for any waste disposal activity conducted by Winchester-Delaware in Hamden prior to December 1931. *See* Final Decree, Exhibit A hereto, at p. 97; Decree Confirming, Exhibit B hereto, at p. 23.

**SUMMARY JUDGMENT STANDARD**

"Summary judgment is appropriate when the evidence demonstrates that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Adair v. Pfizer, Inc.*, 245 F. Supp.2d 437, 440 (D. Conn. 2003) (citing Fed. R. Civ. P. 56(c)). "Rule 56(c) 'mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Imme v. Federal Express Corp.*, 193 F. Supp.2d 519, 522-23 (D. Conn. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)).

## LEGAL ANALYSIS

### I. Under the Doctrine Of No-Successor Liability, Olin Cannot Be Liable For Damages Arising From Winchester Delaware's Activities Prior to December 15, 1931.

Olin cannot be held liable for Winchester-Delaware's activities conducted before the December 1931 sale of Winchester Delaware's assets, because under the no-successor liability doctrine, a corporation that purchases all of another corporation's assets is not liable for the selling corporation's liabilities. "A sale of assets by one corporation to another, in good faith and for valuable consideration, does not impose any liability on the buyer for the debts of the seller. . . Under the general rule, a corporation which purchases ***all*** the assets of another company ***does not become liable for the debts and liabilities*** of its predecessor" *Ricciardello v. J.W. Gant & Co.*, 717 F. Supp. 56, 59 (D. Conn. 1989)(emphasis added); *see also Accashian v. City of Danbury*, 1999 WL 30594 (Conn. Super. Ct., Jan. 8, 1999) (attached hereto as Exhibit 1) (finding "no case in which acquisition of the assets of another corporation, without more, made the acquirer liable for environmental torts of the original owner of the assets").

The law on successor liability is fairly uniform across the states. In Connecticut, as elsewhere, a corporation that purchases the assets of another corporation will only be held accountable for the liabilities of the corporation from which the assets were acquired if it fits into one of the four recognized exceptions to the successor liability rule. In Connecticut, as elsewhere, these exceptions are described as follows:

> Under the general rule, a corporation which purchases ***all*** the assets of another company ***does not become liable for the debts and liabilities*** of its predecessor unless:

(1) the purchase agreement expressly or impliedly so provides;
(2) there was a merger or consolidation of the two firms;
(3) the purchaser is a "mere continuation" of the seller; or
(4) the transaction is entered into fraudulently for the purpose of escaping liability.

*Ricciardello*, 717 F. Supp. at 57-58 (emphasis added).

Winchester-Maryland purchased the Winchester-Delaware assets in a public sale, pursuant to a transaction that was sponsored by and approved by the United States District Court. *See* Decree Confirming, Exhibit B, at pp. 4-5, ¶ 5. Because the transaction does not fall under any of the four recognized exceptions to the no-successor liability rule, Winchester-Maryland, Western Cartridge (and now Olin) cannot be held responsible for the liabilities caused by Winchester-Delaware's pre-December 1931 waste disposal activities.

**A. The Purchase of Winchester-Delaware's Assets From Receivership Does Not Fall Under Any Of The Recognized Exceptions To The No-Successor Liability Doctrine.**

The facts surrounding the receivership proceeding and sale of assets show that Winchester-Maryland, the wholly owned subsidiary of Western Cartridge, purchased the Winchester-Delaware assets in an arms-length, court sponsored and approved transaction, in good faith and for what the Court concluded was fair and valuable consideration. A detailed consideration of each of the four exceptions to the no-successor liability doctrine conclusively establishes that none of these exceptions are met in this case. As a result, Olin cannot be the successor of Winchester-Delaware and thus cannot be liable for Winchester-Delaware's pre-December 1931 actions.

**Exception 1: <u>The purchase agreement expressly or impliedly provides for liability</u>**

There can be no serious argument that Winchester-Maryland expressly or even impliedly assumed any Winchester-Delaware liabilities. To the contrary, the Final Decree and Decree Confirming, which establish the terms of the asset sale, both expressly hold that the purchaser acquired the assets of Winchester-Delaware ***free of any and all liabilities***. Pursuant to the Court's Order: "All . . . claimants against [Winchester-Delaware] and/or [Winchester-Connecticut] . . . are hereby severally and respectively perpetually enjoined from prosecuting against the Receivers or against said P. C. Beardslee and Ben-Fleming Sessel . . . or against [Winchester-Maryland], its successors or assigns . . . any suit or proceeding arising out of or based on any obligation or liability of [Winchester-Delaware], and/or [Winchester-Connecticut], or otherwise to impose liability upon the said P.C. Beardslee and Ben-Fleming Sessel . . . or upon [Winchester-Maryland], its successor or assigns . . . in respect of any claim against [Winchester-Delaware] and/or [Winchester-Connecticut]." Decree Confirming, Exhibit B, at p. 23-24, ¶ 15; *see also* Final Decree, Exhibit A, at p. 97.

Where liabilities are expressly rejected, they can not be found by implication. In *Ricciardello* the Court found that the exception for express or implied assumption of liabilities was "inapplicable because the agreement expressly excluded [successor]'s liability for debts or liabilities of [predecessor]." *Ricciardello*, 717 F. Supp. at 58. *See also City Mgmt. Corp. v. U.S. Chem. Co.*, 43 F.3d 244, 256 (6th Cir. 1994) ("In the face of contractual language that expressly disclaims liability, we cannot find that there was an implied assumption of liability, and we need not consider the argument that plaintiff's conduct manifested an intent to assume such

liability."); *Beck v. Roper Whitney, Inc.*, 190 F. Supp. 2d 524, 534 (W.D.N.Y. 2001) ("express disclaimer of liability warrants a finding that the first exception for finding successor liability does not apply"); *Phase III Marketing, Inc. v. EZ Paintr Co.*, No. 1:99-CV-557, 2000 U.S. Dist. LEXIS 17790, at *23 (W.D. Mich. Dec. 4 2000) (attached hereto as Exhibit 2) ("express disclaimer of liability effectively negates any implied assumption claim"); *Ruiz v. Weiler & Co., Inc.*, 860 F. Supp. 602, 605 (N.D. Ill. 1994), *aff'd sub nom, Ruiz v. Blentech Corp.*, 89 F.3d 320 (7th Cir. 1996) (explicit language disclaiming contractual liabilities "strongly militates against a finding of assumption of liability"); *Nichols v. Roper-Whitney Co.*, 843 F. Supp. 799, 803 (D.N.H. 1994); *Simpson v. DeRussy*, No. 89-3461, 1990 U.S. Dist. LEXIS 20974, at *5 (E.D. La. 1990) (attached hereto as Exhibit 3) (finding no implied assumption of liability in light of express disclaimer).

The Court's decrees expressly rejected any liabilities associated with the acquired assets. No liabilities can be implied. This first exception does not apply. Recognizing this, to date Plaintiffs have not argued that this exception applies.

**Exception 2: <u>There was a merger or consolidation of the two companies</u>**

There can be no serious contention that there was a merger or consolidation of Winchester-Delaware with either Western Cartridge or its wholly owned subsidiary Winchester-Maryland. It is clear that no statutory merger or consolidation occurred, because Winchester-Delaware continued to exist as a separate corporation after the 1931 sale of assets, until the Governor of Delaware voided its charter in 1935 (*see* Letter dated August 27, 1984, from Delaware Department of State, Exhibit I). *See Ricciardello*, 717 F. Supp. at 58.

Nor can it be seriously argued that a *de facto* merger occurred. The court in *Ricciardello* stated the *de facto* merger exception as follows:

> To find that a *de facto* merger has occurred there must be a continuity of the selling corporation, evidenced by the same management, personnel, assets, and physical location; a continuity of stockholders, accomplished by paying for the acquired corporation with shares of stock; a dissolution of the selling corporation; and the assumption of liabilities by the purchaser.

*Ricciardello*, 717 F. Supp. at 58 (citations omitted).

Connecticut courts will only find a *de facto* merger has occurred when the two corporations share common stock, stockholders, and officers, or where the corporation was purchased for inadequate consideration, because only in such situation can the two corporations be considered to have "merged" into one, even though no formal statutory merger occurred. *See Ricciardello*, 717 F. Supp. at 58 ("The merger exception does not apply to this case because plaintiff has not established either a continuity of stockholders or an inadequacy of consideration"); *Pesce v. Overhead Door Corp.*, 1996 U.S. Dist. LEXIS 22244, at *11 (D. Conn., July 25, 1996) (attached hereto as Exhibit 4) ("There are no allegations regarding a continuity of stockholders, inadequate consideration, a mixture of officers and stockholders between the two corporations, or fraud. In the absence of allegations regarding these elements, no merger or consolidation has been shown").

The court in *Cargo Partner AG v. Albatrans, Inc.*, 207 F. Supp. 2d 86, 96 (S.D.N.Y. 2001), engaged in perhaps the most thorough analysis of the de facto merger exception to date. The *Cargo Partner* court found "no case (in New York or in other jurisdictions) in which a court has found a de facto merger without at least some degree of ownership continuity – except in the

area of products liability. . . . . Outside of those areas, it appears that, in practice, ownership continuity has been essential to the finding of a de facto merger." *Id.* at 104. The *Cargo Partner* court cited numerous cases for the proposition that ownership continuity is essential to a finding of a de facto merger. Recently, the Second Circuit affirmed the decision, stating, "[W]e are confident that the doctrine of de facto merger in New York does not make a corporation that purchases assets liable for the seller's contract debts absent continuity of ownership." *Cargo Partner*, 352 F.3d at 46.

Western Cartridge's wholly owned subsidiary Winchester-Maryland purchased the Winchester-Delaware assets in December of 1931 at a public sale, pursuant to a Plan approved by the District Court after a competitive bidding process. The asset acquisition was in good faith and for valuable consideration of $4,000,000, as confirmed by the terms of the Decree Confirming. *See* Decree Confirming, Exhibit B, at pp. 3-5. There is no evidence from which this Court could find that the court-sponsored bidding process was not in good faith or was for inadequate consideration.

Winchester-Maryland did not acquire any of Winchester-Delaware's stock and the companies did not share any common shareholders or directors. *See* Olin's RFA Responses, Exhibit C, ¶ 49; Olin's; Secretary of State Documents, Exhibit G. Winchester-Delaware was not dissolved as a result of the asset purchase; it continued its separate corporate existence until 1935. *See* Letter dated August 27, 1984, from Delaware Department of State, Exhibit I. While Winchester-Maryland continued to manufacture firearms under the Winchester brand name, and employed some former employees of Winchester-Delaware, Winchester-Maryland brought in

new management and new officers and directors. *See* Jackson Deposition I, Exhibit D, pp. 97-98; Jackson Deposition II, Exhibit E, pp. 19-23. There is no allegation, nor could there be given the extensive involvement of the District Court, that the December 1931 transaction was tainted with fraud or was anything other than an arms-length purchase of assets from the receivership proceedings. For these reasons, in *Tracey v. Winchester Repeating Arms Co.*, 745 F. Supp. 1099 (E.D. Penn. 1990), a case in which a plaintiff asserted product liability claims against Olin based upon a product manufactured by Winchester-Delaware prior to 1931, the District Court found that Olin could not be held liable for the activities of Winchester-Delaware under the *de facto* merger exception, because "there is no such continuity of stock ownership in this case." *Id.* at 1110.

Accordingly, because Winchester-Maryland purchased the Winchester-Delaware assets for valuable consideration, and there was no continuity of stock, shareholders, and directors, the merger exception to no-successor liability cannot apply. Plaintiffs have not argued that the de facto merger exception applies.

**Exception 3: <u>The purchaser is a "mere continuation" of the seller</u>**

Like the merger exception, the "mere continuation" exception focuses on a continuity of ownership between the two corporations.

> The focus of the [mere continuation] exception is not whether there is a continuation of the business, but rather ***the test is whether there is a continuation of the corporate identity of the seller***. The key element in determining whether the corporate entity continues to exist is a determination of whether there is a common identity of the officers, directors, and stockholders in both the selling and purchasing corporations.

*Pesce*, 1996 U.S. Dist. LEXIS 22244, at *12-13 (attached hereto as Exhibit 4) (citations omitted) (emphasis added); *National Grange Mutual Ins. Co. v. Montgomery Elevator*, 1994 WL 547747 (Conn. Super. Ct., Sept. 22, 1994) (attached hereto as Exhibit 5) (same). The "mere continuation" exception "envisions a common identity of directors, stockholders and the existence of only one corporation at the completion of the transfer. What it accomplishes is something in the nature of a corporate reorganization rather than a mere sale." *Pesce*, 1996 U.S. Dist. LEXIS 22244, at *12; *Copperthite v. Pytlik*, No. 59053, 1992 WL 209660, at *3 (Conn. Super. Ct. Aug. 25, 1992) (attached hereto as Exhibit 6) (same).

Olin has produced and/or made available over 1000 pages of documents, most from the 1930s, that go directly to the identity of the directors and stockholders of Winchester – Delaware and Winchester – Maryland – the inquiry that the *Pesce* court held to be central to the "mere continuation" analysis. Olin's Rule 30(b)(6) witness, Johnnie Jackson, was deposed at length with respect to these documents, the December 1931 court approved transaction and the events that led to the transaction.

The facts conclusively establish that Winchester-Maryland was not a "mere continuation" of Winchester-Delaware. As explained above, Winchester-Maryland and Winchester-Delaware did not have a "common identity" of directors or stockholders. Winchester-Maryland did not acquire any stock in Winchester-Delaware, and Winchester-Maryland brought in new officers and directors. In addition, Winchester-Delaware did not dissolve at the completion of the sale of assets, but rather continued as a separate corporation for several years. *See Tracey*, 745 F. Supp. at 1110-1111 (holding that Olin could not be liable for pre-1931 activities of Winchester-

Delaware under the "mere continuation" theory of successor liability, because "there is no evidence which demonstrates any continuity of shareholders in this case . . . [and] no evidence to demonstrate that the officers and directors of [Winchester]-Delaware became officers and directors of [Winchester]-Maryland or [Western Cartridge]").

Based upon these facts, it is clear that Winchester-Maryland was not a "mere continuation" of Winchester-Delaware. Accordingly, Winchester-Maryland, Western Cartridge (and now Olin) cannot be held liable for the liabilities of Winchester-Delaware under this exception to the no-successor liability rule.

**Exception 4: <u>The transaction is entered into fraudulently for the purpose of escaping liability</u>**

Finally, there is no basis from which a finding could be made that Winchester-Maryland's purchase of Winchester Delaware's assets was entered into fraudulently for the purpose of escaping liability. Winchester-Delaware was completely insolvent, and went into receivership independent of any action by Winchester-Maryland, well before Winchester-Maryland bid to purchase its assets. *See* Final Decree, Exhibit A, at p. 72. On November 3, 1931, before the sale of Winchester-Delaware's assets to Winchester-Maryland, the Court expressly found that Winchester-Delaware did not have enough assets to meet its liabilities. *See* Final Decree, Exhibit A, at p. 72, ¶¶ 1-2. The sale of assets, for valuable consideration, was ordered by the District Court, as part of the receivership proceeding; the sale of assets to Beardslee and Sissel and their transfer of the assets to Winchester-Maryland was also approved by the Court. Indeed, far from escaping or avoiding any liabilities, the entire purpose of the

receivership and sale of assets was to allow Winchester-Delaware to raise funds so that it could pay its creditors and meet its liabilities.

Clearly, there is no evidence to support any argument that the sale of assets was entered into fraudulently for the purpose of escaping liability. As of yet, Plaintiffs have not argued that this exception applies.

**B. The So-Called "Product Line" Exception To Successor Liability Has Not Been Accepted By The Connecticut Appellate Or Supreme Court, And The Few States Which Have Recognized This Exception Would Not Apply It Under The Facts Of This Case.**

Only a handful of states recognize a fifth exception to the no-successor liability doctrine, called the "product line" exception, whereby a successor corporation which continues the product line of the predecessor corporation after purchasing its assets can be liable in tort for injuries caused by a ***defective product*** made by the predecessor corporation. The overwhelming majority of states which have considered the product line exception have rejected it and have declined to adopt it as a viable exception to the no-successor liability doctrine. The District of Connecticut is among the courts that have considered and rejected adoption of the "product line" exception. *See Pesce v. Overhead Door Corp.*, 1998 U.S. Dist. LEXIS 20665 (D. Conn., Aug. 17, 1998) (attached hereto as Exhibit 7), at *10-11 and notes 4-5 (listing the numerous state and federal courts which have rejected the product line exception). The Connecticut Supreme Court has never adopted this exception to the no-successor liability rule, nor has any appellate court in Connecticut. In *Pesce*, 1998 U.S. Dist. LEXIS 20665, *adhered to on reconsideration*, 1998 U.S. Dist. LEXIS 20615 (D. Conn., Nov. 18, 1998) (attached hereto as Exhibit 8), the U.S. District

Court for the District of Connecticut declined to adopt the product line exception. The Court recognized that some lower courts in Connecticut had applied the product line exception, but noted that "no Connecticut appellate court had recognized the exception," and held that "it is this court's best judgment that the Connecticut Supreme Court would not extend the law to recognize this exception." *Pesce*, 1998 U.S. Dist. LEXIS 20615 at *5.[3]

Moreover, even if Connecticut were to adopt the product line exception, the product line exception would not apply to the facts of this case, because (1) states which have adopted the product line exception have held that this exception only applies to product liability claims, and does not apply to toxic tort claims; and (2) the product line exception does not apply where, as here, the predecessor corporation has declared bankruptcy, because the exception is only applicable when there is a causal link between the asset purchase and the plaintiff's lack of remedy.

**1. The Product Line Exception Only Applies, If At All, In Product Liability Cases.**

Those few courts which have applied the product line exception recognize that this exception only applies in the context of a product liability claim. In *Ray v. Alad Corporation*, 560 P.2d 3, 8 (Cal. 1977), the seminal California case which first created the "product line" exception, the Court held that "a party which acquires a manufacturing business and continues

[3] The U.S. District Court had certified the issue of whether Connecticut would recognize the product line exception to the Connecticut Supreme Court, but the Connecticut Supreme Court did not provide a decisive answer to the certified question. *See Pesce*, 1998 U.S. Dist. LEXIS 20665 at *6.

the output of its line of products under the circumstances here presented assumes ***strict tort liability for defects in units of the same product line*** previously manufactured and distributed by the entity from which the business was acquired." *Ray*, 560 P.2d at 11 (emphasis added). Courts which have adopted the *Ray* product line exception have emphasized that the exception set forth in *Ray* only applies to cases involving a defective product. *See, e.g., Ramirez v. Amsted Industries, Inc.*, 431 A.2d 811, 819 (N.J. 1981) (emphasis added) ("*Ray* completely abandons the traditional [successor liability] rule and its exceptions, utilizing instead the policies underlying strict liability in tort ***for injuries caused by defective products***"); Ruiz, 89 F.3d at 327 ("California courts have quite clearly established that the [product line] exception is a matter of products liability law, not corporate law . . . California uses the exception to insure that manufacturers generally will bear the costs of defective products . . . California has not employed the exception generally as a means to limit efforts by corporations to erase corporate identity in the course of asset sales"). Thus, in *Leo v. Kerr-McGee Chemical Corporation*, 37 F.3d 96 (3rd Cir. 1994), the Third Circuit held that New Jersey would decline to extend the product line exception to a toxic tort claim. The Court found that the rationale which has led some courts to hold a successor corporation liable for injuries caused by a defective product after the successor corporation bought the product line does not apply to liabilities for toxic torts.

No Connecticut Superior Court has applied the product line exception outside the context of a product liability claim – that is, a claim for personal injuries resulting from the continued manufacture of the type of product alleged to have caused injury. Courts in the limited jurisdictions that have adopted the product line exception have emphasized that the exception

only applies to cases involving a defective product. *See, e.g.*, *Leo*, 37 F.3d at 100 (declining to extend product line exception to toxic tort claim); *United States v. Atlas Minerals and Chems.*, No. 91-5118, 1995 U.S. Dist. LEXIS 13097, at *255 (E.D. Pa. Aug. 22, 1995) (attached hereto as Exhibit 9) (declining to extend product line exception to CERCLA action seeking to recover the costs of removing hazardous waste from a landfill); *Ninth Ave. Remedial Group v. Allis-Chalmers Corp.*, No. 2:94-CV-331-RL, 1996 U.S. Dist. LEXIS 5670, at *27 n. 3 (N.D. Ind. Apr. 19, 1996) (attached hereto as Exhibit 10) ("In all the cases reviewed, courts applied the product line exception only in product liability cases…"); *Anderson v. City of Minnetonka*, No. CV 3-90-312, 1993 U.S. Dist. LEXIS 4846, at *24 n. 6 (D. Minn. Jan. 27, 1993) (attached hereto as Exhibit 11) (declining to extend product line exception to CERCLA action, noting, "The product line test has only been applied in products liability cases…[T]his test has not been applied in any environmental liability case."); *Standard Equip., Inc. v. Boeing Co.*, No. C84-1129D, 1987 U.S. Dist. LEXIS 15137, at *17 (W.D. Wash. Nov. 20, 1987) (attached hereto as Exhibit 12) (environmental contamination case in which court held there was no indication of an intention to expand the product line exception to anything but strict products liability); *R.C.M. Exec. Gallery Corp. v. Rols Capitol Co.*, No. 93 Civ. 8571, 1997 U.S. Dist. LEXIS 565, at *16 n. 4 (S.D.N.Y. Jan. 18, 1997) (attached hereto as Exhibit 13) (holding product line exception inapplicable in case alleging plaintiffs were charged usurious rate of interest on a loan made by defendants).

Indeed, the rationale behind the product line exception – that a company which continues to manufacture the same product line as a prior company, under the same trade name, should be liable for injuries to consumers caused by a defect in the product – has no application in a case

outside of the product liability context. In the present case, whether or not Winchester-Maryland, Western Cartridge and/or Olin continued to make the same product or used the Winchester trade name has absolutely no relevance to whether Olin should be held liable for Winchester-Delaware's disposal of wastes before December of 1931.

**2. The Product Line Exception Does Not Apply When The Predecessor Has Declared Bankruptcy, Because There Is No Causal Link Between The Asset Purchase And The Plaintiffs' Lack Of Remedy.**

A handful of states which have adopted the product line exception have universally accepted that the exception only applies where there is a causal link between the asset purchase and the injured consumer's lack of remedy. In such states, a party must prove "the virtual destruction of the plaintiff's remedies ***caused by*** the successor's acquisition of a business." *Ray*, 560 P.2d at 8 (emphasis added); *see also Hall v. Armstrong Cork*, 692 P.2d 787, 792 (Wash. 1984) ( "A key premise of the product line exception is that successor liability is only appropriate when the successor corporation by its acquisition actually played some role in curtailing or destroying the claimants' remedies.").

There is no such causal link in the case of a good faith bankruptcy proceeding, and therefore, the purchaser of the bankrupt's assets incurs no liabilities for the defects in products produced by the prior manufacturer:

> A key premise of the product line exception is that successor liability is only appropriate when the successor by its acquisition actually played some role in curtailing or destroying the claimant's remedies. . . . ***Thus, imposition of liability on the successor under the product line continuation theory is precluded where: . . . the plaintiff's remedies against the predecessor were destroyed by the predecessor corporation's decision to file for bankruptcy and not because of any action of the successors.***

*American Law of Product Liability* 3d, Vol. 1, § 7:16 (1987) (Lawyers Cooperative Publishing Company) (emphasis added).

Numerous courts have recognized that the product line exception does not apply when it was the predecessor's bankruptcy, and not the sale of its assets, that caused a claimant to be without a remedy. For example, the Ninth Circuit explicitly held:

> Thus, it was [predecessor]'s bankruptcy and not [successor]'s subsequent purchase of the assets that destroyed [plaintiff]'s remedies. Even if there had been no sale of assets to [successor], [plaintiff] would not be in any better position today to proceed against [predecessor].
>
> * * *
>
> It is our view that the California Supreme Court's decision in Ray does not apply where there is a good faith dissolution in bankruptcy which is not intended to avoid future tort claims against the predecessor. Under such circumstances, the successor corporation has not contributed to or caused the destruction of the plaintiff's remedies.

*Nelson v. Tiffany Indus., Inc.*, 778 F.2d 533, 537-38 (9th Cir. 1985). *See also Stewart v. Telex Communications, Inc.*, 1 Cal. Rptr.2d 669 (Cal. Ct. App. 1992) (following *Nelson*, holding that the causation element of the product line exception was not met when there was no showing that successor caused predecessor's bankruptcy). *See also* 15 *Fletcher Cyclopedia of Private Corp.*, § 7123.30 (2002) ("the successor corporation is not liable unless there is a showing that the successor caused, or at least contributed to, the plaintiff's inability to recover against the predecessor.").

In the instant case, there can be no possible doubt with respect to the good faith of Winchester-Delaware's dissolution in bankruptcy. The U.S. District Court of Connecticut conducting the bankruptcy found that prior to, and independent of, the subsequent sale of assets

to Winchester-Maryland, all meaningful remedies against Winchester-Connecticut or Winchester-Delaware had already been destroyed. Specifically, the Court made the following findings:

> 1. That it is apparent that continued operation by the Receivers would not produce revenue sufficient to pay the unpaid interest and principal due to pay . . . obligations outstanding and the operating and maintenance expenses of [Winchester-Delaware's] properties.
>
> 2. That the assets of the Delaware Company [Winchester-Delaware] are not and ***will not be of sufficient value to meet its matured liabilities or its liabilities as they mature or accrue*** and its property . . . should be administered and sold and the net proceeds thereof distributed in the manner herein stated.

Final Decree, Exhibit A, at page 72, ¶¶ 1-2 (emphasis added).

It is clear from the Final Decree that it was the inability of Winchester-Delaware "to meet its matured liabilities or its liabilities as they mature or accrue" which led the Court to approve The Reorganization Committee's Plan, which eventually led to the sale of assets to Western Cartridge's wholly owned subsidiary, Winchester-Maryland. Winchester-Delaware was already a failed and insolvent corporation in receivership when Western Cartridge's subsidiary purchased its assets in late 1931. The purchase of Winchester-Delaware's assets, therefore, had no effect on Plaintiffs' or any other claimant's remedies, or lack thereof, against Winchester-Delaware and/or Winchester-Connecticut. Olin, as the successor of Western Cartridge, cannot now be penalized simply because a solvent corporation purchased the assets of an insolvent corporation. Since the sale of the assets "free and clear" to Winchester-Maryland was carried out with the express approval of the Court, and the Court found that the Reorganization Committee's Plan was fair and equitable and confirmed that the sale had taken place pursuant to such Plan, there can be no claim now through a collateral attack that these bankruptcy proceedings served

any fraudulent purpose. *See* Final Decree, Exhibit A, at pp. 74-75; Decree Confirming, Exhibit B, at pp. 6, 23-25.

This conclusion was adopted by the United States District Court for the Eastern District of Pennsylvania in the Tracey case. There, the court held that Olin could not be held liable for any pre-1931 activities of Winchester-Delaware, even if Pennsylvania were to adopt the product line exception, because plaintiff's lack of remedy was caused by Winchester-Delaware's financial difficulties and decision to place itself into receivership, which was completely independent from Western Cartridge's subsidiaries' purchase of Winchester Delaware's assets:

> It is apparent from these facts that [Winchester]-Del. voluntarily placed itself into receivership because of its financial condition. As of January 22, 1931, [Winchester]-Del. was insolvent. . . . [Western Cartridge]'s asset purchase had nothing to do with [Winchester]-Del.'s financial difficulties. Nor did [Western Cartridge] as a condition of its asset purchase require [Winchester]-Del. to dissolve. Thus, the record establishes that the plaintiffs' remedies against [Winchester]-Del. were destroyed by [Winchester]-Del.'s decision to place itself into receivership and not because of any action of [Western Cartridge]. ***Even if there had been no sale of [Winchester]-Del.'s assets to [Western Cartridge], plaintiffs would not be in any better position today to proceed against [Winchester]-Del. Under these facts, the product line exception does not apply to defendants.***

*Tracey v. Winchester Repeating Arms Co.*, 745 F. Supp. 1099, 1109 (E.D. Penn. 1990) (emphasis added).

There is no causal connection between destruction of any remedies that Plaintiffs may have against Winchester-Delaware with respect to waste disposal activities prior to December 1931 and the 1931 purchase of assets by Western Cartridge's wholly owned subsidiary, Winchester-Maryland. The record leaves no possible doubt as to the bona fide nature of

Winchester Delaware's bankruptcy liquidation. There is no basis for finding any causal link between the Plaintiffs' potential loss of remedy and Winchester-Maryland, Western Cartridge or Olin's acquisition of assets.

**II. The District Court's Injunctions Bar Plaintiffs From Maintaining That Olin Is Liable For The Pre-December 1931 Activities Of Winchester-Delaware.**

There is a second, independent reason (in addition to there being no successor liability against Olin) that Olin cannot be held liable for Winchester-Delaware's pre-December 1931 waste disposal: the District Court's two 1931 decrees enjoin all claimants from holding Winchester-Maryland, Western Cartridge or its successors liable for the activities of Winchester-Delaware.

The two decrees of the District Court bar Plaintiffs from seeking to hold Olin liable for the deposit of any waste by Winchester-Delaware, all of which occurred prior to December 15, 1931. The language of the Final Decree and the Decree Confirming are virtually identical. In the broadest possible language, the decrees:

> "enjoin[ed]. . . any suit or proceeding arising out of, or based upon, any obligation or liability of [Winchester]"

*See* Final Decree, Exhibit A, at p. 97; Decree Confirming, Exhibit B, at pp. 23-25.

The District Court's two decrees directly and specifically bar efforts to impose liability upon Olin for any activity by Winchester-Delaware prior to December 1931. To encourage bidders to come forward to acquire Winchester-Delaware's assets, the District Court ensured that the successful bidder would not thereafter be subject to liability because it acquired those assets.

Plaintiffs seek to hold Olin liable for Winchester Delaware's pre-December 1931

activities, in direct violation of the terms of the orders of the District Court. Those orders barred all "claimants against" Winchester-Delaware. According to the Decree Confirming, it did not matter whether a claimant had surfaced as of December of 1931; nor did it matter whether the claim had occurred by December of 1931. *See* Decree Confirming, Exhibit B, p. 23. Whoever bought the assets of Winchester-Delaware from the court-appointed receiver was assured by the Decree Confirming that claims would not thereafter be asserted against them for Winchester-Delaware's pre-December 1931 actions.

To the extent that Plaintiffs seek to impose liability against Olin based on pre-December 1931 waste disposal by Winchester-Delaware, they are enjoined from doing so.

## CONCLUSION

WHEREFORE, Olin respectfully requests that the Court grant Olin's Motion for Partial Summary Judgment and enter an order that Olin is not liable, as a matter of law, for any waste disposed by Winchester-Delaware prior to December 22, 1931.

Respectfully Submitted,

OLIN CORPORATION

By: Michael H. Wetmore /sws

Michael H. Wetmore
Joel B. Samson (ct24898)
Husch & Eppenberger, LLC
190 Carondelet Plaza, Suite 600
St. Louis, Missouri 63105
Telephone: 314-480-1500
Fax: 314-480-1505
michael.wetmore@husch.com
joel.samson@husch.com

and

By: ______________________________
Sandra K. Davis (ct020175)
Brown Rudnick Berlack Israels LLP
185 Asylum St.
CityPlace I, 38th Floor
Hartford, CT 06103
Telephone: 860-509-6500
Fax: 860-509-6501
sdavis@brownrudnick.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and accurate copy of the foregoing was forwarded this 30th day of November, 2004, by first class mail, postage prepaid to:

Neil T. Leifer, Esq.
David C. Strouss, Esq.
Thornton & Naumes L.L.P.
100 Summer Street, 30th Floor
Boston, Massachusetts 02110
Telephone: (617) 720-1333
Facsimile: (618) 720-2445

David B. Zabel, Esq.
Monte E. Frank, Esq.
Cohen and Wolf, PC
1115 Broad Street
Bridgeport, Connecticut 06604
Telephone: (203) 368-0211
Facsimile: (203) 394-9901

Mark Roberts, Esq.
Andrew A. Rainer, Esq.
McRoberts & Roberts, LLP
101 Merrimac Street
Boston, MA 02114
Telephone: (617) 722-8222
Facsimile: (617) 720-2320

***Attorneys for Plaintiffs***

Ann M. Catino
Lori Dibella
Joseph G. Fortner, Jr.
Halloran & Sage LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103
Telephone: (860) 522-6108
Facsimile: (860) 548-0006
***Attorneys for Town of Hamden***

Sandra K. Davis

#40189079 v\1 - davissk - x#3b01!.doc - 70042/5