UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CLARENCE R. COLLINS, JR., et al. | : | CIVIL ACTION NO. 3:03-cv-945 (CFD) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| OLIN CORPORATION, et al. | : | |
| Defendants. | : | DECEMBER 15, 2004 |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT TOWN OF HAMDEN'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The Town of Hamden respectfully submits this Memorandum of Law in support of its Motion for Partial Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("F.R.C.P."), with respect to Counts II, IV, VIII, XII and XV of Plaintiffs' Amended Complaint dated May 28, 2003 ("Amended Complaint") (hereinafter "Am. Compl."). In brief, the undisputed facts and the applicable law establish that Counts II (Negligence), IV (Gross Negligence/Reckless Conduct), VIII (Negligence Per Se), XII (Infliction of Emotional Distress) and XV (Nuisance) of the Amended Complaint are barred by the doctrine of governmental immunity. Thus, summary disposition is appropriate.

### I.  BACKGROUND

This class action lawsuit was filed by Plaintiffs, for themselves and on behalf of similarly situated property owners in the Newhall Street area of Hamden, Connecticut (the "Newhall Section")[1] seeking damages against Defendants Olin Corporation ("Olin") and the Town of

---

[1] The Newhall Section is defined in the Amended Complaint as real property owners in Hamden on the following streets: Newhall Street, Mill Rock Road, Harris Street, Remington Street, Augur Street, Morse Street, St.

Hamden ("Hamden" or "Town") (collectively, the "Defendants") for, *inter alia*, the alleged diminution in the value of their properties, lost use and enjoyment of their properties, emotional distress, and response costs purportedly resulting from Defendants' "contamination" of their properties. *See* Am. Compl., at ¶ 1. Plaintiffs further seek injunctive relief compelling Defendants to conduct any and all response actions necessary to investigate and remediate the alleged contamination on their properties and other natural resources. *Id.* at ¶ 2.

A.   **Procedural Background**

On May 2, 2003, the Plaintiffs served Olin and Hamden with a writ, summons and complaint, returnable to the Superior Court for the Judicial District of New Haven. Hamden, with Olin's consent, removed the case to this court on May 28, 2003; on that same day, Plaintiffs filed their Amended Complaint. On September 30, 2003, Plaintiffs moved for class certification, and the parties are currently conducting discovery regarding the class issues.

On August 1, 2003, pursuant to F.R.C.P. Rules 12(b)(1), 12(b)(6) and 12(h)(3), Hamden moved to dismiss Counts II (Negligence), IV (Gross Negligence/Reckless Conduct), VI (Violation of the Environmental Protection Act of 1971); VIII (Negligence Per Se), X (Abnormally Dangerous Activity/Strict Liability), XII (Infliction of Emotional Distress) and XV

---

Mary Street, Shelton Avenue, Edwards Street, Butler Street, Marlboro Street, Shepard Street, Goodrich Street, Winchester Avenue, Newbury Street, North Sheffield Street, Wadsworth Street and Bryden Terrace. All or portions of these streets are within the boundary set forth in the Consent Order SRD-128 dated April 16, 2003, entered into among the Connecticut Department of Environmental Protection, the Town, Olin, the South Central Regional Water Authority and the State Board of Education.

(Nuisance). *See* Defendant's Motion to Dismiss Plaintiffs' Amended Complaint, dated August 1, 2003 ("Motion to Dismiss").[2] Hamden's Motion to Dismiss is pending.

### B.    DEP Administrative Proceedings

On July 10, 2001, the DEP commenced proceedings to determine the responsibility for contamination in the Newhall Section. The DEP pursued four parties - the Town, Olin, the South Central Regional Water Authority and the State of Connecticut Board of Education (collectively, the "Respondents") - who it claimed were responsible for the contamination. After approximately one and one-half years of proceedings, the Respondents entered into a Consent Order for the investigation and remediation of Plaintiffs' properties. On April 16, 2003, the Consent Order became effective and was entered as a Final Decision by DEP Hearing Officer Janice B. Deshais pursuant to REGS. CONN. STATE AGENCIES § 22a-3a-6(l)(2).[3] *See* Statement Re: Report of Parties Planning Meeting, dated July 14, 2003 (hereinafter "Parties' Report") at IV.3  The parties also have stipulated to the Consent Order and that pursuant to its terms, Olin is to investigate the residential properties that are the subject of this lawsuit and to remediate such properties. Olin and DEP are to jointly fund any remediation on these properties. Parties' Report at ¶ IV.4.

---

[2] Hamden sought to dismiss Counts VI and XV and all claims for injunctive relief under the doctrine of primary jurisdiction and abstention as the proper body to address such claims is the Connecticut Department of Environmental Protection ("DEP"); Counts II, IV, VIII, X, XII, and XV as a matter of law, as Plaintiffs have not and cannot present cognizable claims for relief under the theories asserted; Counts II, IV, VIII, X and XII since those claims are barred by applicable statute of limitations; and Counts II, IV, VIII and XII on the grounds that they are barred as a matter of law by the doctrine of governmental immunity pursuant to C.G.S. § 52-557n.

[3] The Consent Order is attached to the Memorandum of Law in Support of Defendant Town of Hamden's Motion to Dismiss, dated Aug. 14, 2003, as Attachment 1.

Before the Respondents could begin to investigate and remediate the Newhall Section and fulfill their obligations pursuant to the Consent Order, the Plaintiffs filed this class action lawsuit. The significant facts alleged in the Amended Complaint relevant to the Town were derived almost entirely from the DEP's Findings of Fact contained within the Consent Order. *See* Consent Order at ¶¶ 1-22. The Town denied these factual findings in paragraph A.31 of the Consent Order. *Id.* at ¶ A.31.

## II.   LEGAL STANDARD

F.R.C.P. Rule 56(b) provides, in pertinent part, that "[a] party against whom a claim ... is asserted. . . may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories and affidavits demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." F.R.C.P. Rule 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Miner v. Glens Falls*, 999 F.2d 655, 661 (2d Cir. 1993); *Birdsall v. Hartford*, 249 F.Supp.2d 163, 168 (D. Conn. 2003); *West Haven School Dist. v. Owens-Corning Fiberglass Corp.*, 721 F.Supp. 1547, 1556 n. 10 (D. Conn. 1998).

The moving party need not refute all essential elements of the cause of action to show entitlement to summary judgment. Instead, it must demonstrate the *absence or insufficiency of the evidence* offered in support of those essential elements. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "Only when reasonable minds could not differ as to the import of the evidence is

summary judgment proper." *Birdsall*, 249 F.Supp.2d at 169 (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991), *cert. denied*, 502 U.S. 849 (1991)). The inquiry under a summary judgment motion is whether the evidence of record presents a genuine dispute over material facts so as to require submission of the matter to a jury for resolution of that factual dispute, or whether the evidence is so one-sided the moving party must prevail as a matter of law. *Pennsylvania Turnpike Comm'n v. Nationwide Trucking Serv's, Inc.*, 319 F.Supp.2d 569, 573 (W.D. Penn. 2004). Summary judgment is looked upon with favor as a way "to isolate and dispose of factually unsupported claims or defenses" without the necessity of a full-dress trial. *Celotex Corp.*, 477 U.S. at 323-24. The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

### A)  Derivation Of Facts Relevant To This Motion

In brief, the Town's acts or omissions cited by Plaintiffs occurred between 50 and 100 years ago. Material facts relevant to this Motion for Partial Summary Judgment are primarily deduced from the Town's historic records. The relevant records include:[4]

> Town Annual Reports (1871-1967)
> Town Board of Selectmen Records (1871-1967)
> Town Health Officer Reports (1886-1950)
> Town Board of Finance Reports (1908-1967)
> Town Auditor Reports (1926-1967)
> Town Treasurer Reports (1901-1925)

---

[4] Records relevant to this Memorandum are attached to Hamden's Local Rule 56(a)(1) Statement of Facts as Exhibits 1-59 & 65. Exhibits 1-59 are the relevant portions of the Town Annual Reports from 1886-1950, which include – by year – excerpts from the Board of Selectmen Records, Reports of the Health Officer, Board of Finance Reports and Treasurer Reports. Illustrative excerpts from the Board of Health Minutes are also included as Exhibit 65.

Board of Health Minutes (1931-1941)

These records contain the evidence upon which all parties must rely.[5] Because of the age associated with the activities, witnesses and live testimony concerning these events is non-existent. *See Partial Deposition Transcript of Deborah L. Motycka Downie dated July 9, 2004 (attached to Hamden's Local Rule 56(a)(1) Statement of Facts" ("Hamden's Rule 56(a)(1) Statement") as Exhibit 61 thereto) ("Downie Trans.") at pps. 30, 77, 100 and 126.* At the time

---

[5] On July 9, 2004, the Town produced Deborah L. Downie Downie, an environmental consultant from Haley & Aldrich, as its F.R.C.P. 30(b)(6) witness concerning sovereign immunity issues. In accordance with F.R.C.P. 30(b)(6) Notice of Deposition to the Town, Ms. Downie was to testify about the following items:

- Hamden's receipt of any fees, payments, taxes, money or pecuniary benefit of any nature whatsoever in Connection with the landfills in the Newhall Section of Hamden.
- All documents in the possession or control of the Town concerning Hamden's receipt of any fees, payments, taxes, money or pecuniary benefit of any nature whatsoever in connection with the operation of the landfills in the Newhall Section.
- The filling of the wetlands and low lying areas in the Newhall Section with industrial or commercial waste.
- All documents in the possession or control of the Town concerning the filling of the wetlands and low lying areas in the Newhall Section with industrial or commercial waste.
- The dumping of industrial or commercial waste in the Newhall Section.
- All documents in the possession or control of the Town concerning the dumping of industrial or commercial waste in the Newhall Section.
- The Town's receipt of any fees, payments, taxes, money or pecuniary benefit of any nature whatsoever from Winchester Repeating Arms Company or Olin Corporation at any time from 1900 to the present.
- All documents in the possession or control of the Town concerning the Town's receipt of any fees, payments, taxes, money or pecuniary benefit of any nature whatsoever from Winchester Repeating Arms Company or Olin Corporation at any time from 1900 to the present.
- The facts relied on by the Town concerning its defense of sovereign immunity in this case.

Ms. Downie conducted an extensive and thorough file search to perform a Phase I Environmental Investigation – an assessment which evaluates the history of properties through the review of historical documents and interviews -- for the Town. Documents reviewed for the Phase I included those official documents of the Town contained in the Town Hall, the Miller Library, Board of Education, DEP and the DEP archives, aerial photographs, Sanborn Maps, and materials that were generated during the discovery process. *See Downie Trans., at pps. 6 & 128.* This history of the Newhall Section is derived largely from the historical source documents produced as part of the Phase I and as supplemented from the official Town records produced or made available by the Town.

of the DEP proceeding, an exhaustive search of the Town's records was conducted by Town employees, consultants and counsel. *Id.* at pps. 6 & 128. If agreements, contracts or other relevant documents were found with the other named defendants (or anyone) such agreements or documents were produced or made available for inspection. During this proceeding, additional searches were conducted, including reviews of the Town's historic files by counsel for the Plaintiffs. *Id.* at pps. 6 & 102.

Significantly, after this exhaustive search by the Town and the Plaintiffs, the facts which might support Plaintiffs' allegations in Counts II, IV, VIII, XII and XV are notably absent from these historical documents. With a complete failure of proof concerning essential elements of the Plaintiffs' case, all other facts become immaterial. *See Celotex*, 477 U.S. at 322-23; *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied by showing absence of evidence to support essential element of non-moving party's claim). In short, if there is no genuine issue of material fact or if an absence of evidence exists, a court may enter summary judgment. *Celotex*, 477 U.S. at 323. The historical documents demonstrate not only certain indisputable facts but also show the absence of evidence as to Plaintiffs' claims, particularly as they relate to the Town's claim of governmental immunity.

### III.   STATEMENT OF FACTS

In the late 1800s to early 1900s, the Hamden Health Officer was called upon to abate nuisances and the spread of disease in Hamden. *See 1886-1937 Town of Hamden Annual Reports (Reports of Health Officers) (attached to Hamden's Rule 56(a)(1) Statement as Exhibits*

*1-46 thereto ("Health Officer Reports").*[6] Illnesses transmitted by mosquitoes (e.g., malaria, yellow-fever, etc.), in particular, raised serious public health concerns, and by 1915, no subject confronted the residents of Hamden with more vital interest than the elimination of the mosquito nuisance. *Health Officer Reports 1915, Exhibit 24.*

Measures recommended by public health officials and instituted to control mosquito breeding, included ditching, draining, oiling and/or filling wetland areas. *See e.g., Health Officer Reports 1913, 1914, 1916, 1938, Exhibits 22, 23, 25 & 46.* In 1913, the Town Health Officer, sought to eradicate several mosquito breeding areas in Hamden, some of which may have included the swamps in the Newhall Section. *Health Officer Reports 1913, Exhibit 22.* By 1934, some areas in the Newhall Section had been filled in. *See 1934 Aerial Photograph (attached to Hamden's Rule 56(a)(1) Statement as Exhibit 62 thereto).* Other areas (e.g., the site of the Hamden Middle School and Rochford Field) were in the process of being filled in. *Id.* However, significant portions of the Newhall Section residential properties had either been developed or were ready for development.

Hamden was not alone in its efforts to ameliorate mosquito-borne illnesses. Throughout the State of Connecticut from the early 1900s continuing into the mid to late 1900s, it was a well accepted and customary practice to eliminate and control mosquito breeding areas, in order to ensure public health and safety. The Connecticut Agricultural Experiment Station investigated mosquito breeding places and provided assistance to Towns played by the past. To control the breeding of mosquitoes, steps were taken throughout the state to eliminate swamps, marshes,

---

[6] Whenever a type of report as referenced in footnote 4 is cited in this Memorandum, the Exhibit number does not change but the name of the relevant Board is used.

bogs, wetlands and other areas where stagnant water accumulated, places that fostered mosquito breeding. Accepted steps to eliminate mosquito breeding included filling, ditching or oiling the swampy property. *See Excerpts from Connecticut Agricultural Experiment Station Reports Relating to Mosquito Control (1928, 1930 & 1939) (attached to Hamden's Rule 56(a)(1) Statement as Exhibit 64 thereto).*

In addition, and in furtherance of eliminating mosquito breeding areas and the diseases transmitted by mosquitoes, the Town Health Officer proposed the establishment of public dumping places that would be under the control of the Town officials to abate unnecessary accumulations of stagnant water. *Health Officer Reports 1915, Exhibit 24.* At the same time, parts of the area identified for further study under the Consent Order, which includes the Newhall Section, served as a dumping ground for waste generated by Winchester Repeating Arms, Co. ("WRA"), a predecessor to Olin. *Downie Trans., Exhibit 61 at 45-46, 103-107 & 138-42.* From the 1900s through 1941, if not later, WRA deposited its ash and waste products at various locations in the study area identified in the Consent Order. *Id.* Other private dumps also existed in the Newhall Section. *Downie Trans., Exhibit 61 at 134.* Whether and the extent to which the Town established or operated or regulated public dumps in the Newhall Section is a point of dispute and no admission of fact is made herein (or in the accompanying Local Rule 56 Statement) as to these claims. Whether the Town solicited property owners in the Newhall Section to allow their properties to be filled in or used as a dumping ground is also in dispute. Whether the public dumps in the Newhall Section were town regulated or controlled or simply locations where the public dumped, *see Downie Trans., Exhibit 61 at 41*, is also in dispute. The

following facts, however, relative to any (*if any*) town regulated or controlled dumps (in the Newhall Section or elsewhere) cannot be in dispute:

1. Prior to October 1, 1937, to the extent garbage and dumps were regulated at all by the Town, these activities fell under the authority of the Town Health Officer as these activities could pose a nuisance to the public's safety and health. *Health Officer Reports 1886-1936, Exhibits 1-46. Downie Trans. Exhibit 61 at pps. 98 & 133-138.*

2. At certain times, the Health Officer visited the dumps and caretakers were employed by the Town to look after some of the dumps. *Excerpts from the Minutes of the Hamden Board of Health (1931-1939) ("Health Minutes") (attached to Hamden's Rule 56(a)(1) Statement as Exhibit 65 thereto); Downie Trans., Exhibit 61 at pps. 70, 93, 98, 133 & 135.*

3. No fees were collected for the issuance of dump permits by the Town. *Downie Trans., Exhibit 61 at 30-33, 68, 70. & 72-75 Cappelletti Affidavit (attached to Hamden's Rule 56(a)(1) Statement as Exhibit 60 thereto, at ¶ 12).*

4. Hamden did not receive any revenue from garbage or refuse collection and disposal. *Affidavit of Robert V. Cappelletti, CPA ("Cappelletti Affidavit") attached to Hamden's Rule 56(a)(1) statement as Exhibit 60 at ¶ 10.*

5. No fees or income or revenues were collected from Winchester or Olin associated with dump permits, dump related activities, garbage collection or disposal. *See Downie Trans., Exhibit 61 at 99-100; Cappelletti Affidavit, Exhibit 60 at ¶ 16.*

6. Hamden did not generate any profit from collection or disposal of garbage or refuse, issuance of dump permits or control of dump related activities, abatement of mosquito nuisance or collection of revenue or income associated with Winchester or Olin. *Cappelletti Affidavit, Exhibit 60 at ¶ 20A.*

The properties in the Newhall Section were developed at various times over the fifty year period. *Development History Map (Downie Trans., Exhibit No. 10 dated December 2002) (attached to Hamden's Rule 56(a)(1) Statement as Exhibit 63 thereto).* Development happened gradually as each private landowner sought to develop its property. *Id.* Not all residential

properties were built over areas that were filled in with ash, Winchester waste or areas of private or public dumping; some residential development occurred over natural materials with other development occurring over fill consisting of sand and gravel. *Downie Trans., Exhibit 61 at p. 1 & 139-140.*

The Town issued building permits and realized fees from such permits beginning in 1914. *Cappelletti Affidavit, Exhibit 60 at ¶ 14.* These fees were collected to cover the cost of performing administrative functions, including inspections, and were not generated for purposes of making a profit. *Id. at ¶ 18.*

## IV.  ARGUMENT

**A.  The Town Is Shielded From Liability For Damages Arising From The Alleged Negligent Acts Under The Doctrine Of Governmental Immunity, As Those Acts Are Discretionary, Governmental Acts, And No Evidence Reflects The Town Acted With Reckless Disregard For Public Health And Safety**

Section 52-557n of the Connecticut General Statutes, together with applicable common law principles, limits the Town's liability for the alleged tortious acts set forth in Counts II, IV, VIII, and XII. These counts are barred under the doctrine of governmental immunity because Plaintiffs can offer no facts[7] that support these allegations; and even interpreting the allegations

---

[7]   In Plaintiffs' Memorandum in Opposition to Motions to Dismiss to the Town of Hamden and Olin Corporation, dated October 27, 2003 ("Plaintiffs' Opposition to Motion to Dismiss"), Plaintiffs included facts not alleged in the Amended Complaint. Notwithstanding that the so-called "facts" are a moving target, the Plaintiffs are asserting that the Town and Olin were joint venturers; that the Town knew or should have known that residential homes were to be built over toxic and hazardous substances; that the Town arranged for and profited from the disposal of Olin's wastes and its alleged joint venture with Olin; and that the Town profited from the residential development. In the Reply Memorandum of Defendant Town of Hamden in Further Support of Motion to Dismiss, dated November 24, 2003, the Town provided a chart (Attachment A) listing Plaintiff's unsupported claims. It will be these claims that the Plaintiffs, as the non-moving party, must show as affirmative facts to overcome this Motion for Partial Summary Judgment. *Pennsylvania Turnpike Comm'n.*, 319 F.Supp. 2d at 573; *see also Aslandidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (once moving party shows absence of material/issues of

in the Complaint and in Defendant's Statement of Undisputed Facts in a light most favorable to the Plaintiffs, no reasonable trier of fact could find for the Plaintiffs.

It is well settled that governmental immunity protects municipalities from liability for alleged negligence in the performance of discretionary, governmental acts as opposed to ministerial acts.[8] *Williams v. New Haven*, 243 Conn. 763, 766 (1998); *Evon v. Andrews*, 211 Conn. 501, 504 (1989); *Gauvin v. New Haven*, 187 Conn. 180, 184 (1982); *Gordon v. Bridgeport Housing Authority*, 208 Conn. 161, 167 (1988). A discretionary act is one that requires the exercise of judgment by a municipal employee, *Evon*, 211 Conn. at 507; and a governmental act is "performed wholly for the direct benefit of the public" and is supervisory, or discretionary in nature. *Gauvin*, 187 Conn. at 184. In contrast, a ministerial act is "performed in a prescribed manner without the exercise of judgment or discretion as to the propriety of the action." *Id.*; *Tango v. New Haven*, 173 Conn. 203, 204-205 (1977); *Vaillancourt v. Southington*, No. X03CV010510816S, 2002 WL 1041381, at *2. (Conn. Super. Ct. April 6, 2002) (Appended hereto as Attachment A). "Generally, liability may attach for a negligently performed ministerial act, but not for a negligently performed discretionary act." *Koloniak v. Bd. of Education*, 28 Conn. App. 277, 281 (1992).

A municipality, however, will not be shielded from liability if it acted in a proprietary

---

fact, burden of production shifts to non-movant, which must "demonstrate more than some metaphysical doubt as to the materials facts. . . [and] must come forward with specific facts showing that there is a genuine issue for trial") (intentional quotation marks omitted; intentional citations omitted).

[8]     Section 52-557n of the Connecticut General Statutes codifies this concept accordingly: "Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by. . . negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." C.G.S. § 52-557n(a)(2)(B).

manner.[9] In other words, if a town receives a pecuniary benefit, in the form of a special profit, governmental immunity does not attach. *Accashian v. Danbury*, No. X01CV970147228S, 1999 WL 27223, at *2 (Conn. Super. Ct. Jan. 6, 1999) (Appended hereto as Attachment B). Such "[a] proprietary function is done in the management of [a city's] property or rights for its own corporate benefit or profit and that of its inhabitants." *Id.* (internal quotation marks omitted; internal citation omitted). A municipality also will not be shielded from liability if it acts in reckless disregard for public health or safety. C.G.S. § 52-557n(b)(7) and (8).

Given this body of law, the Court need only examine the following questions: :

(1) whether the Town's concern and role in eliminating mosquito breeding grounds in Hamden was for any purpose other than the protection of the health, safety and welfare of its residents in fulfillment of a discretionary, governmental duty;

(2) whether the Town established or operated any dumps in the Newhall Section for profit so that its acts were proprietary – as opposed to governmental – in nature;

(3) whether the issuance of building permits and certificates of occupancy for the houses developed in the Newhall Section constitute discretionary, governmental functions as opposed to ministerial or proprietary functions; and

(4) whether any of the activities performed by the Town constituted a reckless disregard for health or safety.

    **1.    Hamden's Actions Including Encouraging The Filling Of Wetlands And Low Lying Areas To Protect Public Health And Safety, Were Discretionary, Governmental Acts**

In the late 1800s and early 1900s, the Town provided for the health, safety and welfare of its citizens. *Health Officer Reports 1886-1950, Exhibits 1-59*. Such a governmental function

---

[9] C.G.S. § 52-557n(a)(1)(B) states, in relevant part, that "[e]xcept as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by. . . negligence in the performance of functions from which the political subdivision derives a special corporate profit or pecuniary benefit."

was as clearly established then as it is today. Pursuant to C.G.S. § 7-148, among the police powers a town may exercise is: the abatement of nuisances, the causes thereof, and all things detrimental to the health of a town's inhabitants (C.G.S. § 7-148(c)(7)(E)); the control of insect pests in any manner deemed appropriate (C.G.S. § 7-148(c)(7)(H)(x)); and providing for the health of its inhabitants and the doing of all things necessary or desirable to secure and promote the public health. (C.G.S. § 7-148(c)(7)(H)(xi)). In general, a municipality may regulate the filling of land not in public use and provide for the reestablishment of ground level and protection of the area by suitable cover. (C.G.S. § 7-148(c)(8)(C)). Today's words are yesterday's concepts. Between 1886-1950 the town abated nuisances, controlled insects, and undertook or recommended some controls to eradicate such nuisance and pests. Hamden exercised all these governmental powers during the first fifty years of the twentieth century.

In particular, in the early 1900s, Hamden, like many other towns, was presented with a public health crisis, caused by the mosquito-borne illness of malaria. In 1915, in his Annual Report, the Hamden Health Officer, Dr. G.H. Joslin, reports: "Perhaps there is no one subject that confronts the people of the Town of Hamden with so much vital interest as the subject of the elimination of mosquitoes." *Health Officer Reports 1915, Exhibit 24.* This reference in the Town's Annual Report was neither the first nor the last such reference. The earliest reference to abolishing mosquito breeding areas specifically in the Newhall Section was in 1913, when the Town's Health Officer (Dr. Walter Lay) reported that "[s]teps are being taken toward the abolishing of some of the mosquito breeding places. By the time this report reaches the

townspeople it is hoped that the swamps near Newhall Street, Auger Street and Putnam Avenue will be drained and open to sunlight." *Health Officer Reports 1913, Exhibit 22.*

Elimination of malarial breeding grounds remained an objective of the Town Health Officer for decades. *Health Officer Reports, 1915-1917, 1925, 1930, & 1937, Exhibits 24-26, 34, 39 & 46.* In 1916, Winchester Repeating Arms and the New Haven Water Company drained the largest single material breeding swamp in Hamden. Similarly, that same year, a "very bad breeding place on the corner of St. Mary and Morse Streets is nearly filled in." *Health Officer Reports 1916, Exhibit 25.* Although the Town's problem of mosquito extermination was eventually joined with the Connecticut Agricultural Experiment Station, the Town's Health Officer also tried to lead an effort to reduce places where standing water could accumulate and where mosquitoes breed. Toward that end, he proposed reducing the number of private dumping areas where stagnant water could accumulate and the establishment of certain public dumping places in various sections of town. *Health Officer Reports 1915, Exhibit 24.* By 1917, three public dumps were established in Hamden. One was reportedly located "on Highwood on Shelton Avenue, between Goodrich and Morse Streets." *Health Officer Reports 1917, Exhibit 26.* The mosquito nuisance was considered a problem of public health and welfare, and continued into the 1940s. *Report of Department of Public Works 1942, Exhibit 51.* During this time, the Town budget also reflected appropriations for the control of the mosquito nuisance. *Cappelletti Affidavit, Exhibit 60 at ¶ 15.*

This elimination of the wet, low-lying areas, which occurred nearly 90 years before the filing of the Amended Complaint was an activity in furtherance of a governmental function. It