was a discretionary act as well, calling for the exercise of judgment by the Health Officer as to how to control the mosquito nuisance – filling, draining, oil spreading, or the establishment and whether to establish a few public dumps (as opposed to multiple private dumping grounds) in the Town in order to consolidate the areas where water could accumulate. The Town Health Officer also was called upon to decide what locations were suitable for the various treatments. Indeed, to the extent that filling occurred or dumps were established, the Town's activities sought to protect public health and safety by eliminating the accumulation of areas of stagnant water throughout the community. All of this is consistent with DEP's purported findings of fact, which reflect that the purpose of disposing waste in the Newhall Section was to ameliorate the mosquito nuisance through the filling of swamps and low lying areas.

Explicit and implicit public policy establishes that filling of wetlands and low lying areas, in order to abate mosquito nuisances, benefited the Hamden residents; and that such action was for the purpose of protecting public health and safety. Rather than being in reckless disregard, the filling of portions of the Newhall Section was done *for the protection of public health and safety*. Simply put, the only foreseeable conclusion drawn from the Town's conduct was a *benefit* to its citizens. For obvious reasons, the Town could not have foreseen at the time that the filling in of wetlands and low lying areas in the Newhall Section and the subsequent development of residential uses on these properties might cause harm or injury to persons residing or owning Newhall Section properties today. Therefore, claims for any harm to these Plaintiffs arising from the Town's conduct in fulfillment of its mission to protect public health and safety are barred by C.G.S. § 52-557n. *See Gordon*, 208 Conn. at 166; *Jaworski v. Kiernan*,

241 Conn. 399, 405 (1997) (nature of duty and identity of person to whom a duty is owed are determined by specific circumstances surrounding conduct at issue); *Roy v. Friedman Equip. Co.*, 147 Conn. 121, 124 (1960) (question of duty always determined based upon then-existing conditions).

This action was regulatory in nature as it was designed to regulate land use and public health. As such, Hamden is entitled to governmental immunity for any action it undertook in furtherance of eliminating a public health threat caused by malaria infested mosquitoes.

2. **Any Establishment Or Operation Of A Public Dump By The Town In The Newhall Section Was Not A Proprietary Activity.**

Plaintiffs allege that the Town established and operated dumps in the Newhall Section. In support, they also claim that the Town solicited owners of property to allow dumping on their properties and that the Town was providing the dumps for the Winchester/Olin waste materials. Am. Compl. at ¶¶ 21- 24 and 54.

First, *assuming arguendo* that the Town did solicit landowners to allow their properties to be used as public dumps and, thereafter, the Town established or operated dumps on such properties, the doctrine of governmental immunity applies to these municipal landfills. The Connecticut Supreme Court has stated that "[a] refuse disposal operation is generally held to be a governmental function." *Wood v. Wilton*, 156 Conn. 304, 310 (1968). *See also Little Joseph Realty, Inc. v. Babylon*, 41 N.Y.2d 738, 742 (1977). Today, and for at least fifty years, municipalities have had the power to regulate the collection and disposal of garbage, trash and rubbish. *See* C.G.S. § 7-148(c)(4)(H).

Hamden did attempt to provide for and regulate the disposal of wastes in the Town. As early as 1900 Hamden sought to regulate and control "garbage"[10] within the Town, by limiting its importation from New Haven. *Health Officer Reports 1886-1909, Exhibits 1-18.* Refuse,[11] on the other hand, was not collected by the Town. *Health Officer Reports 1916-17, 1924-25, 1927, & 1931, Exhibits 25-26, 33-34, 36 & 40.* Public streets and other areas became public dumping grounds, and in order to control for such nuisance (and the mosquito nuisance associated with the standing water in the rubbish), the Health Department recommended in 1916 that the number of private dumps be reduced. *Health Officer Reports 1916, Exhibit 25.* Public dumps then emerged in the Town for the public disposal of refuse. *Health Officer Reports 1917, Exhibit 26.*

The Town's involvement in dumps and in ensuring an organized disposal of wastes arose from its efforts to abate nuisances and to control for the standing, stagnant water which offered ripe mosquito breeding grounds. *Health Officer Reports 1916, Exhibit 25.* As noted by Ms. Downie, the precise role of the Town as to some of the dumps is not clearly defined in the historical Annual Reports, and the Town's role varied depending upon the dump. *Downie Trans., Exhibit 61 at p. 41.* While some dumps were called "public dumps", the Town's involvement varied among these dumps.[12] Notwithstanding, nothing in any of the documents reflects that the Town's involvement with dumps in the Newhall area was for any purpose other than public

---

[10] "Garbage" is food waste, waste from markets or preparing food, and other organic debris that could be fed to pigs. *Downie Trans., Exhibit 61 at p. 36.*

[11] "Refuse" includes tin cans, ashes, rubbish, bottles, cinders, shells – things that pigs do not eat. *Downie Trans., Exhibit 61 at p. 36.*

[12] For example, certain dumps may be where the public dumped as opposed to a Town-sanctioned public dump. *Downie, Exhibit 61 at p. 41.*

health and safety, as reflected by the fact that issues involving dumps were always part of the Health Officer's report and budget until 1937. *Health Officer Reports 1937, Exhibit 45*.

Whatever jurisdiction the Town had over the regulation of dumps lay with the Health Officer until 1937 as dumps were considered nuisances. *Health Officer Reports 1886-1936, Exhibits 1-45; Health Minutes, Exhibit 65*. Thereafter, oversight was transferred to the Town Department of Public Works. *Health Officer Reports 1937, Exhibit 46*. At various times, the Town inspected dumps to abate nuisances and hired caretakers. *Health Minutes, Exhibit 65*. The Town also issued permits to identify who could dump and who could not, but no fee or charge was levied by the Town for a dump permit. *Downie Trans., Exhibit 61 at pps. 31-33, 68, 70-74; Cappelletti Affidavit, Exhibit 60* at ¶ 12.

Based upon this history and set of facts, it is clear that the Town is shielded from liability as to any alleged role in establishing, operating, maintaining or regulating public dumps. Several Connecticut trial courts have similarly recognized that landfills and dumps are governmental functions and applied the doctrine. The Town acknowledges, as it must, that a determination of whether a municipality is shielded under the doctrine from its acts of permitting, operating or maintaining a landfill turns also on whether the landfill was a proprietary enterprise,[13] and courts have examined such questions as: (1) whether fees are charged; (2) whether the town covers all

---

[13] For example, In *Vaillancourt*, a motion to strike was denied because the allegation that the Town accepted commercial and industrial waste could give rise to the reference that the landfill was operated on a proprietary basis. 2002 WL 1041381, at *2-3  In *Accashian*, the court denied a motion to strike because of allegations that the municipality received landfill fees (approximately twelve million dollars) from the non-residents who disposed of waste materials at the town's landfill. 1999 WL 27223, at *3-4. In *Savelli*, the court determined that whether a landfill transfer station is a governmental or proprietary function is a question of fact. 1999 WL 1063405, at *2.

or part of the costs or whether the landfill generates a profit; (3) whether the landfill is operated for the comfort and convenience of its citizens thereby providing a corporate benefit or, conversely, whether it is the fulfillment of a governmental function related to the health safety and welfare of the public at large.  *Savelli v. Windsor*, No. CV970572274, 1999 WL 1063405, at *2 (Conn. Super. Ct. Nov. 3, 1994) (Appended hereto as Attachment C).

The uncontroverted evidence leads to only one conclusion:  the establishment or operation  or regulation of dumps (if any) in Hamden between 1900 to 1950 was not a proprietary enterprise.  No evidence supports a conclusion that fees were charged.  *See Cappelletti Affidavit, Exhibit 60 at ¶ 12; Downie Trans., Exhibit 61 at pps. 68-74*.  No evidence supports a conclusion that the Town received monies from or profited in any way from Winchester/Olin disposing its wastes and ash in the Newhall Section, and while dump permits were issued, there is no evidence that the Town receive compensation -- let alone a profit -- from such permits.[14]  *Cappelletti Affidavit, Exhibit 60 at ¶ 20A.; Downie Trans., Exhibit 61 at 70.*  Although Plaintiffs may have asserted in a prior Memorandum of Law that the Town entered into a profit-making scheme with Olin to accept and dispose of waste in the Newhall Section, *see* Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss filed by Defendants Town of Hamden and Olin Corporation, dated Oct. 27, 2003, at 47, neither allegations in the Amended

---

[14]    A review of the Selectmen Reports, Treasurer Reports, Auditor Reports and Board of Finance Reports (among other reports) similarly shows no reference to income from garbage collection or dumps.  Given that such reports include references as obscure and *de minimus* as $14.00 for a fireworks permit in 1929 or $60.00 for a pool room license, had the Town received any money from Winchester/Olin (or anyone) for the issuance of dump permits, receipt of those funds would clearly have been identified. *Cappelletti Affidavit, Exhibit 60 at ¶¶ 10, 12, & 16; Downie Trans., Exhibit 61 at pps. 68, 70 & 73; see also Treasurer's Reports 1901-1926, Exhibits 10-35; Board of Finance Reports 1908-1950, Exhibits 17-59.*

Complaint nor competent evidence supports any claim "that Hamden entered into a joint venture with Olin over a period of decades in which Hamden solicited industrial waste from Olin for fill, so that Hamden's unproductive land could converted into residential areas which would allow it to collect building permit fees for hundreds of homes, and expand its tax base."

Given this, the landfills in the Newhall Section clearly existed for the benefit of the Town's citizens and their design, development and operation were related to the health, safety and welfare of the public at large. *See Vaillancourt*, 2002 WL 1041381, at * 3 (municipalities are granted governmental immunity for their regulatory actions including efforts to regulate land use and health); *see, e.g.*, *Evon*, 211 Conn. at 506 (municipality immune from liability for alleged failure to enforce statutes, regulations and codes concerning maintenance of rental dwellings). The only conclusion supported by the record is that the Town derived no revenue at all from the dumps in the Newhall Section, and that not only was no profit generated, but – to the extent that the Town owned or operated any dumps at all – the Town covered all costs of the landfill itself.[15]   Plaintiffs' failure to allege or cite any facts supporting a claim that the Town's alleged activities were proprietary in nature, coupled with a complete record that definitively shows that the Town never received corporate gain or profit from Winchester/Olin or anyone, clearly demonstrates that the Town's activities were governmental, and not proprietary,

---

[15]   No references are made as to the receipt of income from dump permits. A review of the Selectmen Reports, Treasurer Reports, Auditor Reports and Board of Finance Reports (among other reports) similarly show no references to income from garbage collection or dumps. With references as obscure and as low as $14.00 for a fireworks permit in 1929 or $60.00 for a pool room license, if the Town received any money from Winchester/Olin (or anyone) for the issuance of dump permits, receipt of those funds would have been identified. The only conclusion is that the Town derived no revenue at all from the dumps in the Newhall Section. Therefore, not only was a profit not generated, but – to the extent that the Town owned or operated any dumps at all – the Town covered all costs of the landfill itself. Expenses for dumps were identified in the budgets but no offsetting income was similarly noted. *Downie Trans., Exhibit 61 at p. 70.*

acts.

> 3. **Hamden's Issuance Of Building Permits And Certificates Of Occupancy To The Newhall Section Was Not Premeditated For Purposes Of Increasing Revenues And The Town's Tax Base**

Connecticut courts have found the issuance of a building permits and certificates of occupancy to be discretionary governmental functions. *See Maresca v. New Britain*, No. CV920292537S, 1994 WL 228456, at *3 (Conn. Super. Ct. April 7, 1994) (Appended hereto as Attachment F); *Prestia v. Zajac*, No. 370534, 1992 WL 231351 (Conn. Super. Ct. Sept. 15, 1992) (Appended hereto as Attachment E); *see also Farnsworth v. Horrigan*, No. CV950373914S, 1999 WL 49393, at *2 (Conn. Super. Ct. Jan. 22, 1999) (Appended hereto as Attachment F) ("[c]learly the issuance of a governmental permit and conducting of inspections as well as issuing the certificate of occupancy ... are discretionary acts."); *see also Perry v. Bethlehem*, No. CV010084828S, 2002 WL 31050720, at *2 (Conn. Super. Ct. Aug. 8, 2002) (Appended hereto as Attachment G) (issuance of certificates of occupancy and inspection of building require the exercise of discretion); *Evon*, 211 Conn. at 506 (inspector's decision as to whether housing and fire code standards are met involves the exercise of judgment); C.G.S. § 52-557n(b)(7) and (b)(8) (providing exemption from municipal liability for the negligent inspection of property or negligent issuance of a certificate of occupancy or building permit unless such issuance or inspection constitutes a reckless disregard for health or safety under the circumstances). Before issuing a certificate of occupancy, a municipal employee must determine whether the premises conforms to certain standards expressed in both state statutes and the municipality's housing ordinances, a "determination [which] necessarily involves the

governmental decision making process and requires an exercise of discretion." *Prestia*, 1992 WL 231351, at 1. Further, in comparing the condition of the premises to the requirements of the applicable statutes or ordinances, the municipal employee must use judgment in deciding whether a violation arises from any deviation from the standard. *Id.*

Here, the Town's activities required the exercise of discretion or judgment and, therefore, give rise to an absolute immunity to liability under the doctrine of governmental immunity pursuant to C.G.S. § 52-557n(a)(2)(B). Further, while Plaintiffs may argue that the Town engaged in a "proprietary" act because of revenues received through building permits and certificates of occupancy, it has long been the law that the charging of fees for the administration of a municipal function does not convert the governmental service into a profit-making endeavor. *See, e.g., Hannon v. Waterbury*, 106 Conn. 13 (1927) (fees charged for use of municipal swimming pool were not for purpose of deriving corporate profit for municipality). Further, claiming that increased tax revenues leads to a proprietary activity is empty rhetoric, as the logical consequence of this argument renders all local governments' proprietary entities every time they collect or increase tax or provide any services.[16]

---

[16] Governments collect building permit fees for the administration of government, not for the purpose of profit-making. *Cappelletti Affidavit, Exhibit 60 at ¶¶ 14 & 17-19.* Governments use such fees and taxes to provide services to local residents. Further, all residential development necessarily entails increased costs for various services including fire, police, school, sewers, water, etc. *Id. at ¶ 19.* Notwithstanding the theory of public government, the Town did not realize a corporate profit or gain from the issuance of building permits. *Id. at ¶ 18 & 20.*

### 4. Hamden's Discretionary Activities Provide Absolute Immunity

Plaintiffs brought this action against the Town itself. Over the years, the general rule has evolved at common law and under C.G.S. § 52-557n that a municipality is immune from liability unless the legislature expressly abrogates that immunity. *Pane v. Danbury*, 267 Conn. 669 (2004). The legislature has provided certain limits to this immunity to the extent that the acts complained of resulted from a reckless disregard for health and safety,[17] But as a result, the Town is shielded from liability unless Plaintiffs establish facts showing that the Town acted with a reckless disregard for health or safety.

Reckless misconduct under C.G.S. § 52-557n(b)(7) and (b)(8) requires a conscious choice of a course of action which indicates a reckless disregard for the rights or safety of others. *Fusco v. Colchester*, 1993 WL 312224, at *2 (Conn. Super. August 4, 1993) (Appended hereto as Attachment H). Additionally, "the actor must recognize that the conduct involves a risk substantially greater than negligence." *Id.* Here, there is no such intentional conduct that is designed "to injure for which there is no just cause or excuse." *Id.* (citing *Dubay v. Irish*, 207 Conn. 518, 532-33 (1988)). There is no evidence to suggest that the filling of the low-lying swamps was done with an extreme departure from ordinary care by the Town or with the knowledge of the Town. Filling or dumping was *done by others*, of which the Town may have

---

[17] For instance, Hamden will not be liable for: (1) "the issuance... of... any permit, license, certificate, appraisal, order or similar authorization, when such authority is a discretionary function by law, unless such issuance, denial, suspension or revocation or such failure constitutes a reckless disregard for health or safety;" or (2) its "failure to make an inspection or making an inadequate or negligent inspection of any property... to determine whether the property complies with or violates any law or contains a hazard to health or safety, unless the political subdivision had notice of such a violation of law or such a hazard or unless such failure... constitutes a reckless disregard for health or safety under all the relevant circumstances." C.G.S. § 52-557n(b)(7) and (b)(8).

had knowledge However, the activity of filling or dumping was not done with knowledge that a dangerous condition was being created. Indeed, given the recommendations of the Health Inspector and the Connecticut Agricultural Experiment Station, a safe condition was to result.

After full discovery, it is clear that plaintiff cannot show any facts evidencing such a reckless disregard. There is no evidence that the building permits and certificates of occupancy were issued with a reckless disregard for health and safety, as when the properties were filled in and developed, the Town did not act with an awareness of the harm that certain fill areas may have presented. *See Steiger v. Old Lyme*, Nos. 89510846 and 90515733, 1994 WL 67748 (Conn. Super. Ct. Feb. 25, 1994), *rev'd in part*, 39 Conn. App. 32 (1995) (Appended hereto as Attachment I. No facts exist that the Town acted recklessly (or otherwise) or violated any federal, state or local law, regulation, code or ordinance restricting such development. Indeed, given that the environmental laws which arguably might regulate and restrict such residential development today are a product of the modern era,[18] and with limited exceptions, houses in the Newhall Section were all built at various times between 1900 and the 1950s. The Town did not

---

[18] State regulation of environmental issues originated largely in 1958, with the establishment of the Water Resources Commission, the predecessor to Connecticut's DEP. Statutes providing the foundation for the Commissioner's authority to issue the orders such as the Consent Order, were enacted in 1958. 1958 Rev. § 25-54c, d, f, k, l. In 1971, the relevant authority was transferred to the Commissioner of DEP and individuals were empowered to seek declaratory and equitable relief. *See* Connecticut Environmental Policy Act (1971 P.A. 872); Connecticut Environmental Protection Act (1971 P.A. 96). Further growth of permitting and regulatory requirements designed to protect public health, safety and the environment occurred in the 1970s and 1980s, and C.G.S. § 22a-133k, which authorized DEP to enact the remediation standards that regulate the concentrations of contaminants like lead and arsenic in soil, was passed in 1989. 1989 P.A. 365. The Federal environmental scheme also had its genesis in the later part of the 20th century. *See* Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (1972) (regulating water discharges); Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.* (1976) (regulating toxic waste); Toxic Substances Control Act , 15 U.S.C. § 2601 *et seq.* (1976) (regulating hazardous substances); Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* (1980) (regulating the presence of hazardous substances in soil). When EPA evaluated the residential properties, it did so pursuant to CERCLA. *See* Am. Compl. at ¶¶ 27-33.

establish a predetermined course to develop the Newhall Section; instead, private landowners developed these properties on their own over the course of decades. When the conduct at the time of the filling and the development is judged according to the laws, regulations, codes and standards in existence at the time, there can be no reckless disregard for the health and safety of the homeowners.

The Town did not act in reckless disregard for the health and safety of its residents.[19] Plaintiffs cannot demonstrate that the Town failed to or inadequately performed inspections, that the issuance of permits at the time constituted a reckless disregard for health and safety, that the Town – at the time – had notice of a violation of law, or that the Town had notice that a hazard existed and proceeded anyway. Such facts – not mere conclusory allegations -- are required to overcome the Town's municipal immunity under C.G.S. § 52-557n(a)(b)(7), *see Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (1980), and because the Town's historic official record leads to the inexorable conclusion that the activities were conducted in furtherance of public health and safety, Plaintiffs cannot meet their burden. Thus, the Town is entitled to absolute governmental immunity under C.G.S. § 52-557n(a)(2)(B) for performing the discretionary governmental duty of abating the mosquito nuisance, allegedly regulating or operating public dumps, and issuing building permits and certificates of occupancy associated with residential development in the Newhall Section.

---

[19] The Town, additionally, is immune from liability for its failure to detect or prevent polluting acts of Winchester/Olin or others. C.G.S. § 52-557n(b)(9). Pursuant to C.G.S. § 52-557n(b)(9): "[a ]political subdivision. . . shall not be liable for damages to persons or property resulting from. . . failure to detect or prevent pollution of the environment, including groundwater, watercourses and wells, by individual or entities other than the political subdivision." Accordingly, if Winchester/Olin (or others) polluted the residential properties, the Town cannot be held liable for its failure to detect such pollution.

In conclusion, once it is shown that a municipality's acts were discretionary or governmental in nature, the inquiry ends and the town has absolute immunity. Here, the allegedly negligent acts or omissions cited against the Town involved the exercise of judgment or discretion, thereby providing total immunity under C.G.S. § 52-557n(a)(2)(B). Thus, summary judgment is appropriate pursuant to the express language of C.G.S. § 52-557n(a)(2)(B), which excludes municipalities from liability for damage or injuries caused by the negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority granted by law.

      **B.**    **The Town Is Shielded Under The Doctrine Of Governmental Immunity From Any Claim Relating To A Nuisance Because No Facts Exist That Demonstrate That The Town, By Some Positive Act, Created The Condition.**

The Town is also shielded from liability for any nuisance claim as set forth in Count XV of the Amended Complaint. For a public nuisance to exist, the plaintiff must show: "(1) the condition complained of ha[s] a natural tendency to create danger and inflict injury upon [a] person or property; (2) the danger created was a continuing one; (3) the use of the land was unreasonable or unlawful; and (4) the existence of the nuisance was the proximate cause of the plaintiffs' injuries and damages." *State v. Tippets, Abbett, McCarthy, Stratton*, 204 Conn. 177, 183 (1987). Where the alleged creator of the nuisance is a municipality, another element is required: the Plaintiffs must prove that the Town, "by some positive act, intentionally created the condition alleged to constitute a nuisance." *Elliot v. Waterbury,* 245 Conn. 385, 421 (1998). Furthermore, against a municipality, the plaintiff must also plead and prove s positive act on the

part of the town. *Keeney v. Old Saybrook*, 237 Conn. 135, 164-65 (1996); *Accashian*, 1999 WL 27223.

Dismissal of this nuisance count is warranted not only as a matter of law[20] but also as a matter of uncontrovertable fact. It cannot be disputed that the historical facts do not indicate that the Town created a nuisance. It is undeniable that the Town's actions were in furtherance of abating a nuisance (i.e., malaria carrying mosquito breeding grounds) rather than in creating one. To the extent that the Town engaged in any positive act, it was to rid the Town of mosquito breeding grounds. Once the land was treated or filled, the public nuisance threat was eliminated. The land then was developed by private owners into residential dwellings. While plaintiffs may argue that the "positive act" was the issuance of building permits without a warning that the properties had been filled in, this involves, at most, a failure to act rather than the requisite positive act, and a failure to act will not suffice to defeat governmental immunity. *See Keeney*, 237 Conn. at 163-64 (act must be intentional at time it is conducted). *Esposito v. New Britain Baseball Club, Inc.*, 48 Conn. Supp. 643 (Conn. Super Ct. July 16, 2004). It also presumes that the Town knew that each property was developed on fill material that contained materials other than fill, rocks, sand and gravel, a claim impossible to reconcile with the fact that not all properties in the Newhall Section were built on areas that had been dumps, and that the dumps themselves varied in terms of ownership and content. In sum, the Town did not know what was on each property - be it general fill material, Winchester fill or private dump material – and whether, under the standards of the first half of the 20th century, such material might be

---

[20] *See* Memorandum in Support of Motion to Dismiss, dated August 1, 2003, at 37-39.

considered hazardous or toxic. Given this, the Town is immune from liability, for even if the Town knew of dumping, there was no substantial certainty of danger, *Accashian*, 1999 WL 27223, at *10-11, and thus no basis to establish that the Town knew of any of the dangerous results. *See also* C.G.S. § 52-557n(b)(9).

No evidence demonstrates that the Town dumped any ash, wastes or other substances on the properties. No evidence exists that the Town owned, operated or maintained any of the dumps in the Newhall Section. The issuance of dump permits and the provision of caretakers for nuisance abatement in fulfillment of the Town's powers to provide for public health and safety are not the types of positive acts that give rise - 100 years later - to a nuisance claim against a municipality. A purported "failure" to warn residents of the Newhall Section of the possibility that some of their homes could be built on fill that might in some cases include byproducts of Winchester's 100-year old manufacturing processes does not rise to the same level of the kind of intentional and deliberate failures which has given rise to the possibility of liability against municipalities. S*ee Keeney*, 237 Conn. at 166-67. Here, the Town's conduct in allegedly failing to act is considerably less flagrant than that chastised in *Keeney*.

Finally, and not insignificantly, it cannot be denied that whatever contamination – to the extent it exists and causes injury – is being abated. Under the Consent Order, the parties have stipulated as to who will investigate and remediate the Newhall Section, and agreed that Olin will investigate the residential properties in the Newhall Section. To the extent that any nuisance is created or maintained by these parties' failure to respond, the Town is immune under C.G.S. § 52-557n(b)(9).

**V. CONCLUSION**

For all of the foregoing reasons, Defendant Town of Hamden respectfully requests that this Court enter summary judgment in its favor on the ground of its defense of governmental immunity pursuant to C.G.S. § 52-557n.

THE DEFENDANT,
TOWN OF HAMDEN

By /s/ Ann M. Catino

Ann M. Catino
Federal Bar #ct02747
Joseph G. Fortner, Jr.
Federal Bar #ct04602
Thomas C. Blatchley
Federal Bar #ct25892
HALLORAN & SAGE LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103
(860) 522-6103
Its Attorneys

## CERTIFICATION

This is to certify that on this 15th day of December, 2004, I hereby mailed a copy of the foregoing to:

Monte E. Frank, Esq.
David B. Zabel, Esq.
Alison K. Clark, Esq.
Cohen & Wolf, P.C.
158 Deer Hill Avenue
Danbury, CT 06810

Mark Roberts, Esq.
Andrew Rainer, Esq.
Jennifer A. Currie, Esq.
McRoberts & Roberts, LLP
101 Merrimac Street
Boston, MA 02114

Neil T. Leifer, Esq.
Michael A. Lesser, Esq.
Brad J. Mitchell, Esq.
David C. Strouss, Esq.
Thornton & Naumes, LLP
100 Summer Street, 30th Floor
Boston, MA 02110

Michael H. Wetmore, Esq.
Joel B. Sampson, Esq.
Husch & Eppenberger, LLC
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105

Sandra K. Davis, Esq.
Mark S. Baldwin, Esq.
Brown Rudnick Berlack Israels LLP
185 Asylum Street, 38th Floor
Hartford, CT 06103-3402

_____
Ann M. Catino

626485_2.DOC