## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

CLARENCE R. COLLINS, JR., et al. : CIVIL ACTION NO.
for themselves and on behalf of a class : 3:03-CV-945(CFD)
of similarly situated property owners, :
     Plaintiffs, :
v. :
 :
OLIN CORPORATION and THE TOWN OF :
HAMDEN, : FEBRUARY 14, 2005
    Defendants. :

## PLAINTIFFS' MEMORANDUM IN OPPOSITION OF OLIN CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## I. INTRODUCTION

The principal issue before the Court is whether the transfer of every aspect of the

business of a company once known as the Winchester Repeating Arms Company of Delaware to

a newly formed company known as the Winchester Repeating Arms Company of Maryland

constituted a continuation of the enterprise such that the newly formed company succeeded to the

liabilities of the company it replaced. Although these events transpired in the dark hours of the

Great Depression in 1931, the facts surrounding this corporate event, when held up to the light of

day, make clear that:

> **There was not a ripple of change** as the new corporation took over the
> plant and it [was] **the intent of the new company to carry on operations**
> [in New Haven] with the continued manufacture and development of the
> world-famous Winchester products **without the introduction of any**
> **radical changes.**

*See* New Haven Register, December 23, 1931 (Resp-Olin-271-272) (Attached to Plaintiffs'

Local Rule 56(a)(2) Statement of Facts as <u>Exhibit 17</u> thereto) at Olin-272 (emphasis added). The

**ORAL ARGUMENT REQUESTED** 1

newly formed Winchester Repeating Arms Company of Maryland (hereinafter "Winchester

Maryland") continued the business of the prior Winchester Repeating Arms Company of

Delaware (hereinafter "Winchester Delaware") with the same employees, the same

manufacturing operation and the world famous Winchester name.

Through the New Haven Register, John M. Olin, the vice president of the new company,

- "officially and emphatically announced that the **vast 81 acre Winchester plant will
  continue to be operated as a separate and definite corporation going right ahead
  with the Winchester business** which [had] in the course of the company's two third's of
  a century made Winchester world famous."
- "also emphatically announced that **there will be no radical changes in the personnel of
  the plant**"
- "that the plant will reopen … with the **same working force** … and **all departments will
  be operated as usual**.
- "This means … **the [employment of] about 2500 people, … will continue unaffected
  by the corporate changes that have taken place**."

*See* <u>Exhibit 17</u> at Olin-272 (Emphasis added).

In addition to continuing the essential business of Winchester Delaware, the new

Winchester Maryland acquired all the goodwill built up by Winchester since its inception,

including the all important Winchester name, recognized as "The Gun That Won the West."

This allowed the real buyer behind the transaction, the Olin family's Western Cartridge

Company ("Western Cartridge") to play a role in the manufacture of firearms, for the first time.

In 1938, Winchester Maryland was absorbed into Western Cartridge, which assumed all its

assets and liabilities. Western Cartridge continued to produce the famed Winchester firearms

and even began using the Winchester name on its own ammunition. In 1944, Western Cartridge

was merged with Olin Corporation, the defendant before the Court. Olin Corporation is the legal

successor to Western Cartridge.

Not only did Olin continue the Winchester name, product line and manufacturing

operation in New Haven, but relevant to this case, it continued the Winchester practice of

disposing contaminated fill in nearby Hamden land used to develop residential properties. These properties were subsequently purchased by the plaintiffs who in 2001 learned that their homes are contaminated with lead, arsenic and other poisons contained in this manufacturing waste.

Despite the continuity of the Winchester business, its name and its products, a continuity that was not interrupted by even "a ripple of change as the new corporation took over the plant", Olin has moved for summary judgment claiming that as a matter of law it cannot be found to have succeeded to the liabilities created in this case by Winchester's tortious activity in Hamden.

As support for its argument, Olin makes two principal contentions: (1) under its version of the factual history, significant changes were made to the Winchester manufacturing operation so that it cannot be viewed as a mere continuation of the prior enterprise and (2) there was no continuity of the stockholders between Winchester Delaware and Winchester Maryland. There is material dispute of fact as to both contentions, and, in any event, neither justifies holding as a matter of law that Olin Corporation did not succeed to the liabilities of Winchester Delaware that are alleged in this case.

In a motion for summary judgment, all facts and reasonable inferences are to be viewed in a light most favorable to the non-moving party, not the moving party. Here there is substantial evidence from which a reasonable jury could find, as the New Haven Register observed in 1931, that the newly created corporation continued the Winchester Delaware operation without "a ripple of change", employing the same labor force, manufacturing the same products, at the same plant, under the same name, with the same key managers, and disposing of its hazardous waste in the same way.

Second, while continuity of stockholders is a relevant consideration of whether there is a "mere continuation" or a "de facto" merger, it is not the only consideration and it is certainly not

**ORAL ARGUMENT REQUESTED**   3

a precondition to such a holding. While there is evidence of some continuity of stockholders in the case at bar, that fact is not essential. More importantly, there was, as a practical matter, a continuity of ownership through this transaction. At the time of the transaction, Winchester Delaware's debts far exceeded its assets and the company was placed in receivership to protect the interests of its creditors. Inasmuch as the Winchester Delaware stock had no value, the only parties likely to realize any value from the Winchester Delaware operation were the creditors. When the creditors accepted the Western Cartridge's offer in October 1931, they received as consideration for the sale some $3,000,000 in cash and 4.8 million in par value of stock in Western Cartridge. Thus, as a practical matter, the only owners of any value in Winchester Delaware became owners of Western Cartridge by virtue of the stock they were given as consideration for the sale.

Alternatively, Olin succeeded to liability under the "product line" theory of successor liability. There is no serious question that Winchester Maryland continued the product line developed and made world famous by Winchester Delaware. Moreover, while the product line theory was developed in the context of products liability cases, it has been applied by Connecticut courts outside that context, and the principle underlying the exception is directly applicable here – that is, where a company capitalizes on the product and goodwill of a seller, it is fair to also be responsible for the seller's past operations.

## II.    FACTS PERTINENT TO THE MOTION FOR SUMMARY JUDGMENT

Winchester Repeating Arms Company was founded in Connecticut in 1866. *See* R.C. Rikhoff and J.R. Falk, Olin Public Relations, Press Releases (Olin 001058-0001076) (Attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts as Exhibit 29 thereto). The company's fame and stature is legendary. Winchester was promoted by Western icons, such as Buffalo Bill Cody,

and Winchester firearms came to be known as "The Gun that Won the West." Other historical figures associated with the Winchester name include Teddy Roosevelt and Annie Oakley. *See* Exhibit 29 at Olin 001073-76. *See also* Winchester-Western Division, Olin Mathieson Chemical Company, *The Story of Winchester, The Gun that Won the West,* 1956 (Olin 014116-014139) (Attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts as Exhibit 30 thereto). In 1929, the Connecticut corporation was reorganized with a companion corporation and reformed as Winchester Repeating Arms Company of Delaware ("Winchester Delaware"). *See Final Decree of Foreclosure and Sale,* November 10, 1931, *Chase National Bank of New York v. Winchester Repeating Arms Company, et al.,* In Equity, Consolidated Cause No. 2131 (U.S.D.C. Conn.) (Attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts as Exhibit 4 thereto), at page 3 ¶4; page 4 ¶8; pages 19-20, ¶¶7-8.

Winchester manufactured its firearms at a plant in New Haven, Connecticut. By the late 1920's the plant had grown to cover 81 acres and employed some 2500 people. *See* Exhibit 17 at Olin-272. The company manufactured numerous models of firearms pursuant to patents owned by Winchester. *See* Williamson, Harold F. *The Gun that Won the West,* 1st Edition, Combat Forces Press, 1952. (Attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts as Exhibit 13 thereto) at pages 419-447. *See also* MS:20, *Winchester Repeating Arms Company: Office Files* Winchester Inventory List (Attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts as Exhibit 31 thereto) at pages 29-53. Winchester also had subsidiary operations on site that manufactured knives, washing machines, and other products *See* Deposition of Johnnie Jackson, March 24, 2004 (relevant portions are attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts as Exhibit 6 thereto) (hereinafter "Jackson Dep. Vol. I"), at pages 71 and 80.

When financial conditions worsened in the early 1930's, Winchester Delaware's creditors filed a bill that placed the company into receivership. *See Bill of Complaint*, January 22, 1931, *T.A.D. Jones and Company, Inc., v. Winchester Repeating Arms Company,* In Equity, No 2109,(U.S.D.C. Conn.) (Attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts as Exhibit 1 thereto) (hereafter "Bill of Complaint") at 4. The creditors sought receivership to ensure the continued business of Winchester Delaware, including the preservation of the assets in their entirety, the "skilled executed manufacturing operation", and "goodwill acquired through a manufacturing and business history of over fifty years." *See* Exhibit 1 at 6-7. At the time that Winchester Delaware was sold, the stock in the company had no value. *See* Exhibit 6 at 49.

Western Cartridge Company ("Western Cartridge") was founded in 1898. *See* Exhibit 6 at 36. The majority of the stock of Western Cartridge was owned by members of the Olin family. *Western Cartridge Special Meeting Notice and List of Stockholders,* December 12, 1931 (Olin 000734-000739) (Attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts as Exhibit 7 thereto) at Olin 000735-000737. The company was located in East Alton, Illinois and was in the business of manufacturing ammunition for rifles and pistols and shot shells for shot guns. *See* Exhibit 6 at 38. Prior to 1931, Western Cartridge had never been engaged in the manufacture of firearms. *See* id. at 38: 22-25. That all changed by the end of 1931 when Western Cartridge created a wholly owned subsidiary known as Winchester Repeating Arms Company of Maryland ("Winchester Maryland") and through Winchester Maryland took over the entire Winchester Delaware operation in New Haven, including its 81 acre plant, manufacturing processes, product line, patents, employees, key management and all the goodwill associated with the name Winchester. *See Decree Confirming Sale and Directing Execution and Delivery of Deeds*, December 22, 1931, *Chase National Bank of New York, Trustee v.*

**ORAL ARGUMENT REQUESTED**   6

*Winchester Repeating Arms Company, et al.*, Equity Consolidated Cause No. 2131 (U.S.D.C.

Conn.) (Attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts as <u>Exhibit 3</u> thereto), at

page 39. *See also* Statement of Stock and Officers for *Whirldry Company,* July 22, 1932,

*Walden Knife Company* Feb. 15, 1932, *Winchester Manufacturing Company*, Feb. 15, 1932, on

file at McCracken Research Library, MS:20, *Winchester Repeating Arms Company: Office Files*

(Attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts as <u>Exhibit 9</u> thereto); Letter from

William T. Birney, Sales Manager for Winchester Delaware and Maryland, to "Gun Buyers",

January 21, 1932 (Olin 001044-001057) (Attached to Plaintiffs' Local Rule 56(a)(2) Statement

of Facts as <u>Exhibit 10</u> thereto); <u>Exhibit 17;</u> Correspondence and manuscripts from Olin to

Williamson for *The Gun that Won the West*. (MS 20 Series 6 Box 14 Folder 1) (Relevant

portions, including excerpts from Hopkins Epilogue and account of events in 1926 attached to

Plaintiffs' Local Rule 56(a)(2) Statement of Facts as <u>Exhibit 19</u> thereto) at Hopkins Epilogue

page 7, *and* Lists of Companies purchased as part of Winchester Delaware sale, on file at

McCracken Research Library, MS:20, *Winchester Repeating Arms Company: Office Files*

(Attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts as <u>Exhibit 24</u> thereto).

     In 1931, the Olin family recognized that acquiring a manufacturing operation such as

Winchester would enable them to "vertically integrate" their ammunition business "so that they

could have a brand name or a source of outlet for their ammunition products." *See* <u>Exhibit 6</u> at

40:10-18. Thus, on October 13, 1931, Western Cartridge offered to acquire all of the assets of

Winchester Delaware for over $3,000,000 in cash and 4.8 million in par value of stock of

Western Cartridge. *See Final Report and Statement of Account of The Reorganization*

*Committee and Application for Discharge*, March 26, 1934, In Equity Consolidated Cause, No.

2131 (U.S.D.C. Conn.) Attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts as <u>Exhibit</u>

18 thereto), *see also* Letter from Western Cartridge to Winchester Repeating Arms Company's Debenture Holders Committee and First Mortgage Bondholders Committee, October 16, 1931 (Olin 000468-000473) (Attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts as Exhibit 27 thereto). That proposal was accepted by the creditors committees. *See* id at Olin 000473.

As part of the offer, Western reserved the right to either acquire the assets directly or conduct the business through a third corporation. *See* id. at Olin 000470. Western elected the latter approach and proceeded to create Winchester Maryland as its wholly owned subsidiary. *See* Exhibit 6 at 43. In exchange for 100% of Winchester Maryland's stock, Western agreed to provide the cash and stock to Winchester Maryland necessary to complete the transaction to acquire Winchester Delaware. *See* id. at 43:12-19.

Kidder Peabody & Company had a longstanding relationship with Winchester Delaware. *See* id. at 57. It had arranged for financing for the company, was a large creditor and the affiliated Kidder Peabody Trust Company was the trustee to the company's debentures. *See* id. at 57-58. Because Winchester Delaware was in receivership, the acquisition was initiated by a bid and that bid was made by two representatives from Kidder Peabody: Ben-Flemming Sessel and P.C. Beardslee. *See The Indenture*, December 22, 1931 (Olin 000216-000243) (Attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts as Exhibit 7 thereto) at page Olin 000216. However, Messers. Sessel and Beardslee did not provide any separate consideration for the bid; all consideration for the bid, over $3,000,000 in cash and 4.8 million shares of preferred stock of Western Cartridge was provided and guaranteed by Western Cartridge. *See* Exhibit 6 at 63-65 and Exhibit 18.

The bid was made on December 15, 1931 and the transaction was completed on December 22, 1931. *See* Exhibit 5 at Olin 000218 at ¶3. At the time of the acquisition, the stock

**ORAL ARGUMENT REQUESTED**   8

of Winchester Delaware had no value. *See* Exhibit 6 at 49:7-9. Thus, the stockholders received

none of the cash nor any of the stock of Western Cartridge. However, the creditors did. In

consideration for the sale, the creditors (as a practical matter, the only ones who owned anything

of value in Winchester Delaware) received 4.8 million shares of Western Cartridge. *See* Exhibit

18. *See also* Exhibit 3 at Olin 000379.

> The purchase gave Winchester Maryland:
>
> All property of every kind of Winchester [Delaware] … [including] all the business,
> goodwill, including corporate name, or names, patents, trade names, trade marks, … and
> all other tangible or intangible personal property …

*See* Exhibit 3 at Olin 000403.

This purchase allowed Winchester Maryland to continue the business of Winchester

Delaware without "a ripple of change." *See* Exhibit 17 at Olin-272. This was accomplished by

the retention of Winchester Delaware employees, key managers, its product line and its

manufacturing operations. *See* Exhibit 13 at pages 377-390; *see also* Exhibits 17-19.   Two

members of senior management and the key director of Winchester Delaware became officers of

Winchester Maryland. *See* Secretary of State Documents for Winchester Delaware (1929, 1932)

(Olin 000457-000467) (Attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts as Exhibit

20 thereto). *See also* Secretary of State Documents for Winchester Maryland (1932-1938) (Olin

001083-01096) (Attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts as Exhibit 21

thereto).   Once Winchester Maryland took over  the operation in New Haven after December 22,

1931 Winchester Delaware became nothing more than a shell company. "Administratively there

was a wind down period, but [Olin has no evidence] that suggests that they did anything.  It was

just a shell company." *See* Exhibit 6 at 109:13-18.

**ORAL ARGUMENT REQUESTED**   9

Western Cartridge continued to operate the Winchester business through Winchester Maryland until 1938, when it dissolved the subsidiary and absorbed the Winchester operation into Western Cartridge. *See* id. at 44-45. In 1944, Olin succeeded to the assets and liabilities of Western Cartridge through a corporate merger. *See* id.

The goodwill attached to the Winchester name was so valuable that Western Cartridge eventually replaced its own time honored name on its ammunition with the Winchester name. *See* id. at 132-134. Even today, Olin continues to trade on the goodwill and name that Winchester Delaware created since its inception. Olin's website indicates not only that "The History of Winchester Is A Rich One That Continues Today", but represents to the world that "[t]he company who brought to life 'the Gun that Won the West' is the **same company who today continues** to supply sportsmen with the best sporting ammunition in the world." *See* Olin's *Winchester* World Wide Web Site http://www.winchester.com/compnayinfo/history/ last updated on January 26, 2005 and November 8, 2004, (Attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts as <u>Exhibit 16</u> thereto) (emphasis added). Thus, in every manner, shape and form, Olin through Winchester Maryland, then Western Cartridge and finally in its own name, continued the business of Winchester Delaware and continues to benefit from the name and goodwill which it engendered.

### III. STANDARD OF REVIEW

Olin is not entitled to summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. Rule 56(c). Olin cannot meet that burden. As set forth below, Plaintiffs' opposition goes well beyond the initial pleadings and instead identifies specific facts that

demonstrate that genuine issues exist and that Olin is not entitled to summary judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d (1986). To the extent that the parties' presentation of facts developed in discovery can be interpreted in different ways, any ambiguities and reasonable inferences must be resolved in favor of the plaintiffs, the non-moving party. *Ricciardello w. J.W. Gant & Company,* 717 F.Supp. 56, 57 (D.Conn. 1989), *citing United States v. Diebold, Inc.,* 368 U.S. 654, 82 S.Ct. 993, 994 * L.Ed.2d (1962) (per curium); *Donohue v. Windsor Locks Bd. Of Fire Comm'rs,* 84 F.2d 54, 57 (2d Cir. 1987).

## IV. ANALYSIS

### I. There is Ample Evidence from Which a Reasonable Jury Could Find that Olin Succeeded to Winchester Delaware's Liabilities.

The defendants removed this case from the Connecticut Superior Court to this court. As a Connecticut federal court sitting in diversity jurisdiction, this court applies the laws of the State of Connecticut to the case. *See Brown v. Strom,* 2004 WL 2978126 (D.Conn. 2004) (Attached hereto as Exhibit A). Under Connecticut law, a corporation may be found to have succeeded to liabilities of a prior entity, even in the absence of an express assumption of liability, if the circumstances indicate that the transaction in question constituted a "mere continuation" of the enterprise or a "de facto" merger. *See Peglar & Associates, Inc., v. Professional Indemnity Underwriters Corporation,* 2002 WL 1610037 (Conn.Super. June 19, 2002) (Attached hereto as Exhibit B); *Lynch v. Infinity Outdoor, Inc.,* 2003 WL 21213708 (Conn.Super. May 7, 2003) (Attached hereto as Exhibit C); *Water Pollution Control Authority v. Commissioner of Labor,* 1992 WL 201922 at *2 (Conn.Super. Aug. 4, 1992) (Attached hereto as Exhibit D). The circumstances that surrounded the sale of Winchester Delaware to Winchester Maryland justify such a finding under either of these theories. Moreover, Winchester Maryland's continued

**ORAL ARGUMENT REQUESTED** 11

production of Winchester Delaware product line provides an alternative basis for successor

liability. *See Kennedy v. OshKosh Truck Corp.*, 1995 WL 27400 (Conn. Super. Jan. 18, 1995)

(Attached hereto as Exhibit E); *Pastorick v. Lyn-Lad Truck Racks, Inc.*, 1999 WL 608674 (Conn.

Super. Aug. 3, 1999) (Attached hereto as Exhibit F); *Copperthite v. Pytlik*, 1992 WL 316379

(Conn. Super. Oct. 22, 1992)(Attached hereto as Exhibit G); *Strohecker v. Canadian Pacific*

*Express & Transport, Ltd.*, 1999 WL 436574 (Conn. Super. June 16, 1999) (Attached hereto as

Exhibit H); *Piaser v. Cohen*, 1997 WL 435841 (Conn. Super. July 21, 1997) (Attached hereto as

Exhibit I).

> **A.    The asset purchase of Winchester Delaware by Winchester Maryland**
> **resulted in the "de facto" merger of the two companies or represented the "mere**
> **continuation" of the predecessor by the successor.**

In *Peglar & Associates, Inc. v. Professional Indemnity Underwriters Corporation*, 2002 WL

1610037 (Conn.Super. June 19, 2002), the Connecticut Superior Court identified several factors

to assist a court in determining whether a corporate transaction constituted a "de facto" merger or

"mere continuation." *See Peglar*, 2002 WL 1610037 at *7. These factors include:

> (1) continuation of the enterprise of the seller corporation so that there is a
> continuity of management, personnel, physical location, assets and general
> business operations;
> (2) continuity of shareholders;
> (3) the seller corporation ceases its ordinary business operations,
> liquidates, and dissolves as soon as legally and practically possible; and
> (4) the purchasing corporation assumes those liabilities and obligations of
> the seller ordinarily necessary for the uninterrupted continuation of normal
> business operations of the seller corporation.

*Id.*

*Peglar* makes clear that "[n]ot every one of these indicia must be established, however,

but the court should apply more of a balancing test." *Id.; citing, Cargill, Inc. v. Beaver Coal &*

*Oil, Inc.*, 424 Mass 356, 676 N.E.2d 815, 818 (1997)(no single factor is necessary or sufficient to

establish a "de facto" merger); *and National Gypsum Co. v. Continental Brands Corp.*, 895

**ORAL ARGUMENT REQUESTED**  12

F.Supp. 328 (D.Mass. 1995) ("These factors are mere indicia...none of them is essential to

finding of liability"); *see also National Grange Mutual Insurance Co. v. Montgomery Elevator,*

1994 WL 547747 (Sept. 22, 1994) ("continuity of ownership; continuity of management;

continuity of personnel; continuity of physical location, assets and general business operations;

and cessation of the prior business shortly after the new entity was formed" are all "factors" to be

considered in determining whether there has been a "mere continuation" of the business")

(Attached hereto as Exhibit J); *see also Water Pollution Control,* 201922 at *3 (Conn.Super.

1992)(a number of factors should be weighed, including, "whether the successor holds itself out

to the public as the continuation of the previous corporation").

Application of the "balancing test" recognized in *Peglar* and other Connecticut cases to

the facts set forth herein, if accepted by the jury, makes clear that the events and circumstances

involved in Winchester Maryland's purchase of Winchester Delaware justifies finding that

Winchester Maryland succeeded to the liabilities of Winchester Delaware under either theory of

"mere continuation" or "de facto" merger. [1]    Accordingly, summary judgment should be denied.

**1. Winchester Maryland Continued the Enterprise of Winchester Delaware in Every Essential Aspect, Including Adopting the Winchester Name and Goodwill Attached Thereto, Retention of Key Management, All Employees, Patents, the Manufacturing Operation and the Winchester Line of Products.**

The first factor that Connecticut courts identify is whether there is a "continuity of the

enterprise." *See Peglar,* 2002 WL 1610037 at *7. This requires inquiry into whether there is a

---

[1] Although the court in *Peglar* ultimately did not impose liability on the purchasing corporation, the circumstances relied upon by the court are entirely unlike the case at bar. In *Peglar,* the court determined that the purchasing company was not a "mere continuation" of the selling corporation because it was already in the same line of business as the selling company. *Peglar,* 2002 WL 1610037 at *7. Here, Western created Winchester Maryland specifically to continue the line of business of Delaware, a business line that Western had never been in. *See* Exhibit 27 and Exhibit 28. Furthermore, in *Peglar,* only two of the selling corporation's stockholders continued employment with the purchaser for one year, while Winchester Maryland employed the entirety of the Winchester Delaware workforce. *See* Exhibit 17. Some of these individuals became directors of the purchaser. *See* Exhibits 20-23.. Finally, in *Peglar,* the purchasing company did not continue the name of the selling company. *See id.* This circumstance could not be more distinguishable from the present action. The defendants, to this day, exalt the Winchester name at every opportunity. *See* Exhibits 16, 29, 30.

"continuity of management, personnel, physical location, assets and general business operations". *Id.* The evidence demonstrates such continuity here. Although Olin tries to minimize the continuity of the operation, its statements are self serving and factually disputed. Today, Olin testifies through its former vice president and general counsel that "products changed dramatically right from the beginning" and that there were a "lot of changes" in the operational management. *See* Exhibit 6 at pages 72:16-17 and 97:15. But its vice president in December 1931 said just the opposite. As reported in the New Haven Register, John M. Olin, Vice President of Winchester Maryland, "officially and emphatically announced" that the new owners would "go right ahead with the Winchester business which has in the course of the company's two thirds of a century made Winchester world famous" and they would also make "no radical changes in the personnel of the plant." *See* Exhibit 17 at Olin-272. A review of the evidence makes clear that John M. Olin's contemporaneous announcement more accurately described the events in 1931, than Johnnie Jackson's statements in the heat of litigation 70 years later.

While Olin would ask the court to assume for purposes of this motion that there were "a lot of changes" right from the beginning, in fact there were no radical changes when Winchester Maryland took over. Operations continued on January 4, 1932, just two weeks after the Winchester Delaware business changed hands. *See* Exhibit 17 at Olin-272. From the outset, Winchester Maryland retained the Winchester Repeating Arms Company name on the New Haven Plant. *See* Exhibit 6 at 76:15-17. Two and a half weeks later, Winchester Maryland was promoting Winchester Delaware's complete line of Winchester arms and ammunitions for sale to "jobbers." *See* Exhibit 10 at Olin 001056.

**ORAL ARGUMENT REQUESTED** 14

Winchester Maryland uninterrupted continuation of the Winchester Delaware line of business was not limited to firearms. It also included items such as knives, roller and ice skates, batteries, and flashlights that had been earlier developed and manufactured by Winchester Delaware. *See* Inventory report on Winchester Delaware from W.F. Siegmund to F.W. Olin, February 29, 1932 (MS 20 Series 2 Box 6 Folder 18), pages 1-24 on file at McCracken Research Library, MS:20, *Winchester Repeating Arms Company: Office Files* (Attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts as Exhibit 11 thereto*). See also* Exhibit 6 at 71. Six years later, Winchester Maryland's product catalogue sold essentially the same firearm and other products that were sold under Winchester Delaware's ownership. *See Winchester Quality Products*, 1938 Winchester Maryland Catalogue (Olin 000821-001043) (Attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts as Exhibit 12 thereto). Again, using the goodwill earned by Winchester Delaware, Winchester Maryland bragged that its "Winchester guns and ammunition have been world famous for more than three score years for their outstanding quality and service. *Here the same organization* is today making, also, tools, cutlery, ice and roller skates, flashlights and batteries and radio batteries..." *See* id. at Olin 000822 (emphasis added).[2]

To achieve this transition without "a ripple of change", the Olins relied on and retained key Winchester Delaware management. Winchester Maryland retained Thomas C. Johnson, the most essential Winchester Delaware senior management employee, credited as the leading figure for Winchester's firearm innovations, who started his career with Winchester in 1895. *See* Exhibit 13 at page 283. The "stored-up accumulation of new gun models and ideas," which had been developed by Johnson and his engineers, allowed Olin to introduce new products into the

---

[2] Incredibly Olin today disputes that Winchester Maryland acquired tremendous goodwill. *See* Exhibit 6 at 75. But once again, that litigation position is belied by statements made by Olin, and its predecessors, throughout the past 70 years. *See* Exhibits 16, 29 and 30.

market in the first few years of its ownership. *See* Exhibit 16 at

www.winchester.com/compnayinfo/history/worldwars.aspx., and Exhibit 13 at page 283.

    The Olins also retained key Winchester Delaware management to form a Winchester

Maryland Operations Committee. These men included Edwin Pugsley, R.C. Swanton, E.W.

Taft, and William T. Birney. *See* Exhibit 19, *Hopkins Epilogue* at page 7. Edwin Pugsley was

also an officer and director of Winchester Delaware. *See* Exhibit 20. Olin admits that Pugsley

facilitated the continuation of the Winchester business. *See* Exhibit 6 at pages 98:6 . In addition

to their roles in operational management, three of these men, Pugsley, Swanton and Taft, became

officers of Winchester Maryland, then Western and eventually Olin Industries. *See* Exhibit 21.

*See also* Western Cartridge Annual Reports (1938, 1940) (Olin 001339-001365) (Attached to

Plaintiffs' Local Rule 56(a)(2) Statement of Facts as Exhibit 22 thereto). Pugsley and Taft also

became Directors of Olin Industries. *See* Olin Industries, Inc. Annual Reports (1951-1952) (Olin

001366-001368, 001386-001388) (Attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts

as Exhibit 23 thereto). When Johnson died, Pugsley was also promoted to be Winchester

Maryland's chief gun designer. *See* Exhibit 13 at page 380 ¶2.

    In addition to continuing Winchester Delaware's products, capitalizing on its goodwill

and retaining key management, Winchester Maryland retained all of the seller's employees. As

reported by the New Haven Register at the time of the purchase, the entire Winchester Delaware

workforce, totaling 2,500 people, was unaffected by the corporate changes in 1931. *See* Exhibit

17 at Olin-272. The Winchester Delaware employees retained by Winchester Maryland included

those credited with various Winchester patents, ranging in products such as firearms, telescopes,

ice skates, roller skates and flashlights. *See* Exhibit 31 at pages 29-61.

**ORAL ARGUMENT REQUESTED**  16

The plaintiffs have presented admissible evidence demonstrating a continuity of key management, all employees, all business operation and the discontinuation of any business activities by the predecessor. *Contrast National Grange Mutual Insurance Company*, at *4 (declining to find successor liability where none of these aforementioned factors were present).[3]

## 2. Although Continuity of Shareholders is not a Precondition to Establishing Successor Liability Under the Theories of "Mere Continuation" and "de facto" Merger, the Stock Paid to the Creditors Can Be Viewed as Evidence of a Continuity of Ownership.

Apart from considering the continuity of the business enterprise, a trial court should also consider whether there is a "continuity of shareholders" as further justification for finding an implied assumption of liability. *Peglar*, 2002 WL 1610037 at *7. Olin places much of its motion on its contention that such a continuity is a precondition to finding successor liability. (Def.'s Mot. Summary Judgment at 16-17). However there is no such requirement under Connecticut law. As the Superior Court held in *Peglar*, "not every one of these indicia must be established"; *accord, Water Pollution Control Authority v. Department of Labor*, 1992 WL 201922 (the absence of one factor not fatal "so long as other factors are present")(Attached hereto as Exhibit E); *see also National Grange*, 1994 WL 547747 (Conn.Super. 1994) *and Pesce*, 1996 U.S. Dist. LEXIS 22244 (both referring to "continuity of ownership" as one of the list of "factors" to be considered in determining successor liability).

Olin relies on two decisions of the District of Connecticut, *Ricciardello v. J.W. Gant & Co.*, 717 F. Supp. 56 (D. Conn. 1989) and *Pesce v. Overhead Door Corp.*, 1996 U.S. Dist. LEXIS 22244, at *11 (D. Conn. July 25, 1996) (Attached hereto as Exhibit K), and on a decision

---

[3] Olin also cites *Accashian v. City of Danbury*, 1999 WL 20594 (Conn. Super. Jan. 8, 1999) for the proposition that there is "no case in which the acquisition of the assets of another corporation, without more, made the acquirer liable for the environmental torts of the original owner of the assets." However, in *Accashian*, the court ruled on a motion to strike, and did not allow the plaintiffs to develop evidence concerning the nature of the transaction. By contrast, in this case, the plaintiffs have been allowed to develop all of the evidence recited above that the acquisition of Winchester Delaware was much more than an acquisition of assets "standing alone."

**ORAL ARGUMENT REQUESTED** 17

by the District of Pennsylvania, *Tracey v. Winchester Repeating Arms Company*, 745 F.Supp. 1099 (E.D. Penn. 1990), as support for its position that continuity of shareholders is essential. (Def.'s Mot. Summary Judgment at 18).

Olin's reliance on *Ricciardello* is misplaced. Unlike *Ricciardello,* in which none of the purchaser's stock was used to purchase the seller's assets, *Id.* at 58, the purchase of Winchester Delaware included the transfer of 4.8 million par value of Western stock to the creditors of Winchester Delaware. *See* Exhibit 18; *see also* Exhibit 28 at 1210. There is also some evidence that Kidder Peabody, a Winchester Delaware shareholder, became a Western shareholder as a result of the transaction. In addition, *Ricciardello* is factually distinguishable because there was no evidence that the seller in *Ricciardello* "dissolved or [ ] ceased to exist as a distinct corporate entity"; the circumstances were just the opposite with Winchester. Olin admits that following the purchase, Winchester Delaware was nothing more than an shell, without assets of any value, and remained in existence for a wind down period solely for insurance polices and tax purposes. *See* Exhibit 6 at 109:13-18.

Similarly, Olin's reliance on *Pesce* is misplaced. Unlike the minimal record before the court in *Pesce*, which did not permit even an inference that there was any mixture of officers, directors or stockholders, such evidence is present in this case. Moreover, another key factor present in this case and missing in *Pesce* is that there was not even an allegation that the purchaser in *Pesce* "did not exist prior to the acquisition of" the seller. *Id.* at *13. In the case at bar, Winchester Maryland not only "did not exist prior to the acquisition", but was created for that very purpose.

Although *Tracey v. Winchester Repeating Arms Company*, 745 F.Supp. 1099 (E.D. Penn. 1990), involved the same transaction as the case at bar, its outcome was compelled by

**ORAL ARGUMENT REQUESTED** 18

Pennsylvania law which is different than Connecticut law. The court in *Tracey*, was constrained by Third Circuit precedent, and relying on law from Ohio, Wisconsin, and Indiana, determined that under Pennsylvania law ownership was an essential factor. *See Tracey,* 745 F.Supp. at 1110. The law of Connecticut is different. *See Peglar*, 2002 WL 1610037 at \*7 (factors for "de factor" merger or mere continuation should be balanced), *Water Pollution*, 1992 WL 201922 at \*3 (absence of one factor is not fatal, however, if other factors are present). Connecticut has followed other states in holding specifically that continuity of ownership is <u>not</u> a required factor. *E.g. Cargill Inc. v. Beaver Coal & Oil, Ind.* 424 Mass. 356, 676 N.E.2d 815, 818 (1997)("no single factor is necessary or sufficient to establish a *de facto* merger"); *National Gypsum Co. v. Continental Brands Corp.,* 895 F.Supp. 328 (D.Mass. 1995)("These factors are mere indicia. . . none of them is essential to finding of liability); *Andrews v. John E. Smith & Co.,* 369 So.2d 781, 785 (Ala. 1979); *Turner v. Bituminous Cas. Co.,* 244 N.W.2d 873 (Mich. 1976); Restatement 3d of Torts, §12, comment g.

To the extent that continuity of ownership is important there are material facts in dispute. At the time of the sale, Winchester Delaware was essentially run for the financial benefit of its creditors. Its stock had no value. Any tangible benefit from a sale would inure solely to the creditors. Indeed, the creditors put Winchester Delaware into Receivership to preserve the business and goodwill of the company. *See* <u>Exhibit 1</u> at pages 6-7. When Western paid the creditors cash and stock for the Winchester Delaware assets, the creditors became shareholders of Western.

Furthermore, there is also evidence of shareholder continuity. Kidder Peabody and Company owned significant shares of Winchester Delaware stock in 1931. *See* Summary of Winchester Stock by F.A. Hall, May 25, 1933 (MS 20 Series 2 Box 6 Folder 17) on file at

**ORAL ARGUMENT REQUESTED** 19

McCracken Research Library, MS:20, *Winchester Repeating Arms Company: Office Files* (Attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts as Exhibit 25 thereto); *see also* Exhibit 8 at 227. Kidder Peabody was also a creditor of Western Delaware, and consequently became a shareholder of Western Cartridge as a result of the asset purchase. *See* Answer of Pension Claim Committee, June 20, 1931, *Chase National Bank of New York v. Winchester Repeating Arms Company, et al.,* In Equity, Consolidated Cause No. 2131 (U.S.D.C. Conn.) (Attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts as Exhibit 26 thereto) at pages 4-5; *see also* Exhibit 6 at 58.[4] Thus, although continuity of ownership is not a precondition for finding that the asset purchase was a "mere continuation" or "de facto" merger, there is such evidence in the transaction at bar.

### 3. After the Asset Purchase, Winchester Delaware was Nothing More Than a Corporate Shell and was Dissolved as Soon as Legally and Practically Possible.

Another factor enumerated in *Peglar* that justifies successor liability is that the seller "dissolves as soon as legally and practically possible." *See Peglar* 2002 WL 1610037 at *7. Winchester Delaware did just that. As a result of the asset purchase, Winchester Maryland received everything Winchester Delaware had, including all real and personal property. *See* Exhibit 6 at 70:19. After this transfer of assets on December 22, 1931, Olin admits that Winchester Delaware "was pretty much a shell company." *See* Exhibit 6 at 109:13-18. Although Winchester Delaware did not formally dissolve until 1934, Olin recognizes this was due to "insurance policies or tax situations. Administratively there was a wind-down period, but I can't find anything that suggests that they did anything. It was just a shell company." Id.

---

[4] There is also evidence of continuity of management and ownership of several subsidiaries of Winchester that operated from the New Haven plant, both before and after the acquisition. Key officers of Walden Knife, the Winchester Manufacturing Company and the New Haven Transit Stores Company remained in place after the 1931 sale, as did individual shareholders of Whirldry. *See* Exhibits 21-23, and Exhibit 9.

**ORAL ARGUMENT REQUESTED** 20

**4. Winchester Maryland Assumed the Liabilities and Obligations of Winchester Delaware Necessary for the Uninterrupted Continuation of Normal Business Operations.**

The last factor identified in *Peglar*, 2002 WL 1610037 at *7, i.e. whether the purchaser assumed those liabilities and obligations of seller "ordinarily necessary for the uninterrupted continuation of normal business operations" also justifies successor liability under the theories of "mere continuation" and "de facto" merger in the case at bar. Days after the December 22, 1931 asset transfer, Winchester Maryland continued the Winchester operations. As John Olin announced, "[f]ollowing the Christmas recess the plant will reopen on January 4 with the same working force as before the shut-down and all departments will be operated as usual." *See* Exhibit 17 at Olin 272. And just two weeks after the plant re-opened, Winchester Delaware's Sales Manager, William T. Birney, who retained his position with Winchester Maryland, sent a letter to Winchester Delaware jobbers asking for "continued support and cooperation in carrying out the policies of this Company in the sale Winchester arms." *See* Exhibit 10 at Olin 001057.

Winchester Maryland not only assumed the normal business operations, but also Winchester Delaware's contract obligations. The District Court order confirming the sale to Winchester Maryland specifically provided that Winchester Maryland could assume the executory contracts of Winchester Delaware. *See* Exhibit 3 at Art. XX, page 104. By definition, these executory contracts were contracts upon which there were outstanding obligations of Winchester Delaware the Winchester Maryland could assume. One of these lucrative contracts Winchester Maryland choose to acquire was an option, pursuant to a contract made with Winchester Delaware in 1926, to purchase the goodwill, patents, trade-marks, brands, and name for the United States Cartridge Company. *See* Exhibit 19 at 1926 Summary, 4th page of Exhibit. Winchester Maryland exercised this right in 1936. Id. The United States Cartridge Company became a subsidiary of Olin Industries, and in 1940 signed a contract with the United States

**ORAL ARGUMENT REQUESTED** 21

Government to build and operate "the greatest small arms plant in the military history of the

nation." *See* Exhibit 16 at www.winchetser.com/companyinfor/history/worldwars.aspx.

**5. Winchester Maryland held itself out to the public as a continuation of the great Winchester Delaware.**

The *Water Pollution Control* case also considers "whether [the] successor holds itself out

to the public as the continuation of the previous corporation." as a factor in the determination of

successor liability. *Citing Water Pollution Control*, 1992 WL 201922 at*3. In this case,

Winchester Maryland held itself out as the continuation of Winchester Delaware in innumerable

ways, as has Olin. Significantly, Winchester Maryland called itself the "Winchester Repeating

Arms Company." *See* Exhibit 6 at 76:15-17. John Olin told the public in 1931 that the

Winchester company was going to continue. *See* Exhibit 17. Winchester Maryland wrote to the

customers of Winchester Delaware within weeks after the sale promoting the same Winchester

products as Winchester Delaware. *See* Exhibit 10. In 1938, Winchester Maryland issued a

catalogue that described itself as the "same organization" as the previous Winchester companies.

*See* Exhibit 12. This was only the beginning of years of claims that the successor company **was**

Winchester. For example, Olin celebrated the "centennial" of Winchester in 1966, as though it

were its own, releasing a press release with "highlights" of Winchester dating back to the birth of

Oliver Winchester in 1810, and describing the transaction of 1931 as "Winchester Repeating

Arms Company was purchased by the Western Cartridge Company." *See* Exhibit 29 at Olin

001073-001076. Olin also issued a release on "Famous Winchester Developments," that

described the release of Winchester guns beginning in 1866 and continuing through releases in

1966, that moves directly from "the famous model 21" released in 1931 to "the Model 42"

released in 1933. *See* Exhibit 29 at Olin 001077-001079. This release characterizes Winchester

as a division of Western Cartridge Company. Indeed, to this day Olin represents on its website

**ORAL ARGUMENT REQUESTED** 22

that "the company who brought to life 'the Gun that Won the West' is the **same company** who today continues to supply sportsmen with the best sporting ammunition in the world." *See* Exhibit 16. (Emphasis added).

B.      **Olin May Also Be Found To Have Succeeded to Winchester Delaware's Liabilities Because It Held Itself Out As Being The Same Name or Product As Winchester Delaware.**

Olin is also liable as a successor to Winchester because it has always held "itself out as being the same name or product, operation and sale, thereby receiving the benefit of past goodwill, it should likewise bear the burden of past operation." *Peglar.*, 2002 WL 1610037 at *6, *citing Kennedy v. OshKosh Truck Corp.*, 1995 WL 27400 (Conn. Super. June 16, 1999) (Attached hereto as Exhibit H) and *Pastorick v. Lyn-Lad Truck Racks, Inc.*, 1999 WL 608674 (Conn. Super. July 21, 1997) (Attached hereto as Exhibit I). *See also Lynch v. Infinity Outdoor, Inc.*, 2003 WL 21213708 (Conn. Super.) ("Another recognized exception in Connecticut to the general rule is the 'product line' exception"); *Copperthite v. Pytlik*, 1992 WL 316379 .[5]

Connecticut courts have established three factors warranting application of this theory of successor liability:

1.      the transferee has acquired substantially all of the transferor's assets, leaving no more than a corporate shell;

2.      the transferee is holding itself out to the general public as a continuation of the transferor by producing the same product line under a similar name;

3.      the transferee is benefiting from the goodwill of the transferor.

*Pastorick* at *2, citing *Ramirez v. Amsted Ind., Inc.*, 86 N.J. 332, 431 A.2d 811 (1981), *Sullivan v. A.W. Flint Co. and Lyn Ladder and Scaffolding Co., Inc.*, 1996 WL 469716 (Conn. Super. Aug. 5, 1996) (Attached hereto as Exhibit L). The *Pastorick* court stated that, while no

---

[5] Of the 7 Superior Courts which have been asked to apply product line, only one court has declined its application, the *Pesce* decision relied on by Olin.

Connecticut appeals court had specifically dealt with "product line" it was of the opinion that

there is a sound legal basis for its application of this exception to liability in Connecticut.

*Pastorick* at *2. *See also Strohecker v. Canadian Pacific Express & Transport, Ltd.*, 1999 WL

436574 (can assess liability where successor holds itself out as being same by name of product,

operation and sale, thereby receiving the benefit of past goodwill since it should likewise bear

the burden of past operation) *Piaser v. Cohen*, 1997 WL 435841 (employment case - where the

successor corporation holds itself out as being the same by name of product, operation and sale,

thereby receiving the benefit of past goodwill, it should likewise bear the burden of past

operation); *Copperthite v. Pytlik*, 1992 WL 316379 (applying "product line" to furnace installed

by predecessor; denying defendant's motion for summary judgment on successor liability under

"product line" because successor bought substantially all of the assets of predecessor, letter sent

by successor indicated that two companies had merged, use of the predecessor name for a "short

time" after purchase).

     In applying this theory to the facts before it, the *Pastorick* court noted that:

- the sales agreement made it clear that all items of tangible property (inventory, finished goods, work in progress, raw materials, etc.) were transferred to the buyer, leaving cash, accounts receivable, etc., which are mostly intangibles which can be easily distributed to stockholders. There is, therefore, a question of whether what is left is merely a corporate shell;
- it was not clear whether the buyer continued to produce the same product line as the seller. The sales agreement turned over a patented product, which raised the question of whether this patent allowed the buyer to produce ladders of unique or distinctive characteristics which the consuming public would associate with the seller corporation;
- The patent issue above also raises questions of whether, by product identification or otherwise, the buyer benefited from the goodwill of seller.

*Id.* at *2.

     Under Connecticut law, Olin is the successor to Winchester under the "product line"

theory of successor liability. When Olin purchased Winchester it acquired substantially all of

**ORAL ARGUMENT REQUESTED** 24

Winchester's assets, leaving no more than a corporate shell. When Olin purchased Winchester, it purchased all items of tangible property. It purchased the manufacturing plant, its employees, the existing inventory at the manufacturing plant and all work in progress. *See* Exhibit 3 at 39 and Exhibit 17 at Olin-272. It also purchased the patents and the design team, headed by T.C. Johnson, who continued to design and develop Winchester guns, under Winchester patents, up until the day of the corporate transfer. *See* Exhibit 13 at pages 380-381. All assets of value were included in the Winchester purchase by Olin. *See* Exhibit 6 at 48-49, 109.

Second, when Olin purchased Winchester, it held itself out to the general public as a continuation of Winchester. It produced the same product lines under, not just a similar name, but the exact same name and logo. Olin continued to manufacture and distribute Winchester products bearing not the Western Cartridge name, but the established and well known Winchester name, exactly as that name appeared in the years prior to its purchase by Olin. *See* Exhibit 12, Exhibit 13 at pages 419-447, and Exhibit 14.

In addition to Olin products bearing the Winchester name, Olin retained the Winchester name in a majority of other respects as well:

- The manufacturing plant retained the Winchester name;
- The catalogs distributed by Olin retained the Winchester name;
- Letters from Olin to its distributors continued to bear the Winchester name and, in fact, do not contain the name Western or the name Olin.

*See* Exhibit 6 at page 76, Exhibit 10 and 12, respectively. Indeed, the management of Olin was keenly aware that the name Winchester, and Olin's continued use of the well respected name, were important to the ongoing marketing and sales, as they continued to use the name and exalt Winchester accomplishments to this day. *See* Exhibits16, 29, and 30.

Third, Olin benefited from the goodwill of Winchester. In an October 16, 1931 letter from Western Cartridge Company to Winchester Repeating Arms Company, Bondholders and

Debentures, proposal to purchase assets, states that the purchase includes "the goodwill and the corporate name or names, trademarks or patents." *See* Exhibit 27 at ¶5. In addition, the representative of Olin recognized in deposition that the name Winchester would be included as part of the goodwill that was acquired in the purchase. *See* Exhibit 6 at 70:12.

Defendant incorrectly argues that Connecticut courts have applied the product line exception exclusively to product liability cases. It has been applied to an alleged breach of an employment agreement. *Piaser v. Cohen*, 1997 WL 435841. In *Piaser,* the plaintiff had entered into the employment agreement with the predecessor corporation, which was subsequently sold. In determining whether the successor corporation could be held liable for the employment agreement entered into by the predecessor corporation, the trial court then cited *Copperthite v. Pylik*, stating that "'[w]here the successor [corporation] may hold itself out as being the same by name of product, operation and sale, thereby receiving the benefit of past goodwill, it should likewise bear the burden of past operation.'" *Piaser,* 1997 WL 435841 at *2, citing *Copperthite v. Pylik*, 1992 WL 316379.

In addition to six reported decisions in Connecticut applying the product line exception, there are strong policy reasons supporting its application. As the Court explained in *Pastorick*, 1999 WL 608674 at *2, the product line exception:

> "is a continuation of the basic principle that between an injured consumer and a business entity the latter is best able to absorb and to pass off to, the body of customers, the general public, through pricing, the cost of personal injury sustained by ordinary citizens. The concept is almost a century old, commencing with the enactment of the Workers' Compensation Law in the second decade of this century. The concept of strict accountability, even absent carelessness, negligence, recklessness or intent, has been repeatedly redefined in this State throughout the last forty years. See *Hamon v. Digliani,* 148 Conn. 710, 718, 174 A.2d 294 (1961), eliminating necessity of privity of contract in product cases; *Rossignol v. Danbury School of Aeronautics, Inc.,* 154 Conn. 549, 559, 227 A.2d 418 (1967), adopting the concept of strict liability in product cases; *Handler v. Remington Arms Co.,* 144 Conn. 316, 321, 130 A.2d 793 (1957), adopting a continuing duty to warn.

**ORAL ARGUMENT REQUESTED** 26

The other policy principle underlying the exception is that a company that gets the benefits of taking over an established business may reasonably be expected to bear the accompanying burdens that go with that business. As the Court stated in *Ramirez v. Amsted Industries, Inc:*

> Through acquisition of the [seller's] trade name, plant, employees, manufacturing equipment, designs and customer lists, and by holding itself out to potential customers as the manufacturer of the same line of [products], [the buyer] benefited substantially from the legitimate exploitation of the accumulated good will earned by the [seller's] product line. . . . Public policy requires that having received the substantial benefits of the continuing manufacturing enterprise, the successor corporation should also be made to bear the burden of the operating costs that other established business operations must ordinarily bear.

431 A.2d 811, 822 (N.J. 1981), cited with approval in *Pastorick*, 1999 WL 608674 at *2.

These principles are directly applicable to the situation presented here, where innocent homeowners are bearing the burden of environmental torts wrought by Winchester. Olin, which obtained the benefit of Winchester's name, plant, employees, manufacturing equipment, designs and customer lists, and which to this day holds itself out as the "same organization," must bear the burden of Winchester's established operations. Indeed, in *Water Pollution Control Authority v. Commissioner of Labor,* the Court specifically endorsed the view that these same principles should be applied to circumstances of environmental contamination, as they have in Connecticut to products liability cases and employment disputes. 1992 WL 201922 at *4 ("The plaintiff also argues that the successor doctrine is only applicable to labor relations, but that is incorrect, as it has been applied in the environmental area . . .").

The argument for the application of the "product line" in the present case is considerably closer to the majority line of cases in Connecticut, because Olin continued to manufacture, market and sell the products of Winchester, under the Winchester name, and continued to

generate identical contaminated waste, and dispose of this contaminated waste in exactly the same manner as Winchester, its predecessor. The rule stated over and over by Connecticut courts seeks to hold successors liable for predecessors when they benefit from "past operations." *See e.g. Pastorik*, 1999 WL 608674 at *2, *Copperthite,* 1992 WL 316379 at *4, *Piaser,* 1997 WL 435841 at *2. The Connecticut courts have not limited the term past operations to include only the specific product which continues to be manufactured by the successor after purchase. A large part of "past operations" includes the disposal of contaminated waste by Winchester on the Plaintiffs properties. This is especially appropriate here, wherein Olin continued the exact same disposal practices after it purchased Winchester and proceeded to manufacture the exact same products.

Contrary to Defendants' assertion that courts have refused to apply the "product line" in situations where the successor purchased the predecessors assets in bankruptcy, courts in other jurisdictions have done just that. *See e.g. Lefever v. K.P. Hovanian Enterprises, Inc.*, 160 NJ 307, 734 A.2d 290 (1999) (An intermediate owner's bankruptcy did not preclude successor liability, even though the operator's injury occurred before the bankruptcy proceedings were instituted); *Wilkerson v. C.O. Porter Mach. Co.,* 237 NJ Super 282, 567 A.2d 598 (1989) (purchaser liable even though sale of assets occurred in bankruptcy).

Although Connecticut courts have not considered successor liability in the context of bankruptcy, the factors established by the Connecticut courts clearly require only that "the transferee has acquired substantially all of the transferor's assets, leaving no more than a corporate shell". *See e.g. Pastorik*, 1999 WL 608674 at *2, *Strohecker*, 1999 WL 436574 at *2. Connecticut courts do not require that the successor itself (Olin) extinguish the Plaintiffs cause of action, but simply that the cause of action is indeed extinguished by the disappearance of the

**ORAL ARGUMENT REQUESTED** 28

predecessor company. That requirement is certainly satisfied here. In this case, based upon the factors enumerated by the Courts, the bankruptcy of Winchester Delaware would not bar recovery under the product line exception. To the contrary, Connecticut would hold that Olin is liable to the plaintiffs as the successor to Winchester.

## II.    Winchester's Bankruptcy Does Not Relieve Olin of Successor Liability

Olin argues, in the lead section of its brief, that the decrees entered in the bankruptcy sale of Winchester Delaware operate to preclude their claims. That is simply not the law. The fact that Olin acquired Winchester in a bankruptcy proceeding does not affect the ability of the court to impose successor liability on Olin. *See Chicago Truck Drivers, Helpers and Warehouse Workers Union Pension Fund v. Tasemkin Inc.*, 59 F.3d 48 (7th Cir. 1995) ("there is no reason to accord the purchasers of formally bankrupt entities come special measure of insulation from liability that is unavailable to ailing but not yet defunct entities") *see* also *R.C.M Executive Gallery Corp. v. Rols Capital Co.*, 901 F. Supp. 630, 633 (S.D.N.Y. 1995) (holding that a purchaser of assets can be held liable under successor liability even when the sale occurred pursuant to bankruptcy). Bankruptcy sales do not extinguish the rights of future tort claimants, particularly since those future claimants cannot possibly be put on notice or be granted any sort of consideration. *See Zerand-Bernal Group, Inc. v. L.Cox*, 23 F.3d 159, 163 (7th Cir. 1994) (plaintiff whose claim accrued after bankruptcy is not barred from proceeding on a successor liability suit); *see also Chicago Truck Drivers.,* 59 F.3d at 52 ("a second chance is precisely the point of successor liability, and it is not clear why an intervening bankruptcy proceeding, in particular, should have a *per se* preclusive effect on the creditor's chances). Here, no notice was

given to the plaintiffs, many of whom were not yet born at the time of the bankruptcy. Therefore, the plaintiffs' claims against Olin as the successor are preserved.

Olin asks the court to rule that the plaintiffs' claims are barred by the terms of the 1931 District Court orders approving the sale of Winchester Delaware. (Def. Mot. Summary Judgment at pages 7-8). This argument was specifically rejected in *Tracey*, the one decision to previously consider the terms of these orders. In *Tracey*, the Court recognized that the "Final Decree specifically exempts from the injunction 'any claims which may accrue after the entry of this decree." *Tracey*, 745 F.Supp. at 1103, *citing* Final Decree, Art. XVI, Page 96, attached hereto as Exhibit 4. Olin tries to get around this language by arguing that the second decree issued by the District Court does not contain the same language. (Def. Mot. Summary Judgment at page 8, citing Decree Confirming Sale). But the language in the Decree Confirming Sale is limited to claimants, creditors and stockholders as of 1931. This is evidenced by the examples given in the Decree of those whom it intends to enjoin, e.g. "all holders of Bonds and coupons, all holders of Debentures and coupons, all claimants under the "1915 Pension Plain" and all persons claiming by, through or under the Delaware Company an/or the Connecticut Company, their respective creditors and stockholders." *See* Exhibit 3 at page 24. The injunction language does not address and could not have contemplated liability brought by third parties pursuing claims for environmental contamination in 2005.

These present claimants had no notice that either the Winchester Delaware or Winchester Maryland were dumping toxins on their property until the year 2001. Therefore, they were without notice at the time of the bankruptcy that their rights were affected and are therefore not

bound by the terms of any limiting language that enjoins future rights. *See B. Offen & Co., Inc.*

*v. Blanchard Press Inc.* 501 F.2d 1145, 1153 (1st Cir. 1974) (without notice, provision excluding

the assumption of tort liability in an agreement "cannot determine the rights of third parties").

### V. Conclusion

WHEREFORE, the Plaintiffs respectfully request that this court deny Defendant Olin's

Motion for Partial Summary Judgment.

> THE PLAINTIFFS,
>
> By _____
>
> Neil T. Leifer, Esq.
> nleifer@tenlaw.com
> David C. Strouss, Esq.
> dstrouss@tenlaw.com
> Allyson S. Hauck, Esq.
> ahauck@tenlaw.com
> Thornton & Naumes L.L.P
> 100 Summer Street, 30th Floor
> Boston, Massachusetts 02110
> Tele: (617) 720-1333
> Fax: (617) 720-2445
>
> David B. Zabel, Esq. ct 01382
> dzabel@cohenandwolf.com
> Monte E. Frank, Esq. ct13666
> mfrank@cohenandwolf.com
> Cohen and Wolf, PC
> 1115 Broad Street
> Bridgeport, Connecticut 06604
> Tele: (203) 368-0211
> Fax: (203) 394-9901
>
> Mark Roberts, Esq.
> mroberts@mcrobertsandroberts.com
> Andrew Rainer, Esq.
> Jennifer Currie, Esq.
> McRoberts, Roberts, & Rainer LLP
> 53 State Street, Exchange Place
> Boston, Massachusetts 02109
> Tele: (617) 722-8222
> Fax: (617) 720-2320

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was forwarded on the 14th day of February 2005, by first class mail, postage prepaid to:

David B. Zabel, Esq.
Monte E. Frank, Esq.
Cohen and Wolf, PC
1115 Broad Street
Bridgeport, CT 06604
Telephone: (203)368-0211
Facsimile: (203)394-9901

Mark Roberts, Esq.
Andrew Rainer, Esq.
McRoberts, Roberts, & Rainer LLP
53 State Street, Exchange Place
Boston, Massachusetts 02109
Telephone: (617) 722-8222
Facsimile: (617) 720-2320

*Attorneys for Plaintiffs*

Michael H. Wetmore, Esq.
Joel B. Sampson, Esq.
Husch & Eppenberger, LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
Telephone: (314) 480-1500
Facsimile: (314) 480-1505

Mark S. Baldwin, Esq.
Sandra K. Davis, Esq.
Brown Rudnick Berlack Israels, LLP
185 Asylum Street
Hartford, CT 06103-3402
Telephone: (860) 509-6500
Facsimile: (860) 509-6501

*Attorneys for Olin Corporation*

Joseph G. Fortner, Jr., Esq.
Halloran & Sage, LLP
225 Asylum Street
Hartford, CT 06103-4303
Telephone: (860) 522-6103
Facsimile: (860) 548-0006

*Attorney for Town of Hamden*

David C. Strouss, Esq.