IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CLARENCE R. COLLINS, JR., et al. : | CIVIL ACTION NO. |
| for themselves and on behalf of a class : | 3:03-CV-945(CFD) |
| of similarly situated property owners, : | |
| Plaintiffs, : | |
| v. : | |
| : | |
| OLIN CORPORATION and THE TOWN OF : | |
| HAMDEN, : | FEBRUARY 14, 2005 |
| Defendants. : | |

**PLAINTIFFS' LOCAL RULE 56(a)(2) RESPONSE TO DEFENDANTS LOCAL RULE 56(a)(1) STATEMENT AND STATEMENT OF MATERIAL FACTS IN DISPUTE**

NOW COME the Plaintiffs and, pursuant to Local Rule 56(a)(2) of the Local Rules of Civil Procedure for the District of Connecticut, and set forth the following Responses to Defendant's Statement of Material Undisputed Facts and their own Statement of Material Facts in Dispute.

**RESPONSES TO DEFEDANT OLIN'S STATEMENT OF UNDISPUTED FACTS**

1.   Agreed

2.   Agreed in part. Plaintiffs disagree with Defendant's characterization that the creditors' purpose in establishing a Reorganization Committee was to sell Winchester Delaware's "assets." Winchester Delaware's creditors initiated receivership with the court so that the business of Winchester Delaware could continue "as a going concern", and that it could continue specifically "so that [Winchester Delaware's] good will, acquired through a manufacturing and business history of over fifty years, can be preserved and perpetuated." *See Bill of Complaint*, January 22, 1931, *T.A.D. Jones and Company, Inc., v. Winchester Repeating*

1

*Arms Company,* In Equity, No 2109, (U.S.D.C. Conn.) (Attached hereto as Exhibit 1) (hereafter "Bill of Complaint"), at pages 6-7 ¶. When the Reorganization Committee realized that reorganization under the current ownership would require a substantial amount of capital, it began negotiations with companies in the arms and ammunitions business, promoting the "acquisition by them of the business and properties of the Winchester Company," in order to keep the Winchester enterprise intact. *See Plan and Agreement of the Reorganization and Sale of the Winchester Repeating Arms Company,* October 28, 1931 (Attached hereto as Exhibit 2) at pages 4-5.

3. Agreed in Part. Plaintiffs further add that the "assets" entailed "all property of every kind, character and description, ...all the business, good will, including corporate name or names, patents, trade names, trade marks, and all bills and accounts receivable, choses in action and cash" of Winchester Delaware was purchased. *See Decree Confirming Sale and Directing Execution and Delivery of Deeds,* December 22, 1931, *Chase National Bank of New York, Trustee v. Winchester Repeating Arms Company, et al.,* Equity Consolidated Cause No. 2131 (U.S.D.C. Conn.) Olin 000364-000425 (Attached hereto as Exhibit 3), at page 39, Olin 000403 (hereinafter "Decree Confirming Sale").

4. Agreed in part. Plaintiffs disagree that the "assets" of Winchester Delaware would be taken by the purchasers "free of any claims and liabilities." The Final Decree language that barred "creditors" of Winchester Delaware from filing claims and demands specifically referred to pension claimants and other unsecured creditors of Winchester Delaware who had notice of the sale. See *Final Decree of Foreclosure and Sale,* November 10, 1931, *Chase National Bank of New York v. Winchester Repeating Arms Company, et al.,* In Equity, Consolidated Cause No. 2131 (U.S.D.C. Conn.) (Attached hereto as Exhibit 4), at page 96. The

Final Decree specifically excluded from its bar "any claims which may accrue after the entry of this decree." *Id.* This exclusion was NOT superceded by the subsequent Decree Confirming the Sale to Winchester Delaware, but rather was explicitly preserved by the claim preclusion provision of the Decree Confirming the Sale. After listing the claims barred by its terms, the Fifteenth Article says: "except pursuant to the provisions of and in subordination to the Final Decree" and then goes on to preserve the rights of any claimant "whose claim, or any part thereof, is payable under the provisions of the Final Decree". *See Decree Confirming Sale* (Exhibit 3), at pages 24-25, Olin 000388-89.

This language of these Decrees did not and does <u>not</u> prevent claims by third parties whose claims did not accrue for years after the sale, who were not parties to the sale and who had no notice of the existence of their claims at the time the Court entered the Final Decree.

Furthermore, the Court specifically described the sale of Winchester Delaware to include not simply the facility at New Haven, but "all property of every kind, character and description…all the business, good will, including corporate name or names, patents, trade names, trade marks…and all bills and accounts receivable, choses in action and cash." See Decree Confirming Sale, at p. 39, Exhibit 3.

    5.    Agreed.

    6.    Agreed in Part. Plaintiffs agree that, pursuant to the Final Decree, "all property of every kind, character and description,… all the business, good will, including corporate name or names, patents, trade names, trade marks, and all bills and accounts receivable, choses in action and cash" of Winchester Delaware was purchased. See Decree Confirming Sale, at p. 39, Exhibit 3.

7.      Agreed in part. Plaintiffs disagree with defendant's statement that Beardslee and Sessel were the purchasers of Winchester Delaware. These two individuals bid on Winchester Delaware on behalf of and at the direction of Western Cartridge. *The Indenture*, December 22, 1931 (Olin 000216-000243) (Attached hereto as Exhibit 5) at page 25. Western Cartridge was the entity supplying the 4.8 par value of stock and over 3 million dollars in cash for the purchase of Winchester Delaware and, without which, the purchase of Winchester Delaware could not have occurred. See Deposition of Johnnie Jackson, March 24, 2004 (relevant portions are attached hereto as Exhibit 6) (hereinafter "Jackson Dep. Vol.I"), at pages 63-65, *See also Final Report and Statement of Account of The Reorganization Committee and Application for Discharge*, March 26, 1934, In Equity Consolidated Cause, No. 2131 (U.S.D.C. Conn.) Attached to hereto as Exhibit 18). Western also created Winchester Maryland for the purpose of taking title to all of the property and assets of Winchester Delaware. *See Western Cartridge Special Meeting Notice and List of Stockholders,* December 12, 1931 (Olin 000734-000739) (Attached hereto as Exhibit 7) at Olin 000735-000737. The fact that Winchester Maryland itself was the actual purchaser of Winchester Delaware is further confirmed in the Defendant's own statement of undisputed facts, when the Defendant states that:

> In its Decree Confirming, the Court found that the Reorganization Committee's plan was fair and equitable, confirmed the sale of Winchester Delaware's assets *to Winchester Maryland* pursuant to the plan, and ordered, among other things, delivery of the necessary transfer documents *to Winchester Maryland*.

Defendant's Statement of Undisputed Facts, ¶9 (emphasis added).

8.      Agreed in Part. Plaintiffs disagree with defendant's statement that Beardslee and Sessel were the purchasers of Winchester Delaware. In addition, please see Plaintiffs' Response

4

to ¶7 above, which is incorporated by reference into this response to ¶8, as if set forth fully herein.

9. Agreed in Part. Plaintiffs agree that, according to the Defendant's own statement as well as Court documents, in its Decree Confirming Sale, the Court found that the Reorganization Committee's plan was fair and equitable, confirmed the sale of Winchester Delaware to Winchester Maryland pursuant to the plan, and ordered, among other things, delivery of the necessary transfer documents to Winchester Maryland. Plaintiffs disagree that this was a mere "asset" sale, but that it was a sale of all property of every kind, character and description,... all the business, good will, including corporate name or names, patents, trade names, trade marks, and all bills and accounts receivable, choses in action and cash of Winchester Delaware *See* Decree Confirming Sale, at p. 39, Exhibit 3.

10. Agreed in part. Plaintiffs specifically disagree with Defendant's characterization of the Court's designation of enjoined parties under the Decree Confirming Sale. Olin fails to include the following critical language when it quotes, for this Court, the Decree Confirming Sale. Contrary to Defendant's statement, the Decree identifies the creditors, stockholders and claimants whom the Court intended to enjoin:

> "including, but without limiting the generality of the foregoing, all holders of bonds and coupons, all holders of Debentures and coupons, all claimants under the '1915 Pension Plan' of the Connecticut Company referred to in the Final Decree, and all persons claiming by, thorough or under the Delaware Company and/or the Connecticut Company their respective creditors and stockholders...."

See Decree Confirming Sale, at page 23, Exhibit 3. This preclusion did not supercede the language of the Final Decree, which preserved "any claims which may accrue after the entry of this decree." *Id.* To the contrary, Article Fifteenth of the subsequent Decree Confirming the Sale to Winchester Delaware, says: "except pursuant to the provisions of and in subordination to

5

the Final Decree" and then goes on to preserve the rights of any claimant "whose claim, or any part thereof, is payable under the provisions of the Final Decree". *See Decree Confirming Sale* (Exhibit 3), at pages 24-25, Olin 000388-89.

11.   Denied. Please see Plaintiffs' Response to ¶10 above, which is incorporated by reference into this response to ¶11, as if set forth fully herein.

This language does not prevent claims from third parties whose claims did not accrue for years after the sale, who were not parties to the sale and who had no notice of the existence of their claims at the time the Court entered the Decree Confirming Sale.

12.   Denied. Plaintiffs disagree that Beardslee and Sessel purchased Winchester Delaware and that Western Cartridge, through Winchester Maryland, purchased only the assets of Winchester Delaware. Please see Plaintiffs' Response to ¶4 and 7 above, which are incorporated by reference into this response to ¶12, as if set forth fully herein. In addition, Plaintiffs state that Winchester Maryland acquired stock at the Court sponsored sale. At the time of the sale, the property and assets of Winchester Delaware included a number of subsidiary companies owned by Winchester Delaware and operated at the New Haven plant. *See* Houze, Herbert, *Winchester Repeating Arms Company, Its History and Development from 1865 to 1981,*(Krause Publications 1994) (Relevant portions attached hereto as Exhibit 8) at pages 209-212 [my copy of Exhibit 8 is missing page 212 and one page of footnotes]. When Western, through Winchester Maryland, purchased Winchester Delaware, it acquired the majority shares of stock in at least three of these companies. *See* Statement of Stock and Officers for , *Walden Knife Company* Feb. 15, 1932, *Winchester Manufacturing Company*, Feb. 15, 1932, and *Whirldry Company,* on file at McCracken Research Library, MS:20, *Winchester Repeating Arms Company: Office Files* (Attached hereto as Exhibit 9)

13. Denied. Immediately following the purchase, Winchester Maryland began selling product lines previously developed and sold by Winchester Delaware. *See* Letter from William T. Birney, Sales Manager for Winchester Delaware and Maryland, to "Gun Buyers", January 21, 1932 (Olin 001044-001057) (Attached hereto as Exhibit 10). Six years after the purchase, Winchester Maryland continued to advertise, manufacture and sell the same product lines manufactured and sold by Winchester Delaware. *Compare* Inventory report on Winchester Delaware from W.F. Siegmund to F.W. Olin, February 29, 1932 (MS 20 Series 2 Box 6 Folder 18), pages 1-24 on file at McCracken Research Library, MS:20, *Winchester Repeating Arms Company: Office Files* (Attached hereto as Exhibit 11*) with Winchester Quality Products*, 1938 Winchester Maryland Catalogue (Olin 000821-001043) (Attached hereto as Exhibit 12). With respect only to the gun line of products, a large number of Winchester Delaware's popular gun lines were continued under Winchester Maryland. *See* Williamson, Harold F. *The Gun that Won the West*, 1st Edition, Combat Forces Press, 1952. (Excerpts attached hereto as Exhibit 13, citing, as examples of continued models, Models 1890 rifle, 1892 carbine, 1897 shotgun, 1907 rifle, and 1912 shotgun) at pages 429-438. *See also* Yearly Net Orders of Winchester Arms, on file at McCracken Research Library, MS:20, *Winchester Repeating Arms Company: Office Files* (Attached hereto as Exhibit 14).

A gun manufacturer's introduction of a new product or "varied" products developed from scratch takes months to years and could even take a decade. *See* Deposition of Johnnie Jackson, November, 9, 2005 (relevant portions are attached hereto as Exhibit 15) (hereinafter "Jackson Dep. Vol. II"), at page 99. But when Olin traveled to New Haven to survey his purchase, he already found a stored up accumulation of new gun models and ideas developed under Winchester Delaware ownership. *See* Olin's *Winchester* World Wide Web Site

http://www.winchester.com/compnayinfo/history/world.wars.aspx , last updated on November 8, 2004, (Attached hereto as Exhibit 16). During receivership, Winchester Delaware continued to manufacture products and continued to employ its design team, headed by T.C. Johnson, a developer of Winchester Delaware products for 40 years. *See* Exhibit 13, at page 379.

Winchester Maryland utilized these designs, developed months and years before its purchase. Winchester Maryland continued to produce the Winchester Delaware products that were competitive and discontinued those that were not. *See* Exhibit 6 at pages 100-102. Even Olin admits that this is what companies typically do whether or not there is an acquisition . Id. at page 102.

14.     Denied. With respect to product lines, in addition to manufacturing firearms under the Winchester name (discussed in paragraph 13 above), Winchester Maryland continued to manufacture roller skates, knives, flashlights, ammunition, batteries and various accessories under the Winchester brand name. *See* Exhibit 12. Indeed, the Winchester brand name was so beneficial to Western that Western took its own name off its ammunition and replaced it with the Winchester name. *See* Exhibit 6 at pages 81-82.

With respect to employees, contrary to the Defendant's assertion that they employed "some" former employees of Winchester Delaware, Winchester Maryland reassured workers right after the acquisition that it would continue to employ all of Winchester Delaware's 2500 employees. *See* New Haven Register, December 23, 1931 (Resp-Olin-271-272) (Attached hereto as Exhibit 17). With respect to Defendant's assertion that new officers and directors were brought in by Winchester Maryland, please see Plaintiffs' Response to ¶15 below, which is incorporated by reference into this response to ¶14..

8

15.     Denied. Key members of the Winchester Delaware Enterprise were not only employed by Winchester Maryland after the purchase, but were given officer and director positions in Winchester Maryland. Immediately after purchasing Winchester Delaware, John Olin created an Operating Committee made up almost entirely of Winchester Delaware managers—Edwin Pugsley, E.W. Taft, William Birney, R.C. Swanton. *See* Correspondence and manuscripts from Olin to Williamson for *The Gun that Won the West*. (MS 20 Series 6 Box 14 Folder 1) and (MS 20 Series 6 Box 13 Folder 28) (Attached hereto as Exhibit 19) at page 7.

Edwin Pugsley had been an officer and director of Winchester Delaware. *See* Secretary of State Documents for Winchester Delaware (1929, 1932) (Olin 000457-000467) (Attached hereto as Exhibit 20). After the purchase, Edwin Pugsley became an officer of Winchester-Maryland. *See* Secretary of State Documents for Winchester Maryland (1932-1938) (Olin 001083-01096) (Attached hereto as Exhibit 21).. Mr. Puglsey later became an officer of Western, and then an officer and director of Olin Industries. *See* Western Cartridge Annual Reports (1938-1940) (Olin 001339-001365) (Attached hereto as Exhibit 22). *See also* Olin Industries, Inc. Annual Reports (1951-1952) (Olin 001366-001368, 001386-001388) (Attached hereto as Exhibit 23).

In addition to Mr. Pugsley, officers and directors of subsidiary corporations of Winchester Delaware were employed by Winchester Maryland after the purchase. R.C. Swanton was an officer of the Whirldry Corporation beginning in 1926, and Edgar W. Taft was an officer of Winchester Manufacturing Company beginning in 1924, [NOTE: On these lists, Swanton and Taft didn't become officers of Walden Knife or New Haven Transit until 1932]*See* Lists of Companies purchased as part of Winchester Delaware sale, on file at McCracken Research Library, MS:20, *Winchester Repeating Arms Company: Office Files* (Attached hereto as Exhibit

9

24).   After the purchase, Swanton and Taft served as officers of these subsidiaries, and became officers of Winchester Maryland, then Western and eventually Olin Industries. *See* Exhibits 21-32. E.W. Taft also became a director of Olin Industries. *See* Exhibit 23.

   16.   Agreed.

   17.   Agreed.

   18.   Agreed in part. Although Edwin Pugsley was never a director of the corporation, Winchester Maryland, while that corporation continued to exist, Pugsley did become a director of Olin Industries, a company that merged with Western in 1944. *See* Exhibit 23. In addition, it is specifically denied that Edwin Pugsley was the only officer of Winchester Delaware who served as an officer of Winchester Maryland. Please see Plaintiffs' Response to ¶15 above.

   19.   Denied. Kidder Peabody was a substantial shareholder of Winchester Delaware. *See* Summary of Winchester Stock by F.A. Hall, May 25, 1933 (MS 20 Series 2 Box 6 Folder 17) on file at McCracken Research Library, MS:20, *Winchester Repeating Arms Company: Office Files* (Attached hereto as Exhibit 25); Houze, Exhibit 8, at 208 Kidder Peabody owned Winchester Delaware mortgage bonds. *See* Answer of Pension Claim Committee, June 20, 1931, *Chase National Bank of New York v. Winchester Repeating Arms Company, et al.,* In Equity, Consolidated Cause No. 2131 (U.S.D.C. Conn.) (Attached hereto as Exhibit 26). As compensation for those bonds, Kidder Peabody was given shares of Western stock. *See* Letter from Western Cartridge to Winchester Repeating Arms Company's Debenture Holders Committee and First Mortgage Bondholders Committee, October 16, 1931 (Olin 000468-000473) (Attached hereto as Exhibit 27). *See also Olin Corporation v. Commissioner of Internal Revenue,* 42 B.T.A. 1203, 1210 (U.S. Bd. of Tax Appeals, 1940) (Attached hereto as Exhibit 28).

20.   Agreed. In addition, Olin has assumed the liabilities for Winchester Maryland and Western. *See* Exhibit 6 at 43-44.

21.   Agreed in part. After the transfer of all property of every kind, character and description, …all the business, good will, including corporate name or names, patents, trade names, trade marks, and all bills and accounts receivable, choses in action and cash on December 22, 1931 Olin states that Winchester Delaware "was pretty much a shell company." *See* Exhibit 6 at page109. Though on paper Winchester Delaware did not formally dissolve until 1934, Olin states this was due to "insurance policies or tax situations. Administratively there was a wind-down period, but I can't find anything that suggests that they did anything. It was just a shell company." Id.

22.   Agreed.

### PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN DISPUTE

1.   Whether there was continuity of personnel of Winchester Delaware after the purchase, in that Winchester Maryland employed almost *all* of Winchester Delaware's 2,500 employees after the purchase. *See* Exhibit17. This included employees credited with Winchester patents. *See* MS:20, *Winchester Repeating Arms Company: Office Files* Winchester Inventory List (Attached hereto as Exhibit 31) at pages 29-61.

2.   Whether there was continuity of management of Winchester Delaware after the purchase, in that:

a.   Immediately after purchasing Winchester Delaware, John Olin created an Operating Committee made up almost entirely of Winchester Delaware managers—Edwin Pugsley, E.W. Taft, William Birney, R.C. Swanton. *See* Correspondence and manuscripts from

11

Olin to Williamson for *The Gun that Won the West*. (MS 20 Series 6 Box 14 Folder 1) and (MS 20 Series 6 Box 13 Folder 28) (Attached hereto as Exhibit 19) at page 7.

    b.    Edwin Pugsley had been an officer and director of Winchester Delaware. *See* Secretary of State Documents for Winchester Delaware (1929, 1932) (Olin 000457-000467) (Attached hereto as Exhibit 20). After the purchase, Edwin Pugsley became an officer of Winchester- Maryland. *See* Secretary of State Documents for Winchester Maryland (1932-1938) (Olin 001083-01096) (Attached hereto as Exhibit 21). Mr. Puglsey later became an officer of Western, and then an officer and director of Olin Industries. *See* Western Cartridge Annual Reports (1938-1940) (Olin 001339-001365) (Attached hereto as Exhibit 22). *See also* Olin Industries, Inc. Annual Reports (1951-1952) (Olin 001366-001368, 001386-001388) (Attached hereto as Exhibit 23).

    c.    In additional to Mr. Pugsley, officers and directors of Winchester Delaware and Winchester were employed by Winchester Maryland after the purchase. Before the purchase, R.C. Swanton served as an officer and director of Winchester Delaware, as a director of Winchester Repeating Arms Co. of Connecticut, and as an officer and director of two Winchester subsidiaries, The Whirldry Corporation and Winchester Retails Stores Co. Edgar W. Taft served as an officer of Winchester Delaware, an officer and director of Winchester Repeating Arms Co. of Connecticut, an officer of the Winchester Company, and an officer of Winchester Retails Stores Co. See Exhibit 24. After the purchase, Swanton and Taft not only served as officers and directors of various Winchester subsidiaries, but became officers of Winchester Maryland, then Western, and eventually of Olin Industries. Exhibits 21-24. Taft also became a director of Olin Industries. Exhibit 23.

3.      Whether there was a continuity of general business operations of Winchester Delaware after the purchase, in that Winchester Maryland, by its own statements, continued the normal business operation of Winchester Delaware with "no radical changes," operating at the same plant in New Haven, under the same name, with the same employees. *See* Exhibit 16. The products produced at the Winchester plant at the time of Winchester Maryland's purchase at the close of 1931 had not changed significantly by 1938. *See* Exhibits 11-12.

4.      Whether there was continuity in the products manufactured by Winchester Delaware after the purchase, in that:

a.      Olin also relied on the leading innovative creator of Winchester products, T.C. Johnson, who remained at Winchester Maryland until 1934, and explained each gun model, its potential, and ideas that had been planned for new gun model. *See* Exhibit 13 at page 380.

b.      Winchester Maryland continued manufacturing and selling the same products that had been manufactured and sold by Winchester Delaware, under the Winchester name, including firearms, roller skates, knives, flashlights, ammunition, batteries and various accessories under the Winchester brand name. *See* Exhibits 11-14. *See also* Exhibit 12 at Olin 001002-001003 *and* Letter from William T. Birney regarding Winchester Cleaning and Lubricants, Feb. 19, 1932 (MS 20 Series 2 Box 6 Folder 18), on file at McCracken Research Library, MS:20, *Winchester Repeating Arms Company: Office Files* (Attached hereto as Exhibit 32).

c. Prior to the acquisition of Winchester Delaware, Winchester Maryland did not exist and neither Western or Winchester Maryland had never sold or manufactured arms, roller skates, knives, flashlights, and/or batteries, instead it manufactured only ammunition. *See* Exhibit 6 at 38.

   d.  At least twenty of Winchester Delaware's popular gun lines were continued under Winchester Maryland. *See* Exhibits 13-14.

   5.  Whether Winchester Maryland took over the obligations of Winchester Delaware necessary for the uninterrupted continuation of business operations, in that;

   a.  Winchester Maryland told the world that it was taking over the contract obligations of Winchester Delaware. See Exhibit 3.

   b.  The Decree Confirming the sale to Winchester Maryland specifically provided that Winchester Maryland would assume the executory contracts of Winchester Delaware. (Exhibit 3, at Art. XX, page 104. By definition, these executory contracts were contracts upon which there were outstanding obligations of Winchester Delaware that Winchester Maryland assumed.

   c.  One of the lucrative contracts Winchester Maryland acquired was an option, pursuant to a contract made with Winchester Delaware in 1926, to purchase the goodwill, patents, trade-marks, brands, and name for the United States Cartridge Company. *See* Exhibit19 at page 7. Winchester Maryland exercised this right in 1936. *See* Id. The United States Cartridge Company became a subsidiary of Olin Industries, and in 1940 signed a contract with the United States Government to build and operate "the greatest small arms plant in the military history of the nation." *See* Exhibit 16 at www.winchetser.com/companyinfor/history/worldwars.aspx.

   6.  Whether Winchester Maryland benefited from immeasurable good will when it acquired the Winchester company, its business, patents, company name, logo and accounts, in that Olin has consistently traded on the Winchester name, and the pre-1931 history that attached to the celebrity and success of the Winchester name and products. *See* R.C. Rikhoff and J.R.

14

Falk, Olin Public Relations, Press Releases (Olin 001058-0001076) (Attached hereto as Exhibit 29). *See also* Winchester-Western Division, Olin Mathieson Chemical Company, *The Story of Winchester, The Gun that Won the West,* 1956 (Olin 014116-014139) (Attached hereto as Exhibit 30) at Olin 014128 *and* Exhibit 16.

7. Whether Olin has held itself out as the successor to Winchester, in that:

a. Winchester Maryland called itself the "Winchester Repeating Arms Company," just had Winchester Delaware. Exhibit 6 at 76.

b. John Olin told the public in 1931 that the Winchester company was going to continue, See Exhibit 17 at Olin-272, and Winchester Maryland wrote to the customers of Winchester Delaware within weeks after the sale promoting the same Winchester products as Winchester Delaware. See Exhibit 10.

c. In 1938, Winchester Maryland issued a catalogue that described itself as the "same organization" as the previous Winchester companies. See Exhibit 12 at 000822.

d. Olin celebrated the "centennial" of Winchester in 1966, as though it were its own, in a press release with "highlights" of Winchester dating back to the birth of Oliver Winchester in 1810, and describing the transaction of 1931 as "Winchester Repeating Arms Company was purchased by the Western Cartridge Company." See Exhibit 29 at 001073-001076.

e. Olin also issued a release on "Famous Winchester Developments," that described the release of Winchester guns beginning in 1866 and continuing through releases in 1966, that moves directly from "the famous model 21" released in 1931 to "the Model 42" released in 1933. This release characterizes Winchester as a division of Western Cartridge Company. See Exhibit 29 at 001077-001079.

15

f.      To the present, Olin represents on its website that "the company who brought to life 'the Gun that Won the West' is the <u>same company</u> who today continues to supply sportsmen with the best sporting ammunition in the world." Exhibit 16.

8.      Whether there was continuity of ownership after the purchase, in that:

a.      Winchester Delaware's Mortgage Bondholders and Debentureholders, the only investors with any real stake in Winchester Delaware in December 1931, received millions of dollars in Western stock pursuant to the sale. *See Decree Confirming Sale, See* Exhibit 3 at 15.

b.      Kidder Peabody, a significant shareholder and bondholder of Winchester Delaware, *see* Exhibits 25, 26, became a stockholder of Western pursuant to the sale. *See* Exhibits 27 at pages 4-5 and Exhibit 28 at page 1210.

c.      Winchester Maryland became a principal stockholder in the subsidiaries of Winchester Delaware, including The Whirldry Corporation and Walden Knife Company. Exhibits 8 and 9.

9.      Whether the purchase of Winchester Delaware was simply an asset purchase, or was instead a purchase of all property of every kind, character and description, …all the business, good will, including corporate name or names, patents, trade names, trade marks, and all bills and accounts receivable, choses in action and cash. *See* Exhibit 3 at p. 39.

THE PLAINTIFFS,

By_____
Neil T. Leifer, Esq.
nleifer@tenlaw.com
David C. Strouss, Esq.
dstrouss@tenlaw.com
Allyson S. Hauck, Esq.
Thornton & Naumes L.L.P
100 Summer Street, 30th Floor
Boston, Massachusetts 02110
Tele: (617) 720-1333
Fax:  (617) 720-2445

David B. Zabel, Esq. ct 01382
dzabel@cohenandwolf.com
Monte E. Frank, Esq. ct13666
mfrank@cohenandwolf.com
Cohen and Wolf, PC
1115 Broad Street
Bridgeport, Connecticut 06604
Tele: (203) 368-0211
Fax: (203) 394-9901

Mark Roberts, Esq.
mroberts@mcrobertsandroberts.com
Andrew Rainer, Esq.
Jennifer Currie, Esq.
McRoberts, Roberts, & Rainer LLP
53 State Street, Exchange Place
Boston, Massachusetts 02109
Tele: (617) 722-8222
Fax: (617) 720-2320

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was forwarded on the 14th day of February 2005, by first class mail, postage prepaid to:

David B. Zabel, Esq.
Monte E. Frank, Esq.
Cohen and Wolf, PC
1115 Broad Street
Bridgeport, CT 06604
Telephone: (203)368-0211
Facsimile: (203)394-9901

Mark Roberts, Esq.
Andrew Rainer, Esq.
McRoberts, Roberts, & Rainer LLP
53 State Street, Exchange Place
Boston, Massachusetts 02109
Telephone: (617) 722-8222
Facsimile: (617) 720-2320

*Attorneys for Plaintiffs*

Michael H. Wetmore, Esq.
Joel B. Sampson, Esq.
Husch & Eppenberger, LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
Telephone: (314) 480-1500
Facsimile: (314) 480-1505

Mark S. Baldwin, Esq.
Sandra K. Davis, Esq.
Brown Rudnick Berlack Israels, LLP
185 Asylum Street
Hartford, CT 06103-3402
Telephone: (860) 509-6500
Facsimile: (860) 509-6501

*Attorneys for Olin Corporation*

Joseph G. Fortner, Jr., Esq.
Halloran & Sage, LLP
225 Asylum Street
Hartford, CT 06103-4303
Telephone: (860) 522-6103
Facsimile: (860) 548-0006

*Attorney for Town of Hamden*

David C. Strouss, Esq.