UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CLARENCE R. COLLINS, JR., et al. | CIVIL ACTION NO.: 3-03-945 (CFD) |
| Plaintiffs, | |
| v. | |
| OLIN CORPORATION and the TOWN OF HAMDEN, | |
| Defendants. | MARCH 9, 2005 |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT
TOWN OF HAMDEN'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON THE LIMITED ISSUE OF SOVEREIGN IMMUNITY**

The Plaintiffs respectfully submit this Memorandum of Law in Opposition to the Motion

for Partial Summary Judgment filed by defendant Town of Hamden (the "Town" or "Hamden").

In its motion, the Town seeks to avoid liability for the contamination of scores of properties in

the Newhall Section of Hamden by invoking the doctrine of sovereign immunity. Because there

are numerous disputed issues of fact that affect whether the doctrine applies here, the Town's

motion must be denied. In addition, based on the facts not in dispute, i.e., that Hamden allowed

an out-of-town company to dump its industrial waste in Hamden, sovereign immunity is not an

available defense.

I.      **PRELIMINARY STATEMENT**

The Plaintiffs bring this complaint[1], for themselves and on behalf of a class of similarly

situated property owners[2] in the Newhall section of Hamden, Connecticut (the "Newhall

---

[1] Plaintiffs served Olin and Hamden with a writ, summons and complaint on May 2, 2003, made returnable to the
Superior Court for the Judicial District of New Haven. Hamden, with Olin's consent, removed the case to the
United States District Court on May 28, 2003. On that same day, Plaintiffs filed their Amended Complaint (the
"Amended Complaint").

[2] Plaintiffs filed their Motion for Class Certification on September 30, 2003. That motion is pending.

Section") seeking damages against Olin Corporation ('Olin') and the Town for response costs, the diminution in the value of their properties, loss of use and enjoyment of their properties and emotional distress, resulting from Defendants' contamination of their properties. They deserve their "day in Court."

Summary judgment is not warranted on the issue of sovereign immunity because there are genuine issues of material fact as to whether the doctrine applies here. While the Town asserts that it allowed the Winchester Repeating Arms Company ('Winchester') [3] of New Haven to dump its toxic, industrial waste in the Newhall Section of Hamden purely to fulfill the governmental function of controlling mosquitoes, the Town's own records show that dumping continued long after mosquitoes had been brought under control. To the contrary, Winchester was allowed to dump for the proprietary purpose of filling wetlands at minimal expense to the Town and converting unusable swamplands into tax-generating residential properties, a school and a park. In other words, the Town created an entire community on top of a dump, which consisted of Winchester's industrial waste trucked in from New Haven. Indeed, the Town concedes, as it must, that it is inherently a question of fact whether a dump serves a proprietary or governmental purpose.

It is also a disputed issue of fact whether the Town acted recklessly in issuing permits to build hundreds of homes on top of Winchester's toxic, industrial waste. The risks of lead and arsenic contained in that waste were well known even in the 1920's and 1930's, when the Town began to issue permits to build homes in the Newhall Section. It is at least a triable issue – if not, a certainty – that the Town was reckless in exposing Newhall Section residents to enormous health risks when it issued permits for homes to be built on top of these toxins.

---

[3] Olin is the successor to Winchester. Nonetheless, Olin moved for summary judgment on the issue of 'successor liability.' That issue has been briefed by the Plaintiffs and Olin, and is pending.

The Town has also sought summary judgment, as a matter of substantive law (not on the basis of sovereign immunity) as to the Plaintiffs' claims of nuisance. Pursuant to the Case Management Order entered in this case, the Town had the option of moving for summary judgment at this time on the limited issue of sovereign immunity, not on other issues. Thus, the Town's request for summary judgment on the substantive issue of nuisance is not properly before the Court. Under the direction of the Case Management Order, the Plaintiffs have not conducted discovery focused on nuisance, and therefore, summary judgment is not appropriate at this time.[4]

## II.    FACTS

Prior to 1900, the Newhall Section of Hamden consisted largely of streams and associated wetlands. *Deposition of Deborah Motycka Downie (July 9, 2004)("Downie Transcript"), attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts dated March 8, 2005 ["Plaintiffs' Rule 56(a)(2) Statement"] as Exhibit 57 at pp. 44-45.*[5] As early as 1915, Hamden solicited owners of private properties containing low lying areas to allow waste to be dumped as 'fill' onto their properties. *Notice in New Haven Register, July 15, 1915, attached to Plaintiffs' Rule 56(a)(2) Statement as Exhibit 60.* In that year, Winchester began dumping its industrial waste in the Newhall Section, and continued this dumping until the 1950's. *Map from Backyard Nature Man, Book One: My Boyhood to Manhood Years in Old Highwood Village, Anthony V.*

---

[4] If the Court wishes to hear the Town's request for summary judgment on the Plaintiffs' nuisance claims at this time, the Plaintiffs request an opportunity for further briefing after conducting discovery on the substantive nuisance claims. If so, pursuant to Fed. R. Civ. P. 56(f), the Plaintiffs request time for discovery on the nuisance claims. To date, the Plaintiffs' discovery has been limited to class issues, sovereign immunity, and successor liability in full compliance with the Case Management Order. Nonetheless, based on the record developed in discovery on sovereign immunity, there is substantial evidence that the Town engaged in 'positive acts" when it originally allowed Winchester to dump its toxic industrial waste in the Newhall Section and when it issued building permits to allow the building of homes on top of the waste.

[5] Records relevant to this Memorandum are attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts as indicated.

3

*Cosenza, III, dated 1993, attached to Plaintiffs' Rule 56(a)(2) Statement as* Exhibit 64*; Reported*

*Areas of Filling or Dumping Map, attached to Plaintiffs' Rule 56(a)(2) Statement as* Exhibit 63*;*

*Downie Transcript,* Exhibit 57 *at pp. 13-14, 45-46, 103-107, 138-142.*

Winchester had been founded in New Haven in 1866 and was in the business of small

arms and ammunition manufacturing.  *See R.C. Rikhoff and J.R. Falk, Olin Public Relations,*

*Press Releases (Olin 001058-0001076), attached to Plaintiffs' Local Rule 56(a)(2) Statement of*

*Facts dated February 14, 2005 as* Exhibit 29 *thereto.*  By the late 1920's the Winchester plant

had grown to cover 81 acres and employed some 2500 people.  *See New Haven Register,*

*December 23, 1931, attached to Plaintiffs' Local Rule 56(a)(2) Statement of Facts dated*

*February 14, 2005 as* Exhibit 17 *thereto.*  In the 1920's, Winchester also expanded its

manufacturing and product distribution, putting the well-known Winchester brand on everything

from tools and sporting goods to house wares, such as batteries, refrigerators and hardware

items.  *See Deposition of Johnnie Jackson, March 24, 2004 (relevant portions are attached to*

*Plaintiffs' Local Rule 56(a)(2) Statement of Facts dated February 14, 2005 as* Exhibit 6 *thereto)*

*at pp. 71 and 80.*  Winchester continued to produce these products – and the associated

hazardous wastes--after the company was acquired by Olin Corporation in 1931.[6]  Given the

nature of the products Winchester manufactured in New Haven, the company produced a

substantial quantity of hazardous industrial waste, including lead and arsenic.  The

aforementioned substances were already well-known poisons at the time.  *Affidavit of James D.*

*Sargent, M.D. ('Sargent Affidavit'), attached to Plaintiffs' Rule 56(a)(2) Statement as* Exhibit

74*.*

---

[6] The corporate and product history of Winchester are discussed in the Plaintiffs' Opposition to Olin's Motion for
Summary Judgment dated February 14, 2005.

In 1914, around the same time as the Town was encouraging dumping in the Newhall Section, the Town began realizing revenue from the issuance of building permits. *Affidavit of Robert V. Cappelletti, CPA in Support of Defendant Town of Hamden's Motion for Partial Summary Judgment ("Cappelletti Affidavit"), ¶ 14, attached to Plaintiffs' Rule 56(a)(2) Statement as <u>Exhibit 58</u>.* Residential development in the Newhall Section began in approximately 1920, and continued for decades thereafter, including the development of the properties used for dumping by Winchester. *Residential Development Map, attached to Plaintiffs' Rule 56(a)(2) Statement as <u>Exhibit 77</u>.* For example, in 1934, the area which is now Bryden Terrace consisted of a wetland that was being filled in. *1934 Aerial Photograph, attached to Plaintiffs' Rule 56(a)(2) Statement as <u>Exhibit 78</u>; Residential Development Map, <u>Exhibit 77</u>.* The same area was developed into residences in the 1950s. *Residential Development Map, <u>Exhibit 77</u>.* Both the dumping of industrial waste and subsequent development of the dumps into residential properties continued into the 1950s. *Residential Development Map, <u>Exhibit 77</u>; Reported Areas of Filling or Dumping Map, attached to Plaintiffs' Rule 56(a)(2) Statement as <u>Exhibit 63</u>.*

The Town was keenly aware of the development potential of these filled wetlands. *Cappelletti Affidavit, <u>Exhibit 58</u> at ¶ 14; Hamden Board of Health Minutes, January 8, 1937, attached to Plaintiffs' Rule 56(a)(2) Statement as <u>Exhibit 73</u>; 1938 Public Health Survey of Hamden, by Department of Public Health, Yale University School of Medicine ("1938 Public Health Survey"), p. 38, attached to Plaintiffs' Rule 56(a)(2) Statement as <u>Exhibit 56</u>; Downie Transcript, <u>Exhibit 57</u> at p. 50.* Residential building in the area began around 1920, only six years after the Town began realizing revenue from the issuance of building permits. *Residential Development Map, <u>Exhibit 77</u>; Cappelletti Affidavit, <u>Exhibit 58</u> at ¶ 14.* In 1925, the Hamden

Health Officer noted that dumps "can be located on waste land, swamps, etc. thereby eliminating mosquito breeding places and creating play-ground and public parks, much needed in this community." *1925 Hamden Annual Report, attached to Plaintiffs' Rule 56(a)(2) Statement as Exhibit 30.* In 1937, developers approached the Town to ask that the Newhall Street dump be developed for building purposes. *Hamden Board of Health Minutes, January 8, 1937, Exhibit 73.* Moreover, in 1938, the Hamden Board of Health believed that creating a recreational area on top of the Newhall Street dump added greatly to the area's land value. *1938 Public Health Survey, Exhibit 56 at p. 38; Downie Transcript, Exhibit 57 at p. 50.*

The Town acted recklessly, however, in issuing building permits to build on the land that had been filled by Winchester with its toxic, industrial waste. The risks of lead and arsenic contained in that waste were well known even in the 1920's and 1930's, when the Town began to issue permits to build homes in the Newhall Section. *Sargent Affidavit, Exhibit 74.* Indeed, the dangers of lead poisoning were well documented as early as the late 1800s. *Id. at 6.* The production of lead shot had been identified as an industry resulting in the lead poisoning of workers. *Id.* Known symptoms of lead poisoning in 1891 included colic, abdominal pain, vomiting, constipation, anemia, the blue line on gums, and alteration of menstrual function and miscarriage in women. *Id. at 7.* The risks associated with arsenic were also generally known in the early 1900s. *Id. at 10-11.* In industry, arsenic was used in the process of producing lead bird shot, a component of shotgun ammunition. Symptoms of arsenic poisoning were known by the 19th century, and included vomiting, severe muscle cramping and convulsions, resulting in death. *Id. at 11.* These facts and risks associated with lead and arsenic were therefore generally known when the Town of Hamden allowed Winchester to dump in the Newhall Section, as well

6

as when the Town issued building permits for residential development in the Newhall Section in the 1920s and 1930s.

The Town also maintained control over the dumps in the Newhall Section. As admitted by the Town in its Statement of Material Undisputed Facts, at various times throughout the 1930s and into the 1940s, the Hamden Health Officer would inspect both the public and private dumps to investigate nuisances. *Town of Hamden Statement of Material Undisputed Facts, ¶ 25.* The Town also employed caretakers to look after some of the dumps. *Id.* As of October 1, 1937, Hamden dumps were generally supervised by the Town, specifically by the Hamden Department of Public Works. *Id.* at ¶ 26. While under the supervision of the Department of Public Works, caretakers were also employed by the Town to look after some of the dumps. *Id.* Olin continued to dump its industrial waste in the Newhall Section during this time. *Reported Areas of Filling or Dumping Map, Exhibit 63; Downie Transcript, Exhibit 57 at pp. 13-14, 45-46, 103-107, 138-142.*

While there is evidence that the Town invited dumping for purposes of mosquito control in the early part of the 1900's, those concerns quickly abated; these activities did not continue in subsequent decades and were not used to justify the large-scale filling operations that occurred later on. *Hamden Board of Health Minutes, July 3, 1936, attached to Plaintiffs' Rule 56(a)(2) Statement as Exhibit 68; Hamden Board of Health Minutes, September 4, 1936, attached to Plaintiffs' Rule 56(a)(2) Statement as Exhibit 69; Hamden Board of Health Minutes, October 2, 1936, attached to Plaintiffs' Rule 56(a)(2) Statement as Exhibit 70; Hamden Board of Health Minutes, June 11, 1937, attached to Plaintiffs' Rule 56(a)(2) Statement as Exhibit 71; Hamden Board of Health, Report of Health Officer, July, 1938, attached to Plaintiffs' Rule 56(a)(2) Statement as Exhibit 72.* Rather, the less drastic solution of oiling mosquito-prone areas was

7

used. *Hamden Board of Health Minutes, July 3, 1936, <u>Exhibit 68</u>; Hamden Board of Health Minutes, September 4, 1936, <u>Exhibit 69</u>; Hamden Board of Health Minutes, October 2, 1936, <u>Exhibit 70</u>; Hamden Board of Health Minutes, June 11, 1937, <u>Exhibit 71</u>; Hamden Board of Health, Report of Health Officer, July, 1938, <u>Exhibit 72</u>.* Oiling involves the simple spraying of a coating of oil on the surface of standing water. *Id.* Indeed, mosquitoes were of such little concern during the 1930s that in most years they received no mention in Hamden's Annual Report.[7] *1929 Town of Hamden Annual Report, attached to Plaintiffs' Rule 56(a)(2) Statement as <u>Exhibit 34</u>; 1930 Town of Hamden Annual Report, attached to Plaintiffs' Rule 56(a)(2) Statement as <u>Exhibit 35</u>; 1931 Town of Hamden Annual Report, attached to Plaintiffs' Rule 56(a)(2) Statement as <u>Exhibit 36</u>; 1932 Town of Hamden Annual Report attached to Plaintiffs' Rule 56(a)(2) Statement as <u>Exhibit 37</u>; 1933 Town of Hamden Annual Report attached to Plaintiffs' Rule 56(a)(2) Statement as <u>Exhibit 38</u>; 1934 Town of Hamden Annual Report, attached to Plaintiffs' Rule 56(a)(2) Statement as <u>Exhibit 39</u>; 1935 Town of Hamden Annual Report, attached to Plaintiffs' Rule 56(a)(2) Statement as <u>Exhibit 40</u>; 1939 Town of Hamden Annual Report, attached to Plaintiffs' Rule 56(a)(2) Statement as <u>Exhibit 44</u>.* On the other hand, during the 1930s, there was substantial building of residential properties on top of the industrial fill. *Reported Areas of Filling or Dumping Map, <u>Exhibit 63</u>; Residential Development Map, <u>Exhibit 77</u>.*

In or about April 2001, the United States Environmental Protection Agency (the 'USEPA') conducted  surficial soil sampling on 76 private properties in the Newhall Section for the first time and analyzed these samples for a variety of contaminants including lead, arsenic,

---

[7] The Hamden Annual Reports are the primary source of Hamden's claim now that the massive filling operations then were to abate mosquito nuisance in the Newhall Section.  Accordingly, the Annual Reports must be looked at as a whole.

semivolatile organic substances and polyaromatic hydrocarbons.  *United States Environmental Protection Agency, Final Report, Site Investigation and Extent of Surface Soil Contamination Hamden Site, June 2001, p. 4, attached hereto as* <u>Exhibit A</u>.  All of the properties tested were found to be affected by similar types of hazardous substances.  *Id.*  Approximately 10% of the collected samples exceeded the "action level" developed by USEPA and the Connecticut Department of Environmental Protection ("CTDEP").  *Id.*  The CTDEP commenced an administrative proceeding against Olin and the Town which resulted in a Consent Order dated April 16, 2003.  The Consent Order is attached hereto as Exhibit B and was previously filed with the Court.

## III.     ARGUMENT.

### A.     Legal Standard.

Summary judgment is not warranted unless, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *LaFond v. General Physics Serv. Corp.*, 50 F.3d 165, 171 (2d Cir. 1995) (internal quotations and citations omitted).

The moving party has the burden of demonstrating the absence of any material factual issue genuinely in dispute.  *See Weissman v. General Cable Co.*, 862 F.Supp. 731, 735 (D.Conn. 1994).  "Once the  movant has satisfied its burden, the party opposing summary judgment must set forth specific facts showing that there is a genuine issue for trial."  *Eidshahen v. Pizza Hut of America, Inc.*, 115 F.Supp.2d 279, 281 (D.Conn. 1998) (internal quotation marks and citations omitted).

At the summary judgment stage, the trial court "is carefully limited to discerning whether there are any genuine issues of material fact to be tried, *not* to deciding them." *See LaFond*, *supra*, 171 (internal quotation marks and citations omitted, emphasis in original). In determining whether there is a genuine dispute as to any material fact, "the trial court is required to resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought." *Id.* "[I]f reasonable minds could differ in the interpretation of evidence that is potentially determinative under substantive law, summary judgment is not appropriate." *Edwards v. Community Enterprises, Inc.*, 2003 WL 1239288, *5 (D.Conn. 2003) (internal quotations and citations omitted) (copy attached as Exhibit C).

**B.    As the Town  Received Pecuniary Benefit from the Filling of the Newhall Section, It is Not Entitled to the Protections of Sovereign Immunity.**

Under Connecticut law, a municipality is liable for negligence in the performance of "proprietary" functions from which it "derives a special corporate profit or pecuniary benefit." *See* Conn. Gen. Stat.§ 52-557n(a). A proprietary function is an "act done in the management of [a city's] property or rights for its own corporate benefit or profit and that of its inhabitants." *Lyman v. Town of Fairfield*, No. CV-98-0354747, 2002 WL 230702, *3 (Conn. Super. Ct. Jan. 18, 2002) (quoting *Richmond v. Norwich*, 96 Conn. 588 (1921)) (copy attached as Exhibit D). "When municipalities are engaged in proprietary activities, their actions are not considered governmental and, accordingly, they do not enjoy immunity from negligence resulting from such activities." *Couture v. Bd. of Educ.*, 6 Conn. App. 309, 312 (1986).

The "distinction between governmental and proprietary acts is not drawn on the basis of whether the activity serves the public." *Accashian v. City of Danbury*, No. CV-97-0147228S, 1999 WL 27223, *2 (Conn. Super. Ct. Jan. 6, 1999) (copy attached as Exhibit E). Instead, the issue is whether the municipality's allegedly tortious actions were for the sake of corporate gain

10

rather than for the administration of government. *See Elliott v. Waterbury*, 245 Conn. 385, 413 (1998).

Connecticut courts have consistently held that the issue of whether the operation of a municipal landfill constitutes a proprietary or discretionary act involves questions of fact. *See Savelli v. Town of Windsor*, No. CV-97-0572274S, 1999 WL 1063405, *2 (Conn. Super. Ct., Nov. 2, 1999) ("Whether the operation and maintenance of the landfill transfer station is an exercise of a governmental or proprietary function involves several questions of fact.") (copy attached as Exhibit F) (copy attached as Exhibit F); *Accashian*, 1999 WL 27223, at *4 (Conn. Super. Ct., Jan. 6, 1998) ("[T]his court cannot conclude that there is no set of facts provable under the allegations of the complaint that would lead to the characterization of the operations at issue as proprietary rather than governmental"). In *Savelli v. Town of Windsor*, the court denied the Town of Windsor's motion for summary judgment because there existed a "dispute of material fact as to whether the landfill transfer station as operated is a proprietary or municipal function." *Savelli*, 1999 WL 1063405 at *2. Because a similar dispute of material fact exists as to whether the operation of the Newhall Section landfills are a governmental or proprietary function, summary judgment is inappropriate.

Significantly, in *Vaillancourt v. Town of Southington*, No. CV-01-0510816S, 2002 WL 1041381 (Conn. Super. Ct., Apr. 26, 2002) (copy attached as Exhibit G), the court denied a motion to strike based upon its finding that the "allegation that the town accepted commercial and industrial waste could give rise to the inference that it operated the landfill on a proprietary basis." *Vaillancourt*, 2002 WL 1041381 at *3. Similarly, the dumping of industrial waste from Olin's factory in New Haven allows the inference of pecuniary benefit in the present matter.

In its Motion for Partial Summary Judgment, the Town acknowledges disputed issues of fact involving the Town's operation of the Newhall Section landfills, thereby verifying the impropriety of summary judgment in this matter. *Defendant's Memorandum in Support of Motion for Partial Summary Judgment, p.9*. Among these admitted issues of dispute are:

1.  whether and the extent to which the Town established or operated or regulated public dumps in the Newhall Section;

2.  whether the Town solicited property owners in the Newhall Section to allow their properties to be filled in or used as a dumping ground; and

3.  whether the public dumps in the Newhall Section were town regulated or controlled or simply locations where the public dumped. *Id.*

These issues of fact are central to the determination as to whether sovereign immunity applies.

Because of these clearly disputed facts, the Town's Motion for Partial Summary Judgment focuses on the narrow issue of whether it received money from its operation of the Newhall Section landfills. This argument ignores the clear language of Conn. Gen. Stat. § 52-557n(a), which imposes negligence liability on a municipality which receives **any** "special corporate profit or pecuniary benefit." *See Accashian*, 1999 WL 27223, at *2. The extraordinary statutory exception to liability is not limited to the direct receipt of money. Therefore, the Town may not claim the protections of sovereign immunity if it received any special corporate profit or pecuniary benefit, in the form of monetary gain or otherwise, from its operation of the Newhall Section landfills.

Moreover, the facts show that the Town acted in a proprietary manner by operating the Newhall Section landfills for its own corporate benefit and pecuniary profit. First, the Town allowed the importation of out-of-town industrial waste for use as fill in the Newhall Section. *Reported Areas of Filling or Dumping, Exhibit 64; Downie Transcript, Exhibit 57 at pp. 13-14, 45-46, 103-107, 138-142.* This policy of trucking in waste from and permitting dumping by

out-of-town companies allowed the municipality to reap the benefits of development without having to incur the expense of draining and filling wetlands, with clean fill, associated with such activities.

Second, by permitting the dumping of industrial waste from Winchester and other outside sources, the Town converted unusable and unprofitable swampland into a tax-generating residential neighborhood.  As the Town had envisioned, this newly built community increased municipal tax revenue and led to growth in area property values.  *Cappelletti Affidavit, Exhibit 58 at ¶ 14; Hamden Board of Health Minutes, January 8, 1937, Exhibit 74; 1938 Public Health Survey, Exhibit 56 at p. 38; Downie Transcript, Exhibit 57 at p. 50.*  Residential building in the area began around 1920, only six years after the Town began realizing revenue from the issuance of building permits.  *Residential Development Map, Exhibit 78; Cappelletti Affidavit, Exhibit 58 at ¶ 14.*  In 1937, developers approached the Town of Hamden to ask that the Newhall Street dump be closed so that property in the area could be developed for building purposes.  *Hamden Board of Health Minutes, January 8, 1937, Exhibit 74.*  Moreover, in 1938, the Hamden Board of Health believed that creating a recreational area on top of the Newhall Street dump added greatly to the area's land value.*1938 Public Health Survey, Exhibit 56 at p. 38; Downie Transcript, Exhibit 57 at p. 50.*

As a result of its waste solicitation and dumping activities, the Town derived significant corporate profit and pecuniary benefit.  The Town received the benefit of filled wetlands at minimal expense.  Further, residential development of filled wetlands expanded the Town's tax base, increasing property values and transforming unusable wetlands into a tax-generating residential neighborhood.  These pecuniary benefits received by the Town  remove the protections of sovereign immunity and render the Town subject to negligence liability.

13

1.    **The Town of Hamden accepted industrial waste from an out-of-town company.**

The deposit of industrial waste in the landfills in the Newhall Section provided the Town with a pecuniary benefit.  According to the Town of Hamden Annual Reports, Winchester and the New Haven Water Company drained at least one tract of land in Hamden.  *1916 Town of Hamden Annual Report, Report of Health Officer, attached to Plaintiffs' Rule 56(a)(2) Statement as* _Exhibit 21_.  This expense is not reflected in the Town's financial documents, saving the Town the draining costs.  Further, its acceptance of industrial waste relieved the Town of the expense of massive quantities of clean fill, also conspicuously absent from the Town's financial documents, to accomplish the Town's goal of filling wetlands and low-lying areas. [8]   Through its association with Olin and acceptance of industrial waste in connection with its operation of the Newhall Section landfills, the Town received the benefit of free draining and free fill in massive quantities, both pecuniary benefits removing the Town from the umbrella of sovereign immunity.

Moreover, there is no governmental function served by operating a landfill for the benefit of a for-profit corporation from New Haven.  Why would the Town allow Olin to truck in massive quantities of industrial waste, without charging a fee?  The answer is simple; it was receiving massive amounts of fill which it wanted and did not have to pay for.  This allowed for the creation of an entire community complete with hundreds of homes, a school and a park.  In return, Olin received a dumping ground for the well-known toxic byproducts of its enormous New Haven industrial operation.  The Town's and Olin's activities in the Newhall Section stands in stark contrast to a town-run landfill used exclusively for household garbage for town residents

---

[8] While the Town now claims that the purpose of the draining and filling related to killing mosquitoes, the activities continued for decades after mosquitoes were not even mentioned in the Annual Reports.  Clearly, the purpose of the Town's program was to convert unusable and unprofitable wetlands and low-lying areas into a tax generating residential neighborhood, a school and a park.

only, and which, upon closure, does not convert into a large residential community, without being cleaned up first.

>       **2.      By permitting the dumping of industrial waste from outside sources, The Town converted unusable and unprofitable swampland into a tax-generating residential neighborhood, complete with hundreds of homes, a school and a park.**

The Town received pecuniary benefit apart from its acquisition of free drainage services and its receipt of massive amounts of fill.  By permitting the dumping of industrial waste, the Town converted unusable and unprofitable swampland into a tax-generating residential neighborhood, a school and a park.  Prior to 1900, the Newhall Section consisted largely of streams and associated wetlands.  *Downie Transcript, Exhibit 57 at pp. 44-45*.  As early as 1915, the Town solicited owners of private properties containing low lying areas to allow waste to be dumped as "fill" onto their properties.  *Notice in New Haven Register, July 15, 1915, attached to Plaintiffs' Rule 56(a)(2) Statement as Exhibit 60*.  Around this same time, in 1914, the Town began realizing revenue from the issuance of building permits.  *Cappelletti Affidavit, Exhibit 58 at ¶ 14*.  Consequently, residential development began in the Newhall Section in approximately 1920.  *Residential Development Map, Exhibit 77*.  Therefore, the Town has realized revenue from building permits issued in the Newhall Section and taxes from those homes since approximately 1920.  This revenue would not be possible without the filling of this area, which previously consisted of wetlands.  *Residential Development Map, Exhibit 77, Downie Transcript, Exhibit 57 at pp. 44-45*.

In addition to realizing revenue from the issuance of building permits, the Town of Hamden has reaped the benefit of an expanded tax base, a school property and a park, all of which accompanied the residential development of the Newhall Section.   As Hamden had envisioned, the newly-built Newhall community, in an area once dominated by swampland,

15

increased municipal tax revenue and led to growth in area property values. *1938 Public Health Survey,* Exhibit 56 *at p. 38; Downie Transcript,* Exhibit 57 *at p. 50.* As a result of its operation of the Newhall Section landfills, the Town derived significant corporate profit and pecuniary benefit in the form of an increased tax base and building permit revenues, thereby rendering the municipality subject to negligence liability.

**3.    The dumping of industrial waste over the course of fifty years in the Newhall Section of Hamden to combat a negligible mosquito nuisance did not constitute an act of discretion done in the interest of public health.**

In an effort to escape the reasonable conclusion of pecuniary benefit and the resulting liability, the Town repeatedly asserts that its acquisition of industrial waste and issuance of dumping permits were discretionary acts to address the potential dangers of malaria-infected mosquitoes. *Hamden's Memorandum in Support of Motion for Partial Summary Judgment, p.17.* However, although malaria was a concern in the Hamden area at the turn of the twentieth century, Hamden's Motion for Partial Summary Judgment grossly exaggerates the extent of the problem. Malaria concerns had largely abated when residential development began in the Newhall Section in the early 1920s and were essentially non-existent in the later years of the landfill operations. The mosquito problem was so minor that the Hamden Health Officer believed that it could be cured if residents would simply rid their homes of rain barrels and other pools of stagnant water. *1913 Town of Hamden Annual Report, Report of Health Officer, attached to Plaintiffs' Rule 56(a)(2) Statement as* Exhibit 16.

Mosquitoes were of such little concern that for many years the Hamden Health Officer requested a budgetary appropriation for "oiling," to combat the airborne pests. The oiling process, by which an infected area was sprayed with a chemical mix of kerosene or light fuel oil, was considered a far less drastic measure for dealing with a mosquito nuisance than the filling of

a wetland.  *Hamden Board of Health Minutes, July 3, 1936, attached to Plaintiffs' Rule 56(a)(2) Statement as Exhibit 68; Hamden Board of Health Minutes, September 4, 1936, attached to Plaintiffs' Rule 56(a)(2) Statement as Exhibit 69; Hamden Board of Health Minutes, October 2, 1936, attached to Plaintiffs' Rule 56(a)(2) Statement as Exhibit 70; Hamden Board of Health Minutes, June 11, 1937, attached to Plaintiffs' Rule 56(a)(2) Statement as Exhibit 71; Hamden Board of Health, Report of Health Officer, July, 1938, attached to Plaintiffs' Rule 56(a)(2) Statement as Exhibit 72*.  Even the remedy of oiling was not often necessary.  Town financial records reflect the expenditure of funds for abatement of mosquito nuisances only in 1929 and 1937-1941.  *Cappelletti Affidavit, Exhibit 58 at ¶ 15*.

By the 1930s, mosquitoes received almost no mention in Hamden's Annual Reports.  *1929 Town of Hamden Annual Report, attached to Plaintiffs' Rule 56(a)(2) Statement as Exhibit 34; 1930 Town of Hamden Annual Report, attached to Plaintiffs' Rule 56(a)(2) Statement as Exhibit 35; 1931 Town of Hamden Annual Report, attached to Plaintiffs' Rule 56(a)(2) Statement as Exhibit 36; 1932 Town of Hamden Annual Report, attached to Plaintiffs' Rule 56(a)(2) Statement as Exhibit 37; 1933 Town of Hamden Annual Report, attached to Plaintiffs' Rule 56(a)(2) Statement as Exhibit 38; 1934 Town of Hamden Annual Report, attached to Plaintiffs' Rule 56(a)(2) Statement as Exhibit 39; 1935 Town of Hamden Annual Report, attached to Plaintiffs' Rule 56(a)(2) Statement as Exhibit 40; 1939 Town of Hamden Annual Report, attached to Plaintiffs' Rule 56(a)(2) Statement as Exhibit 44*.  Similarly, mosquito concerns remained largely absent from the Town's Annual Reports in the 1940s, as the Town expended no funds for the abatement of mosquito nuisances from 1942 through 1959.  *Cappelletti Affidavit, Exhibit 58 at ¶ 15*.  In addition, malaria was only mentioned once in the Town's Annual Reports from 1920 through 1950.  *Town of Hamden Annual Reports, 1920-1950,*

*Exhibits 25-55*.  Therefore, while Hamden asserts that an imminent malaria epidemic justified the municipality's solicitation and dumping of out-of-town industrial waste, a review of the Town of Hamden Annual Reports reveals that such concerns simply were not prevalent during the operation of the landfills.  The Town's effort to dress up its operation of these landfills as a discretionary governmental function is therefore unavailing.  Hamden's solicitation of industrial waste from out-of-town companies and subsequent dumping thereof in the Newhall Section simply are not acts of discretion to which sovereign immunity applies.

### C.     The Town Is Also Liable Because It Acted In Reckless Disregard of Public Health and Safety.

The Town is also liable to the Plaintiffs because it acted with reckless disregard for health and safety when it issued permits to build homes on the properties that had been filled with Winchester's toxic industrial waste.  While Connecticut General Statutes sections 52-557n(b)(7) and (b)(8) generally apply sovereign immunity to a municipality's issuance of permits or failure to make adequate inspections of property, this protection is not available where the municipality acts with reckless disregard for health or safety.  These statutes state:

> (b)  Notwithstanding the provisions of subsection (a) of this section, a political subdivision of the state or any employee, officer or agent acting within the scope of his employment or official duties shall not be liable for damages to person or property resulting from:

> (7)  the issuance, denial, suspension or revocation of, or failure or refusal to issue, deny, suspend or revoke any permit, license, certificate, approval, order or similar authorization, when such authority is a discretionary function by law, unless such issuance, denial, suspension or revocation or such failure or refusal constitutes a *reckless disregard for health or safety*;

> (8) failure to make an inspection or making an inadequate or negligent inspection of any property, other than property owned or leased by or leased to such political subdivision, to determine whether the property complies with or violates any law or contains a hazard to health or safety, unless the political subdivision had notice of such a violation of law or such a hazard or unless such failure to inspect or

such inadequate or negligent inspection constitutes a *reckless disregard for health or safety* under all the relevant circumstances.

The cases cited by the Defendant in its Motion for Partial Summary Judgment confirm this plain meaning of the statutory language. *See Maresca v. City of New Britain*, No. CV-92-0292537S, 1994 WL 228456, *3 (Conn. Super. Ct. Apr. 7, 1994) ("The issuance of building permits and certificates of occupancy are governmental functions. In order to sustain a cause of action under General Statutes § 52-557n(b)(7), the plaintiff must allege that the failure to issue or issuance of any permit or certificate constituted a reckless disregard for health or safety") (copy attached as Exhibit H); *Farnsworth v. Horrigan*, No. CV-950373914S, 1999 WL 49393, *2 (Conn. Super. Ct. Jan. 22, 1999) ("Inasmuch as the duty is discretionary, liability would attach in this situation only if the ... issuance ... or failure or refusal to issue ... [such] permit ... [or] certificate ... constitutes[s] [sic] a reckless disregard for health and safety, § 52-557n(b)(7)") (copy attached as Exhibit I); *Prestia v. Zajac*, 1992 WL 231351, *2 (Conn. Super. Ct. Sept. 15, 1992) ("[T]he plaintiff' s recovery can result if he alleges and proves that the denial of an issuance of a building permit constituted a reckless disregard for health or safety") (internal quotation marks and citations omitted) (copy attached as Exhibit J). Accordingly, if the Town acted with reckless disregard for health and safety, the immunity protections of Conn. Gen. Stat. §§ 52-557n(b)(7) and (b)(8) do not apply.

Recklessness requires either "knowledge of the serious danger to others [or] knowledge of facts which would disclose this danger to any reasonable man . . . ." *Matthiessen v. Vanech*, 266 Conn. 822, 832 (2003) (internal quotation marks and citations omitted). *See also Sanchez v. Town of New Milford*, No. CV-01-0453299S, 2004 WL 1730198, *6 (Conn. Super. Ct., July 7, 2004) (copy attached as Exhibit K). "The state of mind amounting to recklessness may be inferred from conduct ... [where there is] ... something more than a failure to exercise a

reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them." *Id.* at 832 (internal quotations and citations omitted).

In a recent Connecticut decision, *Kurzyna v. City of New Britain*, No. CV-00-0504388S, 2002 WL 1008450 (Conn. Super. Ct. Apr. 11, 2002) (copy attached as Exhibit L), the court held that by virtue of its claim that "the city was aware that it had disposed of industrial sludge on the plaintiff's property ... [and] failed to inspect the property for contamination," the plaintiff had sufficiently alleged "conduct by the city that constitutes a reckless disregard for the health and safety of others." *Kurzyna v. City of New Britain*, 2002 WL 1008450, *5.  Accordingly, the court applied the exceptions to sovereign immunity under Connecticut General Statutes sections 52-557n(b)(7) and (b)(8) to deny the defendant municipality's motion to strike. *Id.*

In the instant case, because the Town displayed a reckless disregard for the health and safety of Newhall Section residents, the immunity protections of Connecticut General Statues sections 52-557n(b)(7) and (b)(8) are not applicable.  When the Newhall Section was being filled, the health and safety dangers associated with lead and arsenic were well known.  *Sargent Affidavit, Exhibit 74*.  As previously discussed, the dangers of lead poisoning were well documented as early as the late 1800s, and the production of lead shot had been identified as an industry resulting in the lead poisoning of workers.  *Id.*  Known symptoms of lead poisoning in 1891 included colic, abdominal pain, vomiting, constipation, anemia, the blue line on gums, and alteration of menstrual function and miscarriage in women.  *Id. at 7*.  The risks associated with arsenic were also generally known in the early 1900s.  *Id. at 10-11*.  In industry, arsenic was used in the process of producing lead bird shot, a component of shotgun ammunition.  Symptoms of arsenic poisoning were known by the 19th century, and included vomiting, severe muscle cramping and convulsions, resulting in death.  *Id. at 11*.

20

Given the potential risk posed by these substances, the Town should have inspected the Newhall Section property for contamination, *see Kurzyna*, *supra*, or at least inquired as to the contents of the deposited waste before allowing the dumping and then issuing permits for residential construction at the dumping sites.  It is noteworthy that the Town was already aware of the danger posed by certain classes of wastes, and accordingly, prohibited the dumping thereof in its public facilities.  *See 1917 Town of Hamden Annual Reports, Report of Health Officer, p. 36*, *attached to Plaintiffs' Rule 56(a)(2) Statement as* <u>Exhibit 22</u>.  No such consideration, however, was granted to the industrial waste imported and deposited by Olin.  Therefore, by permitting the dumping of industrial waste without inquiring as to its contents, the Town engaged in 'highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent."  *See Matthiessen*, *supra*, 833.  In so doing, The Town acted in reckless disregard for the health and safety of Newhall residents.[9] Accordingly, Connecticut General Statutes sections 52-557n(b)(7) and (b)(8) are inapplicable to this case as these provisions do not provide immunity to a municipality whose actions constitute a reckless disregard for health or safety.[10]

---

[9] Moreover, this case is not about the negligent issuance of a single building permit by a building inspector who just missed something.  Rather, this case concerns a Town scheme to fill acres of wetlands and low-lying areas with industrial waste, level the dumps off, and create a neighborhood, school and park.  It then issued hundreds of building permits and generated tax revenues from the homes built on the toxic dumps.  The sum of this activity was reckless.

[10] In a footnote, more likely resulting from byproduct than forethought, Hamden asserts that its actions are protected under Connecticut General Statutes section 52-557n(b)(9), which provides immunity for the "failure to detect or prevent pollution of the environment ... by individuals or entities *other than the political subdivision*."  (Emphasis added).  This argument is unavailing as while § 52-557n(b)(9) applies  only to a municipality' s failure to detect or prevent pollution of entitles "other than the political subdivision," here, the Town of Hamden was an active participant in the solicitation of industrial waste and the operation of the Newhall Section landfill.  Because Hamden is itself responsible for polluting the Newhall Section, Conn. Gen. Stat. § 52-557n(b)(9) is, on its face, inapplicable. *See Accashian*, *supra*, at *4.

**D.    Even if the Court Were to Consider the Motion with respect to the Nuisance Count, the Town is Liable for Nuisance Because it Engaged in Numerous "Positive Acts."**

The Town also argues that the Plaintiffs' claims for nuisance must fail because the Plaintiffs have not shown that a nuisance was created by some "positive acts" of the Town. Although, on its face, this argument goes beyond the issue of sovereign immunity to which the Town's motion was supposed to be limited at this time, there is some authority analogizing the "positive act" requirement for nuisance with concepts of governmental immunity.    *See Keeney v. Town of Old Saybrook*, 237 Conn. 135, 164 (1996).

Assuming the Court believes it is appropriate to address the Town's nuisance argument at this time, without permitting the Plaintiffs to conduct discovery on the substantive nuisance claim pursuant to Fed. R. Civ. P. 56 (f)[11] the evidence Plaintiffs have gathered to date demonstrates that, once again, there are disputed issues of fact.  Indeed, there is evidence of several "positive acts" that the Town took to create the nuisance at issue in this  case:

- It was a "positive act" when the Town invited Winchester to dump their waste in the Newhall Section in the first place;

- It was a "positive act" when the Town operated and maintained the Newhall dumps; and

- It was a "positive act' when the Town issued building permits to build homes on top of Winchester's toxic waste.

These acts go far beyond the non-action that the Court found sufficient in *Keeney* for the imposition of nuisance liability, or the very limited action that the Court found sufficient in *Esposito v. New Britain Baseball Club, Inc.,* 48 Conn. Supp. 643, 645 (2004) (copy attached as Exhibit M) -- the two cases relied upon by the Town in its memorandum.  Here, it was the Town

---

[11] The Plaintiffs respectfully submit that the substantive nuisance claims should be addressed in due course pursuant to the Case Management Order after the Plaintiffs have been afforded the opportunity to conduct full discovery on the issue in accordance with the Case Management Order.

that set in motion the whole series of events that led to the troubling position in which the Plaintiffs now find themselves, and the Town played a role every step of the way. There is, at the very least, a disputed issue of fact as to whether the Town took a "positive act" toward the creation of the nuisance presented here.

## IV.    CONCLUSION.

In order for the Town to succeed on its Motion for Partial Summary Judgment, it must prove that there are no material issues of fact in dispute. The instant case, however, clearly presents a factual question as to whether the Town's landfill operations invoke the sovereign immunity protections of Connecticut General Statutes section 52-557n(a)(2). There is substantial evidence that the Town received pecuniary benefits from the operation of the landfills in the form of massive quantities of fill for wetlands and low-lying areas in Hamden, an increased tax base, and park and school property. Moreover, the dumping of industrial waste from Olin's factory in New Haven allows the inference of pecuniary benefit in the present matter. The Town is also liable because it acted with reckless disregard for health and safety when it invited Winchester to dump its toxic waste in the Newhall Section and then issued permits to build homes on top of the toxic waste. Because this matter presents genuine issues of material fact, the Town's Motion for Partial Summary Judgment must fail.

THE PLAINTIFFS,


By_____

    David B. Zabel, Esq. ct01382
    dzabel@cohenandwolf.com
    Monte E. Frank, Esq. ct13666
    mfrank@cohenandwolf.com
    Alison Clark, Esq. ct25761
    aclark@cohenandwolf.com
    Cohen and Wolf, PC
    1115 Broad Street
    Bridgeport, Connecticut 06604
    Tele:  (203) 368-0211
    Fax:   (203) 394-9901

    Mark Roberts, Esq.
    mroberts@mcrobertslaw.com
    Andrew Rainer, Esq.
    arainer@mcrobertslaw.com
    Jennifer Currie, Esq.
    jcurrie@mcrobertslaw.com
    McRoberts, Roberts & Rainer, L.L.P.
    53 State Street
    Boston, Massachusetts 02109
    Tele: (617) 722-8222
    Fax:  (617) 720-2320

    Neil T. Leifer, Esq.
    nleifer@tenlaw.com
    David C. Strouss, Esq.
    dstrouss@tenlaw.com
    Brad J. Mitchell, Esq.
    bmitchell@tenlaw.com
    Thornton & Naumes L.L.P
    100 Summer Street, 30th Floor
    Boston, Massachusetts 02110
    Tele: (617) 720-1333
    Fax:  (617) 720-2445

## <u>CERTIFICATION</u>

This is to certify that a copy of the foregoing was mailed First Class, postage prepaid, on this 9th day of March, 2005, to the following:

**<u>Olin Corporation</u>**:

Sandra K. Davis, Esq.
Mark S. Baldwin, Esq.
Brown Rudnick Berlack Israels, LLP
185 Asylum Street, 38th Floor
Hartford, CT 06103-3402

Michael Wetmore, Esq.
Joel Samson, Esq.
Husch & Eppenberger, LLC
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105

**<u>The Town of Hamden</u>:**

Ann Catino, Esq.
Joseph G. Fortner, Jr., Esq.
Thomas Blatchley, Esq.
Halloran & Sage LLP
225 Asylum Street
Hartford, CT 06103-4303

_____
Alison K. Clark