UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CLARENCE R. COLLINS, JR., et al. | : | 3:03-CV-945 (CFD) |
| | : | |
| Plaintiffs, | : | |
| | : | |
| V. | : | |
| | : | |
| OLIN CORPORATION, et al. | : | |
| | : | |
| Defendants. | : | APRIL 8, 2005 |

**DEFENDANT TOWN OF HAMDEN'S REPLY MEMORANDUM TO PLAINTIFFS'
OPPOSITION TO TOWN OF HAMDEN'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant, Town of Hamden ("Town"), respectfully submits this memorandum in reply to plaintiffs' March 9, 2005 Memorandum in Opposition to Town's Motion for Partial Summary Judgment ("Opp.Memo"). Because plaintiffs agree in large measure with all the facts relating to and supporting the Town's Motion for Partial Summary Judgment and fail to offer any material facts in opposition, the Town is entitled to summary judgment.

Plaintiffs' entire opposition rests not upon facts but upon two theories: (1) the Town profited from the filling of the Newhall area, either because it may have received a direct payment from Olin or it received an indirect benefit because the filling allowed swamp land to be converted into income-producing property (i.e., to revenue from building permit fees or residential property taxes), and (2) by allowing houses to be built almost 60-100 years ago, the Town acted recklessly as it should have known then that to use this fill was potentially hazardous to human health. Strikingly, these theories are devoid of **FACTS**. Despite plaintiffs' obligation at this stage to offer facts -- not conjecture -- to establish triable issues, they have failed to do so. While they have repetitiously restated their speculative theories, repetitively proclaiming their theories do no transform their allegations into facts. Because facts -- not postulates -- are required, plaintiffs have failed to carry their burden to defeat summary judgment.

I. **PLAINTIFFS OFFER NO MATERIAL FACTS REFLECTING THAT THE TOWN RECEIVED PECUNIARY BENEFITS**

Plaintiffs' entire argument is that the Town reaped a pecuniary benefit because it allowed Olin/Winchester to deposit "fill" on the various properties, and then gained financially through the development of the area and income derived from the issuance of building permits and increased residential property taxes. Were this argument to be accepted, virtually every activity of local governments would be "proprietary." Every municipal act approving residential development, public parks, schools, open space designations, improved fire and police departments, repaving roads, permitting increased retail and commercial development, or providing public amenities that benefit the community and raise property values would negate governmental immunity, as the consequence is inevitably an enhancement of the tax and revenue base. Well over 100 years of public administration concepts are turned upside down, and virtually all statutory and common law protections afforded under the doctrine of governmental immunity are undone. Yet, leaving aside plaintiffs' efforts to re-write basic Connecticut law, their opposition fails for a more fundamental reason -- they lack facts and supporting law.

The plaintiffs are obligated to identify affirmative, factual evidence in support of their opposition. They must demonstrate more than "some metaphysical doubt as to the material facts, ... [they] must come forward with specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "Thus, the mere possibility that a factual dispute [m]ay exist, without more, is not sufficient to overcome a convincing presentation by the moving party." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980). Plaintiffs did not "bring to the district court's attention some affirmative indication that their version of the events is [more than] fanciful." *Id.* At no time do they offer any affirmative facts independent of those of the Town. If a non-moving party only offers conclusory allegations or unsubstantiated speculation, summary judgment should be

granted. *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998); *see also Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986), *cert. denied*, 480 U.S. 932 (1987) (mere speculation or conjecture as to the true nature of the facts may not overcome a motion for summary judgment). Nor may a party create a genuine issue of material fact by presenting contradictory or unsupported statements. *See SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978). When, as here, a motion for summary judgment is supported by documentary evidence and sworn affidavits, the non-moving party must present significant probative evidence. *Love v. Granby*, 2004 WL 1683159, *1 (D. Conn. July 12, 2004) (Copy attached as Exh. A). Here plaintiffs have not produced specific particularized facts or probative evidence to counter the Town's evidence and affidavits.

Plaintiffs' failure to cite to specific facts after extensive discovery where they poured over the Town's ancient (one-hundred years or more) archives, demonstrates that they cannot contradict the facts offered by the Town. Nearly all plaintiffs' material facts are based initially upon agreement with the Town's facts. Then, the plaintiffs' engage in conjecture and speculation, without any further reference to additional supporting facts, statements or admissible evidence.[1] Consequently, plaintiffs' reliance upon such conclusory allegations, denials, improbable inferences, and unsubstantiated speculation as a vehicle for obtaining a trial is unavailing. *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

---

[1] In their Opposition, plaintiffs seek to rely upon certain documents which are inadmissible. For example, Exhs. 60 (Notice in *New Haven Register* (July 15, 1915)), 61 (Notice in *New Haven Register* (April 30, 1916)), and 64 (Map of Backyard Nature Man, Book One: My Boyhood to Manhood Years in Old Highwood Village, Anthony V. Cosenza, III (1993)) of Plaintiffs' Rule 56(a)(2) Statement are inadmissible hearsay, as privately printed books or publications are not received as evidence of any fact stated in them. *See Ziering v. New York City Dep't of Health*, 621 F Supp. 679, 681 n. 4 (S.D.N.Y. 1985) (newspaper articles are summarily rejected as obvious hearsay). Hearsay is inadmissible in summary judgment proceedings to the same extent it is inadmissible in trial. *Bombard v. Fort Wayne Newspaper, Inc*, 92 F.3d 560, 562 (7th Cir. 1996). Because such documents violate FED. R. CIV. P. 56(e) and L. CIV. R. 56(a)(3), both of which require that the evidence presented must be admissible at trial, they cannot be relied upon to defeat summary judgment.

Among Plaintiffs' many attempts to obfuscate is their contention that filling of wetland areas permitted the *Town* to convert large tracts of unusable land into hundreds of homes, a school and a park, thus increasing the tax base and property values in the area. *See* Opp.Memo. at 2, 5-6, 13, 15-16 & 23; plaintiffs' Local Rule 56(a)(2) Statement of Facts and Facts in Dispute ("56(a)(2) Statement") at ¶¶ 9, 16, 32, 33, 35, 37, & II.3. In making this claim, Plaintiffs gloss over the fact that the Town *was not and is not a developer*. Moreover, none of the references cited support Plaintiffs contention. Plaintiffs offer no evidence that the Town embarked on a concerted effort to develop these properties with the intention of realizing a special corporate profit or pecuniary benefit from the issuance of building permits or collection of property taxes. Plaintiffs further fail to offer facts that the Town owned or operated any of these properties at the time of dumping; that the Town "created an entire community," Opp.Memo. at 2, or that the Town had a master plan of development for the area. In sum, Plaintiffs' postulate without any Town reports, plans of development, Town minutes or other official records in support.

As to the collection of building permit fees, plaintiffs agree that Towns currently do not expect that a profit will be generated. *See* 56(a)(2) Statement at ¶ 32. But, they offer no evidence to suggest that this expectation did not exist from the 1900s to the 1950s. Nor do they offer any evidence to counter Robert Cappelletti's statements that fees for licenses and permits are collected for the purpose of defraying the Town's administrative costs. *See* December 15, 2004 Affidavit of Robert V. Cappelletti, CPA, at ¶¶ 18-19 (Attached to Town's Local Rule 56(a)(1) Statement of Facts dated December 15, 2004 as Exh. 60). Recognizing that the Town began collecting building permit fees in 1914, the plaintiffs fail to offer facts demonstrating a profiteering motive. By the same token, plaintiffs did not produce evidence of revenues exceeding the level of expenditures, which would result in a profit. Despite their unfettered access to the Town's archives over a 12-month period of time, plaintiffs point to no statement in

the historical Town documents reflecting that a Town Selectman -- or any elected or appointed official -- designated the Newhall area as ripe for residential development and then engaged in a campaign to develop for the purpose of realizing a corporate profit.

Plaintiffs similarly do not present any facts showing that Olin/Winchester paid the Town to dump in the Newhall area. Remarkably, in the context of a Motion for Summary Judgment, when faced with the hard evidence that the Town's official financial records show no revenue from such dumping (despite the fact that references as obscure as $ 14.00 for a fireworks permit in 1929 are cited), the plaintiffs ask the court to infer that the Town received a pecuniary benefit. Opp.Memo. at 11. Unlike the situation in *Vaillancourt*,[2] Plaintiffs are not entitled to *any* inferences at this stage, given their failure to present any countervailing evidence.

Wholly lacking evidentiary support for their claim that Olin/Winchester paid the Town to deposit its waste and fill on properties in the Newhall area, plaintiffs next argue that the Town indirectly profited or benefited, by *freely* accepting the fill "it wanted." Opp.Memo. at 13-14. Plaintiffs' contentions fail here, too, as they offer no evidence of the facts which, if believed, might support that conclusion.[3] Plaintiffs also challenge, again without factual support,[4] the Town's proof that the filling was done for purposes of mosquito control, *id.* at 2, 14 & 16, and

---

[2] Plaintiffs' reliance upon *Vaillancourt v. Southington*, No. CV-01-0510816S, 2002 WL 1041381 (Conn. Super. Ct. April 26, 2002) (Copy attached as Exh. B) is ill-founded. That case was decided in the context of a Motion to Strike, the state court equivalent of a Motion to Dismiss under FED. R. CIV. P. Rule 12(b)(6). Thus, while there an "allegation" that the defendant "accepted commercial and industrial waste" sufficed to permit an inference that of a "proprietary" purpose, here plaintiff *has not provided any admissible evidence* of such "acceptance" (especially for remuneration) which might allow such an inference to be drawn. Hence, plaintiff has neither factual nor legal authority to allow for the inference it seeks.

[3] For instance, they fail to show that the Town "wanted" fill, or that it would have paid for the filling of the wetlands, or, for that matter, that the wetlands would have been filled in. Plaintiffs' arguments, in fact, run dangerously close to the boundaries of FED. R. CIV. P. 11, as they offer no factual references and spin theories without a thread of support. This pattern began with Plaintiffs' October 27, 2003 Opposition to Town's Motion to Dismiss (where plaintiffs referred -- without a scintilla of factual support or even an allegation -- to an Olin/Town "joint venture", inferring a financial relationship and payments to the Town).

[4] At best, plaintiffs cite the lack of annual references to the mosquito problem, Opp.Memo. at 7-8, 14 & 17-18, as well as their hypothesis that the problem was not terribly severe as it could be solved by residents own actions, *id* at 16, or through a "less drastic solution" of oiling. *Id* at 7-8.

conclude that filling was chosen because the Town wanted to create developable land for an enhanced tax base. *Id.* at 2 & 13-16. Nowhere is there a supportive factual reference.

Whether it is discussed annually or not, the Town's reports clearly suggest a recurring, periodic, widespread and serious public health threat relating to mosquitoes. This was particularly acute in the Newhall Section due to the large swampy tracts, and it was confronted by a variety of methods – draining, ditching, oiling, filling and through individual initiatives, 56(a)(1) Statement, Exhs. 21-25, 46 & 64, depending upon what was available at the time. *See* Affidavit of Muriel Robinette, PG ("Robinette"), dated April 8, 2005 (Copy attached as Exh. C) at ¶ 17 & 19. The plaintiffs' historical revisionism, made without any countervailing evidence, should be disregarded, as the historic record presented by the Town leads to the undisputed conclusion that the filling was done to eradicate the swamps in order to eliminate risks from mosquitoes and disease.

Even without this, the plaintiffs' argument still collapses under its own weight. Assuming *arguendo*, that the Town wanted the Newhall area filled for purposes of a public park, the construction of residential properties, or to enhance the general aesthetics of the community, Opp.Memo. at 13-14, this does not translate into an activity for profit or pecuniary benefit.

Finally, plaintiffs offer no pertinent judicial authority supporting their claim that fees collected for issuing building permits constitutes a "pecuniary benefit" which would deny the Town sovereign immunity. Nor do they cite legal support for their theory that the revenue from additional residential property taxes or enhanced property values due to public improvements undertaken for the public good constitutes a corporate gain. Such novel arguments are truly ground breaking and, if accepted, would destroy sovereign immunity in virtually all cases.

## II. PLAINTIFFS OFFER NO FACTUAL SUPPORT FOR THEIR CLAIM THAT THE TOWN ACTED RECKLESSLY

Consistent with the rest of plaintiffs' opposition, no facts are offered that the Town knew or should have known that the fill material contained lead or arsenic and, thus, acted in reckless disregard of public health and safety. Plaintiffs' naked assertions regarding the Town's duties to investigate properties, reliance on a single, easily distinguishable case, and blatant failure to acknowledge the history of environmental science and law illustrate the paucity of plaintiffs' arguments.

Plaintiffs pin their hopes on the Affidavit of James D. Sargent, M.D., dated March 8, 2005 ("Sargent") (Exh. 74 of 56(a)(2) Statement). This affidavit consists of opinion testimony (not facts) which is nothing more than simple denials of the Town's Motion. Sargent never addresses what the Town officials knew or should have known about lead and arsenic in the fill at the time it was placed in the Newhall area or when the building permits were issued, nor even what society's view during the relevant period was about the presence of lead and arsenic. Thus, while it may be potentially interesting to learn about what Pliny the Elder knew, it is irrelevant to what the Town's elders knew or what they should have done with that knowledge.

Plaintiffs claim that the Town is liable because it acted with reckless disregard for health and safety when it issued building permits to construct homes on land that had been filled with Olin/Winchester's waste materials. Opp.Memo. at 2, 18 & 20. This contention presupposes, however, that the Town had a duty from 1900 to 1950s to monitor what was placed in wetland areas (which was largely on private property), Robinette at ¶ 18, and to investigate what was in the fill material deposited in wetland areas. It cannot be said -- and plaintiffs do not provide a factual basis to conclude -- that the Town had a reason to investigate *at that time*, especially since environmental regulations, and the Federal and State agencies governing the same, did not

exist until the mid- to late-1900s, primarily from 1970 through the present. *Id.* at ¶¶ 11-15 & 20-22. The lack of regulation of lead and arsenic at the time (and its prevalence) reflects the lack of any duty on the Town to inquire about the nature, degree and extent of such substances.[5] Despite plaintiffs' unsupported rhetoric regarding what the Town knew or should have known, the facts clearly show that the Town did not know of the ill-effects of lead and arsenic, nor was it required to know (or should have known) of any potential dangers at that time. *Id.* at ¶¶ 11-15 and 20-22.

Plaintiffs' reliance on *Kurzyna v. New Britain*, No. CV-00-0504388S, 2002 WL 1008450 (Conn. Super. Ct. Apr. 11, 2002) (Copy attached as Exh. D) is misplaced. There, plaintiff alleged that the City of New Britain (the "City") was aware that *it* had dumped nearly four million gallons of industrial sludge and/or other contaminants on plaintiff's property and then subsequently issued building permits to plaintiff. *Id.* at *1, 5. Here, there is neither an allegation nor proof that the Town actually dumped any material on plaintiffs' properties. Of equal significance is the close proximity between when the alleged dumping in Kurznyna occurred and the issuance of building permits in 1985 and 1986, a time when, arguably, the City might have known about the impact of materials in its own "sludge" disposed by the City on those properties. In contrast, the "fill" was from Olin/Winchester, the properties were not owned by the Town, and the disposal was done long before society's concerns about the environment arose. Robinette at ¶ 18, 20-22. Indeed, Plaintiffs cite no authority that even now, when building permits are issued, it has an obligation to investigate whether any constituents exist in "fill" that may have been placed by third-parties on that site.

---

[5]   Indeed, the analytic methods and technology used to measure lead and arsenic were not developed and implemented until the 1950s. Robinette at ¶ 22. However, such technologies were not readily used until well into the 1970s, and thereafter, upon promulgation of environmental laws and regulations. *Id.* at 22. Given that residential homes in the Newhall area were constructed at various times between the late 1800s-1960, coupled with the fact that lead and arsenic concentrations appear at varying depths and locations (with some properties below regulatory standards), *id.* at ¶ 24-26, plaintiffs' argument that the Town knew or should have known is without merit.

Plaintiffs' fail to recognize that historic Town and State Building Ordinances/Codes have never required subsurface investigation for what is now considered "hazardous waste." Plaintiffs would ask the court to hold that regulations have always governed environmental contamination and thus required building officials to conduct investigations of the same prior to the issuance of building permits. Plaintiffs do not and cannot cite any Ordinance, Codes or other authority imposing such a duty. Even now, the Town's Building Ordinances and State Building Code have not and do not require applicants to submit subsurface investigation reports regarding the nature, extent and/or characterization of environmental contamination; these ordinances and codes seek to protect property and public health and safety through, *inter alia*, the regulation of construction, development, alteration and demolition of buildings and structures.[6]

Similarly, plaintiffs' claim that the presence of any lead has been considered impermissible since Roman times ignores that the above ordinances and codes endorsed the use of lead in building plumbing and gas piping systems *through at least 1960*.[7] Lead was permitted for, *inter alia*, piping for water distribution systems and the caulking of joints between pipes. *See supra*, n. 7. Plaintiff's so-called expert's failure to account for the widespread use of lead, arsenic and their ubiquitous nature, s*ee* Robinette at ¶¶ 5, 6, 8, and 9, negates plaintiffs' so-called support. Likewise, plaintiffs also offer no explanation for the increased used of arsenic from the early 1900s through the mid-1900s, Sargent at 11-12, despite their contention that "[t]he risks associated with arsenic were ... generally known in the early 1900s." Opp.Memo. at 20. In sum, Plaintiffs miss the big picture. Lead and arsenic are ubiquitous and were widely used in a

---

[6] *See* 1914 Town Building Ordinances ("1914 Ordinances"), Town Meetings, Vol. 5 at § 1 (copy of relevant provisions as Exh. E ); 1947 State Building Code (1st ed. 1947) ("1947 Code") at §§ 100 & 101(1) (copy of relevant provisions attached as Exh. F); 1954 Town Building Ordinances (Rev'd 1954) ("1954 Ordinances") at § 100 (copy of relevant provisions attached as Exh. G); 1960 Town Code ("1960 Code") at §§ 100.2 & 100.3 (copy of relevant provisions attached as Exh. H).

[7] *See* 1914 Ordinances (Plumbing Ordinance) at § 12; 1947 Code at §§ 1700(4)(h), (4)(i), (5)(c), (5)(d), (5)(g), (5)(h), 1700(7)(h), 1700(10)(a), 1700(11)(e); 1954 Code at §§ 1204.3, 1204.7, 1204.8, 1206.8, 1209.1, 1210.5; 1960 Code at §§ 1203.8, 1203.9, 1204.3, 1204.7, 1204.8, 1204.11, 1206.8, 1209.1, 1210.5.

Case 3:03-cv-00945-CFD    Document 142    Filed 04/08/2005    Page 10 of 12

number of settings, especially in the early to mid-1900s and continue to be used. Robinette at ¶ 5-9. Lead and arsenic are also not found homogeneously throughout the Newhall neighborhood which was developed at various times between 1900-1960s. Finally, based upon current data, lead and arsenic in the Newhall area poses no current health risk. And, the investigations conducted to date reveal varying concentrations of lead and arsenic, above and below today's standards. *Id.* ¶ 25-26. Thus, plaintiffs' bald assertions regarding the dangers of lead and arsenic require careful scrutiny. *See id.* at ¶¶ 34-37. Simply put, the plaintiffs have not produced any credible, factual evidence of what the Town (and its officials) knew or should have known about the presence of lead and arsenic in the Newhall area at the time of filling or building permit issuance. And, curiously, they have not even claimed damages resulting from any health effects.

## III. CONCLUSION

Summary judgment is a useful tool for unmasking frivolous claims and putting a swift end to meritless litigation. *Quinn*, 613 F.2d at 445. Plaintiffs' claims amount to unsupported posturing, warranting summary disposition due to plaintiffs' failure to offer *any specific evidence* contradicting the evidence presented by the Town, which might leave factual disputes to be resolved at trial.[8] Where, as here, "the defendant demonstrates that there is no evidence to support an essential element of the plaintiff's claim, then trial would be a bootless exercise, fated for an inevitable result but at continued expense for the parties, the preemption of a trial date that might have been used for other litigants waiting impatiently in the judicial queue, and a burden on the court and the taxpayers." *Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1043 (2d Cir. 1986). Plaintiffs' failure to cite specific evidence and law contradicting the Town's Motion is unavailing, and thus the Town should be granted partial summary judgment.

---

[8] Plaintiffs' vociferous contention that the Town is precluded from summary judgment for any nuisance claim is without merit. Opp.Memo. at 3 & 22. Plaintiffs' nuisance claim evolves out of the exact same facts, record and universe by which this Court must adjudicate the parallel question of governmental immunity and thus is ripe for judicial review. Plaintiffs' reliance on the Case Management Order as a smokescreen, for purposes of conducting additional discovery, is simply a waste of this Court's precious judicial resources.

THE DEFENDANT
TOWN OF HAMDEN

By *[signature]*
Ann M. Catino
Federal Bar #ct02747
Joseph G. Fortner, Jr.
Federal Bar #ct 04602
Thomas C. Blatchley
Federal Bar #ct25892
HALLORAN & SAGE LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103
(860) 522-6103

## CERTIFICATE OF SERVICE

This is to certify that on this 8th day of April, 2005, I hereby mailed a copy of the foregoing to the following:

Monte E. Frank, Esq.
Cohen and Wolf, P.C.
158 Deer Hill Avenue
Danbury, CT  06810

David B. Zabel, Esq.
Alison K. Clark, Esq.
Cohen and Wolf, P.C.
1115 Broad Street
Bridgeport, CT  06604

Neil T. Leifer, Esq.
Michael A. Lesser, Esq.
Brad J. Mitchell, Esq.
David C. Strouss, Esq.
Thornton & Naumes, LLP
100 Summer Street, 30th Floor
Boston, MA  02110

Mark W. Roberts, Esq.
Andrew Rainer, Esq.
Jennifer A. Currie, Esq.
McRoberts, Roberts & Rainer, L.L.P.
Exchange Place
53 State Street
Boston, MA  02109

Michael H. Wetmore, Esq.
Joel B. Samson, Esq.
Husch & Eppenberger, LLC
190 Carondelet Plaza, Suite 600
St. Louis, MO  63105

Sandra K. Davis, Esq.
Mark S. Baldwin, Esq.
Brown Rudnick Berlack Israels LLP
185 Asylum Street, 38th Floor
Hartford, CT  06103-3402

_____
Ann M. Catino

673247_3 DOC