# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CLARENCE R. COLLINS, JR., et al., :
  Plaintiffs,     :
           :
  v.         :  Civil Action No.
           :  3:03 CV 945 (CFD)
OLIN CORPORATION, et al.  :
  Defendants.     :

## RULING ON DEFENDANT TOWN OF HAMDEN'S
## MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT

The plaintiffs in this action, homeowners in the Newhall section of Hamden, Connecticut, allege that their properties contain contaminated soil and groundwater as a result of conduct by the defendants, the Town of Hamden and the Olin Corporation ("Olin").  The plaintiffs brought a putative class action on behalf of themselves and a class of similarly situated individuals, seeking damages for the diminution in the value of their properties, response costs, loss of use and enjoyment of their properties, and emotional distress.[1]  They also seek preliminary and permanent injunctions compelling Hamden and Olin to conduct, on an expedited basis, actions necessary to investigate and remediate the alleged contamination.

This ruling addresses the Town of Hamden's motion to dismiss and motion for partial summary judgment.

---

[1]The plaintiffs' motion to certify the class remains pending before this Court.

## I. Procedural History

On May 12, 2003, the plaintiffs brought this action against Hamden and Olin in the

Connecticut Superior Court.  On May 28, 2003, it was removed by the defendants to this Court

and, on the same day, the plaintiffs filed a seventeen count amended complaint.[2]  That complaint

sets forth claims against the Town of Hamden for negligence (count 2); gross negligence/reckless

conduct (count 4); violation of the Connecticut Environmental Protection Act of 1971 ("CEPA

Act"), Conn. Gen. Stat. § 22a-15 *et seq*. (count 6); negligence per se (count 8); abnormally

dangerous activity/strict liability (count 10); infliction of emotional distress (count 12); nuisance

(count 15); and recovery of response costs under the Comprehensive Environmental Response,

Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9607 (count 17).

Hamden has moved to dismiss seven counts of the amended complaint.  The Town also

filed a subsequent motion for partial summary judgment.  Only the CERCLA count is not

addressed by those motions.  As discussed below, the Court grants Hamden's motion to dismiss

as to the alleged violations of the CEPA Act, and claims for strict liability for abnormally

dangerous activity, public and private nuisance, and intentional infliction of emotional distress.[3]

The Court also grants Hamden's motion for partial summary judgment on the basis of the

Town's protection by governmental immunity from alleged liability for negligence, gross

negligence, negligence per se, and negligent infliction of emotional distress.

---

[2]The notice of removal also asserted that this Court had supplemental jurisdiction over
the plaintiffs' state law claims.  See 28 U.S.C. § 1367(a).  The parties do not dispute that
Connecticut law applies, except as to the CERCLA count.

[3]Because the Court dismisses those counts on other grounds, it does not address
Hamden's assertion that plaintiffs have exceeded the statutes of limitations provided for in Conn.
Gen. Stat. §§ 52-577, 52-584, and 52-577c(b).

The Court will first address Hamden's motion to dismiss, then its motion for partial summary judgment.

**II. Motion to Dismiss**

    **A. Background**

The portion of this action against Hamden has its origins in the town's waste management practices in the late nineteenth and early twentieth centuries, specifically in the town's establishment and coordination of dumps and landfills in the Newhall section of Hamden. The following allegations are taken from the complaint or is undisputed background information. The allegations of the complaint are deemed to be true for the purposes of resolving the motion to dismiss.

Until the late 1900's, the State of Connecticut and many of its municipalities attempted to eliminate particular wetlands where mosquitoes might breed by encouraging the filling of those areas. As early as 1915, Hamden encouraged its property owners to allow refuse to be dumped on their properties as part of this effort. Hamden would at times operate dumps on these properties and, when filled, the properties could be developed by their owners. Some time prior to 1917, Hamden established or encouraged dumps in the area bounded to the east and west by Wadsworth Street and St. Mary's street, and bounded to the north and south by Mill Rock Road and Goodrich Street – the area collectively referred to as the Newhall section. In approximately 1915, Winchester Repeating Arms ("Winchester") began disposing of its industrial waste and ash at dumps in the Newhall section, and it continued to dispose of waste at those dumps until they were closed in the early to mid-twentieth century. Winchester was a firearms manufacturer with

a large plant in the neighboring City of New Haven and was a predecessor to the Defendant Olin Corporation. The complaint further alleges that Olin and Hamden were aware that after each dump in the Newhall area was closed to disposal, homes would be constructed on those sites.

During the years 2000 and 2001, the U.S. Environmental Protection Agency ("the EPA") conducted studies in the Newhall area. These studies revealed that chemicals and waste had been deposited in former wetland areas in the Newhall section. The EPA agreed to further investigate these residential areas for the presence of contamination. In April 2001, the EPA conducted surficial soil sampling on seventy-six private properties in the Newhall section, and analyzed these samples for a variety of organic and inorganic contaminants, including lead, arsenic, semi-volatile organic compounds ("SVOCs") and polycyclic aromatic hydrocarbons ("PAHs"). Over twenty-five percent of the samples contained lead concentrations that exceeded acceptable state standards for residential property soils, and approximately ten percent of the samples exceeded the State's "action level."[4] Results of these surveys were sent to various individual property owners by letters dated May 29, 2001, or shortly thereafter. At thirteen residences known to exceed the action level, the EPA carried out "time-critical removal action," removing soil down to eighteen inches and replacing it with clean fill. These removals uncovered the presence of industrial materials related to the manufacture of firearms, ammunition and batteries. Additional tests conducted by the Connecticut Department of Environmental Protection ("the DEP") at twenty properties revealed widespread contamination and filling of industrial wastes throughout

_____

[4]The amended complaint states that the action level is developed by the EPA and the Connecticut Department of Environmental Protection. Although "action level" is not specifically defined, it appears from the amended complaint that lead concentrations above that level are defined by the DEP as levels that can lead to a variety of physical and cognitive impairments for adults and children.

the area.  A large number of the residential properties in the Newhall section remained

"uncharacterized" or untested at that time, with no information concerning the nature or extent of

waste or contamination in surficial and subsurface soils or groundwater, and the risks associated

with such contamination.  In December 2002, consultants for Olin reported that analyses of the

fill in the Newhall area indicate the presence of elevated concentrations of metals (principally

arsenic and lead) in residential site soil, and that groundwater quality and deeper soil deposits

were largely uncharacterized.  The complaint further alleges that elevated concentrations of these

various hazardous constituents – principally arsenic and lead – may lead to a variety of physical

and cognitive ailments including nervous system dysfunction, renal problems and cancer.

On July 10, 2001, the DEP issued an order to the four parties it believed were responsible

for the contamination of the properties in the Newhall section – Hamden, Olin, the South Central

Regional Water Authority and the State Board of Education ("the State BOE") (collectively "the

respondents").[5]  This order required the respondents to investigate and remediate sources of

pollution on a site which consisted of properties principally located within the Newhall section.

The respondents appealed this order within the agency, and the DEP opened a contested case

proceeding.  During the course of this proceeding, both the DEP and the private parties

performed further investigations of the properties in the subject area.  In the spring of 2003, the

DEP drafted a consent order, which was signed by all four of the respondents, and which was

captioned "State of Connecticut v. Town of Hamden, South Central Connecticut Regional Water

---

[5] The predecessor to the South Central Regional Water Authority – the New Haven Water
Company – owned land in the Newhall section.  It had agreed with Winchester to permit
dumping on portions of its property during that time.  The State BOE also owned property in
Newhall during the period of dumping by Winchester.

Authority, State Board of Education, and Olin Corporation."[6]  The consent order became

effective on April 16, 2003, when a hearing officer for the DEP accepted it as a final decision

pursuant to Connecticut regulation § 22a-3a-6(1) and (2).[7]

The consent order makes thirty-one factual findings, noting, however, that those findings

were "for purposes of this consent order only."  The consent order then sets forth the detailed

"order" resulting from those factual findings, which contains twenty-five paragraphs spread over

thirty-one pages.  In the order, the four respondents agreed to investigate and remediate the

private and public properties in the Newhall section and share the responsibilities and costs of

such work.

This lawsuit against Hamden and Olin followed.[8]


**B.     Standard of Review for a Motion to Dismiss**

When considering a motion to dismiss, a court accepts all factual allegations in the

complaint as true and draws inferences in the light most favorable to the plaintiff.  Scheuer v.

Rhodes, 416 U.S. 232, 236 (1974); LaBounty v. Adler, 933 F.2d 121, 123 (2d Cir. 1991).

Dismissal is not warranted unless "it appears beyond doubt that the plaintiff can prove no set of

_____

[6]Nothing in the consent order indicates that the plaintiffs in the instant action were parties to that proceeding.

[7]Because the complaint references and incorporates the consent order, and that order was issued by a public agency, it properly may be reviewed by the Court when considering motions to dismiss.  See Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991); Martin v. Shell Oil Co., 198 F.R.D. 580, 582 n.2 (D.Conn. 2000).

[8]Olin also has filed motions to dismiss and for partial summary judgment, which are addressed in a separate ruling.

facts in support of the claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Weiss v. Wittcoff, 966 F.2d 109, 112 (2d Cir. 1992).  "The issue on a motion to dismiss is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his or her claims." United States v. Yale New Haven Hosp., 727 F. Supp. 784, 786 (D.Conn. 1990) (quoting Scheuer, 416 U.S. at 232).  In other words, "[t]he question is 'whether or not it appears to a certainty under existing laws that no relief can be granted under any set of facts that might be proved in support of' the claims."  Velez v. City of New London, 903 F. Supp. 286, 289 (D.Conn. 1995) (quoting De La Cruz v. Tormey, 582 F.2d 45, 48 (9th Cir. 1978).

In determining the adequacy of a claim under Rule 12(b)(6), consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.  Fed. R. Civ. P. 12(c); see also Courtenay Communications Corp. v. Hall, 334 F.3d 210, 213 (2d Cir. 2003); Leonard F. v. Israel Discount Bank of N.Y., 199 F.3d 99, 107 (2d Cir. 1999).

**C.**     **Discussion of Motion to Dismiss**

     **i.**     **Connecticut Environmental Protection Act of 1971 and Primary Jurisdiction**

The plaintiffs allege in count six of the amended complaint that Hamden violated Connecticut's Environmental Protection Act of 1971, Conn. Gen. Stat. § 22a-14, *et. seq.,* by disposing, releasing, or arranging for the disposal of hazardous substances in the Newhall section

of Hamden.[9]  The CEPA was designed to hold in public trust, "the air, water and other resources

of the state of Connecticut." Conn. Gen. Stat. § 22a-15.  It likewise "declared that it is in the

public interest to provide all persons with an adequate remedy to protect the air, water and other

natural resources from unreasonable pollution, impairment, or destruction." Id.  Pursuant to the

Act's injunctive relief provisions in § 22a-18,[10] the plaintiffs seek preliminary and permanent

injunctions, ordering Hamden to perform response actions on an expedited basis to protect and

restore the land in the Newhall Section.  They also seek preliminary and permanent injunctions in

count fifteen, in which they allege that Hamden has created a public and private nuisance by its

handling, disposal and release of hazardous substances.

Hamden argues that counts six and fifteen, to the extent that they seek injunctive relief,

should be dismissed under the doctrine of primary jurisdiction.  "Primary jurisdiction is not a

doctrine that implicates the subject matter of the federal courts.  Rather, it is a prudential doctrine

under which court may, under appropriate circumstances, determine that the initial decision-

making responsibility should be performed by the relevant agency rather than the courts." Syntek

Semiconductor Co. v. Microchip Technology, Inc., 307 F.3d 775, 780 (9th Cir. 2002).  As the

Second Circuit has noted:

> An examination of the cases illustrates the relatively narrow scope of the doctrine
> of primary jurisdiction. The doctrine has been applied only when a lawsuit raises

---

[9]The Court notes that although the CEPA was enacted in 1971, at least a quarter of a
century after the alleged dumping of materials in Newhall, it is remedial in nature, and can thus
be applied retroactively. Manchester Environmental Coalition v. Stockton, 184 Conn. 51 (1981).

[10]Conn. Gen. Stat. § 22a-18(a) provides: "The court may grant temporary and permanent
equitable relief, or may impose such conditions on the defendant as are required to protect the
public trust in the air, water and other natural resources of the state from unreasonable pollution,
impairment or destruction."

an issue, frequently the validity of a commercial rate or practice, committed by Congress in the first instance to an agency's determination, particularly when the issue involves technical questions of fact uniquely within the expertise and experience of an agency.

Goya Foods, Inc. v. Tropicana Products, Inc., 846 F.2d 848, 851 (2d Cir. 1988). The Second Circuit has "emphasize[d] that primary jurisdiction is a discretionary doctrine," Tassy v. Brunswick Hosp. Center, Inc., 296 F.3d 65, 72 (2d Cir. 2002), under which courts defer to agencies in matters over which they share concurrent jurisdiction in the interest of promoting "[u]niformity and consistency in the regulation of business entrusted to particular agency . . . ." United States v. Western Pac. RR. Co., 352 U.S. 59, 65 (1956); see also Golden Hill Paugussett Tribe of Indians v. Weicker, 39 F.3d 51, 59 (2d Cir. 1994) (as a threshold matter a court must find that the agency has jurisdiction over the issue presented). In general, "courts have resisted creating any fixed rules or formulas for its application. . . . [and therefore in] 'every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation.'" Tassy v. Brunswick Hosp. Center, Inc., 296 F.3d at 68 (quoting Fed. Mar. Bd. v. Isbrandtsen Co., 356 U.S. 481, 498 (1958)). "The aim of the doctrine, then, is to ensure that courts and agencies with concurrent jurisdiction over a matter do not work at cross-purposes." Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp., 84 F.3d 91, 97 (2d Cir. 1996).[11] These principles have been distilled into four factors: "(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's

---

[11]The primary jurisdiction doctrine has been found to apply to the relationship between federal district courts and state administrative agencies. See Martin v. Shell, 198 F.R.D. 580, 585 (2000), citing Johnson v. Nyack Hospital, 964 F.2d 116, 122-23.

particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made."  Niehaus v. AT & T Corp., 218 F. Supp.2d 531, 537 (S.D.N.Y. 2002) (citing National Communs. Assoc., Inc. v. AT & T Co., 46 F.3d 220, 222-23 (2d Cir. 1995).

Generally, the DEP has "jurisdiction over all matters relating to the preservation and protection of the air, water and other natural resources of the state."  Conn. Gen. Stat. § 22a-2(a). Among the extensive statutory powers granted to the DEP is the power to adopt regulations "setting forth standards for the remediation of environmental pollution at hazardous waste disposal sites and other properties which have been subject to a spill . . . which regulations shall fully protect health, public welfare and the environment."  Conn. Gen. Stat. § 22a-133k.[12]  In accordance with Section 22a-133k, the commissioner of the DEP has adopted such regulations. See Regs. Conn. State Agencies § 22a-133k-1 et seq.  In sum, investigations of hazardous waste pollution and remediation conducted by the DEP are subject to an extensive statutory and regulatory framework.  See, e.g., Conn. Gen Stat. §§ 22a-133d (addressing site assessments by

---

[12]Section 22a-133k also provides that, "[i]n establishing such standards the commissioner shall (1) give preference to clean-up methods that are permanent, if feasible, (2) consider any factor he deems appropriate, including, but not limited to, groundwater classification of the site, and (3) provide for standards of remediation less stringent than those required for residential land use for polluted properties which (A) are located in areas classified as . . . under the standards adopted by the commissioner for classification of groundwater contamination, (B) were historically industrial or commercial property, and (C) are not subject to an order issued by the commissioner regarding such spill, consent order or stipulated judgment regarding such spill, provided an environmental use restriction is executed for any such property subsequent to the remedial action in accordance with the provisions of section 22a-133aa and further provided such regulations specify the types of industrial or commercial land uses to which any such property may be put subsequent to such remedial action."

the DEP); 22a-133e (addressing remedial action by the DEP);  See also Conn. Gen. Stat. § 22a-

114 ("The purpose of [these statutes] is to establish a process for the siting of hazardous waste

facilities that will protect the health and safety of Connecticut citizens and assure responsible

economic development and to have that siting process be at least as strict as that required by

federal law").

The DEP's authority in relation to water pollution also is subject to an extensive statutory

and regulatory framework.  See, e.g., Conn. Gen. Stat. §§ 22a-424 (setting forth the powers of the

commissioner concerning water pollution control); 22a-432(f) (granting commissioner power to

"adopt[] such other remedial measures as are necessary to prevent, control or abate pollution");

22a-433 (granting power to issue order to land owner).

In the consent order, the respondents (Hamden, Olin, State BOE, and the South Central

Regional Water Authority) agreed to allocate the responsibility among themselves to investigate

and remediate the site in accordance with the terms set forth therein. (CO at 13).  More

specifically, the consent order provides that the "Town of Hamden shall pay for and perform the

investigation and remediation of Mill Rock Park and the sewage pump station . . . [and] the

investigation and remediation of Rochford Field." (CO at 15).  Similarly, the consent order

provides that Olin shall perform all investigations "that the Commissioner deems necessary to

determine the extent and degree of pollution in the non-public properties."  The consent order

also notes that both Hamden and Olin had retained consultants to "oversee actions required by

this consent order" (CO at 17) and that each party "shall continue to retain its consultant or other

qualified consultants acceptable to the commissioner until this consent order is fully complied

with." (CO at 18).  Moreover, the consent order provides minimum standards for any study

-11-

conducted by the respondents, and requires that the reports submitted by the respondents to the commissioner: (1) define the existing and potential for pollution; (2) evaluate the alternative for remedial actions to abate such pollution; (3) state the most expeditious schedule for each alternative; (4) list all permits and approvals required for each alternative; (5) propose the preferred alternative; and (6) propose a detailed remedial action plan and schedule to perform the preferred remedial action. (CO at 20, 23-25). Once such an alternative is approved by the commissioner, the consent order then requires that the respondent "shall perform the approved remedial actions for the portion of the site for which it is responsible in accordance with the plan," (CO at 27) and that each respondent shall monitor the effectiveness of the remedial actions. (CO at 28). In addition, the consent order provides that, if the approved remedial actions conducted by the respondent on its assigned portion of the site do not result in the prevention and abatement of pollution "consistent with the remediation standard regulations to the satisfaction of the commissioner," additional remedial actions "shall be performed by that respondent in accordance with a supplemental plan and schedule approved in writing by the commissioner." (CO at 29-30). The consent order also provides that a respondent "shall not be considered in full compliance . . . until all actions required by this consent order to be undertaken by such respondent have been completed as approved and to the satisfaction of the commissioner." (CO 32). Finally, the consent order provides that "[a]ny respondent's failure to comply with this order may subject such respondent to an injunction and penalties." (CO at 37).

Regarding the first and second considerations of the primary jurisdiction analysis – whether the relevant issue is within the conventional experience of judges rather than being a technical or policy consideration within the agency's expertise, and whether the question is

within the agency's discretion – Hamden contends that the injunctive relief requested here involves technical and policy considerations within the DEP's field of expertise and discretion, as evidenced by the terms of the consent order. The plaintiffs disagree, arguing that, although there may be some technical issues in this case, they are of the type commonly addressed by district courts.

After reviewing the relevant statutory and regulatory frameworks, and the details of the consent order, the Court finds that issues of injunctive relief in the instant action are more properly within the DEP's field of expertise and discretion. The consent order, which was accepted and became enforceable on April 16, 2003, places specific obligations on the respondents, failure to comply with which could result in the DEP subjecting the parties to "injunctions and penalties." These obligations pertain to investigation and remediating any soil and groundwater pollution on certain properties – including those in the Newhall section. Deciding what remedy is appropriate for varying levels of contamination, and overseeing that remedial effort, is a matter more properly within the technical expertise and experience of the DEP. See Schwartzman, Inc. v. Atchison, Topeka & Santa Fe Railway, Co., 857 F. Supp. 838, 844 (D.N.M. 1994) (citing cases for the proposition that "if injunctive relief is called for, requiring scientific or technical expertise, the doctrine [of primary jurisdiction] is more readily applicable").

The third consideration in questions of primary jurisdiction is the whether there exists a substantial danger of inconsistent rulings. Niehaus, 218 F. Supp.2d at 537. The plaintiffs seek a broad injunction that would require "Olin and Hamden to conduct, on an expedited basis, any and all response actions necessary to investigate and/or remediate the releases or threats of

releases to the soil ground water and other natural resources in the Newhall Section of Hamden."

In the consent order already entered in this matter, however, Olin and Hamden (as well as the

other respondents who were not named as defendants in this action), were assigned specific,

limited areas of responsibility for investigation and remediation.  As noted previously, Hamden is

responsible for investigating and remediating Mill Rock Park, the sewage pump station and

Rochford Field, while Olin is responsible for investigating and remediating any of the "non-

public properties" that the Commissioner "deems necessary."  Thus, if this Court were to issue

the broad injunction sought by the plaintiffs, it could create a situation where Hamden and Olin

may be substantially complying with their obligations under the consent order, and thus free from

the threat of injunction or penalty from the DEP, yet they may also need to conduct additional or

different remedial actions on those same assigned pieces of property pursuant to an injunction

issued by this Court.  Put another way, the injunction sought by the plaintiffs would make

Hamden responsible for the investigation and remediation of areas already assigned by the

consent order to either Olin, the Water Authority, or the State Board of Education.  Indeed,

because the plaintiffs did not name all of the parties to the consent order as defendants in this

action, yet seek an injunction addressing the same conditions already addressed in the consent

order, there is no doubt that the issuance of the requested injunction could lead to inconsistent

rulings, a situation sought to be avoided by the doctrine of primary jurisdiction. Niehaus, 218 F.

Supp.2d at 537; see also Niagara Mohawk Power Corp., 84 F.3d at 97 ("The aim of the doctrine .

. . is to ensure that courts and agencies with concurrent jurisdiction over a matter do not work at

cross-purposes").

      Finally, the fourth consideration in questions of primary jurisdiction is whether a prior

-14-

application to the agency has been made.  Niehaus, 218 F. Supp.2d at 537.  As noted previously, the plaintiffs were not parties to the original order issued by the DEP, or the subsequently issued consent order.  However, many of the named plaintiffs in this action were involved in the original DEP proceedings.  Indeed, the consent order states, that "the commissioner shall develop and implement a public participation plan to ensure public involvement in the investigation and clean up process," and that "each respondent responsible for the investigation and remediation of a portion of the site shall participate in implementing the [public participation] plan."  Although there is no allegation in the amended complaint that the plaintiffs refused to participate via the public participation plan, there is also no claim that the commissioner and the DEP have failed to accommodate their request to participate.  Even if the plaintiffs could show that they satisfied this factor, here the other three factors significantly outweigh this factor.  Moreover, because the DEP is actively overseeing the implementation of the consent order, the doctrine of primary jurisdiction counsels in favor of dismissal.  See Roberts v. Chemlawn Corp., 716 F. Supp. 364 (N.D.Ill.1989) ("It is axiomatic that the advisability of invoking primary jurisdiction is greatest where the issue is already before the agency") (quoting Mississippi Power & Light Co. v. United Gas Pipe Line Co., 532 F.2d 412, 420 (5th Cir. 1976)).

The plaintiffs argue that the claims here should be treated like those in Martin v. Shell Oil Co., 198 F.R.D. 580 (D.Conn. 2000), where the district court declined to dismiss the claims on primary jurisdiction grounds.  The situation the Court faced in Martin was distinct from the situation here, though.  Martin followed a consent order between DEP and Shell Oil after the contamination of ground water resulting from the operation of an underground storage tank owned by Shell.  The Court was unconvinced in Martin that specialized technical expertise was

required to adjudicate plaintiffs' claims for negligence, negligence per se, strict liability for ultrahazardous activity, gross negligence, private nuisance, trespass and fraud.  Nor was the Court convinced of a likelihood of inconsistent rulings, or that the plaintiffs were parties to the DEP action against Shell.  Importantly, the Court in Martin found that "it is not clear that any action by the CTDEP will address the plaintiffs' concerns in the near future.  Nor is it clear that, by considering the plaintiffs' claims, this court will in any way be interfering with the CTDEP's ongoing regulation of the Shell site." Id. at 587.  This Court is convinced, however, that the terms of the Consent Order sufficiently establish that the plaintiffs' concerns in this case are being addressed by the DEP.  Additionally, it is necessary to note that in Martin, plaintiffs sought damages and injunctive relief for the causes of action listed above.  While many of the same claims have been asserted by the plaintiffs against Hamden, the Court does not dismiss any of these on the basis of primary jurisdiction.  The Court, instead, dismisses only the claims asserted for injunctive relief that have already been taken up by the DEP.  For these reasons, this case is distinguishable from Martin.

Finally, the plaintiffs argue that, even if the doctrine of primary jurisdiction applies, this Court should not dismiss their claims, but rather hold them in abeyance.  When exercising the doctrine of primary jurisdiction, a court has discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice.  Reiter v. Cooper, 507 U.S. 258, 268- 69 (1993); Martin v. Shell Oil Co., 198 F.R.D. at 585.  One district court has suggested that "the preferred approach is that 'jurisdiction should be retained by a stay of proceedings, not relinquished by a dismissal,' even if without prejudice." Schwartzman, Inc. v. Atchison, Topeka & Santa Fe Railway, Co., 857 F. Supp. at 844 (quoting Northern Cal. Dist.

Council of Hod Carriers, AFL-CIO v. Opinski, 673 F.2d 1074, 1076 (9th Cir.1982). Despite this guidance, the Court finds that dismissal without prejudice is the more appropriate disposition for claims for injunctive relief set forth in counts six and fifteen. The defendants already are bound by the consent order to perform the investigation and remediation sought by the injunction in this case. Moreover, the obligations placed on the defendants by the consent order do not appear to be limited in nature, and it is unclear at what point these obligations may be terminated or completed. Consequently, given those factors, the Court finds dismissal without prejudice is the proper disposition of the plaintiffs' requests for injunctive relief.[13]

### ii.     Strict Liability for Abnormally Dangerous Activity

Plaintiffs allege in count ten of the amended complaint that Hamden engaged in abnormally dangerous activity when it handled, disposed of and/or released hazardous substances in the landfills in the Newhall section. In addition, count ten alleges that Hamden knew, or should have known, that there was a high degree of risk involved with the handling of hazardous substances, including a risk of harm to the plaintiffs and other purported class members. Hamden contends that this claim is neither properly pled or legally viable, and should be dismissed.

Under Connecticut law, "a plaintiff is not required to show that his loss was caused by the defendant's negligence. It is sufficient to show only that the defendant engaged in an

---

[13]Hamden also argues that the Court should apply the Burford abstention doctrine and abstain from adjudicating counts six and fifteen because of the complex nature of Connecticut's DEP administrative scheme. Burford v. Sun Oil, 319 U.S. 315 (1943). Because the Court dismisses counts six and fifteen based on the primary jurisdiction doctrine, it does not reach the application of the Burford abstention doctrine.

ultrahazardous activity that caused the defendant's loss." Green v. Ensign-Bickford Co., 25 Conn. App. 479, 482, 595 A.2d 1383 (1991).[14]  Imposition of strict liability for an ultrahazardous activity requires that certain factors exist: "an instrumentality capable of producing harm; circumstances and conditions in its use which, irrespective of a lawful purpose or due care, involve a risk of probable injury to such a degree that the activity fairly can be said to be intrinsically dangerous to the person or property of others; and a causal relation between the activity and the injury for which damages are claimed." Caporale v. C.W. Blakeslee & Sons, Inc., 149 Conn. 79, 85, 175 A.2d 561 (1961).  "The issue of whether an activity is abnormally dangerous . . . is a question of  law for a court to decide."  Green v. Ensign-Bickford Co., 25 Conn. App. at 482; Martin v. Shell Oil Co., 180 F. Supp.2d at 325

"The courts in Connecticut and other jurisdictions which recognize the doctrine of strict liability for dangerous activities, impose it only in narrow circumstances." Levenstein v. Yale University, 40 Conn.Sup. 123, 126, 482 A.2d 724 (Conn. Super. Ct., July 31, 1984). Traditionally, strict liability for ultrahazardous activity had been applied solely in the context of blasting and explosives. See Whitman Hotel Corp. v. Elliott & Watrous Engineering Co., 137 Conn. 562, 595-96, 79 A.2d 591 (1951).[15]  It has since been extended by the Connecticut appellate courts to pile driving; Caporale, 149 Conn. at 85; and research experiments involving

---

[14]Connecticut courts use the terms "ultrahazardous" and "abnormally dangerous" interchangeably.

[15]In Whitman Hotel, the defendant "discharged many hundreds of blasts of . . . dynamite . . . in close proximity to a number of compactly located business buildings." Whitman Hotel, 137 Conn. at 564.

highly volatile chemicals.  Green v. Ensign-Bickford Co., 25 Conn. App. at 485-87.[16]  "Neither

Connecticut's Supreme Court nor its Appellate Court has ruled on whether the storage of

hazardous materials constitutes an abnormally dangerous or ultrahazardous activity for the

imposition of strict liability." Levenstein v. Yale University, 40 Conn.Sup. at 126.

Connecticut courts generally look to the Restatement of Torts and apply the following six

factors in section 520 of the Restatement when assessing whether an activity constitutes an

ultrahazardous activity: (a) existence of a high degree of risk of some harm to the person, land or

chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to

eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a

matter of common usage; (e) inappropriateness of the activity to the place where it is carried on;

and (f) extent to which its value to the community is outweighed by its dangerous attributes. See,

e.g., Green v. Ensign-Bickford Co., 25 Conn. App. at 486; Martin v. Shell Oil Co., 180 F.

Supp.2d at 325.  "Any one of those factors is not necessarily sufficient of itself in a particular

case, and ordinarily several of them will be required for strict liability.  On the other hand it is not

necessary that each of them be present, especially if others weigh heavily." Green v.

Ensign-Bickford Co., 25 Conn. App. at 486 (quoting 3 Restatement (Second), Torts § 520,

---

[16]In Caporale, the defendant drove heavy steel piles with a pile driver for four months
within seventy-five feet of the plaintiff's concrete-block buildings, and "actually anticipated [the
potential damage] when it inspected premises nearby before it began work."  Caporale, 149
Conn. at 85-86.
        In Green, "the defendant was engaged in the perilous activity of conducting research with
a highly volatile chemical for use in its explosive manufacturing business."  Green, 25 Conn.
App. at 484.  During that research, "a colossal explosion took place, killing the researchers and
completely destroying the building. At the time of the explosion, the plaintiff was in bed on the
second story of his wood frame house located approximately seven eighths of a mile from the
accident." Id. at 481.

-19-

Comment (f)).

Applying these factors, at least one judge of the Connecticut Superior Court has found that the disposal of toxic and hazardous materials may constitute an abnormally dangerous activity.  See, e.g., Mather v. Birken Manufacturing Co., 23 Conn. L. Rptr. 443, 447-49, 1998 Conn. Super. LEXIS 3669, at *20 (Conn. Super. Ct.,  Dec. 8, 1998) (Hennessey, J.) (denying a motion to strike a strict liability claim, which was based on the defendants' alleged disposal of hazardous waste into the soil and the environment); Barnes v. General Electric Co., 1995 Conn. Super. LEXIS 2132, 14 Conn. L. Rptr. 456, 458-49  (Conn. Super. Ct., July 25, 1995) (Hennessey, J.) (denying motion to strike because allegations of burning, burial and disposal of toxic materials that contained latent defects and dangers sufficiently alleged that the defendants' actions were abnormally dangerous to support a strict liability for ultrahazardous activity claim).[17]

The U.S. District Court for this District, however, has dismissed claims under Connecticut law for strict liability when they are based on the disposal of hazardous waste. See Bernbach v. Timex Corp., 989 F. Supp. 403, 407-08 (D.Conn. 1996) (dismissing a strict liability claim because "the complaint [was] devoid of allegations that could support a finding that the substances stored and disposed of by Timex [were] so inherently dangerous that the risk of probable injury may not be eliminated by the exercise of due care"); McDonald v. Timex Corp., 9 F. Supp.2d 120, 122-23 (D.Conn. 1998) (dismissing a count alleging strict liability for

---

[17]These decisions are persuasive, yet not binding, authority. See generally Commissioner v. Bosch, 387 U.S. 456, 465 (1967) (federal courts are not bound by decisions of state courts other than the highest court of the state); Calvin Klein Ltd. v. Tylon Trucking Corp., 892 F.2d 191, 195 (2d Cir. 1989) ("Absent a rule of decision formulated by the [state's highest court], we are not bound by the opinions issued by the state's lower courts").

ultrahazardous activity despite allegations of hazardous waste disposal and dumping because

sufficient factual allegations regarding the circumstances and conditions of the activities that

would make them intrinsically dangerous irrespective of the exercise of due care had not been

pled).[18]

In the district court opinion most cited in these and the Connecticut Superior Court cases

for the view that strict liability should not apply to hazardous waste disposal, then U.S. District

Judge Cabranes wrote:

> It does not appear that the Connecticut Supreme Court has addressed the issue of
> whether the storage and use of hazardous waste is a basis for strict liability. In the
> absence of any direct decision by the state's highest court, a federal court must
> determine what it believes the state's highest court would find if the same issue
> were before it. . . .  I am persuaded that if given the opportunity to expand the
> narrowly-construed concept of "ultrahazardous" or "abnormally dangerous"
> activity to the storage and use of hazardous wastes, the Connecticut Supreme
> Court would decline to do so. Such activities are subject to extensive federal and
> state regulation, see, e.g., CERCLA, 42 U.S.C. § 9601 et seq.; Conn.Gen.Stat. §
> 22a-452, and I do not believe that the Connecticut Supreme Court would interpose
> an expanding common law into such matters by imposing strict liability in every
> case in which a plaintiff can prove that a defendant stored and used hazardous
> waste. Accordingly, I conclude that the storage and use of hazardous waste is not
> per se an "ultrahazardous" or "abnormally dangerous" activity for the purpose of
> imposing strict liability.

Arawana Mills Co. v. United Technologies Corp., 795 F. Supp. 1238, 1251 (D.Conn. 1992)

(internal citations omitted).

In another decision from this district, however, District Judge Arterton concluded that this

tort applied to a landfill which had accepted hazardous waste.  In Albahary v. City and Town of

Bristol, 963 F. Supp. 150, 156 (D.Conn. 1997), the court distinguished between cases that

---

[18]These decisions also are persuasive, yet not binding, authority.  See generally  18
Moore's Federal Practice § 134.02[1][d] (Matthew Bender Ed.)

involved the "peripheral" disposal of hazardous substances (such as <u>Arawana Mills</u>) and those

that involved the "direct" disposal of hazardous substances.  The peripheral disposal of hazardous

substances resulted from businesses that produce the toxic materials as a result of their

manufacturing activity and store them on their property.  <u>Id</u>. at 154.  The direct disposal of

hazardous substances results "from the purposeful business activity of running a landfill." <u>Id</u>. at

155.  In <u>Albahary</u>, Judge Arterton explained that, "[a] landfill that accepts hazardous materials

for [the] purpose of disposal stands on a different footing than a machine shop whose purpose is

to repair engines, and whose storage and use of hazardous materials is incidental to that repair

business." <u>Id</u>.  Following this analysis, the court held that unlike the court's analysis in <u>Arawana</u>

<u>Mills</u>, "the disposal of hazardous and toxic wastes at a landfill may constitute an abnormally

dangerous or ultrahazardous activity sufficient to maintain a cause of action for strict liability."

<u>Id</u>. at 156.

    This Court is not persuaded by the reasoning in <u>Albahary</u> to accept the distinction

between the direct and peripheral disposal of hazardous materials in this context.  Whether the

waste is a product of the manufacturing defendant or is accepted for disposal by a storage

defendant does not seem to be of such consequence to the analysis of strict liability, especially

for a municipality's operation and maintenance of landfills.  For example, the manufacturing

defendant will most likely have a better understanding of the nature of the waste than the

municipality operating or maintaining a waste disposal facility, and the consequences may be just

as great in the improper handling of concentrated hazardous wastes at the manufacturing facility.

    Other decisions also appear to distinguish between the disposal of hazardous materials

and their "mere storage."  <u>See, e.g.</u>, <u>French Putnam LLC v. County Envtl. Svcs.</u>, 2002 WL

1172341, at *14 (Conn. Super. 2000).  In <u>French Putnam</u>, a lessee of real property stored waste oil, antifreeze, hydraulic fluid, grease and similar materials in tanks and drums, but allegedly permitted discharges of those substances into the land.  The plaintiff land owner/lessor sued for strict liability, but the Superior Court struck that claim because "the mere storage of hazardous materials without sufficient allegations of the abnormally dangerous properties of the materials does not constitute ultrahazardous activity."  <u>Id.</u> at *15.  This distinction between storage and disposal also does not seem to be apt, however.  For example, it may often be impossible to distinguish between what constitutes "mere storage" and disposal:  The machine shop that temporarily gathers its wastes into drums or tanks may very well be "disposing" of those wastes when continuing spillage occurs, while a landfill which clearly is not adequately containing waste on its property should not benefit from a lesser standard for judging its conduct.

It thus appears that the Restatement factors should be applied uniformly to the conduct under scrutiny, whether it be storage or disposal of wastes, either direct or peripheral.  It also appears from the decisions that there can be no blanket or per se application of this tort to waste disposal or storage.  Although most disposal and storage situations would likely not provide a basis for strict liability, there may be ones that justify its application.

Turning to an individualized analysis here, count ten of the amended complaint alleges that the materials placed in the Newhall dumps constituted "hazardous substances."  However, paragraph 24 of that complaint defines that material as "industrial waste and ash."  The complaint alleges that the dumping began in 1915, and the consent order indicates that dumping ceased at most of the Newhall sites by the 1930's and at all of the sites by 1957.  (CO at 8, 9, 20.) In applying the first Restatement factor – "high degree of risk of some harm" – the Connecticut

-23-

courts have determined that the risk of the activity must have been known at that time.  As the

Superior Court in Vaillancourt v. Town of Southington, 2002 WL 1293053 (Conn. Super. Ct.,

May 2, 2002) stated: "The doctrine is inapplicable to a circumstance in which an activity was not

known to be dangerous at the time it was undertaken but is only alleged to have been dangerous

years after the fact."  2002 WL 1293053 at *10.  Although count ten alleges that "Hamden knew,

or should have known that there was a high degree of risk associated with the handling, disposal

and or release of hazardous substances," that is not sufficient to satisfy the "known risk" aspect

of the cause of action even at the pleading stage and even given notice pleading in the federal

courts.[19]  There is no allegation that Hamden knew in the first half of the twentieth century that

industrial waste and ash, even if those materials contained lead and arsenic, would probably

cause harm to future homeowners if deposited into the Newhall landfills.

Another Restatement element not satisfied – or even addressed – by count ten is "inability

to eliminate the risk by the exercise of reasonable care."  There is no allegation that it would be

impossible to dispose of this waste properly without risk to future landowners.  Although there

may be certain types of hazardous substances that can not be stored safely under any

circumstances, there is no claim that Hamden could not have done so here.

Whether Hamden's conduct is to be evaluated through a current lens or one from the

early twentieth century, there is no claim that the landfills could not have been managed in a safe

---

[19] The amended complaint, which is the operative one here, was filed in the Connecticut
Superior Court on the same day this action was removed.  The Connecticut Superior Court
requires fact pleading, not the notice pleading of Fed. R. Civ. P. 8.  Cf. Conn. Prac. Book § 10-1.

way.[20]  Moreover, there is no allegation that Hamden's involvement with those landfills did not comport with any laws or procedures, which then applied to municipal waste management.

As to the remaining Restatement factors, the allegations in the amended complaint and the consent order show that the landfills were established and conducted in accordance with a legitimate health policy, that it was an appropriate activity where they were carried on, and that, given the understanding at the time, their value to the community was outweighed by their harmful potential.  The amended complaint alleges that the dumping facilitated by Hamden occurred in wetlands and low lying areas, and that it was only after the dumps were closed that residential development began in those areas.  One of the key factors underlying decisions that have found an activity to be ultrahazardous is that the activity was conducted in a heavily populated area.  See, e.g., P.R.I.C.E., Inc. v. Keeney, 22 Conn. L. Rptr. 373, 1998 WL 417591 (Conn. Super. Ct., July 10, 1998) (granting motion to strike because, inter alia, the plaintiffs failed to alleged "that the activity was conducted in a heavily populated area or otherwise inappropriate location"[21]); see also Caporale, 149 Conn. at 85 (stressing that courts must review

_____

[20] Hamden's knowledge of the hazardous nature of its activity at the time of the conduct is discussed at further length in the Court's analysis of the Hamden's motion for summary judgment as to the plaintiffs' recklessness claim.

As noted previously in the text, at least two decisions from the Connecticut Superior Court have denied motions to strike claims of strict liability based on the disposal of hazardous waste. See Mather, 23 Conn.L.Rptr. 443, 447-49, 1998 Conn. Super. LEXIS 3669 and Barnes, 1995 Conn. Super. LEXIS 2132, 14 Conn. L. Rptr. 456, 458-49.  This Court finds those decisions unpersuasive, however, because they fail to address the timeliness aspect of strict liability.  In other words, they fail to address whether, at the time the dumping occurred, it "necessarily or obviously expose[d] the person of another to the danger of probable injury." Whitman Hotel, 137 Conn. at 565.

[21] A motion to strike is utilized in the Connecticut state courts in a manner similar to how the motion to dismiss pursuant to Fed. R. Civ. P. 12(b) is utilized in federal courts. See Fort Trumbull Conservancy, LLC. v. Alves, 262 Conn. 480, 498, 815 A.2d 1188 (2003) ("The

the circumstances and conditions surrounding the activity, and noting that the pile driving in that

case occurred within seventy-five feet of the building that was damaged).  Here, the plaintiffs

have not alleged that the landfill activity was *then* conducted in a heavily populated area.  Finally,

the value to the Hamden community of the landfills was important in at least three ways: the

filling helped to reduce the threat of disease spread by mosquitoes, created more land that could

be developed, and helped deal with the waste generated by Hamden's own residents.

   In sum, even when the amended complaint is read in a light most favorable to the

plaintiffs, it is not possible to conclude that Hamden was engaged in an activity that "necessarily

or obviously expose[d] the person of another to the danger of probable injury." Whitman Hotel,

137 Conn. at 565.  Therefore, because count ten fails to state a claim for strict liability, it is

dismissed.


   _____**iii. Nuisance**

   In count fifteen, the plaintiffs allege that Hamden has created both a public and private

nuisance.[22]  Hamden contends that the plaintiffs have failed to state a claim for either.  The

plaintiffs maintain that the allegations for both their private and public nuisance claims are

sufficient, and withstand a motion to dismiss.  Because those two claims "are distinct" they will

_____

purpose of a motion to strike is to contest . . . the legal sufficiency of the allegations of any
complaint . . . to state a claim upon which relief can be granted"); Astech-Marmon, Inc. v.
Lenoci, 349 F. Supp.2d 265, 268 (D.Conn. 2004) ("Fed.R.Civ.P. 12(b)(6) permits dismissal of a
complaint for failure to state a claim upon which relief can be granted").

   [22]In addition to a request for damages, count fifteen also requested that the Court enter a
preliminary and a permanent injunction. As noted previously in this ruling, the Court has
dismissed the plaintiffs' requests for injunctive relief pursuant to the doctrine of primary
jurisdiction.

addressed separately.  Pestey v. Cushman, 259 Conn. 345, 355, 788 A.2d 496 (2002).

### a. Public Nuisance

In order to succeed on a public nuisance claim the plaintiff must allege and prove four elements: "(1) the condition complained of had a natural tendency to create danger and inflict injury upon person or property; (2) the danger created was a continuing one; (3) the use of the land was unreasonable or unlawful; [and] (4) the existence of the nuisance was the proximate cause of the plaintiffs' injuries and damages." Id. (internal quotation marks omitted).[23]  In addition, the Connecticut Supreme Court has explained that:

> Nuisances are public where they violate public rights, and produce a common injury, and where they constitute an obstruction to public rights, that is, the rights enjoyed by citizens as part of the public. [I]f the annoyance is one that is common to the public generally, then it is a public nuisance. The test is not the number of persons annoyed, but the possibility of annoyance to the public by the invasion of its rights. A public nuisance is one that injures the citizens generally who may be so circumstanced as to come within its influence.  Moreover, a private individual may create a nuisance in a public place. Typical examples of public nuisances are: pollution, and obstruction of waterways; air and noise pollution; maintenance of a fire or explosion hazard, or other unsafe premises; maintenance of a house of prostitution; obstruction of safe travel on a public highway; and maintenance of a junkyard or dump.

Ganim v. Smith & Wesson Corp., 258 Conn. 313, 369, 780 A.2d 98 (2001).

A nuisance claim against a municipality contains at least two additional requirements. The factors that, "in order to overcome the governmental immunity of municipal defendants where it applies, the plaintiff must prove that the defendants, by some positive act, intentionally created the conditions alleged to constitute a nuisance." Elliot v. City of Waterbury, 245 Conn.

---

[23]Although the Connecticut Supreme Court has stated that "some adjustment is in order" for these elements; Pestey, 259 Conn. at 358 n.6; neither it or the Connecticut Appellate Court has provided such adjustment.  Therefore, this Court will adhere to the traditional four elements set forth in Pestey.

385, 421, 715 A.2d 27 (1998); <u>see also</u> <u>Wright v. Brown</u>, 167 Conn. 464, 470, 356 A.2d 176

(1975) ("[l]iability in nuisance can be imposed on a municipality only if the condition

constituting the nuisance was created by the positive act of the municipality").  The Connecticut

Supreme Court has also held that "an interference with the public right is intentional if the

municipality . . . knows that it is resulting or is substantially certain to result from its conduct."

<u>Keeney v. Old Saybrook</u>, 237 Conn. 135, 164, 676 A.2d 795 (1996).  "[I]t is not enough to make

an invasion intentional that the actor realizes or should realize that its conduct involves a serious

risk or likelihood of causing the invasion.  The actor must either act for the purpose of causing it

or know that it is resulting or is substantially certain to result from the actor's conduct." <u>Id.</u> (<u>citing</u>

4 Restatement (Second) Torts § 825 (1979)).  Although there is some question about whether the

allegations of the amended complaint satisfy that "positive act" element required to find

municipal liability for public nuisance, it is clear that the public nuisance claim fails here because

of the absence of sufficient allegations concerning Hamden's intent.

In <u>Accashian v. City of Danbury</u>, 23 Conn. L. Rptr. 648, 1999 WL 27223 (Conn. Super.

Ct., Jan. 6, 1999), the plaintiffs alleged that the municipal defendants knowingly permitted

demolition and construction debris to be deposited in the municipal dump.  Moreover, the

plaintiffs alleged that the defendants "knew or should have known of the possibility" that toxic

substances would be created through this dumping.  The court granted the municipal defendants'

motion to strike the count alleging nuisance, finding that the plaintiffs had failed to plead the

level of intent required under <u>Keeney v. Old Saybrook</u>, 237 Conn. at 164.  In so doing, the court

noted:

[The plaintiffs'] allegation is a far cry from the standard required by the Supreme

> Court in [Keeney v. Old Saybrook, 237 Conn. at 164]. The plaintiffs have neither alleged knowledge of the result or substantial certainty of the result of allowing the dumping of demolition and construction materials nor have they alleged facts that would lead to an inference of such knowledge. At most, the factual allegations are that the municipal defendants knew the dumping was occurring, not what the result was or was likely to be. In contrast to a cause of action for trespass, which requires only substantial certainty of invasion, a cause of action in nuisance requires substantial certainty of danger from that invasion.

Id. at *10.  Similar to the plaintiffs in Accashian, the plaintiffs in the instant case have failed to set forth allegations that meet this standard.  Plaintiffs have failed to allege that Hamden permitted the dumping of industrial waste for the purpose of causing a nuisance or with the knowledge or substantially certainty that one would result from its conduct.  Keeney v. Old Saybrook, 237 Conn. at 164.  Consequently, the Court finds that count fifteen, to the extent it sets forth a claim for public nuisance, fails to state a claim upon which relief may be granted.

### b. Private Nuisance

Turning to the plaintiffs' claim of private nuisance, the Connecticut Supreme Court has held that, "in order to recover damages in a common-law private nuisance cause of action, a plaintiff must show that the defendant's conduct was the proximate cause of an unreasonable interference with the plaintiff's use and enjoyment of his or her property." Pestey, 259 Conn. at 361; see also Restatement (Second) of Torts § 822.  The interference may be either intentional or the result of the defendant's negligence. Id., Quinnett v. Newman, 213 Conn. 343, 348-49, 568 A.2d 786 (1990).  "Ultimately, the question of reasonableness is whether the interference is beyond that which the plaintiff should bear, under all of the circumstances of the particular case,

without being compensated." Pestey, 259 Conn. at 361.[24]  Furthermore, as discussed above, a

nuisance claim against a municipality – whether public or private nuisance – must also show that

the condition alleged to be the nuisance "was created by some positive act of the municipality,"

Keeney v. Old Saybrook, 237 Conn. 135, 164, 676 A.2d 795 (1996) (internal quotation marks

omitted), and a heightened intent element.

        As an initial matter, the plaintiffs' private nuisance claim against Hamden suffers from

the same legal deficiency as their public nuisance claim – namely, the amended complaint cannot

support a finding that Hamden acted for the purpose of causing the nuisance or knew that it is

resulting or was substantially certain to result from its conduct.  Keeney v. Old Saybrook, 237

Conn. at 164.  In addition, as Hamden notes, the amended complaint alleges that the nuisance

was created in the past, and not by some ongoing action of the defendants.  In essence, count

fifteen of the amended complaint alleges that the soil and groundwater on the plaintiffs'

---

        [24] When evaluating whether a defendant's conduct caused "unreasonable interference"
with property, a court must be mindful that:

> Whether the interference is unreasonable depends upon a balancing of the
> interests involved under the circumstances of each individual case. In balancing
> the interests, the fact finder must take into consideration all relevant factors,
> including the nature of both the interfering use and the use and enjoyment
> invaded, the nature, extent and duration of the interference, the suitability for the
> locality of both the interfering conduct and the particular use and enjoyment
> invaded, whether the defendant is taking all feasible precautions to avoid any
> unnecessary interference with the plaintiff's use and enjoyment of his or her
> property, and any other factors that the fact finder deems relevant to the question
> of whether the interference is unreasonable. No one factor should dominate this
> balancing of interests; all relevant factors must be considered in determining
> whether the interference is unreasonable.

Pestey, 259 Conn. at 361.  Whether an interference is reasonable or unreasonable is a question of
fact to be decided by the trier of fact. Williams Ford, Inc. v. Hartford Courant Co., 232 Conn.
559, 580, 657 A.2d 212 (1995).

properties were contaminated by Olin when it dumped its industrial waste into dumps maintained

and operated by Hamden in the early 1900s, and that the resulting pollution currently is causing a

private nuisance on the very same property.  One Connecticut Superior Court decision recently

addressed a claim of nuisance in a similar factual situation.  In Carroll v. Absolute Tank

Removal, LLC, 48 Conn. Supp. 166, 166, 834 A.2d 823 (2003), an oil company removed the

homeowner's oil tank from the ground and installed a new tank.  The homeowner claimed that

the new tank began to leak soon after its installation, and brought a seven-count complaint

against the oil company, which included one count of private nuisance.  The company moved to

strike the nuisance claim, arguing that it was legally deficient.  In evaluating the motion to strike,

the court began by noting that "[n]either the parties nor the court . . . have discovered any case

allowing recovery on a common law private nuisance claim for an injury to a property that

originated on that property."  Id. at 169.  The court noted, however, that decisions from the

Connecticut Supreme Court and from courts in other jurisdictions strongly suggested that

"private nuisance law has been used 'as a means of efficiently resolving conflicts between

neighboring, contemporaneous land uses.'" Id. (quoting Philadelphia Electric Co. v. Hercules,

Inc., 762 F.2d 303, 314 (3rd Cir. 1985) (emphasis in original).  Therefore, the court found that,

"because the third count fails to allege that the injury to the plaintiff's property originated outside

the land affected, it does not state a cause of action for common law nuisance."  See also Wiehl

v. Dictaphone Corp., 10 Conn. L. Rptr. 591, 1994 WL 16516 (Conn. Super. Ct., Jan. 12, 1994)

("since the plaintiff is not asserting his private nuisance claim against a defendant who is or was

in control of a neighboring parcel of land, the plaintiff's first count is legally insufficient");

Nielson v. Sioux Tools, Inc., 870 F. Supp. 435, 443 (D.Conn. 1994)("because the defendant is

the plaintiff's predecessor in possession of the property, and not a present neighbor, the court concludes that the plaintiff lacks standing [to bring a private nuisance claim].").

As in <u>Carroll</u>, the plaintiffs here have not alleged that Hamden is in control of a neighboring piece of land from which the alleged nuisance is emanating. To the contrary, the alleged nuisance is within the plaintiffs' own properties.

Consequently, because the plaintiffs do not allege that Hamden knew or was substantially certain of the resulting nuisance and also because the nuisance emanates from plaintiffs' own properties, the Court finds that count fifteen, to the extent it sets forth a claim for private nuisance, fails to state a claim upon which relief may be granted.

### iv. Infliction of Emotional Distress

In count twelve, the plaintiffs set forth a claim for "infliction of emotional distress." Hamden interprets this claim as one for intentional infliction of emotional distress, and contends that the plaintiffs' allegations are legally deficient. The plaintiffs contend that they have asserted claims for both negligent and intentional infliction of emotional distress claims. Therefore, the Court first must determine whether plaintiffs have alleged negligent or intentional infliction of emotional distress claims, or both.

The tort of intentional infliction of emotional distress under Connecticut law is comprised of four elements: (1) that the actor intended to inflict emotional distress; or that he or she knew or should have known that emotional distress was a likely result of his or her conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.

Appleton v. Board of Education, 254 Conn. 205, 210-11, 757 A.2d 1059 (2000); DeLaurentis v. New Haven, 220 Conn. 225, 266-67, 597 A.2d 807 (1991);  Bell v. Board of Education, 55 Conn.App. 400, 409-10, 739 A.2d 321 (1999).  In contrast, the elements of a claim for negligent infliction of emotional distress are: "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." Carrol v. Allstate Ins. Co., 262 Conn. 433, 444, 815 A.2d 119 (2003).

In count twelve of the amended complaint, the plaintiffs claim that Hamden's alleged actions and omissions "represent conduct that is so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency," that Hamden knew or was reckless in not knowing that these actions or omission would inflict emotional distress on the plaintiffs and other purported class members, and that severe emotional distress was inflicted.  Based on these allegations, the Court agrees with Hamden that count twelve sets forth only a claim for intentional infliction of emotional distress.[25]

As to the legal sufficiency of that claim, it is for the court to determine in the first instance whether alleged conduct of a defendant may, as a matter of law, be found to satisfy the elements of an intentional infliction claim. Appleton v. Board of Education, 254 Conn. at 210-11; Ancona v. Manafort Bros., Inc., 56 Conn.App. 701, 712, 746 A.2d 184 (2000); Scott v.

---

[25]Even if count twelve of the amended complaint could be construed as a claim for negligent infliction of emotional distress, the Town of Hamden is not subject to such a claim because it is protected by common law municipal immunity.  This is discussed at length in the summary judgment portion of this opinion.

Town of Monroe, 306 F. Supp.2d 191, 198 (D.Conn. 2004).  Again, the first element is that the

actor intended to inflict emotional distress; or that he or she knew or should have known that

emotional distress was a likely result of his or her conduct.  Appleton, 254 Conn. at 210.  Based

on the facts alleged in the complaint, it cannot be found as a matter of law that Hamden knew or

should have known that its actions or omissions would inflict emotional distress on the plaintiffs.

The plaintiffs were not living at the landfill sites at the time of the dumping; indeed, the area was

not developed and their residences were not constructed until after the dumping on that property

was long completed. The dumping was conducted pursuant to a policy aimed at filling in

wetlands and low lying areas to reduce mosquito infestation, and there is no allegation in the

amended complaint that the dumping was conducted in a manner that violated the law at that

time or for some improper purpose.

The second element requires the defendants' conduct to be extreme and outrageous.

Appleton, 254 Conn. at 210-11.  The Connecticut Supreme Court has stated that:

> Liability for intentional infliction of emotional distress requires conduct that
> exceeds all bounds usually tolerated by decent society . . . Liability has been found
> only where the conduct has been so outrageous in character, and so extreme in
> degree, as to go beyond all possible bounds of decency, and to be regarded as
> atrocious, and utterly intolerable in a civilized community. Generally, the case is
> one in which the recitation of the facts to an average member of the community
> would arouse his resentment against the actor, and lead him to exclaim,
> Outrageous! . . . Conduct on the part of the defendant that is merely insulting or
> displays bad manners or results in hurt feelings is insufficient to form the basis for
> an action based upon intentional infliction of emotional distress.

Id. (internal citations and quotation marks omitted).  Courts in this district, following the

guidance of Connecticut state court decisions, have dismissed claims for intentional infliction of

emotional distress that contain only conclusory allegations of extreme and outrageous conduct.

See, e.g., Scott v. Town of Monroe, 306 F. Supp.2d 191, 198-99 (D.Conn. 2004) (granting

motion to dismiss when facts pled by plaintiff failed to establish extreme or outrageous conduct); Golnik v. Amato, 299 F. Supp.2d 8, 16-17 (D.Conn. 2003)(same); Grigorenko v. Pauls, 297 F. Supp.2d 446, 448 (D.Conn. 2003) (same); Harhay v. Blanchette, 160 F. Supp.2d 306, 315 (D.Conn. 2001), reversed in part on other grounds, 323 F.3d 206 (2d. Cir. 2003)(same); see also Mulkin v. Anixter, Inc., No. 3:03CV901, 2004 WL 288806 (D.Conn. Feb 10, 2004) (plaintiff's intentional infliction of emotional distress claim dismissed because it didn't meet the "stringent requirements" for such a claim).

Even when construed in a light most favorable to the plaintiffs, Hamden's alleged conduct cannot reasonably be characterized as "extreme and outrageous".  The encouragement of landfills in the Newhall section of Hamden to address the mosquito problem and then to develop residential properties was appropriate at the time, and the lack of knowledge of the dangerous aspects of the fill materials is not controverted by the allegations of the complaint.  This conduct, even if true and viewed in a light most favorable to the plaintiff, cannot establish that Hamden engaged in extreme or outrageous conduct. Consequently, count twelve is dismissed.


**III.     Motion for Partial Summary Judgment**

### A.     Additional History of the Newhall Landfills and Dumps[26]

Throughout the late 1800s, Hamden monitored and attempted to regulate the spread of disease caused by garbage and pig sties, and low lying swamp-lands.[27]  By 1912, Hamden had a

---

[26]The following facts are undisputed unless otherwise indicated.

[27]For example, in 1895, new rules were established to abate the emerging health risks caused by garbage disposal.  Those rules "prohibited persons from accumulating decomposing and decaying food (meat, fish, vegetables) in or around dwellings and businesses . . . and from

related mosquito breeding problem, which raised concern about the spread of malaria and yellow fever.  The town responded that year by introducing an experimental garbage collection program for some town residents to bring garbage to pigsties.[28]  The town took steps the following year to further address the mosquito breeding by draining and filling swamps and increasing the sun exposure to those areas.  Hamden also began spreading oil on low lying swamp grounds, also a common practice then for reducing mosquito infestation.  In 1916, the New Haven Water Company and Winchester Repeating Arms, two New Haven companies that were major employers in the area, drained a large tract of land on the corner of Morse and St. Mary Streets, in the Newhall Section.  When completed, the draining project eliminated the largest single malaria-breeding swamp in Hamden.  It also became one of Winchester's multiple waste dumping areas.  During this period, the town also recommended that residents prevent the accumulation of standing water on properties where mosquitoes were likely to breed.  For the first time, apparently, Hamden also established three town-controlled public dumping places in

---

throwing, dumping or depositing garbage, decaying animal or vegetables upon any vacant lot, highway, public place, brood, pond or spring." (Defendant's 56(a)1 Statement, ¶ 3).

[28]According to the town's annual reports, no town fees were charged for garbage licenses or collection.  In 1913, the Town Health Officer noted that, "Perhaps from a financial standpoint the collection [of garbage] is not a great success but it certainly is from a sanitary one." (Defendant's Ex. 22, p. 40).   Prior to 1937, the Town Health Inspector oversaw the supervision and regulation of Hamden's garbage collection and dumps because of the nuisance they may cause to public safety and public health.  Thereafter, supervision of the dumps was transferred to the Town Department of Public Works.  In 1934, those carting rubbish and ash in Hamden were required to obtain permits.  Fees were not collected or charged for these permits.  According to Board of Finance reports for the years between 1934 and 1950, these permits did not produce revenue for the town. By 1942, only one dump remained for use by the residents.

order to mitigate the risks of uncontrolled dumps.[29]

By 1925, Hamden's Annual Report noted the reasons for filling in swampland: "Dumps can be located on waste land, swamps, etc. thereby eliminating mosquito breeding places and creating play-grounds and public parks, much needed in this community." (Plaintiffs' Ex. 30 at 73). Hamden had also began issuing building permits as early as 1914 for property development. Private homes in the Newhall section were developed primarily between 1920 and 1960. Many of the homes built during this period were built on landfill. This included the area that had been drained by Winchester and the New Haven Water Company, and later filled by Winchester. In the mid-1950s, Hamden also built a middle school and recreational center in Newhall on land that had been previously owned by the New Haven Water Company and had received waste from Winchester.

Notwithstanding this development of private homes, by 1934 Newhall still consisted primarily of swamps and wetlands. Winchester Repeating Arms, whose major plant was located in New Haven, by then was regularly dumping its waste, including ash, lead, arsenic, and other industrial wastes in areas of Newhall. The primary dump used by Winchester was the Newhall Street dump, which later became the site of the Hamden Middle School and community center. Hamden did not receive payments from Winchester Repeating Arms for its dumping there. This dump became the subject of complaints in the late 1930s because of the dust and ash that was blown onto nearby properties.

In 1937, the Hamden Board of Health reported that "Real Estate men have approached the

---

[29]There is some dispute between the parties over whether members of the public were encouraged to allow their properties to be used as dumps. Nevertheless, the regulation of dumps became key to the abatement of the mosquito nuisance problem.

Town to ask that the Newhall Street dump be closed so that the property in the area may be developed for building purposes." (Defendant's Ex. 63, Jan. 8, 1937 report). Based on the Health Officer's opinion that the dumping was sufficient to fill in the mosquito breeding area, a contract was signed with the Town for its real estate development.

By 1957, the dumps ceased to operate. (CO at 8, 9, 20). There is no dispute that many of the plaintiffs' homes were built on land formally part of the landfill dump program overseen by Hamden and that Olin's predecessor, Winchester, provided much of the landfill materials from its industrial waste.


### B.    Standard of Review for Summary Judgment

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). The burden of showing that no genuine factual dispute exists rests upon the moving party. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000) (citing Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir. 1994)). Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. Anderson, 477 U.S. at 255;

Graham, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no

rational finder of fact could find in favor of the non-moving party."  Carlton, 202 F.3d at 134.

"When reasonable persons, applying the proper legal standards, could differ in their responses to

the question" raised on the basis of the evidence presented, the question must be left to the jury.

Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).


C.    Discussion

The Town of Hamden argues that the Court should grant summary judgment on certain

counts because it is protected from liability by the doctrine of governmental immunity.  Hamden

specifically seeks summary judgment on the counts alleging negligence, gross negligence and

reckless conduct,[30] negligence per se,[31] infliction of emotional distress,[32] and nuisance.  Plaintiffs'

---

[30]Connecticut courts do not recognize an independent cause of action for gross negligence.  See Martin v. Shell Oil Co. 180 F. Supp.2d. 313, 325 (D. Conn. 2002), citing Decker v. Roberts, 125 Conn. 150, 157 (1939).  Recklessness is discussed in text, infra.

[31]Although the Court grants Hamden municipal immunity from claims based on negligence, it is worth noting, without resolution of the issue, that with regard to plaintiffs' claim for negligence per se (count 8) Connecticut courts have not consistently held that violations of Conn. Gen. Stat. § 22a-427 constitutes negligence per se.  See Water Company v. Town of Thomaston, 1996 WL 168051, **1-4 (Conn. Super. Ct., March 4, 1996) (determining that the doctrine of negligence per se should not be extended to all environmental statutes.). cf. French Putnam v. County Environmental Services, 2000 WL 1172341, **9-11 (Conn. Super. Ct., July 21, 2000) (denying a motion to strike the negligence per se claim based on a violation of Conn. Gen. Stat. § 22a-427 based on the plaintiff's allegation that it suffered the type of injury intended to be protected by the statute).

[32]Count twelve of the amended complaint for infliction of emotional distress is dismissed in the portion of the ruling concerning the motion to dismiss to the extent that it asserts a claim for intentional infliction of emotional distress.  This section of the ruling on Hamden's motion for partial summary judgment addresses, in part, that count as one for negligent infliction of emotional distress.

causes of action for nuisance have been addressed through Hamden's motion to dismiss.  This

section, therefore, will address Hamden's arguments that government immunity bars plaintiffs'

other listed claims.

At the outset, it is important to note that it is well established by Connecticut courts that

"The ultimate determination of whether qualified immunity applies is ordinarily a question of law

for the court . . . [unless] there are unresolved factual issues material to the applicability of the

defense . . .  [where] resolution of those factual issues is properly left to the jury."  Purzycki v.

Town of Fairfield, 244 Conn. 101, 107-108 (Conn. 1998), citing Mulligan v. Rioux, 229 Conn.

716, 736, n.4 (1994); Kolaniak v. Board of Education of the City of Bridgeport, 28 Conn. App.

277, 279 (1992); Gordon v. Bridgeport Housing Authority, 208 Conn. 161, 170 (1988) ("[T]his

court has approved the practice of deciding the issue of governmental immunity as a matter of

law.").

Because some of the events in question took place in Hamden nearly a century ago, the

Court must first identify the appropriate municipal immunity standard to apply.  The parties

primarily rely on Connecticut General Statute § 52-557n, "Liability of Political Subdivision and

its Employees, Officers and Agents.  Liability of Members of Local Boards and Commissions."

Section 52-557n was enacted by the Connecticut legislature as part of the Tort Reform Act of

1986.  That statute has been interpreted by Connecticut state courts and federal courts in this

District to have statutorily adopted and codified the Connecticut common law rules of

government immunity.  "Enactment of § 52-557n did not create any new liability for

municipalities which did not exist at common law."  Caman v. City of Stamford, 746 F. Supp.

248, 249 (D. Conn. 1990).   Some subsequent interpretations of the new governmental immunity

statute, however, indicate that "Section 52-557n abrogates the common-law rule of governmental immunity and sets forth the circumstances in which a municipality is liable for damages to person and property." Tryon v. Town of North Branford, 58 Conn. App. 702, 721, 755 A.2d 317, 328 (App. Ct. 2000). Indeed, other courts have recognized this apparent conflict about the nature of § 52-557n's effect on common law principles of municipal immunity. "The legislative history of § 52-557n is 'worse than murkey' and 'reflects confusion with respect to precisely what part of the preexisting law was being codified, and what part was being limited.'" Colon v. City of New Haven, 60 Conn. App. 178, 183 (2000), citing Sanzone v. Board of Police Commissioners, 219 Conn. 179, 188 (1991). Beyond noting that some provisions of the statute appear to codify common law and others do not, this Court will not address this apparent conflict, however, because "where a legislative enactment does not indicate clearly by its language that it should be applied retroactively, it is to be applied only prospectively, that is to claims arising after its enactment." Jordan v. Town of Branford, 1994 Conn. Super. LEXIS 1960, *5. Section 52-557n "bear[s] no unequivocal legislative statement of intent to apply to causes of action arising before October 1, 1986. In the absence of any clear intent as to retroactive applications, the provisions cited by the movants do not apply." Id. at *7. Because the statute was not intended to apply retroactively and also because of the lack of clarity about whether statute merely codified common law, this Court will only apply Connecticut common law principles of governmental immunity; arguments made by the parties for statutory analysis of § 52-557n will not be resolved.[33]

---

[33]It appears, though, that application of § 52-557n would not result in a different conclusion here.

Generally, according to Connecticut common law, "a municipality is immune from liability for the performance of governmental acts, as distinguished from ministerial acts." Gauvin v. City of New Haven, 187 Conn. 180, 184 (1982). "A municipality is engaged in the performance of a governmental function when its action is for the benefit of the public and not for its own corporate profit." Spitzer v. City of Waterbury, 113 Conn. 84, 87 (1931). A ministerial act "refers to a duty which is to be performed in a prescribed manner without the exercise of judgment or discretion." Tango v. City of New Haven, 173 Conn. 203, 204 (1977). Apart from ministerial acts and actions for "corporate profit", the Connecticut courts recognize three exceptions to governmental immunity from liability for discretionary acts. First, "where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm." Evon v. Andrews, 211 Conn. 501, 505 (1989). Second, governmental immunity may be abrogated by specific statutes providing liability "against a municipality or municipal official for failure to enforce certain laws." Id. Finally, there is no governmental immunity when "the alleged acts involve malice, wantonness, or intent to injure, rather than negligence." Id. Each count against Hamden that is addressed in this ruling is pled in negligence. The Court will therefore apply the relevant exceptions in three parts: First, whether the Town's undisputed conduct consisted of discretionary governmental acts; Second, whether the Town was engaged in a proprietary function in dealing with its garbage, landfill, and mosquito issues; And third, whether any of the Town's conduct in receiving the Winchester waste was in reckless disregard of health or safety.

Hamden asks the Court to assess the following questions. First, "whether the Town's concern and role in eliminating mosquito breeding grounds in Hamden was for any purpose other

than the protection of the health, safety, and welfare of its residents in fulfillment of a

discretionary, governmental duty." (Defendant's MSJ, p. 13, ¶ 1).  Second, "whether the Town

established or operated any dumps in the Newhall Section for profit so that its acts were

proprietary - as opposed to governmental - in nature." (Id. ¶ 2).  Third, "whether the issuance of

building permits and certificates of occupancy for the houses developed in the Newhall Section

constitute discretionary, governmental functions as opposed to ministerial or proprietary

functions." (Id. ¶ 3).  Finally, "whether any of the activities performed by the Town constituted a

reckless disregard for health or safety." (Id. ¶ 4).  These issues will also be specifically

considered as part of the following discussion.


### _____ i. Discretionary Governmental Function Analysis

The Town of Hamden argues that it performed discretionary government functions by

seeking to eliminating mosquito breeding grounds through filling in wetlands and encouraging

fill on private property, by establishing dumps, and by issuing building permits and certificates.

According to Connecticut courts, whether particular conduct is discretionary or ministerial is

generally a question of fact.  Tice v. Southington Board of Education, 2001 U.S. App. LEXIS

1095, *6 (2001); Gauvin v. City of New Haven, 187 Conn. 180, 186 (1982) ("Whether the acts

complained of in operating a city park were governmental or ministerial is a factual question

which depends upon the nature of the act complained of.").  The Connecticut courts have found

that the distinction between ministerial and discretionary municipal functions rests on the

exercise of judgment.  "It is axiomatic that 'ministerial acts [are those that] are performed in a

prescribed manner *without the exercise of judgment*. . . .'" Evon v. Andrews, 211 Conn. 501,

506-7 (1989), <u>citing</u> <u>Gauvin v. New Haven</u>, 187 Conn. 180, 194, (1982) (emphasis in original).

Where there are no disputed issues of material fact, however, the Court may make a

determination as a matter of law regarding the application of the defense to immunity.  <u>See, e.g.,</u>

<u>Martel v. Metropolitan District Commission</u>, 275 Conn. 38, 49-51 (2005) (affirming the Superior

Court's summary judgment finding in favor of the defendant municipality because there were no

genuine issues of material fact regarding the discretionary nature of the municipality's conduct,

allowing the Court find as a matter of law that it was protected by municipal immunity.);

<u>Lombard v. Peters</u>, 252 Conn. 623, 628 (Conn. 2000) ("Although the determination of whether

official acts or omissions are ministerial or discretionary is normally a question of fact for the

fact finder . . . there are cases where it is apparent from the complaint." <u>citing</u> <u>Evon v. Andrews</u>,

211 Conn. at 505-507.).

There are no genuine issues of material fact as to whether the Town of Hamden was

acting in a discretionary or ministerial function when it sought to eliminate the mosquito

breeding grounds, or by monitoring and establishing dumps, and issuing building permits for

residential development.  There is ample undisputed evidence from the Town of Hamden Annual

Reports and Board of Health Reports that the Town first monitored and then addressed the

mosquito breeding problem through the approach of filling in particular areas and managing

dumps.  The parties also agree that the Town made expenditures in 1929 and 1937-1941 to abate

mosquito breeding. (56(a)(1) and (a)(2) statements ¶ 15).

Plaintiffs argue, however, that the Town no longer recognized a mosquito problem at

some time in the early twentieth century.  That assertion does not change the Court's analysis, as

the Town still encouraged the filling for the purpose of developing homes in town.  Also, many

of the Health Reports also indicated that at least some of the dumps were established as part of a new municipal waste management system.  While there is some question about which dumps were specifically owned by the Town, there is little controversy over the fact that until 1937, "the Hamden Health Officer maintained regulatory authority over garbage and dumps in Hamden." (See 56(a)(2) statement, ¶ 22).  There is likewise no question of material fact regarding the discretionary nature of Hamden's issuance of building permits.  While no evidence was submitted that sets forth the procedures for acquiring a building permit, the Court joins with numerous prior Connecticut courts in finding that the issuance of a permit or license is fundamentally discretionary in nature.  See e.g., Farnsworth v. Horrigan, 1999 WL 49393, *2 ("Clearly, the issuance of a governmental permit and conducting inspections as well as issuing the certificate of occupancy, relative thereto, are discretionary acts."); Maresca v. New Britain, 1994 WL 228456, *3 ("The issuance of building permits and certificates of occupancy are governmental functions."); Prestia v. Zajac, 1992 WL 231351, *1 (The issuance of a certificate of occupancy "necessarily involves the governmental decision making process and requires and exercise of discretion.").  Therefore, there is no genuine issue of material fact that would prevent the Town of Hamden from invoking immunity for these discretionary acts.

ii. Proprietary Function Analysis

Hamden also argues that its role in the dumps and landfills in the Newhall section involved discretionary governmental functions, not ones proprietary in nature.  Plaintiffs argue that there are numerous material questions of fact regarding the nature of Hamden's interest in

the establishment and operation of the landfills.  The Connecticut courts that have addressed the

distinction between governmental and proprietary acts have determined that often the distinction

rests on questions of fact.  See, e.g., McDermott v. Calvary Baptist Church, 1999 WL 73981,*2

(Conn. Super. Ct., Feb. 5, 1999) ("Whether the duty to maintain a municipal parking lot is the

exercise of a muncipalities' [sic] governmental/discretionary function or rather a proprietary

function involves several questions of fact."); Savelli v. Town of Windsor, 1999 WL 1063405,

*2 (Conn. Super. Ct., Nov. 3, 1999) ("Whether the operation and maintenance of the landfill

transfer station is an exercise of a governmental or proprietary function involves several

questions of fact."); Lakin v. Matties Automotive Service, 1996 WL 689941, *2 (Conn. Super.

Ct., Nov. 20, 1996) ("In the instant case it would be a question of fact as to whether the operation

of the municipal parking lot is a governmental function, or conversely, a proprietary function.").

        In evaluating municipal conduct in landfill and waste disposal operations, such factual

inquiries involve:

> Whether fees [were] charged, whether the town covers all or part of the costs or
> whether the landfill generates a profit, whether the landfill is operated for the
> comfort and convenience of the citizens thereby providing them a corporate
> benefit or conversely whether it is the fulfillment of a governmental function
> related to the health, safety, and welfare of the public at large.

Savelli, 1999 WL at *2; McDermott, 1999 WL at *2; Lakin, 1996 WL at *2.  Such inquiries are

based on the common law guidance that:

> In order to deprive a municipal corporation of the benefit of governmental
> immunity, the act or function must involve special corporate benefit or pecuniary
> profit inuring to the municipality.  If this element is present, the fact that the
> revenue or profit is applied to the maintenance of the property and the reduction
> of the debt incurred in its construction or acquirement, or otherwise ultimately to
> the benefit of the public, is not sufficient to create immunity.
>         To remove the benefit of the principle, however, the operation must
> contemplate and involve revenue of such amount and nature as to signify a profit

resulting therefrom, as distinguished from the imposition of such a nominal or
small fee or charge as may fairly be regarded as a mere incident of the public
service rendered, such as the fees imposed for the use of the swimming pool
facilities involved in Hannon v. Waterbury. . . .

Carta v. City of Norwalk, 108 Conn. 697, 702 (1929) (citations omitted).

The application of the Savelli and Carta factors in this case indicate that Hamden was not

performing a proprietary function when it operated and maintained the Newhall landfills.  First,

the only evidence of a fee that was charged for the landfills was not for the use of the dumps

directly, but rather for the carting of rubbish and ash.  Second, there is no evidence provided by

the plaintiffs to indicate that Hamden reaped any form of direct profit from the operation of the

landfills.  Finally, there is ample undisputed evidence from town records throughout the late

nineteenth and early twentieth centuries that Hamden first established the landfills in order to

mitigate the potential for a malaria or yellow fever epidemic caused by mosquito breeding in low

lying areas and then to create more property that could be developed for private homes and

public schools and parks.

According to recent Connecticut opinions, however, the "benefit to the public" may not,

by itself, conclude the analysis of a municipality's proprietary function.  "The distinction between

governmental and proprietary acts is not drawn on the basis of whether the activity serves the

public."  Accashian v. City of Danbury, 1999 Conn. Super. LEXIS 36 *4-5.  That being so, the

tortious conduct subject to the challenge must be connected to the proprietary nature of the

municipality's activity.  Elliott v. Waterbury, 245 Conn. 385, 412-13 (1997) (distinguishing the

line of Connecticut water utility cases, in which the provision of water was found to be

proprietary in nature, from the case arising from the injury of a jogger who was allegedly shot by

a hunter on municipal property.).  Where there are no genuine issues of material fact, the Court

may determine, as a matter of law, whether the proprietary function defense to municipal immunity applies. Id., at 414 ("[T]he plaintiff does not allege, and there is no indication in the record, that Waterbury received corporate gain or benefit from the hunting. In these circumstances, we conclude that, as a matter of law, the conduct of which the plaintiff complains constituted governmental, not proprietary, acts.").

The materials presented by the plaintiffs do not raise the existence of any issue of material fact as to whether the acts of the Town were proprietary in nature, therefore abrogating its governmental immunity. Plaintiffs make two primary arguments. First, they argue that the Town had a corporate benefit by allowing Winchester Repeating Arms to dump its industrial waste in landfills in Hamden. Specifically, plaintiffs argue that there was pecuniary benefit to the Town because it was relieved of the costs of draining areas of land in Hamden, and filling wetlands and low lying areas that were home to large-scale mosquito breeding would also provide areas for home development. Plaintiffs, however, point to no factual basis that indicates that the Town directly profited from this alleged relief from expenditure as defined by the Connecticut decisions. Even if there were evidence to support the plaintiffs' position that the Town did not need to pay for the draining and filling of at least some of Hamden's wetlands and low lying areas because of the filling by Winchester, such evidence is not sufficient to indicate that the Town received any corporate profit. For immunity to be abrogated because a municipality acts in its own proprietary or corporate interest, some discernable profit must be reaped by the that municipality, and that profit must be direct and more than minimal. See Carta at 72; Elliott at 412-13. Likewise, plaintiffs' argument that no government function was served by operating the landfills does not lead to finding that the municipality must be acting out of

-48-

pecuniary interest.  Lacking in this case are any records of corporate profit received by the Town through the draining and filling of the Newhall dumps.  Given the detailed nature of the undisputed Town records that have been uncovered through discovery in this case, and in the DEP investigations, the absence of such information does not lead to a material question of fact.  Rather, it indicates that no such "profit" was received by Hamden from Winchester for the use of the Newhall dumps that would remove the shield of immunity.

Plaintiffs also specifically argue that this dumping generated long term "profits" for Hamden because it "converted unusable and unprofitable swampland into a tax-generating residential neighborhood." (Plaintiffs' Opposition Brief, p. 13).  The plaintiffs maintain that the Town's receipt of revenue from building permits and the resulting property taxes from residential development was due to the fact that the property in the Newhall section could be developed as a result of the drained and filled low lying areas.  According to the plaintiffs, "in addition to realizing revenue from the issuance of building permits, the Town of Hamden has reaped the benefit of an expanded tax base, a school property and a park, all of which accompanied the residential developments of the Newhall Section."  (Plaintiffs' Opposition Brief, p. 15).  These benefits, they argue, should subject Hamden to liability.

The issue then, is whether this type of indirect public benefit was proprietary in nature.  The parties do not dispute that fees were paid for building permits, or that properties were developed in the Newhall section of Hamden after 1920, which generated increased property taxes.  However, the evidence provided by the plaintiffs does not indicate that Hamden primarily filled the land in the Newhall Section for the purpose of promoting residential housing development so as to achieve greater tax revenues.  Rather, although the effort to reduce

mosquito breeding may have changed to creating more land and residential development, schools and parks, there is no evidence of a "profit-making" purpose behind that transition.  Rather, the clear purpose was one similar to most municipalities: the improved development of residential communities.  It is simply too tenuous a connection between the fees collected for the building permits and their long-term implications for the Town to find that they were issued for pecuniary or corporate benefit.   The Connecticut Supreme Court made the important distinction in <u>Elliott</u> between prior cases that found that water utilities were proprietary in nature and that case where a jogger was injured when he was shot by a hunter on municipal property.  The Court found that:

> In each of those [water utility] cases, this court concluded that the municipal defendants could not avail themselves of immunity because the municipalities were engaged in the allegedly tortious actions for the sake of corporate gain rather than for the administration of government. . . . Unlike the present case, in each of those cases, the allegedly tortious conduct of the municipalities was inextricably linked to the operation of the water utility for corporate gain.

<u>Elliott</u>, at 413, <u>citing</u> <u>Hourigan v. Norwich</u>, 77 Conn. 358 (1904); <u>Richmond v. Norwich</u>, 96 Conn. 582 (1921); and <u>Abbott v. Bristol</u>, 167 Conn. 143 (1974).  There must be a direct link, then, between the municipal authority and the pecuniary benefit.  There is certainly some evidence to show that the Town intended to build recreational facilities and schools on top of some of the Newhall landfill, and even encouraged residential development.  That evidence does not, however, indicate that the Town was seeking, much less receiving, a direct corporate or pecuniary benefit recognized by the Connecticut decisions which abrogate municipal immunity.

By accepting refuse from Winchester Repeating Arms and filling the low lying areas of the Newhall section of Hamden, the Town was not acting in a proprietary way.  It therefore, remains immune from liability.

### iii.    Reckless Disregard of Health and Safety Analysis

Hamden lastly argues that there is no genuine issue of material fact that its conduct was not in reckless disregard of health and safety.  Plaintiffs argue that the health risks of arsenic and lead – both of which were present in Olin's industrial waste that was dumped in the Newhall Section of Hamden – were well known at the time.  At common law, the immunity typically enjoyed by municipalities for discretionary acts was abrogated "where the alleged acts involve malice, wantonness or intent to injure, rather than negligence." Evon, at 505.

The plaintiffs present evidence that indicates that there were commonly known health risks in the twentieth century from touching, ingesting, or inhaling lead or arsenic.  The affidavit provided by Professor James Sargent details the history of lead and arsenic poisoning.  Sargent explains that "prior to the industrial revolution, lead poisoning was less an occupational disease and more often a disease of consumers poised by lead in food or drink." (Sargent Affidavit, at 3).  Through the mid-nineteenth century, lead poisoning was understood to emanate from the use of lead pipes or lead barrels to store alcohol.  According to Sargent, lead poisoning was also found in workers in industries such as smelting, white lead production, tool production, and production of lead shot.  While the ingestion of lead was long understood be harmful, according to Sargent, the respiratory absorption of lead was not understood to be a hazard until the mid-twentieth century.[34]

---

[34]It is additionally worth noting that federal environmental regulation of lead did not exist until the passage of the Clean Air Act of 1970, Pub. L. No. 91-604, 84 Stat. 1698-1700 (1970), which authorized the newly established Environmental Protection Agency to regulate fuel additives, including lead.

Sargent likewise details the history of arsenic poisoning. He states that arsenic was well-known in homicide cases dating to 1384. "Arsenic was known to be a strong poison . . . . The symptoms of acute arsenic poisoning were known by toxicologists by the 19th century. The interval between ingestion and onset of symptoms, and between onset of symptoms and death was also well known from numerous homicide investigations." (Sargent Affidavit, at 11). Arsenic was also used in the industrial production of pigments, dies, insecticides, and rodenticides. Such production risked the creation of harmful arsine gas when arsenic came in contact with hydrogen. According to Sargent, "Contact with arsine results in the destruction of red cells, bloody urine, renal failure, jaundice and death." (Sargent Affidavit, at 12).

The plaintiffs' evidence is convincing that lead and arsenic were known to be harmful when ingested, inhaled, or touched. The evidence does not, however, show that it was commonly known at the time of the operation of the Newhall landfills that the presence of either of these toxins in landfill material posed any health or safety threat to those who later developed or occupied the land. Therefore, there is no genuine issue of material fact regarding the exception to common law municipal immunity for reckless disregard to the health and safety of the residence of the Newhall Section.

There are no genuine issues of material facts as to whether the Town of Hamden is protected by municipal immunity. Partial summary judgment as to governmental immunity is therefore **GRANTED** to the Town of Hamden as to the counts based on negligence.[35]

---

[35] The analysis in this section concerning recklessness also applies to count four of the amended complaint, which alleges gross negligence/recklessness as a separate cause of action.

In conclusion, Hamden's motion to dismiss counts six, ten, twelve and fifteen **[Doc. # 34]** is **GRANTED**.  Likewise, Hamden's motion for summary judgment **[Doc. # 118]** is **GRANTED** as to counts two, four, and eight.

SO ORDERED this __28__ <sup>th</sup> day of February, 2006, at Hartford, Connecticut.


_____/s/ CFD_____
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**