## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CLARENCE R. COLLINS, JR., et al., | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. |
| | : | 3:03 CV 945 (CFD) |
| OLIN CORPORATION, et al. | : | |
| Defendants. | : | |

## RULING ON DEFENDANT OLIN CORPORATION'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

The plaintiffs in this action, homeowners in the Newhall section of Hamden, Connecticut, allege that their properties contain contaminated soil and groundwater as a result of conduct by the defendants, the Town of Hamden and the Olin Corporation ("Olin"). The plaintiffs brought a putative class action on behalf of themselves and a class of similarly situated individuals, seeking damages for the diminution in the value of their properties, response costs, loss of use and enjoyment of their properties, and emotional distress.[1]

Olin has moved for partial summary judgment, arguing that it is not liable for the actions of a predecessor corporation, Winchester Repeating Arms Company of Delaware. For the following reasons, Olin's motion is **GRANTED.**

## I. Background

The Winchester Repeating Arms Company ("Winchester") began manufacturing firearms at its factory in New Haven, Connecticut in 1866. By the turn of the century, Winchester's plant

---

[1]The plaintiffs' motion to certify the class remains pending before this Court.

covered eighty acres and had become a major employer in the New Haven area. Its Winchester

repeating rifle had achieved worldwide use and fame as "The Gun that Won the West."[2]

Winchester was a Connecticut corporation until 1929 when, during that time of national

economic distress, it was reorganized because of financial difficulties into a newly-formed

Delaware corporation, Winchester Repeating Arms Company of Delaware ("Winchester-

Delaware").[3]

  In 1931, because of its continued weakened financial status, Winchester-Delaware was

the subject of a receivership ordered by the United States District Court for the District of

Connecticut. The appointment of the receiver was precipitated by the filing of a "creditor's bill"

against Winchester-Delaware.[4] Under the supervision of a court-appointed special master, the

Winchester Reorganization Committee ("Committee") was established to develop a proposal for

the sale of the company. The Committee subsequently found that:

> In view of the deficits for the years 1929 and 1930, and the inability to show
> operating profits under the receivership . . . . It became apparent, therefore, that
> the interests of the creditors of the Winchester Company would be best served
> by affiliation with some strong organization in its field, or in related fields . . . .

---

[2]Winchester had also expanded its activities to include the manufacture of household items, tools, and sporting goods through its subsidiaries.

[3]In 1929, Winchester Repeating Arms Company of Delaware acquired the assets of the Winchester Repeating Company and a companion company, the Winchester Company. That transfer is not raised by either party as a relevant issue here.

[4]A creditor's bill is defined as an "[e]quitable proceeding brought to enforce payment of debt out of property or other interest of debtor which cannot be reached by ordinary legal process." BLACK'S LAW DICTIONARY 369 (6th Ed. 1990), citing Sackin v. Kersting, 105 Ariz. 464 (1970). "The ordinary federal equity receivership prior to the federal reorganization statutes was usually commenced in the federal district court by the filing of a creditor's bill and an answer admitting its allegations and joining in the prayer for relief." 16 FLETCHER CYCLOPEDIA OF PRIVATE CORP. § 7675.

> Accordingly, the Committee entered into negotiations with other corporations
> engaged in the arms and ammunition business with a view to the acquisition by
> them of the business and property of the Winchester Company.

Doc. # 130, Plaintiffs' Ex. 2 at 5 (Plan and Agreement of Reorganization and Sale of Winchester

Repeating Arms Company, October 28, 1931).  The Committee recommended the sale of

Winchester-Delaware to the Western Cartridge Company, an Illinois ammunition manufacturer

also interested in producing firearms.  Id. at 10.[5]

The District Court ordered that Winchester-Delaware's assets be sold at a public auction.

The assets were sold on December 15, 1931 to P.C. Beardslee and Ben-Fleming Sessel,

employees of the Kidder Peabody Trust Company, a substantial creditor of Winchester-

Delaware.  Doc. # 130, Plaintiffs' Ex. 3 at 4-5 (Decree Confirming Sale, Dec. 22, 1931)

("Decree Confirming Sale").  Sessel was the secretary of the Winchester Reorganization

Committee and its subcommittee, the Bondholders Protective Committee.  Doc. # 130, Plaintiffs'

Ex. 2 at 2.  Beardslee was the secretary of the Debenture Holder Committee, another

subcommittee of the Winchester Reorganization Committee.  Id.  On December 22, 1931,

Beardslee and Sessel "assigned, transferred and set over" their ownership of the Winchester-

Delaware assets to the Winchester Repeating Arms Company of Maryland ("Winchester-

Maryland") in a court-approved proceeding.  Decree Confirming Sale, at 5.[6]  Winchester-

---

[5]The Western Cartridge Company was founded in 1898 by John Olin.  It is the
predecessor to the Olin Corporation.

[6]Beardslee and Sessel purchased the assets for $4,000,000 in cash.  Their sale to
Winchester-Maryland involved $3,000,000 in cash and $4,800,000 par value preferred stock of
Western Cartridge.  It is undisputed that Western Cartridge funded the initial purchase by
Beardslee and Sessel as well as the subsequent purchase by Winchester-Maryland.  Although it is
unclear why the sale occurred in these two stages, it was the plan of the Winchester
Reorganization Committee that Winchester-Maryland would ultimately receive the assets and

-3-

Maryland was a newly-created subsidiary of the Western Cartridge Company, and acquired only the assets of Winchester-Delaware, not its stock. The District Court found that the sale was fair and equitable. Id. at 6.[7]   The Court also enjoined the liability of Winchester-Maryland for the prior obligations of Winchester-Delaware:

> All creditors and stockholders of, and claimants against, the Delaware Company [(Winchester-Delaware)], and/or the Connecticut Company [(Winchester Repeating Arms Company)], including, but without limiting the generality of the foregoing, all holders of Bonds and coupons, all holders of Debentures and coupons . . . their respective creditors and stockholders, are hereby severally and respectively perpetually enjoined from prosecuting against the Receivers or against said P.C. Beardslee and Ben-Flemming Sessel, their executors and/or administrators, or against the Maryland Company [(Winchester-Maryland)], its successors or assigns or against any nominee or assignee or grantee of said P.C. Beardslee and Ben-Fleming Sessel . . . or against any person or persons, corporation or corporations, claiming by, under or through them or any of them, or against any of the property sold pursuant to the Final Decree, any suit or proceeding arising out of or based on any obligation or liability of the Delaware Company and/or the Connecticut Company or otherwise to impose liability upon the said P.C. Beardslee and Ben-Fleming Sessel, or the executors or administrators of either of them, or upon the Maryland Company, its successors or

_____

that Western Cartridge would fund the transaction with its cash and stock in these amounts.  The entire purchase price for the assets of Winchester-Delaware went to its creditors; Winchester-Delaware's shareholders did not receive any value from the transaction.  It also appears that the sale first went through Beardslee and Sessel before the assignment to Winchester-Maryland because Kidder Peabody was one of the creditors of Winchester-Delaware.

[7]The property subject to sale was described in Schedule A of the Court's Decree Confirming Sale:
> All property of every kind, character and description, real, personal, and/or mixed [of Winchester-Delaware] and . . . all the business, good will, including the corporate name or names, patents, trade names, trade marks, bills and accounts receivable, choses in action and cash, and all other tangible and intangible personal property, and all rights and claims now existing or which may hereafter accrue or arise. . . .

Decree Confirming Sale at 39.

assigns or upon any nominee or assignee or grantee of said P.C. Beardslee and
Ben-Flemming Sessel . . . .

Decree Confirming Sale at 23-25. Winchester-Delaware's corporate existence continued until

1935, when it was dissolved by the Delaware Department of State. Winchester-Maryland

merged with the Defendant Olin Corporation in 1944.[8]


## II. Procedural History

On May 12, 2003, the plaintiffs brought this action in the Connecticut Superior Court

against the Olin Corporation and the Town of Hamden. They alleged that industrial wastes

produced by the Winchester plant in New Haven were deposited in their neighborhood in

Hamden and have contaminated their properties. On May 28, 2003, the plaintiffs filed an

amended complaint that set forth claims for negligence; recklessness; violation of the

Connecticut Environmental Protection Act of 1971, Conn. Gen. Stat. § 22a-15 *et seq.*; engaging

in abnormally dangerous activity; intentional infliction of emotional distress; and recovery of

response costs under the Comprehensive Environmental Response, Compensation, and Liability

Act ("CERCLA"), 42 U.S.C. § 9607.

On May 28, 2003, the defendants removed the action to the District of Connecticut on the

basis of federal question jurisdiction. See 28 U.S.C. §§ 1331, 1441(b). The notice of removal

also asserted that this Court had supplemental jurisdiction over the plaintiffs' state law claims.

See 28 U.S.C. § 1367(a). Defendant Olin seeks partial summary judgment, arguing that it has no

---

[8]In 1981, Olin Corporation sold its firearms manufacturing assets to U.S. Repeating Arms
Company, a Connecticut corporation. Recently, U.S. Repeating Arms closed the New Haven
plant. Although Olin is no longer in the business of manufacturing firearms, its ammunition still
bears the Winchester name.

successor liability for the conduct of Winchester-Delaware occurring before its 1931 sale to Winchester-Maryland.[9]

### III.    Standard of Review

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).  The burden of showing that no genuine factual dispute exists rests upon the moving party.  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000) (citing Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir. 1994)).  Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor.  Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton, 202 F.3d at 134. "When reasonable persons, applying the proper legal standards, could differ in their responses to

---

[9]The Court notes that after New York v. National Services Industries, 352 F.3d 682, 685 (2d Cir. 2003), successor liability analysis of CERCLA claims is based on state common law, not CERCLA.  The parties do not dispute that Connecticut law applies here.

the question" raised on the basis of the evidence presented, the question must be left to the jury.

Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).[10]

## IV.  Discussion

Olin presents two arguments in its motion for partial summary judgment.  First, it argues that the "assets only" acquisition by Winchester-Maryland in 1931 precludes its liability for the activities of Winchester-Delaware.  Second, it argues that the injunction issued by the District Court in 1931 protects Olin from any successor liability for the activities of Winchester-Delaware.

In order to determine whether successor liability may be imposed on Olin arising from Winchester-Maryland's purchase in 1931, the Court must "examine the substance of the transaction to ascertain its purpose and true intent." National Grange Mutual Insurance Company v. Montgomery Elevator, 1994 WL 547747, at *4 (Conn. Super. Ct., Sept. 22, 1994) (citing Bowen Engineering v. Estate of Reeve, 799 F. Supp. 467, 487-88 (D.N.J. 1992)).  Generally, a corporation that acquires the assets of another entity does not assume that entity's former liabilities.  See, e.g., 15 Fletcher Cyclopedia of Private Corp. § 7122.[11]  In Connecticut, four

---

[10]The parties do not dispute that a motion for summary judgment is an appropriate device for addressing successor liability here, although plaintiffs maintain there are genuine issues of material fact precluding summary judgment.

[11]The Connecticut statute concerning assets purchases at the time of the 1931 purchase by Beardslee and Sessel and then Winchester-Maryland, provided that:
> Each corporation . . . . may, unless otherwise expressly provided in its charter or certification of incorporation, when authorized by a vote of two-thirds of all its outstanding stock of each class, at a meeting duly warned and held for the purpose sell, lease or exchange all its property and assets, including its good will and franchises, upon such terms and conditions as it shall deem expedient.

exceptions apply:

> Under the general rule, a corporation which purchases all the assets of another company does not become liable for the debts and liabilities of its predecessor unless: (1) the purchase agreement expressly or impliedly so provides; (2) there was a merger or consolidation of the two firms [or a "de facto merger"]; (3) the purchaser is a 'mere continuation' of the seller; or (4) the transaction is entered into fraudulently for the purpose of escaping liability.

Ricciardello v. J.W. Grant & Co., 717 F. Supp. 56, 58 (D. Conn. 1989) (citations omitted).

Another exception, termed the "product-line" exception, which "imposes liability on a successor corporation for defects in products that a predecessor manufactured if the asset purchaser continues to manufacture the same product," has been applied by some Connecticut Superior Courts, but has not been adopted by the state's higher courts.   Pesce v. Overhead Door Corp. & Emerson Electric Corp., 1998 U.S. Dist. LEXIS 20665, at *9-10 (D. Conn., Aug. 17, 1998); see also Kennedy v. OshKosh Truck Corp., et. al., 1995 WL 27400, at *2 (Conn. Super. Ct., Jan. 18, 1995).

The Court will consider whether Olin is subject to the "*de facto* merger" and "mere continuation" exceptions.[12]   Plaintiffs additionally argue that the product-line exception should apply to Olin, which argument also will be discussed below.

        i. "Mere continuation" or "*De Facto* Merger"

For the purposes of determining successor liability, analysis of a "mere continuation" and

---

Conn. Gen. Stat. §85-3384 (1930).  Plaintiffs do not raise non-compliance with that statute here.

[12]Olin briefed the application of all four exceptions under Ricciardello.  However, the plaintiffs only raise the merger and mere continuation exceptions, and it is clear that the others do not apply.

a "*de facto* merger" may be treated together.  See <u>Peglar v. Professional Indemnity Underwriters Corporation</u>, 2002 WL 1610037, at *6-7 (Conn. Super. Ct., June 19, 2002) ("Where a successor corporation is a 'mere continuation' of the predecessor corporation, the 'mere continuation' exception to the general rule 'in effect takes cognizance of what may be called *de facto* merger.'") (citing <u>Sullivan v. A.W. Flint Co.</u> 17 Conn. L. Rptr. 331 (Super. Ct., Aug. 5, 1996)). According to the Connecticut courts, the consideration of whether a "*de facto* merger" or a "mere continuation" of the former entity has occurred requires the weighing of four factors:

> (1) continuation of the enterprise of the seller corporation so that there is a continuity of management, personnel, physical location, assets and general business operations; (2) continuity of shareholders; (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; (4) the purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

<u>Peglar</u>, 2002 WL 1610037, at *7; <u>see also</u> <u>Ricciardello</u> 717 F. Supp. at 58 (citing <u>Ladjevardian v. Laidlaw-Coggeshall, Inc.</u>, 431 F. Supp. 834, 839 (S.D.N.Y. 1977) ("To find that a *de facto* merger has occurred there must be a continuity of the selling corporation, evidenced by the same management, personnel, assets, and physical location; a continuity of stockholders, accomplished by paying for the acquired corporation with shares of stock; a dissolution of the selling corporation; and the assumption of liabilities by the purchaser.")); <u>Savings Bank of Manchester v. Daly</u>, 2004 WL 3130581, at *1 (Conn. Super. Ct., Dec. 23, 2004) (applying the Peglar factors to find a "mere continuation" of ownership); <u>Lynch v. Infinity Outdoor, Inc.</u>, 2003 WL 21213708, at *1 (Conn. Super. Ct., May 7, 2003) (finding material questions of fact as to the factors for the "mere continuation" exception to successor liability).  <u>Peglar</u> advises that "not every one of these indicia must be established, but the court should apply more of a balancing

test." <u>Peglar</u>, 2002 WL 1610037, at *7.  As one Connecticut court noted, "Analysis of the

necessary factors should be undertaken in a flexible, realistic manner, focusing on intent."

<u>Savings Bank of Manchester v. Daly</u>, 2004 WL 3130581, at *3.[13]

In evaluating the first factor, continuity of enterprise, the Court considers the

management, personnel, physical location, assets and general business operations.  There is no

dispute about the continued use of the former Winchester-Delaware factory in New Haven by

Winchester-Maryland.  The continued use of other assets owned by Winchester-Delaware and

then Winchester-Maryland, such as intellectual property, machinery, and know-how, is also

generally undisputed.  Regarding the continuity of management, plaintiffs assert that "Winchester

Maryland retained Thomas C. Johnson, the most essential Winchester Delaware senior

management employee . . . . and . . . [t]he Olins retained key Winchester Delaware management

to form a Winchester Maryland Operations Committee.  These men included Edwin Pugsley,

R.C. Swanton, E.W. Taft, and William T. Birney."  Doc. # 129 at 15-16.  However, according to

undisputed evidence, including the annual corporate statements filed with the Connecticut

Secretary of State after the December 1931 sale:  (1) no members of the board of directors of

Winchester-Delaware became directors of Winchester-Maryland; (2) the president, first vice

president, and secretary of Winchester-Maryland were Franklin W. Olin, John Olin, and Spencer

T. Olin,  respectively; and (3) the officers of Winchester-Maryland included only one former

_____

[13] The Connecticut courts appear to agree that, in the context of resolving a motion for
summary judgment, the trial court should determine whether there are genuine issues of material
fact as to the elements of the tests for determining successor liability, but the application of the
balancing test is one of law for the court.  <u>See</u>, <u>e.g.</u>, <u>Sullivan v. A.W. Flint Co.</u>, 1996 WL
469716, *1 (Conn. Super. Ct., Aug. 5, 1996).

Winchester-Delaware officer, E.W. Taft, as assistant treasurer.[14]

Plaintiffs also assert that there was a continuity of manufacturing personnel.  The evidence presented to support this argument is the continued involvement of Thomas Johnson in the manufacturing operations, and a 1931 New Haven Register newspaper article that appeared shortly after the transaction recounting statements by John Olin such as that although the Winchester plant would be operated as a "separate and definite corporation," it would "go right ahead with the Winchester business" and "there would be no radical changes in the personnel of the plant."  Doc. #130, Plaintiffs' Ex. 17.[15]  Plaintiffs also point out that the products manufactured by Winchester-Maryland were many of the same as those manufactured by Winchester-Delaware.

In evaluating this evidence, however, the Court's focus "is not whether there is a continuation of the business but rather the test is whether there is a continuation of the corporate

---

[14]The 1932 Winchester-Maryland filing with the Connecticut Secretary of State shows that two other former Winchester-Delaware officers, Edwin Pugsley and R.C. Swanton, became officers of Winchester-Maryland.  Pugsley became a vice president and Swanton an assistant secretary.  However, Franklin, John, and Spencer Olin remained as president, first vice president, and secretary.  Also, Swanton and Taft had only been officers and directors of Winchester-Delaware for three or four days in 1929 to facilitate the creation of Winchester-Delaware.  They had previously been officers of subsidiaries of Winchester-Delaware, however.

[15]These statements, however, are inadmissible because they are hearsay.  The Local Rules of Civil Procedure at the time of the filing of this motion required that: "Each statement of material fact by a movant in a Local 56(a)1 Statement or by an opponent in a Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." L. Civ. R. 56(3) (D. Conn. 2004).  Here, plaintiffs did not provide an adequate foundation for the purported statement in the New Haven Register article under an exception to the hearsay rule.  Fed. R. Evid. 802, 803.  Even if the Court were to consider the statements in the article, they would not be sufficient to alter the Court's conclusion as to successor liability for Winchester-Maryland.  It is clear that John Olin's remarks were intended to assure the New Haven community that there would not be a significant loss of local employment during the Great Depression.

-11-

identity of the seller." <u>Pesce</u>, 1996 U.S. Dist. LEXIS 22244, at *12-13 (internal quotations omitted).  Retaining many of the jobs of the plant workers by Winchester-Maryland and even manufacturing many of the same pre-acquisition products have little weight in determining corporate identity; to hold otherwise likely would expose most assets purchasers to post-acquisition successor liability.

      As to the overlap of directors and officers, it is undisputed that although some Winchester-Delaware senior employees remained, Winchester-Maryland largely brought in new officers, directors, and management.  The company's two most senior officers – President Franklin Olin and Senior Vice President John Olin – had no prior involvement with Winchester-Delaware and had been involved only with Western Cartridge in Illinois.  The appointment of former Winchester-Delaware employees Pugsley, Taft, and Swanton as officers under the direction of the Olins in 1931 and 1932 and even the continued involvement of Johnson is not unusual in making the transition to new ownership and operations.  Finally, there were no former Winchester-Delaware officers or directors on Winchester-Maryland's board of directors.

      The undisputed evidence as to the "continuity of shareholders" test also counsels against successor liability for Winchester-Maryland.  Plaintiffs point out, though, that the Kidder Peabody Trust Company (the employer of Beardslee and Sessel) owned shares in both Winchester-Delaware and Western Cartridge following the sale in 1931.  At the time of the 1931 assets purchase, the stock of Winchester-Delaware had no value.  According to the corporate records of Winchester-Delaware, and the deposition testimony of Johnnie Jackson (an attorney in Olin's legal department between 1978 and 2002), Kidder Peabody was both a substantial creditor of Winchester-Delaware and the company's investment banker.  Doc. # 130, Plaintiffs' Ex. 6 at

58, (Jackson Depo).[16]   However, as the United States District Court for the Eastern District of Pennsylvania determined in evaluating the successor liability of Winchester-Maryland, "there is no evidence which demonstrates any continuity of shareholders in this case.  In contrast, the undisputed evidence demonstrates that no shares of [Western Cartridge] stock were transferred to [Winchester-Delaware] shareholders as a result of [the] asset purchase."  Tracey v. Windham Repeating Arms Co., 745 F. Supp. 1099, 1110-1111 (E.D.PA. 1990).  The Western Cartridge stock was transferred to the creditors of Winchester-Delaware, including Kidder Peabody, in exchange for permitting the assets sale of Winchester-Maryland to occur.  Although some of those creditors may have also owned stock in Winchester-Delaware, it was in their capacity as creditors that they received Western Cartridge stock, in order to address past due obligations of Winchester-Connecticut.  Id. at 1110 n.19.  Finally, all of the shares of Winchester-Maryland were owned by Western Cartridge; none was provided to shareholders of Winchester-Delaware.

The next factor the Court must consider regarding the possible "de facto merger" of Winchester-Delaware and Winchester-Maryland or the "mere continuation" of Winchester-Delaware is whether the seller corporation dissolved "as soon as legally and practically possible." It is undisputed that Winchester-Delaware was dissolved by 1934 and declared "void" by the State of Delaware in 1935.  Doc. # 113, Defendant's Ex. I.  Olin concedes that the three year period following the assets sale of Winchester-Delaware was a "wind-down period" and that Winchester-Delaware had no active operations.  Doc. # 129 at 20 (Plaintiff's Opposition to Olin

---

[16]According to Jackson, Kidder Peabody was "very instrumental all during the '20s in financing the working capital needs and other needs of Winchester." (Jackson Deposition at 57).

Corporation's Motion for Partial Summary Judgment).[17]  Winchester-Delaware's rapid
dissolution after the assets purchase weighs in favor of a finding of successor liability.

 The next factor, the purchaser corporation's assumption of liabilities and obligations of
the seller in order to continue normal business operations, weighs against holding Winchester-
Maryland (and ultimately, Olin) responsible for the obligations of Winchester-Delaware.  By the
express provisions of the Decree Confirming Sale, Winchester-Maryland did not assume the pre-
existing liabilities of Winchester-Delaware.  Winchester-Maryland, however, did assume certain
executory contracts entered into by Winchester-Delaware for the success of future business
transactions.  See Decree Confirming Sale, at 17, ¶ 8; Final Decree of Foreclosure and Sale, at
92-94.

 In conclusion, there are no genuine issues of material fact concerning the relevant
elements of the test for determining the successor liability of Winchester-Maryland and Olin.
After applying the balancing test of Connecticut law, the Court concludes that the 1931 assets
purchase of Winchester-Delaware by Winchester-Maryland was neither a "*de facto* merger" nor
"mere continuation" of Winchester-Delaware.

 ii. Product-Line Exception

 Plaintiffs also argue that the Court should apply the "product-line" exception to the
general rule against successor liability.  While a number of Connecticut Superior Courts have
applied the exception, it has not been endorsed by the Connecticut Appellate or Supreme

---

[17]Johnnie Jackson describes Winchester-Delaware after the 1931 assets purchase as
"pretty much a shell company."  (Jackson Deposition, at 109).

Courts.[18]  Pesce v. Overhead Door Corp. and Emerson Electric Corp., 1998 U.S. Dist. LEXIS

20615, at *5 (D. Conn., Jan. 18, 1998).  Also, most states have expressly rejected the application

of the product-line exception.  See Pesce v. Overhead Door Corp. and Emerson Electric Corp.,

1998 U.S. Dist. LEXIS 20665, at *9-10 (D. Conn., Aug. 17, 1998).  Finally, the Connecticut

Superior Courts that have applied the product-line exception have only done so in cases of strict

products liability for personal injury.  See Chamlink Corp. v. Merritt Extruder, 2005 Conn.

Super. LEXIS 936, at *5 (Conn. Super. Ct., April 11, 2005) ("this exception has only been

applied to strict product liability cases."); see also, Sullivan v. A.W. Flint Co. & Lynn Ladder and

Scaffolding Co., Inc., 17 Conn. L. Rptr. 331 (Super. Ct., Aug. 5, 1996) (discussing the potential

application of the product-line exception in products liability cases, but ultimately denying the

defendant's motion for summary judgment as to the application of that exception); Pastorick v.

Lyn-Lad Truck Racks, 24 Conn. L. Rptr. 677 (Super. Ct., Aug. 3, 1999) (applying the product-

line exception in a products liability action based on the collapse of a ladder and denying

summary judgment); Strohecker v. Canadian Pacific Express & Transport, LTD., 1998 WL

376173, at *1 (Conn. Super. Ct., June 24, 1998) (denying summary judgment in products liability

action based on genuine issues of material fact regarding the application of the product-line

exception); Kennedy v. Oshkosh Truck Corp., 13 Conn. L. Rptr. 376 (Conn. Super. Ct., Jan. 18,

---

[18]The Court notes that "Where the highest court of a state has not resolved an issue, the
Second Circuit has held that a federal court 'must apply what they find to be the state law after
giving "proper regard" to relevant rulings of other courts of the State.'" Kline v. E.I. DuPont de
Nemours & Co., Inc., 15 F. Supp.2d 299, 302 (W.D.N.Y.1998) (citing Travelers Ins. Co. v. 633
Third Assoc., 14 F.3d 114, 119 (2d Cir. 1994)); see also Cunninghame v. Equitable Life Assur.
Soc. of U.S., 652 F.2d 306, 308 (2d Cir. 1981) ("When there is an absence of state authority on
an issue presented to a federal court sitting in diversity . . . the federal court must make an
estimate of what the state's highest court would rule to be its law").

1995) (same);  Copperthite v. Pytlik, 1992 WL 209660, at *1 (Conn. Super. Ct., Aug. 25, 1992) (same).

In Sullivan, the Court explained that the product-line exception would be used only to preserve the principles of strict products liability.  "[T]he product line exception should be viewed not as some radical expansion of the strict liability rule but as a way of preserving the effectiveness of the goals sought to be achieved by imposition of strict liability on the manufacturer in the first place."  Sullivan, 17 Conn. L. Rptr. at 21-22.  Unlike Sullivan, and the other Superior Court decisions cited, this case does not involve strict products liability for personal injuries arising from defective goods.  Therefore, the underlying policy reasons to apply the product-line exception are not implicated here.

When previously faced with the issue of whether to apply the product-line exception in a personal injury action based on a defective product causing injury to a consumer, U.S. District Judge Janet Hall declined to adopt the exception.  "The court declines to join the small minority of courts that have recognized the product line exception. . . . Moreover, [to do so] would impose drastic changes to the principles of state corporate law, changes best reserved for the state legislature." Pesce v. Overhead Door Corp., 1998 U.S. Dist. LEXIS 20665, at *12 (D. Conn. 1998).  The Court agrees with Judge Hall, and similarly declines to apply the product-line exception in this case.

-16-

**V. Conclusion**

In conclusion, Olin's motion for partial summary judgment [**doc. # 111**] is **GRANTED**.[19]

SO ORDERED this ___26___th day of May, 2006, at Hartford, Connecticut.


___/s/ CFD_____
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**

---

[19]Because the Court finds that the nature of the 1931 transaction precludes liability against Olin for the activities of Winchester-Delaware prior to the assets sale in 1931, it need not also address the effect of the 1931 District Court injunction.