IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CLARENCE COLLINS, JR., et al | ) | |
| | ) | 3:03-CV-945 (CFD) |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| OLIN CORPORATION | ) | |
| | ) | |
| Defendant | ) | |
| _____ | ) | |

## MEMORANDUM IN SUPPORT OF OLIN CORPORATION'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT
## <u>BASED ON STATUTE OF LIMITATIONS</u>

Defendant Olin Corporation ("Olin") respectfully submits this memorandum in support

of its motion for partial summary judgment based on statute of limitations.

2665199.01

## Table of Contents

Table of Contents...................................................................................................i

Table of Authorities ...........................................................................................iv

INTRODUCTION ................................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................2

    A    History Concerning The Early Use Of Public Landfills In Hamden. ..................2

    B.    In December 2000, Hazardous Substances Were Discovered At The Hamden Middle School, Triggering Concerns By Local Residents.....................................................3

    C.    The Formation Of The Newhall Coalition. ....................................................4

    D.    In December 2000 and January 2001, The Quinnipiack Valley Health District (QVHD) Stated That It Believed That The Landfill Extended Beyond The Hamden Middle School To Rochford Field And The Surrounding Neighborhood...........................................5

    E.    By April 18, 2001, The DEP Had Determined That Hazardous Substances Were Present At Rochford Field, Mill Rock Park, The Public Rights-Of-Way, And In Several Residential Properties In The Newhall Neighborhood. ..................................................6

        1)    The January, 2001 Meeting Involving Olin ................................................6

        2)    The January, 2001 Public Meeting ...........................................................8

        3)    The February 8, 2001 Public Meeting.........................................................9

        4)    The April 10, 2001 Public Meeting..........................................................12

    F.    By April 18, 2001, The DEP Determined That The Former Landfill Extended To Rochford Field, Mill Rock Park And Several Residential Properties In The Newhall Neighborhood. .....................................................................................14

    G.    By April 18, 2001, It is Undisputed That Plaintiffs Knew (Or Reasonably Should Have Known) That Hazardous Substances Were Present In The Newhall Neighborhood, Allegedly Causing Them To Suffer Damages...........................................................15

    H.    Plaintiffs' Complaint.............................................................................16

SUMMARY JUDGMENT STANDARD ...............................................................17

LEGAL ANALYSIS ...........................................................................................18

I.    Section 52-577c(b)'s Two-Year Statute Of Limitation Applies To Plaintiffs' State Law Claims. ..................................................................................................................18

II.    The Federally Required Commencement Date Under Section 309 Of CERCLA, 42 U.S.C. § 9658, Preempts The Accrual Date Of Conn.Gen.Stat. §52-755c(b).  Thus, Plaintiffs' Claims Accrued On The Date When Plaintiffs Knew, Or Reasonably Should Have Known, That Their Alleged Damages Were Caused Or Contributed To By Hazardous Substances Allegedly Disposed Of By Olin. .............................................................................19

III.    The Court Should Grant Summary Judgment With Respect To The Stigma Subclass, Because By April 18, 2001, Putative Members Of This Subclass Knew, Or Reasonably Should Have Known, That Their Alleged Damages Were Caused Or Contributed To By Hazardous Substances Allegedly Disposed Of By Olin. ..........................................................20

IV.    The Court Should Grant Summary Judgment With Respect To The Contaminated Properties Subclass, Because By April 18, 2001, Putative Members Of This Subclass Knew, Or Reasonably Should Have Known, That Their Alleged Damages Were Caused Or Contributed To By Hazardous Substances Allegedly Disposed Of By Olin. ...........................25

# TABLE OF AUTHORITIES

*AWPU v. Potter,*
  343 F.3d 619 (2d Cir. 2003) ................................................................ 30, 31

*Adair v. Pfizer, Inc.,*
  245 F. Supp. 2d 437 (D. Conn. 2003) .......................................................... 17

*Allaire Corp. v. Okumus,*
  433 F.3d 248 (2d Cir. 2006) .................................................................. 30

*Bello v. Barden Corp.,*
  180 F. Supp. 2d 300 (D. Ct. 2002) ........................................................... 32

*Blair v. DeBoo,*
  2004 WL 3052022 (D. Conn. Dec. 30, 2004) .................................................. 30

*Blue Cross of California v. Smithkline Beecham Clinical Laboratoriess,*
  108 F. Supp. 2d 116 (D. Conn. 2000) ......................................................... 20

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) .......................................................................... 17

*Collins v. Olin Corp.,*
  418 F. Supp. 2d 34 (D. Conn. 2006) ........................................................... 3

*Durham Mfc. Co. v. Merriam Mfc. Co.,*
  294 F. Supp. 2d 251 (D. Conn. 2003) ................................................ 19, 20, 27

*Freier v. Westinghouse Electric Corp.,*
  303 F.3d 176 (2d Cir. 2002), *cert. denied*, 538 U.S. 998 (2003) .............. 20, 33-34, 37

*Halpern v. Bristol Board of Education,*
  52 F. Supp. 2d 324 (D. Conn.  1999) .......................................................... 17

*Hillman v. Town of Greenwich,*
  587 A.2d 99 (Conn. 1991) ..................................................................... 19

*Imme v. Federal Express Corp.,*
  193 F. Supp. 2d 519 (D. Conn. 2002) ......................................................... 17

*LaBauve v. Olin Corp.,*
  231 F.R.D. 632 (S.D. Ala. 2005) .......................................................... 31, 32

*Staehr v. Hartford Financial Services*,
    406 F. Supp. 2d 329 (D. Conn. 2006)..............................................................1, 21, 25

*Syms v. Olin Corp.*,
    408 F.3d 95 (2d Cir. 2005) ........................................................................37

*Village of Milford v. K-H Holding Corp.*,
    390 F.3d 926 (6th Cir. 2004) ......................................................................32

## INTRODUCTION

Plaintiffs served Olin with their original Complaint on May 2, 2003. As a result, Olin's motion for summary judgment focuses on what putative class members knew, or reasonably should have known, concerning the discovery of contamination in the Newhall neighborhood *before* May 1, 2001 – since the parties agree that § 52-577c(b)'s two-year statute of limitations applies to Plaintiffs' state law claims.

It is undisputed that from December 2000 to April 18, 2001, there were several public meetings, a great deal of publicity, and readily available information (such as test data from the Connecticut Department of Environmental Protection (DEP)) that established that contamination had been discovered at the Hamden Middle School, Rochford Field, Mill Rock Park, and in the public rights-of-way in the Newhall neighborhood. Precedent from this District establishes that this readily available and highly-publicized information was known to Plaintiffs by April 18, 2001. *See*, *e.g.*, *Staehr v. Hartford Financial Servs.*, 406 F. Supp.2d 329, 339 (D. Conn. 2006).

It is also undisputed that from January 2001 to April 18, 2001, the Newhall Coalition and Cummings & Lockwood (a law firm that was communicating with and meeting with residents of the Newhall neighborhood), had sought and obtained access from the Connecticut Department of Environmental Protection (DEP) to publicly-available test data results that confirmed the presence of contamination at Rochford Field, Mill Rock Park, and in the public rights-of-way in the Newhall neighborhood. (The "public rights-of-way" are the sidewalks, the grassed strip between the sidewalks and the streets that are located in front of residential properties in the Newhall neighborhood and the streets themselves.)

Furthermore, it is undisputed that on April 18, 2001, the DEP stated, in a publicly-available document, that it had "determined that the former landfill area also includes Rochford

Field, Mill Rock Park and several residential properties."[1]  Notably, on the same date, Joseph

Frasier, the president of the Newhall Coalition, advised the Mayor of the Town of Hamden that

"[t]here is no question that our neighborhood is contaminated," causing residents to allegedly

experience "[s]tress of unknown potential health problems," and a "[d]rastic reduction in

property value."[2]

Under the applicable statute of limitations, Plaintiffs had two years from April 18, 2001

(at the latest) to serve Olin with their Complaint.  Plaintiffs, however, failed to do so.  As a

result, the Court should grant partial summary judgment in favor of Olin with respect to claims

by the Stigma Subclass and the Contaminated Properties Subclass, because their claims are time-

barred.[3]

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    History Concerning The Early Use Of Public Landfills In Hamden.

This Court previously summarized the history concerning the early use of public landfills

in Hamden as follows:

Throughout the late 1800s, Hamden monitored and attempted to regulate
the spread of disease caused by garbage and pig sties, and low lying swamp-lands.
By 1912, Hamden had a related mosquito breeding problem, which raised concern
about the spread of malaria and yellow fever.  The town responded that year by
introducing an experimental garbage collection program for some town residents to
bring garbage to pigsties.  The town took steps the following year to further address
the mosquito breeding by draining and filling swamps and increasing the sun
exposure to those areas….  For the first time, Hamden also established three town-
controlled public dumping places in order to mitigate the risks of uncontrolled
dumps.

By 1925, Hamden's Annual Report noted the reasons for filling in
swampland:  'Dumps can be located on waste land, swamps, etc. thereby
eliminating mosquito breeding places and creating play-grounds and public parks

---

[1] *See* Tab 52; Depo. Ex. 525; 4/18/01 Letter from DEP to EPA.
[2] *See* Tab 48; Depo. Ex. 515; 4/18/01 Letter from Joseph Frasier to the Mayor of the Town of Hamden.
[3] Olin's motion for summary judgment does not address claims by the Response Cost Subclass.

much needed in this community.'  Hamden also began issuing building permits as early as 1914 for property development.  Private homes in the Newhall section were developed primarily between 1920 and 1960.  Many of the homes built during this period were built on landfill.[4]

## B.    In December 2000, Hazardous Substances Were Discovered At The Hamden Middle School, Triggering Concerns By Local Residents.

In the fall of 2000, the Hamden School Board of Education was considering a major

renovation project at the Hamden Middle School.  However, by December 19, 2000,

environmental testing confirmed the presence of hazardous substances at the Hamden Middle

School:

> Recent geotechnical/environmental borings and surficial soil sampling has been conducted by Facility Support Services, LLC on behalf of the Board of Education in conjunction with planned construction of an addition to the school.  **Results of these sampling efforts have revealed elevated concentrations of polynuclear aromatic hydrocarbons and metals (primarily lead) in surficial soils at the site**.[5]

There was a great deal of publicity concerning the discovery of hazardous substances at

the Hamden Middle School.[6]  The following excerpts from an article in the *New Haven Register*

on December 13, 2000 titled "Fear of toxins infiltrates neighbors" highlight this point:

> A dozen residents of Wadsworth Street, Bryden Terrace, Winchester Avenue and Mill Rock Road met this week to share their concerns about the soil contamination at the middle school, which sits a block or two away from their homes.

---

[4] *See Collins v. Olin Corp.*, 418 F. Supp.2d 34, 57-58 (D. Conn. 2006).

[5] *See* Tab 50; Depo. Ex. 521; 12/19/00 Interdepartmental DEP Memorandum (emphasis added).  As noted in the Interdepartmental DEP memorandum, plans for an expansion of the Hamden Middle School failed back in 1993, after tests found contaminants in the soil behind the school.  *See, e.g.*, Tab 31; Depo. Ex. 179; 11/14/00 New Haven Register Article.  *See also* Tab 32; Depo. Ex. 180; 12/6/00 New Haven Register Article ("The middle school was built in 1954 on top of a landfill that was used as an industrial waste dump.  Plans to build onto the back of the school failed in 1993 after tests revealed contaminants in the ground behind the building.").

[6] Christopher Kerin, one of plaintiffs' experts, acknowledges that there "have been 100 news stories covering the contamination in the Newhall neighborhood appearing on television (WFSB – Channel 3, WVIT-Channel 30, WTNH-Channel 8), in the print media (*New York Times*, *Hartford Courant*, *New Haven Register*, *New Haven Advocate, Yale Daily News, The Hamden Journal* and *Hamden Chronicle* ) and online."  *See* Tab 54; Expert Report of Christopher K Kerin at p. 3.

….
Nearly all the residents said they have found bottles, crushed glass and other questionable materials a few feet below the topsoil on their property. Willie Spence, a Winchester Street resident, said he is concerned that he was exposed to contaminated soil when he dug up several feet in his yard to put up a basketball hoop. 'It's really scary,' said Eldridge Hatcher of Wadsworth Street. 'I'm not going to be doing too much digging until we find out what's going on.' Neighbors also said they are worried the underground toxins may be related to several cancer deaths in the neighborhood.[7]

In response to these developments, the Mayor of the Town of Hamden, Carl Amento, sent a letter to local residents.[8] In relevant part, the Mayor stated:

As many of you know, while conducting extensive environmental analysis at the Hamden Middle School in anticipation of a major renovation of the school site, the Town's environmental consultants discovered a number of contaminants left on the site prior to the construction of the school in the 1950's.

**Because of this finding, several area residents have questioned the extent of the environmental problems surrounding the school, which may possibly involve residential homes and the Town parks in the area.** Last week a meeting was held to discuss these concerns.

On Tuesday, December 19, 2000, at 7:00 p.m. at the Hamden Middle School, the Mayor's Office is hosting a meeting in cooperation with the Quinnipiack Valley Health District, to allow the residents an opportunity to discuss their concerns with representatives of the State of Connecticut Department of Environmental Protection (DEP).[9]

Approximately 100 residents attended the December 19, 2000 meeting sponsored by the Mayor's Office.[10] During the meeting, residents "concerned about the safety of their property eagerly listened to what state and local officials had to say about possible contamination beyond the Hamden Middle School property."[11]

## C.     The Formation Of The Newhall Coalition.

---

[7] *See* Tab 25; Depo. Ex. 52; 12/13/00 New Haven Register Article. Many of the putative class representatives live on Wadsworth Street, Bryden Terrace, Winchester Avenue and Mill Rock Road.

[8] *See* Tab 7; Joseph Frasier Depo. at p. 30 (testifying that "sometime before December 19, 2000," the Mayor of the Town of Hamden "sent this letter to residents of the Hamden community").

[9] *See* Tab 33; Depo. Ex. 181; Correspondence from Mayor Amento to Residents (emphasis added).

[10] *See* Tab 34; Depo. Ex. 182; 12/20/00 New Haven Register Article.

[11] *See* Tab 24; Depo. Ex. 39; 12/28/00 Hamden Chronicle Article.

In late 2000, the Newhall Coalition was formed as the "spokesperson for people who could not advocate for themselves or speak on their behalf" with respect to concerns arising from the discovery of contamination at the Hamden Middle School.[12]  Joseph Frasier served as the president of the Newhall Coalition, while Elizabeth Hayes served as its vice-president.[13]

> **D.  In December 2000 and January 2001, The Quinnipiack Valley Health District (QVHD) Stated That It Believed That The Landfill Extended Beyond The Hamden Middle School To Rochford Field And The Surrounding Neighborhood.**

On December 26, 2000, the QVHD published a document that answered various "Frequently Asked Questions" raised by local residents relating to the discovery of contamination at the Hamden Middle School.  Residents of the Newhall neighborhood received this QVHD publication[14]  Among other things, the publication stated as follows:

> **How extensive is the site (landfill area)?  What was dumped there?**
>
> Based on historical information and aerial photographs it is believed that the landfill extended across the street to Rochford Park and into some of the neighborhoods in the area.  The DEP will start testing the soil at the park during the last week of December 2000.[15]

Subsequent testing by the DEP before April 18, 2001 confirmed the presence of contamination at Rochford Field, Mill Rock Park, and in the public rights-of-way in the Newhall neighborhood.

---

[12]  *See* Tab 7; Joseph Frasier Depo. at p. 18.

[13]  *See* Tab 7; Joseph Frasier Depo. at pp. 8-9.

[14]  *See* Tab 40; Depo. Ex. 506; 12/26/00 QVHD Publication.  Shannon Windisch Pociu of the DEP testified that, based on her experience, when the QVHD "prepared these sheets, they were made available to the public."  *See* Tab 20; Shannon Windisch Pociu Depo. at pp. 21 and 24.  Joseph Frasier testified that he recalls residents sharing with him a copy of the QVHD's publication shortly after they received it.  *See* Tab 7; Joseph Frasier Depo. at p. 50.

[15]  *See* Tab 40; Depo. Ex. 506; 12/26/00 QVHD Publication at HAM03086.  The QVHD reiterated this statement in a subsequent publication dated January 16, 2001.  *See* Tab 41; Depo. Ex. 507; 1/16/01 QVHD Publication at HAM04049.  *See also* Tab 36; Depo. Ex. 186 (same information provided on QVHD's website).  Joseph Frasier testified that he recalls residents sharing with him a copy of the QVHD's publication shortly after they received it.  *See* Tab 7; Joseph Frasier Depo. at p. 50.

**E.    By April 18, 2001, The DEP Had Determined That Hazardous Substances Were Present At Rochford Field, Mill Rock Park, The Public Rights-Of-Way, And In Several Residential Properties In The Newhall Neighborhood.**

Between January and April, 2001, several public meetings took place to address issues arising from the discovery of contamination at the Hamden Middle School. During the course of these meetings, Olin was identified as potentially responsible for the contamination. In addition, the DEP confirmed that hazardous substances were located beyond the Hamden Middle School - - at Rochford Field, Mill Rock Park, and in the public rights-of-way in the Newhall neighborhood. In response, residents of the Newhall neighborhood expressed concern about their health and impact on their property values. The following chronology summarizes some of the key events relating to this issue.

**1)    The January, 2001 Meeting Involving Olin**

Shortly after the discovery of hazardous substances at the Hamden Middle School, the DEP requested that Olin review its files relating to any disposal activities conducted at or in close proximity to the Hamden Middle School. In support, the DEP stated:

> Statements made in two of the reports allege that wastes from the former Winchester Co. were disposed at this site in the 1940s and early 1950s prior to the site's development as a school in 1955.
>
> ….
>
> The presence and nature of potential landfill materials on the site is now of utmost concern to the student's parents, teachers and town officials. Therefore, the Department is formally requesting that Olin Corporation please review its Winchester, U.S. Repeating Arms, and Olin files for any information relating to potential historic disposal activities that may have occurred on or proximal to the site.[16]

---

[16] *See* Tab 53; Depo. Ex. 526; 11/28/00 Correspondence from DEP to Olin. Shannon Windisch Pociu of the DEP testified that by January 31, 2001, the DEP's publicly-available files "included information indicating that Winchester had previously deposited waste in the area." *See* Tab 20; Shannon Windisch Pociu Depo. at p. 34.

As a result, Olin was viewed as the alleged "ultimate wrongdoer" from the very outset.

The following excerpts from a December 30, 2000 *New Haven Register* article titled "Olin eyed

in Hamden pollution case" highlight this point:

> The Olin Corp., a Norwalk manufacturing company, has emerged as a player in
> the Hamden Middle School contamination controversy because it may have
> dumped industrial waste on school property before the structure was built.
> ....
> Mayor Carl Amento said Olin which produces copper and sporting ammunition,
> might be the 'ultimate wrongdoers.'   But some historical accounts show town
> government might have operated the dump for a time, Amento said.
> ....
> Officials from Hamden and the state Department of Environmental Protection will
> meet with Olin executives in Hartford on Jan. 10 to discuss the corporation's role
> in bringing hazardous waste to the site decades ago.   Representatives from the
> school neighborhood also will be present.[17]

As noted in the foregoing article, in early January 2001, representatives from

Olin, the DEP, the Mayor's office, and the Newhall neighborhood (including Joseph

Frasier) met to address various issues, including "Olin's potential role with respect to the

contamination that had been found at the Hamden Middle School."[18]   Notably, Bill

Narwold, an attorney from the law firm of Cummings & Lockwood, was also present at

this meeting on behalf of the Newhall community.[19]

---

[17] *See* Tab 21; Depo. Ex. 19; 12/30/00 New Haven Register Article (emphasis added).  *See also* Tab 26;
Depo. Ex. 53; 12/24/00 New Haven Register Article titled "Old-timer recalls Newhall Street mess," in
which John J. Carbrey recalled as follows:  "We kids played in the dumps in the area.  Winchester had
filled in the area from Marlboro Street to Millrock Road bordering on Winchester Avenue on the east to
Newhall on the west."  Many of the older putative class members have personal knowledge concerning
such disposal activities.  *See*, *e.g.*, Tab 3; Henry Blue Depo. at pp. 37-38 (based on his experience living
in the neighborhood, testified that he recalls that "whole area in back of Morse Street at that time was
swamp and brush area and that's where Winchester was dumping.").

[18] *See* Tab 20; Shannon Windisch Pociu Depo. at p. 120.  *See also* Tab 7; Joseph Frasier Depo. at p. 56.
In addition, Elizabeth Hayes (the vice-president of the Newhall Coalition), testified that in March 2000,
she attended a meeting with representatives from Olin, DEP and the Water Authority, to address issues
relating to the discovery of contamination at the Hamden Middle School.  *See* Tab 8; Elizabeth Hayes
Depo. at p. 257.

[19] *See* Tab 7; Joseph Frasier Depo. at p. 56.  *See also* Tab 42; Depo. Ex. 509 (sign-in sheet for meeting).
Shannon Windisch Pociu from the DEP testified that she believed that Mr. Narwold attended this meeting

### 2) The January, 2001 Public Meeting

In January, 2001, more than 100 residents of the Newhall neighborhood attended a meeting to discuss issues relating to the discovery of contamination at the Hamden Middle School.[20] During this meeting, representatives from the DEP announced that they would be taking soil samples from the public rights-of-way in the Newhall neighborhood.[21]

Bill Narwold, from Cummings & Lockwood (and attorneys from the law firm of Koskoff, Koskoff and Bieder) were also present at this meeting.[22] Testimony by Joseph Frasier concerning the role played by these law firms, and in particular, by Cummings & Lockwood, is instructive:

> Q. Do you have an understanding of why attorneys from the law firm of Cummings and Lockwood, including in particular Mr. Narwold, and attorneys from the law firm of Koskoff, Koskoff and Bieder were present at this January 2001 meeting?
> A. To address concerns that citizens would have.
>
> ….
>
> Q. At the meeting that took place in January of 2001, did residents ask for legal advice from the attorneys from Cummings & Lockwood?
> A. Yes.
>
> ….
>
> Q. Did they at any time, to your knowledge, attorneys from Cummings & Lockwood provide answers to any questions seeking legal advice?
> A. I am sure that they did.[23]

Shortly after the January 2001 meeting, the law firm of Cummings & Lockwood prepared and sent a questionnaire to local residents.[24]

---

"on behalf of one of the community or the community members." *See* Tab 20; Shannon Windisch Pociu Depo. at pp. 116-17.

[20] *See* Tab 27; Depo. Ex. 54; 1/18/01 New Haven Register Article.

[21] *Id.*

[22] *See* Tab 7; Joseph Frasier Depo. at p. 61.

### 3) The February 8, 2001 Public Meeting

In early February 2001, a flyer was sent to local residents urging them to attend a meeting on February 8, 2001 at the Hamden Middle School auditorium.[25]  Among other things, the flyer indicated that residents would have an opportunity to address concerns "directly affecting" them, including their health and impact on property values (due *solely* to the discovery of hazardous waste at the Hamden Middle School as of that date):

> **Neighborhood residents will be meeting to discuss those <u>issues most directly affecting us</u>, including our health, and the impact on our property values** and tax assessments.  Representatives of DEP, Mayor's Office, Department of Health and Quinnipiac Health District will be present to update us on the most recent findings at the School, Rochford Field and the Annex.[26]

At the same time, the flyer also urged residents to "complete the questionnaire" that had previously been sent to them by the law firm of Cumming & Lockwood.[27]

In advance of the February 8, 2001 meeting, Shannon Windisch Pociu[28] of the DEP provided Joe Frasier and other "Concerned Parties" with <u>publicly available data</u>[29] relating to

---

[23] *See* Tab 7; Joseph Frasier Depo. at pp. 61-66.  Based on the attorney-client privilege, Plaintiffs' counsel instructed Mr. Frasier to "not answer questions concerning what was discussed at the meeting."  *Id.* at pp. 64-65.

[24] *See* Tab 7; Joseph Frasier Depo. at pp. 68-69.  *See also* Tab 37; Depo. Ex. 191 (Plaintiffs' privilege log).  In their privilege log, Plaintiffs rely on the attorney-client privilege as grounds for not producing the questionnaire sent by Cummings & Lockwood to residents of the Newhall neighborhood.  When asked about the questionnaire, Plaintiffs' counsel instructed his clients "not to answer based on the attorney-client privilege."  *See*, *e.g.*, Tab 8; Dorothy Williams Depo. at pp. 130-32.  At the same time, Mrs. Williams testified that Cummings & Lockwood "were going to represent us."  *Id.* at p. 132.

[25] *See* Tab 35; Depo. Ex. 185.  *See also* Tab 7; Joseph Frasier Depo. at p. 81 (testifying that there "was a call for a meeting").

[26] *See* Tab 35; Depo. Ex. 185 (emphasis added).  Similar concerns about health issues and potential impact on property values due to the discovery of contamination at the Hamden Middle School were raised by residents shortly after the February 8, 2001 meeting.  *See* Tab 7; Joseph Frasier Depo. at pp. 82-83 (testifying that by February 2001, local residents were expressing to him "concerns both about their health and potential impact on property values").  *See also* Tab 29; Depo. Ex. 56; 2/14/01 Hamden Chronicle Article ("Many residents in attendance were concerned about such things as property value and safety.").

[27] *See* Tab 35; Depo. Ex. 185.

[28] From the fall of 2000 until recently, Shannon Windisch Pociu has worked as the "primary project manager on the site" on behalf of the DEP.  *See* Tab 20; Shannon Windisch Pociu Depo. at pp. 165-66.

"results of soil sampling at Rochford Field, Rochford Field Annex, and the Newhall Street School."[30]  The same data was also made available by the DEP to Kim Wantek (a paralegal from Cummings & Lockwood).[31]

During the February 8, 2001 meeting, representatives from the DEP provided residents and attorneys from Cummings & Lockwood,[32] with an update regarding the sampling completed as of that date.  In particular, the DEP noted that "summary data tables" were available with respect to testing at Rochford Field, Rochford Field Annex, and Newhall Street School.[33]  In addition, the DEP noted that "Ash/fill material" was "noted at several locations" in the rights-of-way in the Newhall neighborhood.[34]

Testimony by Shannon Windisch Pociu of the DEP concerning the information that the DEP shared with the public as of February 8, 2001 is instructive:

---

[29] Shannon Windisch Pociu of the DEP testified that DEP data "is public record that anyone can review." *See* Tab 43; Depo. Ex. 510 at Bates # 038.  *See also* Shannon Windisch Pociu Depo. at p. 25.  In fact, Ms. Pociu testified that to the extent "any person at any time asked or wanted access to [DEP] data, they were readily available to the public."  *Id.* at pp. 29-30.  Furthermore, Ms. Pociu provided many examples where individuals (including attorneys) sought and obtained access to DEP test data relating to the discovery of contamination at the Hamden Middle School and surrounding area.  *Id.* at pp. 26-30.

[30] *See* Tab 47; Depo. Ex. 514 (January 31, 2001 letter from Shannon Windisch of the DEP to "Concerned Parties".  *See also* Tab 44; Depo. Ex. 511 (Test data for Rochford Field); Tab 45; Depo. Ex. 512 (Test data for Rochford Field Annex); and Tab 46; Depo. Ex. 513 (Test data for Newhall Street School).  In his deposition, Mr. Frasier admitted that he received some of these test results on or about January 31, 2001.  *See* Tab 7; Joseph Frasier Depo. at pp. 97-100.  Furthermore, Mr. Frasier testified that "[a]ll information" that the Newhall Coalition received from the DEP was "shared with the residents at general meetings."  *See* Tab 7; Joseph Frasier Depo. at p. 89.  In fact, Mr. Frasier emphasized that the "data was available for anyone to review."  *Id.* at p. 102.  Similarly, Shannon Windisch Pociu of the DEP reiterated that "to the extent that any other person in the community" had wanted access to such sampling test data, they "could have made a similar request and obtained it."  *See* Tab 20; Shannon Windisch Pociu Depo. at pp. 36-37 and 331.

[31] *See* Tab 43; Depo. Ex. 510 at Bates # 062-063 (entry on February 2, 2001 indicating that "[Kim Wantek] wants to copy sampling data for Rochford Field, if avail. – yes – ok").

[32] *See* Tab 43; Depo. Ex. 510 at Bates # 062-063 ("The lawyers working on the case are Bill Narwold and Holly Winger.  One of them will be at Thurs. meeting").

[33] *See* Tab 38; Depo. Ex. 226; 2/8/01 Agenda Mayor's Meeting.  *See also* Tab 20; Shannon Windisch Pociu Depo. at p. 49 (testifying that as of February 2001, the DEP had "determined" that contamination was present at Rochford Field, Rochford Field Annex, and the Newhall Street School).

Q. Am I correct that the results of the testing that DEP had conducted as of – prior to January 31, 2001 at Rochford Field, the Rochford Field Annex and the Newhall Street School indicated there was contamination present in those areas, correct?

A. Yes.

Q. And the fact that contamination had been located by the DEP in those areas was shared with the public as of February 8, 2001?

A. Yes.[35]

The test data results that the DEP addressed at the February 8, 2001 meeting received a great deal of publicity. On February 9, 2001, the *New Haven Register* noted that "[t]ests of 15 spots in Rochford Field found elevated levels of lead, arsenic, mercury and carcinogens – the same materials found at the middle school," and that "[a]sh materials were found in several of the planting strips."[36] Several days later, on February 14, 2001, the *Hamden Chronicle* published an article titled "Results show contamination beyond school."[37] In support, the article noted that "[t]est results from Rochford Field, Rochford Field Annex and Newhall School revealed low levels of contaminants such as arsenic and lead three to four feet below the topsoil."[38] In addition, the article emphasized that "[m]any residents in attendance were concerned about such things as property value and safety."[39]

---

[34] *Id*. *See also* Tab 20; Shannon Windisch Pociu Depo. at pp. 49-50 (testifying that as of February 2001, the DEP had found "evidence of ash fill material at several locations within the residential area").

[35] *See* Tab 20; Shannon Windisch Pociu Depo. at p. 47.

[36] *See* Tab 28; Depo. Ex. 55; 2/9/01 New Haven Register Article (emphasis added).

[37] *See* Tab 29; Depo. Ex. 56; 2/14/01 Hamden Chronicle Article.

[38] *Id.*

[39] *Id*. *See also* Tab 7; Joseph Frasier Depo. at pp. 79 and 92 (testifying that "there was a concern about the health and safety of the residents, for themselves and their families, and I would say that you cannot separate your investment in the home from that").

### 4)  The April 10, 2001 Public Meeting

In early April 2001, a flyer was sent to local residents urging them to attend an "Information Meeting on the Newhall Street Neighborhood," to be held at the Hamden Middle School on April 10, 2001.[40]

Over the course of several weeks leading up to the April 10, 2001 meeting, Kim Wantek (a paralegal from Cummings & Lockwood), with the assistance of Joseph Frasier, repeatedly sought and obtained access to additional data from the DEP relating to the testing conducted in the public rights-of-way in the Newhall neighborhood.[41]  The following excerpts from the notebook maintained by Shannon Windisch Pociu of the DEP highlight this point:

- (2/26/01)  Kim Wantek; Cummings & Lockwood:  "I called her back & told her there is additional data, but not all is in yet.  She will stop by this afternoon."

- (3/13/01)  Kim Wantek:  "She called to see if the remainder of the data was available from residential sampling.  I told her not yet."  "Joe Frasier called Holly yesterday to let her know more data was available."

- (3/16/01)  Kim Wantek:  "She left msg. that she thought data available, (per Joe Frasier).  She wants copies of everything & a map."

- (3/16/01)  Kim Wantek:  "She called to discuss results.  She will have Holly call Joe Frasier back to clarify.  If there is a problem, he can call me or Mike.  Most results are in."

- (3/26/01)  Kim Wantek:  "She called to check on lab results make arrangements to have another paralegal pick them up since she'll be out of town."

---

[40] *See* Tab 39; Depo. Ex. 298.  *See also* Tab 7; Joseph Frasier Depo. at pp. 123-24 (testifying that there was a "countywide distribution" of the flyer).

[41] Once again, the same DEP test data was publicly available for anyone to review and/or copy by early April 2001.  *See* Tab 20; Shannon Windisch Pociu Depo. at pp. 62-63 (testifying that as of April 10, 2001, anyone could have "made a request to obtain the underlying data" that supported the conclusions reached by the DEP as of that date).

- (4/9/01)  Kim Wantek:  "Re:  Data for neighborhood sampling.  Arranged for her to stop by in PM to copy data."[42]

During the April 10, 2001 meeting, representatives from the DEP provided local residents with an update concerning the sampling conducted at Rochford Field, Mill Rock Park, and in the public rights-of-way in the Newhall neighborhood.[43]  In addition, residents were provided with a copy of the first issue of the "Newhall Street Neighborhood Update."[44]  Among other things, this brochure summarized the sampling results conducted by the DEP as of that date as follows:

**Sampling in Rights-of-Way & Grassy Strips:**
Between December and February, DEP gathered more than 80 soil samples from borings in the grassed strip along roadways (rights-of-way) in the Newhall Street neighborhood; including areas north, east and south of Hamden Middle School. DEP used the borings to collect soil samples from the surface and as deep down as 4 to 6 feet in certain areas.

<u>Data from the borings demonstrates that ash fill material is located beneath portions of the neighborhood.  Elevated levels of arsenic, lead, polynuclear aromatic hydrocarbons, and petroleum hydrocarbons were found in some of the surface soils</u>.

….

**Rochford Field:**
In January, DEP collected 14 soil samples from the top six inches of soil beneath the grass at Rochford Field.  <u>Results showed consistently elevated levels of arsenic</u>.  Additional samples were collected from the top two inches of soil on March 29th that confirmed the presence of arsenic.

---

[42] *See* Tab 43; Depo. Ex. 510 at Bates # 80, 95, 101-02, 112, and 119.  In summary, Shannon Windisch Pociu testified that by "April 9, 2001, Kim Wantek from Cummings & Lockwood had made several requests … to gain access to the test data results from residential sampling," and that she was provided "access to come and copy such data."  *See* Tab 20; Shannon Windisch Pociu Depo. at p. 96.  *See also* Tab 49; Depo. Ex. 516 (Rights-of-Way Sampling Laboratory Results). Ms. Pociu testified that Exhibit 516 relates to the "rights-of-way sampling laboratory results;" that "a substantial part of that data" was received by the DEP by no later than April 8, 2001; and that the DEP was willing to share such data with "Kim Wantek or anybody else from the public."  *See* Tab 20; Shannon Windisch Pociu Depo. at pp. 332, 334 and 336.

[43] *See* Tab 22; Depo. Ex. 29.

[44] *See* Tab 23; Depo. Ex. 30; EPA Newhall Street Neighborhood Update.  *See also* Tab 7; Joseph Frasier Depo. at p. 129 (testifying that a hard-copy of the brochure was "available for people to pick-up and look at at the April 10, 2001 meeting").

….

**Mill Rock Park:**
DEP collected 15 soil samples from 0 to 6 inches below the grass at Mill Rock Park. <u>Results show that there are three very limited areas of elevated arsenic</u>.[45]

Once again, testimony by Shannon Windisch Pociu of the DEP concerning the

information that the DEP had confirmed to the public by April 10, 2001 is instructive:

> Q. And in fact, by April 10, 2001, the DEP had confirmed to the public that contamination was present at Mill Rock Park, correct?
> A. Yes.
> Q. And by April 10, 2001, the DEP had confirmed to the public that contamination was present at Rochford Field, correct?
> Mr. Rainer: Objection
> A. Yes.
> ….
> Q. Am I correct that by April 10, 2001, the DEP had determined and confirmed to the public that contamination was found in the public rights-of-way?
> A. Yes.[46]

**F.    By April 18, 2001, The DEP Determined That The Former Landfill Extended To Rochford Field, Mill Rock Park And Several Residential Properties In The Newhall Neighborhood.**

On April 18, 2001, the DEP sent a letter to the EPA summarizing the status of the DEP's

investigation into the presence of contamination in the Newhall neighborhood.[47]  In the letter, the

DEP stated:

> Recent investigations by the DEP have allowed the addition of several contiguous areas to the former landfill previously believed to be comprised of only Newhall Street Field and the Hamden Middle School properties located west of Newhall

---

[45] *See* Tab 23; Depo. Ex. 30; EPA Newhall Street Neighborhood Update at p. 2 (emphasis added).

[46] *See* Tab 20; Shannon Windisch Pociu Depo. at pp. 63-64.

[47] *See* Tab 52; Depo. Ex. 525; 4/18/01 Letter from DEP to EPA.  Shannon Windisch Pociu testified that the forgoing "was a determination that the DEP had made as of April 18, 2001."  *See* Tab 20; Shannon Windisch Pociu Depo. at p. 98.  Furthermore, Ms. Pociu testified that "to the extent anybody in the public; Joe Frasier, attorneys from Cummings and Lockwood or anybody else that sought records at the DEP that supported this determination, they would have had access to it."  *Id.* at p. 99.  Finally, Ms. Pociu testified that the DEP's April 18, 2001 correspondence is a "public record" that was available to anyone to review at the DEP's offices as of that date.  *Id.* at p. 348.

Street.  **The DEP has now __determined__ that the former landfill area also includes Rochford Field, Mill Rock Park and several residential properties.**[48]

Also on April 18, 2001, Mike Harder of the DEP was quoted in the *Hamden Chronicle* as follows:  "We certainly have contamination issues and health issues that people should be concerned about."[49]

    **G.**    **By April 18, 2001, It is Undisputed That Plaintiffs Knew (Or Reasonably Should Have Known) That Hazardous Substances Were Present In The Newhall Neighborhood, Allegedly Causing Them To Suffer Damages.**

Based on the foregoing publicly available information, it is undisputed that by April 18, 2001, Plaintiffs knew, or reasonably should have known, that hazardous substances were present in the Newhall neighborhood, allegedly causing them to suffer damages.  The following testimony by Joseph Frasier, the president of the Newhall Coalition, makes this point crystal clear:

> Q.  Am I correct that as of the April 10 meeting the DEP, in Exhibit 30 … summarized for the residents information that disclosed the presence of contamination at Rockford Field, correct?
> A.  Yes.
>
> ….
>
> Q.  Am I correct that as of April 10 the DEP also advised residents that they had confirmed the presence of contamination at Mill Rock Park, correct?
> A.  Yes.
> Q.  Finally, isn't it true that by April 10, 2001, the DEP had confirmed the presence of contamination to the residences and the rights-of-way and grassy strips in the Newhall Street neighborhood, correct?
> A.  That's correct.
> Q.  Okay.  Isn't it true that based on that information, that you reviewed sometime after the April 10 meeting, on April 18, 2001, you wrote the mayor saying that there is no question that our neighborhood is contaminated, correct?
> A.  Yes.[50]

---

[48] *See* Tab 52; Depo. Ex. 525; 4/18/01 Letter from DEP to EPA. (emphasis added).
[49] *See* Tab 30; Depo. Ex. 58; 4/18/01 Hamden Chronicle Article.
[50] *See* Tab 7; Joseph Frasier Depo. at pp. 144-45.

Indeed, in a letter dated April 18, 2001, Mr. Frasier expressed concern to the Mayor of

the Town of Hamden regarding the "known contamination" in the Newhall neighborhood and

stated as follows:

> On behalf of the residents of the Rochford field community, I am writing to you
> to express our concerns regarding the **<u>known contamination</u>** in our
> neighborhood.  This is a very challenging time for us.  The contamination effects
> our lives in many ways, namely:
>
> ❖  <u>Stress of unknown potential health problems</u>.
>
> ❖  <u>Drastic reduction in property value</u>.
>
> ❖  The perception that this community problem is not a high priority for town
>    officials.
>
> ….
>
> We cannot afford a temporary fix.  **<u>There is no question that our neighborhood
> is contaminated</u>**. [51]

**H.     Plaintiffs' Complaint.**

Plaintiffs served Olin with their original Complaint on May 2, 2003 -- **more** that two

years after Plaintiffs had knowledge of all of the foregoing facts (as of April 18, 2001).

On December 20, 2006, Plaintiffs filed their Second Amended Complaint which includes

various claims directed solely against Olin.  In paragraph 1 of the Second Amended Complaint,

Plaintiffs state that they "bring this complaint, for themselves and on behalf of a Class of

similarly situated property owners in the Newhall area of Hamden, Connecticut seeking damages

against Olin Corporation for the diminution in the value of their properties, response costs, loss

---

[51] *See* Tab 48; Depo. Ex. 515; 4/18/01 Letter from Joseph Frasier to the Mayor of the Town of Hamden.
*See also* Tab 7; Joseph Frasier Depo. at pp. 136-37 (testifying that he sent letter).  Similar concerns were
expressed by Mr. Frasier in a local newspaper on the same date: "'**Our homes are built on a landfill**,'
said Joe Frasier, president of the Newhall Coalition.  '**That in itself will devalue our houses**.  We are
paying taxes on properties that have no value in the real estate market.'" *See* Tab 30; Depo. Ex. 58;
4/18/01 Hamden Chronicle Article (emphasis added).

of enjoyment of their properties and emotional distress." Compl. at ¶ 1.[52] Plaintiffs' proposed

Class consists of three subclasses:

- **Contaminated Properties Subclass**:  This subclass includes "all members of the
  Class onto which Olin disposed contaminated fill after it purchased Winchester in
  1931." Compl. at ¶ 31;

- **Stigma Subclass**:  This subclass includes "all members of the Class who own real
  property within the Newhall Section onto which Olin did not dispose of industrial
  waste containing contamination after it purchased Winchester in 1931, but who
  have suffered damages as a result of their close proximity to the Contaminated
  Properties Subclass." Compl. at ¶ 32; and

- **Response Cost Subclass**:  This subclass includes "members of the Class who
  own real property in the Newhall Section who have or will incur response costs in
  order to redress residual contamination." Compl. at ¶ 33.

## SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate when the evidence demonstrates that 'there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law.'" *Adair v. Pfizer, Inc.*, 245 F. Supp.2d 437, 440 (D. Conn. 2003) (citing Fed. R.

Civ. P. 56(c)).  "Rule 56(c) 'mandates the entry of summary judgment . . . against a party who

fails to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial.'" *Imme v. Federal Express*

*Corp.*, 193 F. Supp.2d 519, 522-23 (D. Conn. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986)).  *See also Halpern v. Bristol Bd. of Educ.*, 52 F. Supp.2d 324, 332-33 (D. Conn.

---

[52] Plaintiffs' Second Amended Complaint is referred to as "Compl."

1999) (granting summary judgment based on applicable statute of limitations).

<u>**LEGAL ANALYSIS**</u>

In its Answer and Affirmative Defenses to Plaintiffs' Second Amended Complaint, Olin stated that "Plaintiffs' claims against Olin are barred by any applicable statutes of limitations including, without limitation Conn.Gen.Stat. §§ 52-577, 52-577c and 52-584, which bar each and every claim asserted by Plaintiffs, and by any other applicable statutes of limitation and/or by the doctrine of laches and/or statute or rules of repose."[53]

**I.    Section 52-577c(b)'s Two-Year Statute Of Limitation Applies To Plaintiffs' State Law Claims.**

Section 52-577c of Connecticut's General Statutes is titled "Limitation of action for damages caused by exposure to a hazardous chemical substance or mixture or hazardous pollutant."  Subsection (b) of that section provides as follows:

> Notwithstanding the provisions of section 52-577 and 52-577a, no action to recover damages for personal injury or property damage caused by exposure to a hazardous chemical substance or mixture or hazardous pollutant released into the environment shall be brought but within two years from the date when the injury or damages complained of is discovered or in the exercise of reasonable care should have been discovered.

Conn.Gen.Stat. § 52-577c(b).

It is undisputed that § 52-577c(b)'s two-year statute of limitations applies to Plaintiffs' state law claims against Olin.  Indeed, Plaintiffs previously stated that "the applicable statute of limitations period for the causes of action asserted in the Amended Complaint that this Court should apply is that found in § 52-577c(b)."[54]

Plaintiffs served Olin with their original Complaint on May 2, 2003.  Thus, May 1, 2001

---

[53] *See* Docket No. 201 at Second Affirmative Defense.
[54] *See* Docket No. 54; Plaintiffs' Memorandum of Law in Opposition to Motions to Dismiss filed by Defendants Town of Hamden and Olin Corporation at pp. 53-54.

is the critical date for purposes of Olin's motion for summary judgment based on statute of limitations. *See, e.g., Hillman v. Town of Greenwich*, 587 A.2d 99, 103 (Conn. 1991) (for purposes of statute of limitations, "an action is commenced on the date of service of the writ upon the defendant").

II.     **The Federally Required Commencement Date Under Section 309 Of CERCLA, 42 U.S.C. § 9658, Preempts The Accrual Date Of Conn.Gen.Stat. §52-755c(b).  Thus, Plaintiffs' Claims Accrued On The Date When Plaintiffs Knew, Or Reasonably Should Have Known, That Their Alleged Damages Were Caused Or Contributed To By Hazardous Substances Allegedly Disposed Of By Olin.**

Section 309 of CERLA, 42 U.S.C. § 9658, provides a "uniform standard" for determining the accrual date for claims of personal injury or property damages caused by exposure to hazardous substances. *Durham Mfc. Co. v. Merriam Mfc. Co.*, 294 F. Supp.2d 251, 277 (D. Conn. 2003).  Specifically, Section 309 of CERCLA provides that:

> In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable statute of limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally-required commencement date in lieu of the date specified in such State statute.

42 U.S.C. § 9658(a)(1).  The term "federally required commencement date" ("FRCD") is then defined as the "date the plaintiff knew (or reasonably should have known) that the personal injury or property damages referred to in subsection (1)(a) of this section were caused or contributed to by the hazardous substance or pollutant or contaminant concerned."  42 U.S.C. § 9658(b)(4)(A).

In construing these provisions, the *Durham* court noted that it is:

> 'indisputably clear that Congress intended, in the cases to which § 9658 applies, that the FRCD preempt state law accrual rules if, under those rules, accrual would occur earlier than the date on which the cause of [property damage] was, or

> reasonably should have been, known to be the hazardous substance.'  However, the FRCD 'preempts a more restrictive state law only with respect to the date on which a claim accrues, not with respect to the length of the limitations period.'  Thus, Connecticut law would still control with respect to the length of the limitations period.

294 F. Supp.2d at 277 (quoting *Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176, 196-97 and

210 (2d Cir. 2002), *cert. denied*, 538 U.S. 998 (2003)).  Thus, the *Durham* court held that the

FRCD preempted the accrual date under § 52-577c(b).  294 F. Supp.2d at 278.

The same conclusion applies here.  The FRCD preempts the accrual date with respect to

Plaintiffs' state law claims.  At the same time, Plaintiffs' state law claims are still subject to a

two-year statute of limitations period.  Thus, it follows that Plaintiffs' state-law claims are time-

barred because the undisputed facts demonstrate that by April 18, 2001 (at the very latest),

Plaintiffs knew, or reasonably should have known, that their alleged damages "were caused or

contributed to" by hazardous substances allegedly disposed of by Olin.

**III.    The Court Should Grant Summary Judgment With Respect To The Stigma Subclass, Because By April 18, 2001, Putative Members Of This Subclass Knew, Or Reasonably Should Have Known, That Their Alleged Damages Were Caused Or Contributed To By Hazardous Substances Allegedly Disposed Of By Olin.**

As a matter of law, claims by the Stigma Subclass are time-barred because by April 18,

2001, they knew, or reasonably should have known, that their alleged damages were caused or

contributed to by hazardous waste allegedly disposed of by Olin.  Two decisions by the Federal

District Court of Connecticut are particularly instructive.

In *Blue Cross of California v. Smithkline Beecham Clinical Labs.*, 108 F. Supp.2d 116

(D. Conn. 2000) the court granted summary judgment based on the applicable statute of

limitations.  In support, the court emphasized that it was undisputed that there was "highly

publicized information" that disclosed SBCL's alleged improper practices.  *Id.* at 123.  As a

result, the court stated that it "presumes that this highly publicized, industry-wide information

was known to plaintiffs prior to the end of 1993." *Id.* at 124. Thus, the court held that the plaintiffs' claims were time-barred because they "knew or had reason to know of SBCL's challenged practices prior to August 19, 1994." *Id.*

Similarly, in *Staehr v. Hartford Financial Servs.*, 406 F. Supp.2d 329 (D. Conn. 2006), this Court dismissed plaintiffs' claims because prior lawsuits and press accounts had disclosed the existence of industry-wide contingent commission kickback schemes, thereby placing investors on inquiry notice of alleged fraud. In support, this Court relied on the *Blue Cross* decision and held that "the 'cumulative effect' of the publicly available documents should have suggested to a reasonable investor of ordinary intelligence that The Hartford was likely one of the insurance companies paying contingent commissions to the insurance brokers," thus putting "constructive notice" on the plaintiffs. *Id.* at 339.

The analogous circumstances in this case compel the same result. It is undisputed that from December 2000 to April 18, 2001, there was a great deal of publicly-available information and publicity that confirmed the presence of hazardous substances at the Hamden Middle School, Rochford Field, Mill Rock Park, and in the public rights-of-way in the Newhall neighborhood. Thus, it follows that any claim by a putative member of the Stigma Subclass accrued *before* May 1, 2001 and, therefore, is time-barred. The following hypothetical illustrates this point.

Imagine any putative class member who falls within the Stigma Subclass. Under *Staehr*, the publicly available information and extensive publicity relating to the discovery of hazardous substances at the Hamden Middle School and surrounding areas, establishes that by April 18, 2001 the putative subclass member knew, or reasonably should have known, that hazardous substances were located in **close proximity** to his or her property. Specifically, the extensive

publicity and active involvement of residents of the Newhall neighborhood establishes that:[55]

- By April 18, 2001, any Stigma Subclass putative class member knew (or reasonably

  should have known) that hazardous substances were located at the Hamden Middle

  School, Rochford Field and Mill Rock Park – which, at most, are located less than

  one mile from any property that is included in the Stigma Subclass; and

- By April 18, 2001, any Stigma Subclass putative class member knew (or reasonably

  should have known) that hazardous substances were also located in the public rights-

  of-way – which are located "in very close proximity" to a resident's property.[56]

The underlying basis for the Stigma Subclasses causes of action – all subject to two year

statutes of limitations – is that members of the Stigma Subclass live "in close proximity" to

contaminated property. Any argument by Plaintiffs that the statute of limitations for the Stigma

---

[55] Admissions made by putative representatives of the Stigma Subclass demonstrate that applying the *Staehr* analysis is appropriate in this case. *See*, *e.g.*, Tab 2; Depo. of Matthew Abraham at pp. 106-07 and 139 (testified that he has been reading the *New Haven Register* once or twice a week since 1992 and has attended meetings with the Newhall Coalition "when they are having stuff about the contamination"); Tab 3; Depo. of Henry Blue at pp. 97-98 and 117 (testified that he has followed newspaper articles regarding discovery of contamination and attended meetings of the Newhall Coalition); Tab 8; Depo. of Elizabeth Hayes at pp. 148-50 (testified that she was actively involved in the formation of the Newhall Coalition and that she tried to keep informed "about those issues that impact the Newhall Section of Hamden"); Tab 13; Deposition of Ellecia Sims at p. 33 (testified that she learned about problems at the Middle School by reading the *Register*, which she has "continuously subscribed to" for a number of years); Tab 6; Jennifer Dontfraid at pp. 76, 120 and 214 (testified that she learned about contamination at the Middle School and neighborhood "because I heard it on the news and I saw it in the newspapers"); Tab 16; Venus Walker Depo. at p. 186 (testified that she attended a meeting in 2001 at the Hamden Middle School in which the Mayor of the Town of Hamden was present); Tab 15; Carolyn Smith Depo. at p. 47 (testified that she has subscribed to the *New Haven Register* for many years); Tab 19; Eugalyn Wilson Depo. at pp. 105-08 (testified that she "followed stories of the contamination "by watching the local news "every day" and by reading the *Hamden Chronicle*).

[56] Shannon Windisch Pociu of the DEP testified that the public rights-of-way are basically "the sidewalks and the streets" in front of the residences in the Newhall neighborhood, and thus, are located "**in very close proximity**" to the residential properties. *See* Tab 20; Shannon Windisch (continued on page 23)

Subclass did not accrue until putative members of the Contaminated Properties Subclass received the actual test data results for their properties lacks merit. It ignores the undisputed fact that residents of the Newhall community knew or reasonably should have known that contamination was found "in close proximity" to their properties at the Hamden Middle School, Rochford Field, Mill Rock Park and in the public rights-of-way by mid-April of 2001. Ironically, Plaintiffs' definition of the Stigma Subclass proves this point.

Plaintiffs define the Stigma Subclass to include property owners who "have suffered damages as a result of their **close proximity** to the Contaminated Properties Subclass." Compl. at ¶ 32 (emphasis added). At the same time, Plaintiffs cannot dispute that the Hamden Middle School, Rochford Field, Mill Rock Park, and the public rights-of-way -- where hazardous substances were discovered before April 18, 2001-- are all in **close proximity** to properties owned by putative members of the Stigma Subclass.

The map attached to the affidavit of Kenneth Cichon makes this point crystal clear.[57] In particular, the map demonstrates that the relative distance from properties in the Stigma Subclass to the Hamden Middle School, Rochford Field, Mill Rock Park, and the public rights-of-way is the *same* as the distance from the properties in the Stigma Subclass to properties in the Contaminated Properties Subclass. Thus, it follows that claims by the Stigma Subclass accrued by no later than April 18, 2001 (since contamination had been discovered at the Hamden Middle School, Rochford Field, Mill Rock Park, and the public rights-of-way by that date), and, therefore, are time-barred.

---

Pociu Depo. at p. 39 (emphasis added). *See also* Tab 7; Joseph Frasier Depo. at p. 90 (testifying that the public rights of-way "could be adjacent very close" to a resident's property).

[57] *See* Tab 1; Affidavit of Kenneth Cichon and attached map.

Admissions made by Joseph Frasier and Elizabeth Hayes (the two leaders of the Newhall Coalition) are instructive. Mrs. Hayes (a member of the Stigma Subclass)[58] admitted that events at the Hamden Middle School (such as the discovery of hazardous substances) directly impact the Newhall neighborhood:

> Q. You indicated this morning, Ms. Hayes, in response to one of Ms. Catino's questions that the area in which you live is called "The Newhall Section" because of the presence of the Newhall Middle School; is that correct?
> A. Yes.
> Q. Would you agree with me that the Newhall Middle School is important to the Newhall Section of Hamden?
> A. Yes.
> Q. And that matters that impact on the school would impact on the Newhall Section of Hamden?
> A. In what way?
> Q. **Well, if there is a problem with the school, do you think that negatively impacts on the Newhall Section of Hamden**?
> A. **Reasonably, yes.**[59]

Moreover, on April 18, 2001, Joseph Frasier (writing on behalf of local residents) advised the Mayor of the Town of Hamden that the "known contamination in our neighborhood" was causing "stress of unknown potential health problems" and a "[d]rastic reduction in property value."[60]

---

[58] *See* Compl. at ¶ 32.

[59] *See* Tab 8; Elizabeth Hayes Depo. at p. 129 (emphasis added). *See also* Tab 16; Venus Walker Depo. at pp. 208-09 (testified that "the value of [her] property is tied to what is going on at the Hamden Middle School," and that "the value of [her] property started going down when [she] learned that there was contamination at the Hamden Middle School"); Tab 14 Raymond Sims Depo. at pp. 249-50 (testified that "if there is contamination at the middle school," that affects "[n]ot only my property but the entire area that I live in").

[60] *See* Tab 48; Depo. Ex. 515; 4/18/01 Letter from Joseph Frasier to the Mayor of the Town of Hamden. Notably, putative representatives from the Stigma Subclass made similar admissions; namely, that the discovery of hazardous substances at the Hamden Middle School, Rochford Field and Mill Rock Park (in late 2000 and early 2001) caused them to suffer emotional distress and diminution in property value. *See, e.g.* Tab 11; Sonia Powell Depo. at pp. 96 and 116-17 (testified that her emotional distress was "caused by contamination" concerns in the "community in total," and that the "contamination found at the middle school" and surrounding fields has "impacted the value of [her] property negatively"); Tab 16; Venus Walker Depo. at pp. 206-07 and 209 (testified that she first experienced "concern" when "they started testing at the middle school," and that her property allegedly lost 50% of its value "because of the contamination" at the Hamden Middle School and the Rochford Field); Tab 2; (continued on page 25)

For all these reasons, claims by the Stigma Subclass are time-barred because by April 18, 2001, putative members of this subclass knew, or reasonably should have known, that their alleged damages were caused or contributed to by hazardous waste allegedly disposed of by Olin.

**IV.    The Court Should Grant Summary Judgment With Respect To The Contaminated Properties Subclass, Because By April 18, 2001, Putative Members Of This Subclass Knew, Or Reasonably Should Have Known, That Their Alleged Damages Were Caused Or Contributed To By Hazardous Substances Allegedly Disposed Of By Olin.**

As a matter of law, claims by the Contaminated Properties Subclass are also time-barred because, by no later than April 18, 2001, they knew, or reasonably should have known, that their alleged damages were caused or contributed to by hazardous waste allegedly disposed of by Olin.

As previously noted, under *Staehr*, the extensive publicity relating to the discovery of hazardous substances establishes that by April 18, 2001, any putative class member from the Contaminated Properties Subclass knew, or reasonably should have known, that[61]:

---

Matthew Abraham Depo. at p. 79 (testified that "there has been a diminution of his property value" because of all of the "contamination that is going around," including at the Hamden Middle School); Tab 12; Elias Rochester Depo. at pp. 60-61 (testified that there has been a "diminution in the value" of his property because of everything that was "going on over at the school"); Tab 15; Carolyn Smith Depo. at pp. 227-28 (testified that "contamination at the middle school" has "caused the value of [her] property to be lower than [she] think[s] it should be").

[61]    Admissions made by putative representatives of the Contaminated Properties Subclass demonstrate that applying the *Staehr* analysis is appropriate in this case.  *See, e.g.*, Tab 4; Clarence Collins Depo. at pp. 41-43 (testified that after contamination was discovered at the Hamden Middle School, he followed stories about "environmental contamination concerns" in the "papers or on TV" and also got "most of [his] information from the town meetings"); Tab 5; Louise Craig Depo. at pp. 82-83 (testified that she read the *New Haven Register* "on a regular basis" during 2000 and 2001); Tab 10; Maxine Jones Depo. at pp. 16, 172-73 (testified that she would "pick up copies of the *New Haven Register* when there were articles about the contamination at Hamden"); Tab 17; Charlene Webb Depo. at pp. 24, 27 and 82 (testified that she received the *Hamden Journal* and *Hamden Chronicle* and that "once she found out about the contamination or the middle school problems," she started attending public meetings); Tab 18; Dorothy Williams Depo. at pp. 22 and 136-37 (testified that once she "heard about the contamination at the Hamden Middle School," she "started going to all the meetings" and followed the story on television).

- In December, 2000, hazardous substances were discovered at the Hamden Middle School;

- In December 2000 and January 2001, the QVHD stated that "based on historical information," it believed that "the landfill extended across the street to Rochford Park and into some of the neighborhoods in the area;"[62]

- By April 10, 2001, the DEP confirmed that test data established that hazardous substances were present beyond the Hamden Middle School – at Rochford Field, Mill Rock Park, and in the public rights-of-way in the Newhall neighborhood; and

- On April 18, 2001, the DEP had "determined that the former landfill area also includes Rochford Field, Mill Rock Park and several residential properties."[63]

The following testimony by Shannon Windisch Pociu of the DEP is instructive:

Q. We have in front of us, ma'am, two different letters and am I correct both of them are dated April 18, 2001?
A. Yes.
Q. And the letter from Joe Frasier to the mayor of the town of Hamden he states on the second page that there is no question that our neighborhood is contaminated, correct?
A. Yes.
Q. My question to you, am I correct that on April 18, 2001 the DEP had also concluded that the landfill extended beyond the Hamden Middle School, correct?
Mr. Rainer: Objection
A. Yes.
Q. Also specifically determined that contamination was present at Rochford Field, correct?
A. Yes.
Q. It also determined that contamination extended to Mill Rock Park, correct?
A. Yes.
Q. And it also determined that the contamination extended to several residential properties, correct?
A. Yes.
Q. Am I correct that by April 18, 2001 to the extent Joe Frasier on behalf of the Newhall Coalition or any other resident of the Newhall neighborhood that had sought access to whatever data the DEP had that supported the conclusions it reached as of April 18, 2001 they would have had access to that data?
Mr. Rainer: Objection
A. Yes.
Q. And similarly by April 18, 2001 to the extent any attorneys or paralegals from the law firm of Cummings & Lockwood had sought to obtain any test data results that

---

[62] *See* Tabs 40, 41, and 36; Depo Exs. 506, 507 and 186, respectively.
[63] *See* Tab 52; Depo. Ex. 525; 4/18/01 Correspondence from DEP to EPA.

> supported the conclusions reached by the DEP as of April 18, 2001 they also would
> have had access to such data, correct?
>
> Mr. Rainer:  Objection
>
> A.  Yes.[64]

Thus, it follows that by April 18, 2001, putative members of the Contaminated Properties Subclass knew, or reasonably should have known, that their neighborhood was contaminated with hazardous substances allegedly deposited by Olin.  Claims by the Contaminated Properties Subclass are therefore time-barred.

The *Durham* case supports this conclusion.  The owner of a Superfund site (Durham) brought an action against PRPs (including Merriam) seeking to recover costs incurred in responding to soil and ground-water contamination allegedly caused by the release of hazardous substances.  It was undisputed that in November 1993, the EPA notified Durham and Merriam of their potential liability for the Durham Meadows Superfund Site.  294 F. Supp.2d at 260.  More than three years later, on December 30, 1999, Durham filed suit against Merriam.  *Id.* at 278.  As a result, the court held that under the FRCD, Durham's state-law claims were time-barred:

> It is undisputed that Durham knew that Merriam had disposed of hazardous
> substances on the Durham Meadows Superfund Site at least by 1993, **when both
> Merriam and Durham were notified of their <u>potential</u> joint and several
> liability for the Site's contamination**.  Therefore, regardless of which limitations
> period applies, Durham's state-law claims were time-barred by 1996 at the latest.

294 F. Supp.2d at 279 (emphasis added).

This Court should reach the same conclusion here.  It is undisputed that Olin was considered to be the "ultimate wrongdoer" from the very outset.  In addition, in January 2001, representatives of the DEP, local residents (including Joseph Frasier) and Bill Narwold, from Cummings & Lockwood, met with Olin to discuss "Olin's potential role with respect to the

---

[64] *See* Tab 20; Shannon Windisch Pociu Depo. at pp. 105-06.

contamination that had been found at the Hamden Middle School."[65]  Moreover, by April 18,

2001, the DEP had "determined" that the former landfill extended to "several residential

properties" in the Newhall neighborhood, while Joseph Frasier (acting on behalf of residents of

the Rochford field community) wrote the Mayor of the Town of Hamden and emphasized that

"[t]here is no question that our neighborhood is contaminated."[66]  Thus, here, as in *Durham*,

claims by the Contaminated Properties Subclass are time-barred.

 Common sense supports this conclusion.  Similar to putative members of the Stigma

Subclass, it is undisputed that putative members of the Contaminated Properties Subclass also

live in **close proximity** to the Hamden Middle School, Rochford Field, Mill Rock Park and the

public rights-of-way.  Once again, the map attached to the Affidavit of Kenneth Cichon makes

this point crystal clear.[67]  As a result, it follows that the discovery of hazardous substances in

these areas triggered any claims by putative members of the Contaminated Properties Subclass

by no later than April 18, 2001.

 Admissions made by putative members of the Contaminated Properties Subclass confirm

the foregoing conclusion.  For example, Dorothy Williams testified that once she learned about

contamination at the Hamden Middle School in December 2000, she believed that she was

"affected" and began suffering emotional distress:

> Q.  I'm going to show you Exhibit 182, a December 20, 2000 [article] about a sick-out at
>  the Hamden Middle School.
> A.  Yes.
> Q.  Do you remember all of that?
> A.  I remember that.

---

[65] *See* Tab 20; Shannon Windisch Pociu Depo. at p. 120.  Ms. Pociu further testified that during January 2001, she recalls at least two occasions where she had discussions with Joseph Frasier "about the possibility of Olin being considered a potentially responsible party for contamination that had been found at the Hamden Middle School and surrounding area."  *Id.* at p. 123.

[66] *See* Tab 52; Depo. Ex. 525; 4/18/01 Correspondence from DEP to EPA; Tab 48; Depo. Ex. 515; 4/18/01 Letter from Joseph Frasier to the Mayor of the Town of Hamden.

[67] *See* Tab 1; Affidavit of Kenneth Cichon and attached map.

….

Q. On the second page of the article, toward the third paragraph it says, "Residents are concerned that the landfill may go beyond the school property."
A. Yes, exactly.
Q. And it talks about the neighborhood being built on top of waste.
A. In the area.
Q. Did you have those concerns?
A. Yes.
Q. And did you have those concerns at the meeting?
**A. When I found out about the middle school, I knew I was affected because I was down a ways from it, right across the field.**

….

Q. Now, you also noted that your emotional distress began once possible concerns were raised regarding contamination at the middle school; is that correct?
A. Yes.[68]

  Similarly, Clarence Collins testified that the alleged diminution in value of his property and loss of use or enjoyment of his property were allegedly caused by the discovery of contamination at the Hamden Middle School and in the surrounding parks (which occurred well before April 18, 2001):

Q. Do you assert there's been a diminution in the value of your property at 112 Bryden Terrace?
A. Yes.
Q. And what do you believe that diminution in value to be?
A. The value would be from the contamination in the neighborhood and the settling of the property, or the funhouse –
Q. When you say 'contamination in the neighborhood,' are you referring to both the residential area and the Hamden Middle School?
A. Yes. And the playgrounds.
Q. And the parks, and whatever else, is that correct?
A. Correct.

….

Q. Now you said that you can't do picnics in your backyard. When did you stop doing picnics in your backyard?
A. After the contamination was discovered.

---

[68] *See* Tab 18; Dorothy Williams Depo. at pp. 138-39 and 260.

Q. And [what] are you referring to, when you say that? The contamination on your property?

A. Well, when they found it at the middle school, then I had concerns and waited until I found out what was going on my property. So I just held everything off and I didn't have any cookouts, or anything like that.

Q. So when you learned of the concerns at the middle school, you stopped picnics in the backyard?

A. Yes. I put things like that on hold.[69]

Other putative members from the Contaminated Properties Subclass made similar admissions.[70]

Thus, claims by the Contaminated Properties Subclass accrued by no later than April 18, 2001 and, therefore, are time-barred.

Once again, any argument by Plaintiffs that the statute of limitations for the Contaminated Properties Subclass did not accrue until each putative subclass member received the actual results for testing at his or her property lacks merit. The plain language of the FRCD proves this point.

As previously noted, the FRCD is defined as the "date the plaintiff knew (**or reasonably should have known**) that the personal injury or property damages referred to in subsection (1)(a) of this section were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." 42 U.S.C. § 9658(b)(4)(A) (emphasis added). Thus, to argue that the FRCD requires "actual" knowledge would render the phrase "or reasonably should have known" superfluous – which would violate fundamental rules of statutory interpretation. *See, e.g., Allaire Corp. v. Okumus*, 433 F.3d 248, 253 (2d Cir. 2006) ("It is well-settled that courts should avoid statutory interpretations that render provisions superfluous"); *Blair v. DeBoo*, 2004 WL 3052022 at *2 (D. Conn. Dec. 30, 2004) (same).

---

[69] *See* Tab 4; Clarence Collins Depo. at pp. 118 and 201.

[70] *See*, *e.g.*, Tab 9; Donna Lee Johnson Depo. at p. 75 (testified that after they discovered contamination at the Hamden Middle School, she began to experience "concern" that her property might also be contaminated); Tab 10; Maxine Jones Depo. at pp. 151-52 (testified that seeing TV stories about the sick-out at the Hamden Middle School caused her to have "concern about contamination" at her property).

In *AWPU v. Potter*, 343 F.3d 619 (2d Cir. 2003), the plaintiffs relied on EPA's definition of "emergency" and CERCLA's expansive definition of "removal action" in support of a claim that anthrax contamination at a postal facility required the EPA to conduct a removal action. *Id.* at 626. In rejecting this claim, the Second Circuit emphasized that:

> [A] basic tenet of statutory construction, equally applicable to regulatory construction, [is] that [a text] should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error.

343 F.3d at 626 (alterations in original).

Based on this principle, the Second Circuit held that the anthrax contamination was not an "emergency," because Executive Order No. 12580 made it clear that "emergency removal actions constitute a subset of all removal actions." *Id.* at 626-27.

Similarly, the definition of FRCD demonstrates that actual knowledge is only a "subset" of the circumstances that can trigger the accrual of a statute of limitation. Indeed, the FRCD is defined to include <u>both</u> the "date the plaintiff knew (**or** reasonably should have known)" that the personal injury or property damage were caused or contributed to by the hazardous substance concerned. Thus, it follows that something less than actual knowledge – namely, when a person reasonably should have known – falls within the scope of the definition of the FRCD.

*LaBauve v. Olin Corp.*, 231 F.R.D. 632 (S.D. Ala. 2005) supports this conclusion. Property owners brought a putative class action alleging that mercury contamination from Olin's plant had caused diminution of their property values. In support of their motion for class certification, plaintiffs argued that the appropriate FRCD for one of the plaintiffs (Pressley) was February 2, 2004, "the date their counsel received test results relating to the McIntosh area." *Id.* at 659. The court, however, flatly rejected "the legitimacy of that date, which *postdates* the

filing of plaintiffs' Complaint by six months." *Id.* (italics in original).

Instead, the court noted that by November 16, 1998, Pressley "believed that her property was contaminated" and that Olin was "responsible." *Id.* at 660. As a result, the court held that as of November 16, 1998, Pressley is charged:

> **with whatever knowledge a reasonable inquiry might bring**, including specifically the knowledge of offsite mercury contamination in and around her property. That Pressley opted not to engage in such an inquiry until her lawyers conducted testing on her behalf in early 2004 does not excuse her **from being charged much earlier with the knowledge that such inquiry would reasonably have obtained, had it been done in a reasonably prompt manner**.

*Id.* at 660-61 (emphasis added). As the court explained:

> To hold otherwise would be to allow plaintiffs to manipulate the running of the limitations period by averting their eyes to wrongdoing for years or decades, delaying tests to confirm what they already believe and have reason to believe is true, and then saying they could not have sued earlier because they lacked 'solid information.' The practical ramifications of that scenario are that statutes of limitations would be rendered meaningless.

231 F.R.D. at 661, n. 59. *See also Village of Milford v. K-H Holding Corp.*, 390 F.3d 926, 932 (6th Cir. 2004) ("But **the discovery rule does not permit a party to await certainty.** To toll the limitations period because a prospective defendant denies its liability, or because the plaintiff lacks absolute certainty as to the tortfeasor's identity, would circumvent the purpose of the statute of limitation.") (emphasis added).

*Bello v. Barden Corp.*, 180 F. Supp.2d 300 (D. Ct. 2002) supports the same conclusion. In an attempt to evade application of § 52-577's two-year statute of limitations, plaintiffs argued that "they were not made aware of the identities of the defendants" who delivered hazardous substances until 2001. The court, however, rejected this claim because by 1998, plaintiffs were aware of "the fact there was cause for concern because of the storage of hazardous substances on the property **and of at least one means by which the plaintiffs could have obtained those names, i.e., obtaining them from the DEP**." *Id.* at 311 (emphasis added).

The same holds true here.  As in the foregoing cases, the discovery rule does not permit Plaintiffs "to await certainty."[71]  Indeed, it is undisputed that by April 18, 2001, putative members from the Contaminated Properties Subclass knew, or reasonably should have known, that the DEP had <u>determined</u> that contamination was present at the Hamden Middle School, Rochford Field, Mill Rock Park, in the public rights-of-ways, and several residential properties in the Newhall neighborhood, and that Olin was considered potentially responsible for the contamination.[72]  Thus, claims by putative members of the Contaminated Properties Subclass accrued by no later than April 18, 2001 and, therefore, are time-barred.

In an attempt to evade this result, Plaintiffs will likely rely on the Second Circuit's decision in *Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176 (2d Cir. 2002), *cert. denied*, 538 U.S. 998 (2003).  In *Freier*, plaintiffs alleged that they suffered from various cancers caused by exposure to toxic waste deposited at a landfill.  303 F.3d at 183.  On appeal, the question presented was when, under the FRCD, the plaintiffs knew, or reasonably should have known, that the toxic waste at the landfill allegedly caused them to have the cancers.

In addressing this issue, the Second Circuit held that the district court committed two errors in granting summary judgment based on statute of limitations.  First, the district court "erroneously imputed to the Federal Commencement Date a standard of 'reasonable suspicion.'" *Id.* at 205.

> The discovery-of-cause standard set by the FRCD, defined as 'the date the plaintiff knew (or reasonably should have known) that the personal injury' was caused or contributed to by the hazardous materials, focuses on knowledge, actual

---

[71] As noted in *LaBauve*, to require "actual knowledge" of the test results for each property would lead to the absurd result that despite the fact that Plaintiffs served Olin with their Complaint on May 2, 2003, the claims of most of the putative class members would not have accrued until months, if not years, later, when they received the *actual* test results for their properties.  That clearly cannot be the law.

[72]  All any putative class member needed to do was read the newspaper, attend a public meeting, or ask for information from the DEP.

or imputed, not on suspicion. Mere suspicion, whatever its reasonableness, cannot be equated with knowledge; and the fact that a claimant had only a 'reasonable suspicion' that the injuries were caused by the Landfill is not a sufficient basis for ruling as a matter of law that the claimant 'reasonably should have *known*' that the injuries were caused by the Landfill.

303 F.3d at 205-06 (italics in original).

Second, the district court "inappropriately failed to view" the evidence of publicity submitted by defendants in the light most favorable to the plaintiffs, against whom summary judgment was sought. *Id*. at 208. In support, the Second Circuit noted that:

many studies had been done by two State agencies, DOH and DEC. There is no evidence that they found the Pfohl Landfill to cause cancers, and the record is replete with evidence that the State officials repeatedly assured residents, both through the publicized reports and in personal meetings, that there was no evidence of such causation. We cannot endorse the proposition that, as a matter of law, when reports issued by the responsible public officials stated that there was no provable link between the cancers and the Landfill, members of the public reasonably should have known to the contrary.

303 F.3d at 210.

*Freier* is readily distinguishable for several reasons. First, Plaintiffs in this case do not claim that hazardous substances deposited by Olin allegedly caused them to develop certain cancers. Instead, Plaintiffs claim that Olin allegedly disposed hazardous substances on their property and/or on properties in close proximity to their residence. Thus, the statute of limitation/causation issue presented in *Freier* is fundamentally different and more complex than the issue presented in this case:

- In *Freier*, the issue was when did the plaintiffs know, or reasonably should have known, that there was a "provable link between the cancers and the Landfill."

- In contrast, the issue in this case is when Plaintiffs knew, or reasonably should have known, that Olin had allegedly disposed hazardous substances in the Newhall neighborhood. Here, there is no further link alleged between the presence of the

hazardous substances and the putative class' alleged damages.

The undisputed evidence in this case confirms that Plaintiffs had (or reasonably should have had) such knowledge by no later than April 18, 2001. Indeed, on that date, Joseph Frasier represented to the Mayor of the Town of Hamden that "[t]here is no question that our neighborhood is contaminated."[73]

Second, while it may be true that as of February 26, 2001, the DEP "suspected" the "presence of surface soil contamination on residential properties,"[74] it is undisputed that any such suspicion was eliminated by April 18, 2001. Indeed, by April 18, 2001, after further sampling by DEP in the public rights-of-way in the Newhall neighborhood, the DEP stated that it "has now **determined** that the former landfill area also includes Rochford Field, Mill Rock Park and several residential properties."[75] Testimony by Shannon Windisch Pociu concerning this point is particularly instructive:

> Q. Now, let me direct your attention to Exhibit 524 which counsel showed you earlier and this, for the record, you identified as a communication from the DEP to the EPA dated February 26, 2001, correct?
> A. Yes.
> Q. And Mr. Rainer pointed out that in the first sentence there the DEP was requesting assistance from the EPA and I'm quoting here, to evaluate the presence of surface soil contamination on residential property suspected to be located on landfill materials in the vicinity of the Hamden Middle School, correct?
> A. Yes.
> ….
> Q. Now, I want to focus on the DEP's state of knowledge as of April 18, 2001. Okay. I'm going to show you what was previously marked as Exhibit 525.
> A. Yes.
> Q. Am I correct between February 26, 2001 and April 18, 2001 the DEP had, in fact, collected additional data, correct?
> A. Yes, I believe that would be the rights-of-way data.
> Q. Okay. On April 18, 2001 in Exhibit 525 there is a communication again from the DEP to the EPA, correct?
> A. Yes.

---

[73] *See* Tab 48; Depo. Ex. 515; 4/18/01 Letter from Joseph Frasier to the Mayor of the Town of Hamden.
[74] *See* Tab 51; Depo. Ex. 524; 2/26/01 DEP Correspondence to EPA.
[75] *See* Tab 52; Depo. Ex. 525; 4/18/01 DEP Correspondence to EPA.

Q. Okay. As of April 18, 2001 am I correct it states that the DEP has now determined that the former landfill area includes Rochford Field, Mill Rock Park and several residential properties, am I correct?

A. Yes, the letter states that.

Q. **Am I correct that Exhibit 525, the April 18, 2001 communication doesn't say that the DEP suspects that contamination is present in those areas but rather it says the DEP has now determined that contamination is present in those areas, correct?**

A. **Yes, it does state that.**

Q. Okay. So do you agree with me that as of April 18, 2001 the DEP had, in fact, determined that contamination extended beyond the Middle School, correct?

A. Yes.

Q. Specifically the DEP as of April 18, 2001 had determined that the contamination was present -- strike that. That by April 18, 2001 the DEP had determined that the former landfill area included Rochford Field, correct?

A. Yes.

Q. Also included Mill Rock Park, correct?

A. Yes.

Q. Also included several residential properties, correct?

Mr. Rainer: Objection.

A. Yes.

Q. I want to focus about the residential properties. Counsel asked you some questions about that. Now, am I correct the DEP did not have specific property data as of April 18, 2001, correct?

A. I believe that's correct.

Q. **Nonetheless the DEP was able to determine that the former landfill area included several residential properties by using its professional judgment based on data previously collected, correct?**

A. **Yes.**

Q. That data that was previously collected refers to, among other things, the data shown in Exhibits 511 for Rochford Field, the data in Exhibit 512 for Rochford Field Annex, the data in 513 for the Newhall Street School as well as the data in Exhibit 516 for the residential rights-of-ways, correct?

A. Yes.

….

Q. To the extent that Mr. Michael Hopkins who [is] plaintiff's expert in this case had contacted the DEP as of let's say April 18th and said I'd like to have access to the data shown in Exhibits 511, 512, 513 and 516, again he would have access to that data, correct?

A. Sure, yes.

Q. Likewise Mr. Rainer would have had access to that data as well, correct?

A. Yes.[76]

Third, Plaintiffs cannot point to evidence in this case that after April 18, 2001, the DEP

and/or EPA "repeatedly assured" residents that there was "no evidence" that contamination extended beyond the Hamden Middle School to the surrounding parks and neighborhood. In fact, the undisputed evidence proves the opposite.

Finally, the Second Circuit's more recent decision in *Syms v. Olin Corp.*, 408 F.3d 95 (2d Cir. 2005) demonstrates that actual knowledge is not required to trigger the statute of limitations under the discovery rule. At issue in *Syms* was whether for purpose of application of the statute of limitations to a cause of action under the Federal Tort Claims Act (FTCA), the landowner (Somerset) knew, or reasonably should have known, about the presence of non-radioactive contamination on its land, when Somerset only had actual knowledge of the presence of asbestos and PCBs on its land. *Id.* at 107 and 110-11.[77]

In resolving this issue, the Second Circuit concluded that Somerset's FTCA claim was time-barred even though it did not have actual knowledge of the presence of non-radioactive contamination on its land. In support, the court stated:

> **We agree with the district court that the presence of so many warning signs** – the history of TNT production near the site, the asbestos, the PCBs, the unidentified 'odd smelling' liquid, and the presence of a hazardous waste dump next door **should have prompted an investigation**. Such an inquiry easily could have uncovered the New York State Assembly's 1981 public record documenting a 'vast network of underground waste lines with TNT wastes and residues' and reporting that 'neither the areas above or below-ground were ever fully decontaminated by the Army when the property was declared surplus.'

408 F.3d at 111 (emphasis added).

The same holds true here. At the very least, by April 18, 2001, the presence of so many

---

[76] *See* Tab 20; Shannon Windisch Pociu Depo. at pp. 336-41 (emphasis added).
[77] With respect to the accrual of claims under the FTCA, the *Syms* court noted that in "environmental cases involving latent contamination, courts have generally applied the discovery rule" – namely, "when the plaintiff discovered or in the exercise of reasonable diligence should have discovered, the facts giving rise to the cause of action." 408 F.3d at 107. This standard is almost verbatim identical to the applicable standard under the FRCD. *See Freier*, 303 F.3d at 205 ("'the date the plaintiff knew (or reasonably should have known) that the personal injury' was caused or contributed to by the hazardous materials").

warning signs -- the discovery of contamination at the Hamden Middle School, Rochford Field, Mill Rock Park, and in the public rights-of-way in the Newhall neighborhood -- "should have prompted an investigation" by Plaintiffs. Such an inquiry into readily available information and test data "easily could have uncovered" by April 18, 2001 the same conclusion that underlies Plaintiffs' Complaint: that Olin is allegedly responsible for contamination in the Newhall neighborhood.

For all these reasons, claims by the Contaminated Properties Subclass are time-barred because by no later than April 18, 2001, they knew, or reasonably should have known, that their alleged damages were caused or contributed to by hazardous waste allegedly disposed of by Olin.

## <u>CONCLUSION</u>

For the foregoing reasons, Olin respectfully requests that the Court partial grant summary judgment with respect to all claims by the Stigma Subclass and the Contaminated Properties Subclass, and grant such other relief as the Court deems just and proper.


Respectfully submitted,

HUSCH & EPPENBERGER, LLC

By: _/s/ Michael H. Wetmore_
    Michael H. Wetmore (ct24899)
    Joel B. Samson (ct24898)
    Omri E. Praiss (ECF registration pending)
    190 Carondelet Plaza, Suite 600
    St. Louis, Missouri 63105
    Telephone: 314-480-1500
    Fax: 314-480-1505
    michael.wetmore@husch.com
    joel.samson@husch.com
    omri.praiss@husch.com

and

BROWN RUDNICK BERLACK ISRAELS LLP
    Mark S. Baldwin, Esq.
    185 Asylum St.
    CityPlace I, 38th Floor
    Hartford, CT  06103
    Telephone: 860-509-6500
    Fax: 860-509-6501
    mbaldwin@brownrudnick.com
**_Attorneys for Defendant Olin Corporation_**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the attorneys of record registered for the Court's ECF system (as reflected by the email addresses shown below) or by mailing the same, first class mail, postage prepaid, to the non-participants in the Court's ECF system, on this 10th day of May, 2007.

| | |
|---|---|
| Neil T. Leifer, Esq.<br>Brad J. Mitchell, Esq.<br>Thornton & Naumes L.L.P.<br>100 Summer Street, 30th Floor<br>Boston, Massachusetts  02110<br>Telephone:  (617) 720-1333<br>Facsimile:   (617) 720-2445<br>nleifer@tenlaw.com<br>bmitchell@tenlaw.com<br><br>Monte E. Frank, Esq.<br>Cohen and Wolf, PC<br>158 Deer Hill Avenue<br>Danbury, CT  06810<br>Telephone: (203) 367-6202<br>Facsimile:  (203) 791-8149<br>mfrank@cohenandwolf.com<br><br>David B. Zabel, Esq.<br>Cohen and Wolf, PC<br>1115 Broad Street<br>Bridgeport, Connecticut  06604<br>Telephone: (203) 368-0211<br>Facsimile: (203) 394-9901<br>aclark@cohenandwolf.com<br>dzabel@cohenandwolf.com<br>pgoodman@cohenandwolf.com | Mark Roberts, Esq.<br>Andrew A. Rainer, Esq.<br>McRoberts , Roberts & Rainer, LLP<br>53 State St.<br>Boston, MA  02114<br>Telephone: (617) 722-8222<br>Facsimile: (617) 720-2320<br>mroberts@mcrobertslaw.com<br>arainer@mcrobertslaw.com<br><br>***Attorneys for Plaintiff*** |

/s/ Carrie Hartnett