IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CLARENCE COLLINS, JR., et al ) | |
| ) | 3:03-CV-945 (CFD) |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| OLIN CORPORATION ) | |
| ) | |
| Defendant ) | |

**DEFENDANT OLIN CORPORATION'S LOCAL RULE 56(A)(1) STATEMENT OF MATERIAL UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT BASED ON STATUTE OF LIMITATIONS**

COMES NOW Defendant Olin Corporation ("Olin") and pursuant to Rule 56(a)(1) of the Local Rules of Civil Procedure for the District of Connecticut, hereby sets forth the following material, undisputed facts in support of Olin's Motion for Partial Summary Judgment based on statute of limitations:

1)   By December 19, 2000, environmental testing confirmed the presence of hazardous substances at the Hamden Middle School. *See* Tab 50; Depo. Ex. 521; 12/19/00 Interdepartmental DEP Memorandum.

2)   There was a great deal of publicity concerning the discovery of hazardous substances at the Hamden Middle School. *See, e.g.,* Tab 32; Depo. Ex. 180; 12/6/00 New Haven Register Article; Tab 25; Depo. Ex. 52; 12/13/00 New Haven Register Article. *See also* Tab 54; Report of Plaintiffs' Expert, Christopher Kerin at p. 3.

3)   In response to these developments, the Mayor of the Town of Hamden, Carl Amento, sent a letter to local residents. *See* Tab 33; Depo. Ex. 181. *See also* Tab 7 Joseph

2665798.01

1

Frasier Depo. at p. 30 (testifying that "sometime before December 19, 2000," the Mayor of the Town of Hamden "sent this letter to residents of the Hamden community").

    4)    In relevant part, the Mayor of the Town of Hamden stated as follows in his letter:

> As many of you know, while conducting extensive environmental analysis at the Hamden Middle School in anticipation of a major renovation of the school site, the Town's environmental consultants discovered a number of contaminants left on the site prior to the construction of the school in the 1950's.
>
> Because of this finding, several area residents have questioned the extent of the environmental problems surrounding the school, which may possibly involve residential homes and the Town parks in the area. Last week a meeting was held to discuss these concerns.
>
> On Tuesday, December 19, 2000, at 7:00 p.m. at the Hamden Middle School, the Mayor's Office is hosting a meeting in cooperation with the Quinnipiack Valley Health District, to allow the residents an opportunity to discuss their concerns with representatives of the State of Connecticut Department of Environmental Protection (DEP).

*See* Tab 33; Depo. Ex. 181.

    5)    In late 2000, the Newhall Coalition was formed as the "spokesperson for people who could not advocate for themselves or speak on their behalf" with respect to concerns arising from the discovery of contamination at the Hamden Middle School. *See* Tab 7; Joseph Frasier Depo. at p. 18.

    6)    Joseph Frasier served as the president of the Newhall Coalition, while Elizabeth Hayes served as its vice-president. *See* Tab 7; Joseph Frasier Depo. at pp. 8-9.

    7)    On December 26, 2000, the Quinnipiack Valley Health District (QVHD) published a document that answered various "Frequently Asked Questions" raised by local residents relating to the discovery of contamination at the Hamden Middle School. *See* Tab 40; Depo. Ex. 506; 12/26/00 QVHD Publication.

8)   Residents of the Newhall neighborhood received the foregoing QVHD publication. *See* Tab 20; Shannon Windisch Pociu Depo. at pp. 21 and 24. *See also* Tab 7; Joseph Frasier Depo. at p. 50.

9)   Among other things, the QVHD publication stated as follows:

> How extensive is the site (landfill area)? What was dumped there?
>
> Based on historical information and aerial photographs it is believed that the landfill extended across the street to Rochford Park and into some of the neighborhoods in the area. The DEP will start testing the soil at the park during the last week of December 2000.

*See* Tab 40; Depo. Ex. 506; 12/26/00 QVHD Publication at HAM03086. *See also* Tab 41; Depo. Ex. 507 (similar information provided in 1/16/01 QVHD Publication at HAM04049); Tab 36; Depo. Ex. 186 (similar information provided on QVHD's website).

10)  Shortly after the discovery of hazardous substances at the Hamden Middle School, the DEP requested that Olin review its files relating to any disposal activities conducted at or in close proximity to the Hamden Middle School. In support, the DEP stated:

> Statements made in two of the reports allege that wastes from the former Winchester Co. were disposed at this site in the 1940s and early 1950s prior to the site's development as a school in 1955.
>
> ….
>
> The presence and nature of potential landfill materials on the site is now of utmost concern to the student's parents, teachers and town officials. Therefore, the Department is formally requesting that Olin Corporation please review its Winchester, U.S. Repeating Arms, and Olin files for any information relating to potential historic disposal activities that may have occurred on or proximal to the site.

*See* Tab 53; Depo. Ex. 526; 11/28/00 Correspondence from DEP to Olin.

11)  By January 31, 2001, the DEP's publicly-available files "included information indicating that Winchester had previously deposited waste in the area." *See* Tab 20; Shannon Windisch Pociu Depo. at p. 34.

2665798.01

3

12) On December 30, 2000, the *New Haven Register* ran an article titled "Olin eyed in Hamden pollution case." In relevant part, the article stated that "Olin Corp., a Norwalk manufacturing company, has emerged as a player in the Hamden Middle School contamination controversy because it may have dumped industrial waste on school property before the structure was built." *See* Tab 21; Depo. Ex. 19; 12/30/00 New Haven Register Article.

13) During January 2001, representatives from Olin, the DEP, the Mayor's office, and the Newhall neighborhood (including Joseph Frasier) met to address various issues, including "Olin's potential role with respect to the contamination that had been found at the Hamden Middle School." *See* Tab 20; Shannon Windisch Pociu Depo. at p. 120. *See also* Tab 7; Joseph Frasier Depo. at p. 56. Bill Narwold, an attorney from the law firm of Cummings & Lockwood, was also present at this meeting. *See* Tab 7; Joseph Frasier Depo. at p. 56. *See also* Tab 42; Depo. Ex. 509 (sign-in sheet for meeting).

14) In addition, Shannon Windisch Pociu testified that during January 2001, she recalls at least two occasions where she had discussions with Joseph Frasier "about the possibility of Olin being considered a potentially responsible party for contamination that had been found at the Hamden Middle School and surrounding area." *See* Tab 20; Shannon Windisch Pociu Depo. at p. 123.

15) During January, 2001, residents of the Newhall neighborhood attended a meeting to discuss issues relating to the discovery of contamination at the Hamden Middle School. *See* Tab 27; Depo. Ex. 54; 1/18/01 New Haven Register Article.

16) Bill Narwold, from Cummings & Lockwood and attorneys from the law firm of Koskoff, Koskoff and Bieder were also present at this meeting. *See* Tab 7; Joseph Frasier Depo. at p. 61.

2665798.01

4

17) Joseph Frasier testified that the foregoing law firms were present at the meeting "to address concerns that citizens would have." Mr. Frasier further testified that at the meeting, residents sought legal advice from Cummings & Lockwood, and that Cummings & Lockwood responded to those questions. *See* Tab 7; Joseph Frasier Depo. at pp. 61-66.

18) Shortly after the January 2001 meeting, the law firm of Cummings & Lockwood prepared and sent a questionnaire to local residents. *See* Tab 7; Joseph Frasier Depo. at pp. 68-69. *See also* Tab 37; Depo. Ex. 191 (Plaintiffs' privilege log).

19) In their privilege log, Plaintiffs rely on the attorney-client privilege as grounds for not producing the questionnaire sent by Cummings & Lockwood to residents of the Newhall neighborhood. *See* Tab 37; Depo. Ex. 191 (Plaintiffs' privilege log).

20) In early February 2001, a flyer was sent to local residents urging them to attend a meeting on February 8, 2001 at the Hamden Middle School auditorium. *See* Tab 35; Depo. Ex. 185. *See also* Tab 7; Joseph Frasier Depo. at p. 81 (testifying that there "was a call for a meeting").

21) In relevant part, the flyer stated as follows:

Neighborhood residents will be meeting to discuss those issues most directly affecting us, including our health, and the impact on our property values and tax assessments. Representatives of DEP, Mayor's Office, Department of Health and Quinnipiac Health District will be present to update us on the most recent findings at the School, Rochford Field and the Annex.

*See* Tab 35; Depo. Ex. 185.

22) In addition, the flyer also urged residents to "complete the questionnaire" that had previously been sent to them by the law firm of Cummings & Lockwood. *Id.*

23) By February 2001, local residents expressed to Joseph Frasier "concerns both about their health and potential impact on property values." *See* Tab 7; Joseph Frasier Depo. at pp. 82-83.

2665798.01

24) In advance of the February 8, 2001 meeting, Shannon Windisch Pociu of the DEP provided Joe Frasier and other "Concerned Parties" with publicly available data relating to results of soil sampling at Rochford Field, Rochford Field Annex, and the Newhall Street School. *See* Tab 47; Depo. Ex. 514 (1/31/01 letter from Shannon Windisch of the DEP to "Concerned Parties").

25) Tab 44; Depo. Ex. 511 is a copy of DEP test data for Rochford Field; Tab 45; Depo. Ex. 512 is a copy of DEP test data for Rochford Field Annex; and Tab 46; Depo. Ex. 513 is a copy of DEP test data for Newhall Street School. *See* Tab 20; Shannon Windisch Pociu Depo. at p. 37.

26) Joseph Frasier admits that he received some of the foregoing DEP test data results on or about January 31, 2001. *See* Joseph Frasier Depo. at pp. 97-100.

27) Furthermore, Mr. Frasier testified that "[a]ll information" that the Newhall Coalition received from the DEP was "shared with the residents at general meetings." *See* Tab 7; Joseph Frasier Depo. at p. 89. In fact, Mr. Frasier emphasized that the "data was available for anyone to review." *Id.* at p. 102.

28) Shannon Windisch Pociu testified that DEP data "is a public record that anyone can review." *See* Tab 20; Shannon Windisch Pociu Depo. at p. 25. *See also* Tab 43; Depo. Ex. 510 at Bates # 038. As a result, Ms. Pociu testified that "to the extent that any other person in the community" had wanted access to such sampling test data, they "could have made a similar request and obtained it." *See* Tab 20; Shannon Windisch Pociu Depo. at pp. 36-37 and 331.

29) In particular, DEP test data was made available to Kim Wantek (a paralegal from Cummings & Lockwood) in February 2001. *See* Tab 43; Depo. Ex. 510 at Bates # 062-063

2665798.01

6

(entry on February 2, 2001 indicating that "[Kim Wantek] wants to copy sampling data for Rochford Field, if avail. – yes – ok").

30) During the February 8, 2001 meeting, representatives from the DEP provided residents with an update regarding the sampling completed as of that date. In so doing, the DEP noted that "summary data tables" were available with respect to testing at Rochford Field, Rochford Field Annex, and Newhall Street School. *See* Tab 38; Depo. Ex. 226; 2/8/01 Agenda Mayor's Meeting.

31) As of February 2001, the DEP had determined that contamination was present at Rochford Field, Rochford Field Annex, and the Newhall Street School. *See* Tab 20; Shannon Windisch Pociu Depo. at pp. 49-50. In addition, the DEP had determined that "Ash/fill material" was "noted at several locations" in the rights-of-way in the Newhall neighborhood. *Id.*

32) By February 8, 2001, the DEP "shared with the public" information that contamination had been found at Rochford Field, the Rochford Field Annex and the Newhall Street School. *See* Tab 20; Shannon Windisch Pociu Depo. at p. 47.

33) The test data results that the DEP addressed at the February 8, 2001 meeting received a great deal of publicity. *See, e.g.,* Tab 28; Depo. Ex. 55; 2/9/01 New Haven Register Article; Tab 29; Depo. Ex. 56; 2/14/01 Hamden Chronicle Article.

34) In early April 2001, a flyer was sent to local residents urging them to attend an "Information Meeting on the Newhall Street Neighborhood," to be held at the Hamden Middle School on April 10, 2001. *See* Tab 39; Depo. Ex. 298. *See also* Tab 7; Joseph Frasier Depo. at pp. 123-24 (testifying that there was a "countywide distribution" of the flyer).

35) Tab 49; Depo. Ex. 516 is a copy of DEP test data for the Rights-of-Way Sampling Laboratory Results. *See* Tab 20; Shannon Windisch Pociu Depo. at pp. 68-70 and 332.

36) By no later than April 8, 2001, the DEP received "a substantial part" of that Rights of Way Sampling Laboratory Results, and the DEP was willing to share such data with "Kim Wantek or anybody else from the public." *See* Tab 20; Shannon Windisch Pociu Depo. at pp. 334 and 336.

37) As of April 10, 2001, Shannon Windisch Pociu testified that anyone could have "made a request to obtain the underlying data" that supported the conclusions reached by the DEP as of that date. *See* Tab 20; Shannon Windisch Pociu Depo. at pp. 62-63.

38) Over the course of several weeks leading up to the April 10, 2001 meeting, Kim Wantek (a paralegal from Cummings & Lockwood) repeatedly sought and obtained access to additional data from the DEP relating to testing conducted in the public rights-of-way in the Newhall neighborhood. *See* Tab 20; Shannon Windisch Pociu Depo. at p. 96. *See also* Tab 43; Depo. Ex. 510 at Bates # 80, 95, 101-02, 112, and 119.

39) During the April 10, 2001 meeting, representatives from the DEP provided local residents with an update concerning the sampling conducted at Rochford Field, Mill Rock Park, and in the public rights-of-way in the Newhall neighborhood. *See* Tab 22; Depo. Ex. 29.

40) Shannon Windisch Pociu testified that the public rights-of-way are basically "the sidewalks and the streets" in front of the residences in the Newhall neighborhood, and thus, are located "in very close proximity" to the residential properties. *See* Tab 20; Shannon Windisch Pociu Depo. at p. 39. *See also* Tab 7; Joseph Frasier Depo. at p. 90 (testifying that the public rights of-way "could be adjacent very close" to a resident's property).

41) During the April 10, 2001 meeting, residents were provided with a copy of the first issue of the "Newhall Street Neighborhood Update." *See* Tab 23; Depo. Ex. 30; EPA Newhall Street Neighborhood Update. *See also* Tab 7; Joseph Frasier Depo. at p. 129 (testifying

2665798.01

8

that a hard-copy of the brochure was "available for people to pick-up and look at at the April 10, 2001 meeting").

42) Among other things, the April 2001 issue of the Newhall Street Neighborhood Update summarized the sampling results conducted by the DEP as follows:

> Sampling in Rights-of-Way & Grassy Strips:
> Between December and February, DEP gathered more than 80 soil samples from borings in the grassed strip along roadways (rights-of-way) in the Newhall Street neighborhood; including areas north, east and south of Hamden Middle School. DEP used the borings to collect soil samples from the surface and as deep down as 4 to 6 feet in certain areas.
>
> Data from the borings demonstrates that ash fill material is located beneath portions of the neighborhood. Elevated levels of arsenic, lead, polynuclear aromatic hydrocarbons, and petroleum hydrocarbons were found in some of the surface soils.
>
> ....
>
> Rochford Field:
> In January, DEP collected 14 soil samples from the top six inches of soil beneath the grass at Rochford Field. Results showed consistently elevated levels of arsenic. Additional samples were collected from the top two inches of soil on March 29th that confirmed the presence of arsenic.
>
> ....
>
> Mill Rock Park:
> DEP collected 15 soil samples from 0 to 6 inches below the grass at Mill Rock Park. Results show that there are three very limited areas of elevated arsenic.

See Tab 23; Depo. Ex. 30; EPA Newhall Street Neighborhood Update at p. 2.

43) Shannon Windisch Pociu testified as follows regarding the information that the DEP had confirmed to the public by April 10, 2001:

> Q. And in fact, by April 10, 2001, the DEP had confirmed to the public that contamination was present at Mill Rock Park, correct?
> A. Yes.
> Q. And by April 10, 2001, the DEP had confirmed to the public that contamination was present at Rochford Field, correct?
> Mr. Rainer: Objection
> A. Yes.

2665798.01

9

> ....
> Q. Am I correct that by April 10, 2001, the DEP had determined and confirmed to the public that contamination was found in the public rights-of-way?
> A. Yes.

See Tab 20; Shannon Windisch Pociu Depo. at pp. 63-64.

44) Joseph Frasier, the president of the Newhall Coalition, testified as follows with respect to information provided by the DEP to the public as of the April 10, 2001 meeting:

> Q. Am I correct that as of the April 10 meeting the DEP, in Exhibit 30 ... summarized for the residents information that disclosed the presence of contamination at Rockford Field, correct?
> A. Yes.
>
> ....
>
> Q. Am I correct that as of April 10 the DEP also advised residents that they had confirmed the presence of contamination at Mill Rock Park, correct?
> A. Yes.
> Q. Finally, isn't it true that by April 10, 2001, the DEP had confirmed the presence of contamination to the residences and the rights-of-way and grassy strips in the Newhall Street neighborhood, correct?
> A. That's correct.

See Tab 7; Joseph Frasier Depo. at pp. 144-45.

45) On April 18, 2001, the DEP sent a letter to the EPA summarizing the status of the DEP's investigation concerning the presence of contamination in the Newhall neighborhood.

See Tab 52; Depo. Ex. 525; 4/18/01 Letter from DEP to EPA.

46) Shannon Windisch Pociu testified that the DEP's April 18, 2001 correspondence is a "public record" that was available to anyone to review at the DEP's offices as of that date.

See Tab 20; Shannon Windisch Pociu Depo. at p. 348.

47) In its April 18, 2001 letter, the DEP stated:

Recent investigations by the DEP have allowed the addition of several contiguous areas to the former landfill previously believed to be comprised of only Newhall Street Field and the Hamden Middle School properties located west of Newhall

2665798.01

10

Street. The DEP has now determined that the former landfill area also includes Rochford Field, Mill Rock Park and several residential properties.

See Tab 52; Depo. Ex. 525; 4/18/01 Letter from DEP to EPA.

48) Shannon Windisch Pociu testified that the forgoing conclusion "was a determination that the DEP had made as of April 18, 2001." See Tab 20; Shannon Windisch Pociu Depo. at p. 98.

49) Furthermore, Shannon Windisch Pociu testified that "to the extent anybody in the public; Joe Frasier, attorneys from Cummings and Lockwood or anybody else that sought records at the DEP that supported this determination, they would have had access to it." Id. at p. 99.

50) Also on April 18, 2001, Mike Harder of the DEP was quoted in the *Hamden Chronicle* as follows: "We certainly have contamination issues and health issues that people should be concerned about." See Tab 30; Depo. Ex. 58; 4/18/01 Hamden Chronicle Article.

51) Also on April 18, 2001, Joseph Frasier sent a letter to the Mayor of the Town of Hamden. In part, Joseph Frasier stated as follows:

> On behalf of the residents of the Rochford field community, I am writing to you to express our concerns regarding the known contamination in our neighborhood. This is a very challenging time for us. The contamination effects our lives in many ways, namely:
>
> ❖ Stress of unknown potential health problems.
> ❖ Drastic reduction in property value.
> ❖ The perception that this community problem is not a high priority for town officials.
>
> ....
>
> We cannot afford a temporary fix. There is no question that our neighborhood is contaminated.

2665798.01

11

*See* Tab 48; Depo. Ex. 515; 4/18/01 Letter from Joseph Frasier to the Mayor of the Town of Hamden. *See also* Tab 7; Joseph Frasier Depo. at pp. 136-37 (testifying that he sent letter).

52) Similar concerns were expressed by Joseph Frasier in a local newspaper on the same date: "'Our homes are built on a landfill,' said Joe Frasier, president of the Newhall Coalition. 'That in itself will devalue our houses. We are paying taxes on properties that have no value in the real estate market.'" *See* Tab 30; Depo. Ex. 58; 4/18/01 Hamden Chronicle Article.

53) Shannon Windisch Pociu of the DEP testified as follows with respect to the DEP's April 18, 2001 letter to the EPA and Joe Frasier's April 18, 2001 letter to the Mayor of the Town of Hamden:

> Q. We have in front of us, ma'am, two different letters and am I correct both of them are dated April 18, 2001?
> A. Yes.
> Q. And the letter from Joe Frasier to the mayor of the town of Hamden he states on the second page that there is no question that our neighborhood is contaminated, correct?
> A. Yes.
> Q. My question to you, am I correct that on April 18, 2001 the DEP had also concluded that the landfill extended beyond the Hamden Middle School, correct?
> Mr. Rainer: Objection
> A. Yes.
> Q. Also specifically determined that contamination was present at Rochford Field, correct?
> A. Yes.
> Q. It also determined that contamination extended to Mill Rock Park, correct?
> A. Yes.
> Q. And it also determined that the contamination extended to several residential properties, correct?
> A. Yes.
> Q. Am I correct that by April 18, 2001 to the extent Joe Frasier on behalf of the Newhall Coalition or any other resident of the Newhall neighborhood that had sought access to whatever data the DEP had that supported the conclusions it reached as of April 18, 2001 they would have had access to that data?
> Mr. Rainer: Objection
> A. Yes.
> Q. And similarly by April 18, 2001 to the extent any attorneys or paralegals from the law firm of Cummings & Lockwood had sought to obtain any test data results that

> supported the conclusions reached by the DEP as of April 18, 2001 they also would have had access to such data, correct?
> Mr. Rainer: Objection
> A. Yes.

See Tab 20; Shannon Windisch Pociu Depo. at pp. 105-06.

54) Shannon Windisch Pociu further testified that based on additional sampling conducted by the DEP in the public rights-of-way in the Newhall neighborhood, by April 18, 2001 the DEP had determined that the former landfill area also includes Rochford Field, Mill Rock Park and several residential properties:

> Q. Now, let me direct your attention to Exhibit 524 which counsel showed you earlier and this, for the record, you identified as a communication from the DEP to the EPA dated February 26, 2001, correct?
> A. Yes.
> Q. And Mr. Rainer pointed out that in the first sentence there the DEP was requesting assistance from the EPA and I'm quoting here, to evaluate the presence of surface soil contamination on residential property suspected to be located on landfill materials in the vicinity of the Hamden Middle School, correct?
> A. Yes.
> ....
> Q. Now, I want to focus on the DEP's state of knowledge as of April 18, 2001. Okay. I'm going to show you what was previously marked as Exhibit 525.
> A. Yes.
> Q. Am I correct between February 26, 2001 and April 18, 2001 the DEP had, in fact, collected additional data, correct?
> A. Yes, I believe that would be the rights-of-way data.
> Q. Okay. On April 18, 2001 in Exhibit 525 there is a communication again from the DEP to the EPA, correct?
> A. Yes.
> Q. Okay. As of April 18, 2001 am I correct it states that the DEP has now determined that the former landfill area includes Rochford Field, Mill Rock Park and several residential properties, am I correct?
> A. Yes, the letter states that.
> Q. Am I correct that Exhibit 525, the April 18, 2001 communication doesn't say that the DEP suspects that contamination is present in those areas but rather it says the DEP has now determined that contamination is present in those areas, correct?
> A. Yes, it does state that.
> Q. Okay. So do you agree with me that as of April 18, 2001 the DEP had, in fact, determined that contamination extended beyond the Middle School, correct?
> A. Yes.

2665798.01

> Q. Specifically the DEP as of April 18, 2001 had determined that the contamination was present -- strike that. That by April 18, 2001 the DEP had determined that the former landfill area included Rochford Field, correct?
> A. Yes.
> Q. Also included Mill Rock Park, correct?
> A. Yes.
> Q. Also included several residential properties, correct?
> Mr. Rainer: Objection.
> A. Yes.
> Q. I want to focus about the residential properties. Counsel asked you some questions about that. Now, am I correct the DEP did not have specific property data as of April 18, 2001, correct?
> A. I believe that's correct.
> Q. Nonetheless the DEP was able to determine that the former landfill area included several residential properties by using its professional judgment based on data previously collected, correct?
> A. Yes.
> Q. That data that was previously collected refers to, among other things, the data shown in Exhibits 511 for Rochford Field, the data in Exhibit 512 for Rochford Field Annex, the data in 513 for the Newhall Street School as well as the data in Exhibit 516 for the residential rights-of-ways, correct?
> A. Yes.
> ....
> Q. To the extent that Mr. Michael Hopkins who [is] plaintiff's expert in this case had contacted the DEP as of let's say April 18th and said I'd like to have access to the data shown in Exhibits 511, 512, 513 and 516, again he would have access to that data, correct?
> A. Sure, yes.
> Q. Likewise Mr. Rainer would have had access to that data as well, correct?
> A. Yes.

See Tab 20; Shannon Windisch Pociu Depo. at pp. 336-41.

55)   Attached to Affidavit of Kenneth Cichon (*see* Tab 1) is a map that shows: (a) in orange, all properties that Plaintiffs have identified to fall within the Contaminated Properties Subclass; (b) in yellow, all properties that Plaintiffs have identified to fall within the Stigma Subclass; and (c) in red, based solely on data that the DEP had obtained on or before April 18, 2001, all areas where contamination was known to be present prior to April 18, 2001, including the Hamden Middle School, Rochford Field, Mill Rock Park, and the public rights-of-way

2665798.01

throughout the Newhall neighborhood. As indicated in the legend, the soil sampling locations in the public rights-of-way where contaminants were found are shown in red dots on the map.

          Respectfully submitted,

          HUSCH & EPPENBERGER, LLC

By: _____
    Michael H. Wetmore (ct24899)
    Joel B. Samson (ct24898)
    Omri E. Praiss (ECF registration pending)
    190 Carondelet Plaza, Suite 600
    St. Louis, Missouri 63105
    Telephone: 314-480-1500
    Fax: 314-480-1505
    michael.wetmore@husch.com
    joel.samson@husch.com
    omri.praiss@husch.com

and

BROWN RUDNICK BERLACK ISRAELS LLP
    Mark S. Baldwin, Esq.
    185 Asylum St.
    CityPlace I, 38th Floor
    Hartford, CT  06103
    Telephone: 860-509-6500
    Fax: 860-509-6501
    mbaldwin@brownrudnick.com

*Attorneys for Defendant Olin Corporation*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the attorneys of record registered for the Court's ECF system (as reflected by the email addresses shown below) or by mailing the same, first class mail, postage prepaid, to the non-participants in the Court's ECF system, on this 10th day of May, 2007.

| | |
|---|---|
| Neil T. Leifer, Esq.<br>Brad J. Mitchell, Esq.<br>Thornton & Naumes L.L.P.<br>100 Summer Street, 30th Floor<br>Boston, Massachusetts  02110<br>Telephone:  (617) 720-1333<br>Facsimile:   (617) 720-2445<br>nleifer@tenlaw.com<br>bmitchell@tenlaw.com<br><br>Monte E. Frank, Esq.<br>Cohen and Wolf, PC<br>158 Deer Hill Avenue<br>Danbury, CT  06810<br>Telephone: (203) 367-6202<br>Facsimile:  (203) 791-8149<br>mfrank@cohenandwolf.com<br><br>David B. Zabel, Esq.<br>Cohen and Wolf, PC<br>1115 Broad Street<br>Bridgeport, Connecticut  06604<br>Telephone: (203) 368-0211<br>Facsimile: (203) 394-9901<br>aclark@cohenandwolf.com<br>dzabel@cohenandwolf.com<br>pgoodman@cohenandwolf.com | Mark Roberts, Esq.<br>Andrew A. Rainer, Esq.<br>McRoberts , Roberts & Rainer, LLP<br>53 State St.<br>Boston, MA  02114<br>Telephone: (617) 722-8222<br>Facsimile: (617) 720-2320<br>mroberts@mcrobertslaw.com<br>arainer@mcrobertslaw.com<br><br>***Attorneys for Plaintiff*** |