Case 3:03-cv-00945-CFD    Document 211-5    Filed 05/10/2007    Page 1 of 17
Clarence Collins, jr. v. Olin Corporation et al
5/20/2005                                                                Henry Blue

```
            UNITED STATES DISTRICT COURT
               DISTRICT OF CONNECTICUT
```


```
- - - - - - - - - - - - - - - - )
                                 )
                                 )
CLARENCE R. COLLINS, JR.,        )
ET AL,                           )
         PLAINTIFFS,             )
                                 )
VS.                              ) CASE NO. 303-945(CFD)
                                 )
OLIN CORPORATION, AND            )
THE TOWN OF HAMDEN,              )
         DEFENDANTS.             )
                                 )
- - - - - - - - - - - - - - - - )


         DEPOSITION OF: HENRY BLUE
         DATE TAKEN: MAY 20, 2005
         LOCATION: HALLORAN & SAGE
                   225 Asylum Street
                   Hartford, Connecticut  06103




    Reporter: KATHLEEN S. NORTON, RPR, LSR #105

       BRANDON SMITH REPORTING SERVICE, LLC
     44 Capitol Avenue      Six Landmark Square
     Hartford, CT  06106    Stamford, CT  06901
     Tel:  (860) 549-1850      (203) 316-8591
     Fax:  (860) 549-1537      (860) 549-1537
```

1  into the military, did that knowledge come from your
2  working at Winchester's New Haven facility?
3     A    You mean the disposal practice?  Repeat that
4  again, please.
5     Q    Correct.  Sure.  You mentioned you had
6  knowledge of Winchester's disposal practices prior to
7  your joining the Service, correct?
8     A    Yes.
9     Q    Where did that knowledge come from?
10    A    From where I lived on 472 Shelton Avenue.
11    Q    Okay.  Can you describe for me what your
12 understanding of Winchester's disposal practices were
13 prior to your joining the military?
14         MS. CLARK:  Objection to form.  You can
15    answer.
16         THE WITNESS:  I can answer?
17         MS. CLARK:  Yes.
18    A    Well, my disposal practices were -- it was
19 like a swamp behind Morse Street, swamps and bushes.
20 And in that area, not adjacent to Morse Street, not
21 directly behind Morse Street, but that whole area in
22 back of Morse Street at that time was swamp and brush
23 area and that's where Winchester was dumping.  In
24 other words, that's where the middle school is now.
25 In other words, that's where the area was.  And it was

Case 3:03-cv-00945-CFD   Document 211-5   Filed 05/10/2007   Page 3 of 17
Clarence Collins, jr. v. Olin Corporation et al.
5/20/2005                                                      Henry Blue

Page 38

1    quite a lengthy area.  It went from Winchester Avenue,
2    further up, halfway up near Bryden Terrace and then
3    that whole area there from around Bryden Terrace to
4    St. Mary's Street and somewhat beyond almost near the
5    railroad crossing, almost to Dixwell Avenue if you
6    want to be -- in that particular time.  They dumped in
7    that whole area back there.  That was swamp land and,
8    like I said, brush.  Brushes of all kinds, swamps,
9    bushes, and stuff like that.  That's where they were
10   dumping.  And that is my answer to that.
11   BY MR. SAMSON:
12       Q    And does your knowledge with respect to the
13   answer you just gave come from your work at
14   Winchester, or does it come from your living in the
15   neighborhood?
16       A    That comes from living in the neighborhood,
17   sir.
18       Q    Okay.  And tell me what your basis for saying
19   that Olin -- or Winchester, rather, dumped -- strike
20   that.
21            Did you see Winchester dumping material in
22   this area you have just described?
23       A    Absolutely.  Trucks.
24       Q    Describe for me what you saw.
25       A    They were just trucks.  They didn't have the

Page 87

1              (Reporter read the record.)

2

3        A    Sir, I believe I have that document at home.

4   I believe I can get it, if need be.

5        Q    And you will agree to look for any documents

6   that you have related to your trip to St. Louis to

7   Olin a couple of weeks ago and turn them over to your

8   attorneys?

9        A    If you so desire, yes.  If you so desire,

10  yes.

11             MR. FORTNER:  We do.

12  BY MR. SAMSON:

13       Q    Do you recall what you said at this meeting

14  you attended in St. Louis?

15       A    Well, my testimony wasn't a real long thing.

16  It was just would you please clean up the toxic waste

17  in our residential areas.

18       Q    Do you recall saying anything else?

19       A    I said a few other things, because it hurts

20  us to have to go -- we cannot go out in the yard, we

21  cannot have our kids go out and play.  We're scared to

22  go out there due to the fact that the contamination is

23  there.  It may have been there a long time, but it's

24  there now.  And being obvious of the fact that it's

25  there now is just like if you were going somewhere and

Page 88

```
 1    you knew the place was -- that it may injure your
 2    health in this manner that you won't want to go there
 3    anymore.  That's the same thing that prevails with us.
 4    We want the place cleaned up, that's all we're asking.
 5    And I think I put that in my testimony.
 6        Q    And that's all you recall saying?
 7        A    No, I did bring a jar of some of the toxic
 8    waste in a small jar and gave it to Mr. Koch.  I said,
 9    "Now, do you want me to leave it with you?  I will
10    leave it with you and you can have it analyzed."  He
11    chose not to.
12        Q    How do you know that that jar was full of
13    toxic waste?
14        A    Because I got it out of the yard.  I went
15    back there to get it out just to bring my point
16    across.
17        Q    Where did you get it from?
18        A    My backyard.
19        Q    Did you have it tested to know what its
20    contents were?
21        A    No, I didn't have the jar tested, but my
22    yard, that has been tested, and I have an over -- I'm
23    all in the red there.  I have lead and arsenic
24    overwhelming with lead.  It's overwhelmed with lead
25    and toxins, with arsenic in my backyard.  That I do
```

Page 89

1    know because it was tested by you, Olin.

2        Q    Can you tell me who else spoke at this

3    meeting you attended with Mr. Koch?

4        A    They all spoke. All of them spoke except

5    for -- only three of us spoke. The other ones spoke

6    at the other two meetings, Donald Eaton and Joe,

7    whatever his name is, Joe Frazier. He spoke at the

8    prior meeting. I don't know what this meeting was

9    about. When we got there, it was a little late. We

10   sat down at this big table and they said the vice --

11   somebody would be there that we could talk to.

12   Mr. Koch came out. Mr. Koch was very congenial with

13   us, very nice with us, took our names, addresses

14   telephone numbers, everything, and he said he would

15   get back to us in six weeks. But then he didn't

16   promise nothing. All he said was, "I will investigate

17   it a little more and see what we can do, but I will

18   definitely get back to you," because he took our

19   telephone number and address of each one of us. And

20   he also gave us the card which I just showed to --

21            MR. FORTNER:  Me, Joe.

22            THE WITNESS:  I can't remember your

23       name.

24            MR. FORTNER:  Joe.

25

Case 3:03-cv-00945-CFD   Document 211-5   Filed 05/10/2007   Page 7 of 17
Clarence Collins, jr. v. Olin Corporation et al
5/20/2005                                           Henry Blue

Page 90

1  BY MR. SAMSON:

2      Q    Do you recall anything else Mr. Koch said at
3  this meeting you attended?

4      A    He said, "We moved from where we were in
5  Fairfield to St. Louis." And he said -- I don't know
6  what his reasons were for moving, but they moved. But
7  he also said that he would speak with us, the
8  shareholders and whatnot, and investigate this thing
9  in his way with the shareholders, and whatever, and
10 get back to the people.

11          And we also invited him to come down and look
12 at this area as well to get more informed about this
13 area. And he was very congenial, as I stated before.
14 And when I finished, I thanked him. We all thanked
15 him. He gave us a card and that's about it.

16     Q    Do you recall him saying anything else other
17 than what you have just told us today?

18     A    No, sir. He didn't make any promises except
19 that he would look into it and do what he could. He
20 did say that.

21     Q    You don't recall him saying anything else?

22     A    Not specific, no.

23     Q    Anything generally that you recall?

24     A    Say what?

25     Q    Other than what you have already told us.

Case 3:03-cv-00945-CFD    Document 211-5    Filed 05/10/2007    Page 8 of 17
Clarence Collins, jr. v. Olin Corporation et al
5/20/2005                                                      Henry Blue

Page 91

```
 1      A    No.  As I said before, he would have to get
 2  back to us.  Meeting his members and whatnot, and he
 3  would get back to us.  He definitely said he would get
 4  back to us.
 5      Q    Have you ever heard of the Toxic Action
 6  Center?
 7      A    Not really.
 8      Q    How many people were in the room at this
 9  meeting that you attended in St. Louis with Mr. Koch?
10      A    There was no news media there, if that's what
11  you mean.  As far as I could see, there was -- only we
12  were there, but we had contacted the news media.  Not
13  me, but some of them.
14      Q    So your understanding of this is there were
15  the five of you which was Henry Blue, Donald Eaton,
16  Donald Johnson, Sonia Powell, Elizabeth Hayes and Joe
17  Frazier.  And that's six people.  Plus Mr. Koch and
18  then you said a secretary he brought?
19      A    Yes, a lady.  I don't know her name.
20      Q    So that would be eight people total at this
21  meeting, correct?
22      A    Yes, to the best of my knowledge.  There
23  might have been another one there somewhere, but I'm
24  talking about the ones I was aware of because he's the
25  only one we talked to.
```

Case 3:03-cv-00945-CFD    Document 211-5    Filed 05/10/2007    Page 9 of 17
Clarence Collins, jr. v. Olin Corporation et al
5/20/2005                                                    Henry Blue

Page 92

```
 1      Q    And other than the people from Connecticut,
 2  yourself, Ms. Johnson, Ms. Powell and Ms. Hayes --
 3      A    He even allowed us to take pictures of him.
 4  So I guess he wasn't worried about that. I took
 5  pictures next to the man. In fact, I sat next to him,
 6  right next to him. We took pictures together.
 7      Q    I'm just trying to understand everyone who
 8  spoke.
 9      A    All of us spoke.
10      Q    It was the four of you?
11      A    The biggest speech was given by Elizabeth
12  Hayes.
13      Q    And what did Elizabeth Hayes say?
14      A    More or less the same thing I said only
15  different words. The subject didn't change. The
16  subject was about the cleanup, the remedial cleanup.
17  That's all we asked, that the cleanup of the
18  residential area as well as the school. We feel that
19  the school could stay there if you cleaned it up. We
20  don't feel it's necessary to build a school, but clean
21  up that area, but take the toxic waste out of there.
22  We don't want it near the school or the children.
23  That's all we ask, basically.
24      Q    Do you know if anyone from the Toxic Action
25  Center traveled to St. Louis to meet with Olin a
```

Clarence Collins, jr. v. Olin Corporation et al

5/20/2005                                                          Henry Blue

Page 93

1   couple of weeks ago while you were in Town?
2       A    No, sir.  Not that I know.
3       Q    Have you ever heard of someone named Alyssa
4   Schuren?  S-C-H-U-R-E-N.
5       A    Yes, but they weren't with us.  They were not
6   with us.
7       Q    Were they in the same -- when you say they,
8   who are you referring to?
9       A    You asked who came with us.  I'm talking
10  about who came with us.  It was just our five that
11  came with us.  You're talking about somebody else
12  being there.  These people weren't part of -- they're
13  another unit or something.  I don't know.  They came
14  there, but they were not --
15      Q    At the meeting that you attended with
16  Mr. Koch, was anyone else present other than the eight
17  people we have already identified?
18      A    To the best of my knowledge, no, I told you.
19  I don't remember seeing them there.
20      Q    Have you ever heard of someone named Jay
21  Rasku?  R-A-S-K-U.  Jay Rasku?
22      A    No.  The name don't ring a bell.
23      Q    And you don't recall either Ms. Schuren or
24  Mr. Rasku being present at this meeting you had with
25  Mr. Koch in St. Louis, correct?

Brandon Smith Reporting

e1779462-c839-484d-b1d5-0186d409705f

Case 3:03-cv-00945-CFD  Document 211-5  Filed 05/10/2007  Page 11 of 17
Clarence Collins, jr. v. Olin Corporation et al
5/20/2005                                                              Henry Blue

Page 94

1      A     Schuren?  No.  As I said, there could have
2  been other people there, but I'm talking about I was
3  not concerned with the people.  I thought you were all
4  talking about the people I was traveling with and
5  Mr. Koch that we came to see.  That's all I know.  I
6  don't know of anybody else that was there.
7      Q     Did you meet in a room with Mr. Koch?
8      A     Yes.  We all met, five us, like I said, were
9  all in the room with Mr. Koch.
10     Q     And no one else was in the room, correct?
11     A     Not to my knowledge.
12     Q     Okay.  And I'm saying no one else, whether
13 they were from Connecticut with you or some other
14 organization?
15     A     Well, I was concerned with the people from
16 Connecticut, sir.
17     Q     I'm just trying to get at who spoke and I
18 want to make sure we have covered everyone.
19     A     Well, I don't know these people you're
20 talking about.  They might have been there, but I
21 don't know anybody.  I was only aware of the people
22 that I came down with.  I can't quote -- I can't quote
23 what they said or didn't because I wasn't there with
24 them.  I can only be concerned with what I was there
25 for and the five us that went down or the four of us

Page 95

1  that went down.
2      Q    And were you at the meeting with Mr. Koch
3  during the entire time that that meeting took place?
4      A    Yes, sir.
5      Q    Okay.
6      A    Because he came in there from the other room,
7  I believe, the other meeting. Like I said, I wasn't
8  at the other meeting. There was another meeting, too,
9  that took place prior to our meeting.
10     Q    Did you take any notes of this meeting that
11 you had with Mr. Koch?
12     A    No, sir. I was just interested in giving my
13 testimony. And what he said, maybe, you know, just
14 briefly, but he didn't say that much. He said he was
15 going to get back to us and that he would have us meet
16 with his -- with his -- with his people and come up
17 with -- give us some type of answer within the
18 six-week period of time. And he took our telephone
19 number and addresses, as I stated before, and that he
20 would get back to us. That's it.
21     Q    Do you currently own any Olin stock?
22     A    No, sir, I do not.
23     Q    Have you ever owned any Olin stock?
24     A    No, sir.
25     Q    When you got back to Hamden, do you recall

Case 3:03-cv-00945-CFD    Document 211-5    Filed 05/10/2007    Page 13 of 17
Clarence Collins, jr. v. Olin Corporation et al
5/20/2005                                                                Henry Blue

Page 96

```
 1   reading a newspaper article about your trip to St.
 2   Louis?
 3       A    Yes, sir.
 4            MR. SAMSON:  Tom, do you have that
 5   handy?  You do or don't?
 6            MR. FORTNER:  We do.
 7            MR. SAMSON:  Let's mark that as the next
 8   exhibit.
 9
10            (Defendant's Exhibit No. 352, marked
11             for identification.)
12
13            MR. FORTNER:  I'm handing the witness
14   Exhibit No. 352.
15   BY MR. SAMSON:
16       Q    Mr. Blue, you've been handed an Exhibit 352,
17   a New Haven Register article.  Do you recognize this
18   document or this article?
19       A    Yes.  I'm not sure if this has -- if this is
20   the same article.
21       Q    Well, I will tell you this was taken off the
22   Internet.  You may have seen it in newspaper form, but
23   I'm wondering if it was the same article.
24       A    Well, it looks pretty much like it.  I only
25   have the article that we had.  It was headlined
```

1   differently.
2       Q    Do you recall if you saw an article in the
3   New Haven Register, or if it was some other paper?
4       A    I'm positive it was the Register because I
5   get it every day.
6       Q    You subscribe to the New Haven Register?
7       A    Yes, sir.
8       Q    And how long have you subscribed to the New
9   Haven Register?
10      A    Michael Gannon, yes, he wrote it.
11      Q    How long have you subscribed to the New Haven
12  Register?
13      A    About ten, 15 years, I guess, off and on.
14      Q    And when you say off and on, what do you
15  mean?
16      A    Well, at times I didn't have it, but they are
17  not competitive with any other newspapers so you don't
18  get any news unless you get TV news unless you buy the
19  Register. Except for small, like the Hamden
20  Chronicle, or something like that, that's nothing
21  compared to the Register. The Register is basically
22  your newspaper thing for -- it's all the news for New
23  Haven and vicinity really. And it's the only one that
24  is competitive in the City of New Haven.
25      Q    Now, while you were receiving the New Haven

Page 98

1   Register on and off over the last ten, 15 years, did
2   you follow stories about contamination and
3   contamination concerns in your neighborhood and around
4   the middle school?
5      A    Yes.
6      Q    And do you recall following these stories
7   when contamination was discovered at the middle
8   school?
9           MS. CLARK:  Objection to form.
10     A    Well, I mean, I can't be specific of dates,
11  but I have a rough idea.  I can give you an estimate
12  of the time frame, but I can't be so accurate to say
13  that everything I say is going to be accurate.  I can
14  give you a rough idea, but -- of the time frame, but
15  that's about it.  I cannot be --
16  BY MR. SAMSON:
17     Q    So based on your rough idea, do you believe
18  you followed stories about contamination at the Hamden
19  Middle School at the time that was being discovered?
20     A    Yes.  Say that again?  Repeat that.
21          MR. SAMSON:  Would you read that back,
22     please.
23
24          (Reporter read the record.)
25

Page 117

1       answer.

2       A    I don't know when I began to be a member, but
3  I do know I'm a member.
4  BY MR. SAMSON:
5       Q    You don't know when you became a member of
6  the Newhall Coalition; is that correct?
7       A    It was after the incident with the school and
8  it was about they started this coalition, and since I
9  was in the vicinity, I just joined like the rest of
10 them.  But the specific date, it may be here
11 somewhere, but I don't know where it is.
12      Q    Do you regularly attend Newhall Coalition
13 meetings?
14      A    I don't attend them all, but most of them.
15      Q    And have you attended most of the Newhall
16 meetings since you joined the organization?
17      A    Yes, sir, I have.
18      Q    Are you a member of the Newhall Advisory
19 Committee?
20      A    Yes, I am.  I was.
21      Q    Do you know if the 472 Shelton Avenue
22 property has ever used coal to heat the house?
23      A    I know all of them houses at one time was
24 heated with coal because they didn't have oil.
25 Everybody had oil still, but that came about after.

Case 3:03-cv-00945-CFD   Document 211-5   Filed 05/10/2007   Page 17 of 17
Clarence Collins, jr. v. Olin Corporation et al
5/20/2005                                                              Henry Blue

Page 195

1             CERTIFICATE OF REPORTER

2

3    I, Kathleen S. Norton, a Registered Professional
     Reporter/Commissioner within and for the State of
4    Connecticut, do hereby certify that I took the
     deposition of HENRY BLUE, on MAY 20, 2005, who was by
5    me duly sworn to testify to the truth and nothing but
     the truth; that he was thereupon carefully examined
6    upon his oath and his examination reduced to writing
     under my direction by means of Computer Assisted
7    Transcription, and that this deposition is a true
     record of the testimony given by the witness.

8

9    I further certify that I am neither attorney nor
     counsel for, nor related to, nor employed by any of the
10   parties to the action in which this deposition is taken
     and further that I am not a relative or employee of any
11   attorney or counsel employed by the parties hereto, nor
     financially interested in the outcome of the action.

12

13   IN WITNESS THEREOF, I have hereunto set my hand May 31,
     2005.
14
          *Kathleen Sweeney Norton* (signature)
15

16   _____

17            Kathleen S. Norton

18

19   Notary Public   License No. 00105
     My commission expires: 7-31-07
20

21

22

23

24

25