Transcript of Joseph R. Frasier

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF CONNECTICUT
 2                  CV NO: 3:03-CV-945 (CFD)

 3

 4              DEPOSITION OF JOSEPH R. FRASIER

 5

 6    CLARENCE COLLINS, JR., et. al.,        ORIGINAL

 7                       PLAINTIFFS,

 8         vs.

 9    OLIN CORPORATION,

10                       DEFENDANT.

11

12    -----------------------------------------------------

13    DEPONENT: JOSEPH R. FRASIER

14    DATE:     APRIL 10, 2007

15    TIME:     9:05 A.M.

16    LOCATION: CLARK & ASSOCIATES
                2133 Dorchester Rd.
17              North Charleston, South Carolina

18    -----------------------------------------------------

19

20

21              REPORTED BY:
                WANDA S. BUCKNER
22              NCRA Registered Professional Reporter
                NCRA Certified Realtime Reporter
23              CLARK & ASSOCIATES
                P.O. Box 73129
24              North Charleston, SC 29415
                (843) 762-6294
25
```

Clark & Associates, Inc.
843.762.6294

Transcript of Joseph R. Frasier

Page 8

```
 1          the transcript which I will make available for
 2          your review and you will have 30 days to make
 3          any corrections, and obviously if we need more
 4          time, I am sure Mr. Praiss will agree to give
 5          us more time if we need it.  All right.  Thank
 6          you.
 7              Q    I was asking you questions about the
 8     Newhall Coalition, do you recall that?
 9              A    Okay.
10              Q    Am I correct that the Newhall Coalition
11     was formed in 2000?
12              A    There was an ad hoc group pretty much
13     discussing an advocacy group, yes.
14              Q    Do you recall when it was created or
15     formed?
16              A    Officially?
17              Q    Yes.
18              A    Latter 2000, latter part of 2000, first
19     part of 2001.
20              Q    Okay.  Were you involved in the formation
21     of the Newhall Coalition?
22              A    Yes.
23              Q    What was your role?
24              A    My role initially was president of the
25     association.
```

Transcript of Joseph R. Frasier

```
 1        Q     Is it association or coalition, or is

 2   there a difference in your mind?

 3        A     In my mind, no.

 4        Q     Okay.  So when it was formed sometime in

 5   late 2000, early 2001, you served as president of

 6   the Newhall Coalition, correct?

 7        A     That is correct.

 8        Q     Am I correct that Elizabeth Hayes served

 9   as vice president?

10        A     That is correct.

11        Q     Do you recall approximately how long of a

12   time period you served as president?

13        A     From its inception until '03, June of '03.

14        Q     Who became the president in June of 2003

15   of the Newhall Coalition, if you know?

16        A     Elizabeth Hayes.

17        Q     Up until June 2003, was Elizabeth Hayes

18   the vice president of the Newhall Coalition?

19        A     Not from its inception.

20        Q     Was there a vice president before her?

21        A     No.

22        Q     Why was the Newhall Coalition formed, sir?

23        A     To be a voice for those who were -- could

24   not speak for themselves.

25        Q     Let me go ahead and mark an exhibit real
```

Clark & Associates, Inc.
843.762.6294

Transcript of Joseph R. Frasier

Page 18

```
 1    Newhall Coalition was to be a voice of the people

 2    and to speak on behalf of the people with respect to

 3    issues arising from the discovery of contamination

 4    at the Hamden Middle School and the surrounding

 5    areas?

 6              MR. RAINER:  Objection.  You may answer.

 7         A    I will answer your question with the same

 8    answer that I gave previously.  It was the voice, we

 9    formed -- the mission statement of the Newhall

10    Coalition was to voice the concern, to be the

11    spokesperson for people who could not advocate for

12    themselves or speak on their behalf, and that stems

13    from the crisis that occurred at the Hamden Middle

14    School.

15         Q    Thank you.  When you say people who could

16    not speak for themselves, am I correct you are

17    referring to local residents of the Hamden

18    community?

19         A    I am speaking about residents of the

20    Hamden community.

21         Q    Thank you.  Back to Exhibit 504, do you

22    see at the bottom it talks about news coverage here

23    and it references Associated Press, the New Haven

24    Register, the Hamden Chronicle, Hamden Journal, the

25    New Haven Advocate, do you see those?
```

1    residents advising them of a meeting to be held at

2    the Hamden Middle School on December 19, 2000?

3        A    I know there was a letter sent.

4        Q    Do you recall receiving this letter?

5        A    At this moment I do not recall.

6        Q    I will hand you what previously has been

7    marked as Defendant's Exhibit 181.

8             Have you had an opportunity to read

9    Defendant's Exhibit 181, sir?

10       A    Yes.

11       Q    Am I correct that this is a letter sent by

12   the mayor of the town of Hamden, Carl Amento, to

13   residents of the Hamden community?

14            MR. RAINER:   Objection.   You may answer.

15       Q    I couldn't hear your answer, I'm sorry.

16   There was an objection.

17       A    I see an undated letter that was addressed

18   to the residents.

19       Q    Is it addressed by the mayor of the town,

20   correct?

21       A    Addressed -- signed by the mayor.

22       Q    It is directed to "the resident", correct?

23       A    That is correct.

24       Q    You are correct that this letter is not

25   dated; however, am I correct that in the third

Transcript of Joseph R. Frasier

Page 30

```
 1   paragraph specifically refers to a meeting that is

 2   going to take place on December 19, 2000?  Do you

 3   see that?

 4        A    Yes, sir.

 5        Q    Apparently this letter was sent sometime

 6   before December 19, 2000?

 7             MR. RAINER:  Objection.  You may answer.

 8        A    Do not know.

 9        Q    Do you recall that sometime before

10   December 19, 2000, the mayor of the town of Hamden

11   sent this letter to the residents of the Hamden

12   community?

13        A    Yes.

14        Q    Did you have any discussions with the

15   mayor of the town of Hamden either prior to him

16   sending this letter to the residents?

17        A    No.

18        Q    Did you have any discussions with the

19   mayor of the town of Hamden after he sent this

20   letter to the residents of the town of Hamden?

21        A    At some point, yes.

22        Q    In the second paragraph of the letter the

23   mayor states that several area residents have

24   questioned the extent of the environmental problems

25   surrounding the school which may possibly involve
```

Page 50

```
 1              MR. RAINER:  Do you want to know whether

 2         he remembers getting this specific document, is

 3         that it?

 4         Q    I will ask my question again.  If I

 5    understood you correctly, your testimony was that

 6    you recall residents sharing with you a copy of what

 7    has been marked as Defendant's Exhibit 507, is that

 8    correct?

 9         A    Yes.

10         Q    My question to you is do you recall

11    approximately when residents of Hamden shared with

12    you Defendant's Exhibit 507?

13         A    I do not recall at this time.

14         Q    Do you recall it was sometime in January,

15    February, of 2001 or thereabouts?

16         A    It was shortly after I believe they

17    received it.

18         Q    Okay.  Do you recall that the Newhall

19    Coalition hosted an informational meeting on or

20    about January 18, 2001?

21         A    I can't recall the date when, but Newhall

22    Coalition hosted many meetings.

23         Q    Do you recall that there was a meeting

24    hosted at Christian Tabernacle Baptist Church on or

25    about the middle of January 2001 where a significant
```

Transcript of Joseph R. Frasier

Page 49

1      Q     Do you recall you did receive data about

2  Rockford Park towards the end of January 2001?

3      A     No, I do not.

4      Q     You don't recall Shannon Windisch

5  providing that data to you?

6      A     No, I do not at this point.

7      Q     I will refresh your memory later.

8            (Exhibit No. 507 was marked for

9  identification.)

10     Q     Mr. Frasier, I have handed you what has

11 been marked as Defendant's Exhibit 507.  This is

12 again a publication by the QVHD.  If you notice on

13 the first sentence there it talks about, revised

14 January 16, 2001.  Do you see that?

15     A     Yes.

16     Q     My only question to you is do you recall

17 at any time after January 16, 2001, receiving a copy

18 of this publication from the QVHD?

19           MR. RAINER:  Objection.  You may answer.

20     A     Mailed to me?

21     Q     Or through the Newhall Coalition.

22     A     From residents I reviewed.

23     Q     Do you recall approximately when residents

24 shared with you what has been marked as Defendant's

25 Exhibit 507?

Transcript of Joseph R. Frasier

Page 56

```
 1      A      Yes.

 2      Q      Is that your -- am I correct that your

 3   name appears fourth line down?

 4      A      That is correct.

 5      Q      Did you write that?

 6      A      Yes, I did.

 7      Q      Right below it is Bill Narwold from

 8   Cummings and Lockwood, correct?

 9      A      Yes.

10      Q      Do you recognize this as a sign-up sheet

11   from a meeting that you attended at the DEP where

12   Mr. Narwold was present that took place sometime in

13   January or February of 2001?

14      A      Yes.

15      Q      Do you see that the first line is Tom

16   O'Brien from Olin, do you see that?

17      A      Yes.

18      Q      Does this refresh your recollection that

19   representatives of Olin were present at this

20   meeting?

21      A      Yes.

22      Q      Do you see -- do you have an understanding

23   why Mr. O'Brien on behalf of Olin was present at

24   this meeting?

25      A      Because he was Olin's representative, one
```

Transcript of Joseph R. Frasier

Page 61

1    Antonio Pondford?

2        A    I do not recall.

3        Q    Do you have an understanding of why

4    attorneys from the law firm of Cummings and

5    Lockwood, including in particular Mr. Narwold, and

6    attorneys from the law firm of Koskoff, Koskoff and

7    Bieder were present at this January 2001 meeting?

8        A    To address concerns that citizens would

9    have.

10       Q    Did the company invite these attorneys to

11   the meeting?

12       A    As I recall, Cummings and Lockwood asked

13   if they could sit in on the next meeting.

14       Q    Sit in on the next meeting, you are

15   referring to the meeting we are talking about in

16   January 2001?

17       A    The next meeting.

18       Q    Which took place sometime during

19   January 2001?

20       A    Yes.

21       Q    Did the attorney from Cummings and

22   Lockwood make that inquiry to you as president of

23   the Newhall Coalition?

24       A    Yes.

25       Q    Did they tell you why they wanted to

Transcript of Joseph R. Frasier

Page 62

1    attend the meeting?

2        A    They didn't explain why.

3        Q    Did anybody from the law firm of Koskoff,

4    Koskoff and Bieder contact you asking if they could

5    attend the meeting?

6        A    I don't recall.

7        Q    At any time did you believe that attorneys

8    from Cummings and Lockwood -- strike that.

9            Was it your understanding that attorneys

10   from the law firm of Cummings and Lockwood or from

11   the law firm of Koskoff, Koskoff and Bieder were

12   seeking to represent residents in potential

13   litigation arising from the discovery of

14   contamination at the Hampden Middle School?

15       A    They were there to answer questions of

16   concern by the citizens.

17       Q    I appreciate that.  That doesn't answer my

18   question.  I will ask my question again.

19           At any time did you come to understand

20   that attorneys from the law firms of Cummings and

21   Lockwood or Koskoff, Koskoff and Bieder were seeking

22   to represent residents in potential litigation

23   arising from the discovery of contamination at the

24   Hampden Middle School?

25           MR. RAINER:  How can he know what was in

Transcript of Joseph R. Frasier

Page 63

1          their head?  He answered the question.  I

2          object to it being answered again.  You can

3          answer it again subject to the objection.

4          A     Sir, my answer to the question remains the

5     same.

6          Q     Did you ever have any conversations with

7     any attorneys from either Cummings and Lockwood or

8     Koskoff, Koskoff and Bieder, were there any words

9     expressed to you that they were seeking to represent

10    residents in connection with potential litigation

11    arising from the discovery of contamination at the

12    Hamden Middle School?

13              MR. RAINER:  Objection.  You may answer.

14         A     I don't know that anyone, because no one

15    knew of any -- of the extent of contamination

16    before, so there were legal -- there were questions

17    and concerns that the residents had, had nothing to

18    do with litigation of any sort before you know what

19    was there.

20         Q     Maybe my questions aren't very good and I

21    will try again.

22         A     That is okay.

23         Q     My question is very focused.  I am trying

24    to understand if at any time you had a conversation

25    with an attorney from Cummings and Lockwood where

Transcript of Joseph R. Frasier

Page 64

1    Mr. Narwold or some other attorney said to you,

2    Mr. Frasier, we are going to be attending these

3    meetings because we would like to represent

4    residents in some potential litigation relating to

5    what has taken place at the Hampden Middle School.

6         A    No.

7         Q    At no time did any attorney for Cummings

8    and Lockwood share those thoughts with you, is that

9    your testimony?

10             MR. RAINER:  Objection.  Asked and

11             answered.  You can answer it again.

12        A    No.

13        Q    At any time did an attorney from Koskoff,

14   Koskoff and Bieder express to you or the Newhall

15   Coalition that their law firm was interested to

16   represent residents of Hamden in connection with the

17   discovery of contamination at the Hampden Middle

18   School?

19        A    No.

20        Q    As of February 2001, did you believe that

21   an attorney-client relationship had been created

22   between Cummings and Lockwood and any of the

23   residents of the Hamden area?

24             MR. RAINER:  I instruct him not to answer.

25        I will represent to you that we have had a

1          conversation off the record.  Mr. Frasier

2          informs me that at the meeting you asked about,

3          that residents asked questions of the attorneys

4          present for the purpose of obtaining legal

5          advice; therefore, I instructed him that he

6          should not answer questions concerning what was

7          discussed at the meeting.

8                    I recognize that the proposition,

9          whether they had retained these attorneys to

10         represent them, is different from the question

11         of whether the residents asked questions for

12         purposes of seeking legal advice; however, I

13         believe that under the applicable law, the

14         asking of questions for purposes of obtaining

15         legal advice qualifies for the privilege.

16         Q    To follow up on some comments made by your

17    counsel here, first of all, do you consider

18    Mr. Rainer to be your attorney?

19         A    Yes.

20         Q    At the meeting that took place in January

21    of 2001, did residents ask for legal advice from the

22    attorneys from Cummings and Lockwood?

23         A    Yes.

24         Q    Did the attorneys from Cummings and

25    Lockwood provide answers to those questions?

Transcript of Joseph R. Frasier

Page 66

```
 1        A    At that meeting, no.

 2        Q    Did they at any time, to your knowledge,

 3   attorneys from Cummings and Lockwood provide answers

 4   to the community with respect to any questions

 5   seeking legal advice?

 6        A    I am sure that they did.

 7        Q    Do you recall the circumstances when they

 8   did that?  The second meeting, a follow-up meeting?

 9   I am just trying to follow up.

10        A    No.  At that meeting, that is what I

11   recall.

12        Q    We will get a little more specific,

13   Mr. Frasier.  If I understand you correctly,

14   sometime in this January 2001 meeting, residents

15   asked questions of a legal nature seeking legal

16   advice from attorneys from Cummings and Lockwood,

17   correct?

18        A    Yes.

19        Q    My only question is at any time do you

20   recall the circumstances of when attorneys from

21   Cummings and Lockwood responded to those questions?

22        A    I don't recall.

23        Q    At any time, to your knowledge, did the

24   residents ask questions of a legal nature seeking

25   legal advice from the law firm of Koskoff, Koskoff
```

Transcript of Joseph R. Frasier

Page 79

1    major focus at this particular meeting.

2        Q    Do you recall that by early February 2001

3    neighborhood residents were concerned about their

4    health due to the discovery of contamination at the

5    Hamden Middle School?

6            MR. RAINER:   I'm sorry, what was the date?

7            MR. PRAISS:   Early February 2001.

8        Q    Let me rephrase my question, sir.

9            Do you recall that by early February of

10   2001 neighborhood residents were concerned about

11   their health due to the discovery of contamination

12   at the Hamden Middle School?

13       A    Counsel, as I stated earlier, the ultimate

14   concern of the residents was at all times concerning

15   the landfill at the middle school, what effect it

16   would have upon their health and safety.

17       Q    Do you recall by early February 2001

18   neighborhood residents were also concerned about the

19   impact on property values after the discovery of

20   contamination at the Hamden Middle School?

21       A    As I stated earlier, property value might

22   have been a concern, but it was not first and

23   foremost on the minds of the residents.

24       Q    I am going to hand you what previously has

25   been marked as Defendant's Exhibit 185, sir.  Let me

Transcript of Joseph R. Frasier

Page 80

```
 1    know when you have had an opportunity to review it

 2    and I will ask you some questions.

 3              Do you recognize Defendant's Exhibit 185,

 4    Mr. Frasier?

 5         A    I recall.

 6         Q    Was this document prepared by the Newhall

 7    Coalition?

 8         A    It could have.  I am not definitive on

 9    that.

10         Q    It makes reference to a meeting that is

11    going to take place on February 2001, correct?

12         A    Yes.

13         Q    It states, neighborhood residents will be

14    meeting to discuss those issues most directly

15    affecting us, including our health and the impact

16    upon our property values and tax assessments.  Do

17    you see that?

18         A    Yes.

19         Q    Do you agree that as of February 2001 that

20    issues relating to health and the impact on property

21    values were directly affecting the neighborhood

22    residents?

23              MR. RAINER:  Objection.  You may answer.

24         Q    Let me strike that question and I will ask

25    you one that may be somewhat easier.
```

Transcript of Joseph R. Frasier

Page 81

1          First, was this Exhibit 185 sent to

2   residents in Hamden?

3          MR. RAINER:  Objection.  You may answer.

4      A    Apparently so, yes.  There was a call for

5   a meeting.

6      Q    That first sentence that I read to you

7   before, do you agree that that is an accurate

8   statement?

9          MR. RAINER:  Objection.  I don't see how

10         he can answer that in that form.  You are

11         asking him whether he agreed with a sentence as

12         it was written on this form?

13     Q    Let me ask you the question differently

14   then.

15          As of February 2001, as the president of

16   the Newhall Coalition, did you agree that issues

17   relating to health were directly affecting the

18   neighborhood residents due to the discovery of

19   contamination at the Hamden Middle School?

20         MR. RAINER:  Objection.  You may answer.

21     A    There was a concern, as a concerned

22   resident.

23     Q    Did you also agree as of February 2001

24   that issues relating to the adverse impact on

25   property values was another concern that was

Page 82

1    directly affecting the neighborhood residents due to

2    the discovery of contamination at the Hamden Middle

3    School?

4              MR. RAINER:  Objection.  You may answer.

5         A    I don't see how you can separate the

6    health and welfare and the largest investment a

7    person will make in his or her lifetime would not be

8    impacted.

9         Q    Would you agree that by February 2001,

10   residents were -- at least residents you were

11   speaking with, were expressing concerns both about

12   their health as well as their property values due to

13   the discovery of contamination at the Hamden Middle

14   School, is that correct?

15             MR. RAINER:  Objection.  You may answer.

16        A    I don't see how it -- how you could

17   separate them.

18        Q    I am not asking you to separate them.  I

19   am asking now a different question.

20             Do you recall that by February 2001 local

21   residents were expressing to you, as president of

22   the Newhall Coalition, their concerns both about

23   their health and the potential impact on property

24   values?

25        A    Yes, yes, there were concerns.

Transcript of Joseph R. Frasier

Page 83

1      Q      They were expressing those concerns to

2  you, correct, by February 2001?

3      A      Those concerns as amplified in this

4  correspondence.

5      Q      My question is were they expressing those

6  concerns to you, sir, the residents, as of

7  February 2001?

8      A      Yes.

9      Q      Thank you.  It makes reference here about,

10  it is urgent that you complete the questionnaire

11  sent to you by the law firm and return it

12  immediately in an enclosed envelope.  Do you see

13  that?

14      A      I noticed that.

15      Q      To your understanding, that was the same

16  questionnaire that is referenced in the exhibit, the

17  privilege log I showed you before, Defendant's

18  Exhibit 191?

19      A      Okay.

20      Q      Is there a reason that you recall why in

21  this notice of meeting residents were urged to

22  complete the questionnaire and send it back to the

23  law firm?  Do you recall?  What was the urgency,

24  sir, is what I am trying to understand.

25      A      The questionnaire was sent out and they

Transcript of Joseph R. Frasier

Page 84

```
 1   should respond.

 2       Q    Do you recall, again, any particular

 3   questions that were asked in this questionnaire?

 4       A    I do not recall at this time.  This is

 5   2001.

 6       Q    Did you fill out a copy of the

 7   questionnaire and send it back to the law firm?

 8       A    I might have.  I don't recall.

 9       Q    Did you keep a copy of the questionnaire?

10       A    No.

11       Q    Do you recall which law firm the

12   questionnaire was sent back to, was it Koskoff,

13   Koskoff and Bieder, or Cummings and Lockwood?

14       A    I do not remember.

15       Q    In general, I understand it has been a

16   long time --

17       A    Yeah.

18       Q    -- but I am just trying to see if you have

19   any recollection of, in general, what type of

20   information they were asking for?

21           MR. RAINER:  I instruct the witness not to

22       answer.  Don't answer.

23           MR. PRAISS:  On what basis?

24           MR. RAINER:  I told you I would review the

25       document to see whether it would stand by the
```

1      A      It could have been Shannon, yes.

2      Q      What did you do with that data, sir?

3      A      All information that we received was

4   shared with the residents at general meetings.

5      Q      Do you have any background in chemistry or

6   contamination issues?

7      A      No.

8      Q      Am I correct you yourself did not try to

9   undertake to evaluate the data and draw any

10  scientific conclusions from it, is that a fair

11  statement?

12            MR. RAINER:   Objection.   You may answer.

13     A      Having a little understanding of basic

14  chemistry, I would try to see what I recall.

15     Q      Do you recall if you shared the data on

16  Rockford Field, the Rockford Field Annex, the

17  Newhall Street School with attorneys from the law

18  firm of Cummings and Lockwood?

19     A      I don't recall sharing it with them.

20     Q      Do you recall discussing it with them?

21     A      No, I do not.

22     Q      The next thing on Exhibit 226, the next

23  bullet there indicates neighborhood sampling in

24  public rights-of-way.   Do you see that?

25     A      Yes.

Transcript of Joseph R. Frasier

Page 90

1       Q       It states ash/fill material noted several

2   locations, some analytical data has recently been

3   received.  Do you see that?

4       A       Yes.

5       Q       Do you recall the DEP discussing the fact

6   that ash and fill material had been noted at several

7   locations in the public rights-of-way in the Newhall

8   neighborhood as of February 2001?

9       A       That was their reporting.

10      Q       Describe to me what you understand that to

11  be.

12      A       Nonpublic, nonproperty-owned property.

13      Q       It could be adjacent very close to a

14  property, correct?

15      A       Yes.

16      Q       Like a sidewalk area, is that a public

17  right-of-way?

18              MR. RAINER:  Objection.

19      Q       Is that your understanding, sir?

20      A       Yes.

21      Q       Okay.  Do you recall concern raised by the

22  residents when the DEP announced that they had

23  discovered ash/fill material in various locations in

24  the public rights-of-way in the Newhall

25  neighborhood?

1          MR. RAINER:  Objection.  You may answer.

2     A    Repeat that.

3     Q    Sure.  At the February 8, 2001 meeting, do

4  you recall residents expressing a concern about the

5  fact that the DEP had announced that they had

6  discovered ash/fill material at different locations

7  in the public rights-of-way in the Newhall

8  neighborhood?

9          MR. RAINER:  Objection.  You may answer.

10    A    It was a concern, yes.

11    Q    What concerns did the residents express on

12  or about February 8, 2001, when they learned that

13  ash/fill material was noted at several locations in

14  the public rights-of-way in the Newhall

15  neighborhood?

16         MR. RAINER:  Objection.  You may answer.

17    A    In an open meeting with the presentation

18  by DEP, what the residents thought or how they

19  responded to it could run the full gamut of many

20  concerns.  I cannot speak for how the immediate

21  reaction was.

22    Q    I wasn't at the meeting; you were.  My

23  question is, sitting here today, do you recall in

24  general any specific concerns raised by residents at

25  this February meeting, 2001, when they learned that

1    contamination, ash/fill material, was found in the

2    public rights-of-way?

3        A    No.

4        Q    Okay.  Do you recall that many residents

5    in attendance expressed a concern about their safety

6    and property values?

7            MR. RAINER:  Objection.

8        A    Again, as stated previously, and I will

9    state again, there was concern about the health and

10   safety of the residents, for themselves and their

11   families, and I would say that you cannot separate

12   your investment in the home from that.

13       Q    Let me show you what was previously marked

14   as Defendant's Exhibit 56, sir.  Have you had an

15   opportunity to review Defendant's Exhibit 56,

16   Mr. Frasier?

17       A    Yes.

18       Q    This is an article from the Hamden

19   Chronicle dated February 14, 2001?

20       A    That is correct.

21       Q    The top line says, results show

22   contamination beyond school, am I correct?

23       A    That is what it states.

24       Q    Right below it says, soil tests from the

25   area field around Hamden Middle School indicate that

Transcript of Joseph R. Frasier

Page 97

1          Q      Do you recall that at some time, that in

2    fact, on or about January 31, 2001, Ms. Windisch

3    forwarded to you a copy of the data for Rockford

4    Field, Rockford Field Annex and the Newhall Street

5    School?

6          A      I stated that earlier when you asked that

7    question, yes.

8          Q      Okay.  Let me show you --

9                 (Exhibit No. 511 was marked for

10    identification.)

11          Q      I will hand you what has been marked as

12    Defendant's Exhibit 511, sir.  Do you recognize that

13    as the data for Rockford Field that Ms. Shannon

14    Windisch provided to you on or about January 31,

15    2001?

16          A      I recall some.

17          Q      You recall some of this data being

18    provided to you, sir?

19          A      Yes.

20                 (Exhibit No. 512 was marked for

21    identification.)

22          Q      I will give you another exhibit, please.

23    I will hand you what has been marked as Exhibit 512.

24    This refers to data for the Rockford Field Annex

25    soil sampling data.  Do you see that, sir?

Transcript of Joseph R. Frasier

Page 98

1      A    Yes.

2      Q    Do you recall receiving this data shown in

3   Defendant's Exhibit 512 on or about January 31,

4   2001?

5      A    I recall some of it.  I don't recall all

6   of it.

7      Q    You recall seeing some of this data,

8   correct?

9      A    Yes.

10          (Exhibit No. 513 was marked for

11   identification.)

12     Q    I have handed you now, sir, an exhibit

13   marked 513.  Newhall Street School soil sampling

14   data.  Do you see that?

15     A    Yes.

16     Q    Do you recall receiving this data on or

17   about January 31, 2001, from Ms. Shannon Windisch?

18     A    I recall some of it, yes.

19     Q    Do you recall receiving some of this data,

20   correct?

21     A    Yes.

22          (Exhibit No. 514 was marked for

23   identification.)

24     Q    I hand you what has been marked as

25   Exhibit 514.  This is a communication dated

1      January 31, 2001, from Shannon Windisch to concerned

2      parties, and there is a distribution list shown

3      below.

4          A      Um-hum, yes.

5          Q      Your name appears on the bottom of the

6      sheet as one of the people who received a copy of

7      this correspondence, correct?

8          A      Yes.

9          Q      Do you recall receiving a copy of this

10     correspondence on or about January 31, 2001?

11         A      Yes.

12         Q      She says in the first part, attached

13     please find copies of the analytical results from

14     soil sampling conducted at Rockford Field, Rockford

15     Field Annex and the Newhall Street School by the

16     department between December 27 and 29, 2000.  Do you

17     see that?

18         A      Yes, I do.

19         Q      That is the data we have been referring to

20     in Defendant's Exhibits 511, 512 and 513, correct?

21             MR. RAINER:  Objection.  He did not say

22         that.  You are saying that.

23         Q      I apologize.  Let me correct my question.

24             Am I correct that in reference to

25     analytical results that Ms. Shannon Windisch

Transcript of Joseph R. Frasier

Page 100

1    forwarded to you and other concerned parties

2    includes some of the data that is referenced in

3    Exhibits 511, 512 and 513 which you recall

4    receiving, correct?

5        A    Yes.

6        Q    Thank you.  If you go about halfway

7    through the paragraph right after the sentence that

8    is in bold, she states, additional shallow soil

9    sampling 0 to 6 inches at both Rockford Field and

10   Annex for health risk assessment were completed on

11   January 25, 2001.  These results will be forwarded

12   to you when they become available.  Do you see that?

13       A    Yes, I do.

14       Q    Do you recall receiving additional data

15   from Shannon Windisch and DEP about such testing?

16       A    Not at this moment, I do not.

17       Q    Again, now that you have Exhibits 511,

18   512, 513 in front of you, my question is do you

19   recall what use you or the Newhall Coalition made of

20   this data from February 2001 forward?

21       A    Repeat the question.

22       Q    After you received the correspondence from

23   Shannon Windisch and some of the data she provided

24   you referenced in part in Exhibit 511, 512, 513,

25   what I am trying to understand is what use you and

Transcript of Joseph R. Frasier

Page 101

1    the Newhall Coalition made of this data?

2              MR. RAINER:   Objection.   You may answer.

3         A     The information the Newhall Coalition

4    sought from this was the fact that all of this was

5    done on, again, addressing the school and the

6    playground.

7         Q     Did you make any other use of this

8    information?   Did you share it with anybody else?

9    Let me ask you that.

10        A     I don't recall who I shared -- the Newhall

11   Coalition shared it with its membership and those

12   who were in attendance at meetings.   I guess we

13   would say we summarized what was done.

14        Q     To the extent members of the Newhall

15   Coalition asked to review this data, was there any

16   reason why you wouldn't have provided it to them?

17        A     To answer your question, no.   All of this

18   data, no.

19        Q     I am not sure -- my question and your

20   answer are on the same page.

21        A     I don't understand your question.

22        Q     Let me rephrase.

23              My question is did the Newhall Coalition

24   make available the data shown in Exhibit 511, 512

25   and 513 to members of the Newhall Coalition?

Transcript of Joseph R. Frasier

Page 102

1      A      The data was available for anyone to
2      review.
3      Q      Thank you.  If you could go back, sir, to
4      the notebook from Ms. Shannon Windisch for a minute?
5      A      Sure.
6      Q      I think this was marked as Exhibit 510.
7      A      Yes.
8      Q      If you could go to page 52, please.  Do
9      you see an entry on the very top dated January 25,
10     2001, 10:45 a.m.?
11     A      Yes.
12     Q      It refers to Kim Wantek from Cummings and
13     Lockwood.  Do you see that?
14     A      Yes.
15     Q      It says Kim wanted copies of the
16     preliminary data that is available.  The lawyer she
17     works for spoke to Joe Frasier who said Mike Harder
18     told him preliminary results were available.  I told
19     her I was still analyzing the data and would talk to
20     Mike to find out more.  Do you see that?
21     A      Yes.
22     Q      Does this refresh your recollection --
23     first of all, when it says the lawyer she works for
24     spoke to Joe Frasier, do you know which lawyer that
25     is referring to?

1    and residential sampling in the public

2    rights-of-way?

3             MR. RAINER:  Objection to the form.  You

4         may answer.

5         A    That is not -- I am just -- I recall

6    several meetings but not any specific date there.

7         Q    Let me show you what was previously marked

8    as Exhibit 298.

9         A    Okay.

10        Q    Do you recognize this Exhibit 298, sir?

11        A    Yes.

12        Q    Does this refresh your recollection that

13   on April 10, 2001, there was another informational

14   meeting where the DEP presented some of its results,

15   the sampling results from Rockford Field, Millrock

16   Park and the public rights-of-way?

17            MR. RAINER:  Objection.  You may answer.

18        A    Yes.

19        Q    Do you know who prepared Exhibit 298?

20   Whether it was the Newhall Coalition, the DEP, or

21   some other entity?

22        A    No.  This was definitely not Newhall

23   Coalition.  I don't know.

24        Q    Do you recall if Exhibit 298 was sent to

25   residents of the Newhall neighborhood inviting them

Page 124

```
 1   to attend this meeting on April 10, 2001?
 2        A    I think this was a countywide
 3   distribution.
 4        Q    Okay.  Were you present at this meeting on
 5   April 10, 2001, sir?
 6        A    I am pretty sure that I was in attendance.
 7        Q    Do you recall approximately how many
 8   residents from the Newhall neighborhood were present
 9   at this meeting?
10        A    No, I cannot answer how many from Newhall,
11   because again, it was a townwide meeting.
12        Q    Do you recall how many people were in
13   attendance in general at this meeting?
14        A    Well --
15             MR. RAINER:  Objection.  You may answer.
16        A    A large turnout.
17        Q    You say large turnout, are we talking
18   greater than a hundred people?
19        A    I don't want to specifically say greater
20   or less, but a pretty good sized because it was in
21   the auditorium.
22        Q    Okay.  Do you recall if any attorneys were
23   present at this meeting from the law firm of
24   Cummings and Lockwood or the law firm of Koskoff,
25   Koskoff and Bieder?
```

Transcript of Joseph R. Frasier

Page 129

1      you see that in the top right-hand corner?

2          A     Yes, I do.

3          Q     It is your understanding that this was

4      prepared by the Environmental Protection Agency?

5                MR. RAINER:  Objection.  You may answer.

6          A     I have no idea who prepared this.

7          Q     Okay.  Was it your understanding that this

8      Newhall Street Neighborhood Update was sent out to

9      residents in the Newhall neighborhood?

10         A     I do not recall that.  I recall it at the

11     meeting, but I don't recall it sent out to the

12     community.

13         Q     If I understood you correctly, you recall

14     in the meeting of April 10, 2001, that we discussed

15     a few minutes ago, a copy of Defendant's Exhibit 30

16     was provided to anybody who attended the meeting?

17               MR. RAINER:  Objection.  You may answer.

18         A     It was passed out.  It was on display at

19     the -- along with other materials.

20         Q     When you say it was displayed, was there a

21     hard copy available for people to pick up and look

22     at at the April 10, 2001 meeting?

23         A     To my recollection, yes.

24         Q     You said there was other materials

25     available at the April 10, 2001 meeting.  What other

Transcript of Joseph R. Frasier

Page 130

1    materials were provided to participants at the

2    meeting?

3        A    Just pamphlets, publications.

4        Q    Was any test data provided at the meeting?

5        A    None to my knowledge.

6        Q    Okay.  Referring to Plaintiff's

7    Exhibit 30, if you go to the second page, sir?

8        A    Um-hum.

9        Q    Do you see there is a column on the top

10   left that says, Connecticut DEP sampling results?

11   Do you see that?

12       A    Yes, I do.

13       Q    I want to cover that a little bit with

14   you.

15       A    Okay.

16       Q    The first one is, sampling in

17   rights-of-way and grassy strips.  Do you see that?

18       A    Yes, I do.

19       Q    Do you see it indicates that between

20   December and February the DEP gathered more than 80

21   soil samples from borings and grass strips along

22   roadways, rights-of-way, in the Newhall Street

23   neighborhood.  Do you see that?

24       A    Yes, sir, I do.

25       Q    It states that data from the borings

Transcript of Joseph R. Frasier

1       A    I don't know about the date but I recall

2   writing a letter to the mayor.

3       Q    You agree with me that when writing a

4   letter, especially to the mayor, you would want to

5   be truthful, correct?

6            MR. RAINER:   Objection.   You may answer.

7       A    Repeat that.

8       Q    Am I correct in writing a letter to the

9   mayor your intentions were to be very truthful and

10  honest, correct?

11           MR. RAINER:   Objection.   You may answer.

12      A    Yes.

13      Q    Do you recall if anybody reviewed this

14  letter that you sent to the mayor and helped you

15  draft it?

16      A    Perhaps so, I don't recall at this moment,

17  but could have.

18      Q    While sitting here, who may have helped

19  you draft this letter?

20      A    If I signed the letter that went to the

21  mayor, usually with input from the board members.

22      Q    From board members from the Newhall

23  Coalition?

24      A    Yes.

25      Q    Anybody else you think may have reviewed

Page 136

1    this letter before it was sent out to the mayor?

2        A    Not that I can recall.

3        Q    Let me first show you what has been marked

4    as Exhibit 198, Mr. Frasier.  Do you recognize

5    Defendant's Exhibit 198, Mr. Frasier?

6        A    I have seen Exhibit 198, but I question --

7    there is no date on this and there is no signature

8    attached.

9        Q    Do you recognize this as a draft of a

10   letter that you put together and ultimately sent to

11   the mayor of the town of Hamden?

12       A    Might have been a draft that was drafted,

13   but I can't -- I can't authenticate this without a

14   date or a signature.

15       Q    Okay.

16            (Exhibit No. 515 was marked for

17   identification.)

18       Q    Let me give you Exhibit 515, sir.

19       A    Okay.

20       Q    Please take your time to review

21   Exhibit 515 then I will ask you some questions.

22       A    Okay.

23            MR. RAINER:  Read the whole thing, please.

24            THE WITNESS:  Yes, sir.

25       Q    Have you had an opportunity to review

Transcript of Joseph R. Frasier

Page 137

1    Exhibit 515, sir?

2        A    Yes, I did.

3        Q    Am I correct that this is a letter that

4    you sent and signed to the mayor of the town of

5    Hamden on April 18, 2001?

6        A    Yes.

7        Q    That is your signature on the second page,

8    sir?

9        A    That is my signature.

10       Q    This letter was sent to the mayor, Carl

11   Amento, on letterhead of the Newhall Coalition, is

12   that correct?

13       A    That was sent to the Newhall Coalition,

14   yes.

15       Q    And am I correct that Exhibit 58 -- I'm

16   sorry -- 198 that we looked at a few seconds ago, is

17   a draft of the letter that you ultimately signed and

18   sent to the mayor of the town of Hamden on April 18,

19   2001?

20       A    To be talking points, yes.  But this is

21   not the exact letter that was --

22       Q    That is my point.  This appears to be a

23   draft of the final letter that you sent out on

24   April 18 subject to some changes that were made

25   along the way, correct?

1           MR. RAINER:  Objection.  You may answer.

2       A    Yes.

3       Q    My question is does looking at the draft

4   and the final version in any way refresh your

5   recollection on who helped you work through the

6   draft to come up with the final letter that you sent

7   to the mayor of the town of Hamden?

8       A    As stated earlier, it was reviewed by

9   board members and myself.

10      Q    That would include Elizabeth Hayes,

11  correct?

12      A    Could have been.

13      Q    You state in the letter, at the beginning

14  part, you say, I am writing to you to express our

15  concerns regarding the known contamination in our

16  neighborhood.  Do you see that?

17      A    Yes.

18      Q    And you continue, the contamination

19  affects our lives in many ways.  Do you see that?

20      A    Yes, sir, I do.

21      Q    One way in which -- strike that.

22           Am I correct that you wrote to the mayor

23  that the contamination affects the lives of

24  residents and that it caused stress of unknown

25  potential health problems, is that correct?

1    are potentially built on a landfill or our homes are

2    built on a landfill?

3         A    This is Jim Flynn's writing, and I fully

4    respect how he --

5         Q    Is it your testimony that you did not

6    state to Mr. Flynn, our homes are built on a

7    landfill, our homes are potentially built on a land

8    fill?  That is what I am trying to make sure you are

9    claiming Mr. Flynn got it wrong.  That is what I am

10   trying to find out, sir.

11        A    I can't recall.

12        Q    Do you recall telling Mr. Flynn, we are

13   paying taxes on properties that have no value in the

14   real estate market.  Do you recall saying that?

15        A    No.

16        Q    Okay.  Are you denying you said that or

17   you just don't recall?

18        A    I don't recall, no value.

19        Q    The same exhibit we were just looking at,

20   58, there is a quote attributed to Mike Hartford

21   from DEP that you see at the very end?

22        A    Yes.

23        Q    Mr. Hartford from the DEP stated, we

24   certainly have contamination issues and health

25   issues that people should be concerned about.  Do

 1    you see that?

 2         A     Yes.

 3         Q     As of April 18, 2001, did you agree with

 4    Mike Hartford of the DEP that we certainly,

 5    referring to the residents of the Newhall

 6    neighborhood, have contamination issues and health

 7    issues that the residents should be concerned about?

 8              MR. RAINER:   Objection.  You may answer.

 9         A     There was no conclusive evidence.   That

10    was his opinion as the DEP official.

11         Q     Am I correct that as of the April 10

12    meeting the DEP, in Exhibit 30 there we have looked

13    at, summarized for the residents information that

14    disclosed the presence of contamination at Rockford

15    Field, correct?

16         A     Yes.

17         Q     They also disclosed evidence of

18    contamination at Millpark Road -- Millrock -- Park?

19              MR. RAINER:   Millrock Park.

20         Q     Strike that question.

21              Am I correct that as of April 10 the DEP

22    also advised residents that they had confirmed the

23    presence of contamination at Millrock Park, correct?

24         A     Yes.

25         Q     Finally, isn't it true that by April 10,

Transcript of Joseph R. Frasier

Page 145

1    2001, the DEP had confirmed the presence of

2    contamination to the residences and the

3    rights-of-way and grassy strips in the Newhall

4    Street neighborhood, correct?

5         A    That's correct.

6         Q    Okay.  Isn't it true that based on that

7    information, that you reviewed sometime after the

8    April 10 meeting, on April 18, 2001, you wrote the

9    mayor saying there is no question that our

10   neighborhood is contaminated, correct?

11        A    Yes.

12        Q    Now, do you recall ever getting a copy

13   from Ms. Shannon Windisch of the Newhall Street

14   neighborhood rights-of-way sampling?

15        A    No, I do not recall getting a copy of

16   that.

17             (Exhibit No. 516 was marked for

18   identification.)

19        Q    I will hand you what has been marked as

20   Exhibit 516, sir.  Have you had an opportunity to

21   review Defendant's Exhibit 516, sir?

22        A    Some of it.

23        Q    Take your time.  Defendant's Exhibit 516

24   is titled, Connecticut DEP Newhall Street

25   Neighborhood Rights-of-way Sampling Laboratory

Transcript of Joseph R. Frasier

Page 146

```
 1    Results.   Is that the first page, sir?

 2         A     Yes, that is what I see.

 3         Q     Then there is, if you look, there is a

 4    significant number of pages with data on it.   102

 5    pages of data that are dated March 29, 2001, and

 6    appear the pages maybe also have April 2, 2001 dates

 7    on it.   See that?

 8               MR. RAINER:   Do you see the date?

 9         Q     Yeah.   On the bottom right-hand corner of

10    the pages.

11         A     Oh.   Okay, all right.

12         Q     Do you see the date, March 29, 2001?

13         A     Yes, sir.

14         Q     Do you recall receiving any part of

15    Defendant's Exhibit 516 on or about the April 10,

16    2001, meeting that we discussed earlier?

17         A     No, I do not recall this exhibit.

18         Q     Okay.   Do you know to what extent the law

19    firm of Cummings and Lockwood had requested copies

20    of this data on or about April 10, 2001?

21         A     I have no idea.

22         Q     Let me go back in time.   Let me show you

23    what has been previously marked as Defendant's

24    Exhibit 19, sir.

25               Have you had an opportunity to review
```

Transcript of Joseph R. Frasier

Page 182

```
 1                STATE OF SOUTH CAROLINA      )

 2                COUNTY OF CHARLESTON         )

 3

 4           I, Wanda S. Buckner, Registered
     Professional Reporter and Notary Public for the
 5   State of South Carolina, at Large, do hereby
     certify that the witness in the foregoing
 6   Deposition was by me duly sworn or affirmed to
     testify to the truth, the whole truth, and nothing
 7   but the truth in the within-entitled cause; that
     said deposition was taken at the time and location
 8   therein stated; that the testimony of the witness
     and all objections made at the time of the
 9   examination were recorded stenographically by me and
     were thereafter transcribed by computer-aided
10   transcription; that the foregoing is a full,
     complete and true record of the testimony of the
11   witness and of all objections made at the time of
     examination; and that the witness was given an
12   opportunity to read and correct said deposition and
     to subscribe to the same.
13
                  Should the signature of the witness
14   not be affixed to the deposition, the witness shall
     not have availed himself/herself of the opportunity
15   to sign or the signature has been waived.

16           I further certify that I am neither
     related to nor counsel for any party to the cause
17   pending or interested in the events thereof.

18           Witness my hand, I have hereunto affixed
     my official seal, this 18th day of April, 2007, at
19   Charleston, Charleston County, South Carolina.

20

21

22           Wanda S. Buckner
             NCRA Registered Professional Reporter
23           NCRA Certified Realtime Reporter
             My Commission Expires:
24           August 20, 2013

25
```