```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - )
                              )
CLARENCE R. COLLINS, JR,      )
ET AL,                        )
        PLAINTIFFS,           )
                              )
VS.                           )  NO. 303CV945(CFD)
                              )
OLIN CORPORATION, ET AL,      )
        DEFENDANTS.           )
                              )
- - - - - - - - - - - - - - - )


                                           COPY


          DEPOSITION OF: DOROTHY WILLIAMS
          DATE TAKEN: MAY 20, 2005
          LOCATION: HALLORAN & SAGE
                    225 Asylum Street
                    Hartford, Connecticut  06103




    Reporter: KATHLEEN S. NORTON, RPR, LSR #105

       BRANDON SMITH REPORTING SERVICE, LLC
    44 Capitol Avenue        Six Landmark Square
     Hartford, CT  06106      Stamford, CT  06901
     Tel: (860) 549-1850        (203) 316-8591
     Fax: (860) 549-1537        (860) 549-1537
```

Page 22

1    been the first meeting that you attended?

2        A    It may not have been.

3        Q    Because if I understand you correctly, once
4    you heard about the contamination at the Hamden Middle
5    School, you started going to the meetings?

6        A    I started going to all the meetings, yes.

7        Q    So if there were meetings prior to
8    December 19, 2000, you believe you would have been
9    there?

10       A    Yes.  I went to a lot of meetings so I can't
11   remember all the dates, but I did go to a lot.

12       Q    Sure.  Let's talk about those early meetings.
13   In general, do you recall what was the nature of them?

14       A    The first meeting I remember attending it was
15   all about the middle school.  It wasn't about the
16   neighborhood.  There was a lot of people there, a lot
17   of town officials there and there were people from DEP
18   there.  There were people from the health department,
19   they were all there.  It was a huge crowd of people.
20   Everybody.  There was a lot of parents there also and
21   they were concerned about their children, the children
22   being in the middle school with the contaminants and
23   how it would affect, you know, the children.  But they
24   weren't concerned about the neighborhood.  This was
25   only about the middle school.  Okay?

Page 130

```
 1      A    I don't remember.
 2      Q    Have you spoken to any of your residents --
 3  I'm sorry.  Strike that all.
 4           Have you spoken to any of your neighbors
 5  about the litigation --
 6      A    No.
 7      Q    I didn't finish my question actually.  Let me
 8  ask it a certain way.  Have you spoken to the folks on
 9  that list about this litigation?
10      A    No.
11      Q    Have you spoken to anybody else -- you
12  mentioned your neighbor next door about the
13  litigation -- anyone who is not on that list about
14  what is happening?
15      A    Just my attorney.
16      Q    Just your attorney.  You haven't talk to
17  anybody?
18      A    I haven't talked to anyone.
19      Q    Have you -- has anybody mentioned the
20  litigation to you who is not on that list or your
21  attorney?
22      A    No.  We only talk about contaminants, we
23  don't talk about the litigation.  We just talk about
24  the contaminants.
25      Q    Okay.  Let me show you what we marked as
```

1   Exhibit 191 and it's a list of documents. It's
2   actually called a privileged log that your attorneys
3   prepared. And I'm going to ask you to just take a
4   look at that initially. And you will see that some of
5   the entries dated January 31, 2001 refer to Cummings &
6   Lockwood and Koskoff, Koskoff and Bieder.
7           For example, the second one says
8   "Correspondence to Hamden residents from Cummings &
9   Lockwood and Koskoff, Koskoff and Bieder." It's a
10  questionnaire. Author, Bill Narwold, Holly Winger,
11  Tony Pomfret, K, K & B. There is a number of these
12  entries. Do you have any recollection of receiving
13  any correspondence from Cummings & Lockwood or
14  Koskoff, Koskoff and Bieder?
15      A   Yes.
16      Q   What was that communication?
17          MS. CLARK: I instruct my client not to
18  answer on the basis of attorney-client privilege.
19          THE WITNESS: Do I answer?
20          MS. CLARK: Don't answer.
21  BY MS. CATINO:
22      Q   When you received that correspondence, what
23  did you do?
24      A   I read it.
25      Q   And after you read it, what did you do?

Page 132

```
 1    A    We signed a --
 2              MS. CLARK:  I think we're talking about
 3    two different things.
 4    BY MS. CATINO:
 5    Q    Do you know why or what role Cummings &
 6    Lockwood and Koskoff, Koskoff & Beider were playing?
 7    A    They were going to represent us.
 8    Q    They were going to represent you?
 9    A    I don't remember.  I don't know.
10    Q    Were you personally actively seeking
11    representation in January of 2001?
12    A    No.
13    Q    Do you know who was?
14    A    I don't remember, no.
15    Q    Do you have a copy of this correspondence
16    from Cummings & Lockwood and Koskoff, Koskoff?
17    A    No, I never seen this before.
18    Q    Not this, but a piece of -- this January 31,
19    2001 correspondence, do you have a copy of that?
20    A    Yes.
21    Q    And did you produce that copy to your
22    attorney?
23    A    To my attorney?
24    Q    Right.
25    A    I don't remember.
```

Brandon Smith Reporting

29177973-2c23-4a1a-a66d-7ce27b8e4ce8

Page 135

1   Q   Is when you started. Would you have read
2   articles prior to that in the New Haven Register?
3   A   The articles didn't start to get printed in
4   the Register until after the meeting at the middle
5   school. That's when the articles started to get
6   printed in the Register. There was no knowledge of
7   that before that.
8   Q   What we've got are some copies of New Haven
9   Register articles as well as Hamden Journal articles
10  but they are off the Internet. We printed off the
11  Internet so they probably won't look like clippings
12  from the newspaper. So I'm going to show you what we
13  have as Exhibit 179 and that's an article from the New
14  Haven Register on November 14, 2000. Is that one of
15  the earliest articles that you may recall seeing?
16  A   Yes.
17  Q   Do you recall seeing that article?
18  A   There was one earlier. I don't know. I had
19  a copy of it, but I don't know where it is. That's
20  when the story first broke on the old-timers because
21  of several old-timers, the dump. I don't know where
22  that article is.
23  Q   You think there were articles prior to that
24  date?
25  A   This was 2000. I don't think there was prior

Page 136

1    to this date. I think it was after this date.

2    Q    Okay. Let me show you another article dated

3    December 6th, 2000. It's Exhibit 180, "Hamden Stops

4    Rehab of School," and ask if you recall seeing that

5    article?

6    A    Yeah, I remember this one. I didn't keep a

7    clipping of any of these articles but I remember

8    reading them. This was one particular article that I

9    had a clipping of.

10   Q    That's what I was going to ask. You did

11   produce one article. We'll get it right now. When

12   you would read the articles, would you clip them?

13   A    No, I never clipped them.

14   Q    You never clipped them. Just this one you

15   kept?

16   A    Right.

17   Q    I'm going to show you an article marked

18   Defendant's Exhibit 52. Again, it's another article

19   from the New Haven Register dated December 13, 2000.

20   Do you recall this article?

21   A    Yes.

22   Q    You're definitive about that.

23   A    This is when the story first broke. They

24   were printing stuff like every day. Then they had a

25   lot of TV coverage also, a lot of television coverage

1  on this. But now, there's not a lot now, but when the
2  story first broke, they were printing a lot of stuff.
3      Q    And you were following it?
4      A    Yes.
5      Q    And you followed it on television, too?
6      A    Yes, I watched it on television, too.
7      Q    Were you ever interviewed by the TV?
8      A    No, I declined to be interviewed.
9      Q    They asked you?
10     A    They asked me but I declined.
11     Q    Exhibit 52, it refers to a meeting in the
12 beginning, "A dozen residents at Wadsworth Street,
13 Bryden Terrace, Mill Rock Road met this week to share
14 their concerns about soil contamination at the middle
15 school which sits a block or two away from their
16 homes."
17          Then later on in the article it says, "Nearly
18 all the residents found bottles, crushed glass and
19 other questionable materials a few feet below the top
20 soil on their property." And there are a number of
21 folks who were quoted. Do you recall were you at this
22 meeting?
23     A    I wasn't at that meeting. I think I was
24 working during that time and I think it was one of
25 those noonday meetings or something.

Page 138

1    Q    This was a different meeting than any of the
2  evening meetings you attended at the Hamden Middle
3  School?
4    A    Right.
5    Q    Do you know Eldridge Hatcher of Wadsworth
6  Street?  Do you know him?
7    A    No, I don't know him.
8    Q    And you were following the articles.  I'm
9  going to show you Exhibit 182, a December 20, 2000
10 about a sick-out at the Hamden Middle School.
11   A    Yes.
12   Q    Do you remember all of that?
13   A    I remember that.
14   Q    What did you think of that?
15   A    Well, this was, it was -- I think this was
16 more involved with the middle school because they were
17 saying that some of the kids there, they felt nausea
18 and they were getting headaches, and all this
19 different type of thing.  And they felt the
20 contaminants had something to do with it.  So that's
21 what this was, some of the teachers had contracted
22 cancer during that time teaching at the middle school.
23   Q    On the second page of the article, toward the
24 third paragraph it says, "Residents are concerned that
25 the landfill may go beyond the school property."

Page 139

```
 1     A    Yes, exactly.
 2     Q    And it talks about the neighborhood being
 3  built on top of waste.
 4     A    In the area.
 5     Q    Did you have those concerns?
 6     A    Yes.
 7     Q    And did you have those concerns at the
 8  meeting?
 9     A    When I found out about the middle school, I
10  knew I was affected because I was down a ways from it,
11  right across from the field.
12
13              (Defendant's Exhibit No. 384, marked
14               for identification.)
15
16  BY MS. CATINO:
17     Q    I'm going to show you what we just marked as
18  Exhibit 384.  This came from your production.
19     A    This is the one.
20     Q    This is the article that you remember?
21     A    Yes.
22     Q    This is the old-timer, I think you referred
23  to him, John Carbrey?
24     A    I didn't know him, but I read his article
25  that he printed in the Register.
```

Page 260

```
 1        A    Yes.
 2        Q    Are you also seeking emotional distress
 3   damages?
 4        A    Yes.
 5        Q    Now, you also noted that your emotional
 6   distress began once possible concerns were raised
 7   regarding contamination at the middle school; is that
 8   right?
 9        A    Yes.
10        Q    But you also noted your emotional distress is
11   more specifically related to your own property?
12        A    Yes.
13        Q    Would you say that the majority of the
14   emotional distress is related to your own property?
15        A    I would say so, yes.
16        Q    Now, talking -- when you were talking about
17   responsible parties with Attorney Catino, you said
18   that you thought that Olin was responsible for your
19   property because of the contamination?
20        A    Yes.
21        Q    And that Olin should pay damages with respect
22   to your own property?
23        A    Yes.
24        Q    Would this opinion change at all if you were
25   to find out that the Town of Hamden allowed Olin and
```

Page 294

1        CERTIFICATE OF REPORTER

2

3   I, Kathleen S. Norton, a Registered Professional Reporter/Commissioner within and for the State of
4   Connecticut, do hereby certify that I took the deposition of DOROTHY WILLIAMS, on MAY 20, 2005, who
5   was by me duly sworn to testify to the truth and nothing but the truth; that she was thereupon carefully
6   examined upon her oath and her examination reduced to writing under my direction by means of Computer
7   Assisted Transcription, and that this deposition is a true record of the testimony given by the witness.

8

9   I further certify that I am neither attorney nor counsel for, nor related to, nor employed by any of the
10  parties to the action in which this deposition is taken and further that I am not a relative or employee of any
11  attorney or counsel employed by the parties hereto, nor financially interested in the outcome of the action.

12

13  IN WITNESS THEREOF, I have hereunto set my hand June 10, 2005.

14

15  *[signature: Kathleen Sweeney Norton]*

16  _____

17       Kathleen S. Norton

18

19  Notary Public   License No. 00105
    My commission expires:  7-31-07

20

21

22

23

24

25