IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT


No. 3:03-CV-945(CFD)

CLARENCE COLLINS, JR., ET AL

VS

OLIN CORPORATION

**ORIGINAL**


     Deposition of:  **SHANNON WINDISCH POCIU**, taken
pursuant to Rule 30 of the Federal Rules of Civil
Procedure before Barbara L. Murphy, Licensed Shorthand
Reporter, License No. 305 and Notary Public within and
for the state of Connecticut, held at the offices of
Brown, Rudnick, Berlack, Israels, 185 Asylum Street,
Hartford, Connecticut on April 25, 2007 commencing at
9:10 a.m.


DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE
MADISON, CT 06443
(203)245-9583
(203)245-2760

STAMFORD                    HARTFORD                    NEW HAVEN


**DEL VECCHIO REPORTING SERVICES, LLC**

1  sentence the following frequently asked questions have

2  been prepared to update residents on the activities at

3  the Hamden Middle School?

4      A.   Yes.

5      Q.   And it's dated December 26, 2000, six days

6  after your notation in your notebook, correct?

7      A.   Yes.

8      Q.   And, first of all, do you have an

9  understanding, was this frequently asked questions

10  provided to the public on or about December 26, 2000?

11              MR. RAINER:   Object.

12              MR. PRAISS:   If you know.

13              THE WITNESS:   I'm sure it was

14  distributed.   I don't know how it was distributed.

15              MR. PRAISS:   Okay.

16              THE WITNESS:   But generally my

17  experience with the health district was when they

18  prepared these sheets, they were made available to the

19  public.

20  BY MR. PRAISS:

21      Q.   If I could focus on the question on the

22  second page, how extensive is the site parenthetical

23  landfill area.

24              Do you see that?

25      A.   Yes.

**DEL VECCHIO REPORTING SERVICES, LLC**

BY MR. PRAISS:

    Q.    Do you recognize Exhibit 507 as a publication issued by the QVHD on or about January 16, 2001?

    A.    Yes.

    Q.    If you go to the second page again there is a heading, how extensive is the site and a parenthetical landfill area question mark.

        Do you see that?

    A.    Yes.

    Q.    It says based on historical information and aerial photographs it is believed that the landfill extended across the street to Rochford Park and into some of the neighborhoods in the area.

        Do you to see that?

    A.    Yes.

    Q.    As of January 16, 2001 am I correct that you as an employee of the DEP believed that was an accurate statement?

    A.    Yes.

    Q.    And again it would be your understanding that this type of publication would have been shared with the public by the QVHD, correct?

    MR. RAINER:  Objection.

    THE WITNESS:  Yes.

**DEL VECCHIO REPORTING SERVICES, LLC**

BY MR. PRAISS:

Q.    Am I correct that the DEP considers test
data to be a public record that anyone can review,
they just need to make an appointment?

A.    Yes.

Q.    In fact, if you go to Exhibit 510 at Page 38
do you see an entry on January 12th '01 2:10 p.m.?

A.    Yes.

Q.    And towards the middle of the page do you
see you hand wrote, data is public record that anyone
can review, just make an appointment.

A.    Yes.

Q.    That's an accurate statement, correct?

A.    It is.

Q.    Is it fair to say that to the extent
available at any time any person who would request
from the DEP access to test data results relating to
the discovery of hazardous substances at the Hamden
Middle School, Rochford Park, Rochford Field, the Mill
Rock Park or a sampling that the DEP had conducted in
the residential rights-of-way such a person would have
had access to any such data to the extent it existed?

            MR. RAINER:    Objection.

            THE WITNESS:    Yes with the caveat I'm
not sure we had data from the rights-of-way sampling

**DEL VECCHIO REPORTING SERVICES, LLC**

1    at the time I made this entry.

2    BY MR. PRAISS:

3        Q.    And I understand and that's why my question

4    is broader saying going forward.

5              At any time from let's say the beginning,

6    December 19th, first memo we looked at, all the way to

7    the end of April, okay.  To the extent data was

8    available, as it became available the DEP received it,

9    and anybody in the community that had contacted you,

10   to the extent you had it in your DEP files you would

11   have provided access to such a person of such data,

12   correct?

13              MR. RAINER:  Objection.

14              THE WITNESS:  Yes.

15   BY MR. PRAISS:

16       Q.    And let's go through a few examples of that.

17   If you go to Page 63 of your notebook.  Actually it

18   goes to Page 64, I misspoke.

19              And there is an entry there, Ann Altman

20   from the Hamden Legislative Council.

21       A.    Yes.

22       Q.    Who is Ann Altman?

23       A.    At the time Ann Altman was local

24   councilwoman for I believe part of the district where

25   we were doing sampling, where DEP was doing sampling.

**DEL VECCHIO REPORTING SERVICES, LLC**

1    Q.    She's not employed by the DEP, correct?

2    A.    She is not.

3    Q.    It indicates here she received the data

4    package but needs to know at what levels the compounds

5    are toxic.  It says, I will try and get her copies of

6    the RSRs, correct?

7    A.    Yes.

8    Q.    What does RSR stand for?

9    A.    RSR is an acronym for the Remediation

10   Standard Regulations.

11   Q.    Okay.  So is this an example that on or

12   about February 7th of '01 you provided Ms. Altman with

13   a data package relating to whatever information the

14   DEP had as of that time relating to contamination to

15   Hamden Middle School and the surrounding areas?

16              MR. RAINER:  Objection.

17              THE WITNESS:  Yes.  I'm not sure what

18   the data package included.  It was probably in the

19   files.

20   BY MR. PRAISS:

21   Q.    Let me direct you to Page 67.  Do you see an

22   entry there at the bottom of the page February 13,

23   2001 involving Mr. Steve Studer?

24   A.    Yes.

25   Q.    Who is Mr. Steve Studer?

**DEL VECCHIO REPORTING SERVICES, LLC**

28

1      A.    I don't recall exactly who he represented

2 but I believe he was an attorney.

3      Q.    Do you see it indicates at the very bottom

4 of the page he would like to review files soon?

5            Do you see that?

6      A.    Yes.

7      Q.    To the extent that Mr. Studer made a request

8 to review files, am I correct that DEP provided him

9 with access to look at any files and data that DEP had

10 as of February 13, 2001?

11     A.    Yes.  We had many file reviews.

12     Q.    Let's go through a few more if you don't

13 mind real quickly here on Page 74.

14            Do you see an entry in the middle of the

15 page February 15, 2001 involving Greg Sharp?

16     A.    Yes.

17     Q.    Who is Greg Sharp?

18     A.    Greg Sharp is an attorney representing the

19 South Central Connecticut Regional Water Authority.

20     Q.    And it indicates that he wants to set up an

21 appointment to review files.

22            Do you see that?

23     A.    Yes.

24     Q.    And again, am I correct that ultimately, in

25 fact, Mr. Sharp did review the files?

**DEL VECCHIO REPORTING SERVICES, LLC**

1    A.    Yes, I'm sure he did or someone from his

2    office.

3    Q.    Okay.  Why don't we go to I think on the

4    next page, Page 130 and it might be in this binder or

5    the next one.

6    A.    It's book 2.

7    Q.    Referring you to Exhibit 522, correct?

8    A.    Yes.

9    Q.    Look at Page 130 on the bottom of the page

10   April 19th '01.

11         Do you see a reference to Ann Catino?

12   A.    Yes.

13   Q.    Can you identify who Ann Catino is?

14   A.    Ann Catino is the attorney representing the

15   town of Hamden.

16   Q.    And you see she called to schedule a file

17   review for that Friday in the morning, correct?

18   A.    Yes.

19   Q.    Are these all examples of people,

20   individuals or attorneys who were not working at the

21   DEP who at different times contacted you and sought

22   access to whatever files and records the DEP had with

23   respect to contamination?

24   A.    Yes.

25   Q.    And to the extent that any of them asked or

**DEL VECCHIO REPORTING SERVICES, LLC**

1   any other person at any time asked or wanted access to

2   such data, they were readily available to the public,

3   correct?

4                    MR. RAINER:  Objection.

5                    THE WITNESS:  Yes.

6   BY MR. PRAISS:

7        Q.    Do you recall a gentleman by the name Joe

8   Frasier?

9        A.    Yes.

10       Q.    Do you recall Joe Frasier made requests to

11   get access to raw data that the DEP had?

12       A.    I don't recall specifically but I do know

13   the department had conversations with him.

14       Q.    Okay.  If you go to Page 57 in your

15   notebook, this will be in Exhibit 510 I believe.

16       A.    Yes.

17                    MR. RAINER:  Page what?

18                    MR. PRAISS:  Fifty-seven.

19   BY MR. PRAISS:

20       Q.    Do you see an entry there on January 31,

21   2001 involving Joe Frasier?

22       A.    Yes.

23       Q.    And you state, I let him know I would be

24   sending a copy of the raw data for Rochford Field, the

25   Annex and Newhall Street School to his attention.

**DEL VECCHIO REPORTING SERVICES, LLC**

1  Field was formerly used as a Winchester coke lot.

2  BY MR. PRAISS:

3       Q.    If I understand correctly --

4       A.    I may have told him this.  I don't recall

5  specifically.

6       Q.    Putting aside what you did or didn't tell

7  him, if I understand correctly DEP's files as of at

8  least in January 31, 2001 included information

9  indicating that Winchester had previously deposited

10  waste in that area, correct?

11      A.    Yes.

12      Q.    And that information again would have been

13  available to the public, correct?

14      A.    Yes.

15      Q.    Now, I'm trying to move fast, I know you

16  wanted to get out of here.  This is an exhibit

17  previously marked as Exhibit 514.

18      A.    Yes.

19      Q.    Did you have an opportunity to review

20  Exhibit 514?

21      A.    Yes.

22      Q.    Could you identify it, please, for the

23  record?

24      A.    This is a memo I drafted to concerned

25  parties listed at the bottom of the memo transmitting

1    DEP's investigation as of January 31, 2001?

2        A.    My recollection is that it was a stack of

3    raw test results from the laboratories probably at

4    least an inch thick.  But I don't recall there being

5    necessarily any memo attached to explain what the

6    results mean or if there were exceedances of the

7    remediation standards.

8        Q.    We'll take a look at those in a minute.  One

9    of the people who received this is Joe Frasier from

10   the Newhall Coalition, correct?

11       A.    Correct.

12       Q.    And to the extent that any other person in

13   the community at the time as of January 31, 2001 had

14   wanted to obtain copies of such sampling results, they

15   could have made a similar request and obtained it,

16   correct?

17       A.    Yes.

18       Q.    Why don't we take a look at these exhibits

19   real quick.  Make my box much lighter on the way home.

20             MR. RAINER:  What number is it going to

21   be?

22             MR. PRAISS:  These have all previously

23   been marked.

24   BY MR. PRAISS:

25       Q.    This one to start out with I'm going to hand

1    you what was previously marked as five eleven if you

2    don't mind writing that on there.

3              What's that one again actually before you

4    mark on it?  I messed up.  My fault.

5              This is five eleven for Rochford Field

6    test data.  I'll give you another one real quick.

7    This one should be five twelve which was for the

8    Rochford Field Annex.  And finally five thirteen is

9    the test data result for the Newhall Street School.

10             Do you recognize Exhibits 511, 512 and

11   513 as the test data results for Rochford Field,

12   Rochford Field Annex and the Newhall Street School

13   respectively?

14        A.   Yes.

15        Q.   Okay.  And do you recall if this is the test

16   data results that were shared with the concerned

17   parties that you attached to your January 31, 2001

18   memorandum which is Exhibit 514?

19        A.   Yes.

20        Q.   And again just to make the record clear.  To

21   the extent anybody in the community has sought access

22   to the test data results shown in Exhibit 511, 512,

23   513 on or about January 13, 2001 they could have

24   obtained it from the DEP, correct?

25        A.   Yes.

1        Q.    Am I correct that Exhibits 511, 512 and 513

2    include factual findings, test data results that the

3    DEP had compiled as of that January 31, 2001 date?

4        A.    Yes.

5        Q.    Do you recall earlier we were talking about

6    the testing in the residential public rights-of-ways

7    areas?

8        A.    Yes.

9        Q.    And that took place sometime on or about

10   middle of January, correct?

11       A.    Yes.

12               MS. SHANE:  Of 2001?

13               MR. PRAISS:  Of 2001, thank you.

14               THE WITNESS:  2001.

15   BY MR. PRAISS:

16       Q.    Do you recall that -- in general let me

17   identify some streets and tell me if you recall if the

18   public rights-of-way were tested in those.

19               Morse Street, Newhall, Newbury,

20   Wadsworth, Marlboro, North Sheffield, Augur, Harris,

21   Remington, Winchester Avenue, Bryden Terrace, Mill

22   Rock Road, Mill Rock Road Extension and Prospect Lane?

23       A.    Yes.

24       Q.    So throughout -- first of all, explain for

25   the record what is that, public rights-of-way?  What

1    does that mean?

2        A.    My understanding is the public rights-of-way

3    is basically the streets; the sidewalks and the

4    streets.    Basically what we presume to be town owned

5    land that is not privately owned.

6        Q.    For example, a sidewalk could be literally

7    adjacent to the front yard of somebody's house,

8    correct?

9                MR. RAINER:    Objection.

10                THE WITNESS:    Yes.    Well, it could be

11    but in the absence of having a surveyor locate the

12    extent of all property lines, we were generally using

13    as a rule of thumb around the sidewalks and towards

14    the street as being public.

15    BY MR. PRAISS:

16        Q.    But the area you're testing is in very close

17    proximity, would you agree with me, to the properties

18    themselves?

19        A.    Yes.

20                MR. PRAISS:    Can you mark this as the

21    next exhibit, please.

22                (Defendant's Exhibit No. 523, offered

23                    and marked.)

24    BY MR. PRAISS:

25        Q.    I'm going to hand you what's been marked for

**DEL VECCHIO REPORTING SERVICES, LLC**

1    Q.    Am I correct that the results of the testing

2    that the DEP had conducted as of -- prior to

3    January 31, 2001 at Rochford Field, the Rochford Field

4    Annex and the Newhall Street School indicated there

5    was contamination present in those areas, correct?

6    A.    Yes.

7    Q.    And the fact that contamination had been

8    located by the DEP in those areas was shared with the

9    public as of February 8, 2001?

10    A.    Yes.

11    Q.    The next bullet talks about neighborhood

12    sampling in public rights-of-way.

13          Do you see that?

14    A.    Yes.

15    Q.    It states in this memo ash -- I'm sorry,

16    this agenda, ash slash fill material noted at several

17    locations.

18          Do you see that?

19    A.    Yes.

20    Q.    What does it mean when you say ash slash

21    fill material noted at several locations?

22    A.    The DEP staff who performed the

23    investigation which I was overseeing noted in the

24    borings that there were non-native materials

25    consisting of ash and fill in several of the borings.

1    determine exactly to what extent there was ash and

2    fill material outside in the residential area,

3    correct?

4                    MR. RAINER:  Objection.

5                    THE WITNESS:  I'm sorry, could you --

6    BY MR. PRAISS:

7        Q.    The purpose of the testing that the DEP was

8    conducting in January, February 2001 was to determine

9    to what extent contamination was present beyond the

10   Hamden Middle School, correct?

11       A.    Yes.

12       Q.    So as of February 2001 you had already

13   determined that there was, in fact, contamination

14   beyond the Middle School, correct?

15       A.    Yes.

16       Q.    You determined there was contamination in

17   Rochford Field, correct?

18       A.    Yes.

19       Q.    As well as contamination at the Rochford

20   Field Annex?

21       A.    Yes.

22       Q.    As well as contamination at the Newhall

23   Street School, correct?

24       A.    Yes.

25       Q.    And as well by February 2001 based on the

1    borings that you obtained as of that date you already

2    had evidence of ash fill material at several locations

3    within the residential area, correct?

4         A.    Yes.

5              MR. PRAISS:  Mark that as the next

6    exhibit, please.

7                   **(Defendant's Exhibit No. 524, offered**

8                        **and marked.)**

9    BY MR. PRAISS:

10        Q.    I've handed you what's been marked as

11   Exhibit 524.

12             Please review it and I'll have some

13   questions for you.

14        A.    Yes.

15        Q.    Am I correct that Exhibit 524 is a

16   communication dated February 26, 2001 from the DEP

17   Michael Harder to the EPA?

18        A.    Yes.

19        Q.    And you received that -- it indicates a

20   carbon copy of this communication on or about

21   February 26, 2001?

22        A.    Yes.

23        Q.    Do you recall receiving it?

24        A.    Yes.  Actually I probably drafted most of

25   it.

**DEL VECCHIO REPORTING SERVICES, LLC**

1      Q.   In the bullets underneath it it covers

2  exactly the same areas that are summarized in

3  Exhibit 30, correct?

4               MR. RAINER:   That's a misleading

5  question.   I object.

6  BY MR. PRAISS:

7      Q.   Does -- in the agenda is there -- it

8  indicates that you were going to provide information

9  regarding the results of the sampling in Rochford

10 Field, correct?

11     A.   Yes.

12     Q.   As well as Mill Rock Park, correct?

13     A.   Yes.

14     Q.   As well as sampling the public rights-of-way

15 and green strips, correct?

16     A.   Yes.

17     Q.   Okay.  And do you believe sitting here today

18 that at the April 10, 2001 meeting you shared with the

19 public the same type of information that was

20 summarized in Exhibit 30 with respect to the results

21 of the DEP sampling in those locations?

22               MR. RAINER:   Objection.

23               THE WITNESS:   I believe I did, yes.

24 BY MR. PRAISS:

25     Q.   To the extent anybody from the public as of

**DEL VECCHIO REPORTING SERVICES, LLC**

63

1    April 10, 2001 had made a request to obtain the

2    underlying data that the DEP had compiled as of

3    April 10th that supported the conclusions reached in

4    Exhibit 30, that data would have been made available

5    to the public, correct?

6        A.    Yes.

7        Q.    And, in fact, do you recall sharing that

8    data with individuals?

9        A.    No but it's possible.  I don't recall

10   specifics.

11       Q.    Am I correct that looking at the agenda for

12   the April 10th meeting shown on the first page of

13   Exhibit 29 as well as the summary of the Connecticut

14   DEP sampling results shown on Exhibit 30, that by

15   April 10, 2001 the DEP had confirmed to the public

16   that contamination extended beyond the Hamden Middle

17   School?

18       A.    Yes.

19       Q.    And, in fact, by April 10, 2001, the DEP had

20   confirmed to the public that contamination was present

21   at Mill Rock Park, correct?

22       A.    Yes.

23       Q.    And by April 10, 2001 the DEP had confirmed

24   to the public that contamination was present at

25   Rochford Field, correct?

**DEL VECCHIO REPORTING SERVICES, LLC**

1          MR. RAINER:  Objection.

2          THE WITNESS:  Yes.

3  BY MR. PRAISS:

4      Q.   And by April 10, 2001 the DEP confirmed to

5  the public that contamination was present in the

6  residential areas because contamination was found in

7  the public rights-of-way?

8          MR. RAINER:  Objection.

9          THE WITNESS:  I can't quite answer that

10  the way you asked.

11          MR. PRAISS:  Let me ask it differently.

12  BY MR. PRAISS

13      Q.   Am I correct that by April 10, 2001 the DEP

14  had determined and confirmed to the public that

15  contamination was found in the public rights-of-way?

16      A.   Yes.

17          MR. RAINER:  Objection.

18          THE WITNESS:  May I ask, are you going

19  to continue with --

20          MR. PRAISS:  Those two?

21          THE WITNESS:  Yes.

22          MR. PRAISS:  No.

23          THE WITNESS:  Could I have a short

24  break?

25          MR. PRAISS:  Absolutely.  Any time.

**DEL VECCHIO REPORTING SERVICES, LLC**

1    longer on there.

2    BY MR. PRAISS:

3        Q.    I'm going to hand you what's previously been

4    marked as five sixteen.  Starting all over, Shannon.

5    Thank you, Andrew.

6                    MR. RAINER:  All right.

7    BY MR. PRAISS:

8        Q.    Just to clear the record am I correct that

9    Exhibit 516 is titled Connecticut DEP Newhall Street

10   neighborhood rights-of-way sampling laboratory

11   results?

12       A.    Yes.

13       Q.    And focusing again on the second page of

14   this exhibit.

15                This is an ERI chain of custody we just

16   were discussing, correct?

17       A.    Yes.

18       Q.    For example, it indicates on here and I want

19   to try and understand how this works.

20                There is a field number column.

21       A.    Yes.

22       Q.    And, for example, the first input there is

23   321 MRM.

24                What does that stand for?

25       A.    Okay.  It was an -- my recollection based on

**DEL VECCHIO REPORTING SERVICES, LLC**

69

1   how we were doing sample nomenclature at the time it

2   was a sample taken in front of 321 Mill Rock Road and

3   it is being analyzed for metals.  The third M means

4   the parameter we wanted to have analyzed.

5        Q.    And it shows that that sample was collected

6   on January 10, 2001, correct?

7        A.    Yes.

8        Q.    This basically, am I correct, corresponds to

9   basically the boring logs that we looked at earlier?

10       A.    Yes, it would.

11       Q.    So basically for each boring log now you

12  have a record that shows when a particular collection

13  was made at the public rights-of-way and how it was

14  conveyed to the testing facility, correct?

15       A.    Yes.

16       Q.    And then if you continue basically the next

17  few pages continue showing similar sampling at

18  different public rights-of-ways locations, correct?

19       A.    Yes.

20       Q.    And then if you go to Bates No. 1396.

21       A.    Yes.

22       Q.    What is that summary showing?

23       A.    This is sample results from the laboratory

24  that performed the analysis listing the results of

25  metals analysis for the samples identified on the

**DEL VECCHIO REPORTING SERVICES, LLC**

1    previous -- I believe on the previous few sheets of

2    the chain of custody.

3        Q.    So am I correct that the pages beginning on

4    Bates No. 1396, that summary table, shows basically

5    the results of the sampling done in the public

6    rights-of-way that was conducted -- analyzed on or

7    about January 17, 2001?

8        A.    Yes.

9             MR. RAINER:    Objection.

10   BY MR. PRAISS:

11       Q.    There is a column, date analyzed.  Do you

12   see that?

13       A.    Yes, I do.

14       Q.    January 17th?

15       A.    Yes, that's why I agree.

16       Q.    And basically the rest of the chart shows

17   the results of each of this -- I'll break it in

18   pieces.  There is a column field number, correct?

19       A.    Yes.

20       Q.    That refers to the location within the

21   public rights-of-way where there was testing

22   conducted, correct?

23       A.    Yes, it does.

24       Q.    And so just to walk through this, for

25   example, if you go to again Bates No. 1393, second

1          MR. RAINER:  Objection.

2          THE WITNESS:  Yes.

3  BY MR. PRAISS:

4      Q.   Just to make sure we're on the same page.

5  So to summarize by April 9, 2001 Kim Wantek from

6  Cummings and Lockwood had made several requests of you

7  at the DEP to gain access to the test data results

8  from residential sampling?

9      A.   Yes.

10     Q.   And that you provided her such access to

11  come and copy such data, correct?

12         MR. RAINER:  Objection.

13         THE WITNESS:  Yes.

14  BY MR. PRAISS:

15     Q.   Now, am I correct that by April 18, 2001 the

16  DEP had determined that landfill -- the former

17  landfill extended to Rochford Field, Mill Rock Park,

18  the public rights-of-way as well as several

19  residential properties?

20         MR. RAINER:  Objection.

21         THE WITNESS:  I'm sorry?

22         MR. PRAISS:  Sure.

23  BY MR. PRAISS:

24     Q.   Let me show you a document to refresh your

25  recollection.

**DEL VECCHIO REPORTING SERVICES, LLC**

1    A.    I probably saw it; however, I did not draft

2  this document.

3    Q.    Focus your attention on the first page,

4  second paragraph.

5    A.    Yes.

6    Q.    It indicates in the sentence there it says,

7  recent investigations by the DEP have allowed the

8  addition of several contiguous areas to a former

9  industrial and municipal landfill previously believed

10  to be comprised of only Newhall Street Field and the

11  Hamden Middle School properties located west of

12  Newhall Street.

13         Do you see that?

14    A.    Yes.

15    Q.    It continues, the DEP has now determined

16  that the former landfill area also includes Rochford

17  Field, Mill Rock Park and several residential

18  properties.

19         Do you see that?

20    A.    Yes.

21    Q.    Am I correct that that was a determination

22  that the DEP had made as of April 18, 2001?

23         MR. RAINER:   Objection.

24         THE WITNESS:   Yes.

25  BY MR. PRAISS:

**DEL VECCHIO REPORTING SERVICES, LLC**

1        Q.    Now, to the extent anybody in the public;

2    Joe Frasier, attorneys from Cummings and Lockwood or

3    anybody else that sought records at the DEP that

4    supported this determination, they would have had

5    access to it, correct?

6                    MR. RAINER:  Objection.

7                    THE WITNESS:  Yes.

8    BY MR. PRAISS:

9        Q.    If you go to your second notebook, exhibit,

10    I believe, 522.

11        A.    Yes.

12        Q.    Page 132 of Exhibit 522.  Are you there?

13        A.    Yes.

14        Q.    Do you see an entry at the top of the page

15    on April 23, 2001?

16        A.    Yes.

17        Q.    It's a communication between yourself and I

18    can't pronounce the gentleman's name, Tito --

19        A.    Irizarry.

20        Q.    Tito Irizarry from the EPA?

21        A.    Yes.

22        Q.    And you stated that you discussed the

23    re-sampling of nine homes so far that have elevated PB

24    and AS area one and two along the Morse Street fence

25    line.

**DEL VECCHIO REPORTING SERVICES, LLC**

1   BY MR. PRAISS:

2       Q.   We have in front of us, ma'am, two different

3   letters and am I correct both of them are dated April

4   18, 2001?

5       A.   Yes.

6       Q.   And the letter from Joe Frasier to the mayor

7   of the town of Hamden he states on the second page

8   that there is no question that our neighborhood is

9   contaminated, correct?

10      A.   Yes.

11      Q.   My question to you, am I correct that on

12  April 18, 2001 the DEP had also concluded that the

13  landfill extended beyond the Hamden Middle School,

14  correct?

15              MR. RAINER:   Objection.

16              THE WITNESS:   Yes.

17  BY MR. PRAISS:

18      Q.   Also specifically determined that

19  contamination was present at Rochford Field, correct?

20      A.   Yes.

21      Q.   It also determined that contamination

22  extended to Mill Rock Park, correct?

23      A.   Yes.

24      Q.   And it also determined that the

25  contamination extended to several residential

**DEL VECCHIO REPORTING SERVICES, LLC**

1  properties, correct?

2      A.    Yes.

3      Q.    Am I correct that by April 18, 2001 to the

4  extent Joe Frasier on behalf of the Newhall Coalition

5  or any other resident of the Newhall neighborhood that

6  had sought access to whatever data the DEP had that

7  supported the conclusions it reached as of April 18,

8  2001 they would have had access to that data?

9              MR. RAINER:   Objection.

10             THE WITNESS:   Yes.

11 BY MR. PRAISS:

12     Q.    And similarly by April 18, 2001 to the

13 extent any attorneys or paralegals from the law firm

14 of Cummings and Lockwood had sought to obtain any test

15 data results that supported the conclusions reached by

16 the DEP as of April 18, 2001 they also would have had

17 access to such data, correct?

18             MR. RAINER:   Objection.

19             THE WITNESS:   Yes.

20             MR. PRAISS:   Mark that.

21             **(Defendant's Exhibit No. 526, offered**

22                 **and marked.)**

23 BY MR. PRAISS:

24     Q.    I'm handing you what's been marked as

25 Exhibit 526.

**DEL VECCHIO REPORTING SERVICES, LLC**

1    Q.    And also Carlos Gonzalez?

2    A.    Yes.

3    Q.    Both signed from the community, correct?

4    A.    Yes.

5    Q.    And there is a Richard Inzero as PTA

6    co-president?

7    A.    Yes.

8    Q.    And then there is also Bill Narwold.  Do you

9    see his name?

10   A.    Yes.

11   Q.    Cummings and Lockwood?

12   A.    Yes.

13   Q.    Do you recall why Mr. Bill Narwold from

14   Cummings and Lockwood was present at this meeting?

15         MR. RAINER:  Objection.

16         THE WITNESS:  No, I don't.

17   BY MR. PRAISS:

18   Q.    Do you recall on whose behalf he appeared at

19   this meeting?

20         MR. RAINER:  Objection.

21         THE WITNESS:  Well, on behalf of one of

22   the community or the community members.  Well, he

23   wasn't there for DEP, he wasn't there for Olin and he

24   wasn't there for the town.

25         So my deduction at the time was he was

117

1    there on behalf of the community or the PTA or --

2    BY MR. PRAISS:

3        Q.    Do you recall what was discussed at the

4    January 10, 2001 meeting?

5        A.    I do not.

6        Q.    In your notebook that we looked at earlier

7    there is a December 20th entry.

8        A.    Yes.

9        Q.    Which I believe was on page --

10       A.    Eight.

11       Q.    Eight of your notebook.  Do you see it.  In

12   connection with that entry at least at that time you

13   note that the goal of the proposed meeting was to

14   discuss Olin's past role regarding the site and

15   potential future involvement for investigation and

16   cleanup; is that correct?

17       A.    Yes.

18       Q.    That's what you wrote on December 20, 2000,

19   correct?

20       A.    Yes.

21       Q.    Do you have any reason -- does this refresh

22   your recollection, this entry, that during the January

23   10, 2001 meeting where Olin was present there was some

24   discussion about Olin's past role regarding the site

25   as well as potential future involvement for

**DEL VECCHIO REPORTING SERVICES, LLC**

1  ambiguity in the record.

2  BY MR. PRAISS:

3     Q.   Sitting here today to the best of your

4  ability do you believe that on or about January 10,

5  2001 there was a meeting that took place in Hartford,

6  Connecticut where representatives from the DEP

7  including yourself, representatives from the

8  community, the Newhall neighborhood including Joe

9  Frasier, representatives from Olin Corporation as well

10  as Bill Narwold were present and among other things

11  they discussed Olin's potential role with respect to

12  the contamination that had been found at the Hamden

13  Middle School?

14                MR. RAINER:  Object.

15                THE WITNESS:  Yes.

16                MR. PRAISS:  Thank you.

17                THE WITNESS:  May I take a break for a

18  moment?

19                MR. PRAISS:  Sure.  Absolutely.

20                (A recess was taken.)

21  BY MR. PRAISS:

22     Q.   Shannon, back on the record really quick if

23  I could direct your attention to page -- Exhibit 510,

24  your first notebook.

25     A.   Yes.

**DEL VECCHIO REPORTING SERVICES, LLC**

1    present as well as the communication reflected on

2    January 31, 2001, do you have any doubts in your mind

3    that Mr. Frasier was aware of the fact that Olin was

4    considered potentially to be responsible for some of

5    the contamination that had been found at the Hamden

6    Middle School?

7              MR. RAINER:  Object.

8              THE WITNESS:  Sorry, I got lost in

9    that.

10             MR. RAINER:  He's asking if you know

11   what Mr. Frasier thought at the time.

12   BY MR. PRAISS:

13       Q.   Well, let me ask the question differently.

14   Am I correct that at least on two occasions both at

15   the January 10, 2001 meeting as well as the

16   January 31, 2001 communication reflected on Pages 57

17   and 58 of your notebook, you had discussions with Mr.

18   Frasier about the possibility of Olin being considered

19   a potentially responsible party for contamination that

20   had been found at the Hamden Middle School and

21   surrounding areas?

22             MR. RAINER:  Objection.

23             THE WITNESS:  Yes.

24   BY MR. PRAISS:

25       Q.   Now, if I could direct your attention to

**DEL VECCHIO REPORTING SERVICES, LLC**

1    wells.  Federal and state Superfund depending on if

2    that site was relevant.

3            So I had just been, geez, I'd been

4    working under Tom RisCassi, my supervisor, for only a

5    couple of months before the Newhall site came up.

6    Does that clarify a little bit?

7        Q.   Yes.  Thank you.  And after the Newhall site

8    came up, you've indicated you were assigned to work on

9    it; is that right?

10       A.   Yes, that's correct.

11       Q.   And have worked on it ever since?

12       A.   Yes, that's true.

13       Q.   And throughout that period which -- -- well,

14   let's try to figure out when it started.

15           You said you had only been under Tom

16   RisCassi for only a few months.

17           Do you recall when that was?

18       A.   I believe our reorganization was sometime in

19   the summer of 2000.  And we became aware of the Middle

20   School problem in the fall of 2000.  So from that time

21   forward until recently I was the primary project

22   manager on the site.

23       Q.   Primary project manager?

24       A.   Yes.

25       Q.   And could you estimate a percentage of your

DEL VECCHIO REPORTING SERVICES, LLC

1   time since the fall of 2000 that has been spent

2   associated with the Hamden site?

3        A.    At least 90 percent if not more.

4        Q.    Ninety percent or more.  Okay.  Now, what do

5   you recall you first became aware of with respect to

6   the Middle School?

7        A.    You're asking when we became aware of the

8   problem?

9        Q.    I guess you used the word problem so why

10  don't you tell me what you mean by that?

11       A.    The existence of a contamination problem.

12       Q.    At the Middle School?

13       A.    At the Middle School.

14       Q.    So what did you learn about contamination at

15  the Middle School when you first heard about it, if

16  you recall?

17       A.    Well, I recall that my supervisor had

18  received a press call wanting to know what was DEP

19  doing about the contamination at Hamden Middle School

20  and the site was not currently on our radar screen.

21            And I was asked to look in our public

22  records room to see what information we had on the

23  site.

24            And I started with one red file folder

25  about an inch thick and that's what I learned about

**DEL VECCHIO REPORTING SERVICES, LLC**

237

```
 1                    C E R T I F I C A T E

 2           I hereby certify that I am a Notary Public, in

 3      and for the state of Connecticut, duly commissioned

 4      and qualified to administer oaths.

 5           I further certify that the deponent named in

 6      the foregoing deposition was by me duly sworn, and

 7      thereupon testified as appeared in the foregoing

 8      deposition; that said deposition was taken by me

 9      stenographically in the presence of counsel and

10      reduced to typewriting under my direction, and the

11      foregoing is a true and accurate transcript of the

12      testimony.

13           I further certify that I am neither of counsel

14      nor attorney to either of the parties to said suit,

15      nor am I an employee of either party to said suit, nor

16      of either counsel in said suit, nor am I interested in

17      the outcome of said cause.

18           Witness my hand and seal as Notary Public this

19      1st day of May, 2007.

20

21

22                         Barbara L. Murphy, LSR
23                         Notary Public

24
        My Commission Expires:
25      June 30, 2007
```

**DEL VECCHIO REPORTING SERVICES, LLC**

1          IN THE UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF CONNECTICUT

3    **VOLUME II**

4
                           No. 3:03-CV-945(CFD)
5

6    CLARENCE COLLINS, JR., ET AL

7    VS                              **ORIGINAL**

8    OLIN CORPORATION

9

10          Deposition of:  **SHANNON WINDISCH POCIU,** taken

11   pursuant to Rule 30 of the Federal Rules of Civil

12   Procedure before Barbara L. Murphy, Licensed Shorthand

13   Reporter, License No. 305 and Notary Public within and

14   for the state of Connecticut, held at the offices of

15   Brown, Rudnick, Berlack, Israels, 185 Asylum Street,

16   Hartford, Connecticut on April 26, 2007 commencing at

17   9:10 a.m.

18

19

20

21
                DEL VECCHIO REPORTING SERVICES, LLC
22             PROFESSIONAL SHORTHAND REPORTERS
                       117 RANDI DRIVE
23                    MADISON, CT 06443
                       (203)245-9583
24                     (203)245-2760

25   STAMFORD              HARTFORD              NEW HAVEN

**DEL VECCHIO REPORTING SERVICES, LLC**

**331**

1      Q.   And for the record is -- when it says

2  Rochford Field Annex, does that refer to Mill Rock

3  Park?

4      A.   Yes.

5      Q.   Okay.  They're one in the same?

6      A.   They are.  I was first informed that it was

7  called the Annex and then subsequent it had been

8  renamed Mill Rock Park.

9      Q.   Finally am I correct that by January 31,

10  2001 the DEP had available test data shown in

11  Exhibit 513 which is the Newhall Street School soil

12  sampling data; is that correct?

13      A.   Yes.

14      Q.   And again Exhibit 513 that data was shared

15  with concerned parties including Joe Frasier?

16      A.   Yes.

17      Q.   Am I correct that by April 9, 2001 anybody,

18  whether it be Joe Frasier, Cummings and Lockwood, Mr.

19  Rainer, anybody from the public who had sought access

20  to these three pieces of data; Exhibits 511, 512 and

21  513 could have contacted you at the DEP and had access

22  to them?

23      A.   Yes.

24      Q.   And, in fact, you did provide access to this

25  data to people, correct?

**DEL VECCHIO REPORTING SERVICES, LLC**

1       A.    Yes, I did.

2       Q.    Now, let's look again at Exhibit 510, the

3    April 9th communication between you and Ms. Kim Wantek

4    of Cummings and Lockwood and that was at Page 119.

5       A.    Yes.

6       Q.    That specifically refers to test data with

7    respect to the residential rights-of-way sampling, am

8    I correct?

9       A.    I believe so from discussions we've had over

10   the past two days.  I believe that's what it was, yes.

11      Q.    I show you now what is marked Exhibit 516.

12      A.    Yes.

13      Q.    Am I correct that Exhibit 516 refers to the

14   rights-of-way sampling laboratory results, correct?

15      A.    Yes.

16      Q.    I'm going to ask you to take your time and

17   go through Exhibit 516 and confirm with me that all of

18   the data referenced in there is either referring to

19   data that -- refers to data that was collected and

20   summarized at the latest as of April 2, 2001; is that

21   correct?

22      A.    I'm sorry, can you repeat that?

23      Q.    Sure.  I'm asking you to review Exhibit 516

24   and confirm to me that you agree that all the data

25   that's summarized in that exhibit was collected and

334

1    A.    Yes.  And in some cases the stamp didn't

2  copy at all.

3    Q.    Would you agree with me that based on your

4  review of five sixteen that at least a substantial

5  part of the data, of the residential sampling data

6  summarized in Exhibit 516 was received by the DEP by

7  no later than April 8, 2001?

8    A.    I believe so.

9    Q.    Okay.  Now, going back to Exhibit 510 at

10  Page 119.

11          Am I correct that your notation there

12  indicates that Kim Wantek of Cummings and Lockwood was

13  authorized to come by and copy that data on April 9th,

14  correct?

15    A.    Yes.

16    Q.    Now, you don't know if she did show up,

17  correct, on April 9th?

18    A.    I have no clear recollection but --

19    Q.    Regardless --

20    A.    -- I believe she came in often or -- I don't

21  have a clear recollection.  I'll leave it at that.

22    Q.    Let me ask.  Regardless of whether Kim

23  Wantek or somebody else from Cummings and Lockwood

24  showed up, my question to you is that isn't it true

25  that she had the right to come in and copy that data

1          MR. RAINER:   Objection.

2          THE WITNESS:   I know for the exhibits

3    you mentioned excluding five sixteen, there is no

4    reason why we would have withheld that.

5          I don't know if I would have been holding

6    back on some of the residential data for a short

7    period of time until we all got it in. And I don't

8    know what the dates would have been.

9          But I do recall being concerned about a

10   lot of data being out in the general public without

11   any interpretation or statement as to whether or not

12   it is a health risk.

13   BY MR. PRAISS:

14      Q.   Specifically then about Exhibit 516 am I

15   correct that by at least April 9, 2001 to the extent

16   you had this residential data available that's shown

17   in Exhibit 516 you were willing to share it with Kim

18   Wantek or anybody else from the public?

19      A.   Yes.

20      Q.   Now, let me direct your attention to

21   Exhibit 524 which counsel showed you earlier and this,

22   for the record, you identified as a communication from

23   the DEP to the EPA dated February 26, 2001, correct?

24      A.   Yes.

25      Q.   And Mr. Rainer pointed out that in the first

**DEL VECCHIO REPORTING SERVICES, LLC**

**337**

1    sentence there the DEP was requesting assistance from

2    the EPA and I'm quoting here, to evaluate the presence

3    of surface soil contamination on residential property

4    suspected to be located on landfill materials in the

5    vicinity of the Hamden Middle School, correct?

6         A.    Yes.

7         Q.    And then on the same page it continues,

8    however, and states that based on historical aerial

9    photograph review, preliminary results of the Geoprobe

10   investigation and complaints from residents, the

11   department, referring to the DEP, had identified as of

12   February 26, 2001 three residential areas that are

13   likely to be underlain by landfill materials, correct?

14        A.    Yes.

15        Q.    So as of February 26, 2001 the DEP already

16   believed there were certain areas that were likely

17   underlain by landfill materials that extended beyond

18   the Middle School, correct?

19        A.    Yes.

20        Q.    Now, I want to focus on the DEP's state of

21   knowledge as of April 18, 2001.  Okay.  I'm going to

22   show you what was previously marked as Exhibit 525.

23        A.    Yes.

24        Q.    Am I correct between February 26, 2001 and

25   April 18, 2001 the DEP had, in fact, collected

**DEL VECCHIO REPORTING SERVICES, LLC**

1    additional data, correct?

2        A.    Yes, I believe that would be the

3    rights-of-way data.

4        Q.    Okay.  On April 18, 2001 in Exhibit 525

5    there is a communication again from the DEP to the

6    EPA, correct?

7        A.    Yes.

8        Q.    Okay.  As of April 18, 2001 am I correct it

9    states that the DEP has now determined that the former

10   landfill area includes Rochford Field, Mill Rock Park

11   and several residential properties, am I correct?

12       A.    Yes, the letter states that.

13       Q.    Am I correct that Exhibit 525, the April 18,

14   2001 communication doesn't say that the DEP suspects

15   that contamination is present in those areas but

16   rather it says the DEP has now determined that

17   contamination is present in those areas, correct?

18       A.    Yes, it does state that.

19       Q.    Okay.  So do you agree with me that as of

20   April 18, 2001 the DEP had, in fact, determined that

21   contamination extended beyond the Middle School,

22   correct?

23       A.    Yes.

24       Q.    Specifically the DEP as of April 18, 2001

25   had determined that the contamination was present --

**DEL VECCHIO REPORTING SERVICES, LLC**

**339**

1   strike that.

2              That by April 18, 2001 the DEP had

3   determined that the former landfill area included

4   Rochford Field, correct?

5        A.    Yes.

6        Q.    Also included Mill Rock Park, correct?

7        A.    Yes.

8        Q.    Also included several residential

9   properties, correct?

10                  MR. RAINER:  Objection.

11                  THE WITNESS:  Yes.

12   BY MR. PRAISS:

13        Q.    I want to focus about the residential

14   properties.  Counsel asked you some questions about

15   that.

16              Now, am I correct the DEP did not have

17   specific property data as of April 18, 2001, correct?

18        A.    I believe that's correct.

19        Q.    Nonetheless the DEP was able to determine

20   that the former landfill area included several

21   residential properties by using its professional

22   judgment based on data previously collected, correct?

23        A.    Yes.

24        Q.    That data that was previously collected

25   refers to, among other things, the data shown in

**DEL VECCHIO REPORTING SERVICES, LLC**

1    Exhibits 511 for Rochford Field, the data in

2    Exhibit 512 for Rochford Field Annex, the data in 513

3    for the Newhall Street School as well as the data in

4    Exhibit 516 for the residential rights-of-ways,

5    correct?

6         A.    Yes.

7         Q.    So just to summarize.  By April 18, 2001 the

8    DEP using its professional judgment and relying on

9    that data we just discussed was able to conclude that

10   the former landfill area extended to Rochford Field,

11   Mill Rock Park and several residential properties,

12   correct?

13        A.    Yes.  But I would like to add that I'm sure

14   the assessment was also based on the boring logs that

15   we collected at those areas you just referenced in

16   addition to the laboratory results.

17             The exhibits you refer to are strictly

18   laboratory results.

19        Q.    Am I correct that the sampling results as

20   well as the boring log records were all publicly

21   available as of April 18, 2001?

22        A.    Yes.

23        Q.    To the extent that Mr. Michael Hopkins who

24   was plaintiff's expert in this case had contacted the

25   DEP as of let's say April 18th and said I'd like to

**DEL VECCHIO REPORTING SERVICES, LLC**

```
 1   have access to the data shown in Exhibits 511, 512,

 2   513 and 516, again he would have access to that data,

 3   correct?

 4        A.    Sure, yes.

 5        Q.    Likewise Mr. Rainer would have had access to

 6   that data as well, correct?

 7        A.    Yes.

 8        Q.    Now, if I can direct your attention to

 9   Exhibit 521.

10                  MR. RAINER:  I apologize, what is it?

11                  MR. LOONEY:  Five twenty-one.

12                  MR. PRAISS:  Five twenty-one is a

13   December 19, 2000 communication from Shannon Windisch.

14                  MR. RAINER:  Okay.  To --

15                  THE WITNESS:  To Pat Cam.

16                  MR. RAINER:  Thanks.

17   BY MR. PRAISS:

18        Q.    Do you have Exhibit 521 in front of you,

19   Shannon?

20        A.    Yes.

21        Q.    You identified this as a communication that

22   you authored back on December 19, 2000?

23        A.    Yes.

24        Q.    Again I want to focus am I correct that as

25   of December 19, 2000 you stated that based on previous
```

**DEL VECCHIO REPORTING SERVICES, LLC**

1    A.    I don't recall.

2    Q.    All right.

3    A.    I don't think so.

4    Q.    All right.  And it's true, is it not, that

5  Olin throughout the DEP appeal objected to

6  responsibility for certain acts of Winchester?

7    A.    Yes.

8         MR. RAINER:  Thank you.

9         MR. PRAISS:  I have one question for

10  you.

11       REDIRECT EXAMINATION BY MR. PRAISS

12    Q.    Could you look at Exhibit 525 real quick,

13  the April 18, 2001 letter?

14    A.    Yes.

15         MR. RAINER:  Note my objection for the

16  record.  Well, go ahead.

17  BY MR. PRAISS:

18    Q.    Am I correct that as of April 18, 2001

19  Exhibit 525 would have been a public record available

20  at the DEP?

21    A.    Yes.

22         MR. PRAISS:  Thank you very much.

23         MR. RAINER:  I'm retaining Exhibit 2 --

24  Plaintiff's Exhibit 2, Plaintiff's Exhibit 3,

25  Plaintiff's Exhibit 9 and Plaintiff's Exhibit 10.

**DEL VECCHIO REPORTING SERVICES, LLC**

C E R T I F I C A T E

1

2          I hereby certify that I am a Notary Public, in

3     and for the state of Connecticut, duly commissioned

4     and qualified to administer oaths.

5          I further certify that the deponent named in

6     the foregoing deposition was by me duly sworn, and

7     thereupon testified as appeared in the foregoing

8     deposition; that said deposition was taken by me

9     stenographically in the presence of counsel and

10    reduced to typewriting under my direction, and the

11    foregoing is a true and accurate transcript of the

12    testimony.

13         I further certify that I am neither of counsel

14    nor attorney to either of the parties to said suit,

15    nor am I an employee of either party to said suit, nor

16    of either counsel in said suit, nor am I interested in

17    the outcome of said cause.

18         Witness my hand and seal as Notary Public this

19    1st day of May, 2007.

20

21

22                        Barbara L. Murphy, LSR
                          Notary Public
23

24    My Commission Expires:
      June 30, 2007
25

**DEL VECCHIO REPORTING SERVICES, LLC**