IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CLARENCE COLLINS, JR., et al | ) | |
| | ) | 3:03-CV-945 (CFD) |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| OLIN CORPORATION | ) | |
| | ) | |
| Defendant | ) | |
| _____ | ) | |

**DEFENDANT OLIN CORPORATION'S OPPOSITION TO
PLAINTIFFS' THIRD AMENDED MOTION FOR CLASS CERTIFICATION**

Defendant Olin Corporation ("Olin") respectfully submits this memorandum in opposition to Plaintiffs' Third Amended Motion for Class Certification.

.

<u>**TABLE OF CONTENTS**</u>

Table of Contents………………………………………………………………………….i

Table of Authorities………………………………………………………………....iii

INTRODUCTION…………………………………………………………………...1

STATEMENT OF RELEVANT FACTS…………………………………………………....2

LEGAL STANDARDS APPLICABLE TO RULE 23…………………………………………...3

ARGUMENT………………………………………………………………………...5

I.  The court Should Deny Plaintiffs' Motion for Class Certification Under Rule 23(b)(3) Because Individual Issues Predominate With Respect to Plaintiffs' Claims……………….......9

    A.    Individual Issues Predominate With Respect To Plaintiffs' Claims For Infliction Of Emotional Distress Because The Court Would Have To Undertake A Fact-Intensive (Plaintiff-By-Plaintiff) Inquiry To Determine To What Extent, If Any, Each Plaintiff Suffers Emotional Distress And, If So, Whether Such Emotional Distress Was Caused By Waste Deposited By Olin Or By Various Other Possible Factors………………….…………………………………………………….…..10

    B.    Individual Issues Predominate With Respect To Plaintiffs' Claims For Nuisance And Negligence Because The Court Would Have To Undertake A Fact-Intensive (Property-By-Property) Inquiry To Determine To What Extent, If Any, Any alleged Waste At Each Property Originated From Olin Or From Various Other Possible Sources……...…...................…………………………….....……...14

        1.    Individual Issues Predominate With Respect To The Proximate Causation Requirement Relating To Plaintiffs' Claims For Nuisance And Negligence ………………………………….………….…………………....…...15

            a)    Testimony By Shannon Windisch Pociu Of The DEP……..……17

b)      The Expert Report Of Kenneth Cichon……………………………19

c)      Admissions Made By Michael Hopkins…………………………20

2.      Individual Issues Also Predominate With Respect To The Unreasonable Interference Requirement Associated With Plaintiffs' Claims For Nuisance………..……………………...…………………………………..…22

II.    The Court Should Deny Plaintiffs' Motion For Class Certification Under Rule 23(b)(3) Because, Assuming The Court Denies Olin's Pending Motion For Summary Judgment Based On Statute Of Limitations, Then Individual Issues Would Predominate Because The Court Would Have To Conduct A Fact-Intensive Inquiry Concerning The Extent Of Knowledge Of Each Putative Class Member To Determine Whether Their Claims Are Time-Barred…………………………………………………………………………...24

III.   The Court Should Deny Plaintiffs' Motion For Class Certification Under Rule 23(b)(3) Because Individual Issues Predominate With Respect To Plaintiffs' Alleged Damages………..………………………………………..……………………………28

CONCLUSION…………………………………………………………………………..36

# TABLE OF AUTHORITIES

*Alvarado Morales v. Digital Equip. Corp.*,
669 F. Supp. 1173 (D. Puerto Rico 1987),
*aff'd* 843 F.2d 613 (1st Cir. 1988)……………………………………………………...……..11

*American Surety Co. v. Baldwin*,
287 U.S. 156 (1932)……………………………………………………………………...……28

*Arch v. American Tobacco Co.*,
175 F.R.D. 469 (E.D. Pa. 1997)…………………..………………………………………27, 28

*Ball v. Union Carbide Corp.*,
212 F.R.D. 380 (E.D. Tenn. 2002) *aff'd*, 385 F.3d 713 (6th Cir. 2004)……………………….…7

*Barnes v. American Tobacco Co.*,
161 F.3d 127 (3rd Cir. 1998)……………………………………………………………...22, 26

*Boughton v. Cotter Corp.*,
65 F.3d 823 (10th Cir. 1995)………………………………………………...………………8

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998)………………………………………………………………26

*Brown v. Southeastern PA Transp. Authority*,
1987 WL 9273 (E.D. Pa. April 9, 1987)…………...…………………………………....…9, 11, 16

*Castano v. American Tobacco Co.*,
84 F.3d 734 (5th Cir. 1996)………..……………………………………………………....5

*Church v. General Elec. Co.*,
138 F. Supp.2d 169 (D. Mass. 2001)……………….……………………………….………7, 22

*Cohn v. Massachusetts Mutual Life Ins. Co.*,
189 F.R.D. 209 (D. Conn. 1999)…………………………………………………………….5

*Collins v. Olin Corp.*,
418 F. Supp.2d 34 (D. Conn. 2006)…………………………………...……………………10, 14, 23

*Commonwealth of Puerto Rico v. M/V Emily S.*,
158 F.R.D. 9 (D. Puerto Rico 1994)………......………………………………………………11

*Corley v. Entergy Corp.*,
220 F.R.D. 478 (E.D. Tex. 2004)………..……………………………………………...…26

*Goldberg v. Kelly*,
397 U.S. 254 (1970)……………………………………………………………..…..28

*Hyderi v. Washington Mutual Bank*,
235 F.R.D. 390 (N.D. Ill. 2006)…………………………………………………………30

*Ilhardt v. A.O. Smith Corp.*,
168 F.R.D. 613 (S.D. Ohio 1996)…………………………………….…………..27

*In re Agent Orange Product Liability Litigation*,
818 F.2d 145 (2d Cir. 1987)……………………………………………………1, 6, 7, 9

*In re Ford Motor Co. Vehicle Paint Litig.*,
182 F.R.D. 214 (E.D. La. 1998)…………………………………………………….……28

*In re Initial Public Offering Securities Litigation*,
471 F.3d 24 (2d Cir. 2006)……………………………………...………………5, 24, 25

*In re Masonite Corp. Hardboard Siding Prods. Liab.*,
190 F.R.D. 417 (E.D. La. 1997)…………………………………………………28

*In re Three Mile Island Litig.*,
87 F.R.D. 433 (M.D. Pa. 1980)…………………………………………………11, 12

*In re Visa Check/Mastermoney Antitrust Litig.*,
280 F.3d 124 (2d Cir. 2001)………………………………………………….……………..26

*LaBauve v. Olin Corp.*,
231 F.R.D. 632 (S.D. Ala. 2005)…………………………………………….……7, 16, 26

*Lindsey v. Normet*,
405 U.S. 56 (1972)……………..…………………………………………………...28

*Martin v. Shell Oil Co.*,
198 F.R.D. 580 (D. Conn. 2000)………………………………………………...4, 8, 15

*McGuire v. Int'l Paper Co.*,
1994 WL 261360 (S.D. Miss. Feb. 18, 1994)………..…………………………..……8, 11, 27

*Mejdrech v. Met-Coil Sys. Corp.*,
319 F.3d 910 (7th Cir. 2003)……………………………………………………..……..9

*Millet v. Atlantic Richfield Co.*,
2000 WL 359979 (Me. Super. Ct. March 2, 2000)……………..……………………...……8, 16

*Moore v. Painewebber, Inc.*,
306 F.3d 1247 (2d Cir. 2002)……………………………………………….………….………..4, 9

*O'Connor v. Boeing North American, Inc.*,
197 F.R.D. 404 (C.D. Cal. 2000)………….……………………………………...……8, 27, 28

*Olden v. LaFarge Corp.*,
383 F.3d 495 (6th Cir. 2004)……………………………………………………..……9

*Reilly v. Gould, Inc.*,
965 F. Supp. 588 (M.D. Pa. 1997)………………………….……………...…8, 15, 16

*Robertson v. Sikorsky Aircraft Corp.*,
2000 WL 33381019 (D. Conn. July 5, 2001)………...……………………………...…28

*Sanna v. Delta Airlines*,
132 F.R.D. 47 (N.D. Ohio 1990)……...…...….……………………………………11

*Satsky v. Paramount Comm., Inc.*,
1996 WL 1062376 (D. Col. March 13, 1996)……………….……………………...……8, 11, 22, 30

*Sazbo v. Bridgeport Machs.*,
249 F.3d 672 (7th Cir.), *cert. denied*, 534 U.S. 951 (2001)………………………………..…..5

*Steering Comm. v. Exxon Mobil Corp.*,
461 F.3d 598 (5th Cir. 2006)……………………………………………………….…29

*Sterling v. Velsicol Chem. Corp.*,
855 F.2d 1188 (6th Cir. 1988)………………………………………………….……9

*Thomas v. FAG Bearings Corp.*,
846 F. Supp. 1400 (W.D. Mo. 1994)……………………………………………….……8, 16, 36

*Thompson v. American Tobacco Co.*,
189 F.R.D. 544 (D. Minn. 1999)……………………………………………………...……26

*Tri-State Crematory Litig.*,
215 F.R.D. 660 (N.D. Ga. 2003)……………………………….............……….……11

*Winn. v. Posades*,
913 A.2d 407, 411 (Conn. 2007)…………………………………………………...15

*Yslava v. Hughes Aircraft Co.*,
845 F. Supp. 705 (D. Ariz. 1993)……………………………………………...……..…….9

## INTRODUCTION

This case arises from waste allegedly deposited by Olin decades ago in public landfills that were maintained by the Town of Hamden.  Based on the discovery of contamination in the Newhall neighborhood, Plaintiffs ask this Court to certify under Rule 23(b)(3) a Class and several related Subclasses of property owners from the Newhall neighborhood.  Plaintiffs seek to recover alleged damages for emotional distress, diminution in property value, loss of use and enjoyment of their properties, and response costs.

This case is not suitable for class treatment because it involves individualized claims for injuries resulting from alleged exposure to hazardous substances.  In *In re Agent Orange Product Liability Litigation*, 818 F.2d 145 (2d Cir. 1987), the Second Circuit expressed "skepticism over the usefulness of class actions in so-called mass tort cases and, in particular, <u>claims for injuries resulting from toxic exposure</u>."  *Id.* at 164 (emphasis added).  In so doing, the Second Circuit emphasized that in "an action by civilians based on exposure to [hazardous substances] in the course of civilian affairs, **we believe certification of a class action would have been error**."  *Id.* at 166-67 (emphasis added).  For several reasons, this Court should reach the same conclusion here.

First, individual issues predominate with respect to Plaintiffs' claims.  Individual issues predominate with respect to Plaintiffs' claims for infliction of emotional distress because the Court would have to conduct an individualized (plaintiff-by-plaintiff) inquiry to determine to what extent, *if any*, each plaintiff suffers emotional distress and, if so, whether such emotional distress was caused by waste allegedly deposited by Olin or by various other possible factors.  Similarly, individual issues predominate with respect to Plaintiffs' claims for negligence and nuisance because the Court would have to conduct an individualized (property-by-property)

inquiry to determine to what extent, *if any*, any alleged waste at each property originated from Olin or from various other possible sources.

Second, individual issues predominate with respect to Olin's statute of limitations defense. Assuming the Court denies Olin's pending motion for summary judgment based on statute of limitations, then it follows that individual issues would predominate because the Court would have to conduct a fact-intensive inquiry concerning the extent of knowledge of each putative class member to determine whether their claims are time-barred.

Third, individual issues also predominate with respect to Plaintiffs' alleged damages. Indeed, the measure of any alleged damages suffered by a putative class member would depend on many different individual factors that are not susceptible to common proof, but rather, would require hundreds of mini-trials on complex causation and damages issues.

For the foregoing reasons (which are addressed in detail below), the Court should deny Plaintiffs' Third Amended Motion for Class Certification.

## STATEMENT OF RELEVANT FACTS

On May 2, 2003, Plaintiffs served Olin with their original Complaint. More recently, on December 20, 2006, Plaintiffs filed their Second Amended Complaint.[1]

Plaintiffs' Second Amended Complaint consists of ten counts: Count I – Negligence; Count II – Gross Negligence/Reckless Conduct; Count III – Violation of the Environmental Protection Act of 1971[2]; Count IV – Negligence Per Se; Count V – Abnormally Dangerous Activity/Strict Liability; Count VI – Infliction of Emotional Distress; Count VII – Recovery under Conn. Gen. Stat. § 22a-452; Count VIII – Public Nuisance; Count IX – Private Nuisance; and Count X – Recovery of Response Costs under CERCLA § 107 – 42 U.S.C. § 9607.

---

[1] For convenience, Plaintiffs' Second Amended Complaint is referred to as "Compl."

[2] On January 10, 2007, the Court dismissed this claim against Olin without prejudice.

With respect to each of these claims, Plaintiffs seek to certify the following three subclasses:

- **Contaminated Properties Subclass**:  This proposed subclass includes "all members of the Class onto which Olin disposed contaminated fill after it purchased Winchester in 1931."  Compl. at ¶ 31;

- **Stigma Subclass**:  This proposed subclass includes "all members of the Class who own real property within the Newhall Section onto which Olin did not dispose of industrial waste containing contamination after it purchased Winchester in 1931, but who have suffered damages as a result of their close proximity to the Contaminated Properties Subclass."  Compl. at ¶ 32; and

- **Response Cost Subclass**:  This proposed subclass includes "members of the Class who own real property in the Newhall Section who have or will incur response costs in order to redress residual contamination." Compl. at ¶ 33.

On behalf of the foregoing proposed subclasses, the putative class representatives seek to recover "damages against Olin Corporation for the diminution in the value of their properties, response costs, loss of enjoyment of their properties and emotional distress."  Compl. at ¶ 1.

## LEGAL STANDARDS APPLICABLE TO RULE 23

As the proponents of class certification, Plaintiffs "bear the burden of establishing each requirement for class certification." *Martin v. Shell Oil Co.*, 198 F.R.D. 580, 590 (D. Conn. 2000).  Rule 23(a) sets forth four prerequisites that must be met before a class can be certified: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.

Fed.R.Civ.P. 23(a).  In addition, since Plaintiffs seek certification solely under Rule 23(b)(3),[3]

the Court "must decide whether 'questions of law or fact common to the members of the class

predominate over any questions affecting only individual members,' and whether a class action

'is superior to other available methods for the fair and efficient adjudication of the controversy.'"

Fed.R.Civ.P. 23(b)(3).

> With respect to Rule 23(b)(3), in *Moore v. Painewebber, Inc.*, 306 F.3d 1247 (2d Cir.

2002), the Second Circuit held:

> The Rule 23(b)(3) predominance inquiry tests whether the proposed classes are
> sufficiently cohesive to warrant adjudication by representation.  **It is a more
> demanding criterion than the commonality inquiry under Rule 23(a).**  Class-
> wide issues predominate if resolution of some of the legal or factual questions that
> qualify each class member's case as a genuine controversy can be achieved
> through generalized proof, and if these particular issues are more substantial than
> the issues subject only to individualized proof.

*Id.* at 1252 (citations omitted) (emphasis added).

> Since "'the class determination generally involves considerations that are enmeshed in

the factual and legal issues comprising the plaintiff's cause of action,' the Rule 23 analysis often

requires the court 'to probe behind the pleadings before coming to rest on the certification

question.'"  *Cohn v. Massachusetts Mutual Life Ins. Co.*, 189 F.R.D. 209, 212 (D. Conn. 1999)

(citations omitted).  As a result, the Court's "decision whether to certify a class should be based

on a 'pragmatic assessment of the entire action.'"  *Id.  See also Castano v. American Tobacco

Co.*, 84 F.3d 734, 744-45 (5th Cir. 1996) ("court must understand the claims, defenses, relevant

facts, and applicable substantive law in order to make a meaningful determination of the

certification issues"); *Sazbo v. Bridgeport Machs.*, 249 F.3d 672, 677 (7th Cir.), *cert. denied*, 534

U.S. 951 (2001) (same).

---

[3]  *See* Docket No. 195; Plaintiff's Memorandum in Support of Second Amended Motion for Class
Certification at pp. 14-19.

In *In re Initial Public Offering Securities Litigation*, 471 F.3d 24 (2d Cir. 2006), the

Second Circuit emphasized that the "certification decision requires 'rigorous analysis." *Id.* at 32.

Furthermore, in addressing the "troublesome" issue that arises "when the Rule 23 requirement

overlaps with an issue on the merits," the Second Circuit held that:

> (1) a district judge may certify a class action only after making determinations
> that each of the Rule 23 requirements has been met; (2) such determinations can
> be made only if the judge resolves factual disputes relevant to each Rule 23
> requirement and finds that whatever underlying facts are relevant to a particular
> Rule 23 requirement have been established and is persuaded to rule, based on the
> relevant facts and applicable legal standard, that the requirement is met; (3) the
> obligation to make such determinations is not lessened by overlap between a Rule
> 23 requirement and a merits issue, even a merits issue that is identical with a Rule
> 23 requirement; (4) in making such determinations, a district judge should not
> assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a
> district judge has ample discretion to circumscribe both the extent of discovery
> concerning Rule 23 requirements and the extent of a hearing to determine whether
> such requirements are met in order to assure that a class certification motion does
> not become a pretext for a partial trial of the merits.

471 F.3d at 41.

Applying such a rigorous analysis conclusively establishes that this Court should deny

Plaintiffs' Third Amended Motion for Class Certification.

## ARGUMENT

In *In re Agent Orange Product Liability Litigation*, 818 F.2d 145 (2d Cir. 1987) ("*Agent

Orange Case*"), the Second Circuit affirmed certification under Rule 23(b)(3) of a class

consisting of military personnel who were injured while serving in Vietnam due to exposure to

Agent Orange. *Id.* at 154. In addressing the class certification issue, the court began its analysis

by noting that the "comment to Rule 23(b)(3) explicitly cautions against use of the class action

device in mass tort cases," because:

> A 'mass accident' resulting in injuries to numerous persons is ordinarily not
> appropriate for a class action because of the likelihood that significant questions,

not only of damages but of liability and defenses to liability, would be present, affecting the individuals in different ways.

818 F.2d at 164 (quoting Advisory Committee Notes to 1966 Revision of Fed.R.Civ.P. Rule 23).

Consistent with the foregoing observation, the Second Circuit stated that the "present litigation justifies the prevalent skepticism over the usefulness of class actions in so-called mass tort cases and, in particular, claims for injuries resulting from toxic exposure." *Id.* at 164. In support, the court emphasized that:

> The relevant question, therefore, is not whether Agent Orange has the capacity to cause harm, the generic causation issue, but whether it *did* cause harm and to whom. **That determination is highly individualistic**, and depends upon the characteristics of individual plaintiffs (*e.g.*, state of health, lifestyle) and the nature of their exposure to Agent Orange.

818 F.2d at 165 (italics in original) (emphasis added).

As a result, the Second Circuit concluded that certifying a class would have been improper *but for* the "centrality of the military contractor defense":

> **Were this an action by civilians based on exposure to dioxin in the course of civilian affairs, we believe certification of a class action would have been error.** However, we return to the cardinal fact we noted in denying the petition for writ of mandamus, namely that 'the alleged damage was caused by a product sold by private manufacturers under contract to the government for use in a war.'
>
> ….
>
> In our view, class certification was justified under Rule 23(b)(3) due to the centrality of the military contractor defense…. If the defense succeeds, the entire litigation is disposed of….

818 F.2d at 166-67 (emphasis added).

No dispositive government contractor defense applies in this case. Rather, this is an "action by civilians" based on alleged exposure to contamination "in the course of civilian affairs." Thus, it follows that certification of a class action in this case would be "error."

A long line of environmental class action cases since the Second Circuit entered its decision in the *Agent Orange Case* support this conclusion. Indeed, "the overwhelming majority of courts have denied certification in environmental mass tort cases, even in single-source cases."[4] *See, e.g., LaBauve v. Olin Corp.*, 231 F.R.D. 632, 673 (S.D. Ala. 2005) (denying class certification of claims brought by property owners because "individualized inquiry" would have been needed "to establish most of the elements" of plaintiffs' claims); *Ball v. Union Carbide Corp.*, 212 F.R.D. 380, 391 (E.D. Tenn. 2002), *aff'd*, 385 F.3d 713 (6th Cir. 2004) (denying certification in consolidated cases alleging exposure to radioactive materials because individual issues predominated over common issues); *Church v. General Elec. Co.*, 138 F. Supp.2d 169, 181-82 (D. Mass. 2001) (denying certification in case alleging diminution in property values due to contamination because individual issues predominated); *O'Connor v. Boeing North American, Inc.*, 197 F.R.D. 404, 409-15 (C.D. Cal. 2000) (decertifying classes in case alleging property damage because individual issues predominated over common issues); *Martin v. Shell Oil Co.*, 198 F.R.D. 580, 592 (D. Conn. 2000) (denying certification in contamination case under predominance requirement, because "the proof of causation, while it may involve similar evidence for each of the plaintiffs, will not likely be identical"); *Millet v. Atlantic Richfield Co.*, 2000 WL 359979 at * 10-16 (Me. Super. Ct. March 2, 2000) (denying certification in contamination case under predominance requirement, due to individual issues relating to causation); *Reilly v. Gould, Inc.*, 965 F. Supp. 588, 604 (M.D. Pa. 1997) (dismissing class allegations in lead contamination case because the "possibility that some class members could

---

[4]  "Single-source" refers to one possible source of contamination as to the entire class. As discussed herein, this case is not a single-source case. First, this case involves waste allegedly deposited by Winchester prior to 1931 (for which Olin cannot be held liable) as well as waste deposited by other third-parties, both before and after 1931. Second, this case involves waste (such as lead and arsenic) that did not necessarily originate from any waste allegedly deposited by Olin, but rather, from many other different potential sources.

have been exposed to lead from other origins results in the need for an individual and highly

factually intensive analysis of all plaintiffs involved in this action"); *Satsky v. Paramount*

*Comm., Inc.*, 1996 WL 1062376 at *14-15 (D. Col. March 13, 1996) (denying certification in

contamination case because individual issues predominated, including "the extent and nature of

physical and emotional injuries suffered by plaintiffs"); *Boughton v. Cotter Corp.*, 65 F.3d 823,

828 (10th Cir. 1995) (affirming denial of certification in case alleging uranium exposure to

plaintiffs' property in part because "individual measurements can be quite relevant evidence in

determining the extent of an individual's level of exposure and ... such measurements may vary

from individual to individual"); *Thomas v. FAG Bearings Corp.*, 846 F. Supp. 1400, 1404 (W.D.

Mo. 1994) (denying certification in contamination case where individual issues predominated

with respect to both causation and damages); *McGuire v. Int'l Paper Co.*, 1994 WL 261360 at *7

(S.D. Miss. Feb. 18, 1994) (denying certification in contamination case because "[b]oth the

property damage and emotional distress claims depend on a wide variety of individual factors);

*Brown v. Southeastern PA Transp. Authority*, 1987 WL 9273 at *10 (E.D. Pa. April 9, 1987)

(denying certification in PCB contamination case because "any determination of causation"

would require "individualized inquires" concerning the varying levels of exposure and medical

histories of each plaintiff).[5]

---

[5] The cases relied upon by Plaintiffs in support of their Third Amended Motion for Class Certification with respect to the Rule 23(b)(3) requirement are readily distinguishable:

*Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir. 1988) (*Plaintiffs' Brief* at p. 16) (Docket # 195), is a single-source case and therefore inapplicable. Indeed, the Sixth Circuit recently distinguished *Sterling*, refusing to apply it in the context of multiple sources of contamination. *Ball*, 385 F.3d at 728. Likewise, in *Olden v. LaFarge Corp.*, 383 F.3d 495 (6th Cir. 2004) (*Plaintiffs' Brief* at p. 16), there was no evidence of other contamination sources, so the class was certified as to liability. *Id.* 508-09. Also, the *Olden* plaintiffs sought injunctive relief and their claims were certified under both Rule 23(b)(2) and (b)(3). *Id.* at 510.

*Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705 (D. Ariz. 1993) (*Plaintiffs' Brief,* at p. 17), was certified as a medical monitoring class only under Rule 23(b)(2). Similarly, in *Mejdrech v. Met-Coil Sys. Corp.*,

The above cases, which by no means are exhaustive, are instructive. In particular, the foregoing cases confirm that consistent with the Second Circuit's analysis in the *Agent Orange Case*, class certification should be denied because individual issues predominate with respect to many significant aspects of this case, including Plaintiffs' claims, Olin's statute of limitations defense, and Plaintiffs' alleged damages.

I)   **The Court Should Deny Plaintiffs' Motion For Class Certification Under Rule 23(b)(3) Because Individual Issues Predominate With Respect To Plaintiffs' Claims.**

In *Moore*, the Second Circuit affirmed the denial of class certification because individual issues predominated over issues common to the putative class. 306 F.3d at 1252-56. In support, the court held that "a common course of conduct is not enough to show predominance, because a common course of conduct is not sufficient to establish liability of the defendant to any particular plaintiff." *Id.* at 1255.

Similarly, Olin's alleged common course of conduct in allegedly depositing waste is not sufficient to establish Olin's liability to any particular plaintiff. Indeed, individual issues predominate because the Court would have to undertake a fact-intensive inquiry to address the elements underlying Plaintiffs' infliction of emotional distress, nuisance and negligence claims.

---

319 F.3d 910 (7th Cir. 2003) (*Plaintiffs' Brief*, at p. 16), the court limited certification to whether unlawful contamination occurred, and if so, to its geographical scope. *Id.* at 911-12. "Whether a particular class member suffered any legally compensable harm and if so in what dollar amount" were individualized questions that were not appropriate for certification. *Id.*

A)    **Individual Issues Predominate With Respect To Plaintiffs' Claims For Infliction Of Emotional Distress Because The Court Would Have To Undertake A Fact-Intensive (Plaintiff-By-Plaintiff) Inquiry To Determine To What Extent, If Any, Each Plaintiff Suffers Emotional Distress And, If So, Whether Such Emotional Distress Was Caused By Waste Deposited By Olin Or By Various Other Possible Factors.[6]**

In *Collins v. Olin Corp.*, 418 F. Supp.2d 34 (D. Conn. 2006), this Court noted that the "tort of intentional infliction of emotional distress under Connecticut law is comprised of four elements:  (1) that the actor intended to inflict emotional distress; or that he or she knew or should have known that emotional distress was a likely result of his or her conduct; (2) that the conduct was extreme and outrageous; (3) that the **defendant's conduct was the cause of the plaintiff's distress**; and (4) that the emotional distress sustained by the plaintiff was severe." *Id.* at 55 (emphasis added).

Plaintiffs' claims for intentional infliction of emotional distress are not susceptible to class treatment because individual issues predominate with respect to the causation requirement. Specifically, to determine whether Olin's conduct, rather than various other possible factors, "was the cause" of each putative class member's alleged emotional distress would require a highly individualized analysis concerning the medical history and condition of each putative class member.[7]  As a result, courts routinely deny class certification of emotional distress claims. *See*, *e.g.*, *Tri-State Crematory Litig.*, 215 F.R.D. 660, 698 (N.D. Ga. 2003) (denying certification of claim for intentional infliction of emotional distress because it would require evidence that is "highly individualized and unique to each individual class member"); *Satsky*, 1996 WL 1062376 at *15 (denying certification in contamination case, in part, because "[e]motional distress claims

---

[6] This section applies to Count VI (Infliction of Emotional Distress) of Plaintiffs' Second Amended Complaint.

[7] A highly individualized analysis would also be necessary to establish the fourth factor:  "whether the emotional distress sustained by the plaintiff was severe."  Indeed, to resolve this factor the Court would once again have to consider the medical history and condition of each putative class member.

are intractably individual in character.  Each person's susceptibility and injury would vary");

*Commonwealth of Puerto Rico v. M/V Emily S.*, 158 F.R.D. 9, 14 (D. Puerto Rico 1994) (denying

class certification, in part, because "the alleged class claim for emotional distress . . . is

intractably individual in character"); *McGuire*, 1994 WL 261360 at *7 (denying class

certification because "emotional distress claim depend[s] on a wide variety of individual

factors"); *Sanna v. Delta Airlines*, 132 F.R.D. 47, 50 (N.D. Ohio 1990) (denying class

certification because "Courts have been hesitant to find 'emotional injuries' typical"); *Alvarado*

*Morales v. Digital Equip. Corp.*, 669 F. Supp. 1173, 1185 (D. Puerto Rico 1987), *aff'd* 843 F.2d

613 (1st Cir. 1988) ("It strains credulity to imagine that any two members of the class could have

suffered similar . . . emotional injury which would give rise to common questions of law or fact

or typical claims or defenses"); *Brown*, 1987 WL 9273 at *10 (denying certification in

contamination case because "each plaintiff will bring a unique medical history that will provide

the basis for his or her individual claim").

The analysis in *In re Three Mile Island Litig.*, 87 F.R.D. 433 (M.D. Pa. 1980) is

instructive.  Plaintiffs sought to certify a class of persons claiming injuries stemming from

emotional distress attributed to the nuclear accident at Three Mile Island.  In denying

certification, the court observed:

> The testimony of the three plaintiffs at the certification hearing demonstrates that claims for emotional distress and resulting physical injury are diverse and personal…. Not only will damages have to be assessed on a plaintiff-by-plaintiff basis, so too will the causes of the injuries alleged… **Here, the causation element of plaintiffs' injury/emotional distress claims will require individual proof.  In effect, the class action would break up into separate suits**.

87 F.R.D. at 441 (emphasis added).

This Court should reach the same conclusion here.  First, Plaintiffs have not (and cannot) offer any methodology that could be used to establish on a class-wide basis to what extent each putative class member allegedly suffered emotional distress.[8]

Second, admissions made by putative class representatives demonstrate that resolution of Plaintiffs' emotional distress claim would require a highly individualized inquiry that is not susceptible to class treatment.  A few examples illustrate this point.

In response to Olin's interrogatories, Elias Rochester stated that "he has experienced symptoms of irritability, worry over day to day matters, pessimism about the future, low self esteem, loss of interest and/or decreased participation in significant activities, fatigue or low energy, difficulty falling or staying asleep, restless, unsatisfying sleep and difficulty concentrating or mind going blank."[9]  However, when asked about this response at his deposition, Mr. Rochester admitted that his emotional stress could be caused by various factors that have absolutely nothing to do with any waste allegedly deposited by Olin:

> Q. Do you suffer from fatigue or low energy?
> A. Yeah.
> Q. And do you believe that's related to the alleged contamination?
> A. I don't know.  It could be, it could be not.
> Q. What else can it be related to -- work?
> A. Could be.
> Q. Having an 18 month old?
> A. It could be.
> Q. Do you have difficulty falling or staying asleep?
> A. Yeah, somewhat.
> Q. And what do you attribute that to?
> A. I have no idea.
> Q. And how long have you had trouble falling asleep or staying asleep?
> A. Going on maybe a year or something.  A couple of years probably.
> Q. But you don't know what you attribute that to?
> A. No.  I don't know.

---

[8]  Both experts retained by Plaintiffs admitted this point.  *See* Tab 6; Michael Hopkins Depo. at p. 30; Tab 9; Christopher Kerin Depo. at pp. 14-15.

[9]  *See* Tab 17; Depo. Ex. 87 at Int. No. 9.

Q.  How about the fatigue or low energy; how long have you suffered from that?
A.  Since I moved back up here, really.  I didn't have that in New York.
Q.  Do you think the demands, professionally, on you are harder now that you're back in Hamden, then when you were in New York?
A.  Somewhat, yeah.
Q.  So that could be a cause of the fatigue or low energy; correct?
A.  I don't know.  Maybe, maybe not.
Q.  Do you have difficulty concentrating?
A.  Sometimes.
Q.  How long is that -- what do you attribute that to?
A.  I don't attribute it to anything.  It's just something that happens.

….

Q.  Okay.  Are there other things going on in your life, that can cause irritability, without going into them?
A.  Maybe.  Maybe it's a combination of things, you know.  You know?  You know, that's just the word how you define it, you know?[10]

Similarly, Eugalyn Wilson admitted that she was angry and irritable well before the

discovery of contamination, and therefore, cannot attribute those symptoms solely to

contamination:

Q.  Do you feel you are suffering any physical symptoms as a result of the contamination on your property or in the neighborhood?
A.  There may be.
Q.  And what physical symptoms do you think you may be suffering as a result of the contamination in the neighborhood or on your property?
A.  Just being irritable and angry at times.

….

Q.  I believe you mentioned earlier that you were angry, irritable starting back in 1998; is that correct?
A.  Yes.
Q.  Was that as a result of the contamination concerns in the area?
A.  I wasn't aware of it, that it had anything to do with it.  I'm not sure.[11]

---

[10] *See* Tab 12; Elias Rochester Depo. at pp. 97-100.  *See also* Tab 10; Marc Perry Depo. at p. 107 (testifying that his alleged emotional distress "could be" caused by some of his new "working responsibilities"); Tab 4 Henry Blue Depo. at p. 132 (testifying that his alleged "depression and aggravation can be attributed to other things besides the contamination").

[11] *See* Tab 14; Eugalyn Wilson Depo. at pp. 182-83.  *See also* Tab 8; Maxine Jones Depo. at pp. 153-54 (testifying that she has suffered from "stress, lack of energy, and a couple of other physical symptoms …

The above excerpts provide a glimpse of the highly individualized analysis that the Court would have to undertake to determine to what extent, *if any*, each putative class member actually suffers emotional distress and, if so, whether such emotional distress was caused by waste allegedly deposited by Olin or by various other possible factors.

Thus, for all the foregoing reasons, the Court should deny class certification because individual issues predominate with respect to Plaintiffs' claims for infliction of emotional distress.

**B)      Individual Issues Predominate With Respect To Plaintiffs' Claims For Nuisance And Negligence Because The Court Would Have To Undertake A Fact-Intensive (Property-By-Property) Inquiry To Determine To What Extent, If Any, Any alleged Waste At Each Property Originated From Olin Or From Various Other Possible Sources.[12]**

In *Collins v. Olin Corp.*, 418 F. Supp.2d 34 (D. Conn. 2006), this Court noted that to establish a claim for public nuisance, a plaintiff must demonstrate, among other factors, that "the use of the land was unreasonable or unlawful," and that "the existence of the nuisance was the **proximate cause** of the plaintiffs' injuries and damages." *Id.* at 52 (emphasis added). Similarly, to prevail on a claim for private nuisance, the "plaintiff must show that the defendant's conduct was the **proximate cause** of an unreasonable interference with the plaintiff's use and enjoyment of his or her property." *Id.* at 53. The "proximate causation" requirement also applies to Plaintiffs' negligence claim. *See*, *e.g.*, *Winn. v. Posades*, 913 A.2d 407, 411 (Conn. 2007).

---

starting back in the '90s," -- years before the discovery of contamination -- and that she has "no opinion what is causing those feelings").

[12] This section applies to Count I (Negligence), Count II (Gross Negligence/Reckless Conduct); Count IV (Negligence Per Se); Count VIII (Public Nuisance) and Count IX (Private Nuisance) of Plaintiffs' Second Amended Complaint.

Plaintiffs' claims for nuisance and negligence are not susceptible to class treatment because individual issues predominate with respect to the "proximate causation" and "unreasonable interference" requirements.

>1)    **Individual Issues Predominate With Respect To The Proximate Causation Requirement Relating To Plaintiffs' Claims For Nuisance And Negligence.**

Both *Martin v. Shell Oil Co.*, 198 F.R.D. 580 (D. Conn. 2000) and *Reilly v. Gould, Inc.*, 965 F. Supp. 588 (M.D. Pa. 1997) are particularly instructive with respect to the proximate causation requirement associated with Plaintiffs' claims for nuisance and negligence.

In *Martin*, property owners brought various claims, including nuisance and negligence, against Shell for allegedly contaminating their properties. *Id.* at 582. In denying plaintiffs motion for class certification under Rule 23(b)(3), the court noted that "the proof of causation, while it may involve similar evidence for each of the plaintiffs, will not be identical." *Id.* at 592. In support, the court recognized that the evidence likely to be submitted at trial with respect to causation would require individualized proof:

> The defendants have indicated they will argue at trial that there are several other potential sources of MTBE in the area and that groundwater does not move in a predictable fashion, and the plaintiffs themselves have submitted evidence in support of their motion showing that the levels of MTBE in the water of the two named plaintiffs are dramatically different, suggesting that resolving the questions of how the MTBE traveled to each of the plaintiffs' properties and whether there is another source will likely differ as to different sites.

198 F.R.D. at 592.

Similarly, in *Reilly* residents who lived close to a former battery crushing and lead processing plant filed a class action lawsuit because their properties were contaminated with lead. *Id.* at 593. In denying class certification under Rule 23(b)(3), the court emphasized that lead exposure requires a highly fact-intensive inquiry:

> Although it is well established that the Marjol Battery Plant dealt primarily in the
> reclamation of lead from spent batteries and that the manner in which this was
> achieved may have caused the release of lead into the environment, it has also
> been pointed out by defendant's counsel that there are other prevalent sources of
> lead emissions.[13]   The Centers for Disease Control reports that '[m]any factors
> can affect the absorption, distribution, and toxicity of lead.'
>
> ….
>
> **The possibility that some class members could have been exposed to lead
> from other origins results in the need for an individual and highly factually
> intensive analysis of all plaintiffs involved in this action.**

965 F. Supp. at 603-04 (emphasis added).[14]

The analogous circumstances in this case compel the same result.  In particular, the Court

would have to undertake a highly individualized analysis to determine to what extent, *if any*,

there is any contamination on each property that allegedly originated from waste deposited by

Olin or from various other possible sources.  Testimony by Shannon Windisch Pociu of the

Connecticut Department of Environmental Protection (DEP), the expert report of Kenneth

Cichon (Olin's expert), and admissions made by Michael Hopkins (Plaintiffs' expert) uniformly

support this conclusion.

---

[13]  Michael Hopkins (Plaintiffs' expert) admitted this point.  Specifically, Mr. Hopkins admitted that during the 1930s and 1940s, there were many different potential sources of lead, as well as the other substances of concern found in the Newhall neighborhood, such as polyaromatic hydrocarbons, extractable total petroleum hydrocarbons and arsenic.  *See* Tab 6; Hopkins Depo. at pp. 111-121.

[14]  *See also LaBauve*, 231 F.R.D. at 673 ("[w]hether a plaintiff's property is contaminated, the source(s) of such contamination, the extent of such contamination, the cause and timing of harm, and the resulting damage (measured in diminution of property value) are all questions that will require plaintiff-by-plaintiff scrutiny"); *Millet*, 2000 WL 359979 at *13 ("[t]he issue of causation presents a major obstacle for plaintiffs because the "actual cause" of contamination "will have to be addressed on an individual basis") (citations omitted); *Thomas*, 846 F. Supp. at 1404 ("while there are undoubtedly common issues of law and fact, such as whether [defendant] released TCE into the groundwater, the individual issues so overshadow those in numerosity and complexity to render a class action unhelpful"); *Brown*, 1987 WL 9273 at *10 ("any determination of causation [with respect to contamination] requires individualized inquiries").

a)        **Testimony By Shannon Windisch Pociu Of The DEP**[15]

Plaintiffs allege that lead and arsenic are the primary constituents of Olin's alleged waste. *See* Compl. at ¶ 12. However, testing conducted by the EPA and DEP demonstrates that lead and arsenic did not originate *solely* from waste allegedly deposited by Olin.

From May 24, 2001 to June 6, 2001, the EPA inspected 61 properties in the Newhall neighborhood.[16] Based on that inspection, the EPA concluded that five homes had contaminant levels that exceeded the EPA guidelines for immediate action.[17] At the same time, the EPA concluded that no further action was necessary with respect to two other houses that also had lead concentrations that exceeded the EPA's guidelines, because the EPA had "determined that the most likely cause of elevated lead in soil is lead paint rather than landfill material."[18] For example, with respect to the residence of Ellecia Sims (a putative class representative), the EPA stated:

> EPA depth samples indicate very low lead. No paint chips visible in soil. **EPA believes lead is from paint, not landfill material**. This theory is supported by condition of next door neighbor's house (on corner of Newhall and Morse). Neighbor's is a historic home. Paint was sanded from house several years ago. Mr./Mrs. Sims report that paint removal was messy, with visible dust in their yard. They also report that asbestos shingles were removed from neighbor's home apparently without proper precautions. Mr./Mrs. Sims very concerned about their grandchildren's potential exposures.[19]

---

[15] From the fall of 2000 until recently, Shannon Windisch Pociu worked as the "primary project manager on the site" on behalf of the DEP. *See* Tab 15; Shannon Windisch Pociu Depo. at pp. 165-66.

[16] *See* Tab 18; Depo. Ex. 158 at HAM05285.

[17] *Id.*

[18] *Id.* at HAM05286.

[19] *Id.* at HAM05285 (emphasis added). Based on the EPA's findings, any alleged emotional distress suffered by the Sims was not caused by any alleged contamination deposited by Olin, but rather, by lead paint from their neighbor's house. This example further highlights the individual analysis that would be necessary to address proximate causation with respect to Plaintiffs' claims for infliction of emotional distress.

The DEP reached a similar conclusion based on testing conducted at the residence of Sonia Powell (another putative class representative). On December 19, 2003, the DEP sent Ms. Powell a report summarizing surface soil screening at 137-139 Shepard Street.[20] The report concluded with the following summary:

> **In summary, no waste material or debris indicative of historic filling practices was observed at the 137-139 Shepard Street property**. PAHs in surface (0-3") soils at the property are present at concentrations below the applicable RDEC. Concentrations of arsenic and lead in surface (0-3") soils exceed the RDEC. In one instance (SS-110-4), the concentration of lead is more than twice the RDEC. **Based on the lack of physical evidence and on the chemical data described herein, the presence of arsenic and lead at concentrations above the RDEC do not appear to be related to historic filling**.[21]

When presented with the foregoing evidence, Shannon Windisch Pociu of the DEP testified that "the mere fact you have lead or arsenic present in a place, doesn't necessary mean it originated from the landfill but it could have come from other sources such as pesticides or lead paint."[22] As a result, Ms. Pociu testified that it would be necessary to undertake a highly individualized analysis with respect to *each* property to establish the origin of any alleged contamination:

> Q. Would you agree with me that through the course of the DEP's investigation into the site it determined that there were contaminants, different types of contaminants throughout the site, first of all?
> A. Yes.
> Q. And am I correct that the DEP determined that the contaminants originated potentially from different sources, correct?
> A. Yes.
> Q. Am I correct that the DEP determined that some of the contaminants originated from an industrial waste, correct?
> A. Yes.
> ….

---

[20] *See* Depo. Ex. 470 at Bates # 1685.

[21] *Id.* at Bates # 1689 (emphasis added).

[22] *See* Tab 15; Shannon Windisch Pociu Depo. at pp. 139-40.

Q. Okay.  Am I correct you discovered instances where there were contaminants from household waste?

A. Yes.

Q. And am I correct that the DEP identified instances where contaminants were from lead paint?

A. Yes.

Q. And am I correct that DEP determined there were instances where contaminants were from pesticide use?

A. Yes, I believe so.

**Q. And am I correct that one would have to go and look at data specific for each particular property to evaluate to what extent any contaminants in that property originated from any one of these potential sources?**

Mr. Rainer:  Objection

A. **Yes.**[23]

The foregoing testimony establishes that the Court would need to conduct a fact-intensive analysis (property-by-property) to determine to what extent, *if any*, there is any contamination on each property that allegedly originated from waste deposited by Olin or from various other possible sources.

### b)     The Expert Report Of Kenneth Cichon

The expert report of Kenneth Cichon (Olin's expert) supports the same conclusion. Kenneth Cichon is a geologist who has worked as an environmental professional in the State of Connecticut since 1975.[24]  Since 2001, Mr. Cichon (while employed with Malcolm Pirnie, Inc. and subsequently by Mactec Engineering and Consulting, Inc.) has worked extensively on issues arising out of the discovery of contamination in the Newhall neighborhood.[25]

Based on his expertise and direct knowledge relating to the investigation surrounding the discovery of contamination in the Newhall neighborhood, Mr. Cichon reached the following conclusions in his expert report:

---

[23] *See* Tab 15; Shannon Windisch Pociu Depo. at pp. 344-45 (emphasis added).

[24] *See* Tab 1; Expert Report of Ken Cichon at p. 1.

[25] *See* Tab 1; Expert Report of Ken Cichon at p. 1 and attached resume.

- "There exists considerable variability in the occurrence of fill types throughout the Contaminated Properties Subclass";

- "There are insufficient test data to conclude what type of fill material is present in each property of the Contaminated Property Subclass and to what extent, if any, such fill is attributable to Winchester Repeating Arms"; and

- "**It would be necessary to collect and analyze additional data with respect to each property in the Contaminated Properties Subclass to determine to what extent, if any, contamination present on each property is attributable to Winchester Repeating Arms versus other sources**."[26]

Notably, Michael Hopkins (Plaintiffs' expert) admits that these conclusions are accurate.

### c)     Admissions Made By Michael Hopkins

In his deposition, Michael Hopkins (Plaintiffs' expert) made several admissions that further establish that individual issues predominate with respect to proximate causation relating to Plaintiffs' claims for nuisance and negligence.

First, Mr. Hopkins admitted that additional sampling is necessary to delineate the full extent of fill in the Newhall neighborhood (including in the Contaminated Properties Subclass):

> Q.  Okay.  So focusing on the study area that's the subject of your expert report, sir.  And my question to you is you identified in '04 to the DEP a concern about the fact that there was data gaps, correct?
> A.  Correct.
> Q.  Okay.  And my question is are there any data gaps still present in your opinion with respect to the study area as referenced in your expert report?
> A.  The answer would be yes.
> Q.  And additional sampling with respect to those data gaps in the study area as used in your expert report would be helpful to delineate the extent of fill, correct?
> A.  Yes.[27]

Second, Mr. Hopkins admitted that with respect to any properties in the Newhall neighborhood (including in the Contaminated Properties Subclass) where only "Disturbed Soil"

---

[26] *See* Tab 1; Expert Report of Ken Cichon at pp. 1-2 (emphasis added).  In his report, Mr. Cichon states that he did not attempt "to distinguish between fill which may have been placed by Winchester Repeating Arms before or after 1932."  *Id.* at p. 1, n. 1.

[27] *See* Tab 6; Hopkins Depo. at pp. 23-26.

was present, "some additional information would be necessary to be confident of what the source of the material was."[28]

Third, Mr. Hopkins admitted that the foregoing conclusion also applies to any other properties in the Contaminated Properties Subclass where additional sampling may establish that only Disturbed Soil is present:

> Q. With respect to the 13 properties in the study area where there has been no sampling, am I correct, sir, that to the extent additional testing were done at those properties it may reveal the presence of just disturbed soil?
>
> Mr. Rainer:  Objection.
>
> A. It could reveal the presence of disturbed soil as again defined by Malcolm Pirnie.
>
> Q. And to the extent it would reveal just 100 percent disturbed soil as defined by Malcolm Pirnie, am I correct that you would have to undertake additional investigation, analysis of that data before you could draw any conclusions to what extent, if any, that disturbed soil originated from Winchester, correct?
>
> Mr. Rainer:  Objection.
>
> A. If I was provided with just information that said it was disturbed soil, that would not be enough information to speculate as to the source.... I would need to see more than just the fact it was disturbed soil to provide an opinion as to the source.[29]

Finally, and most importantly, Mr. Hopkins admitted that he cannot testify to a reasonable degree of engineering certainty that to the extent any contamination is located on a particular property, that such contamination originated from Olin:

> Q. **Sitting here today you're not in a position to say within a reasonable degree of engineering certainty to the extent there is fill in each and every property in the study area that it originated from Winchester, correct?**
>
> A. **With that originated from Winchester on there, that would be correct**.[30]

Thus, the testimony of Shannon Windisch Pociu of the DEP, the expert report of Kenneth Cichon, and admissions made by Michael Hopkins <u>uniformly</u> support the same conclusion: Individual issues predominate with respect to the proximate causation requirement relating to

---

[28] *See* Tab 6; Hopkins Depo. at p. 87.

[29] *See* Tab 6; Hopkins Depo. at pp. 94-95.

[30] *See* Tab 6; Hopkins Depo. at p. 126.

Plaintiffs' claims for nuisance and negligence, because additional sampling and testing – property-by-property – would be necessary to determine to what extent, *if any*, there is any contamination on each property that allegedly originated from waste deposited by Olin or from various other possible sources.

> **2)    Individual Issues Also Predominate With Respect To The Unreasonable Interference Requirement Associated With Plaintiffs' Claims For Nuisance.**

*Church v. General Elec. Co.*, 138 F.Supp.2d 169 (D. Mass. 2001) is particularly instructive with respect to the "unreasonable interference" requirement associated with Plaintiffs' claims for nuisance.  In *Church*, homeowners brought an action against GE for contaminating their property with PCBs.  In denying class certification of plaintiffs' nuisance claim under Rule 23(b)(3) the court stated:

> To judge whether there has been a harmful enough invasion by PCBs for liability to attach under nuisance…., an expert must necessarily measure the extent of the contamination of the individual properties and their potential exposure to future contamination.  The individual characteristics of each plaintiff's property are crucial to this analysis….

> These differences pertain not just to damages, as plaintiffs argue, but to the threshold question of whether the contamination constitutes a nuisance….  A Rule 23(b) is therefore not appropriate in this case.

*Id.* at 182.  *See also Satsky*, 1996 WL 1062376 at *15 (denying class certification under Rule 23(b)(3) of nuisance claim because the "amount of contamination on a class member's property and the question of whether the contamination was at a hazardous level is not a question common to the class because even if it is answered as to one class member, it is not answered as to all class members.").

The same individualized issues are present here. Indeed, in *Collins*, this Court noted that to establish unreasonable interference would require an evaluation of the circumstances of "each individual case":

> **Whether the interference is unreasonable depends upon a balancing of the interests involved under the circumstances of each individual case.** In balancing the interests, the fact finder must take into consideration all relevant factors, including the nature of both the interfering use and the use and enjoyment invaded, the nature, extent and duration of the interference, the suitability for the locality of both the interfering conduct and the particular use and enjoyment invaded, whether the defendant is taking all feasible precautions to avoid any unnecessary interference with the plaintiff's use and enjoyment of his or her property, and any other factors that the fact finder deems relevant to the question of whether the interference is unreasonable.

418 F. Supp.2d at 54, n. 24.

Resolution of the foregoing factors would require a highly individualized analysis. For example, to determine whether each putative class members can demonstrate an unreasonable interference with respect to his or her property, the fact-finder would have to consider evidence relating to:

- The "duration" of time that each putative class member has owned his or her property;

- The "extent" of contamination at each individual property (since the level of contamination will directly influence the ability of each plaintiff to enjoy his or her property); and

- The "particular use and enjoyment invaded" with respect to each putative class member.

Thus, for all these reasons, the Court should deny class certification because individual issues predominate with respect to Plaintiffs' claims for nuisance and negligence.

**II)**    **The Court Should Deny Plaintiffs' Motion For Class Certification Under Rule 23(b)(3) Because, Assuming The Court Denies Olin's Pending Motion For Summary Judgment Based On Statute Of Limitations, Then Individual Issues Would Predominate Because The Court Would Have To Conduct A Fact-Intensive Inquiry Concerning The Extent Of Knowledge Of Each Putative Class Member To Determine Whether Their Claims Are Time-Barred.**

On May 10, 2007, Olin filed a motion for summary judgment based on statute of limitations.[31]  In support, Olin established that it is undisputed that by April 18, 2001 (at the very latest), Plaintiffs knew, or reasonably should have known, that their alleged damages were caused or contributed to by hazardous substances allegedly disposed of by Olin.  As a result, since Plaintiffs waited more than two years (until May 2, 2003) to serve Olin with their Complaint, claims by the Stigma Subclass and Contaminated Properties Subclass are time-barred.

Olin's motion for summary judgment should be granted.  However, in the event the Court denies the motion, then it follows that individual issues would predominate with respect to Olin's statute of limitations defense.  Specifically, the Court would need to conduct an individualized inquiry -- focusing on the extent of knowledge of each putative class member.  Many courts, including the Second Circuit, hold that the need to conduct such an individualized inquiry regarding each putative class member's knowledge precludes class certification.

In *Initial Public Offering*, the Second Circuit set forth the legal standards that govern the Rule 23 requirements.  471 F.3d at 32-42.  In light of these standards, the Second Circuit concluded that remand was "not appropriate because the Plaintiffs' own allegations and evidence demonstrate that the Rule 23 requirement of predominance of common questions over individual questions cannot be met under the standards as we have explicated them."  *Id.* at 42.  In support,

---

[31] *See* Docket Nos. 208 and 209.

the court emphasized that individual issues predominated with respect to the extent of

"knowledge" of putative class members:

> There is no dispute that a section 10(b) claimant 'must allege and prove' that the claimant traded' in ignorance of the fact that the price was affected by the alleged manipulation." …. **The Plaintiffs' allegations, evidence, and discovery responses demonstrate that the predominance requirement is defeated because common questions of knowledge do not predominate over individual questions.**  The claim that lack of knowledge is common to the class is thoroughly undermined by the Plaintiffs' own allegations as to how widespread was knowledge of the alleged scheme…. [because] it is this widespread knowledge that would precipitate individual inquiries as to the knowledge of each member of the class, even as redefined.

471 F.3d at 43-44 (emphasis added).

The analogous circumstances in this case compel the same result.  Here, as in *Initial*

*Public Offering*, Plaintiffs cannot satisfy Rule 23(b)(3)'s predominance requirement because in

their pleadings to the Court, Plaintiffs have taken the position that a highly individualized

analysis would be required to resolve the statute of limitations issue:

> **There is no clearer question of fact than what a particular plaintiff knew or should have known at a particular time**, the determination of which is essential to decide whether the applicable statute of limitations set forth in Conn. Gen. Stat. §52-577c(b) has run.
>
> ….
>
> When a plaintiff 'discovered or in the exercise of reasonable care should have discovered property contamination so as to begin the running of the statute of limitations under Conn. Gen. Stat. § 52-577c is an **extremely fact specific determination**.[32]

Thus, consistent with *Initial Public Offering*, class certification should be denied because,

assuming the Court denies Olin's pending motion for summary judgment, then it follows (as

---

[32] *See* Docket No. 54; Plaintiffs' Memorandum of Law in Opposition to Motions to Dismiss filed by Defendants Town of Hamden and Olin Corporation at pp. 52-53 and 55 (emphasis added).

Plaintiffs previously admitted), that an "extremely fact specific determination" would be necessary to determine whether each putative class member's claims are time-barred.[33]

When presented with similar circumstances, courts routinely deny class certification because individual issues predominate with respect to the resolution of the statute of limitations defense. *See, e.g.*, *Barnes v. American Tobacco Co.*, 161 F.3d 127, 149 (3rd Cir. 1998) ("we believe that determining whether each class member's claim is barred by the statute of limitations raises individual issues that prevent class certification"); *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 342 (4th Cir. 1998) ("when the defendant's 'affirmative defenses (such as … the statute of limitations) may depend on facts peculiar to each plaintiff's case,' class certification is erroneous"); *LaBauve*, 231 F.R.D. at 674-75 (denying certification of putative class action brought by property owners in contamination case because "[o]nly after painstaking fact-finding on a plaintiff-by-plaintiff basis will each plaintiff's status vis a vis the statute of limitations defense be ascertainable"); *Corley v. Entergy Corp.*, 220 F.R.D. 478, 488 (E.D. Tex. 2004) ("The issue of whether individual landowners' claims are timely [is] not amenable to class treatment"); *Thompson v. American Tobacco Co.*, 189 F.R.D. 544, 556 (D. Minn. 1999) ("The second insurmountable problem precluding class certification . . . is the

---

[33] The Second Circuit's decision in *In re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001) further supports this conclusion. In particular, the court emphasized that for purposes of Rule 23(b)(3), **the question for purposes of determining predominance is not whether a defense exists, but <u>whether the common issues will predominate over the individual questions raised by that defense</u>**. *Id.* at 138 (citations omitted) (emphasis added). In addition, the court's conclusion that the predominance requirement was satisfied with respect to the mitigation of damages defense is readily distinguishable. First, the court emphasized that "Defendants' mitigation defense goes only to the calculation of damages." *Id.* at 138. Second, the court noted that the "majority of the issues relating to this defense are common to the class." *Id.* at 139. The exact opposite is true here. Olin's statute of limitation defense has nothing to do with damages, but rather, is directed *solely* to Olin's alleged liability. Indeed, if a putative class member's claims are time-barred, Olin cannot be held liable to that plaintiff. Moreover, Plaintiffs cannot dispute the fact that they previously took the position that the statute of limitations defense is an "**extremely fact specific determination**." *See* Docket No. 54; Plaintiffs' Memorandum of Law in Opposition to Motions to Dismiss filed by Defendants Town of Hamden and Olin Corporation at p. 55 (emphasis added).

individual nature of applicable defenses. . . . Of particular concern in this regard is Defendants'

assertion of a statute of limitations defense against each and every Plaintiff. . . . Determining

whether a class member's claim is barred by the statute of limitations would take thousands of

'mini-trials.'"); *Arch v. American Tobacco Co.*, 175 F.R.D. 469, 490-91 (E.D. Pa. 1997) ("The

facts and claims of this case implicate a number of affirmative defenses [including statute of

limitations], all of which raise individual issues that preclude a Rule 23(b)(3) certification.");

*Ilhardt v. A.O. Smith Corp.*, 168 F.R.D. 613, 619 (S.D. Ohio 1996) (denying certification under

Rule 23(b)(3) because "Defendant's affirmative defenses, including … statute of limitations,

depend on facts peculiar to each plaintiff's case."); *McGuire*, 1994 WL 261360 at *7 (denying

certification under Rule 23(b)(3) in part because "[s]ome claims may be barred by the applicable

statute of limitations").

     *O'Connor v. Boeing North American, Inc.*, 197 F.R.D. 404 (C.D. Cal. 2000) is

particularly instructive.  In denying class certification of a putative class of residents living near

nuclear testing facilities, the court held that:

> Additionally, in applying the statute of limitations to the Samuels and many
> personal injury plaintiffs, the Court considered several factors that varied from
> individual to individual:  (1) when and how each Plaintiff actually discovered his
> or her claim; (2) the newspaper readership of  each Plaintiff; (3) the community
> group membership, or lack of it, of each Plaintiff; and (4) the residency history of
> each Plaintiff….
>
> **Plaintiffs appear to concede that the limitations defense raises individual
> issues**.    The real question is whether these individual issues make class
> certification inappropriate.
>
> ….
>
> **Based on the individualized, fact-intensive nature of the necessary inquiry in
> this case, the statute of limitations issues preclude a finding that common
> issues predominate over individual issues**….

*Id.* at 411-14 (emphasis added).

The same holds true here.  Plaintiffs have previously taken the position that the statute of limitations defense requires an extremely fact specific determination.  Thus, as in *O'Connor* and the other cases cited above, the Court should deny class certification because, assuming the Court denies Olin's pending motion for summary judgment, then it follows that individual issues would predominate with respect to whether Plaintiffs' claims are time-barred under the applicable statute of limitations.[34]

**III)    The Court Should Deny Plaintiffs' Motion For Class Certification Under Rule 23(b)(3) Because Individual Issues Predominate With Respect To Plaintiffs' Alleged Damages.**

Olin recognizes that individual questions relating to damages – standing alone – may not defeat class certification.  However, the need to conduct a highly individualized inquiry to determine to what extent, if any, each putative class member allegedly suffered any damages further militates against class certification, especially where individual issues already predominate with respect to other critical issues, such as causation and statute of limitations. *See, e.g., Robertson v. Sikorsky Aircraft Corp.*, 2000 WL 33381019 at *10 (D. Conn. July 5, 2001) (denying class certification under Rule 23(b)(3) because "**from the standpoint of both**

---

[34] It is important to note that class certification would violate Olin's due process right that "there be an opportunity to present every available defense.'" *Lindsey v. Normet*, 405 U.S. 56, 66 (1972) (quoting *American Surety Co. v. Baldwin*, 287 U.S. 156, 168 (1932)); *see also Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) ("In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses.").  Consistent with this fundamental principle, courts hold that class certification is inappropriate if it would preclude a defendant from presenting its defenses. *See, e.g., In re Masonite Corp. Hardboard Siding Prods. Liab.*, 190 F.R.D. 417, 425 (E.D. La. 1997) (denying class certification and holding that "[w]ithout judging the merits of plaintiff's claims, it is apparent that [the defendant] cannot receive a fair trial without a process which permits a thorough and discrete presentation of [its individualized] defenses."); *In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 221 (E.D. La. 1998) (holding that plaintiff's proposal to prove causation by submitting affidavits was a "one-sided procedure [that] would amount to an end-run around defendant's right to cross-examine individual plaintiffs"); *Arch v. American Tobacco Co.*, 175 F.R.D. 469, 489 at n. 20 (E.D. Pa. 1997) (holding that "the use of questionnaires to establish the elements of causation and injury – without cross examination or rebuttal evidence – would violate defendants' due process rights.").  That is precisely what would happen in this case – Olin's due process right to present its statute of limitations defense with respect to each putative class member would be infringed if the Court granted Plaintiffs' motion for class certification.

**liability and damages** … questions of fact are not common to the members of the class but would differ as to each class member") (emphasis added).

In this case, Plaintiffs seek to recover from Olin damages for alleged emotional distress, loss of use and enjoyment of their properties, and diminution in value of their properties. None of these alleged damages, however, can be determined using common proof on a class-wide basis.

> It is clear from the record that the damages claims in this case are not subject to any sort of formulaic calculation. Instead, each individual plaintiff suffered different alleged periods and magnitudes of exposure and suffered different alleged symptoms as a result. Some plaintiffs allege both personal and property injuries, while other allege only one or the other. Moreover, many plaintiffs allege as part of their claim for compensatory damages emotional and other intangible injuries. 'The very nature of these damages, compensating plaintiffs for emotional and other intangible injuries, necessarily implicates the subjective differences of each plaintiff's circumstances; they are an individual, not class-wide, remedy. The amount of compensatory damages to which any individual class member might be entitled cannot be calculated by objective standards.'

*Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006) (citations omitted).

The record in this case supports the same conclusion. To determine to what extent, if any, a putative class member suffered any damages due to emotional distress (due to waste allegedly deposited by Olin), the Court would have to consider: (1) whether the plaintiff suffered emotional distress before contamination was discovered; (2) identify all the different causes that may have contributed to the plaintiff's emotional distress; (3) determine exactly how the alleged emotional distress has impacted the plaintiff; and (4) evaluate to what extent the alleged emotional distress will continue after remediation is completed.[35]

---

[35] *See*, *e.g.*, Tab 13; Ellecia Sims Depo. at p. 97 (testifying that if her property and surrounding area were "remediated in accordance with proper, expert approved methodology," she would "no longer have that stress and worry").

Due to the presence of all of these highly individualized issues, it is telling that Plaintiffs fail to offer any methodology that purports to establish Plaintiffs' alleged emotional distress damages on a class-wide basis using common proof.[36]  This omission is not surprising since courts recognize that emotional distress claims are "a highly plaintiff-specific issue" and therefore, are not subject to class certification.  *Hyderi v. Washington Mutual Bank*, 235 F.R.D. 390, 397 (N.D. Ill. 2006).

The same conclusion applies to Plaintiffs' alleged loss of use and enjoyment of their properties damages.  To determine the extent of any such alleged damages, the Court would have to consider with respect to each putative class member:  (1) what use was made of each property prior to the discovery of contamination; (2) the level of contamination found on each property or in areas close to each property, and what limitations, if any, such contamination imposed on the use and enjoyment of each property; and (3) to what extent the alleged loss of use and enjoyment will continue after proposed remediation is completed.[37]  Once again, it is telling that Plaintiffs fail to offer any methodology that purports to address all of these individual inquiries using common proof on a class-wide basis.

Finally, individual issues also predominate concerning the extent, if any, of any alleged diminution in property value damages.  *See, e.g., Satsky*, 1996 WL 1062376 at *15 (emphasizing that addressing "[p]roperty values would require property-by-property analysis").  Plaintiffs' prior representation to the Court and admissions made by their real-estate expert are particularly instructive on this issue.

---

[36] *See* Tab 6; Hopkins Depo. at pp. 30-31; Tab 9; Kerin Depo. at p. 17.

[37] *See, e.g.*, Tab 11; Sonia Powell Depo. at p. 159 (testifying that "if the DEP and/or qualified experts indicate that any remediation that was needed was conducted on [her] property and in the neighborhood, that [she] would then again be able to use [her] property for barbecues and cookouts and having [her] friends over and family over").

In support of their motion for class certification, Plaintiffs stated:

In addition, **Plaintiffs will present expert testimony to explain how Plaintiffs' claims of diminution in value of their property may be proven on a class-wide basis. Plaintiffs intend to prove this via expert testimony utilizing a hedonic price model based upon multiple regression analysis and/or other statistical methods of establishing diminution of property damage on an area-wide basis.** Utilizing these tools, property valuation experts are able to assess the loss of property values on an area-wide basis despite the fact that the Contamination Area contains properties of differing types and sizes. This model can account for differences in concentrations of contamination, property type, and communities by including different factors as variables in the models, enabling the expert to analyze property depreciation for an entire environmentally-affected community.[38]

Despite making this representation, Plaintiffs fail to offer any such expert testimony. Indeed, Christopher Kerin (Plaintiffs' real-estate expert) admits that he does not consider himself "to be an expert in statistical analysis" and that he has not conducted any such analysis in this case:

Q. In connection with your engagement in the case am I correct that you have not utilized a hedonic price model based on multiple regression analysis and/or other statistical methods to establish on a class-wide basis the amount of any alleged damages suffered by plaintiffs due to alleged diminution in value of their properties?

A. That's correct.[39]

Moreover, Mr. Kerin made several other admissions that demonstrate that the Court would have to undertake a highly individualized (plaintiff-by-plaintiff) analysis to determine to what extent, *if any*, each plaintiff allegedly suffered any diminution in property value due to waste deposited by Olin.

Mr. Kerin admits that not all properties in the class have suffered the "identical" loss in value due to the discovery of contamination in the Newhall neighborhood.[40] Furthermore, Mr.

---

[38] *See* Docket No. 195; Plaintiffs' Memorandum in Support of Second Amended Motion for Class Certification at p. 17 (emphasis added).

[39] *See* Tab 9; Kerin Depo. at pp. 20 and 32.

[40] *See* Tab 9; Kerin Depo. at p. 109.

Kerin admits that many "different factors may impact to what extent, if any, a particular property owner has suffered or will suffer a loss in property value due to the discovery of contamination in the Newhall neighborhood."[41]  This point is highlighted in Mr. Kerin's expert report, where he states that:

> **The final, precise amount of loss will depend, among other things**, on the final remedy selected by the Department of Environmental Protection, whether residual contamination is left on these properties, and whether they are burdened, as currently planned, with Environmental Land Use Restrictions.[42]

By definition, resolution of the foregoing factors, among others, would require a highly individualized analysis that is not susceptible to class treatment.  Indeed, Mr. Kerin admits that to properly pursue his proposed "paired-sales" analysis, he would have to undertake, among other things, the following steps:

- He would have to "inspect" each property;

- It "would be prudent to inspect the exterior of the properties";

- To get a precise amount of alleged diminution in property value, he would have to "take into consideration the interior condition" of each property;

- He would have to take into consideration "the knowledge by a prospective buyer with respect to the extent of contamination," since that "impacts to what extent there has been any loss in property value to the seller"; and

- He would have "to take into consideration the status of any remediation at any point in time when a transaction takes place."[43]

---

[41] *See* Tab 9; Kerin Depo. at pp. 109-110.

[42] *See* Tab 9; Kerin's Expert Report at ¶ 10 (emphasis added).

[43] *See* Tab 9; Kerin Depo. at pp. 25; 27; 102; 114-115; and 123-124.

As a result, Mr. Kerin admits that his proposed paired-sale analysis would require a "very individualized analysis" that is not susceptible to class treatment:

> Q. …. -- bottom line to make the paired-sales analysis work, you'd have to find similar properties that take into account all the factors that you identified before that are relevant for a value of that single-family property, correct?
> A. Yes.
> Q. **And that's going to be a <u>very individualized analysis</u> trying to find similar properties that have these similar characteristics, correct?**
> Mr. Rainer:  Objection.
> A. **For the paired sales, yes**.[44]

Testimony adduced in this case supports this conclusion. First, it is undisputed that putative class members believe that they have suffered varying amounts in alleged diminution in property values.[45] Second, some putative class members claim that their alleged diminution in property values would remain the same despite any future remediation, while others admit that property values would increase after remediation is completed.[46]

Third, testimony by putative class members demonstrates that the timing of the sale of a property and the purchaser's knowledge concerning the presence of contamination in the Newhall neighborhood would directly impact to what extent, *if any*, each plaintiff allegedly suffered any diminution in property value damages. The sale of the property owned by Joseph Frasier (the president of the Newhall Coalition) to Marc Perry (a putative class representative) is instructive.

---

[44] *See* Tab 9; Kerin Depo. at pp. 20 and 32.

[45] *Compare* Tab 3; Matthew Abraham Depo. at p. 81 (testifying that his property has allegedly lost 20 to 25 percent of its value due to contamination) with Tab 12; Elias Rochester Depo. at p. 63 (testifying that his property has allegedly lost between 30 to 50 percent of its value due to contamination).

[46] *Compare* Tab 7; Donna Lee Johnson Depo. at p. 117 (testifying that her property value would increase if contamination is cleaned up); Tab 11; Sonia Powell Depo. at pp. 157-58 (same) with Tab 12; Elias Rochester Depo. at p. 63 (testifying that his property value would not necessarily go up if contamination concerns are addressed); Tab 14; Eugalyn Wilson Depo. at pp. 139-40 (testifying that regardless of any proposed remediation, there "is always going to be stigma in the neighborhood").

In May 2002, Joseph Frasier and his wife decided to put their house located at 46 Wadsworth on the market, so they could move to Charleston, South Carolina.[47] They sought $159,900 for their house.[48] Shortly thereafter, on May 29, 2002, Marc Perry obtained an appraisal on the property.[49] In relevant part, the appraiser's report stated:

> The subject neighborhood is currently undergoing environmental testing to determine the extent of subsoil contamination as a result of a nearby industrial waste disposal area. While a remediation plan is not yet in place, there is no market evidence to date of adverse impact.[50]

Significantly, despite the presence of contamination in the Newhall neighborhood, the appraiser concluded that the property was worth $170,000 – $10,100 more than the asking price sought by the Joseph Frasier and his wife.[51]

Marc Perry purchased the property for $159,900.[52] In so doing, Mr. Perry admitted that he had full knowledge of the information disclosed in the appraiser's report regarding the presence of contamination in the Newhall neighborhood, and that such information was a "factor" in his decision to purchase the property.[53] Nonetheless, Mr. Perry still claims that "[b]ecause of the contamination in the Newhall neighborhood I believe my property is worth at least 40 to $45,000 less than other comparable properties in Hamden."[54]

Any such alleged damages are doubtful, at best. At his deposition, Joseph Frasier testified that *but for* the presence of contamination, he would have asked more for his property:

---

[47] *See* Tab 5; Joseph Frasier Depo. at p. 157.

[48] *Id.*

[49] *See* Tab 16; Depo. Ex. 1B.

[50] *Id.* at Bates # 796.

[51] *Id.* at Bates # 794.

[52] *See* Tab 10; Marc Perry Depo. at pp. 40-41.

[53] *See* Tab 10; Marc Perry Depo. at pp. 36-37; *id.* at pp. 41-43.

[54] *Id.* at pp. 43-44 (quoting Marc Perry's Supplemental Interrogatory Response).

> Q. Do you believe that the fact that contamination had been discovered in the Hamden neighborhood played a part in how you set the price for your house?
>
> A. Yes, it did –
>
> Q. Am I correct –
>
> A. -- in my opinion.
>
> Q. Am I correct that the presence of contamination caused you to ask less for your house than you otherwise, you believe you would have been able to ask for it, correct?
>
> A. In my opinion, yes.[55]

As a result, Mr. Perry could not suffer any alleged diminution in property value damages because the price he paid for the property *already* took into consideration the presence of contamination. Moreover, to the extent Mr. Perry would sell his property after the proposed remediation is completed, any alleged diminution in property value would likely be eliminated. In fact, based on the timing of his purchase (with full knowledge of the contamination) and the timing of a future sale of his property, Mr. Perry could potentially incur a financial gain due to the presence of contamination in the Newhall neighborhood.

The foregoing example illustrates the highly fact-intensive analysis that the Court would have to undertake to determine to what extent, *if any*, each plaintiff allegedly suffered any diminution in property value damages. Thus, for all these reasons, individual issues predominate with respect to Plaintiffs' alleged damages. This conclusion further militates against class certification because:

> Assuming causation is proved, each plaintiff must prove entitlement to damages. The measure of damages is depended almost exclusively on individual factors…. [A]ll medical damages (mental anguish …) require proof of individual injury. Other damages, such as … diminution in property value, loss of use and enjoyment, and annoyance, would also require individualized proof. This would start hundreds or thousands of individual mini-trials on complex causation and damages issues, while the only benefit of a class would be that the ruling of several common, but not particularly daunting issues, would be made applicable to the entire class. The Court does not believe that result is consistent with the language or spirit of Rule 23(b)(3)(C), (D). Since the Court finds that a class is

---

[55] *See* Tab 5; Joseph Frasier Depo. at p. 163.

not superior, or even desirable mechanism in this case, plaintiffs' argument that the class should be certified under Rule 23(b)(3) is rejected.

*Thomas*, 846 F. Supp. at 1404-05.

The same holds true here.  Resolution of Plaintiffs' claims for infliction of emotional distress, nuisance and negligence would require hundreds of individual mini-trials on complex causation, statute of limitations, and damages issues.  Such a result is not consistent with the language or spirit of Rule 23(b)(3) and, therefore, Plaintiffs' argument that the class should be certified should be rejected.

## <u>CONCLUSION</u>

For all these reasons, Olin respectfully requests that the Court deny Plaintiffs' Third Amended Motion for Class Certification, and grant such other relief as the Court deems just and proper.

Respectfully submitted,


HUSCH & EPPENBERGER, LLC



By:  _/s/ Michael H. Wetmore_
       Michael H. Wetmore (ct24899)
       Joel B. Samson (ct24898)
       Omri E. Praiss (ECF registration pending)
       190 Carondelet Plaza, Suite 600
       St. Louis, Missouri 63105
       Telephone: 314-480-1500
       Fax: 314-480-1505
       michael.wetmore@husch.com
       joel.samson@husch.com
       omri.praiss@husch.com


and

BROWN RUDNICK BERLACK ISRAELS LLP
       Mark S. Baldwin, Esq.
       185 Asylum St.
       CityPlace I, 38th Floor
       Hartford, CT  06103
       Telephone: 860-509-6500
       Fax: 860-509-6501
       mbaldwin@brownrudnick.com


**_Attorneys for Defendant Olin Corporation_**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the attorneys of record registered for the Court's ECF system (as reflected by the email addresses shown below) or by mailing the same, first class mail, postage prepaid, to the non-participants in the Court's ECF system, on this 29th day of June, 2007.

| | |
|---|---|
| Neil T. Leifer, Esq.<br>Brad J. Mitchell, Esq.<br>Thornton & Naumes L.L.P.<br>100 Summer Street, 30th Floor<br>Boston, Massachusetts 02110<br>Telephone: (617) 720-1333<br>Facsimile: (617) 720-2445<br>nleifer@tenlaw.com<br>bmitchell@tenlaw.com<br><br>Monte E. Frank, Esq.<br>Cohen and Wolf, PC<br>158 Deer Hill Avenue<br>Danbury, CT 06810<br>Telephone: (203) 367-6202<br>Facsimile: (203) 791-8149<br>mfrank@cohenandwolf.com<br><br>David B. Zabel, Esq.<br>Cohen and Wolf, PC<br>1115 Broad Street<br>Bridgeport, Connecticut 06604<br>Telephone: (203) 368-0211<br>Facsimile: (203) 394-9901<br>aclark@cohenandwolf.com<br>dzabel@cohenandwolf.com<br>pgoodman@cohenandwolf.com | Mark Roberts, Esq.<br>Andrew A. Rainer, Esq.<br>McRoberts , Roberts & Rainer, LLP<br>53 State St.<br>Boston, MA 02114<br>Telephone: (617) 722-8222<br>Facsimile: (617) 720-2320<br>mroberts@mcrobertslaw.com<br>arainer@mcrobertslaw.com<br><br>***Attorneys for Plaintiff*** |

*/s/ Carrie Hartnett*