IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CLARENCE COLLINS, JR., et al | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| OLIN CORPORATION | ) |
| | ) |
| Defendant | ) |
| | ) |

### EXPERT REPORT OF KENNETH E. CICHON

I am a degreed Geologist who has practiced as an environmental professional within the State of Connecticut since 1975. My qualifications are presented in the attached resume.

The Defendant's counsel has engaged me to render an expert opinion in this case, specifically with respect to the Plaintiffs' Third Amended Motion for Class Certification, Exhibit B, Contaminated Properties Subclass. I have been asked whether, based on the available record, an individualized inquiry would be necessary to establish to what extent, if any, each of the 56 properties in the Contaminated Properties Subclass have been impaired by fill attributable to Winchester Repeating Arms.[1]

### SUMMARY CONCLUSIONS

Based upon my knowledge of the investigations conducted within the Non-Public Properties Study (NPP) Area of Hamden, which includes 50 of the 56 properties in the Contaminated Properties Subclass, and my review of selected documents, I have reached the following conclusions:

- There exists considerable variability in the occurrence of fill types throughout the Contaminated Properties Subclass;
- Fill of any type in the Contaminated Properties Subclass, regardless of source, has a high probability of exceeding an applicable CTDEP RSR criterion for one or more Substance of Concern;
- There are insufficient test data to conclude what type of fill material is present in each property of the Contaminated Property Subclass and to what extent, if any, such fill is attributable to Winchester Repeating Arms; and

---

[1] For the purposes of this report I have not attempted to distinguish between fill which may have been placed by Winchester Repeating Arms before or after 1932.

- It would be necessary to collect and analyze additional data with respect to each property in the Contaminated Property Subclass to determine to what extent, if any, contamination present on each property is attributable to Winchester Repeating Arms versus other sources.

## BACKGROUND

Exhibit B to the Plaintiffs' Third Amended Motion for Class Certification lists 56 property addresses which comprise the Contaminated Properties Subclass. These properties are shown on the attached Exhibit 1, occupy all or portions of four blocks, and are described as follows:

- 16 properties bounded by Newhall Street to the west, Newbury Street and Rochford Field to the North, Winchester Avenue to the east, and Morse Street to the south. Comprising all of the block except four parcels at the southeast corner of the block. (Block E);
- 12 properties bounded by Winchester Avenue to the West, Mill Rock Park to the North, Wadsworth Street to the East, and Bryden Terrace to the South. Comprising all residential properties of the block. (Block C);
- 22 properties bounded by Winchester Avenue to the West, Bryden Terrace to the North, Wadsworth Street to the East, and Morse Street to the South. Comprising all of the properties within the block. (Block F); and
- 6 properties comprising a portion of the block bounded by Wadsworth Street to the West and Bryden Terrace to the South. (No block designation)

The first 50 properties lie within the Non-Public Properties (NPP) Study Area subject to Olin Corporation's investigations and the parenthetical block designations refer to the environmental data management system for their investigation. The later 6 properties lie outside of the boundary of the NPP Study Area and were not subject to investigations by Olin.

In the course of my professional employment with Malcolm Pirnie, Inc. and my capacity as Project Manager for Olin Corporation's investigation of the NPP Study Area I have developed an ongoing familiarity with project documentation produced by Olin Corporation as well as the other Respondents and the CT Department of Environmental Protection (CTDEP). In preparing this report I have drawn upon this familiarity with the record and have reviewed selected documents as needed. Where appropriate, specific references for data or information cited have been provided.

With respect to the questions posed regarding degree of impairment and characterization, four basic questions are relevant:

1. Is the fill present on the properties similar in texture and source?;
2. Does the fill exhibit similar chemical characteristics, particularly with respect to exceedence of applicable criteria of the CTDEP Remediation Standard Regulations (RSR)?;

3. Have all properties undergone equivalent characterization?; and
4. Can one reasonably conclude with a high degree of certainty that equivalent conditions with respect to the fill prevail throughout the Subclass and to what extent, if any, Winchester Repeating Arms contributed to the material in place on each property?

## FILL CLASSIFICATION

Malcolm Pirnie, Inc. (*Supplemental Investigation Work Plan, Non-Public Properties Study Area*, Revised January 2004) described three types of fill material found in soil borings performed within the Study Area. These are described as follows in text excerpted from the referenced document:

> "Disturbed Soil Fill - Fill composed primarily of reworked natural soil. It may have been reworked locally or brought in from another location. It may contain minor or trace commingled proportions of brick, ceramics, concrete, asphalt paving fragments, and miscellaneous refuse such as wood debris, metal, or glass. This description is based on texture and the absence of other fill indicators, and does not imply that substance concentrations meet the RSR in all cases.
>
> Refuse Fill - Fill composed primarily of commingled articles such as wood (e.g. construction and demolition debris), metals, glass, ceramics, papers and cardboard, dishware, leather goods, bottles, cinders, paint chips, roof shingles, margarine containers and newspapers. Also may contain white to gray ash from the combustion of these articles and minor commingled proportions of reworked soil and rock, and ash, slag, and cinders. The key distinction is that it contains differing discarded and/or incinerated manufactured items but implies no specific source(s) for the items observed such as residential versus industrial/commercial. This type of fill is similar to municipal solid waste.
>
> Waste Fill - Fill composed primarily of typically black ash, slag, cinders, coal and/or coke, or a discrete, identifiable waste product item in quantity (such as wood chips or batteries). It may contain a significant refuse fraction and/or minor commingled proportions of soil and rock. The key distinction is that it consists of materials disposed in quantity, indicative of a waste byproduct from a single source or source(s) that contributed loads, of discrete materials."

Leggette, Brashears & Graham the consultant for the South Central Connecticut Regional Water Authority, Respondent for the Newhall School property, concluded there were four types of material present within their study area (*Supplemental Scope Of Study, Phase III Environmental Site Investigation*, April, 2004). These were listed as

1) Black matrix fill/industrial waste,
2) Construction debris,
3) Domestic/municipal waste, and

4) Non-fill

As described by LBG "The nomenclature "non-fill" includes materials such identified as the soil cap and underlying native materials, thus natural constituents, only."

Haley & Aldrich, Inc. the Consultant for the Town of Hamden, Respondent for Rochford Field and Mill Rock Park, similarly concluded there were three types of fill material present within their study area (*Report on Phase II and III Environmental Investigations, Rochford Field and Mill Rock Park*, Hamden, Connecticut, December 2002).

Haley & Aldrich listed these fill materials as

1) Earthen fill,
2) Domestic refuse fill, and
3) Industrial waste fill

All three investigators, operating independently, reached similar conclusions regarding the type of fill material present within their respective study area. They discriminated fill type based on the site sampling and separated it into three (or four) broad and roughly equivalent types of material with associated likely sources of origin. All investigators characterized the (industrial) waste fill as to include material which may contain artifacts typical of or attributable to Winchester's products or manufacturing processes. By comparison, the refuse fill and soil fill are not attributable to Winchester and are typical of generic or municipal solid waste sources. It can reasonably be concluded that such classification reflects actual field conditions that can be reliably ascertained by experienced personnel.

Malcolm Pirnie, Inc. determined based on their review of soil boring and test hole logs the approximate percentage of each fill material type encountered at each sample location within the NPP Study Area. These data were presented as pie charts in their report (*Supplemental Investigation Report & Remedial Action Plan*, Non-Public Properties Study Area, Hamden, Connecticut, Sheet 2 of 10, March 2005) and included the area containing 50 of the 56 Contaminated Subclass properties.

Based on the available data, the fill type classifications show wide variability throughout the Contaminated Properties Subclass for the parcels tested. Individual borings display any combination of fill types from 100% of any single fill type to combinations of any two, or all three, fill types. Further, where numbers of samples are sufficient to establish an overall character for densely sample areas, there appear to be areas where individual fill types predominate.

Throughout the area of Blocks C and F, refuse fill predominates. This is particularly evident in Block C, the properties on the north side of Bryden Terrace backing on Mill Rock Park. This block was subjected to a relatively distributed boring plan and absent any clusters of borings that would bias results to localized area(s). This is a subjective observation and not intended to imply that the block was subjected to a systematic sampling plan that was specifically designed to achieve characterization of the area sampled to a specific confidence level. In this block of 12

4

properties, a total of 17 borings, including CTDEP borings in the adjacent ROW, were characterized for fill type. Of these 17 borings, 11 exhibited refuse fill at 50% or greater, 5 exhibited disturbed soil fill at 50% or greater, and 3 exhibited waste fill at 50% or greater. Waste fill was present in detectable amounts in only 6 of the 17 borings. It follows that in the remaining 11 borings no fill material is present that can be attributed to Winchester Repeating Arms.

In Block E data for the area between 1030 Winchester Avenue and 499 Newhall Street show the potential local variability of fill type. 1030 Winchester Avenue had 3 soil borings logged for waste type. Additional borings, many of which penetrated native soils, were conducted for perimeter delineation since this property contains an occurrence of isolated fill. All borings in the fill were 100% disturbed soil fill which is not attributable to Winchester Repeating Arms. Transiting a few hundred feet to the west, passing through several properties and an area logged as principally disturbed soil fill, is 499 Newhall Street where waste fill predominates. Based on four borings and test pits at this address, fill varies from mostly refuse fill with a trace of disturbed soil at one location to approximately 75% waste fill and 25% disturbed soil at three locations.

This general area in Block E was subject to a relatively high density of sampling and fill characterization compared to other areas within the Contaminated Properties Subclass and the previous example at Bryden Terrace. Over a contiguous area of about 6 parcels, some 20 borings and test pits were characterized for fill type. Based on these data and their density of sampling, one can reasonably conclude that fill varies from principally or exclusively disturbed soil at the eastern limit of the area coincident with 1030 Winchester Avenue and transitions over a distance of about 300 feet to principally waste fill at 499 Newhall Street.

In summary, the fill type descriptions show that fill type varies throughout the area of the Contaminated Properties Subclass. In areas where the sampling density is sufficient or the boring locations are relatively evenly distributed, one may reliably conclude that certain fill types predominate. In areas shown to be refuse and/or disturbed soil fill, these materials are not attributable to Winchester Repeating Arms. In other areas, the data are insufficient to reach any conclusion. The existence of areas where certain fill types predominate is consistent with the record which documents that dumping was regulated and that the town controlled where items were placed within the dump (*New Haven Register*, July 29, 1935).

## SUBSTANCES OF CONCERN

The Malcolm Pirnie, Inc. investigations identify the following principal Substances of Concern (SOC) for the entire NPP Study Area:

- 15 metals (as typified by lead and arsenic)
- Extractable Total Petroleum Hydrocarbons (ETPH)
- Polyaromatic hydrocarbons (PAH, as typified by benzo(a)pyrene)

One of the stated data quality objectives for the investigation was that the analytical data be sufficient for "determining the range of SOC concentrations in fill" (*Supplemental Investigation Report & Remedial Action Plan, Non-Public Properties Study Area, Hamden, Connecticut*, Malcolm Pirnie, Inc., March 2005). These concentrations were compared to the appropriate remedial criteria established in the CTDEP Remediation Standard Regulations (RSR). To accomplish the stated objective, all available data were compiled for fill of any type located within contiguous areas of filling. Within each of these areas of fill the range of concentrations exhibited, and frequency of concentrations exceeding RSR criteria, were established. Fill types were not discriminated in these evaluations and the individual ranges of SOC concentrations within each fill type, or frequency of samples exceeding RSR criteria, were not presented.

The Bryden Terrace (fill) Area described by Pirnie in the previously cited report generally coincides with the 34 Contaminated Properties in Blocks C and F. The Newhall Street (fill) Area includes 8 Contaminated Properties in the western half of Block E within a larger area of fill. Pirnie notes that in the Bryden Terrace Fill Area "The comparatively large number of samples exceeding the benzo(a) pyrene and other PAH criteria in this area relative to the other contiguous fill areas is apparently related to the burning of refuse that occurred here." It may reasonably be concluded from the PAH data that there is a fundamental difference in chemical quality of the fill between the properties located in the Bryden Terrace area and the properties located in the Newhall Street area

It may be reasonably concluded from the data for the entire site, that any fill material entails a high degree of probability that one or more SOC would exceed an applicable RSR criteria. Lead and arsenic in particular are elevated throughout the fill. The SOCs, while associated with the fill, are not unique to fill, or solely attributable to Winchester Repeating Arms. Lead and arsenic were widely used in industry and in consumer products throughout the 20th century. Lead was famously used as pigment in paint and gasoline additive and arsenic in inorganic pesticides. ETPH is associated with fossil fuels, coal debris, and oil historically used for mosquito control on areas of standing water. PAHs are combustion byproducts and associated with ash and atmospheric releases. The presence of a SOC within the fill matrix, particularly at depth, strongly indicates that the SOC is intrinsic to the fill. However, the presence of a SOC in surface soils or native soils removed from the fill may indicate a different source or release mechanism. By example, the USEPA determined that elevated lead levels in surface soil at 481 Newhall Street, located across Morse Street from Block E, was attributable to lead paint residue and the property was not subject to a removal action (Meg Harvey, CTDPH, memorandum dated June 14, 2001).

In their present form, the analytical database and evaluations are structured to be broad-based. The data quality objective of the investigation was to characterize the range of SOC concentrations in fill. Except for any distinctions which are evident among the major fill areas throughout the entire NPP study area, the existing data are generally insufficient to support comparison and distinctions among fill types on a smaller scale, such as among individual lots within the Contaminated Properties Subclass.

## DEGREE OF CHARACTERIZATION

There is a general absence of comparable sampling and analyses on a lot-by-lot basis. This is the result of the data quality objectives for the characterization investigations as noted above. All fill was considered generally equivalent with respect to its potential to exceed one or more RSR criteria. Subsurface characterization was directed toward determining the presence, overall areal extent, and thickness of fill. Malcolm Pirnie, Inc. noted in their discussion of data quality objectives that "The areas of contiguous fill are understood well enough to predict which parcels lay completely within them even if not previously investigated,...Only the edge of fill must be mapped on a parcel-specific scale so that the degree of contiguous fill on any given parcel can be predicted...." (*Supplemental Investigation Report & Remedial Action Plan, Non-Public Properties Study Area, Hamden, Connecticut*, Malcolm Pirnie, Inc., March 2005).

Within the Contaminated Properties Subclass of the NPP Study Area the following distribution of borings and test pits locations are available for subsurface characterization:

|                               | Block C | Block E | Block F | Total |
|-------------------------------|---------|---------|---------|-------|
| **Total Lots**                | 12      | 16      | 22      | 50    |
| **Lots with Two to Six Locations** | 3   | 8       | 9       | 20    |
| **Lots with a Single Location** | 7     | 5       | 5       | 17    |
| **Lots with No Pit or Boring** | 2      | 3       | 8       | 13    |

Notes:
1) Excludes the CTDEP ROW borings, by definition are not within a private parcel.
2) Excludes surface soil samples associated with the USEPA removal action
3) None of the 6 Contaminated Properties Subclass outside of the NPP Study Area have been subject to characterization under these investigation protocols
4) Source of boring count: *Supplemental Investigation Report & Remedial Action Plan, Non-Public Properties Study Area, Hamden, Connecticut*, Malcolm Pirnie, Inc., March 2005, Sheet 2 of 10.

The above table shows that the information available for subsurface characterization varies widely throughout the area of the Contaminated Properties Subclass. Of the 50 properties within the Study Area, 13 (26%) have not been subject to direct characterization of subsurface conditions at even a single location. Seventeen properties (34%) have one boring or test pit, and 20 (40%) have from 2 to 6 borings and test pits. Where multiple borings or test pits are available within a single lot area, variability in the type of fill present is often demonstrated. Although the data are sufficient to conclude that fill is present throughout the area, one cannot reasonably conclude on a lot-by-lot basis, with an equal degree of confidence, what type of fill exists within any individual lot. Given the limited characterization data for many lots in the Subclass, it is impossible to determine to what extent, if any, Winchester Repeating Arms contributed to the material in place on the individual lots without additional sampling. It is likely, given the results

in areas already subject to more intensive characterization, that similar variability in fill type and presumed source(s) would be shown.

*[signature: Kenneth E. Cichon]*

Kenneth E. Cichon

DATED: May 17, 2007