IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT


No. 3:03-CV-945(CFD)

CLARENCE COLLINS, JR., ET AL

VS

OLIN CORPORATION                    **ORIGINAL**


          Deposition of:  **MICHAEL E. HOPKINS**, taken

pursuant to Rule 30 of the Federal Rules of Civil

Procedure before Barbara L. Murphy, Licensed Shorthand

Reporter, License No. 305 and Notary Public within and

for the state of Connecticut, held at the offices of

Brown, Rudnick, Berlack, Israels, 185 Asylum Street,

Hartford, Connecticut on June 12, 2007 commencing at

10:45 a.m.

DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE
MADISON, CT 06443
(203)245-9583
(203)245-2760

STAMFORD              HARTFORD              NEW HAVEN

**DEL VECCHIO REPORTING SERVICES, LLC**

1    investigation answered concerns that you had raised to

2    the DEP about data gaps?

3        A.    Not all of them.

4        Q.    Which concerns did you still have after

5    Malcolm Pirnie's supplemental investigation?

6        A.    In general I think still the issue was that

7    there were areas in which more sampling was still

8    needed to fully delineate the extent of the fill.

9             I don't know that -- most of the comments

10   that I had made prior, you know, a number of them were

11   suggesting that additional -- that additional sampling

12   beyond what was proposed in the work plan was still

13   necessary.

14            And I think essentially what was done --

15   I mean I think there was some additions to the work

16   plan but it didn't incorporate everything that I

17   suggested should have been incorporated in the work.

18       Q.    If I understand you correctly, while

19   additional sampling was done, it wasn't sufficient to

20   address all of your concerns about the data gaps that

21   you believe were present with respect to the extent of

22   fill in the study area?

23       A.    That's correct.

24       Q.    Okay.  As of today do you believe that there

25   has been sufficient testing -- strike that.

**DEL VECCHIO REPORTING SERVICES, LLC**

1              As of today do you believe that

2     additional sampling is still necessary to determine --

3     to fully delineate the extent of fill in the study

4     area?

5              MR. RAINER:  Objection.  You may

6     answer.

7              THE WITNESS:  Yes, I do.

8     BY MR. PRAISS:

9        Q.    And that would include sampling on specific

10    properties, correct?

11       A.    That's correct.

12       Q.    My last question I think was a little

13    awkward so I'm just going to ask it again.

14              I want to make sure I'm correct that as

15    of today it's your position that additional sampling

16    is necessary in the study area to fully delineate the

17    extent of the fill; is that correct?

18              MR. RAINER:  Objection.  You may

19    answer.

20              THE WITNESS:  I guess my -- as far as

21    the question is study area.  Study area being the area

22    studied by Malcolm Pirnie in the supplemental

23    investigation?

24    BY MR. PRAISS:

25       Q.    The study area used in your expert report?

**DEL VECCHIO REPORTING SERVICES, LLC**

1        A.    In my report?

2        Q.    Yeah.

3        A.    Okay.    That's not the context I was using

4    that or assuming that you meant by that.

5              If you -- in the majority of -- in terms

6    of determining the extent of the fill itself with the

7    exception of a couple of individual lots, I do believe

8    that there is sufficient data to, you know, say beyond

9    a shadow of a doubt, that there is fill on those

10   properties.

11       Q.    Sir, I want to make sure I understand why

12   you're changing your position from what you testified

13   before.

14             What's the difference in the extent of

15   the study area I was referring before and what you're

16   referring to now?

17       A.    Well, Malcolm Pirnie looked at a much larger

18   area.    And at that point in time, you know, I reviewed

19   their report.    I was looking not just at the

20   properties that are -- a portion of the subject area

21   of this report but, you know, to an area that was

22   probably several times larger which was the area that

23   was incorporated in Malcolm Pirnie's initial

24   investigation and supplemental investigation.

25       Q.    Okay.    So focusing on the study area that's

**DEL VECCHIO REPORTING SERVICES, LLC**

1    the subject of your expert report, sir.

2              And my question to you is you identified

3    in '04 to the DEP a concern about the fact that there

4    was data gaps, correct?

5         A.    Correct.

6         Q.    Okay.  And my question is are there any data

7    gaps still present in your opinion with respect to the

8    study area as referenced in your expert report?

9         A.    The answer would be yes.

10        Q.    And additional sampling with respect to

11   those data gaps in the study area as used in your

12   expert report would be helpful to delineate the extent

13   of fill, correct?

14        A.    Yes.

15        Q.    Okay.  Now, let's go -- have you provided an

16   expert report in connection with a class certification

17   before?

18        A.    No.

19        Q.    Have you ever testified in connection with

20   any class certification motions?

21        A.    No.

22        Q.    In your expert report, Exhibit 528, you

23   indicate that you've not testified as an expert either

24   at a deposition or trial within the last four years,

25   correct?

**DEL VECCHIO REPORTING SERVICES, LLC**

1    BY MR. PRAISS:

2        Q.    Okay.    For example, since March of '07 when

3    you submitted this expert report have you amended it

4    in any way or supplemented it in any way in another

5    written document that I'm not aware of?

6        A.    No. There have been no written documents

7    since the date of this report.

8        Q.    Now, in connection with your engagement in

9    this case am I correct that you've not developed any

10   methodology that can be used to establish on a

11   class-wide basis to what extent each putative class

12   member suffered emotional distress?

13       A.    I have not addressed that issue at all.

14       Q.    In connection with your engagement in this

15   case am I correct that you have not developed any

16   methodology that can be used to establish on a

17   class-wide basis to what extent, if any, putative

18   class members suffered emotional distress from

19   contamination or from various other possible factors?

20       A.    No, I do not.

21       Q.    In connection with your engagement in this

22   case am I correct that you have not developed any

23   methodology that can be used to establish on a

24   class-wide basis the amount of any alleged damages

25   suffered by plaintiffs due to their alleged emotional

**DEL VECCHIO REPORTING SERVICES, LLC**

1   distress?

2       A.    No.

3       Q.    In connection with your engagement in this

4   case am I correct that you've not developed any

5   methodology that can be used to establish on a

6   class-wide basis the amount of any alleged damages

7   suffered by plaintiffs due the alleged loss of use and

8   enjoyment of their property?

9       A.    No.

10              MR. RAINER:  Objection.

11  BY MR. PRAISS:

12      Q.    In connection with your engagement in this

13  case am I correct that you've not developed any

14  methodology that can be used to establish on a

15  class-wide basis the amount of any alleged damages

16  suffered by plaintiffs due to alleged diminution in

17  value of their properties?

18      A.    No.

19      Q.    Okay.  And in connection with your

20  engagement in this case am I correct that you've not

21  developed any methodology that can be used to

22  establish on a class-wide basis to what extent

23  punitive class members knew or reasonably should have

24  known that contamination was present in the Newhall

25  neighborhood thereby allegedly causing them to suffer

94

1    somebody else created.  That's what you're asking in

2    that question.

3                    MR. PRAISS:  Can you answer my

4    question, sir?

5                    MR. RAINER:  Note my objection.

6                    THE WITNESS:  I'm going to have to ask

7    you to repeat it.  I lost track of it there.

8    BY MR. PRAISS:

9        Q.    With respect to the 13 properties in the

10   study area where there has been no sampling, am I

11   correct, sir, that to the extent additional testing

12   were done at those properties it may reveal the

13   presence of just disturbed soil?

14                   MR. RAINER:  Objection.

15                   THE WITNESS:  It could reveal the

16   presence of disturbed soil as again defined by Malcolm

17   Pirnie.

18   BY MR. PRAISS:

19       Q.    And to the extent it would reveal just 100

20   percent disturbed soil as defined by Malcolm Pirnie,

21   am I correct that you would have to undertake

22   additional investigation, analysis of that data before

23   you could draw any conclusions to what extent, if any,

24   that disturbed soil originated from Winchester,

25   correct?

**DEL VECCHIO REPORTING SERVICES, LLC**

1          MR. RAINER:  Objection.

2          THE WITNESS:  If I was provided with

3     just information that said it was disturbed soil, that

4     would not be enough information to speculate as to the

5     source.

6          So, you know, the question would be if

7     I had the information that was used to determine it

8     was disturbed soil, then I may or may not.  I'd have

9     to see the information to know.

10    BY MR. PRAISS:

11         Q.   But at a minimum you would need to look at

12    that data, correct, in order to draw a conclusion to

13    what extent the disturbed soil that may be found in

14    those locations originated from Winchester, correct?

15         MR. RAINER:  Objection.  You may

16    answer.

17         THE WITNESS:  I would need to see more

18    than just the fact it was disturbed soil to provide an

19    opinion as to the source.

20    BY MR. PRAISS:

21         Q.   So am I correct implicit in your answer is

22    sitting here today with respect to the 13 properties

23    in the study area where we have no sampling data,

24    you're not in a position to provide an expert opinion

25    to what extent any disturbed soil that may or may not

1   standard, doesn't say anything about whether or not --

2   you know, where they might have come from.

3              As far as the source of the material,

4   one of the things that you're looking at is just the

5   patterns of those contaminants in those and -- it has

6   nothing to do with the chemical analysis.

7              So the fact that they didn't exceed any

8   standards doesn't have anything to do with where they

9   may have come from.

10  BY MR. PRAISS:

11      Q.   Let's talk about those substances of concern

12  for a moment.  And maybe talk about each of them.  The

13  first one that's mentioned there is lead, correct?

14      A.   Yes.

15      Q.   Based on your expertise what are all the

16  sources o possible sources of lead?

17      A.   I don't know you can name all the possible

18  sources of lead but there are -- lead can come from a

19  variety of industrial processes; smelting foundry

20  operations, machine operations, metal working

21  operations, painting.

22              Other such things.  Lead can come from --

23  lead is inherent in dozens of consumer products.  Lead

24  is inherent in things like -- at that point in time it

25  was common in motor oil.  Lead was -- actually this

1    probably predates leaded gasoline to some extent.

2              But as far as the dates of the filling,

3    leaded gasoline, lead concentrations in soils in

4    various locations.  There are probably lots of other

5    potential sources.

6         Q.   To the extent lead is present in any

7    particular sample in the study area, have you done any

8    analysis that lets you determine to a reasonable

9    degree of engineering certainty that that lead

10   originated from Winchester rather than some of the

11   other sources you identified?

12        A.   Lead is itself an element.  So you really

13   can't determine the source just based on the presence

14   of lead alone.  That in and of itself is not

15   sufficient.

16        Q.   I appreciate the explanation.  I want to

17   make sure I get an answer to my question.

18             To date have you undertaken any analysis

19   that allows you to provide an expert opinion to a

20   reasonable degree of engineering certainty that to the

21   extent lead is present in any sample in the study

22   area, that it originates from Winchester versus the

23   other potential sources that you've identified?

24             MR. RAINER:  Objection.  His answer was

25   responsive to your question.  You may answer it again.

**DEL VECCHIO REPORTING SERVICES, LLC**

113

1          THE WITNESS:  In general you can't look

2    at the lead and just say based on looking at the lead

3    as to what the source of that lead is.

4          Now, the lead is part of a larger

5    chemical profile.  There are other compounds there,

6    somewhat the composition -- the combinations and

7    proportions of those compounds give you some

8    indication of where it came from.

9          But so just based on lead alone, I

10   cannot say anything about where it came from.

11   BY MR. PRAISS:

12      Q.    Okay.  Second substance of concern is

13   arsenic, correct?

14      A.    Yes.

15      Q.    During the time period 1930s to 1940s based

16   on your expertise what are the possible sources OF

17   arsenic?

18      A.    There really aren't a lot of artificial

19   sources of arsenic in general.  Where arsenic

20   predominantly is found in the case of environmental

21   samples is usually with regard to the historic use of

22   lead arsenate pesticides.

23          There is no indication -- in particular

24   those were primarily used in orchards.  There is no

25   indication that orchards were ever present in this

**DEL VECCHIO REPORTING SERVICES, LLC**

114

1     area.

2              So I don't think that's likely to be the

3     source of the arsenic in this case.

4          Q.   You are familiar with a report prepared by

5     Haley and Aldrich, right?

6          A.   Yes.

7          Q.   Do you recall that they specifically

8     testified about sources of arsenic that may have been

9     present in the Hamden area?

10         A.   I don't recall that, no.

11              MR. PRAISS:   Let me refresh your

12    recollection.   Mark this as the next exhibit.

13                  **(Defendant's Exhibit No. 532, offered**

14                       **and marked.)**

15    BY MR. PRAISS:

16         Q.   I handed you what's been marked as Exhibit

17    532.

18              Are you familiar with this document?

19         A.   I've read this document.

20         Q.   Could you identify for the record the

21    document?

22         A.   It's entitled, "Report on ASTM Phase 1

23    Environmental Site Assessment, Hamden Middle School

24    and Surrounding Newhall Street Neighborhood, Hamden,

25    Connecticut by Haley and Aldrich January 2002.

**DEL VECCHIO REPORTING SERVICES, LLC**

115

1          Q.    This is, in fact, one of the documents you

2    relied on in support of your expert report, correct?

3          A.    Yes, it is.

4          Q.    Can you go to Page 30, please.  Do you see

5    in the middle of the page there is a paragraph talking

6    about the Connecticut Agricultural Experimental

7    Station?

8          A.    Yes.

9          Q.    Do you see in the middle of the page it says

10   according to the reports chemical spraying, spraying

11   with oil and draining and ditching were reported as

12   methods used in Connecticut to reduce mosquito

13   populations in the early 1900s?

14              Do you see that?

15         A.    Yes.

16         Q.    And it describes some of that process in the

17   next sentence.

18              Do you see that?

19         A.    Yes.

20         Q.    It specifically states, according to the

21   Agricultural Experiment Station reports lime sulfur

22   sprays may have also been used as fungicides and

23   chemicals containing lead arsenate may have been used

24   for mosquito control in the early 1900s, correct?

25         A.    Yes, that's what it says.

**DEL VECCHIO REPORTING SERVICES, LLC**

116

1      Q.    Does this refresh your recollection that

2    there is potentially -- that one source of that

3    arsenic in the study area may have originated from

4    spraying of fungicides in the early 1900s?

5                MR. RAINER:  Objection.

6                THE WITNESS:  In a case of arsenic in

7    general that may be true.  But I don't know of any

8    documentation that fungicides were applied in this

9    area.

10   BY MR. PRAISS:

11     Q.    Doesn't this paragraph say that according to

12   the report chemical spraying, spraying with oil and

13   draining and ditching were reported as methods used in

14   Connecticut to rid mosquito populations?

15                What other evidence are you looking for?

16     A.    Well, that's -- you don't use fungicides for

17   spraying mosquitos.

18     Q.    Would the spraying -- chemical spraying and

19   spraying with oil that's referenced in this paragraph

20   potentially be a source of arsenic -- lead arsenate?

21                MR. RAINER:  Objection.  You may

22   answer.

23                THE WITNESS:  I've never seen lead

24   arsenate used in that manner.  I do recognize that it

25   says that here.

**DEL VECCHIO REPORTING SERVICES, LLC**

1          But in general where I've come across

2     lead arsenate has been in terms of the spraying of

3     agriculture crops and primarily orchards.  I think

4     it's the only place I've ever seen it used.

5     BY MR. PRAISS:

6          Q.    Okay.  The next substance of concern that's

7     again referenced on Page 14 of your expert report is

8     ETPH, correct?

9          A.    Correct.

10         Q.    And that refers to extractable total

11    petroleum hydrocarbons?

12         A.    That's correct.

13         Q.    And in the 1930s and 1940s based on your

14    expertise can you identify potential sources of ETPHs?

15         A.    Essentially it's associated with all forms

16    of petroleum products.  It is a measure of the

17    concentration of petroleum hydrocarbons in the

18    material.

19              So heating oil would contain it, vehicle

20    fuel would contain it, lubricating oils would contain

21    it.  More or less any type of oil probably would

22    contain it.

23         Q.    And have you to date undertaken any analysis

24    with respect to samples from the study area that

25    permits you to provide expert testimony to what

118

1    extent, if any, fill in the study area that contains

2    ETPHs originated from Winchester as compared to other

3    sources?

4               MR. RAINER:  Objection.

5               THE WITNESS:  I guess the question is

6    have I performed any analysis of that?  I've attempted

7    to do that.

8    BY MR. PRAISS:

9        Q.   Is it your testimony to a reasonable degree

10   of engineering certainty that all the ETPHs present --

11   strike that.

12              Is it your position that to the extent

13   any ETPHs are present in a particular property in the

14   study area, that such ETPHs originated from Winchester

15   and not other sources?

16              MR. RAINER:  Objection.

17              THE WITNESS:  No. It's not my position.

18   BY MR. PRAISS:

19       Q.   Am I correct that you would have to

20   undertake additional investigation and analysis of the

21   particular samples in order to be able to draw any

22   conclusion about the origin of any such ETPHs?

23              MR. RAINER:  Objection.  That's not his

24   testimony so far.

25              MR. PRAISS:  I'm asking.

**DEL VECCHIO REPORTING SERVICES, LLC**

119

```
 1              THE WITNESS:   I think I have performed
 2    some of that analysis.
 3    BY MR. PRAISS:
 4         Q.    Are you in a position today based on the
 5    analysis that you've undertaken to testify that to the
 6    extent any ETPHs are present at each and any property
 7    in the study area, that such ETPHs originated from
 8    Winchester?
 9              MR. RAINER:   Objection.
10              THE WITNESS:   I would say that --
11    Winchester would be a potential source of some of
12    those compounds that are -- there are no doubt other
13    sources in any sampling anywhere.
14    BY MR. PRAISS:
15         Q.    What additional analysis, additional
16    sampling, additional investigation permits you to draw
17    -- to eliminate the other sources except Winchester as
18    the source?
19         A.    I think there are a couple things that go to
20    that.   No. 1, there was a sampling of the fill
21    performed.   There was also sampling of the soil above
22    and below the fill.
23              And ETPH, it was not prevalent anywhere,
24    I can't say it was not detected but definitely there
25    were much lower concentrations in the soil beneath the
```

**DEL VECCHIO REPORTING SERVICES, LLC**

1    fill and the soil above the fill which suggests No. 1,

2    that the ETPH probably was not present prior to the

3    placement of the fill.

4             And second of all, that the topsoil --

5    it's not inherent in that the use of the site --

6    certainly the concentrations on the surface soil are

7    lower than those in the fill which suggests it's not

8    something that happened after the placement of the

9    fill, it's associated with the ETPH or at least the

10   elevated concentrations of the ETPH.

11            The other way I looked at it was to

12   compare the ETPH concentrations in the fill in other

13   locations where it appears that Olin has placed but

14   primarily the middle school property.

15            And in general the ranges of

16   concentrations in the fill in the site area are

17   similar to those at some of the other locations

18   pertaining to the middle school location.

19       Q.   Is it your testimony then to a reasonable

20   degree of engineering certainty that to the extent

21   there is any ETPHs found in the study area, it

22   originated from Winchester rather than other sources?

23   I'm back to my question before.

24       A.   Any is the word I'm stuck on.  Potentially

25   there could be ETPHs from other sources; however, they

1    do seem to be higher in the fill in that they do seem

2    to be in the same range that was found in fill in

3    other locations.

4            So I guess the question is I personally

5    have not been the one to determine where the fill in

6    some of those other locations came from.

7        Q.    Let's talk a minute about the next substance

8    of concern, PAHs.

9        A.    Those are actually multiple substances.

10       Q.    So that refers to polyaromatic hydrocarbons,

11   correct?

12       A.    Yes, that's correct.

13       Q.    Based on your expertise back in the 1930s

14   and 1940s what are all the possible sources of PAHs?

15       A.    The primary -- there are actually three

16   primary sources of PAHs.  The first would be

17   combustion byproducts.  Combustion of almost any type

18   whether it be wood, coal.  Really anything that burns

19   will produce some PAHs.

20            Secondly, they are inherent in coal and

21   coal derivatives.  Coal tar compounds, that sort of

22   thing which would include things like tars, roofing

23   tars, asphalt materials.  Not true asphalt so much but

24   things that resemble asphalt and are used in a manner

25   like asphalt.

**DEL VECCHIO REPORTING SERVICES, LLC**

1          And lastly there are PAHs associated with

2    petroleum products.  There are other sources that are

3    -- I mean there are other sources but those would be

4    the primary ones.

5      Q.   Based on your analysis to date is it -- have

6    you reached an expert opinion to what extent, if any,

7    PAHs that are present in the study area originated

8    from Winchester versus some of the other sources that

9    you just identified?

10     A.   My answer would be very similar to the ETPH.

11   That the concentrations in the fill are definitely

12   higher than in the native soil which suggests they are

13   No. 1, associated with the fill.  Not associated with

14   other activities in the area.

15          Second of all, that the range of PAH

16   concentrations is very similar to the range of PAH

17   concentrations found at the middle school and other

18   locations where it's known or alleged that Winchester

19   placed waste.

20     Q.   Do you agree the mere fact that the presence

21   of a compound in similar ranges does not necessarily

22   indicate that it has to be from the same source, it

23   could just be that somebody else deposited something

24   else that contributed to that product in a sufficient

25   volume in that area?

1          MR. RAINER:  Is that a question?

2          MR. PRAISS:  Yeah.

3          MR. RAINER:  Does he realize it?

4          MR. PRAISS:  I'm asking do you agree

5    with that?

6          THE WITNESS:  The presence again of the

7    PAHs alone is not sufficient to draw a conclusion like

8    that.

9          Looking at the data in whole that there

10   are ranges for the lead, the arsenic, the PAHs, the

11   ETPH and then there are other compounds that would be

12   associated with a lot of other waste materials that

13   are not present in significant quantities in the

14   samples.

15         And then looking at things like

16   physical characteristics of the waste, some of the

17   other things that were observed and identified in the

18   waste and, you know, looking at all of that

19   collectively, the fill is certainly similar to fill

20   that, you know, that is known or suspected to have

21   come from the Winchester facility or Olin facility.

22         You know, it generally is impossible in

23   all cases to say with certainty unless you actually

24   saw somebody dump something there, that it absolutely

25   came from a given location.

**DEL VECCHIO REPORTING SERVICES, LLC**

1      Q.   Drawing your attention to Page 15 of your

2  report.  Focusing on the paragraph on the bottom, the

3  last full paragraph that starts with although

4  additional pockets.

5           Do you see that?

6      A.   Yes.

7      Q.   I want to make sure I understand what you're

8  stating in that paragraph.

9           You say first although additional pockets

10  of isolated fill may be present on the eastern portion

11  of Block E that have not yet been delineated or

12  sampled, the sampling data from areas E01, E02 are

13  assumed to be representative of fill pockets

14  throughout this area.

15           Did I read that correctly?

16      A.   That's correct.

17      Q.   You are making an assumption there, correct?

18      A.   Yes, I am.

19      Q.   The last part of the paragraph you state it

20  appears that the soil overlying and underlying the

21  fill was not sampled but the characteristics are

22  assumed again to be similar to the samples from the

23  adjoining area to the west, correct?

24      A.   Yes.

25      Q.   That's again an assumption you're making?

**DEL VECCHIO REPORTING SERVICES, LLC**

1    you to testify to a reasonable degree of scientific

2    certainty that to the extent artificial fill is known

3    or likely to be present beneath every lot in the study

4    area except for 155 and 161 Morse Street, that such

5    fill originated from Winchester?

6                    MR. RAINER:  Objection.

7                    THE WITNESS:  I don't think that I can

8    say that -- it's the originated from Winchester

9    portion of it that I don't think I can say that -- you

10   know, I don't know if additional testing would be able

11   to answer that question or not.

12   BY MR. PRAISS:

13       Q.   Sitting here today you're not in a position

14   to say within a reasonable degree of engineering

15   certainty to the extent there is fill in each and

16   every property in the study area that it originated

17   from Winchester, correct?

18       A.   With that originated from Winchester on

19   there, that would be correct.

20       Q.   Thank you.  Now, what sample boring log data

21   have you actually reviewed?

22            Do you have records that would show I

23   looked for the sample boring log for this property and

24   not this property?

25       A.   Essentially I looked at it in all cases

**DEL VECCHIO REPORTING SERVICES, LLC**

1                    C E R T I F I C A T E

2          I hereby certify that I am a Notary Public, in

3     and for the state of Connecticut, duly commissioned

4     and qualified to administer oaths.

5          I further certify that the deponent named in

6     the foregoing deposition was by me duly sworn, and

7     thereupon testified as appeared in the foregoing

8     deposition; that said deposition was taken by me

9     stenographically in the presence of counsel and

10    reduced to typewriting under my direction, and the

11    foregoing is a true and accurate transcript of the

12    testimony.

13         I further certify that I am neither of counsel

14    nor attorney to either of the parties to said suit,

15    nor am I an employee of either party to said suit, nor

16    of either counsel in said suit, nor am I interested in

17    the outcome of said cause.

18         Witness my hand and seal as Notary Public this

19    13th day of June, 2007.

20

21

22                    Barbara L. Murphy, LSR

23                    Notary Public

24

       My Commission Expires:
25     June 30, 2007

**DEL VECCHIO REPORTING SERVICES, LLC**