```
                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF CONNECTICUT


                                No. 3:03-CV-945(CFD)

   CLARENCE COLLINS, JR., ET AL

   VS                                    ORIG......

   OLIN CORPORATION


         Deposition of:  CHRISTOPHER K. KERIN, taken
   pursuant to Rule 30 of the Federal Rules of Civil
   Procedure before Barbara L. Murphy, Licensed Shorthand
   Reporter, License No. 305 and Notary Public within and
   for the state of Connecticut, held at the offices of
   Brown, Rudnick, Berlack, Israels, 185 Asylum Street,
   Hartford, Connecticut on June 13, 2007 commencing at
   8:35 a.m.




                  DEL VECCHIO REPORTING SERVICES, LLC
                     PROFESSIONAL SHORTHAND REPORTERS
                             117 RANDI DRIVE
                           MADISON, CT  06443
                             (203)245-9583
                             (203)245-2760

   STAMFORD              HARTFORD              NEW HAVEN
```

**DEL VECCHIO REPORTING SERVICES, LLC**

1  There is an area of open wetlands.
2      Q.    Does Augur Street continue in any direction?
3      A.    There is a street called Augur Street to the
4  east of Newhall Street which runs to Whitney Avenue.
5      Q.    Is that a continuation of this Augur Street?
6      A.    Yes, I think it is.
7      Q.    Why are the houses on the continuation of
8  Augur Street to the east not included as part of the
9  neighborhood?
10     A.    Because Newhall Street in my opinion formed
11 a boundary.  The area to the east in my opinion is a
12 different neighborhood due to the topography.
13     Q.    Okay.  Any other expert opinions other than
14 what's in your report and assisting Andrew Rainer in
15 defining the neighborhood that you were asked to
16 provide in this case?
17     A.    Not that I recall.
18     Q.    Okay.  Is it fair to say that your expert
19 report and the attached map include all of the expert
20 opinions that you've reached in this case?
21     A.    Yes.
22     Q.    Have you in any way amended your expert
23 report since March 23rd of 2007?
24     A.    No.
25     Q.    In connection with your engagement in this

1  case am I correct that you have not developed any
2  methodology that can be used to establish on a
3  class-wide basis to what extent each putative class
4  member suffered emotional distress?
5      A.   I have not.
6      Q.   In connection with your engagement in this
7  case am I correct that you have not developed any
8  methodology that can be used to establish on a
9  class-wide basis to what extent, if any, putative
10 class members suffered emotional distress from
11 contamination or from various other possible factors?
12     A.   I have not.
13     Q.   In connection with your engagement in this
14 case am I correct that you have not developed any
15 methodology that can be used to establish on a
16 class-wide basis to what extent any contamination in
17 the Newhall neighborhood can be attributed to Olin and
18 Winchester rather than other potential sources?
19     A.   I have not.
20     Q.   In connection with your engagement in this
21 case am I correct that you've not developed any
22 methodology that can be used to establish on a
23 class-wide basis to what extent putative class members
24 knew or reasonably should have known that
25 contamination was present in the Newhall neighborhood

```
 1   contamination had been discovered at the Hamden Middle
 2   School and some of the surrounding parks like Rochford
 3   Field and Mill Rock Park?
 4               MR. RAINER:  Objection.  You may
 5   answer.
 6               THE WITNESS:  My recollection is that
 7   it was approximately five to seven years ago where
 8   articles were first starting to come out regarding the
 9   contamination of the middle school and the park.
10   BY MR. PRAISS:
11        Q.   In connection with your engagement in this
12   case am I correct that you've not developed any
13   methodology that can be used to establish on a
14   class-wide basis the amount of any alleged damages the
15   plaintiffs claim they have suffered due to their
16   alleged emotional distress?
17        A.   I have not.
18        Q.   And in connection with your engagement in
19   this case am I correct that you've not developed any
20   methodology that can be used to establish on a
21   class-wide basis the amount of any alleged damages the
22   putative class members allege they've suffered due to
23   their alleged loss of use or enjoyment of their
24   properties?
25        A.   I would say that the use and enjoyment of
```

1                MR. PRAISS:  What a way to start the
2    day.
3    BY MR. PRAISS:
4        Q.   In connection with your engagement in the
5    case am I correct that you have not utilized a hedonic
6    price model based on multiple regression analysis
7    and/or other statistical methods to establish on a
8    class-wide basis the amount of any alleged damages
9    suffered by plaintiffs due to alleged diminution in
10   value of their properties?
11       A.   That's correct.
12       Q.   In connection with your engagement in the
13   case am I correct that you have not developed any
14   methodology that can be used to establish on a
15   class-wide basis the amount of any alleged damages
16   suffered by plaintiffs due to the alleged diminution
17   of value of their properties?
18       A.   My report relates to the diminution in the
19   value of their properties.
20       Q.   I understand your report relates to it but
21   am I correct there is nothing in your report, some
22   formula, some methodology that you've developed that
23   we can use to establish the exact amount of damages
24   that each putative class member allegedly suffered due
25   to loss of property value?

1  that you believe you developed that would allow you to
2  determine the alleged diminution of value for each
3  property?
4      A.   I just read it from the report but basically
5  it's a paired-sales methodology in which properties in
6  the neighborhood that sold are compared to similar
7  properties outside of the neighborhood that have sold.
8           And any -- and these properties are
9  compared and adjusted and any difference in value
10 would be attributable to their location in the
11 neighborhood.
12          And in this case the properties had
13 contamination, known contamination.
14     Q.   If I wanted to know today the loss in value
15 to a specific property, what steps would you have to
16 do under your methodology to determine it?
17          MR. RAINER:  Objection.  Asked and
18 answered.  You may answer.
19          THE WITNESS:  I would inspect the
20 property.  And then I would perform a paired-sales
21 analysis depending on the characteristics of that
22 property.
23 BY MR. PRAISS:
24     Q.   And that analysis would be required --
25 strike that.

1  to apply that to all the properties that share that
2  characteristic.
3  BY MR. PRAISS:
4      Q.  Would you have to inspect each property in
5  order to arrive at the amount of alleged diminution in
6  property value?
7      A.  I would not have to inspect the interior of
8  each property.  I have information on the land records
9  as to the descriptions of the properties.
10         The properties in this neighborhood were
11 built around -- they were built at different times but
12 there is no brand new colonial construction.  They're
13 are all pretty similar as far as size, lot size,
14 design.
15         So they could be put into categories and
16 I would not need to do interior inspections of each
17 individual property.  I have driven the neighborhood
18 and inspected the exterior.
19     Q.  Would you have to inspect the exteriors of
20 each property in order to arrive at the amount of the
21 alleged diminution of each property in the class?
22     A.  I think it would be prudent to inspect the
23 exterior of the properties, yes.
24     Q.  When were you engaged my plaintiffs'
25 counsel?

31

1 University of Connecticut, how many courses did you
2 take on statistics?
3    A.   I think there was one course on statistics.
4    Q.   Is this -- what year did you take that
5 course?  I'm referring to freshman, sophomore, junior
6 or senior year.
7    A.   Okay.  That makes it easy.  I think it was
8 approximately sophomore year.
9    Q.   Was this an introductory course to
10 statistics?
11    A.   I don't know the name.  It was a statistics
12 course.  It was all about statistics.
13    Q.   Have you ever taken any other courses
14 relating to statistics?
15    A.   Statistics is introduced into, you know,
16 appraisal courses here and there.  But specifically a
17 statistics course, that is the only one that I recall.
18    Q.   Do you consider yourself to be an expert in
19 statistical analysis?
20    A.   No.
21    Q.   Could you identify for me all the different
22 factors that you believe affect the value of a
23 single-family residence property?
24    A.   Location, physical characteristics of the
25 land such as topography, such as wetlands, shape,

**DEL VECCHIO REPORTING SERVICES, LLC**

1  looks at homes that are similar in square footage,
2  similar in lot size, similar in style, similar in age
3  and date of sale.
4          So those factors were considered. What
5  fell out of that was simply location. You are correct
6  though that to put a percentage on this, further
7  analysis is needed in which pairs are identified which
8  are -- taking in those considerations was value and
9  influencing factors more closely.
10 BY MR. PRAISS:
11     Q.  And, for example, you didn't take into
12 account the condition of the interior of the home as
13 to what extent it has been renovated, to what extent
14 it has a new roof and new appliances in your paired
15 analysis to be able to through multiple regression
16 analysis give an expert opinion today that the impact
17 due to alleged contamination is X excluding all other
18 factors; is that correct?
19         MR. RAINER: Objection, objection,
20 objection. You may answer.
21         THE WITNESS: Again, I'd give the same
22 answer I just gave. I didn't do a multiple
23 regression. My analysis did take into consideration
24 many of the physical characteristics of a property but
25 again to get that precise percentage, I would go

```
 1   further and take into consideration the interior
 2   condition of the property and the other factors that
 3   you mentioned.
 4   BY MR. PRAISS:
 5       Q.   Bottom line is you've not excluded all
 6   relevant factors that impact the price of the homes to
 7   provide today an expert opinion on what is the alleged
 8   diminution of property value due to contamination and
 9   only contamination; is that correct?
10              MR. RAINER:  Objection.  You may
11   answer.
12              THE WITNESS:  I've gone far enough to
13   exclude all the relevant characteristics of the home
14   that would significantly impact it.
15              I think the paired-sales analysis was
16   sufficient at this point for me to determine that
17   there is a loss in market value in this neighborhood
18   by virtue of its location and contamination of the
19   neighborhood.
20   BY MR. PRAISS:
21       Q.   Have you taken into account the things I
22   mentioned before?  I want to make sure I'm not missing
23   something here.
24              Have you taken into consideration the
25   improvements to the home in the interior in your
```

1           MR. PRAISS:  You're not allowed to
2  instruct the witness not to answer but I'll be doing
3  the same thing.  What's good for the goose is good for
4  the gander.
5           And when I don't like your questions
6  next week, I'm just going to say, you know, Ken, don't
7  answer that one.  We don't want to answer that one
8  because it's obnoxious.
9           It's inappropriate.  You're looking for
10 a clean answer.  I'm allowed to ask any question I
11 Goddamn want to with all due respect.  You're are just
12 wrong.
13          MR. RAINER:  Oh no, you are not.
14          MR. PRAISS:  But that's okay.
15 BY MR. PRAISS:
16     Q.   How many hours did you spend doing your
17 multiple list analysis, sir?
18     A.   I would estimate maybe twenty or 30 hours.
19     Q.   Would you agree that all properties in the
20 class have not suffered identical loss in value due to
21 the discovery of contamination in the Newhall
22 neighborhood?
23     A.   Yes.
24     Q.   Would you agree that different factors may
25 impact to what extent, if any, a particular property

```
 1   owner has suffered or will suffer a loss in property
 2   value due to the discovery of contamination in the
 3   Newhall neighborhood?
 4              MR. RAINER:  Objection.  Ambiguous.
 5   You may answer.
 6              THE WITNESS:  Yes.
 7   BY MR. PRAISS:
 8       Q.   Am I correct that you would have to take an
 9   individualized analysis to determine to what extent,
10   if any, each property owner from the class has
11   allegedly suffered or will suffer loss in property
12   value due to the discovery of contamination?
13              MR. RAINER:  Objection.  Asked and
14   answered twice.  You may answer again but not three
15   times though.
16              THE WITNESS:  No.
17   BY MR. PRAISS:
18       Q.   Are you familiar with the sale of property
19   from Mr. Joseph Frasier to Marc Perry?
20       A.   I'm not sure as far as the parties involved.
21   I may be familiar with the property by its location.
22       Q.   Did you read in preparation for your expert
23   report or your deposition today the deposition of
24   Mr. -- either Mr. Joe Frasier or Marc Perry?
25       A.   No.
```

**DEL VECCHIO REPORTING SERVICES, LLC**

1  sure -- strike that.
2         Am I correct then that the knowledge by a
3  prospective buyer with respect to the extent of
4  contamination impacts to what extent there has been
5  any loss in property value to the seller?
6     A.   That's correct.
7     Q.   Okay. If I heard you correctly, any changes
8  in the level of knowledge about the contamination in
9  the marketplace will also impact any subsequent
10 transactions potentially as well in terms of
11 diminution of property value, correct?
12    A.   It may.
13    Q.   Have you developed any methodology that
14 purports to establish on a class-wide basis what each
15 and every person knew at a particular time when they
16 decided to purchase the property in the Newhall
17 neighborhood with respect to the extent of
18 contamination in the neighborhood?
19         MR. RAINER:  Objection.
20         THE WITNESS:  The methodology that I
21 developed could be applied to different points in
22 time.  But I was not asked as of this time to apply it
23 as of different points in time.
24 BY MR. PRAISS:
25    Q.   But you agree with me that knowledge is

```
 1  relevant to determine potential impact on diminution
 2  of property, correct?
 3              MR. RAINER:  Objection.  You may
 4  answer.
 5              THE WITNESS:  Yes.
 6  BY MR. PRAISS:
 7     Q.   And I just want to make sure.  You have at
 8  this point no -- undertaken no analysis that sets
 9  forth the relative knowledge of each and every party
10  in every transaction with affected property in the
11  putative class, correct?
12              MR. RAINER:  Objection.
13              THE WITNESS:  I didn't study this issue
14  over time for each and every individual party, that's
15  correct.
16  BY MR. PRAISS:
17     Q.   Would you agree with me to determine any
18  alleged diminution of property, one would have to take
19  into consideration the relative knowledge of the
20  parties with respect to contamination at that point in
21  time, correct?
22              MR. RAINER:  Objection.
23              THE WITNESS:  Appraisal analysis is
24  usually a snapshot in time.  It's done in a specific
25  point in time.
```

1    Q.    And what would that depend on?

2    A.    That would depend on facts that come to bear

3    between the date of sale and the date of his resale.

4    Q.    It would also depend on the knowledge of the

5    prospective purchaser, correct?

6    A.    Yes.

7    Q.    So for each and every transaction to

8    determine the alleged impact due to contamination one

9    would have to look at the moment in time when the

10   transaction takes place.

11         Do you agree with that?

12   A.    If you want to determine the impact as of

13   that moment in time, yes.

14   Q.    You'd also have to take into consideration

15   the relevant knowledge of the parties at that moment

16   in time with respect to the presence of contamination,

17   correct?

18         MR. RAINER:  Objection.

19         THE WITNESS:  What's generally known in

20   the market I would say, yes.

21   BY MR. PRAISS:

22   Q.    And you have to take into consideration the

23   status of any remediation at any point in time when a

24   transaction takes place, correct?

25         MR. RAINER:  Objection.  You may

**DEL VECCHIO REPORTING SERVICES, LLC**

```
 1   answer.
 2              THE WITNESS:  Yes.
 3   BY MR. PRAISS:
 4        Q.   So again for each and every transaction at a
 5   minimum to determine any alleged impact due to the
 6   presence of contamination, you're going to have to
 7   look at various variables including the state of
 8   knowledge in the marketplace about contamination, the
 9   status of remediation in the neighborhood, things of
10   that nature, correct?
11              MR. RAINER:  Objection.  You may
12   answer.
13              THE WITNESS:  If your point is to
14   allocate the damages to each individual owner in a
15   chain of ownership, that would be a way to do it, yes.
16   BY MR. PRAISS:
17        Q.   For purposes of your analysis do you presume
18   that the knowledge that the market has -- strike that.
19              Is it your expert opinion that you
20   presume that the prospective sellers -- buyers have
21   the same knowledge as the market does with respect to
22   the presence of contamination?
23        A.   Yes.
24        Q.   So if in the marketplace there is general
25   knowledge that there has been contamination discovered
```

```
 1                    C E R T I F I C A T E
 2         I hereby certify that I am a Notary Public, in
 3  and for the state of Connecticut, duly commissioned
 4  and qualified to administer oaths.
 5         I further certify that the deponent named in
 6  the foregoing deposition was by me duly sworn, and
 7  thereupon testified as appeared in the foregoing
 8  deposition; that said deposition was taken by me
 9  stenographically in the presence of counsel and
10  reduced to typewriting under my direction, and the
11  foregoing is a true and accurate transcript of the
12  testimony.
13         I further certify that I am neither of counsel
14  nor attorney to either of the parties to said suit,
15  nor am I an employee of either party to said suit, nor
16  of either counsel in said suit, nor am I interested in
17  the outcome of said cause.
18         Witness my hand and seal as Notary Public this
19  13th day of June, 2007.
20
21
22                          _____
                            Barbara L. Murphy, LSR
23                          Notary Public
24
25  My Commission Expires:
    June 30, 2007
```

**DEL VECCHIO REPORTING SERVICES, LLC**