## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| CLARENCE R. COLLINS, JR., <u>et al.</u><br><br>                              Plaintiffs,<br><br>v.<br><br>OLIN CORPORATION<br>                              Defendant. | CIVIL ACTION NO. 3-03-945 (CFD)<br><br><br><br><br><br>August 3, 2007 |

## <u>PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF</u>
## <u>THIRD AMENDED MOTION FOR CLASS CERTIFICATION</u>

Olin Corporation's Memorandum in Opposition to Plaintiffs' Motion for Class

Certification ("Memorandum") is more notable for what it does <u>not</u> say than for what it

does say.  Olin's Memorandum does not dispute that the Plaintiffs have satisfied the four

requirements for class certification set forth in Fed. R. Civ. P. 23(a) – numerosity,

commonality, typicality and adequacy.  Olin's Memorandum does <u>not</u> dispute that, under

Rule 23(b), "a class action is superior to other available methods" for resolving the

disputes presented here.  Olin's Memorandum focuses entirely on one requirement of

Rule 23(b) -- trying to show that common questions of law and fact do not "predominate"

over non-common issues.  In pressing this point, however, Olin identifies only three

issues it says are non-common issues (causation, damages and the statute of limitations),

and ignores entirely a long list of common legal and factual issues that are squarely set

forth in Plaintiffs' Second Amended Complaint ("complaint").  Olin's Memorandum

does not even discuss Plaintiffs' claims of liability for abnormally dangerous activity

(Count V),  public nuisance (Count VIII), liability under Conn. Gen. Stat.  § 22a-452

(Count VII), or Recovery of Response Costs under CERCLA, 42 U.S.C. § 9607 (Count X), all of which present common legal and factual issues.

In this Reply Memorandum, Plaintiffs:

- respond to Olin's assertions about the standard to be applied in ruling on a motion for class certification;

- articulate how the caselaw on environmental class actions favors class certification, not the denial of certification, in this case;

- demonstrate how the requirements of Rule 23(a) – numerosity, commonality, typicality and adequacy – have been satisfied;

- point out the many common legal and factual issues presented by this case, and how those issues clearly predominate over the non-common issues; and

- explain why a class action is the superior way -- if not the only way -- to efficiently adjudicate the issues here.

### I.    The Standard for Determining Class Certification.

Olin's Memorandum conveniently skips over the hornbook proposition that class actions serve an important public policy purpose, and that therefore courts are to give the requirements of Rule 23 a "liberal rather than a restrictive interpretation." *In re MBTE Products Liability Litigation,* 241 F.R.D. 185, 194 (S.D.N.Y.), *citing* 5 Moore's Federal Practice §23.02. Consistent with these principles, it has long been the law that, in making a determination on class certification, a court "must accept as true the allegations in the complaint," and "must not inquire into the merits of the underlying claims." *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 160, 102 S.Ct.2364 (1982); *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140 (1974).

The Second Circuit's recent decision in *In re Initial Public Offerings Securities Litigation,* 471 F.3d 24 (2d Cir. 2006), has clarified these standards, holding that a court *may* determine an issue on the merits if such a determination is necessary in order to decide whether the requirements for class certification under Rule 23 have been met.  471 F.3d at 40-41.  The decision in *In re Initial Public Offerings Securities Litigation,* however, cautions that a class certification hearing should not extend "into a protracted mini-trial of substantial portions of the underlying litigation."  *Id.* at 41.  It also makes clear that, in deciding class certification, a trial court need not delve into the merits of factual or legal issues if there is no dispute about them.  *Id.* at 40  ("A legal standard, *e.g.*, numerosity, commonality, or predominance, is being applied to a set of facts, *some* of which might be in dispute.").

In its Memorandum in this case, Olin has not disputed any of the Rule 23(a) requirements – numerosity, commonality, typicality, or adequacy – nor the requirement of Rule 23(b) that "a class action is superior to other available methods" for resolving the disputes presented here.  Thus, this Court need not delve into the merits in order to resolve these issues.  Olin has limited the dispute here to the question, under Rule 23(b), of whether common issues predominate over non-common issues.  In weighing whether common issues predominate over non-common issues in this case, no one legal issue is dispositive (unlike in *In re Initial Public Offerings Securities Litigation,* where the Second Circuit determined that the issue of reliance was dispositive).  As set forth below, this Court needs to weigh whether all of the factual and legal issues common to the members of the class outweigh the issues that separate them.  In order to do this

balancing, the Court must assess what the issues *are*, but there is no reason why the Court needs to decide how it would *come out* on the issues themselves.

## II.     The Caselaw on Environmental Class Actions

Olin's Memorandum (at 7) claims that the "overwhelming majority of courts have denied certification in environmental mass tort cases." That is simply not true. There are numerous cases that have certified class actions where there has been environmental damage to property. In addition to the list of cases cited in Plaintiffs' opening memorandum,[1] *see Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 60 (S.D.Ohio 1991); *Bates v. Tenco Svcs., Inc.*, 132 F.R.D. 160 (D.S.C. 1990); *Yslava v. Hughes Aircraft Co.*, 845 F.Supp. 705, 712 (D.Ariz. 1993); *In re Asbestos School Litig.*, 104 F.R.D. 422, 429 (E.D.Pa. 1984), *aff'd (re Rule 23(a) in part rev'd in part*, 789 F.2d 996 (3rd Cir. 1986); *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988); *Mejdreck v. Lockformer Co.*, 2002 WL 1838141, at *6-7 (N.D. Ill. 2002), *aff'd sub nom; Mejdrech v. Met-Coil Systems Corp.*, 319 F.3d 910 (7th Cir. 2003); *Olden v. LaFarge*, 203 F.R.D. 254 (D. Mich. 2001), *aff'd*, 383 F.3d 495 (6th Cir. 2004), there are numerous recent decisions that have certified environmental class actions. *See Ludwig v. Pilkington North American, Inc.,* 2003 WL 22478842 (N.D. Ill.2003); *Bentley v. Honeywell International, Inc.,* 223 F.R.D. 471 (S.D. Ohio 2004); *Muniz v. Rexnord Corp.,* 2005 WL 124328 (N.D. Ill. 2005); *Turner v. Murphy Oil USA,* 234 F.R.D. 597 (E.D. La. 2006); *Stanley v. U.S.*

---

[1] That Memorandum is entitled Plaintiffs' Memorandum in Support of *Second* Amended Motion for Class Certification. After filing that Memorandum, Plaintiffs, with the assent of the Defendant, filed a Third Amended Motion for Class Certification that made minor adjustments in the properties listed in the Class and the Contaminated Properties Subclass, but did not otherwise change the relief requested from the Second Amended Motion. Thus, Plaintiffs did not file a new memorandum.

*Steel Co.,* 2006 WL 724569 (E.D. Mich. 2006); *Flournoy v. Honeywell International, Inc.,* 239 F.R.D. 696 (S.D. Ga. 2006); *In re MBTE Products Liability Litigation,* 241 F.R.D. 185 (S.D.N.Y. 2007); *In re MBTE Products Liability Litigation,* 241 F.R.D. 435 (S.D.N.Y. 2007).

Moreover, contrary to Olin's contention, these are *not* all cases where there was a single possible source of pollution or identical dispersion of pollution within an area. Indeed, several of the decisions specifically rejected the argument that differences in the source or location of pollution warranted denial of a class.  *See Bentley v. Honeywell International, Inc.,* 223 F.R.D. 471, 481 (S.D. Ohio 2004)("the existence of multiple sources of contamination over a period of time is not a *per se* bar to class certification . . . The key issue is the alleged conduct engaged in by Defendants"); *Ludwig v. Pilkington North American, Inc.,* 2003 WL 22478842, at 5 (N.D. Ill.2003)(factual differences among class members as to the sources of arsenic contamination did not defeat the common questions presented by plaintiffs); *Stanley v. U.S. Steel Co.,* 2006 WL 724569, at 5 (E.D. Mich. 2006)(rejecting defendant's argument that class certification should be denied because there was "not a single source of pollution").

Also, quite a number of the decisions cited by Olin in which class certification was *denied* were actions asserting physical injuries, as opposed to property damage claims like those presented here.  *E.g. Ball v. Union Carbide Corp.,* 212 F.3d 380 (6th Cir. 2002); *Boughton v. Cotter Corp.,* 65 F.3d 823 (10th Cir. 1995); *Thomas v. FAG Bearings Corp.,* 846 F. Supp. 1400 (W.D. Mo. 1994).  A prime example is *In re Agent Orange Product Liability Litigation*, 818 F.2d 145 (2d Cir. 1987), which Olin touts as controlling here.  The plaintiffs in the *Agent Orange* case were former U.S. service men

and women who claimed to have suffered *physical* injuries as a result of exposure to Agent Orange. [2] As is acknowledged by the leading treatise on class actions, certification of a class action alleging physical injuries presents considerably more difficulties than certification of a class action, as here, alleging damage to property. 5 Newberg on Class Actions §17.7(4). This is because physical injuries involve human bodies; and different human bodies react differently, even if exposed to the same conditions. Each body brings a different history, a different set of vulnerabilities, a different pain tolerance. *See In re MBTE Products Liability Litigation,* 241 F.R.D. 435, 449 (S.D.N.Y. 2007)(distinguishing between a class seeking to recover property damage from contamination from a class seeking to recover for physical injuries from contamination, and certifying the former).

The claims at issue in this case are not claims for physical injury, but claims for damage to the plaintiffs' properties and their use and enjoyment of those properties, caused by the disposal on those properties by Olin of waste containing lead, arsenic and other hazardous substances. Prior caselaw involving environmental class actions fully supports the certification of the class and subclasses on these facts.

### III.    Olin Does Not Dispute Numerosity, Commonality, Typicality or Adequacy

As noted above, Olin's Memorandum does not dispute that the Plaintiffs have satisfied the four requirements for class certification set forth in Fed. R. Civ. P. 23(a) – numerosity, commonality, typicality and adequacy of the named representatives. All of

---

[2] It is also fair to note that, in the *Agent Orange* case, the Second Circuit was *affirming* certification of a class, in part because there was an important defense that the Court believed supported class treatment. By analogy, Olin in this case has asserted that the statute of limitations defense should be applied to two major subclasses.

these requirements are addressed in Plaintiffs' opening memorandum, and so the discussion in this Reply brief will be limited to factual references from the class discovery that support the Plaintiffs' prior analysis.

      **A.    Numerosity.**

The proposed Class set forth in Plaintiffs' Third Amended Motion for Class Certification consists of the owners of more than 300 properties, plainly enough to satisfy the established requirement of numerosity (40 or more).  The precise addresses of the members of the Classs are listed in the motion, and are also defined geographically in the map attached as Exhibit B to the report of Plaintiffs' Real Estate Expert, Christopher Kerin (Exhibit 1 hereto).

The Contaminated Properties Subclass consists of the owners of approximately 50 properties within the Class whose properties received contaminated fill after Olin acquired Winchester Repeating Arms in 1931.  Again, this is a number sufficient to demonstrate numerosity; and again, the precise addresses of this Subclass are listed in the motion, and are also defined geographically in the map attached as Exhibit 1 to the report of Plaintiffs' Environmental Expert, Michael Hopkins (Exhibit 2 hereto).

The Stigma Subclass consists of the owners of the properties in the Class that are <u>not</u> contained in the Contaminated Properties Subclass-- this is the negative subset of the Class, again several hundred properties defined by address in the motion and geographically in Exhibit 1 to Mr. Hopkins' Report, and again enough to demonstrate numerosity.

The Response Cost Subclass consists of the owners of approximately 135 properties within the Class who have or will incur costs in order to redress residual

contamination on their properties, again enough to satisfy numerosity. The properties are identified by address in the motion, and are those properties on which the Connecticut Department of Environmental Protection has proposed to leave contamination in soils below four feet. *See* Kerin Report ¶3(c); Proposed Remedy Selection Plan for the Newhall Street Neighborhood Remediation Project, Table 1 (Exhibit 3 hereto).

> **B.    Commonality**

There are certainly questions of law and fact that are common to the members of the Class and Subclasses. Plaintiffs' opening memorandum identified a number of common legal issues, and class discovery has highlighted a number of common factual issues:

The properties in the Class are the properties generally regarded as being in the "Newhall Neighborhood." Kerin Report ¶4(a). (The neighborhood in the past has also been called "Newhallville"). The discovery of contaminated fill has had a negative impact on the value of the properties owned by the members of the Class. *Id.* ¶5. In Mr. Kerin's opinion, all the properties in the Class "will suffer a loss in value due to the contamination in the neighborhood." Olin has not offered an expert opinion to rebut Mr. Kerin's opinion.

The properties in the Contaminated Properties Subclass are properties that received contaminated fill after Olin acquired Winchester Repeating Arms in 1931. Hopkins Report ¶3.0. Michael Hopkins' professional opinion is supported not only by an aerial photograph taken in 1934, which shows that almost all of the area of this Subclass was still a swamp at that time (Exhibit 4 hereto), but also by a compilation of the dates when the properties were subsequently filled and developed (Exhibit 5 hereto). Indeed,

the expert report submitted by Olin does not dispute that the properties of the Subclass were all filled after 1931.  Expert Report of Kenneth Cichon (Olin Tab 1), at 1 n.1 (stating that Mr. Cichon did "not attempt[] to distinguish between fill which may have been placed by Winchester Repeating Arms before or after 1932").

Likewise, the soil of the Contaminated Properties Subclass contains the contaminants – lead, arsenic, and polyaromatic hydrocarbons – that are associated with Olin's waste stream and that are scientifically indistinguishable from the contaminants dumped by Olin in other parts of the Newhall area.  Hopkins Report ¶3.0.  This conclusion is supported by testimony from Shannon Pociu, the lead investigator in Newhall for the Connecticut Department of Environmental Protection,  who observed industrial [Winchester-type] waste in test pits dug in the Subclass area.  Pociu Deposition (Exhibit 7), at 234-36.  Again, the conclusion is also largely undisputed by Olin's Expert, Kenneth Cichon.  While Mr.Cichon disagreed with Mr. Hopkins that there was enough data to conclude that all the properties in the Subclass had fill with these "constituents of concern," he opined that there is a "high probability" that fill in the Subclass contained these contaminants.  Cichon Report (Olin Tab 1), at 1.  Mr. Cichon also testified that the chemicals that characterized Olin's waste stream at its plant in New Haven were -- in fact -- lead, arsenic and polyaromatic hydrocarbons.  Cichon Deposition (Exhibit 8), at 159-64.

The properties in the Stigma Subclass, by definition, are all properties that have suffered a loss in value by virtue of their proximity to contamination in the neighborhood. As Mr. Kerin explains, stigma is "[a]n adverse public perception regarding a property; the identification of a property with some type of opprobrium (environmental

contamination, a grisly crime), which exacts a penalty on the marketability of a property and hence its value." Kerin Report ¶8. As noted above, all the properties in Class have suffered a loss in value by virtue of their location in the Newhall Neighborhood. Those in the Contamination Properties Subclass have suffered an additional loss in value as a result of the disposal of contaminated fill directly on or next to them; those in Stigma subclass have suffered only the loss attributable to association with the neighborhood. Kerin Report ¶5, 10. Again, Olin has offered no expert opinion to dispute this.

Finally, the properties in the Response Cost Subclass all share the fact that the Connecticut Department of Environmental Protection has determined to leave contamination on them below four feet, and they will need to incur costs in order to remove that contamination. *See* Proposed Remedy Selection Plan for the Newhall Street Neighborhood Remediation Project, Table 1 (Exhibit 3). Again, Olin has presented no expert testimony to dispute this (probably because Olin itself proposed this scheme).

Thus, the Class and each of the Subclasses plainly share common legal and factual issues. "[T]he commonality requirement does not require class members to share all issues in the action, but only a single common issue of law or fact." This requirement is amply met here.[3]

### C.    Typicality

The Class and each of the Subclasses is represented in this case by multiple plaintiffs, each of whom is named in the complaint. All of the named plaintiffs have been

---

[3] The requirement of commonality requires a lesser showing than the requirement of predominance, and it is only the latter point that Olin has contested.

deposed.[4]  Each owns the property identified in the complaint.  Each property is in the

Class Area and in one or more of the Subclasses. Each claims damages arising from

Olin's contamination of the Newhall Neighborhood, including loss in property value, loss

of use and enjoyment, and emotional distress.

By way of example, named plaintiff Ruth Eaton owns the property at 499

Newhall Street, which is one of the properties identified in the Third Amended Motion

for Class Certification as part of the Class, part of the Contaminated Properties Subclass,

and part of the Response Cost Subclass.   Interrogatory Answers of Ruth Eaton (Exhibit

9), at 2; Eaton Deposition (Exhibit 10), at 9.  In 1931, her property was still part of a

swamp, which was subsequently filled in, and the house built in 1944.  *See* Exhibits 4, 5.

She has received test results showing that her property is contaminated with lead, arsenic,

and other chemicals.  Exhibit 10, at 19.  She has found places in her yard where plants

will not grow. Exhibit 10, at 42.  Due to the contamination on her property, she and her

husband no longer sit their yard, no longer have family barbecues there, and no longer

play horseshoes, volleyball or badminton.  Exhibit 9, at 12.  She does not entertain in the

yard any more and this has affected the amount of time she visits with family and friends

at her home.  Exhibit 9, at 10.  The Connecticut Department of Environmental Protection

has proposed to leave contamination on Eaton's property below four feet.  Exhibit 3,

Table 1.  She and her husband are worried about the safety of their home, and she

believes the property has lost much of its value.  Exhibit 9, at 12; Exhibit 10, at 39-40.

---

[4] The two exceptions to this are William Jones and Clifford Senior, each of whom, by
agreement with the defendant, have agreed to dismiss their claims, and who no longer
seek to represent the Class or Subclasses.

As another example, named plaintiff Eugalyn Wilson owns the property at 132-34 Shepard Street, which is identified in the Third Amended Motion for Class Certification as part of the Class and the Stigma Subclass. Wilson Deposition (Exhibit 11), at 27. Ms. Wilson is concerned that her property has lost value because of the stigma of contamination in the neighborhood, and asserts claims against Olin to recover for that loss. Exhibit 11, at 139-43.

These facts are typical of the facts experienced by the members of Class and Subclasses that these plaintiffs seek to represent. Despite having deposed all of the named plaintiffs, Olin has pointed to no facts suggesting that the named plaintiffs are not typical. Even more important, the claims these plaintiffs have asserted – negligence, abnormally dangerous activity, public nuisance, private nuisance, infliction of emotional distress, liability under Conn. Gen. Stat. §221-452, and liability under CERCLA -- are typical of the claims held by the members of the Class and Subclasses. *See Weinberger v. Thornton,* 114 F.R.D. 559, 603 (S.D. Cal. 1986)("typicality refers to the nature of the claim or defense of the class representative").

### D.     Adequacy

This requirement is addressed to whether there are any conflicts of interest between the interests of the named plaintiffs and the Class or Subclasses they seek to represent, and whether they have retained competent counsel to represent the class. Olin's Memorandum points to no conflicts of interest between the named plaintiffs and the Class or Subclasses they seek to represent, and Plaintiffs are aware of none. Affidavit of Andrew Rainer (Exhibit 6 hereto) ¶2. To the extent the interests of putative class members differ, Plaintiffs' Counsel has proposed appropriate subclasses.

With respect to the competence of counsel, Plaintiffs' counsel are competent and qualified to advance the interests of the Class and Subclasses. McRoberts, Roberts & Rainer, L.L.P. is a firm that specializes in environmental law and litigation; Andrew Rainer, a partner of the firm, also has over 15 years of experience handling class actions. Rainer Affidavit (Exhibit 6) ¶3. Also representing the plaintiffs is Cohen & Wolf, a general practice Connecticut law firm with substantial experience in complex environmental and land use litigation, and Thorton & Naumes, a Massachusetts firm with extensive national experience in mass torts and complex litigation. *Id.* ¶4-5. Perhaps because of these stellar credentials (or maybe just courtesy), Olin has not challenged the adequacy of counsel or the named plaintiffs.

### IV.     Common Issues Predominate Over Non-Common Issues in This Case

Olin's Memorandum argues that non-common issues predominate over common legal and factual issues in this case, and points in particular to three issues – causation, the statute of limitations, and damages. These three issues are dwarfed, however, by the legal and factual issues that the Class and Subclasses share, the common trial of which would achieve substantial judicial economy. It does not require looking much past the claims asserted in the Second Amended Complaint to identify some of the many common issues, almost all of which focus on the conduct of the defendant, Olin:

Negligence and Gross Neligence

1. whether Olin disposed of its industrial waste, containing lead, arsenic, and polyaromatic hydrocarbons, in the Newhall Neighborhood, and in particular on the properties of the Contaminated Properties Subclass;

2. whether Olin knew that the areas where this waste was dumped were expected to be developed with residences;

3.      whether and to what extent Olin knew or understood that the materials it was disposing of were hazardous;

4.      whether Olin's actions in disposing of those hazardous materials in soil expected to be developed with residences constituted a breach of the standard of care at the time;

5.      whether Olin's actions in disposing of those hazardous materials in soil expected to be developed with residences constituted willful, wanton or reckless conduct;

6.      whether Olin's actions in disposing of those hazardous materials in soil expected to be developed with residences constituted negligence per se;

7.      whether Olin had a duty to warn residents of the hazards of its wastes.

<u>Abnormally Dangerous Activity</u>

8.      whether Olin engaged in ultrahazardous and abnormally dangerous activities when it handled, disposed of and/or released hazardous substances in its possession, including industrial waste containing lead and arsenic;

9.      whether Olin knew, or should have known, that there was a high degree of risk associated with the handling, disposal and/or release of hazardous substances;

10.     whether, at the time it was generating and disposing of the hazardous substances, Olin knew, or should have known, that the hazardous substances were harmful to humans and the environment;

11.     whether, at the time it was disposing of the hazardous substances in the Newhall Section, Olin knew, or should have known, that the hazardous substances would cause harm to future landowners.

<u>Infliction of Emotional Distress</u>

12.     whether Olin's actions in disposing of its industrial waste in the Newhall neighborhood was extreme and outrageous in character;

13.     whether Olin knew or was reckless in not knowing that its actions and omissions would inflict emotional distress on that neighborhood.

Public Nuisance

14.    whether Olin, by its handling, disposal and release of hazardous substances, industrial waste containing lead and arsenic in the Newhall neighborhood, unreasonably interfered with public health, safety, peace, comfort or the convenience of the public and thereby caused a public nuisance.

Private Nuisance

15.    whether Olin, by its handling, disposal of, and release of hazardous substances, emanating from its own nearby property, including industrial waste containing lead and arsenic, in the Newhall neighborhood, unreasonably interfered with the use and enjoyment of private properties in that neighborhood.

Conn. Gen. Stat. § 22a-452

16.    whether Olin was the owner or operator of a site from which there has been a disposal and release of materials defined as hazardous waste under Conn. Gen. Stat. §22a-115(1), or is otherwise legally responsible for the releases from that site;

17.    whether Olin, directly or indirectly, arranged for the transport and disposal of hazardous wastes from its nearby site to the Newhall niegborhood.

18.    whether Olin will remove all hazardous wastes that it deposited in the Newhall neighborhood, or whether instead the residents of that neighborhood will have to incur costs for the containment, removal, and/or mitigation of such hazardous waste.

CERCLA   42 U.S.C. § 9607

19.    whether Olin disposed of or arranged for disposal of substances defined as hazardous substances under 42 U.S.C. § 9601(14) and 40 CFR Part 302.4 in the Newhall neighborhood;

20.    whether Olin's hazardous substances have contaminated the soil and ground water in the Newhall neighborhood at levels exceeding maximum allowable contaminant levels; and

21.    whether Olin will remove all such substances or whether instead the residents of the Newhall neighborhood will be required to incur response costs, consistent with the national contingency plan, including costs entailed in removing residual contamination.

This list of common legal and factual issues -- focused on the conduct of the defendant – is just like the list of common issues that the Court considered in the very recent decision certifying a class in *In re MBTE Products Liability Litigation,* 241 F.R.D. 185 (S.D.N.Y. 2007).  In that case, the plaintiffs alleged that their residential properties had been contaminated and devalued by releases of gasoline containing MBTE into the soil and groundwater of their nieghborhood.  Judge Scheindlin cited the following list of common issues that she believed supported the certification of a class:

> a.. Whether Defendants released MTBE and other contaminants into the soil and groundwater of the area surrounding the Crossroads Exxon;
>
> b. Whether MTBE reached, or will reach, the subsurface and/or groundwater beneath the area encompassed by the Homeowners' Sub-Class;
>
> c. Whether Defendants' release of MTBE and other contaminants into the soil and groundwater of the area surrounding the Crossroads Exxon was negligent, reckless and/or intentional;
>
> d. Whether Defendants' release of MTBE and other contaminants into the soil and groundwater of the area surrounding the Crossroads Exxon constituted an unreasonable interference with the Plaintiffs' and the Class's use and enjoyment of their property;
>
> e. Whether Defendants' release of MTBE and other contaminants into the soil and groundwater of the area surrounding the Crossroads Exxon physically invaded the properties of the Homeowners' Sub-Class, so as to constitute a trespass;
>
> f. Whether Defendants' release of MTBE and other contaminants into the soil and groundwater of the area surrounding the Crossroads Exxon constituted an unreasonable interference with rights common to the general public, so as to comprise a public nuisance;
>
> g. The costs of sampling, investigating and restoring the groundwater beneath the region encompassed by the Homeowners' Sub-Class, in order to assess the amount of the Homeowners' Sub-Class's claims for restoration damages . . . .
>
> j. Whether contamination of groundwater by MTBE adversely affects or impairs market value of residential property

The same set of common issues warrant class certification in this case.

As against this litany of common issues, Olin points to three issues that it says defeat predominance in this case – causation, the statute of limitations, and damages.  All three are readily addressed.  Causation is an important element of several of the claims set forth in the Second Amended Complaint, but it is not the only one.  As set forth above, there are numerous elements that Plaintiffs need to prove in order to establish its claims against Olin.  Most of them – a predominant number – relate to Olin's knowledge, duties and conduct, and will be most efficiently tried once in a class trial, not over and over again.  Thus, for example, to establish negligence, proof will be needed of what wastes Olin brought to the Newhall neighborhood, whether it knew those wastes were hazardous, whether it knew the properties on which the wastes were being disposed were expected to be developed with residences, and whether it had a duty to warn of what it knew.  None of these issues has anything to do with causation, but all are common issues.

The plaintiffs have also asserted several causes of action that do not require proof of causation.  Most notable is Plaintiffs' claim that Olin engaged in abnormally dangerous activity, which is nowhere mentioned in Olin's Memorandum.  Also not mentioned are Plaintiffs' claims under Conn. Gen. Stat.  § 22a-452 and under CERCLA §107, which also do not require proof of causation.  These are claims as to which there is not even an argument that individualized issues of causation defeats predominance.

With respect to the statute of limitations, Olin itself has argued to the Court that the statute of limitations is a common issue:  Olin has filed a motion for summary judgment, contending that the claims of all the members of the Contaminated Properties Subclass and all the members of the Stigma Subclass are time barred.  *See* Memorandum in Support of Olin's Motion for Summary Judgment Based on Statute of Limitations

(Docket No. 208). Whether or not the Plaintiffs agree with this position, the Court must consider whether the commonality of the statute of limitations defense in and of itself supports class certification. *See Ludwig v. Pilkington North American, Inc.,* 2003 WL 22478842, at 3 (N.D. Ill.2003)(certifying a class in part because the defendant had argued that "many if not all of the plaintiffs' claims . . . may be barred by the statute of limitations"); *In re Agent Orange Product Liability Litigation*, 818 F.2d 145, 166-67 (2d Cir. 1987)(upholding certification of a class in part because of the commonality of a different defense, the military contractor defense).

As to damages, it is a matter of hornbook law that differences among class members in the amount and recoverability of damages do not defeat predominance. *See In re Visa Check/Master Money Antitrust Litigation,* 280 F.3d 124, 138-39 (2nd Cir. 2001)(holding that individual damages issues did not preclude predominance); *Blackie v. Barack,* 524 F.2d 891, 905 (9th Cir. 1975)("The amount of damages is invariably an individual question and does not defeat class action treatment."); *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988)("no matter how individualized the issue of damages may be, these issues may be reserved for individual treatment"); *Mejdreck v. Lockformer Co.*, 2002 WL 1838141, at *6-7 (N.D. Ill. 2002)("it is very common for Rule 23(b)(3) class actions to involve differing damage awards for different class members."). Indeed, Olin's Memorandum (at 28) admits as much. Plaintiffs' error was to promise in their opening brief that damages could be established in this case through a hedonic price model, but then retain a more conventional property value expert. However, that error certainly does not mean that any differences in Plaintiffs' damages warrant the denial of the motion for class certification. They don't.

When the Court considers the numerous common legal and factual issues presented in this case, there can be little doubt that those issues predominate over the non-common ones.[5]

### V.    Trial of This Case as a Class Action is Clearly Superior

Olin has not even tried to attempted to argue that individual trials would be a superior way to achieve a "fair and efficient" adjudication of the claims in this case. That is because, if class certification is denied, the Court faces not only 30 individual liability trials, but probably many more than that. There are approximately 50 members of the Contaminated Properties Subclass, there are 135 members of the Response Cost Subclass, and there are hundreds of members of the Stigma Subclass, any of whom may seek to intervene in the absence of a class. (Under the doctrine of *American Pipe*, the statute of limitations has been tolled for all of them.)

Moreover, given the number of common legal and factual issues, the *only* efficient way to adjudicate those issues is through a common trial. Again, the remarks of Judge Scheindlin in *In re MBTE Products Liability Litigation,* 241 F.R.D. 435, 449-50 (S.D.N.Y. 2007), are instructive on this point: "In this case, trying each individual plaintiff's action separately would only lead to wasteful repetition . . . ." By contrast, a common trial could provide a forum for adjudication of numerous common issues, such as—

- how did the dumping begin in the Newhall neighborhood

- what kinds of materials did Olin dump

---

[5] Indeed, to the extent the Court is concerned about predominance, Rule 23(c)(4) empowers the Court to certify the class and subclasses as to certain issues only, in order to efficiently try the case.

- did Olin know that these materials were hazardous

- did Olin appreciate the extent of the risks posed by these materials

- did Olin know that the land was expected to be developed with residences

- what chemicals were contained in Olin's waste stream

- what chemicals have been found in the fill in Newhall

- what is entailed in removing the chemicals from the neighborhood

- how has the discovery of contamination affected the neighborhood

- has the neighborhood been stigmatized by the contamination

- has the contamination affected the prices of real estate

In truth, Olin does not want to retry these issues 50 or 100 times. What it really wants is to limit its exposure to liability as much as possible. That, however, is not a reason for the Court to deny class certification.

**<u>Conclusion</u>**

The Plaintiffs have established each of the requirements of Rule 23(a) and Rule

23(b)(3), and therefore ask the Court to grant class certification.

Respectfully submitted,


By   /s/ Andrew Rainer
      Mark Roberts, Esq.  ct25062
      mroberts@mcrobertslaw.com
      Andrew Rainer, Esq. ct25938
      arainer@mcrobertslaw.com
      McRoberts, Roberts & Rainer LLP
      53 State Street
      Boston, Massachusetts 02109
      Tele: (617) 722-8222
      Fax:  (617) 720-2320

      David B. Zabel, Esq. ct01382
      dzabel@cohenandwolf.com
      Monte E. Frank, Esq. ct13666
      mfrank@cohenandwolf.com
      Cohen and Wolf, PC
      1115 Broad Street
      Bridgeport, Connecticut 06604
      Tele:  (203) 368-0211
      Fax:   (203) 394-9901

      Neil T. Leifer, Esq.
      nleifer@tenlaw.com
      David C. Strouss, Esq.
      dstrouss@tenlaw.com
      Thornton & Naumes L.L.P
      100 Summer Street, 30th Floor
      Boston, Massachusetts 02110
      Tele: (617) 720-1333
      Fax:  (617) 720-2445

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3rd day of August, 2007, a copy of the foregoing was served electronically and by first class U.S. mail, postage prepaid, upon all counsel of record, as follows:

Michael H. Wetmore, Esq.
Joel B. Samson, Esq.
Omri Praiss, Esq.
Husch & Eppenberger, LLC
190 Carondelet Plz Ste 600
Saint Louis MO 63105-3433

Mark S. Baldwin, Esq.
Brown Rudnick Berlack Israels LLP
185 Asylum St Fl 38
Hartford CT 06103-3408

Ann M. Catino, Esq.
Joseph Fortner, Esq.
Halloran & Sage, LLP
One Goodwin Square
225 Asylum Street
Hartford, CT  06103

/s/ Andrew Rainer
Andrew Rainer