# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CLARENCE R. COLLINS, JR., et al

      Plaintiff

v.

OLIN CORPORATION,

      Defendant

## EXPERT REPORT OF MICHAEL HOPKINS

   I am a licensed environmental professional, whose qualifications are set forth in Exhibit A hereto. I have not testified as an expert either at deposition or at trial within the last four years, nor authored publications within the last ten years. I have been engaged by Plaintiffs' counsel to render an expert opinion in this case, and am being paid at rates ranging from $100 to $135 per hour.

## 1.0 PURPOSE AND SCOPE OF INVESTIGATION

   The purpose of this report is to provide an opinion as to which non-public properties in the Newhall Street area of Hamden, Connecticut received waste and other fill materials which to a reasonable degree of scientific certainty were generated by the Olin Corporation from its operations at Winchester Repeating Arms Company after December 1931.

   My evaluation and opinions are based on independent review of standard historical reference sources (such as maps, photographs, insurance maps and municipal records) and specific information provided in the following reports and work plans prepared by the Connecticut Department of Environmental Protection (CTDEP) and other environmental firms. My review included all tables, figures, photographs, appendices, attachments and/or exhibits associated or referenced by the documents referenced below.

- CTDEP, *Memorandum regarding Newhall Street Neighborhood Rights-of-Way Sampling, Hamden, CT,* June 15, 2001

- Haley & Aldrich, *ASTM Phase I Environmental Site Assessment, Hamden Middle School and Surrounding Newhall Street Neighborhood, Hamden, Connecticut,* January 2002

1

- GZA GeoEnvironmental, Inc. (GZA), *Remedial Investigation, Newhall Street, Neighborhood, Hamden, Connecticut,* May 12, 2002

- Haley & Aldrich, *Report on Oversight of U.S. EPA Remedial Activities , Newhall Neighborhood, Hamden, Connecticut,* November 2002

- Malcolm Pirnie, *Initial Findings: Newhall Street Residential Area,* December 2002

- Haley & Aldrich, *Report on Oversight of Leggette, Brashears & Graham, Inc., Malcolm Pirnie and GZA GeoEnvironmental Investigation Activities, Newhall Neighborhood, Hamden, Connecticut,* December 2002

- Malcolm Pirnie, *Supplemental Investigation Workplan, Non-public Properties Study Area,* July 2003 (revised January 2004)

- Malcolm Pirnie, *Supplemental Investigation Interim Report on Isolated Fill, Non-public Properties Study Area, Hamden, Connecticut,* November 2004

- Malcolm Pirnie, *Supplemental Investigation Report & Remedial Action Plan, Non-public Properties Study Area, Hamden, Connecticut,* March 2005

- Olin Response to August 17, 2006 and November 10, 2005 CTDEP comment letters (letter dated Sept 21, 2006) and associated exhibits and figures, as posted on http://www.newhallinfo.org/olindocuments.html#

- Loureiro Engineering Associates, Inc. (Loureiro), *Report of Soil Sampling, Newhall Street Neighborhood, 25 Bryden Terrace, Hamden, Connecticut,* November 15, 2005

- Louriero, *Report of Soil Sampling, Newhall Street Neighborhood, 47 Bryden Terrace, Hamden, Connecticut,* November 15, 2005

- Louriero, *Report of Soil Sampling, Newhall Street Neighborhood, 71 Bryden Terrace, Hamden, Connecticut,* November 15, 2005

- Louriero, *Report of Soil Sampling, Newhall Street Neighborhood, 53 Wadsworth Street, Hamden, Connecticut,* November 15, 2005

- Louriero, *Report of Soil Sampling, Newhall Street Neighborhood, 61 Wadsworth Street, Hamden, Connecticut,* November 15, 2005

- Sanborn Fire Insurance Company Maps, New Haven, Connecticut (Volume 5, Maps 506, 531 and/or 532), 1924, 1950 and 1967

- Aerial Photographs, Connecticut State Library Collection 1934 and 1951[1]

- US Coastal Survey, *Map of the New Haven Region - Sheet II*, 1877 (portions only[2])

- United States Geological Survey (USGS), New Haven, Connecticut 15-minute topographic quadrangle, 1892

- US Army Corp of Engineers Map Service, New Haven, Connecticut 15-minute topographic quadrangle, 1914

- US Army Corp of Engineers Map Service, New Haven, Connecticut 7.5-minute topographic quadrangle, 1947

- USGS New Haven, Connecticut 7.5-minute topographic quadrangle, 1954

- USGS New Haven, Connecticut 7.5 minute topographic quadrangle, 1982

---

[1] Other aerial photographs provided as attachments to the 2002 Haley & Aldrich Phase I report were also examined.

[2] The portion of the survey examined was provided as a base map overlain with other data that was prepared by Malcolm Pirnie in 2006 and was obtained from CTDEP's Newhall Street Remediation Project website.

## 2.0 FILL HISTORY AND CHARACTERISTICS

### 2.1 Study Area Location

For purposes of this report, the term "study area" will refer a portion of the Newhall neighborhood of Hamden, Connecticut. In general, the study area is bounded to the south by Morse Street, to the west by Newhall Street, to the north by Rochford Field and Mill Rock Park and to the east be Wadsworth Street, and also includes six contiguous residential properties east of Wadsworth Street. Specifically, the study area includes the following residential properties:

- 95, 103, 109, 115, 121, 127, 135, 155[3], 161, 165-167, 171-173, 177 and 185 Morse Street
- 499, 507, 513, 517 and 523 Newhall Street
- 18, 22 and 26 Newbury Street
- 1019, 1027, 1028, 1030, 1032, 1035, 1042, 1048, 1061, 1067, 1071 and 1099[4] Winchester Avenue
- 84, 90, 94, 99, 105, 106, 112, 113, 117, 118, 124, 125, 130, 131, 136 and 142 Bryden Terrace
- 12, 17, 20, 21, 46, 53, 61, 54 and 60 Wadsworth Street

I originally defined the study area from a screening of 1934 aerial photographs and several prior environmental investigation reports. Based on that screening, I excluded properties that appeared to be either fully developed by 1931, may not have received fill material, or were isolated properties that may have received fill after 1931, but were surrounded or nearly surrounded by properties that did not appear to meet the above criteria. I included entire city blocks within the study area if the majority of properties within that block appeared to meet the inclusion criteria.

As part of the evaluation described later in this report, I subsequently added four additional properties located east of Wadsworth Street which form a contiguous group and appear to have historically been part of the same wetland system as other included properties located west of Wadsworth Street. These four properties were 39, 47, 51 and 71 Bryden Terrace.[5]

-----

[3] The address of the property at 155 Morse Street was incorrectly listed as "151" instead of "155" in prior motions due to a typographical error.

[4] The property at 1099 Winchester Avenue was subsequently determined to be a public property and was not further evaluated as part of my study.

[5] This evaluation was based on the information currently available to me. Subsequent testing or other developments may provide evidence that additional properties received fill after 1931.

**2.2 History of Fill Placement Within the Study Area**

The study area is part of an historic wetland complex that occupied a sub-basin that drained to a tributary to the Mill River. Prior to being filled, the former wetland complex included the study area, portions of the publicly owned properties now occupied by Rochford Field, Mill Rock Park, the Hamden Community Center and the Hamden Middle School and other private properties to the south, southwest and west.

Based on the 1877 coastal survey, the 1892 USGS 15-minute topographic quadrangle, the 1914 US Army 15-minute topographic quadrangle and 1934 aerial photographs[6], the study area was undeveloped in the late 1800s and the early 1900s. The study area, along with Rochford Field, Mill Rock Park and portions of the Hamden Middle School property collectively comprised a sub-basin that drained to the Mill River via a former stream that flowed generally to the west-northwest across the northern portion of the study area and Rochford Field. The stream was surrounded by low-lying wetlands that occupied most of the central portion of the study area. At least three swales extended from the central wetland area that drained to the stream. Overall the stream, the associated wetlands and the swales occupied essentially all of the study area, except for a slight topographic rise near the intersection of Morse Street and Winchester Avenue, and a narrow band of uplands along Morse Street. In general, the characterization of the central portion of the study area as being a "wooded depression" in the late 1800s and early 1900s appears to be accurate.[7]

Standing water was present on approximately 40% of the study area on the 1934 aerial photographs. Most of the remainder of the study area was low lying wetlands, especially on the central and eastern portions of the study area and in a swale east of Newhall Street (between Newbury Street and Morse Street). There was a narrow upland band along Morse Street and five houses near the intersection of Morse Street and Winchester Avenue (at 165-167 and 171-73 Morse Street, and 1028, 1030, 1032 Winchester Avenue) appear to have been constructed on dry ground. The grounds around the five houses were unvegetated and the lawns had not yet been established. This provides evidence that these lots were recently filled and/or graded at the time of the aerial photographs, (March 1934). In addition, there are depressions on the rear portions of these lots, supporting the conclusion that they had not been completely filled at the time of the photograph.

The 1892 and 1914 topographic quadrangles and the 1877 coastal survey have 20 foot contour intervals. Since essentially the entire study area is situated between the 40 and 60 foot elevation contours on these maps, and the fill thickness in these areas is

---

[6] The 1934 aerial photographs were obtained from the Archives Division of the Connecticut State Library. These are the same photographs examined by Malcolm Pirnie and Haley & Aldrich. No older photography is known to exist.

[7] The term "wooded depression" was used to describe the central portion of the study area in various prior reports.

typically in the range of four to twelve feet[8], it is difficult to directly compare the historic surface elevations to the current elevations. In addition, the vertical datum used to prepare the 1892 and 1914 maps appears to be different from the datum used on recent maps[9]. Regardless, it can be concluded to a reasonable degree of scientific certainty that the surface elevation of most of the study area was lower in the early 1900s than it is currently. There are no obvious indications that significant filling had yet occurred within the study area, with the possible exceptions of the swale on the western portion of the block bounded by Newbury Street, Winchester Avenue, Morse Street and Newhall Street (which may be partially, but not completely filled) and area surrounding the five previously mentioned houses. Therefore, the 1934 photographs can be used to approximate the topography of the study area prior to being filled. Based on the examination of stereo pairs of aerial photographs and using off-site locations of "known" elevations[10] as vertical controls, the surface elevation of the standing water is estimated to be approximately 40 feet (which would be four to nine feet lower than the current surface elevation in that area). The accuracy of this estimate was determined to be plus or minus one to two feet. This is consistent with Malcolm Pirnie's estimate that the surface elevation of the standing water was approximately 38 feet.

Based on the aerial photographs, it can be concluded to a reasonable degree of scientific certainty that the current residential properties within the study area were still undeveloped in March 1934, except for five houses at 165-167 and 171-173 Morse Street, and 1028, 1030, 1032 Winchester Avenue and two associated garages on the rear portions of the lots at 165-167 and 171-173 Morse Street. In addition, the adjoining lots at 155 and 161 Morse Street (which occupy a topographic high) were at or near their current grade on the 1934 aerial photograph. Based on an examination of the aerial photographs, the properties at 165 and 173 Morse Street were fully developed and had been filled to their current extent by March 1934. However, the properties at 1028, 1030 and 1032 Winchester Avenue appear to have only been recently constructed on the 1934 photographs. This conclusion is based upon observations that the area around the houses is unvegetated and shows signs of having been recently graded. No lawns have been

---

[8] The thickness of the fill was estimated from boring logs which will be further discussed later in this report.

[9] The elevations of various points of known elevation outside the study area on the 1892 and 1914 maps appear to generally be four to six higher than the elevations provided for those points on recent 7.5-minute topographic maps and the base survey used to develop various figures included in the Malcolm Pirnie, Haley & Aldrich and Loureiro reports.

[10] Since there is a discrepancy between the vertical datum used to prepare various USGS and US Army quadrangles, the elevations shown on the base survey used in the Malcolm Pirnie, Haley & Aldrich and Loureiro reports was used as a vertical control for purposes of interpreting the 1934 photographs. Since the boring logs and cross-sectional drawings in the site investigation reports are based on the elevations in the base survey, this allows better correlation between the boring data and the historic topography, and facilitates estimating the depth and volume of the fill.

established on these properties, which supports the conclusion that the houses were constructed shortly prior to the March 1934 photographs. In addition, the surface of the rear portions of these lots is irregular and depressions are present. On this basis, it can be concluded to a reasonable degree of scientific certainty that the houses at 1028, 1030 and 1032 Winchester were constructed shortly before the March 1934 photographs, and that additional fill was placed on these lots after December 1931[11].

An earthen path is discernable on the 1934 aerial photographs along the current Bryden Terrace right-of-way (between Winchester Avenue and Wadsworth Street) portions of which were flooded at that time. Winchester Avenue, Newbury Street and Wadsworth Street are present, but unpaved. A short section of Winchester Avenue immediately south of Newbury Street has been cut into the slope to the west and is one to two feet lower than the adjoining properties to the west[12]. Standing water covered most of the central portion of the study area, and extended onto the adjoining Rochford Field and Mill Rock Park properties. The portion of Winchester Avenue between Mill Rock Road and Newbury Street was submerged, as was most of the "diagonal" street depicted on the earlier survey and maps.

The remainder of the blocks between Winchester Avenue and Wadsworth Street from Mill Rock Park south to Morse Street[13] comprise a low-lying swampy area on the 1934 aerial photograph, except for a narrow band of uplands immediately along Morse Street. At least two swales are visible that extended east and southeast, respectively, from the standing water. The swale that extended to the south terminates at Morse Street midway between Winchester Avenue and Wadsworth Street. The swale that extended to the east crossed Wadsworth Street[14] and included the current properties at 53 and 61

---

[11] As will be discussed later in this section, the Hamden tax assessment card for 1028 Winchester Avenue lists the "date of construction" as 1931. Based on conversations with employees at the Hamden Tax Assessor's office, the dates on the tax cards are typically the date on which the building permit was obtained, which is not necessarily the date on which construction commenced. In addition, the staff stated that these dates should be considered approximate. No records pertaining to the construction of this building were on-file at the Hamden Building Department. Since the building appears to be recently constructed on the 1934 aerial photograph, it is my opinion to a reasonable degree of scientific certainty that it appears more likely than not that the house at 1028 Winchester Avenue was actually constructed after 1931.

[12] A low retaining wall is currently present at that location.

[13] Since Bryden Terrace was not yet present the entire area bounded by Mill Rock Road, Wadsworth Street, Morse Street and Winchester Avenue was a single block at that time.

[14] Wadsworth was elevated slightly where it crossed the swale. This may explain the presence of several feet of "disturbed soil" in CTDEP's borings 46-WAD and 60-WAD (which were located in the Wadsworth Street right-of-way). On this basis, it can be concluded that the Wadsworth Street right-of-way has been filled with soil fill. It could not be determined if a culvert was present beneath Wadsworth Street in March 1934.

Wadsworth Street and 39, 47, 51 and 71 Bryden Terrace[15]. The portion of the swale east of Wadsworth Street is not as deep and the portion to west, but had not yet been filled at that time.

No buildings are depicted within the study area on the 1877 coastal survey, the 1892 USGS quadrangle or the 1914 US Army quadrangle. No key is provided for the land use symbols used on the 1877 survey, but it appears that woodlands, wetlands, standing water and cleared fields are indicated on various portions of the study area. Woodland symbols are depicted on portions of the study area on the 1914 map. No woodland overlay is provided on the 1892 map. The portion of Bryden Terrace between Winchester Avenue and Wadsworth Street was not yet present on the 1877 survey, the 1892 map or 1914 maps. A former street is depicted that crossed the central portion of the site "diagonally" from southwest to northeast from the current intersection of Winchester Avenue and Morse Street to Mill Rock Road midway between Winchester Avenue and Newhall Street. Neither the maps, nor the survey, specify if the streets were paved or paved, but from the 1934 photographs it can be concluded that Winchester Avenue, Wadsworth Street, Newbury Street, the former "diagonal street" and Bryden Terrace (east of Wadsworth Street) were not paved as of the time of those photographs. Newhall Street and Morse Street appear to have been paved on the 1934 aerial photographs.

Based on the location of the 50 foot contour[16] on the 1947 US Army Map Service 7.5 minute New Haven Quadrangle and the 1954 USGS 7.5 minute New Haven Quadrangle, it can be concluded that the study area (and much of the surrounding area) was filled to its current elevation by 1943[17]. The only buildings depicted within the study area on the 1947 map are houses at the approximate locations of the current houses at 165-167 and 171-73 Morse Street and 1028, 1030 and 1032 Winchester Avenue. All of the current streets are depicted on the 1947 map, except for the section of Bryden Terrace between Winchester Avenue and Wadsworth Street. The "diagonal" street is no longer depicted on these maps. The topography is unchanged on the 1954 map. Twenty nine buildings are depicted within the study area on the 1954 quadrangle (17 in the block bounded by Newhall Street, Newbury Street, Winchester Avenue and Morse Street, 10

---

[15] Based on the 1934 aerial photographs, it appears that the swale did not extend significantly south of Bryden Terrace (east of Wadsworth Street). While the photographs indicate that the properties at 17 and 21 Wadsworth Street were undeveloped and vegetated at that time, they appear to be at or near their current elevations. This suggests that any fill on those properties is likely to have been placed there prior to 1934. On that basis, they were ultimately excluded from the final list of properties that received fill after December 1931. Attempts to use topographic maps and other reference sources to establish the history fill placement at 17 and 21 Wadsworth Street were unsuccessful, primarily due to the contour intervals on the available maps.

[16] The contour interval on the 1947 and 1950 quadrangles is 10 feet.

[17] The 1947 quadrangle was based on surveys performed in 1943.

along or near Morse Street between Winchester Avenue and Wadsworth Street and one each at or near the current houses at 1061 Winchester Avenue and 46 Wadsworth Street).

Sanborn Fire Insurance Company maps do not provide topographic data, but do provide detailed information on buildings, structures and other improvements. No coverage of the study area is provided on Sanborn Fire Insurance Company maps dated 1886 or 1901. Coverage of the study area is limited to the block between Newbury Street (which is listed as "unnamed"), Winchester Avenue, Morse Street and Newhall Street on the 1924 Sanborn Fire Insurance Company maps (New Haven Volume 5, Sheet 506). No buildings are depicted within that block, except for a small unlabelled building (possibly a shed) on what is now the rear portion of the lot of what is now 1036 Winchester Avenue.

Coverage of the entire study area is provided on the 1950 Sanborn Fire Insurance Company Map (New Haven Volume 5, Sheets 506 and 532). Newbury Street is named on the 1950 Sanborn map and nine houses are depicted in the block bounded by Newbury Street, Winchester Avenue, Morse Street and Newhall Street (499 Newhall Street, 165-167 and 171-173 Morse Street and 1028, 1030, 1032, 1036, 1042 and 1048 Winchester Avenue). Ten houses are present along or near Morse Street between Winchester Avenue and Wadsworth Street on the 1950 Sanborn map. These are the current houses at 1019 and 1027 Winchester Avenue, 12 Wadsworth Street and 95, 103, 109, 115, 121, 127 and 135 Morse Street. No buildings are depicted on the any of the other lots that comprise the study area on the 1950 maps. All of the current buildings are depicted on the 1967 Sanborn maps.

The 1982 USGS topographic map does not provide details of individual buildings in this area, but shows it as being fully developed (pink shaded). Bryden Terrace is depicted to between Winchester Avenue and Wadsworth Street on the 1982 map. Overall, the area appears to be developed to essentially its current extent on the 1982 USGS topographic map.

Selected municipal records provided in the appendices of the 2002 Haley & Aldrich Phase I report, including copies of the Hamden Board of Health records, Town of Hamden Annual Reports and copies of correspondence between the Town of Hamden, Southern New England Telephone Company, the New Haven Water Company and Olin/Winchester Repeating Arms provide evidence that dumping occurred within the study area during the 1930s and 1940s. Haley & Aldrich stated that the earliest reference to a dump (referred to as the "Mill Rock Dump") in the area bounded by Mill Rock Road, Winchester Avenue, Wadsworth Street and Morse Street (which includes approximately 60% of the study area and Mill Rock Park) was in 1934. Hamden Board of Health minutes state that four public refuse dumps, including the Mill Rock Dump, were operating in Hamden in March 1935. Based upon the municipal records, the Mill Rock Dump was not owned by the Town of Hamden, but Board of Health records indicate that the town hired caretakers to supervise and "rake out" the wastes at the Mill Rock Dump from at least 1936 to 1941. Board of Health records state that the wastes from both non-residential and residential sources were accepted in town dumps during that period. The

9

Board of Health recommended the closing of the "Newhall and Mill Rock Dumps" in March 1937.  H&A stated that the "northern portion" of the Mill Rock Dump (assumed to be the area currently occupied by Mill Rock Park) was closed in 1937, but that dumping continued on the "southern portion" (which is believed to be part of the area also referred to as the "Winchester Avenue Dump") until at least until 1941.  Board of Health minutes from May 1941 stated that four dumps were active including one on Wadsworth Street.  Haley & Aldrich also reviewed a July 1936 New Haven Register article from July 1936 that referenced dump fires in the Mill Rock Dump.

Based on a review of Hamden tax assessment cards and tax assessment cards for the six houses located east of Wadsworth Street at the Hamden town hall, the houses currently present in the study area were built between 1931 and 1960, except for the houses at 1030 and 1032 Winchester Avenue, for which the dates of construction were not specified on the cards.  The only house listed as having been built in 1931 was 1028 Winchester Avenue.  Based on discussions with staff at the Town of Hamden Assessor's office, the dates listed on the assessment cards are generally based on the date the building permit was issued, and that many of the dates (especially those from the 1930s and 1940s) are approximate.

Based on the information provided above, it can be concluded to a reasonable degree of scientific certainty that the majority of the study area was filled in the 1930s and 1940s.  Based on historic maps and aerial photographs, the only properties that are unlikely to have received fill after 1931 are 155, 161, 165-167 and 171-173 Morse Street.  The majority of the fill on the all other lot was placed between 1934 and 1941.  Residential construction began on in the subject area in the 1930s.  The only buildings present within the study area on a 1934 aerial photograph were at 165-167 and 171-173 Morse Street and 1028, 1030 and 1032 Winchester Avenue.  The properties at 165-167 and 171 Morse Street were fully developed and had established lawns on the 1934 aerial photographs.  Therefore, it can be concluded to a reasonable degree of scientific certainty that these properties are likely to have been filled to their current extent prior to 1931.  However, based upon the physical condition of the houses at 1028, 1030 and 1032 Winchester Avenue in the March 1934 photograph it can be concluded to a reasonable degree of scientific certainty that these houses were recently constructed and that additional fill was placed on the rear portions of those lots since that time.  Therefore, it is my opinion that the properties at 1028, 1030 and 1032 Winchester Avenue received fill after 1931.  It is also my opinion that the remainder of the lots received fill after 1931 (with most of it deposited between 1934 and 1941), with houses being built between 1934 and 1960.  All of the private properties in the study area have been used solely for residential purposes since that time.

**2.3 Extent of Fill**

Based on the historical topographic maps, aerial photographs and town records discussed in the prior section, it is my conclusion to a reasonable degree of scientific certainty that essentially the entire study area has been filled since 1934.  Collectively,

the boring data from investigations performed by CTDEP (2001), Malcolm Pirnie (2002 and 2004), GZA GeoEnvironmental (2002) and Louriero Engineering Associates (2004) are sufficient to confirm the presence of fill (including materials described in the previous investigation reports as "disturbed soil", "domestic refuse fill" and/or "industrial fill"[18]) beneath all or portions of every property within the study area, with the possible exceptions of 155 Morse Street and 161 Morse Street[19].

Where present, the fill thickness varies from less than one foot to more than eleven feet. More than four feet of fill is present beneath 43 of the 59 properties in the study area and more than ten feet of fill is present beneath 14 properties. All properties in the area bounded by Morse Street, Wadsworth Street, Mill Rock Park and Winchester Avenue (referred to as Blocks C and F by Malcolm Pirnie) are within the designated as the "Bryden Terrace Fill Area" in the Malcolm Pirnie Reports. The properties on the western portion of the block bounded by Newbury Street, Winchester Avenue, Morse Street and Newhall Street (referred to as Block E by Malcolm Pirnie) are within the area designated as the "Newhall Street Fill Area" in the Malcolm Pirnie report.

Based upon the investigations conducted to date, the fill beneath the properties in the eastern portion of the block bounded by Morse Street, Wadsworth Street, Mill Rock Park and Winchester Avenue (18 and 22 Newbury Street; 1028, 1030, 1032, 1038, 1042 and 1048 Winchester Avenue; and 155, 161, 165-67 and 171-173 Morse Street) does not appear to be continuous, but rather exists in noncontiguous pockets. The largest of these pockets (referred to as "areas of isolated fill" in the Malcolm Pirnie reports) are designated as E01 and E02 in the 2005 Malcolm Pirnie Supplemental Investigation Report. These pockets were estimated to contain 140 and 65 cubic yards of fill (respectively). Area E01 is located primarily on 165-167 Morse Street and encroaches onto 171-173 Morse Street, 18 Newbury Street and 1032 Winchester Avenue. Area E02 is primarily located on the rear of the lot at 1032 Winchester Avenue and extends on to the adjoining lots at 1028 and 1032 Winchester Avenue.

---

[18] The Malcolm Pirnie reports attempt to differentiate between "domestic refuse fill" and "industrial waste fill". Malcolm Pirnie defined domestic refuse fill as soil intermixed with products associated with household and/or on-site burning of paper/wood/coal, rusted metal cans and numerous whole batteries and broken glass, various broken ceramic items and brick. Industrial waste fill was defined as "black silt and sand sized particulates with slag, cinders and ash intermixed primarily with wood box fragments and/or woodchips, batteries, Winchester-related paper products and shell casings".

[19] It is noted that the fill beneath several properties along Winchester Avenue is limited to "disturbed soil". However, since the criteria used by Malcolm Pirnie and others to designate "disturbed soil" on the borings logs allow limited quantities of ash, brick and other man-made materials to be present, and since elevated concentrations of lead, arsenic and other pollutants have been identified in various "disturbed soil" samples, it is my opinion that the presence of "disturbed soil" is evidence of artificial fill for purposes of delineating the extent of artificial fill.

11

No fill was specifically identified on the lots at 22 Newbury Street, 1042 Winchester Avenue and 1048 Winchester Avenue. However, since the fill in the vicinity of these lots has been documented to occur in scattered pockets and only a limited number of borings are present on these lots, it is reasonable to conclude that pockets of fill may be present that have not been discovered. No fill was identified at 155 and 161 Morse Street. Given the fact that these properties occupy historically high ground it is reasonable to conclude that no fill was required prior to construction on these lots.

Boring data for Loureiro's 2004 investigations was used to evaluate the extent of fill on the six lots east of Wadsworth Street. The boring data documents that two to seven feet of fill is present at 61 Wadsworth Street and 39, 47 and 71 Bryden Terrace[20,21]. No borings were performed at 51 Bryden Terrace, but fill since all of the surrounding lots have been documented to contain fill, and the aerial photographs indicate that it was part of the same wetland area as the surrounding nearby properties, it is my opinion to a reasonable degree of scientific certainty that this lot was also filled prior to construction. It is noted that no fill was reported in the borings at 53 Wadsworth Street. However, fill has been confirmed on adjoining properties and the 1934 aerial photographs indicates the presence of wetlands on this lot at that time, and therefore, it is my opinion to a reasonable degree of scientific certainty that this lot also has been filled since 1931.

Based upon the boring data, topographic data and the cross-sectional drawings provided in the Malcolm Pirnie report, it is estimated that approximately 120,000 cubic yards of artificial fill is present beneath study area. The data is sufficient to conclude to a reasonable degree of scientific certainty that artificial fill is known or likely to be present beneath every lot included in the study area, except for 155 and 161 Morse Street.

**2.4 Fill Characteristics**

Subsurface investigations were performed by CTDEP in 2001, GZA GeoEnvironmental in 2002, Malcolm Pirnie in 2002 and Loureiro Engineering in 2004. Collectively, boring logs, field notes and/or analytical data from 151 boring and/or sampling locations were used to evaluate the fill characteristics in the study area. Additional subsurface data from the excavations performed by USEPA at 1067 Winchester Avenue; 118, 124, 131 and 136 Bryden Terrace; 115 Morse Street and 127 Morse Street in 2002 as part of a CERCLA soil removal action were also considered.

---

[20] Fill is also present on the adjoining properties at 178-180, 188, 190-192, 196-198, 202-204 and 210-212 Mill Rock Road. Those properties were not included in the study area, since my evaluation of the 1934 aerial photographs resulted in the conclusion that those properties were filled and developed prior to that time.

[21] Fill is also present on 25 Bryden Terrace, but the 1934 photograph demonstrates that this lot was filled prior to that time, therefore, it was excluded from the study area.

Based upon boring logs and narrative descriptions provided in the reports identified above, the characteristics of the fill are similar throughout the study area. Except as discussed below, characteristics of "domestic refuse fill" and/or "industrial fill" where encountered on and/or adjacent to all properties in the study area. One or more of the following constituents was present at these locations: sand[22], ash, cinders, coal, slag, brick, concrete, wood, glass and/or ceramic. Wire, cardboard, a bed frame and leather scraps were also reported in the USEPA soil removal excavation at 1067 Winchester Avenue; 118, 124, 131 and 136 Bryden Terrace; 115 Morse Street and/or 127 Morse Street. In some cases, the ash and cinders are further described as being either white or black, or as "ash", "cinder" or "clinker". Based on these descriptions, it can be concluded that fill contains commingled "domestic refuse fill" and "industrial waste fill".

It is noted that most of the borings in which no "domestic refuse fill" or "industrial fill" was identified are located either in the public rights-of-way and/or on lots west of Winchester Avenue. The absence of significant quantities of refuse or industrial fill beneath the public streets is not surprising since based upon the historic records, the current streets pre-date the filling of the adjoining lots, with the exception Newbury Street and the portion of Bryden Terrace between Winchester Avenue and Wadsworth Street[23]. It is noted that refuse and/or waste fill was identified in the borings beneath these streets.

Based on my experience at multiple other sites with contaminated fill, it is typically difficult to distinguish between historic wastes from residential sources and those from industrial sources. Therefore, the attempts by Haley & Aldrich and Malcolm Pirnie to quantify the relative proportions the fill from residential as opposed to industrial sources are only considered to be crude estimates. Materials such as ash, cinders, brick and concrete can originate from either residential or industrial sources, but that slag and clinker would typically be associated with industrial sources. The presence of these materials in a large percentage of borings indicates that industrial wastes are present in the fill and commingled with residential materials. It is also noted that at the time the study area was filled, coal was more commonly used for industrial purposes than for residential purposes, and that coal waste is much more likely to have originated from

---

[22] It is noted that sand is a component of the native soils in this area as well as a component of various waste streams. Attempts were made to differentiate sand associated with refuse and waste disposal activities from sand associated with undisturbed soil using the information provided on the boring logs. In most cases, the sand was assumed to be associated with waste or refuse fill if it was either commingled with other waste constituents, was reported to be black or otherwise discolored and/or if no fines (such as silt or clay) were reported in the strata in which the sand was reported.

[23] It is again noted that "disturbed soil" was encountered in most borings where no " domestic refuse fill" or "industrial waste fill" was noted. as discussed above due to the presence of ash, slag, brick, asphalt or similar materials, as well as Hazardous Substances in "disturbed soil" for the purposes of this report, "disturbed soil" is considered to be artificial fill. .

industrial sources. Similarly, significant quantities of sand are commonly used in various industrial processes (such as foundry operations), but relatively limited amounts are typically present in residential waste streams from that time. Finally, it is noted that domestic type wastes are also generated by industrial facilities (from office operations, cafeterias, shipping and receiving operations, etc.). On this basis, the data indicate that industrial waste is present in the fill, but the relative proportions of industrial waste to residential refuse cannot be reliably determined as the waste streams based upon all of the available data are to a reasonable degree of scientific certainty, commingled.

Analytical data from more than 500 samples collected during prior investigations by CTDEP, GZA and Malcolm Pirnie is compiled and summarized in the 2005 Malcolm Pirnie *Supplemental Investigation Report*. Analytical data from the samples collected by Loureiro in 2004 is provided in a series of letter reports (one for each property sampled).

Based upon this data, it is clear that the chemical characteristics of the fill are similar throughout the study area, and that the composition of the fill in the study area is indistinguishable from the fill in other nearby areas where industrial fill from the Winchester Repeating Arms Company and/or Olin is known to be present, such as on the grounds of the Hamden Middle School. While its is noted that the actual contaminant concentrations in individual samples vary over a range of one to two orders of magnitude, this would be expected due to the heterogeneity inherent in typical waste streams and with the field operations (including possible historic open burning, compaction, covering and grading activities) typically associated with fill placement and/or waste disposal at uncontrolled sites. However, the data demonstrate that the concentrations of lead, arsenic, total petroleum hydrocarbons and polyaromatic hydrocarbons are significantly higher in the fill samples than they are in either the underlying native soil or the surficial cover soil. One or more of these parameters (lead, arsenic, ETPH or PAHs) exceeds CTDEP remediation criteria in the majority of fill samples, whereas there are relatively few exceedences in the overlying surface soils[24]. It is noted that the lead, arsenic, ETPH and PAH concentrations in fill samples collected within the study area have the same characteristics and range of concentrations of hazardous substances to those collected from other nearby areas from which industrial waste from Winchester Repeating Arms Company and/or Olin Corporation is known to be present (such as on the Newhall Middle School property).

Based on that compilation, it is clear that the chemical composition of the fill in the study area has the same characteristics and range of concentrations of hazardous substances to those collected from other nearby areas from which industrial waste from Winchester Repeating Arms Company and/or Olin Corporation is known to be present. A total of 161 fill samples have been analyzed from the Bryden Terrace Fill Area (which

---

[24] It is further noted that the concentrations of one or more contaminants of concern in various surficial samples may be elevated due to entrainment of the underlying fill material in those samples (particularly since the surficial soil is less than six inches thick in many case) either during historic grading, landscaping or construction activities, or during field sampling activities.

includes approximately 60% of the study area). 82 of these samples exceed the Residential Exposure Criteria (RDEC) for arsenic (10 mg/kg) and/or lead (400 mg/kg). 115 of these samples have extractible (SPLP) lead concentrations in excess of the GA Pollutant Mobility Criteria (GAPMC; 15 ug/l for lead). 78 fill samples exceeded the RDEC for benzo(a)pyrene (a representative polyaromatic hydrocarbon compound) of 1,000 ug/kg and the GAPMC of 26 ug/kg. Various other polyaromatic hydrocarbons were also present in the fill samples. The extractible total petroleum hydrocarbon (ETPH) concentration in 26 samples exceeded the RDEC and GAPMC (both 500 mg/kg). It is noted that the arsenic, lead, polyaromatic hydrocarbons and ETPH concentrations in both the native soil beneath the fill and surficial soil above it had substantially lower concentrations, indicating that the elevated contaminant concentrations in the fill are attributable to the fill itself, rather than pre-existing conditions prior to its placement or land uses subsequent to its placement.

A total of 115 fill samples have been analyzed from the Newhall Fill Area (which includes the portion of the study area bounded by Winchester Avenue, Morse Street, Newhall Street and Newbury Street). 42 of these samples exceed the Residential Exposure Criteria (RDEC) for arsenic (10 mg/kg) and/or lead (400 mg/kg). 32 of these samples have extractible (SPLP) lead concentrations in excess of the GA Pollutant Mobility Criteria (GAPMC; 15 ug/l for lead). 23 fill samples exceeded the RDEC for benzo(a)pyrene (a representative polyaromatic hydrocarbon compound) of 1,000 ug/kg and the GAPMC of 26 ug/kg. Various other polyaromatic hydrocarbons were also present in the fill samples. The extractible total petroleum hydrocarbon (ETPH) concentration in 12 samples exceeded the RDEC and GAPMC (both 500 mg/kg). It is noted that the arsenic, lead, polyaromatic hydrocarbons and ETPH concentrations in both the native soil beneath the fill and surficial soil above it had substantially lower concentrations, indicating that the elevated contaminant concentrations in the fill are attributable to the fill itself, rather than pre-existing conditions prior to its placement or land uses subsequent to its placement.

Although additional pockets of "isolated fill" may be present on the eastern portion of block E that have not yet been delineated (or sampled), the sampling data from areas "E01" and "E02" are assumed to be representative of fill pockets throughout this area. Two fill samples were analyzed from E001 and two samples were analyzed from E02. Both samples from E01 and one sample from E02 exceed the Residential Exposure Criteria (RDEC) for arsenic (10 mg/kg) and/or lead (400 mg/kg). One sample from E02 had extractible (SPLP) lead concentrations in excess of the GA Pollutant Mobility Criteria (GAPMC; 15 ug/l for lead). It appears that the soil overlying and underlying the fill was not sampled, but the characteristics are assumed to be the similar to samples from the adjoining area to the west.

Information on the characteristics of the fill on the parcels east of Wadsworth Street is provided in Loureiro's reports. The boring logs indicate that slag, coal, ash, brick, debris, glass and porcelain were present in the borings on all properties in this area, except 53 Wadsworth Street. It is noted that additional artificial fill may be present, since

Loureiro apparently did not attempt to distinguish between disturbed and undisturbed soil.

Loureiro analyzed approximately 50 samples from 23 borings on properties within the study area, although not all samples were analyzed for all parameters of concern. No samples were analyzed for SPLP metals. In general, the metals concentrations in the samples containing fill are higher than those from of the surface and underlying soil samples, but the only compounds that exceeded the RDEC in Loureiro's samples from within the study area was lead in several samples and chlordane in one sample.

Overall, the arsenic, lead, polyaromatic hydrocarbons and ETPH concentrations in fill samples from within the study area are consistently elevated above the ranges typically associated with native soil and the average concentrations of these constituents in the fill samples are higher than those in either the underlying or overlying soil. Therefore, it is my opinion to a reasonable degree of scientific certainty that the elevated concentrations of these compounds are attributable to the fill itself. Arsenic, lead, polyaromatic hydrocarbons and ETPH are commonly associated with fill containing ash, slag, cinders and industrial waste. While there is significant variability in the concentrations of these constituents, this is not uncommon in cases such as this due to the heterogeneity of original waste streams (due in part to changes in the products, production processes and production rates over time) and the inherent intermixing of waste materials with other soil and/or waste streams during their deposition, compaction and grading. Based upon all of this data, it is my opinion to a reasonable degree of scientific certainty that the contaminants present in the fill beneath the properties within the study area are characteristically similar to those present in fill at the Hamden Middle School and other nearby areas that is known to have originated to from Winchester Repeating Arms Company and/or Olin.

## 3.0 CONCLUSIONS

Based on the findings of my investigation, as discussed the proceeding sections of this report, the following conclusions are provided to a reasonable degree of scientific certainty with respect to fill deposited within the study area:

Most of the study area was filled in the 1930s and 1940s. Based on historic maps and aerial photographs, the only properties that are unlikely to have received fill since 1931 are 155, 161, 165-167 and 171-173 Morse Street and 17 and 21 Wadsworth Street. The majority of the fill on the other lots was placed in the study area between 1934 and 1941. Residential construction began on in the subject area in the 1930s. The only buildings present within the study area on a 1934 aerial photograph were at 165-167 and 171-173 Morse Street and 1028, 1030 and 1032 Winchester Avenue. The properties at 165-167 and 171 Morse Street appear to have been fully developed and had established lawns on the 1934 aerial photographs. Therefore, these properties were filled to their current extent prior to 1931. However, on the 1934 photographs, there is substantial evidence to support that conclusion that the houses at 1028, 1030 and 1032 Winchester Avenue were recently constructed and that additional fill has been placed on the rear portions of those lots since that time. The remainder of the lots have received fill after 1931 (with most of it deposited between 1934 and 1941, with houses being built on them between 1934 and 1960. All of the private properties in the study area have been used solely for residential purposes since that time.

The arsenic, lead, polyaromatic hydrocarbons and ETPH concentrations in fill samples from within the study area are consistently elevated above the ranges typically associated with native soil. The average concentrations of these constituents in the fill samples are higher than those in either the underlying or overlying soil. Therefore, the elevated concentrations of these compounds are attributable to the fill itself. Arsenic, lead, polyaromatic hydrocarbons and ETPH are commonly associated with fill containing ash, slag, cinders and industrial waste. While there is significant variability in the concentrations of these constituents, this is not uncommon in cases such due to the heterogeneity of original waste streams (due in part to changes in the products, production processes and production rates over time) and the inherent intermixing and commingling of waste materials with other soil and/or waste streams during their deposition, compaction and grading. The contaminants present in the fill beneath the properties within the study area are scientifically indistinguishable from those present in fill at the Hamden Middle School and other nearby areas that is known to have originated from Winchester Repeating Arms Company and/or Olin Corporation.

In conclusion, the available information is sufficient to conclude that artificial fill, including industrial waste containing contaminants scientifically indistinguishable from those present in fill at the Hamden Middle School and other nearby areas that is known to have originated to from Winchester Repeating Arms Company and/or Olin Corporation, was deposited on the following properties after December 1931:

- 95, 103, 109, 115, 121, 127, 135, 177 and 185 Morse Street

17

- 499, 507, 513, 517 and 523 Newhall Street
- 18, 22 and 26 Newbury Street
- 1019, 1027, 1028, 1030, 1032, 1035, 1042, 1048, 1061, 1067 and 1071 Winchester Avenue
- 39, 47, 51, 71, 84, 90, 94, 99, 105, 106, 112, 113, 117, 118, 124, 125, 130, 131, 136 and 142 Bryden Terrace
- 12, 20, 46, 53, 61, 54 and 60  Wadsworth Street

These properties are shown as the "Contaminated Properties Subclass Area" on Figure 1. The properties at 155, 161, 165-167 and 171-173 Morse Street and 17 and 21 Wadsworth Street were excluded from the list above and the Contaminated Properties Subclass Area on Figure 1. The basis for is excluding these properties is that any fill on those properties was deposited there prior to 1931.

Dated March 23, 2007

_____

Michael E. Hopkins
Professional Engineer and Licensed Environmental Professional

Dated March 23, 2007

_____

Michael E. Hopkins
Professional Engineer and Licensed Environmental Professional

**MICHAEL E. HOPKINS, P.E., LSP, LEP**
**Principal/New York Branch Manager/Director of Due Diligence Services**

## EDUCATION

State University of New York at Buffalo
B.S. Civil Engineering, 1981

SUNY College of Environmental Science and Forestry (in conjunction with Syracuse University)
B.S. Forest Engineering, 1980

## PROFESSIONAL EXPERIENCE

**Environmental Compliance Services, Inc.,** January 1, 2000 to present
Principal/New York Branch Manager/Director of Due Diligence Services

**Hopkins Environmental Management, Inc.,** 1991 to 1999
President

**C/P Utility Services Company, Inc.,** 1990 to 1991
Manager of Environmental Engineering

**Environmental Risk Limited,** 1989 to 1990
Senior Associate

**Niagara County (New York), Health Department,** 1981 to 1989
Public Health Engineer/Supervising Public Health Engineer

## PROJECT EXPERIENCE

**Remediation**

- Performed remedial investigations, developed work plans, interpreted data and designed various remediation systems.
- Projects have included soil removal, capping, groundwater recovery and treatment, sparging, soil vapor extraction, free product recovery, drum removal, building decontamination, asbestos abatement, and complex, multi-phased remediation projects.
- Managed all phases of remedial projects including initial assessments, detailed remedial investigations, cost estimates, negotiations with regulatory agencies, permitting, remedial system design, plan implementation, system start-up and operations, and professional engineering certifications.
- Managed more than 200 remediation projects with budgets up to $3 million dollars.

**MICHAEL E. HOPKINS, P.E., LSP, LEP**
**Principal/New York Branch Manager/Director of Due Diligence Services**

**Environmental Site Assessments**

- Corporate Director of Due Diligence Services. Manages and directs more than 500 phase I, II and III assessments per year, including personally reviewing and approving all final reports.
- Conducted environmental site assessments for more than 2,000 properties in 35 states, and managed more than 6,000 assessment projects.
- Assessment clients have included financial institutions, government agencies, attorneys, industries, developers, investment firms, municipalities, property owners and potential buyers.
- Conducted assessments of properties valued up to $600 million.
- Peer reviewed and evaluated more than 1,400 assessment reports prepared by other firms.
- Routinely provides second opinions and independent peer reviews of environmental site assessments, risk assessments and remedial cost estimates.

**Hydrogeology/Site Investigation**

- Worked as a hydrogeologist, chief investigator, technical supervisor, project engineer and project manager on soil and groundwater contamination studies, aquifer characterization projects, hydrogeologic investigations, and remedial investigations.
- Has substantial experience in interpreting hydrogeologic and groundwater quality data.

**Engineering**

- Licensed Professional Engineer with experience as a project, remedial, public health and design engineer.
- Managed engineering groups of up to twelve professionals for consulting firms and a government agency.
- Designed groundwater collection, wastewater treatment, spill contaminant and tank systems.
- Provided professional engineering evaluations and certifications for a variety of projects.
- Prepared bid specifications and technical contract documents for various projects.

**Regulatory Compliance**

- Has enforcement and regulatory experience in solid and hazardous waste management, underground storage tank compliance, water pollution control, air pollution control, and public health regulations.
- Worked as a review engineer, regulatory analyst, technical supervisor and program manager.
- Acted as a consultant to a variety of companies to audit regulatory compliance, to develop compliance programs and as a day-to-day advisor on compliance matters.
- Has managed solid and hazardous waste, wastewater discharge and air emission source permitting projects.

**MICHAEL E. HOPKINS, P.E., LSP, LEP**
**Principal/New York Branch Manager/Director of Due Diligence Services**

### Environmental Auditing/Risk Management

- Skilled environmental auditor with experience in conducting both internal and third party audits.
- Developed protocols, policy guidance and screening procedures for use by a major international insurance company in conjunction with underwriting underground storage tank insurance policies, and coordinated field investigations of more than 600 claims for that client.
- Developed environmental risk management programs for clients including banks, an insurance company, manufacturers, numerous small businesses, and an electric utility company.

### Miscelleanous

- Acted as on-site technical assessment officer at more than 600 hazardous material emergency response incidents.
- Provided expert opinions in hazardous waste management enforcement and public health assessment cases.
- Was implemental in remedial actions and public health assessment activities at the Love Canal (1981-1988). Acted as Niagara County spokesman with respect to Love Canal communications (1984 -1988).

### PROFESSIONAL CERTIFICATIONS AND LICENSES

Licensed Professional Engineer, Connecticut and New York
Connecticut Licensed Environmental Professional (#153)
Massachusetts Licensed Site Professional (#9599)



Figure 1 - Contaminated
Properties Subclass Area
Newhall Street Neighborhood
Hamden, Connecticut

Legend

Class Area

Contaminated Properties
Subclass Area