Page 1

```
         UNITED STATES DISTRICT COURT
           DISTRICT OF CONNECTICUT


------------------------------------)
CLARENCE R. COLLINS, JR., et al.    )
                                    )
     Plaintiffs,                    ) Civil Action No.
                                    )
          vs.                       ) 303CV945 (CFD)
                                    )
OLIN CORPORATION, et al.,           )
                                    )
     Defendants.                    )
------------------------------------)



         DEPOSITION OF:  EUGALYN WILSON
              DATE:  JUNE 28, 2005
                    HELD AT:
              HALLORAN & SAGE, LLP
      ONE GOODWIN SQUARE, 225 ASYLUM STREET
              HARTFORD, CONNECTICUT
                    - - -



                    Reporter:

     Sandra V. Semevolos, RMR, CRR, LSR #74

         BRANDON SMITH REPORTING SERVICE
               44 Capitol Avenue
           Hartford, Connecticut 06106
                 (860) 549-1850
```

### Page 26

1  Q. And where did he move?
2  A. To Torrington.
3  Q. And where is that?
4  A. In Connecticut.
5  Q. How far away is that from Hamden?
6  A. About an hour drive.
7  Q. Did anyone else live with you at 222 Morse
8  Street between May of 1989 and 1993?
9  A. My daughter who was born when I lived there.
10 Q. And what is your daughter's name?
11 A. Samantha.
12 Q. And what was her birth date, or what is her
13 birth date?
14 A. 9/28/89.
15 Q. Did anyone else live with you at 222 Morse
16 Street between May of 1989 and 1993?
17 A. My older daughter who came there in 1990.
18 Q. And what is her name?
19 A. Shakerah.
20 Q. And what is her date of birth?
21 A. 7/19/82.
22 Q. And where did Shakerah live prior to coming
23 to live with you at 222 Morse Street in 1990?
24 A. Jamaica.
25 Q. Who was she living with in Jamaica?

### Page 27

1  A. Her grandmother.
2  Q. Where was Shakerah born?
3  A. Jamaica.
4  Q. Did anyone else live with you at 222 Morse
5  Street between May 1989 and 1993?
6  A. No.
7  Q. Did your daughter Samantha live with you
8  from May of 1989 through 1993 at 222 Morse Street?
9  A. Yes.
10 Q. Is 222 Morse Street the only property you
11 are claiming gives rise to your claims in this
12 lawsuit?
13 A. No.
14    I also own --
15    MR. MITCHELL: You can wait for a
16 question.
17 BY MR. SAMSON:
18 Q. Go ahead.
19 A. I also own 132-134 Shepard Street.
20 Q. And when did you purchase 132 to 134 Shepard
21 Street?
22 A. December 17, 2002.
23 Q. Have you ever lived at 132 to 134 Shepard
24 Street?
25 A. No.

### Page 28

1  Q. Do you know if 132-134 Shepard Street is
2  inside or outside of the study area contained in the
3  consent order?
4  A. Within.
5  Q. You believe it's within the study area
6  contained in the consent order?
7  A. Yes.
8  Q. What causes you to believe it's within the
9  study area covered by the consent order?
10 A. Because across the street from where that
11 is, the neighbor had her place tested, and it's also
12 within the map that was given to me.
13 Q. What map are you referring to?
14 A. A map of the Newhallville neighborhood.
15 Q. When did you receive that map?
16 A. I gotten one sometime ago and I gotten one,
17 another one, if I'm not mistaken, it's either March or
18 April.
19 Q. Have you produced those maps in this case?
20    MR. MITCHELL: Are they in this pile?
21    Maybe you can tell him the Bates
22 number. 4358, Joel.
23 BY MR. SAMSON:
24 Q. That's the one you believe you received
25 recently?

### Page 29

1  A. Yes.
2  Q. And was that given out at a meeting?
3  A. Yes -- no. It was mailed to me.
4  Q. That map was mailed to you, contained within
5  4358?
6  A. Yes.
7  Q. Do you recall who mailed that to you?
8  A. I don't recall at the moment.
9  Q. If you'd flip back to page 4351 in that same
10 packet, which is the agenda of a May 17, 2005 meeting,
11 was this also mailed to you?
12 A. Yes.
13 Q. Do you recall when you received this
14 document?
15 A. No.
16 Q. Did you attend this May 17, 2005 meeting?
17 A. I was there.
18 Q. We will get into that a little more later.
19 But you believe you received a map with that packet of
20 information prior to the May 17, 2005 meeting?
21 A. Yes.
22 Q. Do you recall discussing that map which has
23 a Bates number of 4358 on it? Do you recall
24 discussing that map with anybody?
25 A. Yes. I did.

Page 138

1  two feet, three feet, four feet or more, would you
2  agree with whatever assessment and recommendation or
3  approval they give? Let me rephrase that.
4      If the DEP says that three feet should be
5  removed from your property and replaced with clean
6  fill, would you be comfortable then that that was the
7  appropriate remedy for your property?
8      A. That I wouldn't be sure of.
9      Q. I'm sorry, I didn't hear that.
10     A. I would not be sure that that would be the
11 remedy.
12     Q. And why would you say you wouldn't be sure
13 of that as the remedy?
14     A. Because what if my area is more than -- it's
15 four feet.
16     Q. You've indicated that testing indicated that
17 the contamination on your property was less than four
18 feet; correct? And I assume we are talking about 222
19 Morse Street; correct?
20     A. I'm within four feet or less. I'm not sure
21 if mine is four feet or if it's less.
22     Q. And this is at 222 Morse Street; correct?
23     A. Yes.
24     Q. So let's say the contamination goes down to
25 four feet. If the DEP says, remove four feet of soil

Page 139

1  from the property and replace it with clean soil, when
2  that is completed, would you be comfortable that your
3  property had been properly remediated?
4      A. I'm not sure how comfortable I'll be, but it
5  makes me a little more comfortable than I am at this
6  moment.
7      Q. Do you believe that your property value will
8  return to whatever value you think the property should
9  have if there is no contamination?
10     A. I'm not sure.
11     Q. And why are you not sure?
12     A. Because I'm just not sure if it would be.
13 There would still be a stigma in the neighborhood.
14     Q. So even if your property is cleaned up to
15 the standards DEP sets, and after all the testing they
16 indicated, we don't believe there is anymore concern
17 over contamination on your property, do you think
18 there would still be a stigma?
19     A. There is always going to be a stigma in the
20 neighborhood.
21     Q. And why do you say that?
22     A. Because of the fact that the neighborhood
23 was contaminated.
24     Q. And you believe that's true regardless of
25 what cleanup occurs in the neighborhood?

Page 140

1      A. Yes.
2      Q. And what is your basis for that statement
3  and belief?
4      A. When something or someone is labeled, there
5  is always a label.
6      Q. Do you have a belief as to what the 222
7  Morse Street property would be worth today if there
8  were no contamination on the property or in the area?
9      A. I don't know.
10     Q. When you say your 222 Morse Street property
11 has little value now, what is your basis for that
12 statement?
13     A. Because houses in the neighborhood that are
14 put up for sale, they hang around in the market for a
15 while, although there is a great demand for houses.
16     Q. Now do those houses ultimately sell?
17     A. Eventually.
18     Q. And I think you've indicated you don't know
19 whether the houses sell for their asking price or not;
20 is that correct?
21     A. That I don't know.
22     Q. So it could be all these owners are getting
23 exactly what they are asking for their houses;
24 correct?
25     A. I'm not sure. They are getting out of the

Page 141

1  neighborhood, too, if they can.
2      Q. It's also possible -- go ahead.
3      A. I said, they are getting out of the
4  neighborhood also, if they can.
5      Q. You also mentioned that you purchased both
6  of your properties at below the asking price; correct?
7      A. Yes.
8      Q. And that wasn't based on contamination
9  concerns, was it?
10     A. No. I'm not sure of the motive why Shepard
11 Street was sold, but Morse Street, at the time, no.
12     Q. Do you think it's possible Shepard Street
13 was sold because of contamination concerns in the
14 neighborhood?
15     A. Possible.
16     Q. At the time were you aware of such concerns?
17     A. Of Shepard Street? No.
18     Q. At the time were you aware of concerns in
19 the neighborhood generally?
20     A. Yes.
21     Q. At the time you purchased the Shepard Street
22 property, you were aware of contamination concerns in
23 the area?
24     A. I was aware of the middle school whole
25 issue.

Page 142

1  Q. And that didn't prevent you from purchasing
2  132-134 Shepard Street; correct?
3  A. I wasn't thinking that it was all the way --
4  that that would have become a concern.
5  Q. I'm sorry, could you repeat that?
6  A. At the time I wasn't thinking of Shepard
7  Street being a concern. It wasn't like right in the
8  neighborhood of the middle school as Morse Street is.
9  Q. Do you have any estimate, as you sit here
10 today, of how much value you think your property has
11 lost due to contamination concerns in the area? And
12 first let's talk about 222 Morse Street.
13 A. It has lost a lot of value because it's
14 not -- even if I think of selling right now, I
15 wouldn't be able to get the price I could have get for
16 it.
17 Q. Do you know what you'd ask for that 222
18 Morse Street property?
19 A. Never think about it.
20 Q. You do or don't think about it?
21 A. I don't think about it.
22 Q. Do you have any idea of how much money would
23 you get for the Morse Street property today,
24 regardless of what you asked for?
25 A. Based on the price in the neighborhood, over

Page 143

1  200,000.
2  Q. And you think that's below what you think
3  the property should be worth today?
4  A. It is.
5  Q. And if I'm correct, you paid 41,000 for the
6  222 Morse Street property in 1995; correct?
7  A. Yes.
8  Q. How much more than 200,000 dollars do you
9  think that property should sell for today?
10 A. I don't know.
11 Q. Have you consulted anyone about this
12 question or issue?
13 A. No.
14 Q. What do you think the 132-134 Morse
15 Street -- I'm sorry. What do you think the 132-134
16 Shepard Street property should sell for today?
17 A. I have no idea.
18 Q. Do you have any idea how much value that
19 property has lost due to contamination concerns?
20 A. Neither.
21 Q. You don't know how much you think it's lost?
22 A. No.
23 Q. Have you discussed your concerns about the
24 loss in value of your property with anyone?
25 A. I've talked about it with other concerned

Page 144

1  neighbors that are in the neighborhood.
2  Q. What other neighbors have you talked with
3  about your concerns about loss in value of the
4  property?
5  A. Their names?
6  Q. Yes.
7  A. Sonia Powell and I talked a lot.
8  Q. Anybody else?
9  A. Mostly her and there is one lady at 650
10 Newhall Street, Murline Wellesley.
11 Q. Anyone else you speak to about these
12 concerns?
13 A. Just those two people and I talk more
14 in-depth.
15 Q. And what have you and Sonia Powell
16 discussed?
17 A. I mean, we talked about, you know, things
18 that we could be doing with our property, and if we
19 chose to sell the place, you know, how would that
20 affect us.
21 Q. What type of things have you come up with?
22 A. Not able to sell the place, that we might
23 not be able to sell the property as quick as it would
24 have sold had it not been contaminated.
25 Q. Has Sonia Powell given you any estimates of

Page 145

1  what she thinks the property should be worth or what
2  they are actually worth now?
3  A. No.
4  Q. Has Murline Wellesley given you any
5  estimates of what the property should sell for now or
6  what she thinks they are actually worth because of the
7  contamination concerns?
8  A. No.
9  Q. How often do you talk to Sonia Powell?
10 A. Once in a while.
11 Q. When was the last time you spoke with Sonia
12 Powell?
13 A. Maybe about three weeks ago.
14 Q. And was that about this case?
15 A. No, not really.
16 Q. What did you speak to her two or three weeks
17 ago?
18 A. What did we speak about?
19 Q. Yes.
20 A. We talked about the area and general talk
21 about, you know, the area and the cleanup of it and
22 other personal things.
23 Q. How often do you talk to Murline Wellesley?
24 A. Quite frequently.
25 Q. More often than Sonia Powell?