UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CLARENCE R. COLLINS, JR., et al | : | 3:03-CV-945 (CFD) |
| | : | |
| Plaintiffs, | : | |
| VS. | : | |
| | : | |
| OLIN CORPORATION | : | |
| | : | |
| Defendant. | : | MAY 12, 2008 |

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
OLIN CORPORATION'S PARTIAL MOTION FOR SUMMARY JUDGMENT
BASED ON STATUTE OF LIMITATIONS

**TABLE OF CONTENTS**

I.   INTRODUCTION................................................................................1-2

II.  PROCEDURAL HISTORY.................................................................2-3

III. PLAINTIFF'S COUNTERSTATEMENT OF FACTS..............................3-17

IV.  SUMMARY JUDGMENT STANDARD...............................................17-18

V.   ARGUMENT....................................................................................18

     A.  The Accrual Date For The Statute Of Limitations Is A Question Of
         Fact.......................................................................................18-19

     B.  Under Either The FRCD Or Conn. Gen. Stat. §52-577c(b), The Contaminated
         Subclass Members' Claims Are Not Time-Barred..............................20-21

         1.  Under The FRCD, This Case Is Timely..................................21-36

         2.  Under Conn. Gen. Stat. §52-577c(b), The Contaminated Properties
             Subclass Members' Claims Are Not Time-Barred.....................35-37

     C.  Under Either The FRCD Or Conn. Gen. Stat. §52-577c(b), The Stigma Subclass
         Members' Claims Are Not Time-Barred.......................................37-39

CONCLUSION....................................................................................40

I.    **INTRODUCTION**

Defendant Olin Corporation ("Olin") has moved for partial summary judgment, on the basis of the statute of limitations, as to the claims of the Contaminated Properties Subclass and the Stigma Subclass. Olin's motion should be denied in all respects. As to the Contaminated Properties Subclass, there are genuine issues of material fact because as of May 2, 2001: (1) the Connecticut Department of Environmental Protection ("CTDEP"), the regulatory authority responsible for identifying responsible parties for the environmental contamination at the Hamden Middle School, surrounding parks and the residential properties in the Newhall Neighborhood,[1] did not have "concrete evidence" that any residential properties were contaminated, and which entities were responsible, (2) neither the CTDEP nor the United States Environmental Protection Agency (the "USEPA") had notified any resident that a single residential property in the Newhall Neighborhood was contaminated, and therefore the members of the Subclass did not know, nor reasonably should have known, that their properties were contaminated; and (3) since they had yet to discover the fact of contamination on their properties, the Plaintiffs could not have known that Olin was the responsible party for the unknown contamination. It was not until July 10, 2001 that the CTDEP determined that Olin was a responsible party —a determination that Olin disputed and continued to challenge into 2003.

Genuine issues of material fact also exist as to the Stigma Subclass' claims because (1) as of May 2, 2001, the Plaintiffs and members of the Subclass did not know, nor reasonably should have known, that Olin was responsible for contamination in the Newhall Neighborhood, because

---

[1]  For the purposes of the Plaintiffs' Opposition, the Newhall Neighborhood consists of all properties in the Newhall Area of Hamden, Connecticut which have contaminated fill or are in close proximity to properties which have contaminated fill. The Newhall Neighborhood includes the Hamden Middle School, surrounding parks and private residential properties.

the CTDEP did not make this determination until July 10, 2001, and (2) the properties in the Stigma Subclass experienced a separate, distinct and additional harm when, on May 3, 2001, regulatory authorities confirmed the existence of contamination at a private residential property within the Newhall Neighborhood.

Because issues of material fact exist as to when the Plaintiffs' claims accrued, summary judgment is not proper, and Olin's motion must be denied.

## II.    PROCEDURAL HISTORY

The Plaintiffs commenced this case in the Connecticut Superior Court on May 2, 2003 by writ, summons and complaint.[2] The case was commenced before the expiration of the statute of limitations with respect to any of the Class Members.

On May 10, 2007, Olin filed its Motion for Partial Summary Judgment Based on Statute of Limitations. On May 31, 2007, the Plaintiffs moved to stay briefing on the motion until after the Court ruled on the Plaintiffs' Third Amended Motion for Class Certification. On February 21, 2008, the Court allowed the Plaintiffs' Third Amended Motion for Class Certification. See Docket No. 232. The Court certified the Class as:

> All persons who own property in the Newhall neighborhood of Hamden, Connecticut who have, as a result of Olin's disposal of contaminated fill in that neighborhood since 1931, suffered damages, including the loss in value of property, the loss of use or enjoyment of property, or emotional distress, or who have or will incur response costs.

The Court also certified three subclasses:

- Contaminated Properties Subclass: all persons who have suffered damages as a result of Olin's disposal of contaminated fill on their property or properties since 1931.

- Stigma Subclass: all persons who have suffered damages as a result of their properties' proximity to the Contaminated Properties Subclass.

---

[2] The case was removed to this Court on May 28, 2003.

- Response Cost Subclass: all persons who have or will incur response costs in order to address residual contamination on their properties.

<u>See</u> Docket Nos. 204 and 232.

**III.    PLAINTIFFS' COUNTERSTATEMENT OF FACTS**

In assessing what the members of the Contaminated Properties Subclass knew or should have known as of May 2, 2001 about contamination on their own properties, the following are the essential facts:

1.    As of May 2, 2001, the CTDEP did not have "concrete evidence" of contamination of residential properties in the Newhall Neighborhood.  Its testing prior to that date had been only on public properties such as the Hamden Middle School, Mill Rock Park, and public rights of way (spots in streets and sidewalks).  <u>See</u> *Deposition of Shannon Pociu*, attached hereto as Exhibit C at pp. 187-89, 207-08, 223-24 and 324-325.

2.    The first round of testing on residential properties was done by the USEPA,[3] and the USEPA did not even begin this testing until April 2001.  <u>See</u> *EPA Environmental News Press Release*, dated May 3, 2001, attached hereto as Exhibit E.

3.    It took the USEPA several weeks to analyze the results of its testing of residential properties, and the USEPA did not report any results until May 3, 2001.  <u>See</u> *Olin's Statement of Material Facts*, Tab 30; Exhibit E.

4.    When the USEPA did report results on May 3, 2001, the results were "preliminary" and had not yet been verified.  Nor did the results identify which particular residential properties were affected.  <u>See</u> Exhibit E.

5.    The USEPA did not begin sending the final results to property owners until May

---

[3] One class member, Dorothy Williams, appears to have had results sent to her by CTDEP on May 3, 2001.  <u>See</u> Exhibit B(1).  There is no evidence that any resident received results from residential testing before that date.

22, 2001. See *Affidavits of Contaminated Properties Subclass Members*, attached hereto as Exhibits B(2)-(5)(attaching test results sent to plaintiffs on May 22, May 29, May 30, and June 5).

6.    When the residents, who are ordinary homeowners with no background in environmental testing, first received the results, they did not understand them. See Exhibit B.

7.    The USEPA and CTDEP promised residents that they would meet with residents to explain the test results, and did so. Individual meetings were held over the course of several weeks in late May and June, and a public meeting was held on June 27, 2001. See Exhibit C, at p. 213; *Notice and Presentation Materials from June 27, 2001 meeting*, attached hereto as Exhibit F.

In assessing what the members of the Contaminated Properties Subclass knew as of May 2, 2001 about Olin's responsibility for contamination, the following are the essential facts:

1.    The CTDEP identified itself as the entity that it was responsible for determining what parties had caused the contamination in the Newhall Neighborhood. See *Olin's Statement of Material Facts* Tab 22; Exhibit C at p. 186.

2.    In January of 2001, the CTDEP was only beginning to gather evidence from Olin about its potential role in contamination of the Hamden Middle School, including its relationship with the prior company, Winchester Repeating Arms. See Exhibit C at pp. 176-78.

3.    The CTDEP told residents at its public meeting in April 2001 that it was still in the process of determining what parties were responsible for contamination. See id. at p. 186; *Olin's Statement of Material Facts* Tab 23.

4.    As of May 2, 2001, the residents did not know what Olin's responsibility was for contamination of the *public* properties in the Newhall Neighborhood, and certainly did not know

that Olin had any responsibility for contamination of residential properties. See Exhibit B.

   5.    Indeed, as of July 3, 2001, the CTDEP was still gathering information concerning

Olin's responsibility for the contamination at the Hamden Middle School, surrounding parks and

private residential properties in the Newhall Neighborhood. See Exhibit C at pp. 276-77.

   6.    It was not until July 10, 2001 that the CTDEP issued an administrative order

designating Olin as a Responsible Party for the contamination in the Newhall Neighborhood.

See *CTDEP Final Decision and Consent Order*, dated April 16, 2003, attached hereto as Exhibit

G at p. 1.

   7.    Even after the CTDEP designated Olin as a responsible party, Olin continued to

dispute this designation into 2003. See id. at pp. 2,13; Exhibit C, at pp. 178-79.

   In assessing what members of the Stigma Subclass knew as of May 2, 2001, the

following are the essential facts:

   1.    While members of the Stigma Subclass had information by May 2, 2001

concerning the contamination of the Hamden Middle School, the surrounding parks, and the

public rights-of-way, no one yet had "concrete evidence" that any residential properties were

contaminated. The first, preliminary results of such testing were announced on May 3, 2001, and

even then, the announcement did not identify the properties involved. See Exhibit C, at pp. 187-

89, 222-24; Exhibit E.

   2.    While the residential properties in the Stigma Subclass *may* have experienced

some reduction in property value as a result of their properties' proximity to the Hamden Middle

School and surrounding public parks, the properties in the Stigma Subclass experienced a

***separate, distinct and additional harm*** when regulatory authorities confirmed the existence of

contamination at private residential properties within the Newhall Neighborhood. See *Affidavit*

*of Christopher K. Kerin, MAI, CCIM*, dated March 31, 2008, attached hereto as Exhibit H at pp. 3-4. Once contamination was discovered on private residential properties within the Newhall Neighborhood, the likelihood that remediation would take place within the residential areas of the Newhall Neighborhood, as opposed to just publicly-owned lands (Middle School and surrounding public parks), significantly increased. Id. Likewise, the risk of being relocated during the construction phase of remediation, as well as the loss of quiet enjoyment due to construction noise and truck traffic greatly increased. Id.

3.    Also, while members of the Stigma Subclass had information by May 2, 2001 concerning the contamination of the Hamden Middle School, the surrounding parks, and the public rights-of-way, the CTDEP was still determining as of that date what parties were responsible for this contamination. See Exhibit C at p. 186; *Olin's Statement of Material Facts* Tab 23.

4.    Indeed, as of July 3, 2001, the CTDEP was still gathering information concerning Olin's responsibility for the contamination at the Hamden Middle School, surrounding parks and private residential properties in the Newhall Neighborhood. See Exhibit C at pp. 276-77.

5.    It was not until July 10, 2001 that the CTDEP issued an administrative order designating Olin as a Responsible Party for the contamination in the Newhall Neighborhood. See Exhibit G at p. 1.

6.    Even after the CTDEP designated Olin as a responsible party, Olin continued to dispute this designation into 2003. See id. at 2, 13; Exhibit C, at 176-79.

In its motion papers, Olin points to a number of earlier events that it says demonstrate that the Plaintiffs' claims had accrued before May 2, 2001. On close examination, however, none of these events demonstrate, as a matter of law, that the claims of the Contaminated

6

Properties Subclass or the Stigma Subclass had accrued:

      *a. December 30, 2000 article in the New Haven Register*

Olin points to an article that appeared in the New Haven Register on December 30, 2000, which stated that Olin had emerged as a "player in the Hamden Middle School contamination controversy because it may have dumped industrial waste on school property before the structure was built." See *Olin's Statement of Material Facts* Tab 21. The article, however, dealt entirely with the Middle School, and did not inform the public that any residential property was contaminated. It also pointed to other parties who might be responsible for the Middle School contamination, such as the Town of Hamden. See id. (quoting the Mayor of Hamden saying that the Town might be a wrongdoer). As of January 2001 (and later), the CTDEP was still gathering information about whether Olin was a responsible party. Exhibit C, at pp. 176, 186.

      *b. February 8, 2001 Mayor's Meeting*

Olin also points to a public meeting that Mayor Carl Amento held on February 8, 2001, at the Hamden Middle School to provide an update on the soil sampling and results pertaining to the publicly owned properties. See *Agenda Mayor's Meeting February 8, 2001,* attached hereto as Exhibit A. At that meeting, the CTDEP provided summary data tables of results from sampling at Rochford Field, Rochford Field Annex, and Newhall Street School. See id. The CTDEP announced that sampling at the soccer field behind the Middle School was tentatively planned. See id. The CTDEP also reported that results from sampling in the *public* right-of-ways had not been reviewed. See id.

Notably, the CTDEP acknowledged at this meeting that there had yet been no testing of residential properties. In particular, the CTDEP said that residential sampling probably would be forthcoming, and said that it was seeking assistance from the USEPA with sampling at private

properties, which would be administered in phases. See id. In other words, at this point in time, testing of residential properties could at best be characterized as in the planning stages at the CTDEP. No residential properties in the Newhall Neighborhood had been tested, and it was still not known whether the residential properties contained contaminated soil.

This status was further confirmed by the article about this meeting that appeared on February 9, 2001 in the New Haven Register. The article reported that the USEPA planned to "collect data from state and local officials over the *next six weeks, which will determine how many soil samples will be conducted in the neighborhood.*" See *Olin's Statement of Material Facts* Tab 28 (emphasis added). A resident reading the paper would have learned only that the USEPA was in the planning stages for testing certain private properties in the Newhall Neighborhood. See id.

   c.   *April 10, 2001 Public Meeting*

Next, Olin points to another public information meeting that was held on April 10, 2001 to provide the local residents with an update on the CTDEP sampling program at Rochford Field, Mill Rock Park, sampling in public rights-of-way and the soccer field behind the Middle School. See *Olin's Statement of Material Facts* Tab 22. At this meeting, the USEPA did not present the results of testing of residential properties; it presented a *plan* for residential soil sampling. See id. The USEPA notified residents that it planned on selecting sampling locations, requesting and obtaining permission for access, contacting homeowners prior to sampling, collecting and analyzing soil samples, and sharing results with the homeowners. See id.

The CTDEP also did not tell residents at that meeting that it had found contamination on any residential property. Shannon Pociu of the CTDEP was asked about this at deposition, and testified as follows:

8

Q        And do you recall why EPA was asked to do testing on residential property?

A.       Yes, I do.

Q        What do you recall about that?

A.       Based on the results of the investigation we had done in Rochford Field, Rochford
         Field Annex and the public rights-of-way, we strongly suspected that there was
         waste underlaying the residential properties. . . .

Q        So at the point in time when you were requesting EPA to do testing on residential
         properties, is it fair to say that you did not yet know whether there was
         contamination on residential properties?

Mr. Praiss      Object to the form of the question.

A.       One could deduce that contamination was underlaying these properties but we did
         not have actual physical evidence or chemical evidence to prove it.

Exhibit C at pp. 187-89. See also Exhibit C at pp. 223-24 ("we did not actually have any

concrete data collected from those individual properties"); pp. 324-25 ("It appeared likely but we

did not have concrete information to support that claim".)

     Also at the April 10, 2001 meeting, Ms. Pociu told residents that the CTDEP was still in

the process of identifying the party or parties responsible for contamination that had been found

in the Newhall Neighborhood. See id. at p. 124. In other words, the agency had not yet made

this determination and the search was continuing.

     d.  *April 2001 Newhall Street Neighborhood Update (distributed at April 10,*
         *2001 meeting)*

     The USEPA and the CTDEP published a newsletter for the local residents which was

distributed at the April 10, 2001 meeting. See *Olin's Statement of Material Facts* Tab 23, and

Tab 7 at p. 129. The newsletter did not inform the residents that any contamination had been

found on residential properties, but again only that testing of residential properties was planned.

See id. at Tab 23. The newsletter stated, in relevant part:

- USEPA is assisting CTDEP with evaluating whether contamination is present in surface soils on residential properties in the Newhall Street neighborhood.

- Over the next few weeks EPA staff and contractors will

    - Contact residents in targeted areas to gain permission to access their properties for sampling.
    - Survey residential areas of concern and select locations from which to collect soil samples.
    - Collect soil samples.

- Once results come back from the lab, USEPA will contact individual homeowners to go over the results for their property.

See id.

    *e.  April 18, 2001 Letter from the CTDEP to the USEPA*

On April 18, 2001, the CTDEP sent a letter to the USEPA requesting approval from the USEPA to conduct a limited Phase III/Remedial Action Plan Brownfields Targeted Site Assessment (Phase III/RAP) at the Newhall Street Field using funding provided under the Multi-State Cooperative Agreement ("MSCA").  See *Olin's Statement of Material Facts* Tab 52.  Olin points to a sentence in that letter, which it argues shows that, as of April 18, 2001, CTDEP knew that residential properties in the Newhall Neighborhood were contaminated.  In that sentence, the CTDEP stated that the former landfill area in the neighborhood also included "several residential properties."  Id.

Notably, the letter did not provide any details on which properties landfill material was found, when sampling was conducted, results from the sampling, or any other evidence relied on to make this statement.  See id.  Also, besides this one statement, the CTDEP did not, in any way, discuss the residential areas of the Newhall Neighborhood.  See id.  Instead, the letter focused on the CTDEP's investigation at Rochford Field and efforts with the Department of Public Health and local health officials to "develop an interim plan for remediation that would

10

allow the Town to reopen Rochford Field." Id.

Nor does Olin point to any evidence that this letter was ever disseminated to the public. The letter was an intra-agency communication focused on funding. While Ms. Pociu acknowledged that it was possible that a member of the public could have obtained the letter, Olin points to no evidence that this ever happened before May 3, 2001, when the USEPA first announced the preliminary results of its residential testing.

There is also no supporting evidence—no test results, no other letter, no internal memorandum—to demonstrate that the CTDEP actually had concrete evidence of contamination on residential properties on this date. To the contrary, Ms. Pociu testified that, at the time of this letter to the USEPA, the CTDEP did not have such "concrete data"  See Exhibit C at pp. 223-24. Nor were any test results showing contamination disclosed at that meeting. See *Olin Statement of Material Facts* Tabs 22 and 23. Again, Ms. Pociu testified: "It may have been stated that we were concerned . . . . but we did not have concrete information to support that claim." See Exhibit C at pp. 324-25.

*f.  April 18, 2001 article in Hamden Chronicle*

An article describing the April 10, 2001 meeting that appeared in the Hamden Chronicle on April 18, 2001 did not report that contamination had been found on residential properties, but rather emphasized the residents' concerns "over the *lack* of information about contaminated land" in the Newhall Neighborhood. See *Olin's Statement of Material Facts* Tab 30 (emphasis added).  The article then described steps that were going to be taken in the future to test for contamination:

- USEPA officials hosted a meeting last week to map out a series of *future* testing with CTDEP, the Department of Public Health and the Quinnipiack Valley Health District on residential properties.

- USEPA began taking samples of "soil on residential property" on Monday [April 16, 2001].

- Testing on *private* property would take place over the "next couple of weeks," according to Gilberto "Tito" Irizzarry, USEPA on-scene coordinator.

- USEPA "will sit down with residents to discuss options" after soil samples from private residences were analyzed.

- Mike Harder of CTDEP stated that "[i]n the future, significant notice will be given to residents via meetings, newsletters and the local media."

See id. Thus, at that time, the representations being made by the CTDEP and USEPA were that certain of the residential properties would be tested, results would be analyzed, and then they would discuss the results with impacted property owners. See id.

     g.   *Joseph Frasier's Testimony*

     Finally, Olin points to a letter written on April 18, 2001 by Joseph Frasier, the former President of the Newhall Coalition, in which he stated that "there is no question that our neighborhood is contaminated." See *Olin's Statement of Material Facts* Tab 48. Mr. Frasier, who is not a plaintiff in this action, and no longer lives in the Newhall Neighborhood, was deposed about this letter. At deposition, Mr. Frasier explained that, as of April 18, 2001, Newhall residents had "concern" that there was contamination in the Newhall Neighborhood. Specifically, Mr. Frasier clarified his testimony with the following:

Q.    ...Isn't true that by that date [April 18, 2001] you believed there was no question that the Newhall neighborhood was contaminated?

Mr. Rainer: Objection. You may answer.

A.    No.

Q.    You didn't believe that?

A.    No.

Q.    Isn't it true that by April 18, 2001, you believed that contamination affected the

lives of residents in many ways, including stress of unknown potential health problems, and a drastic reduction in property value?

Mr. Rainer: Objection.  You may answer.

A.     Based upon what was reported to us, of course there was a *concern*.

See *Deposition of Joseph R. Frasier*, dated April 10, 2007, attached hereto as Exhibit D at p. 134

(emphasis added).

Addressing the letter of April 18, 2001, Mr. Frasier testified:

Q.     Am I correct that as of April 18, 2001, you represented to the mayor of the town of Hamden that there is no question that our neighborhood is contaminated?

A.     That is what I wrote.

Q.     You wouldn't have written that unless you believed it was truthful, correct?

A.     No.  There was the *potential*.

Id. at p. 140 (emphasis added).

While it is clear that Mr. Frasier was concerned about contamination in the Newhall Neighborhood, Mr. Frasier did not, and could not, know on April 18, 2001 that any residential property had been contaminated, since the results of such testing had not yet been completed.

*h.  May 3, 2001 USEPA Environmental News Press Release*

It was not until May 3, 2001 that the preliminary results of testing on residential

properties were reported.  On that date, the USEPA issued a press release stating that:

- Sampling of residential surface soils began on April 16, 2001.

- *Preliminary* results indicated that **some** of the residential properties in the Newhall
  Neighborhood were contaminated with landfill materials.

- USEPA would remain in "close contact with property owners as more sampling
  information comes in and about possible next steps."

- The preliminary data had to go through a quality assurance review by USEPA before
  it could be finalized, a process that was expected to be completed "within a couple of
  weeks".

- Once the data had been confirmed, "EPA will meet with homeowners to discuss the
  individual results from their property."

See Exhibit E (emphasis added).

*i.  Subsurface Soil Sampling Result Packets to Individual Property Owners after
    May 3, 2001*

The results of the USEPA sampling were first sent to residents in May and June of 2001.

See *Affidavit of Louise Craig*, Exhibit B(2) (attaching USEPA letter of May 22, 2001); *Affidavit*

*of Donna Lee Johnson*, Exhibit B(3) (attaching USEPA letter of May 29, 2001); *Affidavit of Ruth*

*Eaton*, Exhibit B(4) (attaching USEPA letter of May 30, 2001); *Affidavit of Charlene Webb*,

Exhibit B(5) (attaching USEPA letter of June 5, 2001).[4]  The result packets contained a brief

explanation about the contaminant levels found on the property, provided contact information for

questions, and stated that "[r]epresentatives from EPA and the Connecticut Department of

Public Health will meet with you to discuss any next steps for your property."  See Exhibit B(2)-

(5).

---

[4]  The first test result from a residential property was sent to a single private property owner by CTDEP on May 3,
2001.  See *Affidavit of Dorothy Williams*, Exhibit B(1)

14

These meetings with impacted property owners did not occur until late May and early

June 2001. Exhibit C, at p. 213. As is clear from the affidavits submitted by certain members of

the Contaminated Properties Subclass:

- While they attended public meetings prior to May of 2001 at which it was announced that testing for contamination would be done on a limited number of the residential properties in the area, they were not aware of any results of such testing before May 2, 2001;

- Additionally, during the public meetings held through April of 2001, they did not recall an announcement that contamination had been found on any residential property;

- They all received their first test results after May 2, 2001;

- Even when they received the test results in May and June of 2001, they did not understand the results or what they meant for them until they were explained later; and

- As of the time they discovered their properties were contaminated, they did not know then who was responsible for placing the contaminants on their properties.

See id.

    *j.  June 27, 2001 the EPA/DEP Information Meeting*

On June 27, 2001, the USEPA and the CTDEP held a public informational meeting for

the Newhall Neighborhood to explain the results of the limited residential surface soil sampling

program that had been conducted by USEPA. In the powerpoint slides disseminated at the

meeting, the USEPA recited its efforts to meet with 59 property owners to go over the sampling

results, and stated that it would publish a report describing the process of obtaining the results.

    *k.  The CTDEP Issues Administrative Order on July 10, 2001*

On July 10, 2001, the CTDEP issued an administrative order identifying Olin as a

Responsible Party for the contamination discovered at the Hamden Middle School, surrounding

parks and private residences throughout the Newhall Neighborhood. See Exhibit G at p. 1. Olin

appealed the issuance of the administrative order. See id. at p. 2.

*l.  Olin Enters into Consent Order on April 16, 2003*

Olin continued its appeal of the CTDEP's issuance of the administrative order until April 16, 2003 when it entered into the Consent Order allocating the responsibility to investigate and remediate the Newhall Neighborhood. See id. at pp. 2,13.  Olin did so without making an admission of fact or law with respect to any of the matters asserted in the Consent Order.

*m.  The Stigma Subclass Suffered Separate, Distinct and Additional Harm*

As set forth in the Affidavit of the Plaintiffs' real estate expert, Christopher K. Kerin, while the residential properties in the Stigma Subclass *may* have experienced some reduction in property value as a result of their properties' proximity to the Hamden Middle School and surrounding public parks, *the properties in the Stigma Subclass experienced a separate, distinct and additional harm when regulatory authorities confirmed the existence of contamination at private residential properties within the Newhall Neighborhood.*  See Exhibit H at pp. 3-4 (emphasis added).  This separate, distinct and additional harm was a reduction in property value as a result of their properties' proximity to private residential properties within the Newhall Neighborhood that have confirmed contamination.  Id.  Once contamination was discovered on private residential properties within the Newhall Neighborhood, the likelihood that remediation would take place within the residential areas of the Newhall Neighborhood, as opposed to just publicly-owned lands (Middle School and surrounding public parks), significantly increased.  Id. Likewise, the risk of being relocated during the construction phase of remediation, as well as the loss of quiet enjoyment due to construction noise and truck traffic greatly increased.  Id.  These factors had a downward impact on market value of the Stigma Subclass properties that was separate, distinct and additional from any potential impact on the market value of these

properties as a result of their proximity to the Hamden Middle School and surrounding public parks. Id. Moreover, the Stigma Subclass suffered additional harm as rounds of subsequent testing confirmed the levels and extent of contamination throughout the private residential properties within the Newhall Neighborhood. Id.

IV.       SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Hermes Int'l v. Lederer de Paris Fifth Ave, Inc., 219 F.3d 104, 107 (2d Cir. 2000). The moving party bears the burden of showing that no genuine factual dispute exists. Carlton v. Mystic Transp.,Inc., 202 F.3d 129, 133 (2d Cir. 2000), citing Gallo v.Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223(2d Cir. 1994). "A fact is 'material' for these purposes when it might affect the outcome of the suit under the governing law." Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005) (internal citations omitted).  When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

Summary judgment is not warranted unless, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." LaFond v. General Physics Serv. Corp., 50 F.3d 165, 171 (2d Cir. 1995) (internal quotations and citations omitted).  The moving party has the burden of demonstrating the absence of any material factual issue genuinely in dispute. See Weissman v. General Cable Co., 862 F.Supp. 731, 735 (D.Conn. 1994).  At the summary judgment stage, the trial court "is

carefully limited to discerning whether there are any genuine issues of material fact to be tried, *not* to deciding them." See LaFond, 50 F.3d at 171 (internal quotation marks and citations omitted, emphasis in original). In determining whether there is a genuine dispute as to any material fact, "the trial court is required to resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought." Id. "[I]f reasonable minds could differ in the interpretation of evidence that is potentially determinative under substantive law, summary judgment is not appropriate." Edwards v. Community Enterprises, Inc., 2003 WL 1239288, at *5 (D.Conn. 2003) (internal quotations and citations omitted).

V.        ARGUMENT

    A.    **THE ACCRUAL DATE FOR THE STATUTE OF LIMITATIONS IS A QUESTION OF FACT.**

At its very core, Olin's motion presents questions of fact which must be resolved by the jury. The issue before the Court is the date that the Plaintiffs knew, or reasonably should have known, that their properties were damaged and that Olin caused that damage. When faced with this question, courts have held that the date the plaintiffs knew they had "actionable harm" is a question of fact, not appropriate for resolution by summary judgment. Lessord v. General Electric Co., 258 F. Supp.2d 209 (W.D.N.Y. 2002); see also Nemecek v. Town of Ashford, 2000 WL 33115401, *1 (Conn. Super. Dec. 14, 2000). In Freier v. Westinghouse Elec. Corp., 303 F.3d 176, 184 (2d Cir. 2002), the Court of Appeals for the Second Circuit reversed the District Court's granting of summary judgment on statute of limitations grounds because of the existence of genuine issues of material fact.

The Lessord decision is also instructive:

> Plaintiffs do not contest these general allegations that information about chemical contamination in the area was disseminated to the public during the mid 1990s. They deny, however, that they were aware of any

18

significant contamination of the stream emanating from the GE Site until 2000, and I see no evidence in the record that demonstrates conclusively that plaintiffs were aware of the contamination before then. While the evidence may persuade a jury that plaintiffs knew or should have known of the contamination at some earlier date, the Court cannot make such a determination on a motion for summary judgment.

258 F.Supp.2d at 216.

Similarly, in the case at bar, the Plaintiffs do not challenge Olin's claims that there was information available concerning contamination at the *Middle School* and other *publicly*-owned property as of May 2, 2001. However, as in *Lessord*, the Plaintiffs were not aware (and there is no evidence in the record of knowledge) of any contamination on the *private* residential properties in the Newhall Neighborhood as of May 2, 2001.[5] See id. As such, there are genuine issues of material fact in this case, and Olin's motion must be denied. See id.

---

[5] A general claim of public knowledge or publicity surrounding the cause of action does not constitute discovery as a matter of law. See O'Connor v. Boeing North Am., Inc., 311 F.3d 1139 (9th Cir. 2002) (overturning grant of summary judgment because while there was publicity surrounding the potential release of radiation from the facility, the determination of plaintiffs' awareness of this publicity, or whether they should have been aware, was a fact intensive inquiry concerning the scope of publicity in the community and the likelihood that a person such as the plaintiff would have read it); In re Swine Flu Immunization Products Liability Litigation, 880 F.2d 1439 (D.C. Cir. 1989) (finding that the plaintiff's claims were not barred by the statute of limitations as a matter of law, where the government had not shown sufficient evidence that public awareness of the connection between the swine flu vaccine and plaintiff's illness were so widespread as to put plaintiff on notice.); Maughan v. SW Servicing, Inc., 758 F.2d 1381 (10th Cir. 1985), (in action for leukemia caused by radiation from a uranium processing plant, the court found that defendants' allegations of public knowledge regarding the link between radiation and leukemia were insufficient to bar the plaintiffs' claims stating "even if the plaintiffs are chargeable with the contents of public records . . . the mere fact that there were public statements concerning the possible link between radiation and leukemia is not enough to establish, as a matter of law, that the plaintiffs should have known that emissions from the uranium processing plant in Monticello were the likely cause of the leukemia of their children and spouse. . . . [T]he leap from a plaintiff's alleged knowledge of the various news articles to actual or constructive knowledge [sic] . . . of his or her cause of action involves factual issues which are inappropriate for summary treatment."); McGowan v. University of Scranton, 759 F.2d 287 (3rd Cir. 1985) (finding that evidence of publicity surrounding toxic shock syndrome did not necessarily suggest that plaintiffs were on notice of the connection between toxic shock and their daughter's death); Avance v. Kerr-McGee Chem. LLC., 2006 U.S. Dist. LEXIS 94933 (E.D. Tex.) (in an action for claims of injuries sustained as a result of creosote contamination the Court found that evidence of other lawsuits and publicity regarding health hazards at other facilities was not sufficient to charge the plaintiffs with constructive knowledge of their cause of action sufficient to end the tolling of the statute of limitations.)

**B.    UNDER EITHER THE FRCD OR <u>CONN</u>. <u>GEN</u>. <u>STAT</u>. §52-577c(b), THE CONTAMINATED SUBCLASS MEMBERS' CLAIMS ARE NOT TIME-BARRED.**

Whether the Court applies the state or federal statute is of no significance. In either instance, the claims in this case are not time-barred. CERCLA §309 establishes a federally required commencement date ("FRCD"), which starts the running date of the applicable state period of limitations governing the accrual dates of claims of personal injury and property damages due to exposure to hazardous substances. <u>Freier</u>, 303 F.3d at 184. That date is defined as "the date the plaintiff knew (or reasonably should have known) that the personal injury or property damage . . . [was] caused or contributed to by the hazardous substance or pollutant or contaminant concerned." <u>Id</u>.; <u>see also</u> 42 U.S.C. 9658(b)(4)(A). Congress' purpose in enacting the FRCD was to provide greater access to the courts for injured parties as part of its comprehensive response to the national problem of controlling and remediating the effects of release of dangerous contaminants. <u>Freier</u>, 303 F.3d at 186.

Accordingly, when a state law's accrual date is more restrictive than the FRCD, the FRCD will preempt the state statute of limitations for purposes of determining the accrual date:

> In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date *which is earlier than the federally required commencement date*, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute.

42 U.S.C. § 9658 (a)(1) (emphasis added). Under Section 309, the FRCD will apply only if a state provides a commencement date "which is earlier than the [FRCD]." <u>Id</u>. Thus, if a state provides a commencement date later than the FRCD, the FRCD would not be controlling.

Under Connecticut law, Conn. Gen. Stat. §52-577c(b), provides the applicable statute of limitations for claims to recover property damages caused by exposure to contamination:

> Notwithstanding the provisions § 52-577 and 52-577a, no action to recover damages for personal injury or property damage caused by exposure to a hazardous chemical substance or mixture or hazardous pollutant released into the environment shall be brought but within 2 years *from the date when the injury or damage complained of is discovered or in the exercise of reasonable care should have been discovered.* (emphasis added).

Conn. Gen. Stat. § 52-577c(b).

Under 52-577c(b), the statute is triggered as of the date that the injury or damage is discovered or in the exercise of reasonable care should have been discovered. This contrasts the FRCD which begins to run on "the date the plaintiff knew (or reasonably should have known) that the personal injury or property damage . . . [was] caused or contributed to by the hazardous substance or pollutant or contaminant concerned." Freier, 303 F.3d at 184.

In its Motion for Summary Judgment, Olin argues that the FRCD preempts the accrual date provided for in Conn. Gen Stat. §52-577c(b). *See Memorandum in Support of Olin Corporation's Motion for Partial Summary Judgment Based on Statute of Limitations* ("Olin's Memorandum") at pp. 19-20. While arguments can be made for applying either the FRCD or § 52-577c(b), since the purpose of the FRCD is to preempt a more restrictive state law statute of limitations' accrual date, the Court must apply the statute that provides the later accrual date.

1.    *Under the FRCD, this case is timely*

"The discovery-of-cause standard set by the FRCD, defined as 'the date the plaintiff knew (or reasonably should have known) that the personal injury [or property damage]' was caused or contributed to by the hazardous materials, focuses on knowledge, actual or imputed, not on suspicion. Mere suspicion, whatever its reasonableness, cannot be equated with knowledge." Freier, 303 F.3d at 205-206 (internal citation omitted). The Court of Appeals for

21

the Second Circuit expressly rejected "reasonable suspicion" and "notice of controversy" as the standard under the FRCD, noting that mere local concern was not enough. Id. at 205, 211.

In Freier, the plaintiffs alleged that toxic wastes deposited in a local landfill by the defendants caused them to suffer from various cancers. Id. at 183. The defendants contended that the plaintiffs' action, which was brought in 1995, was barred by New York's two year statute of limitations on wrongful death actions and three year statute of limitations on actions for personal and property damage caused by hazardous materials. Id. at 184-185. The defendants argued that by 1991 the plaintiffs "knew or should have known" that their cancers were caused by the defendants' actions. Id. at 187. To support their contention, defendants pointed to "more than 100 newspaper articles, dozens of public meetings, and numerous government reports and letters." Id. Among some of the articles/warnings were:

- Various signs were posted outside the landfill in 1986 stating, "DANGER HAZARDOUS WASTE AREA UNAUTHORIZED PERSONNEL KEEP OUT."

- Numerous newspaper articles reporting on studies by the New York Department of Health and Environmental Conservation. For example, a May, 31 1986 article in the newspaper reporting that the landfill was "among 194 considered by the state to pose the most serious threat to the public and safety."

- Expressions of public concerns by the plaintiffs that the landfill contained hazardous wastes. A 1986 letter from a town councilman requesting that the landfill be investigated because he "observed flows into ditches and drainage channels leading to a creek and along the public highway."

- An October 11, 1988 letter from the Department of Environmental Conservation to the residents of the area detailing "preliminary investigations" that revealed "low level radiation" in the area. The letter stated that the department determined that the levels of radiation did not present any immediate threat to the public.

- Public meetings coordinated by the residents of the town.

- A March 1991 report from the Department of Health entitled "Cancer Incidence in the Cheektowaga/Elliott Creek Area, Erie County, New York" for the period of 1978-1987. The study showed that the number of observed cancer cases among females was significantly greater than expected.

22

Id. at 187-193. The defendants there contended that no reasonable person who lived or worked near the landfill could still have been unaware of the health hazards posed by the landfill and that the public displays and reports of health concerns were sufficient to put a reasonable person on notice as to the need to investigate such concerns. Id.

The Court of Appeals for the Second Circuit rejected defendants' argument and held that "the record did not permit the court to conclude that no reasonable fact-finder could fail to infer that plaintiffs reasonably should have known prior to the end of 1991 that the Landfill was the cause of the injuries." Id. at 210. The Court unambiguously held that:

> [M]ere suspicion, whatever its reasonableness, cannot be equated with knowledge; and the fact that a claimant had only a reasonable suspicion that the injuries were caused by the Landfill is not a sufficient basis for ruling as a matter of law that the claimant reasonably should have known that the injuries were caused by the Landfill.

Id. at 205-206. Thus, in Freier, the injuries (cancer) were known, but the cause of the injuries was not known or reasonably should have been known to the injured plaintiffs. Id. at 210. Accordingly, the Court held that in applying the FRCD, the case was timely. Id.

In the case at bar, prior to two years before the filing of their Complaint, the Plaintiffs did not even know that their properties were contaminated, and certainly did not know who had caused the as-yet unknown contamination. The sum and substance of the facts set forth in Olin's summary judgment at best show that the Plaintiffs were "suspicious." Compare Freier, 303 F.3d at 205-206. As a matter of law, however, this is not enough to deprive the Plaintiffs of their day in Court.

Similarly, in Nemecek v. Town of Ashford, the plaintiffs brought claims for personal injury and property damage arising from the defendant's alleged control and maintenance of underground fuel storage tanks and salt reservoir. 2000 WL 33115401 at *1. The defendant

there had claimed that the plaintiffs' claims were barred by the applicable statute of limitations because the plaintiffs received notification in 1995 of abnormalities in their drinking water, yet they did not file their original complaint until over three years later. Id. at *4. The Nemecek court reasoned that to have "actionable harm" a plaintiff must discover that he has been injured *and* that the defendant's conduct caused his injury. Id., quoting Nash v. Yap, 247 Conn. 638, 646 (1999).[6]

In Lessord v. General Electric Co., two defendants moved for summary judgment on the grounds that the plaintiffs' CERCLA and state law claims for environmental contamination on their property were time-barred under the applicable statute of limitations. 258 F.Supp.2d at 210. While there were "general allegations" that there was some chemical contamination in the area in the mid-1990s, the New York Department of Environmental Conservation ("DEC"), the agency leading the investigation of the contamination, did not notify the plaintiffs until September 1999 (less than two years before suit was filed in February 2001) that (i) preliminary sediment samples found contamination above levels that require remediation, (ii) further testing was needed to determine the extent of contamination, and, (iii) in the meantime, the plaintiffs should avoid contact with discolored sediment. Id. at 217. The DEC's September 1999 letter did not identify any suspected source of the contamination, and the Court found that it was not until 2000, at the earliest, that there was solid evidence that the defendants were a possible source of the contamination. Id. The Court reasoned that, "[p]laintiffs in toxic tort cases, then, should not be encouraged to take a shotgun approach and sue everyone who *might* be liable, before they have

---

[6] See also Hamilton v. Smith, 773 F.2d 461, 465 (2d Cir. 1986), where the Court of Appeals for the Second Circuit, interpreting Connecticut's statute of limitations for medical malpractice actions, reasoned that if it started the statute of limitations period when the plaintiff learned of his physical injury, even if he had not yet discovered its cause, then the period for bringing the suit would be over before plaintiff even knew he had a cause of action. The Court stated that it did not think that the purpose of Connecticut's statute of limitations was "that the game be over before a plaintiff has had his innings." Id. at 462. The Hamilton decision emphasized knowledge of the *cause* of plaintiff's injury as being just as important as knowledge of the injury itself. Id. at 465.

an evidentiary basis for asserting a claim." Id. at 219. In denying the defendants' motion, the

Court held that:

> [I]t would be inappropriate as a matter of law to find the plaintiffs' claims time-barred merely because they did not undertake to go beyond what DEC had done and have their own tests performed to try to ascertain sooner the nature, extent and source of the suspected contamination.

Id. at 220.

In yet another environmental case, Taygeta Corporation v. Varian Associates, Inc. 436

Mass. 217 (2002), the Massachusetts Supreme Judicial Court reviewed the Massachusetts statute

of limitations which, like the FRCD, requires discovery not only of injury but also of causation.

Significantly, in overturning the district court's granting of summary judgment, the Taygeta

Court held that the plaintiff's cause of action accrued on the date it received completed test

results from its environmental consultant. Id. at 227-228. Like the Court in Lessord and Freier,

the Taygeta Court made clear that suspicion is not enough to start the running of the statute of

limitations, and that the plaintiff was under no obligation to conduct its own testing. Id. The

Court reasoned, "[t]hat Taygeta may have harbored suspicions prior to that date did not trigger a

duty to conduct an independent investigation, and Taygeta was not under any obligation to

undertake its investigation at some earlier point in time." Id. at 228. The Court reached this

conclusion while at the same time acknowledging that the plaintiff had the financial resources to

perform its own testing, noting that "many victims of contamination will not have such

resources." Id., n.13.

As these cases make clear, summary judgment is not warranted in the case at bar. Olin's

attempt to distinguish Freier is unavailing and not supported by the facts. In Freier, the

plaintiffs had known injuries, but did not know the cause (their suspicion was held to be

insufficient). 303 F.3d at 205-206. In this case, the Plaintiffs may have been suspicious or even

concerned that their private residential properties were contaminated but they did not have knowledge (or reason to know) of *actual* contamination on their properties until after May 2, 2001. See Exhibits B and E. In addition, as in Lessord and Taygeta, the Plaintiffs here cannot be charged with performing their own tests to ascertain (sooner than the CTDEP) the nature, extent and source of the suspected contamination. See Lessord, 258 F.Supp.2d at 220; Taygeta, 436 Mass. at 228.

The other cases cited by Olin are easily distinguished. First, Olin relies heavily on Blue Cross of California v. Smithkline Beecham Clinical Laboritories, Inc. 108 F.Supp.2d 116 (D.Conn. 2000) and Staehr v. Hartford Financial Services 406 F.Supp.2d 329 (D.Conn. 2006) to support its claim that summary judgment is warranted. See *Olin's Memorandum* at pp. 20-21. In both of those cases, the Courts granted summary judgment because the plaintiffs had knowledge of the underlying actionable harm. See Blue Cross, 108 F.Supp.2d at 123; Staehr, 406 F.Supp.2d at 339. Moreover, neither Blue Cross nor Staehr is an environmental case. Neither interprets the FRCD or §52-577c(b). Both were fraud cases in which published reports disclosed the alleged fraudulent activity and the party that committed the fraudulent activity, so that a person exercising reasonable diligence should have known they were in the class of people potentially affected by the fraud. By contrast, in the case at bar, unlike the public information in the fraud cases, the public information available to the Plaintiffs did not inform them that they were harmed or which entity was responsible for the harm. All of the environmental cases cited above make clear that: (1) "mere suspicion" or "concerns" are not enough to start the running of the statute; and (2) the Plaintiffs could reasonably rely on the CTDEP and the USEPA's investigation, and were under no obligation to conduct an independent environmental investigation. See Lessord, 258 F.Supp.2d at 220; Taygeta, 436 Mass. at 228.

Olin also cites the environmental case of <u>Bello v. Vera Associates Limited Partnership</u>, 180 F.Supp.2d 300 (D.Conn. 2002), for the proposition that the Plaintiffs should have known of the contamination on their residential properties by April 18, 2001. <u>See</u> *Olin's Memorandum* at p. 32. However, in <u>Bello</u>, not only was the plaintiff aware that hazardous materials were being stored on his property; he was also aware that there had been a release of hazardous substances on his property which the USEPA had already cleaned up. 180 F.Supp.2d at 311. Those facts are significantly different than in the case at bar where the Plaintiffs had <u>no</u> knowledge of contamination on their properties, the USEPA was only in the beginning stages of conducting testing, but had not confirmed the presence of contamination on any residential property, and certainly had not conducted a clean-up.

Olin also argues that the Plaintiffs should have conducted their own investigation. <u>See</u> *Olin's Memorandum* at p. 37, relying on <u>Syms v. Olin Corp.</u>, 408 F.3d 95 (2d Cir. 2005). However, Olin glosses over the fact that, as of April 18, 2001, the USEPA was conducting an investigation as to whether contamination even existed on the private residential properties in the Newhall Neighborhood. It is clear that the Plaintiffs could reasonably rely on this regulatory agency's investigation rather than being required to have conducted their own. <u>See</u> <u>Lessord</u>, 258 F.Supp.2d at 220; <u>Taygeta Corporation</u>, 436 Mass. at 228. In addition, unlike <u>Syms</u>, the Plaintiffs in this case did not have knowledge of contamination on any of the residential properties. At most, in the case at bar, there was a suspicion or expression of concern that the residential properties might be contaminated, which is not enough to start the running of the statute. <u>Id.</u> Indeed, as of April 18, 2001, neither the CTDEP nor the USEPA had "concrete data" that there was contamination on residential properties. Exhibit C, at 223-24, 324-25. The CTDEP "suspected" that there was, but "did not have actual physical evidence or chemical

evidence to prove it." Id. at 187-89.

Like the defendants in Freier, Olin incorrectly argues that the residents here knew, or reasonably should have known, that their properties were contaminated and that Olin was the responsible party for contamination in the Newhall Neighborhood through information that was "readily available" and "highly publicized" to residents by April 18, 2001, at the latest. See Olin's Motion for Partial Summary Judgment at pp. 1-2. Olin deliberately ignores evidence that clearly demonstrates that (1) as of May 2, 2001, not a single resident had been notified that the private properties in the Newhall Neighborhood were contaminated; (2) as of May 2, 2001, the CTDEP, the regulatory authority responsible for identifying responsible parties for the environmental contamination at the Hamden Middle School, surrounding parks and the private residential properties in the Newhall Neighborhood, was still investigating which entities were responsible for the contamination, and (3) even after the CTDEP determined that Olin was a responsible party in July 2001, Olin vigorously challenged its responsibility for cleanup of the Newhall Neighborhood.

> i.    *As of May 2, 2001, no one knew that any residential property was contaminated, and the CTDEP and the USEPA were still conducting their investigations.*

It was not until April 16, 2001 that the USEPA began to sample residential properties, and it advised residents that this testing would continue over the course of several weeks. See Olin's Statement of Material Facts Tab 30. The USEPA and the CTDEP also assured residents that, when the results of the soil samples were analyzed, they would first discuss the results with the individual residents. Id.

On April 18, 2001, the CTDEP sent a letter to the USEPA stating that the "former landfill area also includes Rochford Field, Mill Rock Park and several residential properties." See Olin's

*Statement of Material Facts* Tab 52. Olin argues that the Plaintiffs reasonably should have

known that they suffered damages as a result of contamination on their properties because the

Plaintiffs, their attorneys or an expert retained by them should have gained access to the

CTDEP's April 18, 2001 letter on that date. See *Olin's Memorandum* at pp. 25-38. Olin's

argument is unavailing because: (i) there is no evidence that the CTDEP letter was disseminated

to the public or to anyone besides the USEPA at that time; (ii) the CTDEP did not have any data

at that time to support its contention about residential properties, nor did the letter in any way

identify which residential properties were involved; and (iii) the argument is premised on the

notion that the Plaintiffs should have conducted and paid for their own environmental

investigation, independent of the CTDEP and the USEPA's on-going investigation (a proposition

which is completely contrary to prevailing case law).

     Olin's contention that each of the residential property owners in the Newhall

Neighborhood should have known that they had contamination on their properties because of a

single line in an intra-agency letter is just that—a contention. Although Shannon Pociu, the

CTDEP engineer who oversaw the investigation of the Newhall Neighborhood for many years,

testified that the CTDEP's April 18, 2001 letter could have been obtained by a member of the

public at the time, there is no evidence that the letter was made available to anyone besides the

USEPA. See *Olin's Statement of Material Facts* Tab 20 at p. 348. The letter also did not

identify which residential properties had contamination, the extent of the contamination, or

which entity caused the contamination. See id. Tab 52. Ms. Pociu also testified that as of the

date of the April 18, 2001 letter, the CTDEP "did not actually have any concrete data collected

from individual properties." See Exhibit C at pp. 223-24, 324-25. It was the USEPA, not the

CTDEP, that was responsible for the initial round of sampling at the residential properties and it

did not even begin sampling until April 16, 2001. See Exhibit E. Moreover, as Ms. Pociu

testified, the USEPA controlled the process whereby results of the residential sampling were

disseminated to the public. See Exhibit C at pp. 207-08.[7] The USEPA and the CTDEP told the

residents in April of 2001 that it would take several weeks for them to conduct testing on

residential properties in the Newhall Neighborhood, that they would share the results of the

testing with the individual property owners first, and they would meet with the individual

property owners to explain the soil results. See Exhibit E.

　　　Specifically, it was not until May 3, 2001 that the USEPA issued a press release notifying

the public that *preliminary* results indicated that some of the residential properties in the Newhall

Neighborhood were contaminated. See Exhibit E. The press release made clear that these

results were still being verified. See id. The release also did not identify which specific

properties had contamination, but assured the public that, if data was confirmed (through a

quality assurance review), the USEPA would meet individually with the property owners to

discuss their individual results over the next several weeks. See id.

　　　Most importantly, it was only after May 2, 2001 that residential property owners actually

began to receive the results from sampling on their respective properties. See Exhibit B. The

results of the USEPA sampling were first sent to residents in May and June of 2001. See Exhibits

B(2)-(5).[8] The result packets included information about subsurface soil sampling, a brief

explanation about the contaminant levels found on the property, sampling anticipated in the

future, and contact information for questions. See Exhibit B. Even though some residents

---

[7] Olin also points to a letter written by Joseph Frasier on April 18, 2001, in which he expressed concern about whether residential property values in the Newhall Neighborhood had been affected by the discovery of contamination. See *Olin's Memorandum* at p. 15. As Mr. Frasier testified at his deposition, he wrote the letter to express a "concern" about the subject, not based on confirmed data. See Exhibit D at p. 134. As of this date, neither Mr. Frasier nor anyone else had data confirming the presence of contamination on residential properties. See Exhibit C at pp. 187-89, 223-24.

[8] The first test result from a residential property was sent to a single private property owner on May 3, 2001. See *Affidavit of Dorothy Williams*, Exhibit B(1).

30

received their soil result packets indicating the presence of contamination of their properties in May and June of 2001, the residents did not understand the results until they were explained to them at a later date. See id.

The only way the Plaintiffs—ordinary residential property owners—could have known there was contamination on their properties before May 2, 2001 would have been to hire their own environmental engineer or consultant. Clearly, such a requirement is not reasonable nor is it consistent with the prevailing case law. See id. at 219-220; Taygeta Corporation, 436 Mass. at 228; Freier, 303 F.3d at 205-206. Private residential property owners are not required to go beyond the investigation conducted by environmental regulatory authorities, and "perform their own tests to try to ascertain sooner the nature, extent and source of the suspected contamination." Lessord, 258 F.Supp.2d at 220; see also Taygeta Corporation, 436 Mass. at 228, n. 13.

In the instant case, the Plaintiffs appropriately relied upon the USEPA and the CTDEP, the regulatory agencies with the resources and authority to investigate the contamination in the Newhall Neighborhood, to conduct the soil sampling at the private residential properties (conducted in April and May 2001), to provide the results to individual property owners (sent soil packet results to individual property owners after May 2, 2001), and to meet with the individual property owners to explain the soil results (June 27, 2001 informational meeting). As such, the evidence is clear that the earliest possible date the Plaintiffs could possibly have known (or should have known) that contamination existed on private residential properties in the Newhall Neighborhood was May 3, 2001, and even then the Plaintiffs still did not know the cause thereof.

> ii.     As of May 2, 2001, CTDEP was still investigating which entities were responsible for the environmental contamination in the Newhall Neighborhood.

The Plaintiffs did not know, nor reasonably should have known, that Olin caused the

contamination until well after May 2, 2001. In its motion, Olin relies on a newspaper article published on December 30, 2000, that identified Olin as a "player" in the "Hamden Middle School controversy." See *Olin's Memorandum* at p. 3. However, just because a newspaper article provided speculation that Olin was a "player" in connection with the *Middle School* contamination does not mean that the residents knew or should have known that their properties were contaminated and that Olin caused that unknown contamination.

At some point after January 10, 2001, Olin provided (and the CTDEP began to review) over 200 boxes of archived documents per the CTDEP's November 20, 2000 request for information related to Olin and its predecessors' operations in Hamden, Connecticut. See Exhibit C at p. 176. According to Shannon Pociu's testimony, as of January 10, 2001, Olin had not accepted responsibility for contamination at the Middle School, let alone the surrounding areas. See id. at 178.

As of April 2001, the CTDEP's investigation to find potentially responsible parties was still on-going. In April 2001, the CTDEP and USEPA distributed a "Newhall Street Neighborhood Update" flyer to residents to update them on all current CTDEP and USEPA activities. See *Olin's Statement of Material Facts* Tab 23. The flyer stated that:

> DEP *is* using historical records and other information to identify responsible parties who contributed to waste in the Newhall Street area. The R[esponsible] P[artie]s *will be* called upon to investigate the extent and degree of contamination in the area, including the nature and extent of contamination at depth, and to address the contamination under CT DEP oversight.

See id. (emphasis added). This flyer published and disseminated by the CTDEP indicates that the investigation for identifying responsible parties was ongoing and that a responsible party had yet to be identified.

Likewise, at the April 10, 2001 public meeting, the CTDEP notified local residents that

(i) it was the entity responsible for identifying the party or parties responsible for the hazardous substances found at the Hamden Middle School (and other areas if contamination was found), and (ii) the investigation was on-going at that time. See Olin's Statement of Material Facts Tabs 23; Exhibit C at p. 186. Furthermore, at the meeting, the CTDEP was soliciting information from the general public regarding the dumping of waste or disposal activities at the Hamden Middle School or in the neighboring areas. See Olin's Statement of Material Facts Tab 23.

Additionally, the April 18, 2001 letter from the CTDEP to the USEPA, the letter cited by Olin multiple times in its Memorandum, did not even mention Olin, nor any other potentially responsible party. See Olin's Statement of Material Facts Tab 52. Similarly, in its May 3, 2001 press release to the public, the USEPA did not identify a responsible party for the contamination at the Middle School, surrounding parks or residential properties in the Newhall Neighborhood. See Exhibit E. Later, in May and into June of 2001, when the first wave of private property owners began receiving their test results from the CTDEP and the USEPA, the results did not discuss the identity of any party responsible for the contamination on their properties. These property owners did not receive information concerning the identity of the responsible party through any other source. See Exhibit B.

On June 27, 2001, the CTDEP and the USEPA hosted another public meeting where they shared the soil sampling results from the first fifty-nine (59) residential properties; however, again, neither agency identified the party responsible for the environmental contamination. See Exhibit F. In fact, Shannon Pociu testified that, as of July 3, 2001, the CTDEP was still gathering information concerning Olin's responsibility for the contamination at the Hamden Middle School, surrounding parks and private residential properties in the Newhall Neighborhood. See Exhibit C at pp. 276-77. It was not until July 10, 2001 that the CTDEP

issued an administrative order identifying Olin as a Responsible Party for the contamination in the Newhall Neighborhood. See Exhibit G at p. 1.

Like the DEC in Lessord, the CTDEP was responsible for investigating not only the existence of contamination on the residential properties in the Newhall Neighborhood, but the *cause* of any contamination that was determined to exist. See Lessord, 258 F.Supp.2d at 217-220. The evidence, including deposition testimony from a CTDEP representative, shows that the CTDEP was still investigating the cause of the contamination in July 2001. See Exhibit C at pp. 276-77. Again, the Plaintiffs "should not be encouraged to take a shotgun approach and sue everyone who *might* be liable, before they have an evidentiary basis for asserting a claim." Lessord, 258 F.Supp.2d at 220 (emphasis added). Nor should they be required to "go beyond" what the CTDEP had done and conduct their own investigation into the source of the contamination on their properties, especially when the CTDEP assured the residents that it was the entity responsible for identifying the party responsible. See id. at 219-220; see also Olin's Statement of Material Facts Tab 23; Exhibit C at p. 186.

> iii.   *Even after Olin was identified as the responsible party on July 10, 2001, it continued to contest its responsibility for the contamination and entered into the Consent Order without admitting any underlying facts.*

Even after CTDEP issued an administrative order identifying Olin as the responsible party for the contamination in the Newhall Neighborhood on July 10, 2001, Olin vigorously disputed the designation arguing, among other things, that is was not responsible for the actions of a prior company, Winchester Repeating Arms Company. See Exhibit G at pp. 1-2; see also Exhibit C at pp. 177-178.

It was not until April 16, 2003, that the CTDEP and Olin resolved Olin's appeal by entering into a Consent Order. See Exhibit G. The Consent Order contained statements that

Olin had sent waste to "Non-Public Properties," i.e. private residential properties in the Newhall Neighborhood. See id. at p. 14. Even though Olin entered into the Consent Order, which allocated the responsibility to investigate and remediate the Newhall Neighborhood, it did so "without making admission of fact or law with respect to any matter asserted" in the Order. See Exhibit G at p. 13.[9]

Following well-established case law, the Contaminated Properties Subclass members' claims are not barred by the statute of limitations under the FRCD because, as of May 2, 2001 (the date two years prior to the filing of the Plaintiffs' Complaint), the Plaintiffs did not have "actionable harm" in that they did not know (nor should they have known) that they had been injured. Nemecek, 2000 WL 33115401, at *4; Lessord, 258 F.Supp.2d at 220. Likewise, the Plaintiffs could not have known that Olin was the responsible party by May 2, 2001 because the CTDEP, the regulatory authority responsible for identifying responsible parties for the environmental contamination at the Hamden Middle School, surrounding parks and the private residential properties in the Newhall Neighborhood, was still investigating which entities were responsible for the environmental contamination at that time. See Exhibit C at pp. 276-77. In fact, even after CTDEP determined that Olin was a responsible party in July 2001, Olin challenged the CTDEP's designation into 2003. See Exhibit G at p. 13. Thus, at the very least, the Plaintiffs have demonstrated a genuine issue of material fact as to the date they knew or reasonably should have known the *cause* of the injury to their properties. See Nemecek, 2000 WL 33115401 at *4; Lessord, 258 F.Supp.2d at 220. Accordingly, Olin's motion must be denied.

      2.    *Under Conn. Gen. Stat. §52-577c(b), the Contaminated Properties Subclass*

---

[9] Indeed, Olin continued to challenge its responsibility for the actions of Winchester all the way into the proceedings in this Court. See Olin's Motion for Partial Summary Judgment on Successor Liability Issues (Docket No. 111).

*Members' Claims are Not Time-barred*

In the event the Court determines that the accrual date is governed by Gen. Stat. §52-577c(b), Olin's motion still fails. Connecticut courts have held that the statute of limitations for actions brought pursuant to Conn. Gen. Stat. §52-577c(b) begins to run on the date the "plaintiff discovers or should have discovered the injury." Conn. Gen. Stat. §52-577c(b). Injury "is synonymous with legal injury or actionable harm." Tolchin v. Shell Oil Co., 2004 WL 1965848, *4 (Conn. Super. July 30, 2004), quoting Legassey v. State, 268 Conn. 723, 748-749 (2004). Actionable harm "occurs when the plaintiff discovers, or in the exercise of reasonable care, should have discovered the essential elements of a cause of action." Id.

First, Connecticut courts have refused to grant summary judgment in similar cases because the very nature of these claims raises questions of fact. In Tolchin, the plaintiff alleged that she suffered from a pre-leukemic illness caused by gasoline in her family's well water which leaked from an underground storage tank at the gasoline station owned and operated by Shell. 2004 WL 1965848 at *1. The court denied Shell's motion for summary judgment because "the question of whether Tolchin in the exercise of reasonable care should have discovered her injury ("actionable harm") before the date she was diagnosed pc vera, a serious illness, in 1996, is a material issue of fact that cannot be resolved on summary judgment." Id. at *5. "Although [Tolchin] could have known of her legal injury sooner, this does not compel the conclusion that she should have known it." Id.; see also French Putnam, LLC v. County Environmental Services, Inc., 2002 WL 31236213 (Conn. Super. Sept. 6, 2002) (summary judgment denied despite actual knowledge because the question is "quintessentially an issue for a jury to decide.") In the case at bar, the question of when the Plaintiffs knew or reasonably should have known, in the exercise of reasonable care, of the damage to their properties is a question of fact that should

36

be resolved by the jury. This case raises precisely such questions of fact.

Second, as demonstrated above, the Plaintiffs did not have actual knowledge of contamination at any private residential properties in the Newhall Neighborhood as of May 2, 2001. Additionally, the Plaintiffs, as ordinary citizens with no particular expertise in environmental contamination, should not have known of the contamination in the exercise of reasonable care prior to that time. To the contrary, the Plaintiffs reasonably relied on the CTDEP and the USEPA to conduct an investigation. It was not until after May 2, 2001 that any resident knew the results of this sampling, and it was not until June 2001, when environmental officials explained the results, that the Plaintiffs understood the significance of the sampling data. See Exhibit B.

In its motion, Olin relies heavily on the April 18, 2001 letter from CTDEP to USEPA. For the reasons set forth above, that letter does not start the running of the statute of limitations At best, as of May 2, 2001, the Plaintiffs were concerned and harbored suspicion that their properties may be contaminated. Here, the statute does not begin to run until the CTDEP and the USEPA confirmed that their concerns and suspicions were valid which was after May 2, 2001. Accordingly, if controlling, the Complaint was filed in the time proscribed by §52-577(c)b and therefore, Olin's motion must be denied.

### C.    UNDER EITHER THE FRCD OR CONN. GEN. STAT. §52-577c(b), THE STIGMA SUBCLASS MEMBERS' CLAIMS ARE NOT TIME-BARRED

In its motion, Olin argues that, as a matter of law, the putative members of the Stigma Subclass knew, or should have known, that their damages were caused by the hazardous waste disposed of by Olin by April 18, 2001. See *Olin's Memorandum* at pp. 20-21. The premise of this argument is that, even if the Plaintiffs did not know by that date that their own properties

were contaminated, they did have reason to know by then that nearby public properties (the Hamden Middle School and surrounding parks) were contaminated, and this nearby contamination stigmatized their properties. See id.

First, as the Plaintiffs argued above, the putative Class members, including the Stigma Subclass members, did not know, nor should they have known, that Olin was the entity responsible for the environmental contamination at the Hamden Middle School and surrounding parks in the Newhall Neighborhood as of May 2, 2001. As of that date, the CTDEP was still investigating which entity was responsible for this contamination, and did not make a determination that Olin was responsible until July 10, 2001 – a determination that Olin continued to contest thereafter. See Exhibit G.

Second, as set forth in the affidavit of the Plaintiffs' real estate expert, Christopher K. Kerin, while the Stigma Subclass *may* have experienced some reduction in property value as a result of their properties' proximity to the Hamden Middle School and surrounding public parks, *the properties in the Stigma Subclass experienced a **separate, distinct and additional harm** when regulatory authorities confirmed the existence of contamination at private residential properties within the Newhall Neighborhood.* See Exhibit H at p. 3 (emphasis added). As the Plaintiffs demonstrated above, the CTDEP and the USEPA did not even disclose preliminary testing demonstrating the existence of contamination at private residential properties within the Newhall Neighborhood until after May 2, 2001. See Exhibits B and E.

According to the Plaintiffs' real estate expert, this separate, distinct and additional harm was a reduction in property value as a result of their properties' proximity to the contaminated private residential properties within the Newhall Neighborhood. See Exhibit H at p. 3. Mr. Kerin's conclusions are based on his expert opinion that once contamination was discovered on

private residential properties within the Newhall Neighborhood, the likelihood that remediation would take place within the residential areas of the Newhall Neighborhood, as opposed to just publicly-owned lands, significantly increased. See id. Likewise, the risk of being relocated during the construction phase of remediation, as well as the loss of quiet enjoyment due to construction noise and truck traffic greatly increased. See id. These factors had a downward impact on the market value of the Stigma Subclass properties that was separate, distinct and additional from any potential impact on the market value of these properties as a result of their proximity to the Hamden Middle School and surrounding public parks. See id. Moreover, Mr. Kerin concluded that, as rounds of subsequent testing confirmed the levels and extent of contamination throughout the private residential properties within the Newhall Neighborhood, the Stigma Subclass suffered additional harm. See id. at pp. 3-4.

For the foregoing reasons, there is at least a genuine issue of material fact as to whether the claims of the Stigma Subclass members had accrued as of May 2, 2001 and, Olin's motion fails.

## CONCLUSION

For the foregoing reasons, Olin's motion for partial summary judgment based on statute of limitations must be denied.

Respectfully submitted,
PLAINTIFFS

By  /s/ Monte E. Frank
David B. Zabel, Esq. ct01382
dzabel@cohenandwolf.com
Monte E. Frank, Esq. ct13666
mfrank@cohenandwolf.com
Cohen and Wolf, PC
1115 Broad Street
Bridgeport, Connecticut 06604
Tele: (203) 368-0211
Fax:  (203) 394-9901


Mark Roberts, Esq.  ct25062
mroberts@mcrobertslaw.com
McRoberts, Roberts & Rainer LLP
53 State Street
Boston, Massachusetts 02109
Tele: (617) 722-8222
Fax: (617) 720-2320

Neil T. Leifer, Esq.
nleifer@tenlaw.com
David C. Strouss, Esq.
dstrouss@tenlaw.com
Kristen Marquis Fritz, Esq. (phv02624)
kfritz@tenlaw.com
Thornton & Naumes L.L.P
100 Summer Street, 30th Floor
Boston, Massachusetts 02110
Tele: (617) 720-1333
Fax:  (617) 720-2445

Dated: May 12, 2008

## CERTIFICATION OF SERVICE

I hereby certify that on May 12, 2008, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Monte E. Frank

41