# EXHIBIT C

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

No. 3:03-CV-945(CFD)

CLARENCE COLLINS, JR., ET AL

VS

OLIN CORPORATION

**FILE COPY**

Deposition of: **SHANNON WINDISCH POCIU**, taken
pursuant to Rule 30 of the Federal Rules of Civil
Procedure before Barbara L. Murphy, Licensed Shorthand
Reporter, License No. 305 and Notary Public within and
for the state of Connecticut, held at the offices of
Brown, Rudnick, Berlack, Israels, 185 Asylum Street,
Hartford, Connecticut on April 25, 2007 commencing at
9:10 a.m.

DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE
MADISON, CT 06443
(203)245-9583
(203)245-2760

STAMFORD                    HARTFORD                    NEW HAVEN

124

1   Exhibit 29, it's going to be a challenge finding it

2   there.

3                 I'll tell you what it looks like.

4   Exhibit 29 is the agenda for the April 10, 2001

5   meeting which I believe you testified you prepared the

6   first page.

7        A.   Yes.

8        Q.   Do you recall we looked at Exhibit 29

9   before?

10       A.   Yes.

11       Q.   Am I correct you did testify that you

12  believe you had prepared the first page of that agenda

13  for the April 10, 2001 meeting?

14       A.   Yes.

15       Q.   Do you see there is an entry towards the

16  bottom of the page it says Connecticut DEP responsible

17  party search?

18       A.   Yes.

19       Q.   Do you recall what discussion took place at

20  the April 10, 2001 meeting with respect to a

21  responsible party search?

22       A.   Not specifically.  But I think at these

23  meetings we were soliciting members of the public who

24  had any direct knowledge of how the waste got there to

25  come forward and speak to one of us.

176

1    A.    Yes.

2    Q.    And then it says, I don't know, something --

3 is that a number after the word "files" or is that to?

4 I'm just not sure.

5    A.    Oh, to review.

6    Q.    Two hundred boxes of archived files to

7 review and index binders?

8    A.    Yes.

9    Q.    And then it says unlikely that any file

10 review will occur prior to 1/10/01 meeting; is that

11 right?

12    A.    Yes.

13    Q.    So certainly as of November 20, 2000 the

14 process of document review was just beginning, fair to

15 say?

16    A.    Yes.

17    Q.    Do you recall whether prior to a meeting in

18 early January 2001 you had gotten any documents from

19 Olin?

20    A.    I don't recall when we received the

21 documents from Olin but -- I don't recall exactly when

22 we got them but I don't think it was before.

23         I think it took a little while for them

24 to sort through their boxes and make them available to

25 us or provide copies.  I forgot how it went.

**DEL VECCHIO REPORTING SERVICES, LLC**

1     Q.   Do you remember at some point they did

2 provide copies?

3     A.   I believe they did, yes.

4     Q.   And is this something that you recall

5 because there were large quantities or were there very

6 few, do you remember?

7     A.   You know, I don't honestly remember the

8 amount of -- the number of documents that were

9 produced.

10        We had made similar requests of the

11 Regional Water Authority and the Regional Water

12 Authority had provided documents that referenced Olin

13 and I'm not sure Olin came up with anything above and

14 beyond at that time what we already had from the

15 Regional Water Authority.

16     Q.   Okay.  And so as far as making any

17 determination as to whether Olin Corporation had any

18 responsibility for this, would it be fair to say you

19 weren't in a position to do that as of the end of

20 December 2000?

21        MR. PRAISS:  Object to the form of the

22 question.  Vague.

23        THE WITNESS:  I'm sorry, could you

24 repeat it?

25        MR. RAINER:  I'll ask a different

178

```
 1   question.
 2                    THE WITNESS:  I'm sorry, I was
 3   thinking.
 4   BY MR. RAINER:
 5        Q.   I'll ask a different question.  As of this
 6   point in time Olin Corporation had not accepted
 7   responsibility for contamination at the school, had
 8   it?
 9        A.   Oh, no.
10        Q.   In fact, the Olin Corporation contested
11   responsibility for contamination at the Middle School,
12   did it not?
13        A.   It did appeal the issuance of the
14   administrative order the department issued.
15        Q.   And do you recall that you were actually
16   scheduled to testify at a fact-finding hearing in
17   connection with that appeal, administrative appeal?
18        A.   Yes.
19        Q.   And that was in December of 2002; is that
20   right?
21        A.   Yes.
22        Q.   And so prior to December of 2002 Olin
23   Corporation didn't agree that it had any
24   responsibility for contamination at the Middle School,
25   did it?
```

1          MR. PRAISS:  Object to the form of the

2    question.  Mischaracterizes the documents.

3          THE WITNESS:  Yes.  But all of the

4    respondents to the order appealed it.  So yes, they

5    were all contesting it.

6    BY MR. RAINER:

7       Q.   So Olin and others were contesting their

8    responsibility?

9          MR. PRAISS:  Object to the form of the

10   question.  There is a difference between contesting an

11   order and contesting responsibility which is vague.

12         THE WITNESS:  Yes, that's true they

13   contested the order.

14         MR. PRAISS:  Look at the language of

15   the order and see what it provides for and that's what

16   they were contesting.  Fundamentally different than

17   what you're asking Andrew and it's misleading.

18         MR. RAINER:  It's a fair objection.

19   BY MR. RAINER:

20      Q.   Do you recall that a consent decree was

21   entered into with respect to some portions of Hamden,

22   Connecticut in 2003?

23      A.   Yes.

24      Q.   And do you recall whether as part of that

25   consent decree Olin Corporation continued to dispute

**DEL VECCHIO REPORTING SERVICES, LLC**

181

1    A.    The document is familiar.  If there is a

2  particular section you'd like me to review, I can do

3  that instead of going through all 54 pages of it or 45

4  pages of it.

5    Q.    Does this look familiar to you as an order,

6  a consent order that was entered into on April 16,

7  2003?

8    A.    Yes.

9    Q.    And as part of -- in connection with

10  properties located in the town of Hamden, right?

11    A.    Yes.

12    Q.    And I was going to have reference on

13  Page 13, to Paragraph 31.  If you would read that to

14  yourself.

15          Do you recall seeing this before?

16    A.    Yes.

17    Q.    And there is the phrase there without making

18  admission of fact or law with respect to any matter

19  asserted herein.

20          Do you see that?

21    A.    Yes.

22    Q.    And did you understand that in entering this

23  decree Olin Corporation which was one of the

24  respondents was not making admission of fact or law

25  with respect to any of the matters asserted therein?

182

```
 1       A.    Yes.

 2       Q.    And those matters included, did they not,

 3   allegations concerning Olin having sent waste to the

 4   site?

 5       A.    Yes.

 6       Q.    If I might ask you to turn to Page 7,

 7   Paragraph 14 as it continues on to Page 8.  If you

 8   would read that to yourself and let me know when

 9   you're done.

10       A.    This Paragraph 14?

11       Q.    Paragraph 14, Page 7.

12       A.    Yes, I read the paragraph.

13       Q.    Okay.  Now, this makes reference to a series

14   of corporate transactions involving the Winchester

15   Repeating Arms Company and several other companies,

16   does it not?

17       A.    Yes, it does.

18       Q.    Now in November of 2000, did you know any of

19   the material that's reflected in this paragraph?

20              MR. PRAISS:  Object to the form of the

21   question.  Overbroad.

22              THE WITNESS:  No, I did not.  I was not

23   aware of all the transfers and such described in the

24   paragraph.

25   BY MR. RAINER:
```

186

THE WITNESS:  Yes.

BY MR. RAINER:

Q.    All right.  At to time we had reference earlier to Exhibit 30 and I'll provide you a copy of it, if I may.  I guess it's in here.  Here we go.

And you recall in April of 2001 seeing this update that had been prepared by EPA?

A.    Yes.

Q.    And if you look at the second page of the exhibit it says on the right-hand column second paragraph, DEP is using historical records and other information to identify responsible parties who contributed to the waste at the Newhall Street area.

Do you see that?

A.    Yes.

Q.    And do you see the use of the word "is" in that sentence?

A.    Yes.

Q.    So the process of identifying responsible parties was ongoing, was it not, in April of 2001?

A.    That's correct, it was ongoing.

Q.    Now, there is also in this document, Exhibit 30, there is a reference to -- on the first page to investigation work that was about to be done -- it says, do you see -- let me refer you to the

187

1    third paragraph that begins, over the next few weeks.

2                    Do you see that?

3        A.    Yes.

4        Q.    It says -- well, why don't you read it to

5    yourself what it says under that.  Tell me when you're

6    done.

7        A.    Yes.

8        Q.    Okay.  So is it fair to say that it was in

9    April of 2001 that EPA began to get permission to do

10   sampling on residential property?

11       A.    Yes.  I'm not sure exactly when EPA began to

12   solicit access.  It was likely in April, May.  May

13   have been in March but I don't think much earlier than

14   that.  But it was about that timeframe, yes.

15       Q.    Late March or April?

16       A.    Yes.

17       Q.    And do you recall why EPA was asked to do

18   testing on residential property?

19       A.    Yes, I do.

20       Q.    What do you recall about that?

21       A.    Based on the results of the investigation we

22   had done in Rochford Field, Rochford Field Annex and

23   the public rights-of-way, we strongly suspected that

24   there was waste underlaying the residential

25   properties.

1          DEP, my division, is very understaffed
2    and we did not have the staff to perform the
3    investigation ourselves.  We knew EPA had resources
4    available to respond to this in a very short timeframe
5    and my management contacted EPA emergency removal
6    program people to see about the feasibility of EPA
7    helping us with this in performing the work.
8          Q.    Okay.  And I take it you, yourself, were
9    involved with contacts with EPA in connection with
10   this?
11         A.    Yes, that's correct.
12         Q.    In response to my last question you said DEP
13   suspected that there was contamination on the
14   residential properties.
15               Do you recall saying that?
16               MR. PRAISS:  Object to form.
17               MR. RAINER:  Using that word.
18               THE WITNESS:  Yes.
19               MR. PRAISS:  Object to the form of the
20   question.  Mischaracterizes prior testimony.
21   BY MR. RAINER:
22         Q.    Do you recall saying the word "suspected" in
23   your testimony?
24         A.    Yes.
25         Q.    So at the point in time when you were

1    requesting EPA to do testing on residential

2    properties, is it fair to say that you did not yet

3    know whether there was contamination on residential

4    property?

5                    MR. PRAISS:  Object to the form of the

6    question.

7                    THE WITNESS:  One could deduce that

8    contamination was underlaying these properties but we

9    did not have actual physical evidence or chemical

10   evidence to prove it.

11   BY MR. RAINER:

12        Q.   And so you asked EPA if they could help

13   provide such evidence; is that right?

14        A.   Yes and also address any potential health

15   risks.  We were also very concerned about the health

16   risk, of course.

17        Q.   I'm going to turn your attention to

18   Exhibit 524 that we had previously looked at.  Yeah,

19   this is it.  This is a letter of February 26, 2001

20   from Mr. Harder upon which you were copied.

21                    Do you see that?

22        A.   Yes.

23        Q.   Was this the formal request to DEP for

24   assistance with that residential testing?

25        A.   Formal request to EPA.

1      A.    Correct.

2      Q.    Now, the date here May 30, 2001.  Do you

3  know whether EPA had given out the sampling results by

4  that point?

5                  MR. PRAISS:  Object to the form of the

6  question.

7                  THE WITNESS:  I don't know exactly.

8  BY MR. RAINER:

9      Q.    Okay.  Well, do you recall in response to a

10  question Mr. Praiss asked you about the timing of the

11  residential results becoming available, you testified

12  that EPA put some limits on that?

13                  MR. PRAISS:  Object to the form of the

14  question.  Mischaracterizes prior testimony.  I think

15  my question dealt with the residential public

16  rights-of-way testimony by the DEP.

17                  MR. RAINER:  Actually it didn't but I'm

18  going to ask the question again.

19                  THE WITNESS:  I'm sorry, could you

20  repeat that?

21                  MR. RAINER:  Sure.

22  BY MR. RAINER:

23      Q.    Okay.  This was in same volume, Page 132,

24  Mr. Praiss had asked you about an entry on 4/23/01 at

25  10:30 a.m. with Tito Irizarry of the EPA.

207

1      A.   Yes.

2      Q.   Referring to the re-sampling of the nine

3  homes.

4           Do you see that?

5      A.   Yes.

6      Q.   And do you recall in response to a question

7  from Mr. Praiss this morning that he asked you whether

8  the results of EPA's sampling was available through

9  DEP?  The question is only do you remember him asking

10  you that?

11      A.   Yes, I do.

12      Q.   Do you recall that in response to that

13  question you indicated to him that EPA had put some

14  limits on what could be disclosed?

15      A.   Yes.

16      Q.   What do you recall about that?

17      A.   I recall that EPA, as I think I had stated

18  earlier, EPA had specific confidentiality agreements

19  with property owners.

20           So that DEP actually wasn't given -- I

21  don't recall us being given hard copies of data for

22  quite some time.  And even when we were, property

23  address information was redacted to protect the

24  confidentiality of the residents.

25           So those were the limits to which I was

208

1   referring.

2      Q.   Okay.  So as of April 23, 2001, you didn't

3   know what homes had evidence of contamination, true?

4      A.   Probably not.  If it's not in my notes --

5   I'm sure I had discussions with Tito and he probably

6   told me generally what they were finding and where.

7           But EPA did -- if you saw copies of the

8   EPA reports in our files, they went out and did grab

9   samples from maybe between four and six locations in

10  each yard.

11          And depending on what those results were,

12  if they were very elevated, they went back and did

13  grid sampling of the particular yard.

14          So it may -- depending on where they were

15  in the investigation, they may have been gathering

16  different types of analytical data.  Does that make

17  sense?

18     Q.   It makes sense to me.  And is it fair to say

19  that EPA controlled the process whereby the results of

20  EPA sampling was provided to people?

21     A.   Yes.

22     Q.   And do you know whether any of the residents

23  actually got their sampling results before the end of

24  May 2001?

25     A.   No, I can't state definitively when the

213

1  question, vague.  Visits by whom?

2              MR. RAINER:  I'm just asking if she

3  sees the reference in this letter to visits by --

4  conducted by EPA Tito Irizarry and me, Meg Harvey,

5  during the period May 24 to June 6, 2001.  Do you see

6  that?

7              THE WITNESS:  Yes.

8  BY MR. RAINER:

9      Q.   And do you know whether these were the

10  visits in which the EPA shared with residents the

11  results of the tests?

12     A.   I believe they were.  May not be all of the

13  sampling results but certainly a good portion of them.

14     Q.   Okay.  And is it your understanding that as

15  part of EPA's process it wanted to meet with people

16  individually to discuss the results of the sampling

17  that EPA had done?

18              MR. PRAISS:  Object to the form of the

19  question.

20              THE WITNESS:  Yes.

21              MR. RAINER:  All right.  I'd like to

22  take a break if that's okay.  And I'm going to review

23  where I am.  Off the record.

24              (A recess was taken.)

25  BY MR. RAINER:

214

1    Q.   I'm going to ask you to -- I'm in book 2,

2  Exhibit 522 and ask you to turn to Page 132.  We

3  looked at that before.

4    A.   Yes.

5    Q.   There was a reference in the notation from

6  Mr. Irizarry at 10:30 a.m., discussed re-sampling of

7  nine homes.

8         Do you see the word "re-sampling" in that

9  note?

10   A.   Yes.

11   Q.   Okay.  So do you remember discussing with

12  Mr. Irizarry having to re-sample -- that EPA felt that

13  they needed to re-sample some homes?

14   A.   I don't recall the conversation

15  specifically, only from what my notes state.

16   Q.   Does looking at the note on Page 131, the

17  page before for 4/20/01 again Mr. Irizarry, they're

18  re-sampling some properties for -- and that's lead and

19  arsenic; is that right?

20   A.   Yes.

21   Q.   Do you remember -- does this refresh your

22  recollection about why there was re-sampling going on?

23   A.   No. I'm sorry, it doesn't.  It may be -- it

24  may have been that they had high results for lead and

25  arsenic and, therefore, they wanted to do the grid

216

1    of when the background work was done?

2         A.    I think it would have been done sometime

3    during the time period that EPA was in the

4    neighborhood doing the sampling on the residential

5    properties.

6         Q.    Um-hm.

7         A.    But I don't recall specifically.

8         Q.    If you look on Page 133, again a notation

9    4/23/01 to conversation with Mr. Irizarry.  He was

10   asking you then at the end of April about where to

11   collect background samples.

12              Do you see that?

13        A.  ' Yes.

14        Q.    Okay.  So would it be fair to say that they

15   hadn't -- EPA hadn't yet collected background samples

16   as of·4/23/01?

17              MR. PRAISS:  Object to the form of the

18   question.

19              THE WITNESS:  It's a possibility.

20   BY MR. RAINER:

21        Q.    You don't know?

22        A.    I don't know for sure.  It seems likely they

23   had not yet sampled if he was asking me where they

24   should obtain background samples.

25        Q.    And then if you look at Page 148 there is an

217

1   entry with Mr. Irizarry's name for 5/16/01.

2       A.   Yes.

3       Q.   And it talks about -- what is the first

4   word?  Is that some?

5       A.   Yes.   Some arsenic confirmation results at

6   background locations eight and three parts per

7   million.

8       Q.   So this is when he was getting results for

9   background testing, right?

10      A.   Yes, I believe so.

11      Q.   So in terms of understanding the

12  significance of arsenic findings before this, is it

13  fair to say that the background information was needed

14  in order to fully assess the prior findings of

15  arsenic?

16              MR. PRAISS:  Object to the form of the

17  question.

18              MR. RAINER:  It's a bad question.  I'll

19  do it again.

20  BY MR. RAINER:

21      Q.   Would you agree that in assessing the

22  significance of findings of arsenic Mr. Irizarry was

23  looking to know the background levels?

24              MR. PRAISS:  Object to the form of the

25  question.  Vague, overbroad.

224

1        A.     I believe I explained earlier during my

2    testimony that, you know, one could likely deduce that

3    the landfill was contiguous from say Mill Rock Park to

4    the Bryden Terrace rights-of-way itself with

5    residential properties being in between.

6            But we did not actually have any concrete

7    data collected from those individual properties, the

8    privately owned properties at that time.  So I just

9    wanted to be complete about that.

10       Q.   All right.

11       A.    It was bugging me.

12            MR. RAINER:  All right.  It's twenty

13    minutes to four.  I'm going to say right now despite

14    my more optimistic hopes, I will not be done by four

15    o'clock.

16            I'm happy to proceed up to that point

17    but I am clear in my own mind that I need to resume

18    this another day.  So we will take a break and go off

19    the record for a minute.

20            (A recess was taken.)

21            MR. RAINER:  There is a previously

22    marked version of this.  I'm inclined to mark a

23    previously marked version.

24            THE WITNESS:  This has an Exhibit 22A

25    on it.

1  parens question mark.

2              Do you see that?

3      A.   Yes.

4      Q.   And do you see in that paragraph where it

5  says, this is the beginning of an organized structured

6  plan to define the site and its potential impact on

7  the vicinity and health.

8              Right now nobody knows exactly what was

9  dumped there.  Do you see that?

10     A.   Yes.

11     Q.   Well, do you agree that that was the state

12  of knowledge in the end of December 2000?

13     A.   Yes.  Mr. Rainer, could we go back up to a

14  question.  The more --

15     Q.   Exhibit 525?

16     A.   The more I'm looking at this document I

17  think I understand which residential properties Mr.

18  RisCassi is referring to in the letter.  Sorry, just

19  the more I'm looking at these documents and trying to

20  remember --

21     Q.   Sure.

22     A.   -- I believe we would have been referring to

23  at that time properties on Bryden Terrace based on the

24  rights-of-way investigation results that we had.

25     Q.   Okay.

237

```
  1              C E R T I F I C A T E

  2         I hereby certify that I am a Notary Public, in

  3  and for the state of Connecticut, duly commissioned

  4  and qualified to administer oaths.

  5         I further certify that the deponent named in

  6  the foregoing deposition was by me duly sworn, and

  7  thereupon testified as appeared in the foregoing

  8  deposition; that said deposition was taken by me

  9  stenographically in the presence of counsel and

 10  reduced to typewriting under my direction, and the

 11  foregoing is a true and accurate transcript of the

 12  testimony.

 13         I further certify that I am neither of counsel

 14  nor attorney to either of the parties to said suit,

 15  nor am I an employee of either party to said suit, nor

 16  of either counsel in said suit, nor am I interested in

 17  the outcome of said cause.

 18         Witness my hand and seal as Notary Public this

 19  1st day of May, 2007.

 20

 21

 22                         _____
                            Barbara L. Murphy, LSA
 23                         Notary Public

 24

     My Commission Expires:
 25  June 30, 2007
```

**DEL VECCHIO REPORTING SERVICES, LLC**

238

1          IN THE UNITED STATES DISTRICT COURT
2             FOR THE DISTRICT OF CONNECTICUT

3   **VOLUME II**

4                        No. 3:03-CV-945(CFD)

5

6   CLARENCE COLLINS, JR., ET AL          **COPY**

7   VS

8   OLIN CORPORATION

9

10      Deposition of: **SHANNON WINDISCH POCIU**, taken

11  pursuant to Rule 30 of the Federal Rules of Civil

12  Procedure before Barbara L. Murphy, Licensed Shorthand

13  Reporter, License No. 305 and Notary Public within and

14  for the state of Connecticut, held at the offices of

15  Brown, Rudnick, Berlack, Israels, 185 Asylum Street,

16  Hartford, Connecticut on April 26, 2007 commencing at

17  9:10 a.m.

18

19

20

21          DEL VECCHIO REPORTING SERVICES, LLC
22          PROFESSIONAL SHORTHAND REPORTERS
                      117 RANDI DRIVE
23              MADISON, CT 06443
                      (203)245-9583
24                    (203)245-2760

25  STAMFORD              HARTFORD              NEW HAVEN

**DEL VECCHIO REPORTING SERVICES, LLC**

276

1    old-timers.

2                Do you remember saying that?

3         A.   Yes.

4         Q.   So, for example, your notes and I direct

5    your attention if I may to Page 77 reflect a

6    conversation with a Louis Landino on February 21,

7    2001.

8                Do you see that?

9         A.   Yes.

10        Q.   And is he one of the old-timers you were

11   thinking of?

12        A.   Respectfully, yes.

13        Q.   And is it fair to say that you continued to

14   talk to old-timers and others to gather information

15   with respect to Olin's responsibility over the course

16   of the spring and summer of 2001?

17                MR. PRAISS:  I object to the form of

18   the question.  Overbroad.

19                THE WITNESS:  Yes.

20   BY MR. RAINER:

21        Q.   If I might ask you to turn to Page 1 of book

22   2, Page 173 to 74 and it's a notation with respect to

23   Carbury and begins from the date of July 3, 2001.

24                Do you see that?

25        A.   Yes.

**DEL VECCHIO REPORTING SERVICES, LLC**

277

1      Q.    Was he also one of the old-timers?

2      A.    Yes; he was.

3      Q.    So you were still gathering information at

4  this point in July of 2001; is that right?

5      A.    Yes.

6      Q.    And I believe you said yesterday that you

7  recall getting records from the Regional Water

8  Authority relative to dumping at some of the

9  properties in question here?

10      A.    The Regional Water Authority had produced

11  documents that my recollection was pertained primarily

12  to the disposal at the Middle School property.

13      Q.    Okay.  What do you remember about that

14  material?  Was there correspondence with Winchester?

15      A.    Yes, there was.

16      Q.    Now, I believe you testified this morning

17  that around the time of the EPA residential sampling

18  -- withdrawn.

19            I believe you said that around the time

20  of the EPA removal action, that DEP took formal action

21  itself with respect to Newhall?

22            MR. PRAISS:  I object to the form of

23  that question.  Vague.  Formal action, date of the EPA

24  testing.  Both unclear.

25            THE WITNESS:  If you're referring to

**DEL VECCHIO REPORTING SERVICES, LLC**

314

1          Do you recall yesterday in questions of

2   you Mr. Praiss had asked you whether in order to see

3   DEP files relative to the Newhall area one just needed

4   to make an appointment.

5          Do you recall him asking you that?

6      A.   Yes.

7      Q.   Now, the thing that I want to ask about that

8   is are -- were there any circumstances where

9   information that you received relative to properties

10  in Newhall was not immediately made available?

11     A.   I think there were probably a couple of

12  occasions where we may have preferred to have an

13  entire data set available prior to -- I don't want to

14  say prior to releasing it but we wanted to have a good

15  understanding of the data before the general public

16  got ahold of it and potentially blew things out of

17  proportion.

18     Q.   Okay.

19     A.   There was a lot of press at the time and

20  things were being twisted, the press wasn't accurately

21  reporting in some cases what the actual problems were

22  and what the risks were.

23     Q.   Well, all right.  So that you can recall

24  instances in which you were waiting for a full set of

25  data to come in before you made the full set available

```
 1   material that was made available to you that you
 2   didn't immediately make available to the public?
 3                   MR. LOONEY:  What do you mean by
 4   enforcement materials?
 5                   MR. RAINER:  I better ask some
 6   foundation, okay.
 7   BY MR. RAINER:
 8       Q.   I don't want to ask you about things that
 9   you can't properly talk about so I'm going to be
10   careful how I ask these questions.
11                   Was there a point in time when -- I
12   believe you testified when Mr. Looney was here that
13   from time to time you've had involvement in
14   enforcement matters.
15                   Do you recall saying that?
16       A.   Yes.
17       Q.   Were you involved in any enforcement matters
18   as that term is used with respect to the Newhall
19   properties?
20       A.   As it pertains to the site as a whole, yes.
21       Q.   So what I'm asking is and I'm not asking
22   what the information is, I'm asking whether you got
23   information for enforcement purposes in connection
24   with the Newhall properties that you did not make
25   available immediately?
```

DEL VECCHIO REPORTING SERVICES, LLC

324

```
1    aerial photograph we had concluded that it was likely
2    that the same materials underlain the residential
3    properties as well.
4              So specifically on the north side of
5    Bryden Terrace we had a good feeling on and possibly
6    on the south side.  Whether that was publicly
7    disclosed, I don't recall.
8              Based on my phone notes we probably had
9    some discussions with some of the homeowners about it.
10   I think you and Mr. Praiss had brought to my attention
11   phone calls with Joe Frasier so he seemed to be aware
12   I think.
13        Q.   But as to -- I mean it's -- let me ask the
14   question this way.
15             You don't have a memory, do you, of their
16   being a discussion at a public meeting that certain
17   properties on Bryden Terrace had contamination at this
18   time?
19        A.   I don't know if the department would have
20   gone so far as to say we definitively know there is
21   contamination.
22             It may have been stated that we were
23   concerned that there might be hence why we are asking
24   EPA to perform this investigation.
25        Q.   Okay.
```

325

1          A.    It appeared likely but we did not have

2     concrete information to support that claim.

3          Q.    All right.

4          A.    Again, just the professional judgment that

5     we had from observing data we had previously

6     collected.

7          Q.    All right.  I want to ask you about exhibit

8     -- two more exhibits and then we're done.

9               I'm going to ask you about Exhibit 182

10    previously marked, Defendant's Exhibit 182 and I don't

11    know if Mr. Praiss had used it here.

12              I want to ask you about it, so I would

13    ask you to please look at it for a moment and read as

14    much of it as you want.  I'm going to be asking you

15    about something -- a statement at the end of the

16    article.

17         A.    Okay.

18         Q.    So directing you in particular to the

19    quotation from Mr. Mike Harder at the end of this

20    article of December 20, 2000 where he said, I don't

21    think we have any direct information that houses in

22    the neighborhood were built on top of waste Harder

23    said.

24              We are going to do tests and see if there

25    are reasons to test beyond the school.  We need to do

336

1          MR. RAINER:  Objection.

2          THE WITNESS:  I know for the exhibits

3    you mentioned excluding five sixteen, there is no

4    reason why we would have withheld that.

5          I don't know if I would have been holding

6    back on some of the residential data for a short

7    period of time until we all got it in.  And I don't

8    know what the dates would have been.

9          But I do recall being concerned about a

10   lot of data being out in the general public without

11   any interpretation or statement as to whether or not

12   it is a health risk.

13   BY MR. PRAISS:

14       Q.   Specifically then about Exhibit 516 am I

15   correct that by at least April 9, 2001 to the extent

16   you had this residential data available that's shown

17   in Exhibit 516 you were willing to share it with Kim

18   Wantek or anybody else from the public?

19       A.   Yes.

20       Q.   Now, let me direct your attention to

21   Exhibit 524 which counsel showed you earlier and this,

22   for the record, you identified as a communication from

23   the DEP to the EPA dated February 26, 2001, correct?

24       A.   Yes.

25       Q.   And Mr. Rainer pointed out that in the first

**DEL VECCHIO REPORTING SERVICES, LLC**

350

```
 1              C E R T I F I C A T E

 2         I hereby certify that I am a Notary Public, in

 3    and for the state of Connecticut, duly commissioned

 4    and qualified to administer oaths.

 5         I further certify that the deponent named in

 6    the foregoing deposition was by me duly sworn, and

 7    thereupon testified as appeared in the foregoing

 8    deposition; that said deposition was taken by me

 9    stenographically in the presence of counsel and

10    reduced to typewriting under my direction, and the

11    foregoing is a true and accurate transcript of the

12    testimony.

13         I further certify that I am neither of counsel

14    nor attorney to either of the parties to said suit,

15    nor am I an employee of either party to said suit, nor

16    of either counsel in said suit, nor am I interested in

17    the outcome of said cause.

18         Witness my hand and seal as Notary Public this

19    1st day of May, 2007.

20

21

22                        _____
                          Barbara L. Murphy, LSR
23                        Notary Public

24
      My Commission Expires:
25    June 30, 2007
```

**DEL VECCHIO REPORTING SERVICES, LLC**