# EXHIBIT D

Transcript of Joseph R. Frasier

Page 1

```
1           IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF CONNECTICUT
2              CV NO: 3:03-CV-945 (CFD)

3

4          DEPOSITION OF JOSEPH R. FRASIER

5

6   CLARENCE COLLINS, JR., et. al.,

7                  PLAINTIFFS,                 COPY

8        VS.

9   OLIN CORPORATION,

10                 DEFENDANT.

11

12  --------------------------------------------

13  DEPONENT: JOSEPH R. FRASIER

14  DATE:     APRIL 10, 2007

15  TIME:     9:05 A.M.

16  LOCATION: CLARK & ASSOCIATES
              2133 Dorchester Rd.
17            North Charleston, South Carolina

18  --------------------------------------------

19

20

21         REPORTED BY:
           WANDA S. BUCKNER
22         NCRA Registered Professional Reporter
           NCRA Certified Realtime Reporter
23         CLARK & ASSOCIATES
           P.O. Box 73129
24         North Charleston, SC 29415
           (843) 762-6294
25
```

Clark & Associates, Inc.
843.762.6294

Transcript of Joseph R. Frasier

1    Q    Is it association or coalition, or is

2  there a difference in your mind?

3    A    In my mind, no.

4    Q    Okay.  So when it was formed sometime in

5  late 2000, early 2001, you served as president of

6  the Newhall Coalition, correct?

7    A    That is correct.

8    Q    Am I correct that Elizabeth Hayes served

9  as vice president?

10    A    That is correct.

11    Q    Do you recall approximately how long of a

12  time period you served as president?

13    A    From its inception until '03; June of '03.

14    Q    Who became the president in June of 2003

15  of the Newhall Coalition, if you know?

16    A    Elizabeth Hayes.

17    Q    Up until June 2003, was Elizabeth Hayes

18  the vice president of the Newhall Coalition?

19    A    Not from its inception.

20    Q    Was there a vice president before her?

21    A    No.

22    Q    Why was the Newhall Coalition formed, sir?

23    A    To be a voice for those who were -- could

24  not speak for themselves.

25    Q    Let me go ahead and mark an exhibit real

Clark & Associates, Inc.
843.762.6294

Transcript of Joseph R. Frasier

Page 54

1     Q     When was the first time you met

2  Mr. Narwold, sir?

3     A     At a DEP meeting in Hartford.

4     Q     Do you recall what month that meeting took

5  place?

6     A     Not at this moment, no.

7     Q     Was it in the winter of 2001?

8     A     It was in the winter of 2000 --

9     Q     Winter of 2000?

10    A     2001.

11    Q     Sometime in January or February of 2001?

12    A     Yes.

13    Q     Where did this meeting take place at the

14  DEP?

15    A     At DEP's headquarters.

16    Q     Prior to the meeting did you know that

17  Mr. Narwold was going to be present?

18    A     No.

19    Q     What was the purpose -- what did you

20  understand the purpose of that meeting?

21    A     To inform the DEP meeting to answer some

22  of the concerns of the community.

23    Q     Who else was present at this meeting

24  besides yourself and Mr. Narwold?

25    A     DEP officials, Ms. Hayes, and others.

Transcript of Joseph R. Frasier

Page 57

1    of the parties.

2        Q    Do you have an understanding why, as of

3    January or February of 2001, a representative of

4    Olin was present at this meeting at the DEP?

5            MR. RAINER:  Objection.  You may answer.

6        A    The -- it was a DEP-called meeting.

7        Q    Do you recall to what extent during this

8    meeting there were any discussions about Olin's

9    potential responsibility for contamination that had

10   been discovered at the Hamden Middle School or with

11   respect to any other contamination in the

12   neighborhood?

13           MR. RAINER:  Objection.  You may answer.

14       A    Not that I recall, not that I recall

15   specifically.  It was regarding the contamination at

16   the middle school.

17       Q    By the time of this meeting sometime in

18   January, February 2001, did you, as a representative

19   of Newhall Coalition, understand that Olin may be a

20   potential lead responsible party for the discovery

21   of contamination at the Hamden school and that the

22   possibility of contamination may be found in the

23   surrounding areas?

24           MR. RAINER:  Objection.  You may answer.

25       A    I was not aware that they were a party.

Transcript of Joseph R. Frasier

Page 58

```
1      Q    Not a party; I said that they were
2  potentially responsible, sir, to the discovery of
3  contamination.
4           MR. RAINER:  As you well know, that is a
5      legal term of art.  You were asking the witness
6      to answer a question based upon it.
7               I object and the witness is well
8      within his right to point that out to you.  I
9      object.
10              You may answer.
11     Q    Sir, I am not asking you in terms of any
12 legal connotation of that term.  My question to you
13 is did you, as of the time of your attending this
14 meeting at the DEP in January or February 2001,
15 consider Olin to be potentially responsible for some
16 of the contamination that had been discovered at the
17 Hamden Middle School and for the possibility of
18 other contamination that may be found beyond the
19 middle school, sir?
20          MR. RAINER:  Objection.  You may answer,
21     sir.
22     A    At that point it was unknown.
23     Q    I am not asking what was known or unknown.
24 I am asking what you understood, what you believed
25 to be the case as of that time of that meeting.
```

Transcript of Joseph R. Frasier

Page 60

```
 1   present at that meeting that took place sometime in
 2   the middle of January 2000 that was held at the
 3   Christian Tabernacle Church?
 4        A    The date I do not recall, but the meeting
 5   was held there and I know Cummings and Lockwood was
 6   there.
 7        Q    Do you recall if there were any other
 8   attorneys from Cummings and Lockwood at that
 9   meeting?
10        A    Again, I would have to answer that
11   question by stating that there were attorneys there.
12        Q    Okay.  Does the name Holly Winger ring a
13   bell?
14        A    Perhaps.
15        Q    How about Kim Wantek, was she there?
16        A    I don't recall.
17        Q    Were attorneys from the law firm of -- I
18   think it's called Koskoff, Koskoff and Bieder
19   present at this meeting that took place sometime in
20   January of 2001?
21        A    They could have been.
22        Q    Are you familiar with an attorney named
23   Richard Bieder?
24        A    Yes.  The name sounds familiar.
25        Q    Are you familiar with an attorney named
```

Transcript of Joseph R. Frasier

Page 61

1    Antonio Pondford?

2         A    I do not recall.

3         Q    Do you have an understanding of why

4    attorneys from the law firm of Cummings and

5    Lockwood, including in particular Mr. Narwold, and

6    attorneys from the law firm of Koskoff, Koskoff and

7    Bieder were present at this January 2001 meeting?

8         A    To address concerns that citizens would

9    have.

10        Q    Did the company invite these attorneys to

11   the meeting?

12        A    As I recall, Cummings and Lockwood asked

13   if they could sit in on the next meeting.

14        Q    Sit in on the next meeting, you are

15   referring to the meeting we are talking about in

16   January 2001?

17        A    The next meeting.

18        Q    Which took place sometime during

19   January 2001?

20        A    Yes.

21        Q    Did the attorney from Cummings and

22   Lockwood make that inquiry to you as president of

23   the Newhall Coalition?

24        A    Yes.

25        Q    Did they tell you why they wanted to

Transcript of Joseph R. Frasier

Page 62

```
 1    attend the meeting?

 2        A    They didn't explain why.

 3        Q    Did anybody from the law firm of Koskoff,

 4    Koskoff and Bieder contact you asking if they could

 5    attend the meeting?

 6        A    I don't recall.

 7        Q    At any time did you believe that attorneys

 8    from Cummings and Lockwood -- strike that.

 9             Was it your understanding that attorneys

10    from the law firm of Cummings and Lockwood or from

11    the law firm of Koskoff, Koskoff and Bieder were

12    seeking to represent residents in potential

13    litigation arising from the discovery of

14    contamination at the Hampden Middle School?

15        A    They were there to answer questions of

16    concern by the citizens.

17        Q    I appreciate that.  That doesn't answer my

18    question.  I will ask my question again.

19             At any time did you come to understand

20    that attorneys from the law firms of Cummings and

21    Lockwood or Koskoff, Koskoff and Bieder were seeking

22    to represent residents in potential litigation

23    arising from the discovery of contamination at the

24    Hampden Middle School?

25             MR. RAINER:  How can he know what was in
```

Transcript of Joseph R. Frasier

Page 63

1    their head?  He answered the question.  I

2    object to it being answered again.  You can

3    answer it again subject to the objection.

4        A    Sir, my answer to the question remains the

5    same.

6        Q    Did you ever have any conversations with

7    any attorneys from either Cummings and Lockwood or

8    Koskoff, Koskoff and Bieder, were there any words

9    expressed to you that they were seeking to represent

10   residents in connection with potential litigation

11   arising from the discovery of contamination at the

12   Hamden Middle School?

13       MR. RAINER:  Objection.  You may answer.

14       A    I don't know that anyone, because no one

15   knew of any -- of the extent of contamination

16   before, so there were legal -- there were questions

17   and concerns that the residents had, had nothing to

18   do with litigation of any sort before you know what

19   was there.

20       Q    Maybe my questions aren't very good and I

21   will try again.

22       A    That is okay.

23       Q    My question is very focused.  I am trying

24   to understand if at any time you had a conversation

25   with an attorney from Cummings and Lockwood where

Transcript of Joseph R. Frasier

Page 64

```
 1    Mr. Narwold or some other attorney said to you,

 2    Mr. Frasier, we are going to be attending these

 3    meetings because we would like to represent

 4    residents in some potential litigation relating to

 5    what has taken place at the Hampden Middle School.

 6        A    No.

 7        Q    At no time did any attorney for Cummings

 8    and Lockwood share those thoughts with you, is that

 9    your testimony?

10            MR. RAINER:  Objection.  Asked and

11        answered.  You can answer it again.

12        A    No.

13        Q    At any time did an attorney from Koskoff,

14    Koskoff and Bieder express to you or the Newhall

15    Coalition that their law firm was interested to

16    represent residents of Hamden in connection with the

17    discovery of contamination at the Hampden Middle

18    School?

19        A    No.

20        Q    As of February 2001, did you believe that

21    an attorney-client relationship had been created

22    between Cummings and Lockwood and any of the

23    residents of the Hamden area?

24            MR. RAINER:  I instruct him not to answer.

25        I will represent to you that we have had a
```

Transcript of Joseph R. Frasier

Page 65

1    conversation off the record.  Mr. Frasier
2    informs me that at the meeting you asked about,
3    that residents asked questions of the attorneys
4    present for the purpose of obtaining legal
5    advice; therefore, I instructed him that he
6    should not answer questions concerning what was
7    discussed at the meeting.
8              I recognize that the proposition,
9    whether they had retained these attorneys to
10   represent them, is different from the question
11   of whether the residents asked questions for
12   purposes of seeking legal advice; however, I
13   believe that under the applicable law, the
14   asking of questions for purposes of obtaining
15   legal advice qualifies for the privilege.
16   Q     To follow up on some comments made by your
17   counsel here, first of all, do you consider
18   Mr. Rainer to be your attorney?
19   A     Yes.
20   Q     At the meeting that took place in January
21   of 2001, did residents ask for legal advice from the
22   attorneys from Cummings and Lockwood?
23   A     Yes.
24   Q     Did the attorneys from Cummings and
25   Lockwood provide answers to those questions?

Transcript of Joseph R. Frasier

Page 66

1      A      At that meeting, no.

2      Q      Did they at any time, to your knowledge,

3   attorneys from Cummings and Lockwood provide answers

4   to the community with respect to any questions

5   seeking legal advice?

6      A      I am sure that they did.

7      Q      Do you recall the circumstances when they

8   did that?  The second meeting, a follow-up meeting?

9   I am just trying to follow up.

10     A      No.  At that meeting, that is what I

11  recall.

12     Q      We will get a little more specific,

13  Mr. Frasier.  If I understand you correctly,

14  sometime in this January 2001 meeting, residents

15  asked questions of a legal nature seeking legal

16  advice from attorneys from Cummings and Lockwood,

17  correct?

18     A      Yes.

19     Q      My only question is at any time do you

20  recall the circumstances of when attorneys from

21  Cummings and Lockwood responded to those questions?

22     A      I don't recall.

23     Q      At any time, to your knowledge, did the

24  residents ask questions of a legal nature seeking

25  legal advice from the law firm of Koskoff, Koskoff

Transcript of Joseph R. Frasier

1      Q      Mr. Frasier, am I correct that after this

2   meeting that took place sometime in January 2001 you

3   had an ongoing relationship with attorneys of

4   Cummings and Lockwood, correct?

5      A      No.

6      Q      Isn't it true that for -- that you had

7   conversations with attorneys in which you relayed to

8   them information about data being collected by the

9   DEP?

10      A      I do not recall that.

11      Q      Do you recall any conversations that you

12   had with attorneys from the law firm of Cummings and

13   Lockwood after the January 2001 meeting, sir?

14      A      No.

15      Q      Your testimony is you had no such

16   conversation or you just don't recall?

17      A      I do not recall any at this time.

18      Q      After this January 2000 meeting do you

19   recall any conversations you had with attorneys from

20   the law firm of Koskoff, Koskoff and Bieder?

21      A      I do not recall.

22      Q      You may have, you just don't recall, is

23   that your testimony?

24      A      I do not recall at this time.

25      Q      Do you recall if attorneys from either of

Transcript of Joseph R. Frasier

Page 72

1    these law firms attended any other meetings after

2    the January 2001 meeting that we have been

3    discussing?

4         A    I do not recall.

5         Q    Let me show you what was previously marked

6    as Exhibit 54.  Before we talk about Exhibit 54,

7    Mr. Frasier, let me interrupt you for a second.

8         A    Sure.

9         Q    The meeting you mentioned earlier at the

10   DEP when Mr. Narwold was present, do you remember,

11   we looked at the attendance sheet that was marked as

12   Exhibit 509?

13        A    Yes.

14        Q    Do you recall any conversation that you

15   had with Mr. Narwold after that meeting?

16        A    Yes.

17        Q    Tell me what conversations you had with

18   Mr. Narwold after that meeting, sir.

19             MR. RAINER:  I guess I would instruct the

20        witness not to answer those questions to the

21        extent, if any, that you were seeking

22        Mr. Narwold's legal advice in the conversation.

23        Do you understand my instruction?

24             THE WITNESS:  Yes.

25        Q    Were you seeking Mr. Narwold's legal

Transcript of Joseph R. Frasier

Page 73

1   advice in conversations you had with him after the
2   meeting that you and Mr. Narwold attended with
3   representatives of the DEP in year 2001?
4       A    No.
5       Q    What did you ask Mr. Narwold?
6       A    I didn't.
7       Q    You had conversations with him.  What did
8   you discuss?
9       A    The possibility -- repeat that.
10      Q    Tell me what you discussed with
11  Mr. Narwold after the meeting that you both attended
12  at the DEP in the winter of 2001.
13      A    Let me tell you what I recall.  I received
14  a card from Mr. Narwold that said he would like to
15  attend the next meeting with the community.  That
16  was the extent of our conversation.
17      Q    After he shared with you his business
18  card, at any time did you have any other discussions
19  with Mr. Bill Narwold?
20          MR. RAINER:  Again, I instruct the witness
21      not to answer --
22          MR. PRAISS:  I am just asking if he has.
23          MR. RAINER:  So it's yes or no.  Other
24      than the meeting of the 18th and the meeting at
25      DEP and the conversation he just described to

Clark & Associates, Inc.
843.762.6294

Transcript of Joseph R. Frasier

Page 134

1    discussed on April 10.  Isn't it true that by that

2    date you believed that there was no question that

3    the Newhall neighborhood was contaminated?

4            MR. RAINER:  Objection.  You may answer.

5        A·    No.

6        Q    You didn't believe that?

7        A    No.

8        Q    Isn't it true that by April 18, 2001, you

9    believed that contamination affected the lives of

10.  residents in many ways, including stress of unknown

11   potential health problems, and a drastic reduction

12   in property value?

13           MR. RAINER:  Objection.  You may answer.

14       A    Based upon what was reported to us, of

15   course there was a concern.

16       Q    Again, the concern that you believed to

17   apply directly to residents as of April 18, 2001,

18   was one a concern about potential health problems as

19   well as a drastic reduction of property values,

20   correct?

21           MR. RAINER:  Objection.  You may answer.

22       A    Perhaps they discussed that.

23       Q    Do you recall writing a letter to the

24   Mayor Amento on or about April 18, 2001, on behalf

25   of the residents?

Transcript of Joseph R. Frasier

Page 140

1      A      Yes.

2      Q      Am I correct that as of April 18, 2001,

3   you represented to the mayor of the town of Hamden

4   that there is no question that our neighborhood is

5   contaminated?

6      A      That is what I wrote.

7      Q      You wouldn't have written that unless you

8   believed it was truthful, correct?

9      A      No.   There was the potential.

10     Q      You put -- did you put it was potentially

11  contaminated?

12     A      No, I did not put that.

13     Q      You wrote there is no question that our

14  neighborhood is contaminated, correct?

15     A      Yes.

16     Q      Now, do you recall that you were speaking

17  with the press on or about April 18, 2001,

18  concerning these issues?

19     A      On or about April what?

20     Q      18, 2001.  Same date that you wrote the

21  mayor the letter we just talked about.

22     A      I could have.

23     Q      Do you recall advising Jim Flynn of the

24  Hamden Chronicle that our homes are built on a

25  landfill, that in itself will devalue our houses.

Clark & Associates, Inc.
843.762.6294

Transcript of Joseph R. Frasier

Page 142

1  residential sampling in public rights-of-way in the

2  Newhall neighborhood?

3          MR. RAINER:  Objection.  You may answer.

4      A    This was at a public meeting.

5      Q    I am asking you anywhere.  As president of

6  the Newhall Coalition, do you recall by April 18,

7  2001, residents expressed a concern to you that

8  there is a concern about their property values

9  dropping due to the contamination that had been

10 discovered as of that date?

11     A    They didn't express it to me.  They

12 expressed it to the mayor and all of the officials

13 who were present at this meeting which Flynn was at,

14 apparently this article was written at, and you can

15 see the mayor's response and the response of others

16 who were there as well.

17     Q    Now, do you see in Exhibit 58 also there

18 is a quote attributed to you, that our homes are

19 built on a landfill?  Do you see that?

20     A    Yes, I see that.

21     Q    Did you make that statement, sir?

22     A    Based on the information that was provided

23 that the potential exists that the homes were built

24 on landfill.

25     Q    Does it say here in this article the homes

Transcript of Joseph R. Frasier

Page 143

1   are potentially built on a landfill or our homes are

2   built on a landfill?

3        A    This is Jim Flynn's writing, and I fully

4   respect how he --

5        Q    Is it your testimony that you did not

6   state to Mr. Flynn, our homes are built on a

7   landfill, our homes are potentially built on a land

8   fill?  That is what I am trying to make sure you are

9   claiming Mr. Flynn got it wrong.  That is what I am

10  trying to find out, sir.

11       A    I can't recall.

12       Q    Do you recall telling Mr. Flynn, we are

13  paying taxes on properties that have no value in the

14  real estate market.  Do you recall saying that?

15       A    No.

16       Q    Okay.  Are you denying you said that or

17  you just don't recall?

18       A    I don't recall, no value.

19       Q    The same exhibit we were just looking at,

20  58, there is a quote attributed to Mike Hartford

21  from DEP that you see at the very end?

22       A    Yes.

23       Q    Mr. Hartford from the DEP stated, we

24  certainly have contamination issues and health

25  issues that people should be concerned about.  Do

Clark & Associates, Inc.
843.762.6294

Transcript of Joseph R. Frasier

Page 182

1          STATE OF SOUTH CAROLINA    )

2          COUNTY OF CHARLESTON       )

3

4          I, Wanda S. Buckner, Registered
Professional Reporter and Notary Public for the
5     State of South Carolina, at Large, do hereby
certify that the witness in the foregoing
6     Deposition was by me duly sworn or affirmed to
testify to the truth, the whole truth, and nothing
7     but the truth in the within-entitled cause; that
said deposition was taken at the time and location
8     therein stated; that the testimony of the witness
and all objections made at the time of the
9     examination were recorded stenographically by me and
were thereafter transcribed by computer-aided
10    transcription; that the foregoing is a full,
complete and true record of the testimony of the
11    witness and of all objections made at the time of
examination; and that the witness was given an
12    opportunity to read and correct said deposition and
to subscribe to the same.

13          Should the signature of the witness
14    not be affixed to the deposition, the witness shall
not have availed himself/herself of the opportunity
15    to sign or the signature has been waived.

16          I further certify that I am neither
related to nor counsel for any party to the cause
17    pending or interested in the events thereof.

18          Witness my hand, I have hereunto affixed
my official seal, this 18th day of April, 2007, at
19    Charleston, Charleston County, South Carolina.

20

·21

22          Wanda S. Buckner
NCRA Registered Professional Reporter
23          NCRA Certified Realtime Reporter
My Commission Expires:
24          August 20, 2013

25