```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF CONNECTICUT


                            No. 3:03-CV-945(CFD)

CLARENCE COLLINS, JR., ET AL

VS                                    ORIGINAL

OLIN CORPORATION


       Deposition of: SHANNON WINDISCH POCIU, taken
pursuant to Rule 30 of the Federal Rules of Civil
Procedure before Barbara L. Murphy, Licensed Shorthand
Reporter, License No. 305 and Notary Public within and
for the state of Connecticut, held at the offices of
Brown, Rudnick, Berlack, Israels, 185 Asylum Street,
Hartford, Connecticut on April 25, 2007 commencing at
9:10 a.m.




              DEL VECCHIO REPORTING SERVICES, LLC
                PROFESSIONAL SHORTHAND REPORTERS
                       117 RANDI DRIVE
                      MADISON, CT 06443
                        (203)245-9583
                        (203)245-2760

STAMFORD              HARTFORD              NEW HAVEN
```

**DEL VECCHIO REPORTING SERVICES, LLC**

```
 1   Field was formerly used as a Winchester coke lot.
 2   BY MR. PRAISS:
 3       Q.   If I understand correctly --
 4       A.   I may have told him this.  I don't recall
 5   specifically.
 6       Q.   Putting aside what you did or didn't tell
 7   him, if I understand correctly DEP's files as of at
 8   least in January 31, 2001 included information
 9   indicating that Winchester had previously deposited
10   waste in that area, correct?
11       A.   Yes.
12       Q.   And that information again would have been
13   available to the public, correct?
14       A.   Yes.
15       Q.   Now, I'm trying to move fast, I know you
16   wanted to get out of here.  This is an exhibit
17   previously marked as Exhibit 514.
18       A.   Yes.
19       Q.   Did you have an opportunity to review
20   Exhibit 514?
21       A.   Yes.
22       Q.   Could you identify it, please, for the
23   record?
24       A.   This is a memo I drafted to concerned
25   parties listed at the bottom of the memo transmitting
```

```
 1   2001?
 2       A.   I make reference to it.  Something must have
 3   been planned.  I don't recall the specifics of any
 4   meeting.
 5       Q.   I'm just wondering, I don't have any, you
 6   know, sign-in sheets or anything else for that
 7   meeting.
 8            So I guess my question is sitting here
 9   today do you have a recollection of a meeting with RPs
10   taking place sometime in April 2001?
11       A.   I recall having meetings with potential RPs
12   but I don't recall the timeframe in which they
13   occurred.
14       Q.   Okay.  Do you recall any discussions with
15   Kim Wantek of Cummings and Lockwood on or about
16   April 16, 2001 about the identity of potential RPs?
17       A.   It is possible.  I'm sure by that point we
18   had an idea of who we, being the department, had an
19   idea of who we were looking at as potential RPs.
20       Q.   Who as of April 16, 2001 was the DEP looking
21   at as potential RPs for the site?
22       A.   Again a little fuzzy on the dates but
23   knowing the dates and knowing that we were in the
24   process of drafting an administrative order, we were
25   looking at the town of Hamden, we were looking at Olin
```

```
 1   Corporation, the Regional Water Authority and possibly
 2   the State Board of Education.  I'm not sure at what
 3   point we --
 4       Q.   And to the extent Kim Wantek wanted to know
 5   the identities of potential RPs, would that have been
 6   shared with her or anybody else in the public?  Let me
 7   strike that and ask you a different question.
 8            Did the DEP have records available to it
 9   that it believed supported its position that the
10   parties that you just mentioned were potentially
11   responsible parties for the contamination at the site?
12       A.   I believe so.
13       Q.   To the extent anybody from the public such
14   as Joe Frasier, Kim Wantek or anybody else wanted
15   access to those public records again they would have
16   had access to them, correct?
17       A.   Possibly.  It would have depended on if they
18   were considered enforcement strategy planning at that
19   point whether we could have made them available to the
20   public.
21       Q.   Let's talk about Olin specifically.  The
22   historic records about the potential of depositing of
23   the waste by Winchester, would those have been subject
24   to any enforcement orders?
25            MR. RAINER:  Objection.
```

```
 1              THE WITNESS:  I'm sorry, could you
 2   restate that or rephrase it?
 3              MR. PRAISS:  Sure.  I'll rephrase it.
 4   BY MR. PRAISS:
 5       Q.   Do you have a memory I showed you before a
 6   letter that was sent to Olin back in November of 2000?
 7       A.   Yes.
 8       Q.   We looked at it a few minutes ago.
 9       A.   Yes.
10       Q.   And it made reference in that letter already
11   back in November of 2000 to the fact that the DEP had
12   information about potential waste deposited by
13   Winchester in the area involving the Hamden Middle
14   School and surrounding areas?
15       A.   Yes.
16       Q.   Any records that the DEP had that's related
17   to potential waste deposited by Winchester, am I
18   correct that would have been made available to the
19   public?
20              MR. RAINER:  Objection.
21              THE WITNESS:  Yes.  That would have
22   been in our public files, that information.
23   BY MR. PRAISS:
24       Q.   I'm giving you what was previously marked as
25   Exhibit 158.
```

1  Q.   And am I right that in the beginning of 2001
2  you made a point of trying to seek information from
3  people in the community about the potential
4  responsibility of Olin?
5  A.   Yes or any other possible responsible party.
6  The information that I had seen through my own file
7  review up to that point indicated that most of the
8  waste likely came from the former Winchester factory.
9       There was certainly a possibility that
10 others may have disposed in the neighborhood as well
11 but we had no record of that.  So certainly if people
12 come forward with information, you know, we would
13 follow-up on it.
14 Q.   Well, you recall in -- at the end of
15 January 2001 asking -- telling Mr. Frasier that DEP
16 needs to question people with direct knowledge of
17 dumping in the area in order to have a good case to
18 include Olin as an RP having reference to Pages 57 and
19 58?
20 A.   I don't currently have that exhibit in front
21 of me.  Is it over here?
22      MR. LOONEY:  You only have book 1.
23      THE WITNESS:  Book 2 is in the stack.
24 What page were you referring to?
25      MR. RAINER:  Fifty-seven and

C E R T I F I C A T E

I hereby certify that I am a Notary Public, in and for the state of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn, and thereupon testified as appeared in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this 1st day of May, 2007.

_____
Barbara L. Murphy, LSR
Notary Public

My Commission Expires:
June 30, 2007