UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____
                                                    )
CLARENCE COLLINS, JR., et al,          )
                        *Plaintiffs,*               )          CIVIL ACTION
                                                    )          3-03-cv-945 (CFD)
v.                                                  )
                                                    )
OLIN CORPORATION,                          )          CLASS ACTION
                        *Defendant.*             )
_____)          MARCH 3, 2010

## PROPOSED OPINION

This matter has come before the court seeking approval of the proposed settlement (the "Settlement") set forth in the Settlement Agreement dated October 20, 2009 (the "Settlement Agreement") and filed with the court on October 29, 2009 (Doc. # 303). The court has considered all papers filed and proceedings had herein, and otherwise is fully informed in the matter. The court has determined that the proposed Settlement set forth in the Settlement Agreement and the proposed allocation of settlement proceeds are fair, reasonable, and adequate, and they are approved. In addition, the court grants the Motion for Attorney Fees and the Reimbursement of Expenses.

I.      **Background**

This case (the "Action") arises from waste allegedly deposited by the defendant Olin Corporation ("Olin") in the Newhall neighborhood of Hamden, Connecticut. The Plaintiffs, owners of real property in the Newhall neighborhood, sought damages against Olin for the diminution in the value of their properties, the loss of use and enjoyment of their properties, and emotional distress because of the discovery of contamination.

This Action has been actively litigated for over 6 years with extensive motion practice and discovery.  The parties substantially completed fact discovery, which included depositions of class representatives, bellwether plaintiffs, Olin representatives, and others, and extensive document discovery, and were on the precipice of expert discovery.  The parties had previously disclosed the subject matter for expert reports and trial testimony.

The court has ruled on motions to dismiss and motions for summary judgment.  In the first motion for summary judgment, the court granted Olin's motion as to the actions of the Winchester Repeating Arms Company that existed before 1932.  Therefore, under the court's previous ruling, Olin is potentially liable only for events that took place after 1931, and therefore cannot be held liable for the contamination of property in the Newhall neighborhood that resulted from waste being placed there prior to 1932.  *See Collins v. Olin Corp.,* 434 F.Supp. 2d 97, 107 (D.Conn. 2006).  As a result of this ruling, the Stigma Subclass (as described below) could only assert a claim based on the diminution in value of their property from being *near* contaminated property for which Olin is potentially responsible.  The court denied Olin's second motion for summary judgment based on statute of limitations (Doc. # 281).

1.     **The Class**

On February 21, 2008, the court certified a class comprised of all persons who owned property on May 2, 2003 in the Newhall neighborhood of the Town of Hamden, Connecticut, who allegedly have suffered injury as a result of Olin's alleged disposal of contaminated fill in that neighborhood (Doc. # 232).  The court certified three subclasses:  (1) the Contaminated Properties Subclass which includes all members of the Class who owned properties onto which Olin allegedly disposed of contaminated fill after December of 1931; (2) the Stigma Subclass, which includes all members of the Class who owned properties onto which Olin did not dispose

of waste after December 1931, but who allegedly suffered injury as a result of their proximity to the Contaminated Properties Subclass; and (3) the Response Costs Subclass which includes all members of the Class who own property in the Newhall neighborhood who have incurred or will incur response costs in order to address residual contamination on their properties.[1]

### 2.      The Settlement

The Settlement was hard-fought, intensively negotiated, and crafted at arm's length by experienced counsel on both sides at mediation under the direction of the Honorable Judge William Cahill (Ret.), a retired judge from San Francisco, California and well-regarded mediator on the JAMS panel with extensive experience in the mediation of complex environmental and class action lawsuits.

The Settlement provides guaranteed relief for the Class while eliminating all of the many risks and delays that would have been associated with the continued litigation of the Action, including the risk of no recovery at all.

The Action asserts claims for diminution in property value, loss of use and enjoyment and emotional distress.  The Action does not assert claims with respect to the investigation and remediation that is the subject of a Consent Order that was entered into among the State of Connecticut, the Town of Hamden, the South Central Regional Water Authority, the State Board of Education and Olin Corporation, Order No. SRD-128 ("Consent Order").  The remediation will be performed pursuant to a Remedy Selection Plan issued by the Connecticut Department of Environmental Protection ("CTDEP") in October of 2007.  The Settlement resolves claims for diminution in property values, loss of use and enjoyment and emotional distress.  The Settlement

---

[1] The members of the Response Costs Subclass are also members of either the Contaminated Properties Subclass or the Stigma Subclass.  The Settlement does not allocate any funds specifically to the Response Costs Subclass.

does not concern or in any way impact the parties rights and/or obligations regarding any proceeding with the CTDEP, including the Consent Order, Remedy Selection Plan or otherwise.

Under the terms of the Settlement, as set forth in the Settlement Agreement, Olin will deposit $1,391,500[2] to the Settlement Fund (as defined in the Settlement Agreement), in exchange for the dismissal of the Claims (as defined in the Settlement Agreement) brought against Olin in the Action and a full release of claims (as set forth in Paragraph 10 of the Settlement Agreement), except that the Settlement and the releases specifically carve out:  (1) the rights of Class Members to challenge the Remedy Selection Plan approved by the CTDEP or any other aspect of the Consent Order; and (2) claims of injury or damage from an express manifest physical injury.  At the Fairness Hearing held on February 18, 2010, Olin's counsel acknowledged that the Settlement Agreement does not address nor impact the remediation that is set forth in the Remedial Action Plan, nor does it address or impact the rights of Class Members to challenge the Remedial Action Plan or any other aspect of the Consent Order or the CTDEP's administrative process with respect to the Consent Order.

The Settlement Fund will be distributed, after deduction of court-approved attorneys' fees and expenses (the "Net Settlement Fund"), to Class Members who are not otherwise excluded and who timely submit valid Proof of Claim and Release forms.

The court preliminarily approved the Settlement by its Order dated November 4, 2009 (the "Preliminary Approval Order" Doc. # 304).

### 3.    Notice

The Preliminary Approval Order directed that a hearing be held to determine the fairness, reasonableness and adequacy of the Settlement (the "Fairness Hearing").  In accordance with the

Preliminary Approval Order, the Notice was mailed to potential Class Members on November 16, 2009 and November 17, 2009.  The Summary Notice was published in the *New Haven Register* on November 22, 2009.  On or about December 2, 2009, Class Counsel sent a supplemental notice to potential Class Members providing the final computation of litigation expenses and a proposed distribution sheet, including a net settlement payment.  A website (www.newhallclassaction.com) was established to provide potential Class Members with information, including the Notices and other documents, concerning the Settlement and the Action.  In addition, Plaintiffs' Counsel provided an email address and phone number so that the Class Members could contact them and discuss the Settlement.  As a result, Plaintiffs' Counsel spoke to over seventy Class Members on the phone about the Settlement.

The Class Members were provided with a detailed description of the nature and procedural history of the Action, as well as the material terms of the Settlement, including: (i) an estimate of the recovery for each of the subclasses; (ii) the manner in which the Net Settlement Fund will be allocated among participating Class Members (including the amount each class member will receive); (iii) a description of the claims that will be released in the Settlement; (iv) the right and mechanism for Class Members to opt-out or exclude themselves from the Class; (v) the right and mechanism for Class Members to object to the Settlement and to attend the Fairness Hearing; and (vi) the respective effects of opting out, objecting and/or not filing proof of claim and release forms.

**4.      Exclusions**

The exclusion period ended on December 18, 2009 with only six opt-outs in the Stigma Subclass and no opt-outs in the other subclasses.  The court further finds that the Objection

---

[2] In accordance with the Settlement Agreement, the Settlement Fund of $1,396,000 was to be reduced by $750 for each opt-out in the Stigma Subclass.  Since there were only six opt-outs in the Stigma Subclass, the Settlement Fund

submitted by Elizabeth Hayes (discussed below) was not intended to be an opt-out by Ms. Hayes or by the signatories to the Objection.

5.      **Proof of Claims**

As of the date of the Fairness Hearing, Plaintiffs' Counsel had received one hundred and seventy-one (171) proof of claim and release forms ("Settlement Forms") from Class Members as follows:

- 30 of 41 (73.17%) from the Contaminated Subclass properties with greater than 4 feet of fill

- 7 of 15 (46.66%) from the Contaminated Subclass properties with less than 4 feet of fill

- 133 of 452 (29.42%) from the Stigma Subclass.

The Preliminary Approval Order permits Plaintiffs' Counsel to extend the deadline for accepting Settlement Forms as long as it does not delay the disbursement of Settlement proceeds to those Class Members who timely submitted their Settlement Forms.  At the Fairness Hearing, Plaintiffs' Counsel stated that they would be willing to extend the deadline for accepting Settlement Forms following the court's ruling on this Motion for Final Approval.  Olin indicated that it did not object to an extension.

6.      **The Objection**

The court received one objection to the proposed settlement on January 18, 2010 and a follow up letter dated February 13, 2010 (collectively the "Objection").  The Objection was prepared by a class member, Elizabeth Hayes.  Appended to the January 18, 2010 document were eighty-five (85) signatures from people whom Ms. Hayes described as "residents of the

_____

was reduced to $1,391,500.  There were no opt-outs in the Contaminated Properties Subclass.

Newhall area that is included in the consent order by DEP for a massive clean-up" (the "Additional Signatories").  The Objection did not include proof of class membership for the Additional Signatories.  Twenty-seven (27) of the Additional Signatories are not members of the Class.  Of the remaining fifty-eight (58) Additional Signatories, seven (7) are in the Contaminated Subclass and fifty-one (51) are in the Stigma Subclass.  The Class Members who signed the Objection constitute less than 12% of the Class.

        7.        **The Fairness Hearing**

        On February 18, 2010, the court conducted the Fairness Hearing.

        At the Fairness Hearing, Ms. Hayes and the other Class Members who spoke voiced their concerns, which primarily focused on issues regarding the on-going remediation, and issues regarding possible future physical injury.  Virtually all of the Class Members who spoke at the Fairness Hearing voiced concerns that the remediation being performed in their neighborhood was inadequate and said that they wanted the contaminated soil to be remediated to a depth of greater than four feet, and did not want restrictions imposed on their properties.

        Shanon Poicu of the CTDEP spoke at the Fairness Hearing.  Ms. Poicu stated that the remediation is being conducted in accordance with the applicable Connecticut regulations and that even with contamination remaining below four feet, it is safe to use the properties.  Both Ms. Poicu and Olin's counsel represented to the court that the remediation is projected to cost more than $40 million, with the State of Connecticut and Olin each contributing over $20 million.  They also reported that Olin and the State of Connecticut would each be contributing $1 million to a fund to be managed by the Town of Hamden (the "Soil Management Fund").  They also confirmed that the remediation will not be limited to the Contaminated Subclass properties, but will also include more than one hundred of the Stigma Subclass properties.  The issues of the

remediation and personal injuries allegedly related to the contamination are not a part of the Action and are specifically excluded from the Settlement being presented for approval.

## II.        Standard of Review

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise of claims brought on a class basis. The issue of whether a proposed settlement should be approved is within the sound discretion of the district court, which should be exercised in the context of public policy strongly favoring the pretrial settlement of class action lawsuits. *See Joel A. v. Giuliani*, 218 F.3d 132, 139 (2d Cir. 2000).  There is an overriding public interest in settling litigation, particularly in class action suits. *See United States v. Glens Falls Newspapers*, 160 F.3d 853, 856-57 (2d Cir. 1998); *see also Joblove v. Barr Labs., Inc. (In re Tamoxifen Citrate Antitrust Litig.)*, 429 F.3d 370 (2d Cir. 2005); *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (U.S. 1910).  Recognizing that a settlement represents an exercise of judgment by the negotiating parties, the Court of Appeals for the Second Circuit has held that the court's responsibility in reviewing the agreement negotiated between the parties to a lawsuit is limited to ensuring that the settlement is fair and not a product of collusion, and that the class members' interests were represented adequately.  *See Grant v. Bethlehem Steel Corp*., 823 F.2d 20, 22-23 (2d Cir.1987); *See also In re Warner Communications Sec. Litigation*, 798 F.2d 35, 36 (2d Cir. 1986).

In evaluating the Settlement, the court is required to consider "both the settlement's terms and the negotiating process leading to settlement." *Wal-Mart Stores, Inc. v. VISA U.S.A. Inc.,* 396 F.3d 96, 116 (2d Cir. 2005); *Wright v. Stern,* 553 F. Supp. 2d 337,343 (S.D.N.Y. 2008); *In re Merrill Lynch & Co. Research Reports Sec. Litig.,* 246 F.R.D. 156, 165 (S.D.N.Y. 2007). While the decision to grant or deny approval of a settlement lies within the broad discretion of the trial court, a general policy favoring settlement exists, especially with respect to class

actions. *Wright,* 553 F. Supp. 2d at *344; In re Veeco Instruments Inc. Sec. Litig.,* No. 05 MDL

01695 (CM), 2007 U.S. Dist. LEXIS 85629, at *16 (S.D. N.Y. Nov. 7, 2007); *In re Ashanti*

*Goldfields Sec. Litig.,* No. CV-00-717 (DGT), 2005 U.S. Dist. LEXIS 28431, at *3-*4 (E.D.NY

Nov. 15,2005); *Taft v. Ackermans,* No. 02 Civ. 7951 (PKL), 2007 U.S. Dist. LEXIS 9144, at

*13-*14 (S.D.N.Y. Jan. 31, 2007). *See also Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.

1982) (The settlement of complex class action litigations are clearly favored by the courts.).

Moreover, "[c]lass action suits readily lend themselves to compromise because of the difficulties

of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re*

*Luxottica Group S.P.A. Sec. Litig.,* 233 F.R.D. 306, 310 (E.D.N.Y. *2006); see also Weinberger,*

698 F.2d at 73 ("There are weighty justifications, such as the reduction of litigation and related

expenses, for the general policy favoring the settlement of litigation.").

     Recognizing that a settlement represents an exercise of judgment by the negotiating

parties, the Second Circuit has cautioned that while a court should not give "rubber stamp

approval" to a proposed settlement, it must "stop short of the detailed and thorough investigation

that it would undertake if it were actually trying the case." *Detroit v. Grinnell Corp.,* 495 F.2d

448, 462 (2d Cir. 1974); *Veeco,* 2007 U.S. Dist. LEXIS 85629, at *17. As stated by the court in

*Newman* v. *Stein,* 464 F.2d 689 (2d Cir. 1972):

> the role of a court in passing upon the propriety of the settlement of a derivative
> or other class action is a delicate one. . . . [W]e recognized that since "'the very
> purpose of a compromise is to avoid the trial of sharply disputed issues and to
> dispense with wasteful litigation" the court must not turn the settlement hearing
> 'into a trial or a rehearsal of the trial.'"

*Id.* at 691-92 (citation omitted).

9

III.    **Discussion**

A.    **The Settlement is Procedurally Fair**

A strong initial presumption of fairness attaches to a proposed settlement if it is reached by experienced counsel after arm's-length negotiations, and great weight is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation. *Luxottica Group,* 233 F.R.D. at 315; *see also In re Alloy, Inc., Sec. Litig.,* No. 03 Civ. 1597 (WHP), 2004 U.S. Dist. LEXIS 24129, at *5 (S.D.N.Y. Dec. 2, 2004). A court may find the negotiating process is fair where "the settlement resulted from 'arm's-length negotiations and that plaintiffs' counsel have possessed the experience and ability. . . necessary to effective representation of the class's interests.'" *D'Amato* v. *Deutsche Bank,* 236 F.3d 78, 85 (2d Cir. 2001) (citation omitted); *In re Paine Webber Ltd. P'ships Litig.,* 171 F.R.D. 104, 125 (S.D.N.Y.) ("So long as the integrity of the arm's length negotiation process is preserved. . . a strong initial presumption of fairness attaches to the proposed settlement."), *aff'd,* 117 F.3d 721 (2d Cir. 1997).

This initial presumption of fairness and adequacy applies here because the Settlement was reached by experienced, fully-informed counsel after vigorous arm's-length negotiation. *See In re Price line. com, Inc. Sec. Litig.,* No. 3:00-CV-1884(A VC), 2007 U.S. Dist. LEXIS 52538, at *8 (D. Conn. July 20, 2007). In addition, Plaintiffs' Counsel were fully informed of the merits and weaknesses of the case by the time the Settlement was reached. Here, the parties have been actively litigating this case for over six years since its commencement in May, 2003. Plaintiffs' Counsel conducted a sophisticated and extensive investigation into the claims asserted in the Complaint, including but not limited to multiple interviews with factual witnesses, review of the extensive document production, numerous depositions, and consultation with experts. By the time settlement discussions leading up to the Settlement began, merits discovery had

substantially concluded, class certification was granted, and numerous dispositive motions had been decided.  Thus, Plaintiffs' Counsel had a solid understanding of the strengths and weaknesses of the Plaintiffs' claims, both factually and legally, and was able to engage in a rigorous negotiation process with Olin and its counsel.

Additionally, throughout the Action and the settlement negotiations, Olin has been represented by experienced counsel from a prominent law firm.  Olin's counsel was as well-informed as Plaintiffs' Counsel, and its representation of Olin was no less rigorous than Plaintiffs' Counsel's representation of the Class.

As a result, the parties' settlement negotiations were clearly hard-fought and required a formal full-day mediation session in Boston, Massachusetts, which was conducted under the direction of the Honorable Judge William Cahill (Ret.), a retired judge from San Francisco, California on the JAMS panel with extensive experience in the mediation of complex environmental actions.  The parties had previously engaged in a settlement conference with Magistrate Judge Thomas Smith, but were not able to resolve the Action.  The Settlement Fund is almost three times more than the final offer made by Olin at the settlement conference with Magistrate Judge Smith.  The parties ultimately settled at the amount to be provided to each Subclass pursuant to Judge Cahill's written proposal made at the end of the full day of mediation.

Therefore, the court concludes that the Settlement was reached without collusion and after good-faith arms-length bargaining between the parties, and this factor supports a finding that the Settlement is fair, adequate and reasonable.  Thus, the Settlement is entitled to the presumption of procedural fairness.

**B.     The Second Circuit's Standards Governing the Substantive Fairness of Class Action Settlements Are Met**

Courts within the Second Circuit observe the universal standard for determining whether a proposed class settlement is substantively fair: whether the proposed settlement is "'fair, reasonable, and adequate.'" *Luxottica Group,* 233 F.R.D. at 310 (citation omitted); Fed. R. Civ. P. 23(e)(2). The Second Circuit established nine factors that courts should consider in deciding whether to approve a proposed settlement of a class action:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Grinnell,* 495 F.2d at 463 (citations omitted).  All nine factors need not be satisfied.  Instead, the court should look at the totality of these factors in light of the specific circumstances involved. *In re Merrill Lynch* & *Co., Inc. Research Reports Sec. Litig.,* No. 02 MDL 1484 (JFK), 2007 U.S. Dist.LEXIS 93423, at *25-*26 (S.D.NY Dec. 20, 2007); *In re Global Crossing Sec.* & *ERISA Litig., 225* F.R.D. 436, 456 (S.D.N.Y. 2004).

**1.   The Complexity, Expense and Likely Duration of the Litigation Justifies the Settlement**

"The expense and possible duration of the litigation should be considered in evaluating the reasonableness of [a] settlement." *Milstein* v. *Huck,* 600 F. Supp. 254, 267 (E.D.N.Y. 1984). It is recognized that cases involving contamination and determinations as to when such contamination occurred, like the present case, are complex and involve difficult issues of proof. *See, e.g. Timex Corporation v. Home Insurance Co. et al.*, 1998 Conn. Super. LEXIS 1567, at

*21.

As set forth above, the Settlement provides for the recovery of $1,391,500 in cash to be allocated among Class Members after deduction for court-approved fees and expenses.  If the Action had continued, Class Members, especially Stigma Subclass members, faced significant risk at summary judgment or trial, and thereafter on appeal, including risk establishing Olin's liability, and risk regarding the amount of damages recoverable by the Class.

In addition, litigating this complex environmental contamination class action to completion would result in significant expense, including substantial experts' fees, which would reduce any recovery, and delay providing compensation to the Class.  While Plaintiffs' Counsel had consulted with a team of experts in order to prosecute the Action[3], at the time of the Settlement, the parties were on the brink of the full-blown expert phase of the litigation.  On June 30, 2008, the Plaintiffs preliminarily disclosed seven categories for expert testimony, including toxicology, waste disposal practices, emotional distress/psycho-social impacts, historian, ammunition, environmental contamination and diminution of property values.

During the expert discovery phase, the Plaintiffs would have incurred significant expense to: (1) obtain expert reports for the seven categories of expert testimony for disclosure to Olin; (2) prepare the experts for depositions, and for the depositions themselves; (3) engage in expert discovery of Olin's experts; and (4) retain these experts, and possibly other experts, to rebut Olin's team of experts.  The Plaintiffs would also incur substantial expense for experts to prepare for and testify at trial.  Clearly, had the Settlement not been reached, the cost of litigating the Action from that point forward would have reduced the amount of funds, if Plaintiffs were successful, to be distributed to the Class.

There can be no doubt that because this Action is settling against Olin at this time, after

more than six years of litigation, the litigants have been saved further delay and expense of continued litigation.  Even if the Class were to recover a larger judgment after a trial, the additional delay through expert discovery, summary judgment on liability and/or damages, the conduct of a trial or trials[4], post-trial motions, and the inevitable appellate process, would deny the Class any recovery for years, further reducing the value of any judgment. *See In re Sony SXRD Rear Projection Television Class Action Litig.,* No. 06 Civ. 5173 (RPP), 2008 U.S. Dist. LEXIS 36093, at *18 (S.D.N.Y. May 1,2008)*; Strougo v. Bassini,* 258 F. Supp. 2d, 254, 261 (S.D.N.Y 2003) ("even if a shareholder or class member was willing to assume all the risks of pursuing the actions through further litigation. . .the passage of time would introduce yet more risks. . . and would, in light of the time value of money, make future recoveries less valuable than this current recovery"); *Hicks* v. *Morgan Stanley & Co.,* No. 01 Civ. 10071 (RJH), 2005 U.S. Dist. LEXIS 24890, at *16 (S.D.N.Y. Oct. 24, 2005) ("Further litigation would necessarily involve further costs [and] justice may be best served with a fair settlement today as opposed to an uncertain future settlement or trial of the action.").  The Settlement for $1,391,500 in cash at this juncture results in an immediate and substantial tangible recovery without the considerable risk, expense and delay of trial(s) and appeal(s), and, therefore, this factor weighs heavily in favor of the proposed Settlement.

### 2.    The Reaction of the Class to the Settlement

The reaction of the Class to the Settlement is another factor in assessing its fairness and adequacy.

Here, in response to a broad court-approved notice program, of the 452 members of the Stigma Subclass, only six requested exclusion, and there were no opt-outs in the Contaminated

---

[3] Some of the experts provided affidavits in connection with various pleadings filed in the Action.
[4] The current case management plan calls for an initial trial of "bellwether" plaintiffs.

Properties Subclass. The court did receive the Objection, and heard from Elizabeth Hayes and others at the Fairness Hearing.

In approving a class action settlement, the court has a fiduciary responsibility to ensure that the settlement is fair and not a product of collusion, and that the class members' interests were represented adequately. *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 22 (2d. Cir, 1987). The Second Circuit has made clear that a "settlement can, of course, be fair notwithstanding a large number of objectors." *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 462 (2d Cir. 1982)(approving settlement despite objections of approximately 56% of class). *See also County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1325 (2nd Cir. 1990) (finding that the district court did not abuse its discretion in approving the settlement even if a majority of the class were opposed); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20 at 23 (finding that the district court did not abuse its discretion in approving the settlement where 36 or 48 percent of the class, depending on the method of calculation, objected to the settlement). No evidence was presented of collusion, and the court finds there was no collusion and that that the Class Members' interests were represented adequately.

The Second Circuit has instructed that "majority opposition to a settlement cannot serve as an automatic bar to a settlement that a district judge, after weighing all the strengths and weaknesses of a case and the risks of litigation, determines to be manifestly reasonable. Preventing settlement in such circumstances not only deprives other class members of the benefits of a manifestly fair settlement and subjects them to the uncertainties of litigation, but, in this case, would most likely have resulted in the eventual disappointment of the objecting class members as well." *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456 at 462-63.

Accordingly, there are many examples where courts have approved settlements notwithstanding having received and considered objections from class members.  See *Van Horn v. Trickey*, 840 F.2d 604, 606 (8th Cir. 1988) (approving a settlement opposed by 70 percent of the class); *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 891 (7th Cir. 1985) (approving a settlement opposed by 15 percent of the class); *Reed v. General Motors Corp.*, 703 F.2d 170, 174-75 (5th Cir. 1983) (approving a settlement over the objections of 85 percent of the named plaintiffs and nearly 40 percent of the member class where many of the objections involved allocation of the settlement fund); *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 803 (3rd Cir. 1974) (approving a settlement over the objections of more than 20 percent of the class); *Stoetzner v. U.S. Steel Corp.,* 897 F.2d 115 (3d Cir. 1990)(approving settlement over objection of 10% of the class); *Boyd v. Bechtel Corp.*, 485 F.Supp 610, 624 (N.D.Cal.1979)(approving settlement over objection of 16% of the class).  The Class Members who signed the Objection represent less than 12% of the Class.

Furthermore, at the Fairness Hearing the Court heard from many of the Class Members who objected.  The Class Members who spoke predominately expressed dissatisfaction over the scope of the Remedial Action Plan and concern over possible health impacts in the future.  The court recognizes that those issues were specifically carved out of the Settlement and the Releases specifically exclude them.

Moreover, a significant majority of the Contaminated Subclass have submitted Settlement Forms and 133 of the 452 (29.42%) Stigma Subclass members have submitted their Settlement Forms.

In the Objection, Elizabeth Hayes stated that Class counsel negotiated the Settlement without her knowledge or participation. Class counsel submitted a written response which was

supported by the Declaration of Mark Roberts [Doc. # 313], one of the counsel for the Class. Based on the Response, Attorney Roberts' Declaration, and the Fairness Hearing, the court finds that Class counsel had authority to negotiate a proposed settlement with Olin.

Accordingly, the Court finds that this factor does not weigh against approval of the Settlement.

### 3.   The Mature Stage of the Proceedings

There can be no question that at the time the Settlement was reached, Plaintiffs' Counsel had a clear view of the strengths and weaknesses of the claims in the Action and of the legal and factual defenses that Olin was likely to raise in a subsequent motion for summary judgment, and at trial if summary judgment was not successful. *Teachers' Ret. Sys. of La. v.A.C.L.N.,* No. 01-CV-1l814 (MP), 2004 WL 1087261, at *3 (S.D.N.Y. May 14,2004) (finding action had advanced to a stage where parties "'have a clear view of the strengths and weaknesses of their cases'") (citation omitted); *see also Heyer v. N.Y. City Hous. Auth.,* No. 80 Civ. 1196 (RWS), 2006 U.S. Dist. LEXIS 25089, at *9 (S.D.N.Y. Apr. 28, 2006) (although limited discovery was completed before settlement negotiations began, familiarity of counsel for all parties with case justifies settlement).

Here, Plaintiffs' Counsel advanced the case through a complaint, numerous motions to dismiss and for summary judgment, fact discovery, consultation with a team of experts, a motion for class certification, and preparation and participation in a settlement conference with Magistrate Judge Smith and a mediation session before Judge William Cahill (Ret.).  Plaintiffs' Counsel conducted a thorough investigation of the facts and claims involved in this case, including review and analysis of the environmental investigation of the Hamden, Connecticut community; scientific reporting and other public statements; attendance at many Newhall

Coalition meetings; meetings with CTDEP representatives; interviews of factual witnesses; review and analysis of hundreds of boxes of documents produced by Olin and the Town of Hamden and third-parties; review and analyses of potential sources of recovery; and depositions.

Thus, Plaintiffs' Counsel had more than sufficient information to intelligently negotiate the terms of the Settlement that is before the court for approval.  Therefore, the court finds that this factor supports approving the Settlement.

### 4.   The Risk of Establishing Liability

In assessing the Settlement, the court should balance the benefits afforded the Class, including the immediacy and certainty of a recovery, against the continuing risks of litigation. *See Grinnell,* 495 F.2d at 463; *Veeco,* 2007 U.S. Dist. LEX IS 85629, at *25.  While Plaintiffs' Counsel believe that the Plaintiffs' claims could survive another motion for summary judgment, it is also clear that ultimate success is not assured, and this very substantial Settlement, when viewed in light of the risks of proving liability, is undoubtedly fair, adequate and reasonable. "Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation." *Teachers' Ret. Sys.* v. *A.C.L.N., Ltd.*, No. 01-CV-11814 (MP), 2004 U.S. Dist. LEXIS 8608, at *11 (S.D.N.Y. May 14, 2004).

While Plaintiffs' Counsel remain confident in their ability to prove the claims in the Action and to effectively rebut Olin's defenses, they recognize that proving liability is far from certain.  If the litigation had continued, Plaintiffs faced risk, as set forth in Olin's Response to the Objection [Doc. # 314], including establishing negligence and nuisance, as well as the Class' full amount of damages.

There were also significant risks, in light of the court's ruling on successor liability, with respect to potential sources of recovery for the largest sub-class, the Stigma Subclass.  Olin made

it clear that it intended to file a motion for summary judgment as to the Stigma Subclass, and, in spite of the court's ruling on summary judgment with respect to statute of limitations, that it would pursue its statute of limitations defense at trial.

Therefore, the court finds that this factor also supports approval of the Settlement.

### 5.   The Risk of Establishing Damages

Had this Action gone to trial, Olin would have not only pressed defenses as to liability, but also asserted defenses as to Plaintiffs' claims of damages.  See Olin Response to the Objection [Doc. # 314].

In addition, the damage assessments of the parties' trial experts would be sure to vary substantially, and trial would become a "battle of experts."  *See, e.g., Paine Webber,* 171 F.R.D. at 129 (noting unpredictability of outcome of battle of damage experts); *In re Cendant Corp. Litig.,* 264 F.3d 201, 239 (3d Cir. 2001) ("establishing damages at trial would lead to a 'battle of experts' . . . with no guarantee whom the jury would believe").  This battle would likely have focused on the following issues: (1) with respect to the contaminated properties, the amount of diminution of property values caused by the contamination, a dispute that would no doubt involve testimony from competing appraisers; (2) assuming diminution of values, whether they would remain depressed in light of the remediation of the contamination in the neighborhood in accordance with the CTDEP's Remedial Action Plan, which includes funding from Olin and the State; (3) the impact of market forces and conditions on values; (4) with respect to the Stigma Subclass, whether the properties suffered diminution in value as a result of stigma from neighboring contaminated property on which Olin did deposit fill, or from the contamination on the Stigma Subclass properties themselves for which Olin is not responsible as result of the court's ruling on successor liability.  The outcome of such battles is never predictable, and there

existed the very real possibility that a jury could be swayed by experts for Olin to minimize the subclasses' losses or to show that the losses were attributable to factors other than Olin's alleged conduct.

Thus, even if Plaintiffs prevailed as to liability at trial, the judgment obtained could well have been but a fraction of the damages claimed.  Despite these risks, Plaintiffs' Counsel obtained a $1,391,500 cash settlement, and have avoided the risk of establishing damages.  The fairness and reasonableness of the Settlement, in light of the risks, are manifest.

### 6.   The Risks of Maintaining the Class Action Through Trial

While it has not done so, Olin could move to decertify the Class.  The Settlement avoids any uncertainty with respect to this issue.  Courts have approved settlements where the risk of maintaining class certification is not an issue.  *See,e.g., Veeco,* 2007 U.S. Dist. LEXIS 85629, at *32; *In Re Luxottica,* 233 F.R.D. at 313-14 (factor weighs neither for nor against approval).

### 7.   The Reasonableness of the Settlement in Light of the Strengths and Weaknesses of the Plaintiffs' Case

The adequacy of the amount agreed upon in settlement must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *In re "Agent Orange" Prod. Liab. Litig.,* 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd,* 818 F.2d 145 (2dCir. 1987). "[T]he Court is not to compare the terms of the Settlement with a hypothetical or speculative measure of a recovery that might be achieved by prosecution of the litigation to a successful conclusion." *Veeco,* 2007 U.S. Dist. LEXIS 85629, at *33.  The Court need only determine whether the Settlement falls within a "range of reasonableness." *Paine Webber,* 171 F.R.D. at 130 (citation omitted); *Newman,* 464 F.2d at 693 ("[I]n any case there is a range of reasonableness with respect to a settlement."); *See also Indep. Energy,* 2003 U.S. Dist. LEXIS 17090, at * 13 (noting few cases tried before a jury result in full

amount of damages claimed). The Second Circuit has described the "range of reasonableness" as "a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in. . . any litigation." *Wal-Mart Stores,* 396 F.3d at 119 (quoting *Newman,* 464 F.2d at 693).

In light of the complex legal and factual issues typically present in environmental class actions generally, and, certainly, in this Action, the unpredictability of a lengthy and complex trial (or multiple trials) and the appellate process that would most likely follow, the fairness of the $1,391,500 cash settlement is clearly apparent.  At the very least, the Settlement falls within the "range of reasonableness."

## 8.    Olin's Ability to Withstand a Greater Judgment

The Court may also consider the defendant's' ability to withstand a judgment greater than that secured by settlement. *Grinnell,* 495 F.2d at 463. The fact that Olin *could* have paid more money does not render the Settlement unreasonable. *See In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 538 (3d Cir. 2004) ("[T]he fact that DuPont could afford to pay more does not mean that it is obligated to pay any more than what the. . . class members are entitled to under the theories of liability that existed at the time the settlement was reached."); *Sony,* 2008 U.S. Dist. LEXIS 36093, at *23 ("a defendant is not required to 'empty its coffers' before a settlement can be found adequate") (citation omitted). "Where, as here, the other Grinnell factors weigh in favor of approval, this factor alone does not suggest the settlement is unfair." *Id.* at *23-*24.

Accordingly, based on the above, the *Grinnell* factors, taken together, weigh in favor of approving the Settlement, as fair, reasonable and adequate.

**D.      The Plan of Allocation is Approved as Fair and Reasonable**

"'As a general rule, the adequacy of an allocation plan turns on . . . whether the proposed apportionment is fair and reasonable under the particular circumstances of the case.'" *In re Visa Check/Mastermoney Antitrust Litig.,* 297 F. Supp. 2d 503, 518 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,* 396 F.3d 96 (2d Cir. 2005) (citation omitted).  A plan of allocation is fair, reasonable and adequate as long as it has a "reasonable, rational basis." *Veeco,* 2007 U.S. Dist. LEXIS 85629, at *37 citing *Maley v. Del Global Techs. Corp.,* 186 F. Supp 2d 358, 367 (S.D.N.Y. 2002).  Further, courts enjoy "broad supervisory powers over the administration of class-action settlements to allocate the proceeds among the claiming class members … equitably." *Beecher v. Able,* 575 F.2d 1010 (2d Cir. 1978).

With the assistance of Judge Cahill, Plaintiffs' Counsel and Olin reached a tentative agreement to settle the lawsuit based on negotiations for each of the following three categories of property owners: (1) the 41 properties in the Contaminated Properties Subclass that have contaminated fill below the top four feet; (2) the 15 properties in the Contaminated Properties Subclass that do not have contaminated fill below the top four feet; and (3) the properties with no contaminated fill deposited after 1931.  The list of properties in each of these categories was provided with the Notice and posted on the website established by Plaintiffs' Counsel.

The Settlement payment a class member will receive depends on what subclass she is in and whether her property has contaminated fill below the top four feet.  For the forty-one (41) properties in the Contaminated Properties Subclass that have contaminated fill below the top four feet the Settlement payment is $23,000 per property before deduction of court-approved attorney fees and expenses.  For the fifteen (15) properties in the Contaminated Properties Subclass that

do not have contaminated fill below the top four feet the Settlement payment is $7,600 per property before deduction of court-approved attorney fees and expenses.  For properties with no contaminated fill deposited after 1931 (the Stigma Subclass), the Settlement payment is $750 per property before deduction of court-approved attorney fees and expenses.  Any unclaimed settlement funds will be distributed on a pro rata basis among the three categories of Class Members as set forth in the Settlement Agreement.

On or about December 2, 2009, Plaintiffs' Counsel sent all Class Members a letter providing notice of the amount of attorneys' fees and expenses sought and a net settlement payment amount for their particular property.  Accordingly, each Class Member was provided with information about which category his/her property lies in, the amount of the gross settlement amount for that category, the amount of attorneys fees and expenses being sought, and the net settlement payment amount for each category.

The proposed plan for allocation has a rational basis and is fair and equitable.  Clearly, some property owners may benefit more from the Settlement than others depending upon whether their properties were filled with contaminated fill before or after December 1931 and due to the depth of the contaminated fill.  This is fair and reasonable, as there is no rule that a settlement benefit all class members equally. *Veeco, 2007* U.S. Dist. LEXIS 85629, at *39; *Global Crossing,* 225 F.R.D. at 462.  Indeed, it is appropriate for interclass distributions to be based upon, among other things, the comparative strengths and weaknesses of the claims. *See In re Holocaust Victim Assets Litig.,* 413 F.3d 183, 186 (2d Cir. 2001); *Paine Webber,* 171 F.R.D. at 133.

While property owners in the Stigma Subclass will receive substantially less than property owners in the Contaminated Subclass, the court is mindful that in ruling on Olin's

Motion for Summary Judgment, *Collins v. Olin Corp.,* 434 F.Supp. 2d 97, 107 (D.Conn. 2006), the court held that Olin is not responsible for the contamination of properties that received fill prior to 1932.  As a result, the Stigma Subclass could only assert a claim based on the diminution in value from being *near* contaminated property for which Olin is responsible.

Accordingly, the plan for allocation is fair and reasonable, and is approved.

### E.      The Attorneys Fees and Expenses Requested by Plaintiffs' Counsel are Approved

#### 1.      Attorneys' Fees

Plaintiffs' Counsel submitted a Motion for an Award of Attorneys' Fees and Reimbursement of Expenses pursuant to Rules 23(h) and 54(d)(2) requesting an award of attorneys' fees in the amount of $463,833.33, which represents 33.33% of the Settlement Fund. In addition, Plaintiffs' Counsel requested $183,294.84 in reimbursement of expenses that were reasonably and necessarily incurred in prosecuting this class action and obtaining this settlement for the benefit of the Class.

A lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole. *Boeing Co.* v. *Van Gemert*, 444 U.S. 472, 478 (1980); *see also Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 47 (2d Cir. 2000); *Savoie* v. *Merchants Bank*, 166 F.3d 456, 460 (2d Cir. 1999).  Awards of attorneys' fees in class settlements are generally calculated through the use of one of two methods; the percentage of the award method, or the Lodestar method. *See, e.g. Goldberger,* 209 F.3d at 47.  The trend in the Second Circuit is toward the percentage method.  *Wal-Mart Stores, Inc.* v. *Visa U.S.A. Inc.,* 396 F.3d 96 (2d Cir. 2005).  In expressly approving the percentage method, the Second Circuit recognized that "the lodestar method proved vexing" and had resulted in "an inevitable waste of judicial resources." *Goldberger,* 209 F.3d at 48, 49.   The

percentage approach not only aligns the interests of the counsel and the class, *Lloyd's Am. Trust Fund*, 2002 U.S. Dist. LEXIS 22663, at *74, it also recognizes that the quality of counsel's services is measured best by the results achieved, and "can serve as a proxy for the market in setting counsel fees." *In re Am. Bank Note Holographies*, 127 F. Supp. 2d 418, 432 (S.D.N.Y. 2001).

The Second Circuit in *Goldberger* explained that whether the court used the percentage-of-the-fund method or the lodestar approach, it should continue to consider the traditional criteria that reflect a reasonable fee in common fund cases, including: the time and labor expended by counsel; the risks of the litigation; the magnitude and complexity of the litigation; the requested fee in relation to the settlement; the quality of representation; and public policy considerations.  209 F.3d at 50. *See also In re Priceline.com, Inc. Sec. Litig.,*No. 3:00-CV-1884 (A VC), 2007 U.S. Dist. LEXIS 52538, at *14 (D. Conn. July 20, 2007).  An analysis of these factors demonstrates that the requested fee is reasonable.

The entire amount requested by Plaintiffs' Counsel is accounted for through the time and labor already expended.  Counsel has provided the court with a Lodestar cross check confirming that the Settlement is the product of considerable time and labor expended by Plaintiffs' Counsel.  Time and labor expended by Plaintiffs' Counsel includes pre-filing investigation and more than six years litigating the case.  Since its inception, Plaintiffs' Counsel have devoted a combined 8,468.6 hours to this Litigation which, at their normal billing rates, would amount to $1,951,423 in fees.  In light of such evidence, the reasonableness of the requested fee award of $463,833.33 is apparent.

The risks of litigation in this matter were significant at the time counsel agreed to represent the plaintiff class. *Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974) (citation

25

omitted).  Plaintiffs' Counsel undertook the Action on a wholly contingent-fee basis, investing a substantial amount of time and money to prosecute the Action without a guarantee of compensation or even the recovery of out-of-pocket expenses.  Plaintiffs' Counsel have not been compensated for any time or expenses since this case began more than six and a half years ago, and would have received no compensation or even reimbursement of expenses had this case not been successful.

Plaintiffs' success remains uncertain if settlement is not approved.  If the Action had continued, Plaintiffs faced risk, as described in detail above.  Accordingly, these risks undercut the certainty of ultimate recovery and weigh in favor of the requested fee award.

The magnitude and complexity of the case further supports the requested attorneys' fee award. *See Chatelain* v. *Prudential-Bache Sec.*, 805 F. Supp. 209, 216 (S.D.N.Y. 1992).  It is recognized that cases involving contamination and determinations as to when such contamination occurred, like the present case, are complex and involve difficult issues of proof. *See, e.g. Timex Corporation v. Home Insurance Co. et al.*, 1998 Conn. Super. LEXIS 1567, at *21.  As described in greater detail elsewhere in this ruling, the present case involved difficult and complex issues concerning environmental contamination, successor liability and property damages.  The Action was vigorously contested, and Olin was represented by very experienced and highly qualified attorneys. *See In re Brown Sec. Litig.*, 355 F. Supp. 574, 592-93 (S.D.N.Y. 1973) (standing of opposing counsel underscores complexity of litigation and challenges faced by class counsel).  Accordingly, the magnitude and complexity of this environmental contamination class action supports the conclusion that the requested fee is reasonable and fair.

The quality of the representation by Plaintiffs' Counsel and the standing of that counsel at the bar are also important factors that support the reasonableness of the requested fee. *See*

*Ressler* v. *Jacobson*, 149 F.R.D. 651, 654 (M.D. Fla. 1992).  It took a great deal of skill to achieve the Settlement.  Plaintiffs Counsel are well-known in the field of environmental cases and complex litigation.  The Settlement represents a favorable result for the Class, one that is attributable to the diligence, determination, hard work and reputation of Plaintiffs' Counsel, who developed, litigated and successfully negotiated the Settlement, consisting of an immediate and significant cash recovery, without the risk of further litigation.

Public policy considerations also favor the granting of the fee application. Court's encourage private suits for all who have suffered any harm from environmental contamination. *See DMJ Associates v. Carl A. Capasso*, 288 F. Supp. 2d 262, 271 (E.D.N.Y. 2003).  Counsel for plaintiffs in environmental contamination cases are typically retained on a contingent fee basis, largely due to the huge commitment of time and expense required.  The typical class representative is unlikely to be able to pursue long and protracted litigation at his or her own expense.  Furthermore, the significant expense combined with the high degree of uncertainty of ultimate success means that contingent fees are virtually the only means of recovery in such cases.  Thus, public policy favors the granting of the fee and expense application.

The fee requested in this case – 33.33% of the Settlement Fund – is well within the range of fees awarded by courts in this Circuit, whether considered as a percentage-of-the-fund or as a lodestar (requiring no multiplier).  In selecting an appropriate percentage award, the Supreme Court recognizes that an appropriate fee is intended to approximate what counsel would receive if they were bargaining for the services in the marketplace. *Missouri v. Jenkins*, 491 U.S. 274, 285 (1989).  In cases such as the present action, the customary fee arrangement is contingent, on a percentage basis, and in the range of 33.33% to 40%. *Blum v. Stenson*, 465 U.S. 886, 903

(1984) ("In tort suits, an attorney might receive one third of whatever amount the plaintiff recovers. In those cases, therefore, the fee is directly proportional to the recovery." (concurring)).

On a percentage basis, the compensation requested here is within the range of percentage fee awards within the Second Circuit. *Silverberg v. People's Bank*, No. 00-9548, 2001 U.S. App. LEXIS 22859, at *1-*7 (2d Cir. Oc. 16, 2001)(affirming district court order awarding attorneys' fees and expenses of nearly one-third of settlement fund). Indeed, the requested fee is equal to or below what courts in this Circuit commonly award in common fund cases. *See Stefaniak*, 2008 U.S. Dist. LEXIS 53872, at *10 (awarding 33% of $2.9 million settlement, finding it "typical in class action settlements in the Second Circuit"); *In re Van DerMoolen Holding N.V. Sec. Litig.*, No. 1:03-CY-8284 (RWS), slip op. at 2 (S.D.N.Y. Dec. 6, 2006)(awarding 33.33% of $8 million fund); *Spann v. AOL Time Warner, Inc.*, No. 02 Civ. 8238 (DLC), 2005 U.S. Dist. LEXIS 10848, at *24 (S.D.N.Y. June 7, 2005)(awarding 33.33% of settlement fund); *Eastman Kodak*, 228 F.R.D. at 189 (awarding 40% of the settlement fund, and noting that due to the relatively small settlement fund, the requested fee award was necessary to compensate counsel adequately).

To date, Plaintiffs' Counsel have directly mailed the Notice to Class Members and published the Notice informing the Class, *inter alia*, that Plaintiffs' Counsel intended to apply to the Court for an award of attorneys' fees not to exceed 33.33% of the Settlement Fund, plus expenses not to exceed $183,575. The time to object to the fee request expired on January 18, 2009. To date, not a single objection to the fee and expense request has been received. "[S]uch a low level of objection is a 'rare phenomenon.'" *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005)(citation omitted). The fact that no objections have been received is

compelling evidence of the fairness of the fee request.

      2.      **Expenses**

Plaintiffs' Counsel also request $183,294.84 in expenses incurred while prosecuting the Action.  Plaintiffs' Counsel have submitted separate declarations attesting to the accuracy of these expenses, which are properly recovered by counsel. *See In re Indep. Energy Holdings PLC Sec. Litig.*, 302 F. Supp. 2d 180, 183 n.3 (S.D.N.Y. 2003)(court may compensate the class counsel for reasonable out-of-pocket expenses necessary to the representation of the class). Most of Plaintiffs' Counsel's expenses were incurred for professional services rendered by Plaintiffs' Counsel's experts and consultants.  The remaining expenses are attributable to the costs of depositions, travel and other incidental expenses incurred in the course of the litigation. These expenses were critical to Plaintiffs' Counsel's success in achieving the Settlement. *See Global Crossing*, 225 F.R.D. at 468 ("The expenses incurred – which include investigative and expert witnesses, filing fees, service of process, travel, legal research and document production and review –are the type for which 'the paying, arms' length market' reimburses attorneys. . . [and] [f]or this reason they are properly chargeable to the Settlement Fund.").  Not a single objection to the expense request has been received.

For the foregoing reasons, the Court finds that the request for an award of attorneys' fees in the amount of $463,833.33, which represents 33.33% of the Settlement Fund, plus expenses in the amount of $183,294.84, is reasonable.

## <u>CONCLUSION</u>

For the reasons given above, the Settlement and plan for allocation of the Settlement proceeds are approved as fair, reasonable and adequate.  In addition, the request for an award of attorneys' fees in the amount of $463,833.33, which represents 33.33% of the Settlement Fund, plus expenses in the amount of $183,294.84, is approved.  The deadline for accepting Settlement Forms is extended until on or before April 30, 2010.

A separate Judgment and Order of Dismissal With Prejudice will be entered.

SO ORDERED this ___ day of _____ 2010, at Hartford, Connecticut.


_____
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**

DATED: March 3, 2010                    Respectfully submitted,
                                        PLAINTIFFS,


                                        By:    /s/    Monte E. Frank
                                              Monte E. Frank, Esq., ct13666
                                              mfrank@cohenandwolf.com
                                              Cohen and Wolf, P.C.
                                              1115 Broad Street
                                              Bridgeport, Connecticut  06604
                                              (203) 368-0211 – Telephone
                                              (203) 394-9901 – Facsimile

                                              Mark Roberts, Esq., ct25062
                                              mroberts@mcrobertslaw.com
                                              Heather Spurlock Kennealy, Esq.
                                              hskennealy@mcrobertslaw.com
                                              McRoberts and Roberts LLP
                                              15 Broad Street
                                              Boston, Massachusetts  02109
                                              (617) 722-8222 – Telephone
                                              (617) 720-2320 – Facsimile

                                              Neil T. Leifer, Esq.
                                              nleifer@tenlaw.com
                                              David C. Strouss, Esq.
                                              dstrouss@tenlaw.com
                                              Brad Mitchell, Esq.
                                              bmitchell@tenlaw.com
                                              Thornton & Naumes LLP
                                              100 Summer Street, 30th Floor
                                              Boston, Massachusetts  02110
                                              (617) 720-1333 – Telephone
                                              (617) 720-2445 – Facsimile

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on the date hereof, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be send by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


　　　__/s/  Monte E. Frank_____
　　　Monte E. Frank